# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 99-4451 L
c/w 04-277 L, 05-1353 L, 05-1381 L, 06-72 L

| | | |
|---|---|---|
| JOHN H. BANKS, MARY E. BANKS, et. al.<br>Plaintiffs,<br>v.<br>THE UNITED STATES OF AMERICA<br>Defendant. | ) | NO. 99-4451 L<br>Judge Emily C. Hewitt |
| STONE ERROL L. & SUSAN H. as trustees of the Susan H. Stone Trust,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 04-277 L<br>Consolidated |
| EUGENE J. FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | ) | No. 05-1353 L<br>Consolidated |

PLAINTIFFS' REPLY IN THE MATTER
OF THEIR MOTION TO STRIKE
DR. ROBERT B. NAIRN'S REPORT

# TABLE OF CONTENTS


| | |
|---|---|
| Background Qualifications of Dr. Nairn | 1. |
| METEOROLOGY | !. |
| NOAA National Oceanic & Atmospheric Administration Data Buoy | 2. |
| INDIANA ENVIRONMENTAL IMPACT STATEMENT Chicago Dist. | 2. |
| PERIOD OF RECORD NOT RELEVANT | 2. |
| DEPENDS ON THE WEATHER | 3. |
| A ROSE BY ANY OTHER MODELER | 3. |
| SWING STORM | 3. |
| LICENSING AGREEMENT | 4. |
| FORMULAE_EQUATIONS | 5. |
| ACCURACY AND TAKINGS LAW ARGUMENT | 5. |
| 100,000 Cubic Yards per Year | 6 |
| MODELING THE LAW | 8. |
| geology - NAIRN'S PROBLEM WITH GLACIAL TILL | 9. |
| GEOLOGIST GRAHAME J. LARSON Ph.D | 10. |
| WATER WELL DIGGER HOLES | 11. |
| NAIRN'S COMPENSATION | 12. |
| Dr. Larsons July 14, 2006 Deposition SUMMARIZED | 13,14,15 |
| ARGUMENT SUMMARY | 16. |


## CITATIONS


| | |
|---|---|
| Banks v. USA 314 F.3d 1304 at 1309 (1-2-03) | 8. |
| Owen v. USA 851 F.2d 1404 at 1413 (7-18-88) | 8. |
| Michigan Public Health Code Part 127 of 1978 PA368 | 11. |

## BACKGROUND

A. Dr. Nairn's (Nairn) Qualifications as an Expert Witness.

1. In order to qualify in a 5th Amendment Takings Case about property loss caused by removal of sand from the shore, Nairn needs to be a geologist, meteorologist, lawyer and modeler. His basic academic education is in Civil Engineering which would be helpful to redesign the piers or provide shoreline protection. The basic thrust of his thinking on structures is that the shore protection structures are the cause of the erosion because they block the sand and till from falling down and nourishing the beaches.

2. Plaintiffs give examples of failures in each of the matters of expertise he needs to have.

## METEOROLOGY

3. Meteorology is approached first because the sum of Nairn's Nairn's position is that plaintiffs' property rights depend on the period of record (POR) for the winds he decides to measure. He has decided to use the winds of Milwaukee, Wisconsin's Mitchell Airport (about 3 miles inland from Lake Michigan)(Plaintiffs' Reply Appendix01. - PA 01). This location is more remote from St. Joseph Harbor Michigan and the plaintiffs properties than the Muskegon, Michigan location (JR 0725) used by the Detroit District Corps (DDC) in the 1973 Detailed Project Report (DPR)(JR0696) which concluded the the net longshore littoral transport of sand was 110,000 cy/y (84, 000 $m^3$/y)(JR0785) ie interrupted, dredged or diverted annually.

NOAA DATA BUOY

4. He then referred the Milwaukee wave information to a National Oceanic and Atmospheric Administration (NOAA) Data Buoy located about midway across Lake Michigan between Chicago and St. Joseph, Michigan (PA 02 - 06). Why he did this is not known. That buoy 45007 is equipped to acquisition wind speed and direction plus wave heights and direction without reference to the weather station at Milwaukee. It should be noted that these data buoys are vulnerable to winter ice damage and vandals. PA-03 shows 45010 and 45011 have been "disestablished".

5. Putting aside the flop from Muskegon to Milwaukee for hindcasting construction of waves at the plaintiffs properties, it is worthy of note that the wave rose drawn by Nairn at JR0244 is vastly different from the wave rose at PA-13 prepared by the Final Environmental Impact Statement (EIS) of the Indiana Lake Michigan Coastal Program April 2002 (PA-07 thru PA-14). That EIS was made for the Chicago District Corps (CDC).

INDIANA EIS

6. The Indiana EIS is important for other reasons in that it declares diversion to deep water by shore structures of essentially all sediment (PA 08). The EIS also declares a "persistent southerly drift along the southeastern shore of the lake" (PA 10). At PA14 is an excellent depiction of the "swing storm" with the storm track clearly shown. It is described that the strongest waves are generated from the 300 mile northerly open water fetch.

Period of Record Not Relevant

7. Nairn's rose is constructed from a new POR extended to the year 2000. The plaintiffs line of fortifications were already in place by the 1990s. Bunker - the southernmost plaintiff

Was completed in 1986 or 1987. Thus, there could be no loss landward of that line of fortifications, if as Nairn claims, the wave weather moderated for the new period of record. While the fortification line is holding, the lake is very low. Due to downcutting and lake bed lowering the sea walls are in great danger. "Eventually, the clay layer lacking sand protection will erode and undermine the wall and dune with a more catastrophic failure" Henry Rosenfield 12-4-00 (PA15 & 16).

DEPENDS ON THE WEATHER

8. The ineluctable conclusion which must be reached is that Nairn's legal opinion is that 5th Amendment Property Rights to Just Compensation are to be determined by the weather. This conclusion is not supported by any case citation or logic. It is chutzpah. Max Mayfield, Director of the National Hurricane center would be the first to admit that weather can't be predicted by computer models. 2006 was supposed to be another bad year like 2005, but not a hurricane touched land in the Gulf Coast.

A ROSE BY ANY OTHER MODELER

9. Nairn's Wave Rose for 45007 (NOAA Data Buoy) bears no resemblance to the Indiana Coastal Management Program wave rose for the same 45007 wave data buoy (PA 13 and JR0244). It all depends on the weather.

SWING STORM

10. The Indiana study clearly shows a typical storm track across Lake Michigan (PA-14). This graphically confirms the SWING STORM phenomenon recognized by the 1997 Corps Report by Nairn Ex. 24 (PA 17 & JR 1211).

11. In 1984 the Army Corps Shore Protection Manual (SPM) warns that "confidence in computed results begins to deteriorate when wind direction variations exceed 15$^{o}$; confidence deteriorates significantly when direction deviations exceed 45$^{o}$." (PA 19 & 20 also APP0226). (App0226 = PA 21)

12. Cyclonic (counterclockwise looking down) movement about a low pressure center in the Northern Hemisphere would produce the complete reversal of wave direction. Wave energy would deminish to zero at some point and then rebuild to a maximum from the north.

13. All this would net out to a zero movement of sand if the wave energy was the same from the north as from the south. Therefore an individual property owner would have a net loss of zero sand. But if the piers are interposed, essentially all the sand in the littoral system is lost to the deep water forever.

LICENSING AGREEMENT

14. Keeping in mind that Nairn wanted us to sign licensing agreements and protective orders (Petrie letter 8-31-06 JR1289 and Jr 1290), it is apparent that the formulae he gives are not for Longshore transportation (LST) volume and are public Army Corps property (See APP081, 0213, 0233 and o234).

15. The 1977 Shore Protection Manual at APP0233 states that "These simplified wave prediction schemes are based on the implicit assumption that the waves being considered are due entirely to a wind blowing at constant speed and direction for an overwater

distance called the fetch and for a time period called the duration." ( JR1289, 1290 APP081 0213 0233 0234 - defendant's nos.
( PA22 PA23 PA24 PA25 PA26 PA27 - plaintiffs' nos.

FORMULAE-EQUATIONS

16. It is clear that the formulae revealed by Nairn on APP081 (PA 24) are a function of wind speed "U". As indicated above, the wind speed data are collected for conditions not considered proper by the Army Corps Shore Protection Manual of 1977 or 1984. The 1977 SPM warns on PA21 (APP0226) that over the Great Lakes "wind near the surface has little relation to the wind estimate determined from synoptic wheather chart." PA04 shows the National Data Buoy Station Information for 450007. The anemometer height is 5m above the site elevation. The 1984 repeats the warning about wind direction changes of only $45^{o}$ at two locations PA20 and 31.

17. The formulae revealed to us on PA24 (APP081) are not Nairn's. Nor are the constants listed as K, A, B, C and D. Each of those constants represents assumptions made by some other person, for some other location at some other time.

18. These are only wave forecasting formulae (equations) and we can't tell if they are for deep or shallow water waves, fetch length or duration limited etc. In any event the exact 1977 SPM formulae can't be found in the 1984 SPM (See PA 28, 29 & 30).

ACCURACY AND TAKINGS LAW ARGUMENT

19. Two overarching specters haunt all the above. First is the error concept which Nairn admits is +/- 25% and no better

110,000 cy/yr

than a factor of two from the actual rates"(JR039). He wants to list his model against available evidence, But for 100 years (since 1907), the best available evidence has been accepted to be 110,000 cy/yr (84,000 $m^3$/yr). PA32 is the 1958 Beach Erosion Control Board which compared the surveys of 1907 and 1954 (PA33). The document was signed by three generals, one colonel and three University Deans. (PA34). They did not measure the erosion in bluff line recession but rather as "25,000 cubic yards per mile per year at Shoreham village to about 4,000 cubic yards per mile per year at New Buffalo (PA35).

20. In 1973 the Section 111 DPR (PA36) stated that: "The best estimate presently available of the rate at which material reaches the harbor area from the north would be that computed from comparison of 1907, 1954 and 1971 surveys.." (PA37 & 38). "The rate (of 110,000 cy/y) appears reasonable for use in design computations concerning beach fill losses." (PA38). It is to be noted that in 1973 they were working with a third survey made in 1971, Surveys are direct evidence, not inferences from wave data collected across the lake.

21. Then in 1994 (June 8th), at a public meeting at the Shoreham Village Council Meeting (PA39) the Corps restated that "the harbor structure is blocking 30% of the Littoral material coming from the north and that placing 110,000 cubic yards per year would replace the lost material."(PA40). Five of the most experienced and highly placed DDC executives were present. (PA39, 40 & 41)

22. The Nairn CERC Report of June 1996 was coauthored by Parson, Morang and Nairn. It restated that the jetties interrupt the southward transport of approximately 84,000$m^3$ per year. That equals 110,000 cy/yr. (JR1068). Since that is 30%, then 70% was getting downdrift, leaving 366,000 cy/yr total (110,000 divided by .30 = 366,000cy/yr) originally available.

23. The Nairn CHL Report of July 1997 was coauthored by Zuzek, Morang and Parson (JR1165). It states at JR1188 that "For the important southward directed transport component, the predicted values ranged from 159,500$m^3$/year at Line 9 to 79,900 $m^3$/year at Line 14. This range of values corresponds more closely to the 84,000 $m^3$/year which was estimated by USACE (1973)." But earlier on the same page Nairn says that "The southward directed transport component ranges from 375,328 $m^3$ at Line 8 to 170,794$m^3$/year at Line 14" (JR1188).

24. Then finally, but not by any means all inclusively, the FY-1999 Annual Report of Section 111 Beach Nourishment Monitoring Program Table 2 states that there was a 327,000cy shortfall cumulatively in the 110,000 cy/yr average quantity authorized. This leads to the conclusion that the Corps pretty much quit beach nourishment in 1996. By this time the beaches downdrift were seeing the cobble/gravel being dumped at Park Street in St. Joseph.

## MODELING THE LAW

25. When Nairn modeled the St. Joseph Harbor with COSMOS 2D in his 1997 Coastal Hydraulics Lab (CHL) Report he assumed that the jetties were a complete barrier to alongshore transport. (JR 1198). He elaborated on this at JR1198 describing the jetties not only as a "total littoral barrier" but adding that they "trap all sediment reaching this area from either the north or the south".

26. Now he says that the program is for net littoral drift not gross littoral drift. That is the same as reversing the model as he explained above. The United States Court of Federal Appeals in Banks v. USA 314 F.3d 1304 at 1309 said that they were relying on that 1997 CHL Report amongst others reviewed at that time.

27. On July 18, 1988, Senior Judge Bennett wrote the en banc opinion reversing PITMAN in Owen v. USA 851 F.2d 1404 at 1413 explaining the causal relation between interrupting littoral drift and erosion:

> "....existing sand is moved southward by the littoral drift's currents and new sand from the north is deposited in its place. The loss of such shorefront was due to the blocking of the northern "replacement" sand, causing the drift to remove more sand than "it replaced".

Thus, for the first time, a "cause of action" was established for a case of interruption or blockage of littoral drift.

28. In 1997, Nairn also endorsed "replenishing the sand cover to its historic level" (JR1262). He advocated a minimum cover of 1 meter of sand. We can only wonder if he still so advocates. That would require recognition of the total trapping and diverting effect of the piers. About 2,500,000 cy missing.

29.The takings law is about just compensation, not beach nourishment or prediction. To take is to remove. To remove is to capture, divert, dredge, bulldoze all sand - north and south- and not net sand. This is a legal concept. While case law to date has dealt only with net littoral drift, justness requires that the jetties be held responsible for losses in both directions. If wave energy were equal to the north and to the south, the loss would be the same as if it were all in in one direction. To Nairn's computer model the net loss would be zero.

## GEOLOGY
## NAIRN'S PROBLEM WITH GLACIAL TILL

30. During his Deposition on August 24, 2006, Nairn was queried about the May 1992 USGS-NOAA report of the area south of St. Joseph to New Buffalo. Specifically at JR478 he describes a depth difference map between two bathymetries, one taken in 1991 by USGS and one in 1945-1946 by NOAA. The difference map is provided herein as PA44. The map states and Nairn acknowledges "that as much as 4 meters of vertical lake bed have been removed by erosion south of St. Joseph".

31. At page 39 (JR0493) of the Nairn deposition he reads

"The glacial till appears as a massive seismic unit that contains scattered internal reflections. Till occurs in the subsurface throughout most of the study area." At line 24 of page 39 (JR493), Nairn states that to understand "massive seismic unit" you'd have to ask a geologist.

GEOLOGIST
GRAHAME J. LARSON
PROFESSOR MICHIGAN STATE UNIVERSITY

31. Since Dr. Nairn is not a geologist, he touts Dr. Larson. We don't think it is reasonable to refute the generally accepted fact "that the Wadsworth Till member forms the consolidated lake bed of the southern and southeastern parts of Lake Michigan and underlies the younger non-till sidements. The Wadsmorth Till is gray in color and is composed of clayey-silty materials characterized by illite content of 70%." (See JR1073 Nairn 1996, JR1325 Lineback 1974 and USGS JR1365 thru 9). For Nairn it became essential, because he has often repeated the following:

32. "The CRITICAL POINT to understanding the evolution of cohesive shores is that the shoreline recession could not continue without the ongoing downcutting of the nearshore lake bed. The long term average rate at which the bluff or shoreline receds on a cohesive shore is controlled by the rate at which the nearshore profile is eroded or downcut" PA45. COHESIVE SHORES by Nairn, April 1997 American Shore & Beach Assc.

33. Later quotes will show that Larson excludes littoral drift from his definition of erosion, but he includes down-cutting.

34. Nairn makes a similar, if not identical statement in 1996 (JR1077) and 1997 (JR1179), with both reports having been relied upon by the Federal Circuit in their January 2003 Opinion in Banks et al.

35. With the entire shore of plaintiffs zone being cohesive, the properties are doomed by Nairn's CRITICAL POINT. Prospective damages far accede all other damages. The defendant's defense is that it is not a "cohesive shore". WHAT TO DO?

WATER WELL DIGGER HOLES

36. Hire Dr. Larson and have him examine well digger records. Based on these records and Nairn's reporting of them, he defines the problem away by declaring the shore noncohesive.

37. Attorney Ehret attaches hereto, PA46 Water Well & Pump Record and PA47,8 Ground Water Advisory Committee. PA46 shows a drilling location about 2,000 feet inland from the lakeshore at Grand Mere State Park. At block 2 - Formation Description, the digger shows "soft gray clay at 14 feet". At block 6 and 12 he shows a steelcasing, 4" in diameter, grouted with 2 bags of Bentonite Grout from 0 to ? feet deep. PA47,8 Ground Water Advisory Board (GWAB) shows that the Well Construction Regulatory Program's Mission is to "protect the public health through the development of safe and reliable drinking water wells". Part 127 of 1978 PA368 (Public Health Code).

38. The GWAB is composed of 9 members, including 5 drillers, 3 health department officials (state & local) and one from the Geological Survey Division of the Department of Natural Resources (MDNR).

39. Plaintiffs are severely critical of the government's use of digger data, provided remotely landward from the shore, to counter the broadly held professional conviction that the plaintiffs property zone is without question for over 30 years, 100% Wadsworth Till.

NAIRN'S COMPENSATION

40. Nairn and his employer have an IDIQ (indefinite delivery, indefinite quantity) contract with the DDC for $1,000,000 per year with a $3,000,000 ceiling. At the time of his deposition he had used 75% of the $3 million and about $950,000 had been for this case. (JR0515,516,517 & 518).

41. Plaintiffs attorney notes that the Water Well and Pump Record, PA46, cost him $1.00 at the Berrien County Health Department.

42. The well digger report is further away from the shoreline than the side-scan sonar mosaics of the 1992 USGS-NOAA Report.

43. Aside from his efforts with well logs to overcome the known lake bed's status as clay, armored by compressed glacial till, which is currently breaking up (PA63-68), Dr. Larson has numerous opinions favorable to property owners.

BELOW ARE LARSON'S DEPOSITION ANSWERS - SUMMARIZED OR PARAPHRASED

PA49(144:11-18) Q. Could have been a hundred year period with no erosion at all? A. There's a high probability. Comment: This would be ignored by Nairn's model - lost in the averages.

PA50(145:19-24) Q. Your analysis would capture harbor erosion as natural erosion? A. That's correct. Yes. Comment: so would Nairn's model

PA51(149:1-24) Q. Grand Mere spits: Natural erosion or accretion? Answer: Accretion. Comment: Nairn calls accretion, erosion in his model.

PA52(160:10-24 and 161:2) Downcutting is erosion. Littoral Drift is not erosion. It is transport.

PA53(163,164:1-14) Lake Michigan has in general been shrinking for 12,500 years. Larson says that's not erosion. Comment: It is oxymoronix to say the lake shore is eroding at the same time that it is shrinking.

PA54(173:7) Sandy beaches on Lake Michigan are imbalanced.

(174:3) The beaches are replenished by streams continuously.

PA55(175:1-9) River dams and jetties have reduced the supply of sand.

(175:23,24 & 176:1-24) Jetties divert sand into deep water where it is permanently lost. Comment: Nairn must show this in his model but we aren't allowed to see it.

PA56(177:4-18) Rivers were once the main source of sand to the beach system but are now the site of impoverishment.

(180:22-24)(181:1-2) Q. It is possible that the volume of blockage by dams and to littoral drift is causing the absence of sand? Answer: For some segment of beach, yes.

PA57(181:9-24) "Offshore sand and beach sand that provide protection for underlying glacial till and for the bluffs along the shore are thin to nonexistent." Larson endorses this.

(182, 183 & 184) The 1871 National Archives drawing by the Army Corps shows no clay - all sand. (Please see PA69-73) along the shore for 3000 feet. Larson wants more sampling. Comment: The Corps findings of data are much closer together that the well hole presented in Nairn's Report.

PA58(186:14-19) Question: Would the presence of sand inhibit erosion? Answer: "Presence of sand along the beach would Prohibit erosion of the shore." Comment: Larson changed inhibit to prohibit.

PA59(190:19-24)(191:1-24)(192:1-8) Storm moved sand at 3 feet per second. 80 hour storm would move sand 160 miles. (192:1-8) Not in a computer model.

PA60(202:19-24)(203:1-7) Larson's shoreline recession number of .58 is not known to be applicable to the last 100 years. Just an average. Comment: Then is really has nothing to do with any individual property in this case.

PA60,1(204:17-24)(205:1-3) Averages do not apply to any individual property.

PA61.1 (205 & 206) Dr. Larson recognized that the DISSERTATION by Buckler was on file at Michigan State University but that he didn't use it although he considered it. Please see PA78, 79 & 80). There is an excellent facts witness quote by William J. Gibbs, Jr. that there was no erosion to the bluff as far back as 1872. Also the shore was in "near equilibrium" prior to the 1830's.

PA74,5,6 & 7 Excerpts from Grahame Larson's article entitled Origin and Evolution of the Great Lakes are included as published by the J. of Great Lakes Research 2001 27(4) 518-546. The article is quoted by Ehret to Larson in his deposition of 7-14-06. Dr. Larson is seen to stand by this article repeatedly during his deposition.

ARGUMENT SUMMARY

44. A Long Shore Sediment Transport (LST) formula or equation is not mentioned by defendants. The post litigation Nairn just isn't going to tell us his secret equations. If we were to succumb to licensing we might get something we can use.

45. Nairn did give us a copy of a 1977 SPM formula PA24 and 27 but that solves for wave height and wave period as a function of wind speed. Where is the LST formula? Where are the calculations?

46. The value of the constants on PA24 and PA27 are not explained.

K = 6.5882
A = 0.0161
B = 0.3692
C = 2.2024
D = 0.8798

The big number is 6.5882 and that is a multiplier. It multiplies the errors. Maybe it has to do with plunging or spilling breakersPA81 and PA82 give a pictorial explanation of these breakers by P. D. Komar of Oregon State University, College of Oceanic & Atmospheric Sciences.

47. Plaintiffs motion to strike shows LST formula used by the Corps at Vicksburg, Mississippi. Exhibit 4 at page 35 tabulates a variation from -55% to +575% (roughly 10 to one difference) between spilling and plunging breakers.(PA83 & 84).

25,000 CUBIC YARDS PER MILE PER YEAR

48. In 1958 the DDC presented the most authoritative determination of property losses (PA32-35) at 25,000 cy/ft/year. We

calculate that this amounts to 4 cubic yards per foot of frontage on the lake per year. After about 40 depositions of plaintiffs and updating of titles plaintiffs have put together a calculation of of total sand lost per plaintiff on PA85, 86 and 87. Nothing that Nairn has produced can provide the basis of such a calculation. The total is about 750,000 cubic yards to date.

Respectfully submitted,

John B. Ehret

John B. Ehret
Plaintiffs' Attorney

Dated: January 4, 2007

20860 Greenwood Drive
Olympia Fields, IL 60461
Phone: 708-748-8975
FAX: 708-748-7661

# CERTIFICATE OF SERVICE

I, the attorney, John B. Ehret, do hereby certify that on the 5th day of January, 2007 a copy of PLAINTIFFS' REPLY BRIEF IN THE MATTER OF THEIR MOTION TO STRIKE THE REPORT OF DR. ROBERT B. NAIRN by Express Mail from the United States Post Office in Olympia Fields, Illinois, postage prepaid the the below listed Counsel of Record:

Attorney Terry M. Petrie
U. S. Department of Justice - ENRD
1961 Stout Street 8th Floor
Denver, CO 80294

Drew William Marrocco, Attorney
for Errol L. Stone
SONNENSCHEIN, NATH & ROSENTHAL LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005

Eugene J. Frett, Attorney
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, IL. 60603

Date: January , 2007

John B. Ehret
John B. Ehret, Attorney

20860 Greenwood Drive
Olympia Fields, Il 60461
P. 708-748-8975
F. 708-748-7661
Email: jbehret@covad.net