striking a vertical surface, such as a seawall, where the immense energy of the wav[illegible] concentrated within a small area. The same amount of energy is released by a wave breaking over a gently sloping beach, but the energy is spread out rather than concentrated.

Offshore bars, small ridges of sand parallel to the shore, are to be found at one time or another on most beaches and can also spread the energy of breaking storm waves. Their presence can easily be recognized by watching the surf zone for two or sometimes three distinct rows of breaking waves. The shoaling depths atop the bars virtually trips incoming waves, forcing them to break.

In the 1960s, John Zeigler, then a Woods Hole Oceanographic Institute coastal geologist, first observed the role of offshore bars when he studied seasonal changes in beaches along the outer shore of Cape Cod. Although he did not see offshore bars during the summer, he observed that after the first storm waves of winter, three offshore bars appeared parallel to shore and remained there until the next summer. The largest waves broke on the outer bar, intermediate-size waves broke on the middle bar, and so on. Zeigler noted that the waves that reached the shoreline were quite small compared to the waves breaking on the outer bar.

The beach, whether it has responded by flattening or forming offshore bars, usually "recovers" after each storm or after the winter storm season. The sand that moved offshore under the influence of the big waves moves onshore under the influence of the smaller fair-weather waves. Offshore bars flatten or gradually move onshore, and the beach between the low- and high-tide lines tends to steepen over a time frame ranging from days to years, depending on the size of the storm or severity of the winter and the subsequent amount of adjustment made by the beach within the constraints of its dynamic equilibrium.

Storm conditions cause large-scale changes of slope, extending from the dune line hundreds of yards into the surf zone. The grain size of beach sand is also responsible for the slope of the beach on a smaller scale, between the high- and low-tide lines. The effect of grain size on beach slope is related to the permeability of the beach sand: its ability to allow water to pass through it. On a coarse beach—for instance, one consisting of gravel—as the breaking wave rushes landward, a lot of the water is absorbed into the gravel and little water remains for wave backwash. In other words, the forces pushing beach material up on to the beach are stronger than those moving material seaward, and the beach steepens in response.

On beaches composed of fine sand, permeability of the fine material

PA 18



is much less than for gravel, so little water from breaking waves is absorbed; the upwash and backwash of the wave have essentially equal volumes of water. Backwash tends to move sand in a seaward direction, with the net result of a flattened beach.

## The Beach As a River of Sand

Winds, waves, and storms keep sand in constant motion in every direction on the beach. Sand is moved offshore to deeper water by bottom currents, usually storm related. Wind blows sand from the beach into nearby dunes to be trapped by dune vegetation. But by far the largest volume of sand is carried by longshore currents. Longshore currents are formed as waves strike the shoreline at an oblique angle, forcing some of the surf-zone water to move laterally (Figure 2–5); the strongest current is formed when the waves strike the shoreline at a thirty-degree angle. Large volumes of sediment are carried by longshore currents because the current acts in concert with breaking waves. Breaking waves suspend sand, and currents move it. By this wave-current interaction, even large particles, such as seashells, can be carried at very low current velocities.

CORPS & SHORE
Orrin Pilkey
Katharine Dixon
Island Press




Figure 2–5. Breaking waves approach the shoreline at an angle and direct a part of their energy parallel to the shoreline. This produces the longshore current responsible for transporting beach sand laterally.

US Army Corps of Engineers





# SHORE PROTECTION MANUAL

## VOLUME I

Coastal Engineering Research Center

DEPARTMENT OF THE ARMY
Waterways Experiment Station, Corps of Engineers
PO Box 631
Vicksburg, Mississippi 39180

1984

Approved For Public Release; Distribution Unlimited

Prepared for

DEPARTMENT OF THE ARMY
US Army Corps of Engineers
Washington, DC 20314

PA 19

1984
SPM

# V. SIMPLIFIED METHODS FOR ESTIMATING WAVE CONDITIONS

When estimates of wave heights, periods, and directions are needed, the most accurate procedures are the numerical methods discussed in Chapter 3, Section III. However, there are often cases where neither the time available nor the cost justifies using complex numerical methods. In these cases, a simplified method may be justified. Chapter 3, Section V,3 presents a series of equations and nomograms that give significant wave height by $H_{m_0}$ and period of the spectral peak, $T_m$ for a given windspeed and fetch or duration. Estimating surface winds is treated in Chapter 3, Section IV. Estimating fetch length is treated in Chapter 3, Section V,1.

The spectrally based significant wave height $H_{m_0}$ is four times the square root of the variance of the sea surface elevation. In deep water $H_{m_0}$ is approximately equal to the significant wave height $H_s$, which is based on counting and measuring individual waves (see Chapter 3, Section II,5). In shallow water, $H_{m_0}$ becomes less than $H_s$. In both deep and shallow water, $H_{m_0}$ is based on the wave energy; this is not true for $H_s$.

The following assumptions pertain to these methods. The methods will be used for cases where fetches are short (80 to 120 kilometers (50 to 75 miles) or less) and the wind can be assumed uniform and constant over the fetch. Cases where the wind field varies rapidly in time or with distance over the fetch or where swell from distant sources propagates into the area are best treated numerically. Since these conditions are rarely met and wind fields are not usually estimated accurately, do not assume the results are more accurate than warranted by the accuracy of the input or the simplicity of the method. Good, unbiased estimates of all parameters for input to the wave equations should be sought and the results interpreted conservatively. Individual input parameters should not each be estimated conservatively, since to do so may bias the results.

## 1. Delineating a Fetch.

A fetch has been defined subjectively as a region in which the windspeed and direction are reasonably constant. Confidence in the computed results begins to deteriorate when wind direction variations exceed 15°; confidence deteriorates significantly when direction deviations exceed 45°. The computed results are sensitive to changes in windspeed as small as 1 knot (0.5 meter per second), but it is not possible to estimate the windspeed over any sizable region with this precision. For practical wave predictions it is usually satisfactory to regard the windspeed as reasonably constant if variations do not exceed 5 knots (2.5 meters per second) from the mean. A coastline upwind from the point of interest always limits a fetch. An upwind limit to the fetch may also be provided by curvature or spreading of the isobars as indicated in Figure 3-20 (Shields and Burdwell, 1970) or by a definite shift in wind direction. Frequently the discontinuity at a weather front will limit a fetch, although this is not always so.

PA 20

1977
SPM

Table 3-1. Correction for Sea-Air Temperature*

| Sea Temperature minus Air Temperature | Ratio of Surface Wind Speed to Geostrophic Wind Speed, U/Ug |
|---|---|
| 0 or negative | 0.60 |
| 0 to 10 | 0.65 |
| 10 to 20 | 0.75 |
| 20 or above | 0.90 |

*Pore and Richardson (1969) and Hasse and Wagner (1971) report recent studies designed to refine the above table. Neither were able to find enough high quality observations of large differences between air and sea temperatures to rigorously establish any effect of the sea-air temperature difference on the ratio of the surface wind speed to the gradient wind speed over the ocean. Both recommended the use of a constant value near 0.6 for most routine work.

If there are several observed wind reports within the fetch region, and these consistently deviate in the same manner from wind speeds arrived at by the instructions given above, an average between the reported values and those computed by the above instructions will usually be the best estimate.

Over the Great Lakes and some coastal regions, large temperature inversions (temperature increasing with elevation) may be observed. Bellaire (1965) reports air temperatures more than 15°C (27°F) greater than the water temperature in May 1964. When air temperature is much greater than that of the sea, all turbulent motion in the lower atmosphere is suppressed, and the wind near the surface has little relation to the wind estimate determined from a synoptic weather chart. Near mountainous coasts and particularly in fjords, the wind near the sea is often channeled to flow parallel to the mountains. The local temperature contrast between snow-covered mountains and relatively warm open water may have more control over the wind near the water than the isobaric pressure pattern from weather maps. In these cases, the wind determined from the pressure analysis on a weather map has little if any value for wave prediction. For these exceptional cases, there is no valid substitute for wind observations.

3.42 DELINEATING A FETCH

The fetch has been defined subjectively as a region in which the wind speed and direction are reasonably constant. Confidence in the computed results begins to deteriorate slightly when wind direction variations exceed 15°, and deteriorates significantly when direction deviations exceeding 45° are accepted in the fetch area. The computed results are sensitive to changes in wind speed as small as 1 knot (0.5 meter/second), but it is not possible to estimate the wind speed over any sizable region

**U.S. Department of Justice**

Environment and Natural Resources Division

*Terry M. Petrie, Attorney*
*Denver Field Office*
*1961 Stout Street, 8th Floor*
*Denver, CO 80294*

*Telephone (303) 844-1369*
*Facsimile (303) 844-1350*

August 31, 2006

**BY FACSIMILE**

John Ehret, Esq.
5986 Dunham
Stevensville, MI 49127

Drew W. Marrocco
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20005

RE: Banks, et al. v. United States, No. 99-4451 L; Stone, et al. v. United States, No. 04-277 L; Frett, et al. v. United States, No. 05-1351 L

Gentlemen:

In addition to the separate but largely identical requests each of you made on August 28, 2006, for computer modeling information used by Dr. Nairn in arriving at the opinions rendered in his expert reports, today I have read John Ehret's August 29 request for "data input files" for the COSMOS 2D and 3D models use in the Corps' 1996 and 1997 reports. (As John knows, I was in Chicago the last couple of days in conjunction with Dr. Shabica's deposition as a fact witness.) Regarding this latter request, Dr. Nairn is attempting to determine if the "data input files" still exist.

The three of us are attempting to have a conference call on Tuesday, September 5, to discuss this matter. I have now had the chance to speak with Dr. Nairn about what has been requested and the breadth and volume of information presently sought is enormous. The complexity of attempting to carry out this request (again, as I stated in my August 28 letter to Drew, assuming the Government agrees to provide the information) is also enormous. For example, some of the issues to address include:

- licensing of the use of multiple models proprietary to W.F. Baird & Associates Ltd;



PA 22

* drawing up and obtaining the Court's approval for a protective order;

* the need for plaintiffs to use (and employ, if not already retained) competent personnel for this exercise to be meaningful. (I do not presume to define "meaningful" for plaintiffs. Rather, the observation follows from my understanding of what plaintiffs will need just to prepare, apply and understand the information that would be used and the resulting outputs.); and,

* the software and other possible tools that plaintiffs would need to use the information requested.

The magnitude of the plaintiffs' request increases with the additional information sought for the 1996 and 1997 use of COSMOS 2D and 3D, respectively. The overall undertaking ranges far from John's comment, made in regards to the latter request, of "just addition and subtraction not calculus." Nothing I have learned so far suggests that either request is accurately described by such a simple characterization.

I also have a concern about the expense to the Government of this undertaking. I have an initial, preliminary sense that producing the requested information will not be inexpensive. At some point – as we size up what ultimately may need to be done – it may become unduly burdensome. In that circumstance, I will ask the plaintiffs to share the cost of this exercise.

Additionally, we also need to consider the time element associated with these requests which plaintiffs have promulgated approximately two weeks before the close of discovery. All of the processes integral to carrying out this exercise, including the time necessary to produce the information (assuming we agree), time for plaintiffs to apply the information, and time possibly for additional discovery will place us well beyond the present September 14 close of discovery.

I have asked Dr. Nairn to join us in our prospective call this coming Tuesday, September 5. Please feel free to ask him questions in order to obtain a better understanding of the logistics of what you are attempting or want to do. My goal is to have as open and clear discussion as possible in order that we all become more informed, educated, and to minimize any confusion or misunderstandings. For the conference call, I have arranged for us to use a call-in number. For those of us located outside Washington, D.C., please call 800-521-6079. If you are in Washington, D.C., please call 202-353-0878. The pass code for both numbers is 6700#.

I have one last note for you, John. Your last couple of letters sent by facsimile have transmitted with a black smear in several places along the right-hand margin of the letter. I have included a copy of your August 29 letter as an attachment so you can see what I am describing. I

$$\frac{gH}{U^2} = 0.283 \tanh\left[0.0125\left(\frac{gF}{U^2}\right)^{0.42}\right],$$

$$\frac{gT}{2\pi U} = 1.20 \tanh\left[0.077\left(\frac{gF}{U^2}\right)^{0.25}\right],$$

and,

$$\frac{gt}{U} = K \exp\left\{\left[A\left(\ln\left(\frac{gF}{U^2}\right)\right)^2 - B \ln\left(\frac{gF}{U^2}\right) + C\right]^{1/2} + D \ln\left(\frac{gF}{U^2}\right)\right\},$$

where

$$\exp\{x\} = e^{(x)}$$
$$\ln = \log_e$$
$$K = 6.5882$$
$$A = 0.0161$$
$$B = 0.3692$$
$$C = 2.2024$$
$$D = 0.8798$$

See 0234

X

X

X

In the above SMB equations, wave height (H) and wave period (T) are a function of wind speed (U), fetch (F) and wind duration (t) (g is gravitational acceleration). The fetch is the distance over which the wind blows for a given direction as explained in SPM (1977) – Exhibit 8.

It is standard practice to validate a wave hindcast model to assess its accuracy and reliability, particularly owing to the uncertainty of applying winds from a land station to represent over-water winds SPM (1977) – Exhibit 8, p. 3-17. As noted in Baird (1999) Exhibit 9 referenced in Section 5.1 of Nairn (2006) at JR198, winds from the Milwaukee Mitchell Airport station were selected as best representative of over-water winds on Lake Michigan and the BWH model was tested as part of the Baird Lake Michigan Potential Damages study (reference provided under Section 5.2 of Nairn (2006) – JR202) and the results were not reproduced in Nairn (2006). The validation process for the BWH is described in more detail below based on another recent project on southern Lake Michigan.

In general terms, the verification process involves a series of "trial hindcasts" undertaken at the buoy location (i.e. with fetches representative of the location of the recorded wave data), with the application of a wind speed transformation function to estimate the over-water wind field from available land-based records. The initial transformation function is typically defined based on

U.S. ARMY CORPS OF ENGINEERS · COASTAL ENGINEERING RESEARCH CENTER

# U.S. Army Coastal Engineering Research Center

# SHORE PROTECTION MANUAL

## Volume I



DEPARTMENT OF THE ARMY
CORPS OF ENGINEERS
1977

APP0213

PA 25

Nairn Dec. Exh. 8

*fully arisen sea*. The assumption of a universal form for the fully arisen sea permits the computation of other wave characteristics such as total wave energy, significant wave height, and period of maximum energy. The equilibrium state between wind and waves rarely occurs in the ocean, and may never occur for higher wind speeds.

A more general model may be constructed by assuming that the sea is calm when the wind begins to blow. Integration of the equations governing wave growth then permits the consideration of changes in the shape of the spectrum with increasing fetch and duration. If enough wave and wind records are available, empirical data may be analyzed to provide similar information. Pierson, Neumann, and James (1955) introduced this type of wave prediction scheme based almost entirely on empirical data. Inoue (1966, 1967) repeated this exercise in a manner more consistent with the Miles-Phillips theory using a differential equation for wave growth. Inoue was a member of Pierson's group when this work was carried out, and his prediction scheme may be regarded as a replacement for the earlier Pierson-Neuman-James (PNJ) wave prediction model. The topic has been extended by Silvester and Vongvisessomjai (1971) and others.

These simplified wave prediction schemes are based on the implicit assumption that the waves being considered are due entirely to a wind blowing at constant speed and direction for an overwater distance called the *fetch* and for a time period called the *duration*.

In principle it would be possible to consider some effects of variable wind velocity by tracing each wave train. Once waves leave a generating area and become swell, the wave energy is then propagated according to the group velocity. The total energy at a point, and the square of the significant wave height could be obtained by adding contributions from individual wave trains. Without a computer, this procedure is too laborious, and theoretically inaccurate.

A more practical procedure is to relax the restrictions implied by derivation of these schemes. Thus wind direction may be considered constant if it varies from the mean by less than some finite value, say 30°. Wind speed may be considered constant if it varies from the mean by less than ± 5 knots (2.5 meters/second) or ½ barb on the weather map. This assumption is not much greater than the uncertainty inherent in wind reports from ships. In this procedure, average values are used and are assumed constant over the fetch area, and for a particular duration.

The theoretical spectra for the partially arisen sea can be used to develop formulas for such wave parameters as total energy, significant wave height and period of maximum energy density.

Similar formulas can also be developed empirically from wind and wave observations. A quasi-empirical - quasi-theoretical procedure was used by Sverdrup and Munk (1947) to construct the first widely used wave prediction system. The Sverdrup-Munk prediction curves were revised by Bretschneider (1952a, 1958) with additional empirical data. Thus, this prediction system is often called the Sverdrup-Munk-Bretschneider (SMB) method. It is the most convenient wave prediction system to use when a limited amount of data and time are available.

### 3.51 SMB METHOD FOR PREDICTING WAVES IN DEEP WATER

Revisions of earlier SMB forecasting curves are seen in Figures 3-15 and 3-16. The curves represent dimensional plots from the empirical equations,

[redacted], (3-21)

[redacted], (3-22)

and,

$$\frac{gt}{U} = K \exp\left\{\left[A\left(\ln\left(\frac{gF}{U^2}\right)\right)^2 - B \ln\left(\frac{gF}{U^2}\right) + C\right]^{1/2} + D \ln\left(\frac{gF}{U^2}\right)\right\}, \quad (3\text{-}23)$$

SEE 081 app

where

$$\exp\{x\} = e^{(x)}$$
$$\ln = \log_e$$
$$K = 6.5882$$
$$A = 0.0161$$
$$B = 0.3692$$
$$C = 2.2024$$

and

$$D = 0.8798 .$$

With these relationships, the significant wave height $H_F$, and significant wave period $T_F$, at the end of a fetch may be estimated when wind speed, fetch length, and duration of wind over the fetch are given. Estimation of wind parameters is discussed in Section 3.4, Wind Information Needed for Wave Prediction, following the evaluation of simplified prediction techniques. In using Figures 3-15 or 3-16 the estimated wind velocity U, the fetch length F, and the estimated wind duration t, when a fetch first appears on a weather chart, are tabulated. Figure 3-15 or 3-16 is then entered with the value of U, using the scale on the left if U is in knots, or the scale on the right if U is in statute miles per hour. This U line is then followed from the left side of the graph across to its intersection with the fetch length or F line, or the duration t line, whichever comes first.

$$b = \exp - \left[ \frac{(f - f_m)^2}{2\ \sigma^2\ f_m{}^2} \right]$$

1984 SPM

$f_m$ is the frequency of the spectral peak, and $\alpha$, $\sigma$, and $\gamma$ are coefficients either fit to an observed spectrum or calculated as functions of dimensionless fetch (Hasselmann et al., (1973, 1976). This formula is called the Joint North Sea Wave Project (JONSWAP) spectral shape after the field experiment on which it is based. Frequently, a single peaked spectrum is fitted to this form if parametric analytic spectra are required for mathematical analysis.

Similar formulas can also be developed empirically from wind and wave observations. A combined empirical-analytical procedure was used by Sverdrup and Munk (1947) in the first widely used wave prediction system. The Sverdrup-Munk prediction curves were revised by Bretschneider (1952, 1958) using empirical data. This prediction system is therefore often called the Sverdrup-Munk-Bretschneider (SMB) method.

More recent field data (Mitsuyasu, 1968; Hasselman et al., 1973) have resulted in some revisions to this method. The resulting curves are given in the next section. This wave prediction system is convenient when limited data and time are available.

3. Formulas for Predicting Waves in Deep Water.

It is desirable to have a simple method for making wave estimates. This is possible only if the geometry of the waterbody is relatively simple and if the wave conditions are either fetch-limited or duration-limited. Under fetch-limited conditions, winds have blown constantly long enough for wave heights at the end of the fetch to reach equilibrium. Under duration-limited conditions, the wave heights are limited by the length of time the wind has blown. These two conditions represent asymptotic approximations to the general problem of wave growth. In most cases the wave growth pattern at a site is a combination of the two cases. Equations (3-33) to (3-38) (Table 3-2) were obtained by simplifying the equation used to develop the parametric model (Hasselmann et al., 1976). Two dimensionless plots for wave growth are given in Figures 3-21 and 3-22, which also include adjustments for shallow water discussed in Chapter 3, Section IV.

In the fetch-limited case, the parameters required are the fetch, F and the wind-stress factor $U_A$ (adjusted windspeed), where $U_A$ has been adjusted as described in Chapter 3, Section IV, and represents a relatively constant average value over the fetch. The spectral wave height $H_{m_o}$ and peak spectral period $T_m$ are the parameters predicted.

$$\frac{gH_{m_o}}{U_A^2} = 1.6\text{x}10^{-3} \left(\frac{gF}{U_A^2}\right)^{1/2} \qquad (3\text{-}33)$$

$$\frac{gT_m}{U_A} = 2.857\text{x}10^{-1} \left(\frac{gF}{U_A^2}\right)^{1/3} \qquad (3\text{-}34)$$

PA28




Figure 3-21. Forecasting curves for wave height. Constant water depth.



PA 29

and

$$\frac{gt}{U_A} = 6.88\times10^1 \left(\frac{gF}{U_A^2}\right)^{2/3} \qquad (3\text{-}35)$$

Note that $T_{1/3}$ is given as 0.95 $T_m$ . The preceding equations are valid up to the fully developed wave conditions given by

$$\frac{gH_{m_o}}{U_A^2} = 2.433\times10^{-1} \qquad (3\text{-}36)$$

$$\frac{gT_m}{U_A} = 8.134 \qquad (3\text{-}37)$$

$$\frac{gt}{U_A} = 7.15\times10^4 \qquad (3\text{-}38)$$

where

$H_{m_o}$ = the spectrally based significant wave height

$T_m$ = the period of the peak of the wave spectrum

$F$ = the fetch

$t$ = the duration

$U_A$ = the wind-stress factor

Often in applying the wave growth formulas, the engineer must determine if the design situation is fetch limited or duration limited. In these cases estimates of a one half- to 5-, etc. hour windspeeds with some return period (often 25 or 50 years) may be available. The objective is to find the largest wave height that occurs under these conditions. For example, a given return period, the 30-minute windspeed, will be higher than the 1- to 3-, etc. hour windspeeds, but because of its short duration it may produce a smaller wave height than the 1-hour windspeed.

A given calculation for a duration should be checked to ensure that it has not exceeded the maximum wave height or period possible for the given wind-stress factor and fetch. The nomograms in Figures 3-23 and 3-24 show wave prediction curves of empirical values which can be used to check the reasonableness of the mathematical solutions. For example, for $U_A$ = 20 meters per second a duration of 5 hours yields a height of 2.5 meters. However, if the fetch were only 30 kilometers long, the maximum wave height can only be 1.75 meters for a wind-stress factor of 20 meters per second. If the wind-stress factor is 20 meters per second and its duration is only 3 hours, the fetch-limited wave height of 2.5 meters for a fetch of 30 kilometers would not be reached; therefore, the wave height is duration limited. It is essential that fetch-limited wave calculations be checked to see if they are duration limited; likewise, duration-limited cases should be



PA 30

1984
SPM

## V. SIMPLIFIED METHODS FOR ESTIMATING WAVE CONDITIONS

When estimates of wave heights, periods, and directions are needed, the most accurate procedures are the numerical methods discussed in Chapter 3, Section III. However, there are often cases where neither the time available nor the cost justifies using complex numerical methods. In these cases, a simplified method may be justified. Chapter 3, Section V,3 presents a series of equations and nomograms that give significant wave height by $H_{m_o}$ and period of the spectral peak, $T_m$ for a given windspeed and fetch or duration. Estimating surface winds is treated in Chapter 3, Section IV. Estimating fetch length is treated in Chapter 3, Section V,1.

The spectrally based significant wave height $H_{m_o}$ is four times the square root of the variance of the sea surface elevation. In deep water $H_{m_o}$ is approximately equal to the significant wave height $H_s$, which is based on counting and measuring individual waves (see Chapter 3, Section II,5). In shallow water, $H_{m_o}$ becomes less than $H_s$. In both deep and shallow water, $H_{m_o}$ is based on the wave energy; this is not true for $H_s$.

The following assumptions pertain to these methods. The methods will be used for cases where fetches are short (80 to 120 kilometers (50 to 75 miles) or less) and the wind can be assumed uniform and constant over the fetch. Cases where the wind field varies rapidly in time or with distance over the fetch or where swell from distant sources propagates into the area are best treated numerically. Since these conditions are rarely met and wind fields are not usually estimated accurately, do not assume the results are more accurate than warranted by the accuracy of the input or the simplicity of the method. Good, unbiased estimates of all parameters for input to the wave equations should be sought and the results interpreted conservatively. Individual input parameters should not each be estimated conservatively, since to do so may bias the results.

### 1. Delineating a Fetch.

A fetch has been defined subjectively as a region in which the windspeed and direction are reasonably constant. Confidence in the computed results begins to deteriorate when wind direction variations exceed 15°; confidence deteriorates significantly when direction deviations exceed 45°. The computed results are sensitive to changes in windspeed as small as 1 knot (0.5 meter per second), but it is not possible to estimate the windspeed over any sizable region with this precision. For practical wave predictions it is usually satisfactory to regard the windspeed as reasonably constant if variations do not exceed 5 knots (2.5 meters per second) from the mean. A coastline upwind from the point of interest always limits a fetch. An upwind limit to the fetch may also be provided by curvature or spreading of the isobars as indicated in Figure 3-20 (Shields and Burdwell, 1970) or by a definite shift in wind direction. Frequently the discontinuity at a weather front will limit a fetch, although this is not always so.



PA31

85/2 H. Doc. 336
DOCUMENTS
LIBRARY
COLORADO STATE UNIVERSITY
FORT COLLINS COLORADO

# BERRIEN COUNTY, MICHIGAN, BEACH EROSION CONTROL STUDY

---

## LETTER

FROM

## THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, DEPARTMENT OF THE ARMY, DATED 3 DECEMBER 1957, SUBMITTING A REPORT, TOGETHER WITH ACCOMPANYING PAPERS AND ILLUSTRATIONS, ON A COOPERATIVE BEACH EROSION CONTROL STUDY OF BERRIEN COUNTY, MICHIGAN, PREPARED UNDER THE PROVISIONS OF SECTION 2 OF THE RIVER AND HARBOR ACT APPROVED 3 JULY 1930, AS AMENDED AND SUPPLEMENTED

FEBRUARY 17, 1958.—Referred to the Committee on Public Works and ordered to be printed with two illustrations

---

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1958

21651

PA 32

diately lakeward of the entrance to the jetty channel, between maintenance dredging operations. It is reasonable to assume that little or no beach building material presently passes naturally across the harbor entrance to the downdrift shore due to the frequency with which maintenance dredging is performed.

66. Assuming that the capacity and application of littoral forces for transporting material alongshore in the littoral zone are similar for locations both immediately north and south of the St. Joseph Harbor entrance jetties, then the net rate at which material reaches the harbor entrance from the north should approximate the net rate at which material leaves the eroding area immediately south of the harbor entrance with allowances made for the effect of protective structures. The average rate of accumulation north of the jetties, estimated over the longest period of record, 1872–1954, may be expected to be somewhat less than the averaged net rate of littoral drift actually transported to the area as certainly over some portions of that period material must have passed around the north jetty and entered the channel, from which it was later removed by maintenance dredging. Although construction of the north jetty was begun in 1836, it was not completed to its present length until 1903 when the outer 1,000-foot section was added. The best estimate presently available of the rate at which material reaches the harbor area from the north would be that computed from comparison of the 1907 and 1954 surveys for accumulation north of the harbor, plus the estimated quantity passing around the north jetty. These quantities total on the order of 100,000 cubic yards per year. Of the material eroded from the south St. Joseph and Shoreham village areas over the period of record, probably no more than one-third of the material supplied by the bluffs and one-half of the material eroded from offshore areas has been suitable and available for transport alongshore as littoral drift. The remainder of the material eroded was lost either to the offshore bottom lakeward of the 20-foot depth, impounded in the lee of the south jetty, or carried into the harbor channel during reversal in littoral transport direction. Under the latter assumptions material leaving the eroding area south of the jetties as littoral drift would appear also to have done so at the rate of about 100,000 cubic yards per year. Construction of protective structures south of St. Joseph Harbor no doubt further decrease the natural supply of beach material available to the area under consideration in recent years, and the result has been extension of severely eroding areas southward.

67. On the above basis the potential rate of littoral transport to be expected in the vicinity of St. Joseph Harbor might be approximated at 100,000 cubic yards per year. This rate appears reasonable for use in design computations concerning beach fill losses. Data upon which to base a more accurate determination of the rate of littoral transport are not available.

68. *Methods of modifying or correcting problem conditions.*—General methods of protecting lake front bluffs from erosion by wave action are provision of nonerodible armor to prevent waves from reaching the erodible bluff material, or provision of a protective beach of suitable height and width to dissipate wave energy and prevent its reaching the bluff. Armoring by revetment, bulkhead or wall, could successfully stabilize the bluff areas but would result in decreasing the supply of beach material to the area so that eventually a continuous

PA 33



belt of armor protection would be necessary. In areas not previously protected by groins, scour could be expected at the lakeward toe of the wall or revetment type of structure.

69. Groin construction alone is not a suitable means for stabilizing the bluff in the portion of Berrien County immediately south of St. Joseph Harbor, as natural sources of supply are insufficient to supply material at a rate required for impounding a suitable protective beach. Material for protective beaches must, therefore, be supplied artificially from other sources. Existing groins will have to be filled or shortened, and protective beaches of suitable dimensions placed directly where immediate protection is needed. For the remainder of the shore, in the study area, beach material in sufficient quantity for providing and nourishing protective beaches can be placed in appropriately located stockpiles for distribution by natural shore processes. The approximately 13,360 feet of frontage extending from about Elm Street (range 8) in the city of St. Joseph to a point about 300 feet south of range 20, requires direct placement of sand fill to provide a suitable protective beach. Direct placement of fill to widen the beaches in the Grand Beach and Michiana Shores areas will also be required, if immediate protection is to be provided in these areas. Nourishment of protective beaches immediately south of St. Joseph can be accomplished by periodic replenishment of the beach south of St. Joseph Harbor with a quantity of suitable material sufficient to restore the normal rate of littoral drift. However, due to the distance (some 25 miles) of Michiana Shores and Grand Beach from the St. Joseph Beach, and a probable excess of losses over the supply to these areas, from updrift shore areas, as indicated by past behavior of this shore, some additional maintenance fill would be necessary, directly at these areas.

70. Sampling of available land borrow areas in the Stevensville-Grand Marais Lakes area approximately 5 miles south of the study area indicates that material suitable for protective beaches is available within a reasonable distance of the study area. Analysis of a typical sample is shown in table A–7 of appendix A. Although land borrow will provide an adequate source of beach building material, and will result in a more conservative appraisal of project justification, detailed investigations of offshore sand supply will be made when the project reaches a construction stage.

*Design criteria*

71. *Lake level.*—Works for the protection of the shore should be designed for the maximum lake level that can be anticipated to recur with a reasonable frequency. Such a design level is considered to be the maximum monthly average stage that may be expected to occur once each 20 years together with a temporary rise of expected frequency of occurrence of once each year, superimposed upon it. Considering the period of record 1900–54, the maximum monthly average stage of Lake Michigan recurring with a frequency once in 20 years is 582.0 and the temporary rise is 1.8 feet. The design lake stage is then 583.8. For purposes of this report a design lake level 5 feet above low-water datum has been assumed.

72. *Waves.*—The amount of energy to be dissipated by a beach or structure depends directly upon the size of the wave that can reach the beach or structure. The design wave should be the largest wave

problem area. Periodic nourishment by increasing the regularity of supply of beach material, will prevent enlargement of the problem area and to an indeterminate extent will benefit the shores for some distance south of the project area. The Board therefore concurs in the opinion that the project is eligible for Federal aid in periodic nourishment, subject to an initial limitation to a period of 10 years to permit reevaluation of benefits, methods, and techniques.

10. In accordance with existing statutory requirements the Board states its opinion that—

(*a*) It is advisable for the United States to adopt a project authorizing Federal participation in the first costs, and costs of periodic nourishment for 10 years, of a plan for protecting the shores of the city of St. Joseph, Mich., from Elm Street to the southern limit of State Highway protective works;

(*b*) The public interest involved in the proposed measures is associated with prevention of damages to publicly owned property, including the necessity for relocating a public highway, and recreational benefits to the public;

(*c*) The share of the expense which should be borne by the United States is one-third of the costs of the work applicable to publicly owned shores and one-third of the costs adjusted by the ratio of public to total benefits for those privately owned shores where benefits accrue from public use of the shore or protection to nearby public property, in accordance with the provisions of Public Law 826, 84th Congress. The Federal share so computed amounts to 22.6 percent of the costs of the initial work and of periodic nourishment for a period of 10 years.

11. Accordingly, the Beach Erosion Board recommends adoption of a project by the United States authorizing Federal participation in the first and periodic nourishment costs of a plan for protection of the shore of the city of St. Joseph, Mich., from Elm Street to the southern extremity of the State protective works, a distance of 13,360 feet, comprising direct placement of suitable sand to form a protective beach with berm elevation of 10 feet above low-water datum at the base of the bluff and 50 feet in width at elevation 8 feet, substantially in accordance with the plan of the district engineer, with such modifications thereof as may be considered advisable by the Chief of Engineers. The plan contemplates periodic nourishment commencing during the initial placement of the protective beach. Federal assistance would entail contribution of funds in amount of 22.6 percent of the initial construction costs of the protective beach and of the costs of periodic nourishment for a period of 10 years after the year of completion of the initial construction. Initial costs as presently estimated are $1 million of which the estimated Federal share is $226,000. The estimated Federal share of the recurring costs of periodic nourishment amounts to about $7,800 per year, or a total of $78,000 for a 10-year period. The Board further recommends that local interests consider direct placement of a protective beach fill along the Shoreham village shore, as discussed by the district engineer, based on their own determination of its economic justification.

PA 34



12. Federal participation is recommended subject to conditions that local authorities will—

(*a*) Obtain approval by the Chief of Engineers, prior to commencement of work, of detailed plans and specifications for the project, and also of the arrangements for prosecuting the work;

(*b*) Provide at their own expense all necessary lands, easements, and rights-of-way; and

(*c*) Furnish assurances satisfactory to the Secretary of the Army, that they will—

(1) Provide periodic nourishment of the protective beach during its economic life, as may be required to serve its intended purpose;

(2) Prevent water pollution that would endanger the health of bathers; and

(3) Maintain continued public ownership of the public shore upon which a part of the recommended Federal participation is based, and its administration for public use during the economic life of the project, and continued availability for public use of the private shore for which the recommended Federal participation is based on such public use.

For the Board:

CHAS. G. HOLLE,
*Major General, United States Army,*
*President.*

At the time of adoption of this report the members of the Beach Erosion Board were—

Maj. Gen. Chas. G. Holle, President
Dean Thorndike Saville, State of New York
Dean Morrough P. O'Brien, State of California
Dr. Lorenz G. Straub, State of Minnesota
Brig. Gen. H. J. Hoeffer, United States Army
Brig. Gen. William F. Cassidy, United States Army
Col. Clarence Renshaw, Corps of Engineers

---

## REPORT OF THE DISTRICT ENGINEER

### SYLLABUS

The purpose of this cooperative beach erosion control study of the shore of Berrien County, Mich., is to determine the most suitable plans for preventing the erosion of the shore by waves and currents.

As a result of this study, it is concluded that the most suitable method of preventing erosion and stabilizing the shore within the study area is by means of sand fill supplied from a local source. A plan of protection has been developed for the St. Joseph area, and suggestions made for that portion of the county shoreline south of St. Joseph.

The adoption of a project authorizing Federal participation in protective measures to the extent of 22.6 percent of the first cost thereof for approximately 13,360 feet of shoreline in St. Joseph is recommended, subject to certain conditions of local cooperation. The estimated first cost of the plan of improvement is $1,000,400, and the Federal share is $226,090. In addition it is recommended that the Federal Government participate in annual nourishment of the plan of improvement for a period of 10 years. The estimated Federal share of annual nourishment for a 10-year period is $78,000. The total Federal share in the proposed plan of improvement is $304,090.

58. *South end of State highway protective works to south limit village of Shoreham.*—This section of the shoreline, extending approximately 2 miles, is entirely privately owned. Approximately 22 individual structures built by property owners are in existence and range from typical groin construction to steel sheet-pile seawalls and revetments. The protection provided by a large portion of this work is limited, and erosion is continuing in those intermediate areas not protected. Detailed descriptions of shore protective works in this area are shown on sheet 5 of the drawings.

59. *Lincoln, Lake, and Chikaming Townships.*—The lake shore along this 18.5 mile section of Berrien County is relatively undeveloped. Only 8 shore protective structures are located in the area as shown on sheet 6 of the drawings. Much of the area is fronted by extensive sand dune deposits which provide a source of material to the beaches.

60. *New Buffalo Township.*—The 8-mile shoreline along New Buffalo Township has been developed extensively. Many cottages and homes of year-round residents front directly on the lake. Approximately 36 individual shore protective structures have been noted in the area as shown on sheet 6 of the drawings. No coordination has been noted between works constructed by individual owners, and structures range from wood sheeting and piling to steel sheet-piling groins and seawalls. Those unprotected areas existing between shore protection structures have been eroded with resulting flanking in many cases. The mouth of the Galien River is controlled by the existence of parallel entrance piers, approximately 160 to 260 feet in length, constructed of wood sheet piling.

61. *Profiles.*—The establishment of profiles as surveyed in November 1954 is discussed in appendix A and their locations are shown on sheet 4 of the drawings. The profiles generally extend from 50 to 200 feet landward of the mean lake level shoreline to the 20-foot depth contour in the lake. The bluff slopes south of St. Joseph Harbor were generally from 1 on 1 to 1 on 4. The elevation of the beach at the toe of the bluff averaged 6 to 10 feet above low water datum. Beach slopes were generally about 1 on 15 (table A–1, app. A). Near shore slopes, in water depth from low water datum to the 10-foot depth, averaged approximately 1 on 55. These near shore slopes included a natural bar located approximately 500 to 600 feet offshore. Offshore slopes in depths from 10 to 20 feet averaged approximately 1 on 130.

62. *Volumetric changes.*—Detailed computations of the rate of bluff erosion contained in table A–4 of appendix A indicate that the volume lost from the bluffs in the area south of the St. Joseph Harbor jetties to the southern limits of Shoreham village averaged about 100,000 cubic yards per year during the period 1830–1954. During the period 1872–1954 erosion from the offshore bottom to the 20-foot depth in the same region approximated 160,000 cubic yards per year. (See par. 12 and table A–9 of app. A.) Data given in these tables indicate that for the same periods accretion immediately north of the harbor jetties may have averaged about 25,000 cubic yards per year in the region above low water datum and about 11,000 cubic yards per year in the offshore region. Comparison of a 1907 survey of the St. Joseph Harbor vicinity with the 1954 survey indicates accretion north of the harbor jetties amounting to an average of about 75,000 cubic

PA 35



yards per year for the 47-year period. Before and after dredging surveys indicate that accretion between annual maintenance operations in the St. Joseph Harbor entrance channel averaged about 28,600 cubic yards per year in a 3.5-acre area immediately off the lakeward entrance to the jetty channel during the 6-year period 1950–56.

## IV. ANALYSIS OF THE PROBLEM

63. *Shore processes.*—The Lake Michigan shore of Berrien County is of glacial or lacustrine origin, the present shore formations being associated with the extensive variation of the lake level during the glacial era. Existence of the high clayey or sandy till bluffs in the area can be associated with a long term pattern of wave erosion and recession of the shore. Much of the material composing sand beaches fronting the bluffs is supplied by wave erosion of those bluffs. High lake levels in recent years (1943 to 1954) have inundated protective beaches and accelerated the erosion rate of the bluffs. Bluffs in the problem areas contain from about 25 to 50 percent material of sufficient size to remain on the beach, averaging about 32 percent. Material supplied to the beaches by streams and rivers emptying into Lake Michigan within the study area must presently be of an unimportant quantity. The St. Joseph and Paw Paw Rivers probably deposit most of their sediment load within St. Joseph Harbor from which it is removed by dredging. From 1906 to 1915, the harbor dredging averaged about 41,500 cubic yards per year for a 16-foot project depth. Over the 15-year period, 1940–54, dredging from St. Joseph Harbor averaged about 90,000 cubic yards per year for a 21-foot project depth.

64. Littoral drift in the area is predominantly southward as evidenced by the greater accumulation of beach material on the north side of the St. Joseph Harbor piers. Consideration of hindcast wave characteristics shows a preponderence of southward directed wave energy over that directed toward the north, and supports the conclusion regarding southward predominance of littoral drift. However, there is also evidence of northward moving beach material, reversals of direction of drift occurring periodically.

65. The net rate of littoral transport in the area to be considered for improvement may be approximated through consideration of the past volumetric changes in the vicinity of the St. Joseph Harbor jetties. Erosion of bluff and bottom material to the 20-foot depth, in the area south of the harbor jetties to the south limit of Shoreham, has averaged about 260,000 cubic yards per year over the period of record, of which amount bluff recession is estimated to have contributed about 100,000 cubic yards annually. The estimated volume of material annually eroded from the bluffs per mile of shore decreased from about 25,000 cubic yards per mile per year at Shoreham village to about 4,000 cubic yards per mile per year in New Buffalo Township. The average rate of accumulation north of the St. Joseph Harbor jetties during the same period was indicated to be about 36,000 cubic yards per year. However, comparison of surveys for the latter part of this period (1907–54) indicates accretion north of the jetties accumulating at an average rate of about 75,000 cubic yards per year. Also, an average accumulation of 28,600 cubic yards per year was indicated to have occurred during the 6-year period 1950–56, in the area imme-

77

# SECTION 111 DETAILED PROJECT REPORT ON SHORE DAMAGE AT ST. JOSEPH HARBOR, MICHIGAN



U.S. ARMY ENGINEER DISTRICT, DETROIT
CORPS OF ENGINEERS
DETROIT, MICHIGAN
MAY 1973

PA 36

the harbor jetties to the south limit of Shoreham, has averaged about 260,000 cubic yards per year over the period of record 1872 to 1954. For the period of record 1954 to 1971, the erosion of the bluff, foreshore, and nearshore areas has been at the rate of approximately 350,000 cubic yards per year. Of this quantity, erosion of the nearshore area has been at a rate of about 315,000 cubic yards per year. The average rate of accumulation north of the St. Joseph Harbor jetties during the period 1872 to 1954 was indicated to be about 36,000 cubic yards per year. However, comparison of surveys for the latter part of this period (1907-1954) indicates accretion north of the jetties accumulating at an average rate of about 75,000 cubic yards per year. An average accumulation of 28,600 cubic yards per year was also indicated to have occurred during the 6-year period 1950-1956, in the area immediately lakeward of the entrance to the jetty channel, between maintenance dredging operations. The area north of the north pier has changed from an area of accretion to one of erosion during the period of 1954-1971. It is considered that during this period the shoreline stabilized and then underwent erosion due to high lake levels in the latter part of the period.

45. Assuming that the capacity and application of littoral forces for transporting material alongshore in the littoral zone are similar for locations both immediately north and south of the St. Joseph Harbor entrance jetties, the net rate at which material reaches the harbor entrance from the north should approximate the net rate at which material leaves the eroding area immediately south of the harbor entrance with allowance made for the effect of protective structures. The average rate of accumulation north of the jetties, estimated over the period of record, 1872-1954, was somewhat less than the average net rate of littoral drift actually transported to the area. Over some portions of that period, material must have passed around the north jetty and entered the channel from which it was later removed by maintenance dredging or bypassed the harbor. Although construction of the north jetty was begun in 1836, it was not completed to its present length until 1903 when the outer 1,000-foot section was added. The best estimate presently available of the rate at which material reaches the harbor area from the north would be that computed from comparison of the 1907, 1954, and 1971 surveys for accumulation north of the harbor, plus the estimated quantity passing around the north jetty. These



PA 37

quantities total on the order of between 100,000 and 110,000 cubic yards per year. Of the material eroded from the south St. Joseph and Shoreham Village areas over the period of record, probably no more than one-third of the material supplied by the bluffs and one-half of the material eroded from offshore areas has been suitable and available for transport alongshore as littoral drift. The remainder of the material eroded was lost either to the offshore bottom lakeward of the 20-foot depth, impounded in the lee of the south jetty, or carried into the harbor channel during reversal in littoral transport. Under the latter assumptions, material leaving the eroding area south of the jetties as littoral drift would appear also to have done so at the rate of about 110,000 cubic yards per year. Construction of protective structures south of St. Joseph Harbor no doubt further decreased the natural supply of beach material available to the area under consideration in recent years, and the result has been extension of severely eroding areas southward.

46. On the above basis, the potential rate of littoral transport to be expected in the vicinity of St. Joseph Harbor might be approximated at 110,000 cubic yards per year. This rate appears reasonable for use in design computations concerning beach fill losses.

47. INFLUENCE OF THE NAVIGATION STRUCTURES ON THE SHORELINE

The earliest recorded data on the shorelines north and south of the harbor piers were obtained in 1863. Condition drawings of St. Joseph Harbor are included as plates 10 through 16. Between 1863 and 1937, the shoreline north of and adjacent to the north pier advanced lakeward a distance of about 870 feet. The average rate of shore movement lakeward was about 10 feet per year. Immediately south of and adjacent to the south pier, a slight amount of accretion has taken place due to reversals in the direction of littoral drift.



PA 38

Sec 111

CENCE-ED-LR 21 June 94

MEMORANDUM FOR RECORD

SUBJECT: Shoreham, MI Village Council Meeting

1. **PURPOSE:** To present an overview of the District's Section 111 beach nourishment issues at St. Joseph.

2. **DATE AND PLACE:** 8 June 94 at the Shoreham Village Hall.

3. **CORPS ATTENDEES:** C. Thompson, D. Schweiger, J. Karmo, D. Zande, R. Kittleman.

4. **NARRATIVE:**

(Note: To supplement this narrative, attached are copies of the presentations made by C. Thompson (Eng Divn), J. Karmo (Plng Divn), and D. Zande (C-O Divn)).

Mr. Thompson began the presentation with a discussion on the existing beach nourishment monitoring program, with emphasis placed on the fact that the Corps is mitigating only for that portion of the erosion attributable to the harbor structures. According to the Section 111 DPR for St. Joseph, that amount is 30%. The mitigation plan is not designed to alleviate erosion caused by other factors such as non-federal shore protection structures or natural erosion.

The beach nourishment program for St. Joseph calls for the annual placement of an annual average of 110,000 cubic yards of sand south of the harbor. Two feeder beaches are designated at St. Joseph--one just north of the water intake plant in Lions Park; and the second at the foot of Hawthorne St. Although much of the initial placement was at Hawthorne St., that was the only time this feeder beach was used. Material for beach nourishment is obtained from two sources--the navigation channel and from inland sand pits.

Mr. Thompson noted that the purpose of the Section 111 monitoring program is to monitor the beach nourishment, evaluate its effectiveness at mitigating the erosion caused by the harbor jetties and to recommend changes that might improve its effectiveness.

He then discussed the activities at St. Joseph under the Corps' Coastal Engineering Research Center (CERC) Monitoring of Completed Coastal Projects (MCCP) program. The goal of this study is to determine the effectiveness of using coarse graded beach nourishment material. He also noted that the United States Geological Survey (USGS) has been conducting detailed hydrographic/sidescan sonar/ground penetrating radar

PA 39

EXHIBIT 61 RECORD

surveys along southeastern Lake Michigan, including the Shoreham and St. Joseph shorelines.

For further details on Mr. Thompson's presentation, refer to the attachment.

Ms. Karmo briefly discussed the authorities related to the Section 111 program at St. Joseph. The shore damage feasibility study for the St. Joseph Harbor was prepared under the authority of Section 111 of the River and Harbor Act of 1968. This study resulted in the preparation of the Detailed Project Report (DPR), which was completed in 1973, at 100% federal expense. She noted, however, that now such studies require a non-federal study/project sponsor who is responsible to provide 50% of the feasibility phase costs. Furthermore, the benefits resulting from the implementation of the project must exceed the cost to design and implement a solution. Ms. Karmo emphasized that in determining economic justification of a project, the Corps can only consider publically owned structures. She summarized by stating that, under current Corps' planning authorities and Administration policies, there are no programs available to restudy or further study this area.

Mr. Zande then discussed the District's planned construction activities for FY 94 and 95. He noted that the Section 111 program has provided annual nourishment St. Joseph since the 1970's in the amount of 2,000,000 cubic yards. The District will be placing about 25,000 cubic yards of dredged at Shoreham this year, although it is not expected to stay in place very long, because it is such fine material. He proposed that the District, through supplemental nourishment funds, would like to place a much coarser, cobble-sized material at Shoreham in FY95. This material would tend to stay in place longer than the fine beach sand and help reduce wave energy.

Following these presentations, questions from the audience (mainly homeowners, but also representatives from the local newspaper and radio station) were addressed. Below is a sampling of the primary concerns.

Q. If the Corps is responsible for 30% of the erosion south of the harbor structure, who is responsible for the other 70%?

A. The remainder of the erosion in the area is due to natural causes and to the vast number of private shore protection structures placed along the shoreline in the last 50 years.

Q. Does the Corps feel that the 110,000 cubic yards per year is addressing 30% of the erosion?

A. There is really no way of knowing. The only answer that can be given is that the DPR stated that the harbor structure is blocking 30% of the littoral material coming from the north and that placing 110,000 cubic yards per year would replace this lost material.

PA 40

Q. I have purchased some shore property along the lake in Shoreham and would like to build a home on it--can you give me an idea on how far from the bluff I should put my home?

A. It is advisable to put your home as far away from the bluff as possible. It is best if I take a look at your property and then I can give you an indication of the MDNR setback limits.

In summary, the audience was informed that the Shoreham shoreline is in very unstable condition and that there is very little that can be done to inexpensively remediate the situation. They seemed to understand their plight, but were looking for any advice/assistance that the Corps could provide. In general, they were very receptive to the presentors and seemed very appreciative of the Corps' presence.

5. **ACTIONS TO BE TAKEN:**

a. C-O Divn will ensure that sufficient funds are included in the FY95 for supplemental nourishment.

b. Eng Divn, in coordination with C-O Divn, will make a determination as to the most cost-effective and stable stone gradation which could be placed at Shoreham.

c. Once this determination is made, Eng and C-O Divn's will again meet with the Shoreham Village officials and residents to present the Corps' specific proposal for FY95.

David L. Schweiger

David L. Schweiger, P.E.
Chief, Riverine & Coastal Sec.

CF:
✓CENCE-CO
CENCE-CO-O
CENCE-ED
CENCE-ED-DG
CENCE-ED-LR
CENCE-PD-PF

PA 41