# ANNUAL REPORT ON THE SECTION 111 BEACH NOURISHMENT MONITORING PROGRAM

FY-1999

January 2000



PA 42

1) The length of time between harbor construction and the beginning of mitigation. For most of the Section 111 harbors a considerable length of time had passed before mitigation was begun. For the harbors located along cohesive coastlines in particular this has likely contributed to sand loss and downcutting. While any adverse effects due to this interval prior to the start of mitigation is not a shortcoming of the beach nourishment program, it is a situation that affects the nourishment program. At St. Joseph, for example, the transport of the beach nourishment material is hampered by the downcutting that had occurred prior to the start of the nourishment program.

2) The accuracy of the sediment budget. At the present time there is no evidence to suggest that the long-term, average alongshore transport rates as calculated in the original Section 111 Detailed Project Reports of the individual harbors (DPRs) are inaccurate. However, it may be of benefit to refine the sediment budget for each of the harbors, particularly the alongshore transport rate. Further study is recommended at each harbor and would cost approximately $70K for modeling efforts.

3) Forecasting alongshore transport direction. The placement location for each of the harbors was originally determined based on the statistical wind and wave climate. Conditions for any year, however, can change significantly. An ability to forecast the alongshore transport direction for the upcoming nourishment cycle would increase effectiveness; however, accurate forecasting of wind/wave conditions a year in advance is not yet feasible.

An alternative to forecasting the transport direction would be to place a surplus of nourishment at a stockpile location(s). The stockpile would be closely monitored and renourishment scheduled such that the stockpile would not become completely depleted. This alternative would eliminate the need to forecast as material would always be available regardless of which direction the transport would occur.

4) Identifying physical properties and conditions. The beach nourishment material should have the same physical characteristics (composition, gradation, etc.) as the natural material found on the beach and nearshore. In addition, the stockpile sites must be located such that the nourishment material is most effectively introduced into the littoral system.

5) Execution of the program. The District has successfully identified and determined the design parameters for the beach nourishment programs. However, its past efforts have been marginal at executing and maintaining a consistent nourishment plan, as evidenced by the shortfalls in quantities and the intervals between nourishments. Table 2 summarizes the Section 111 dredging/placement during FY99:

Table 2
Section 111 Dredging/Placement for FY99

| Harbor | Authorized Average Quantity | Authorized Ave. Placement Interval | Last Placement | Quantity Placed | Placement Location | Cumulative Shortfall |
|---|---|---|---|---|---|---|
| New Buffalo | N/A | N/A | May 1999 | 18,600 D | South | N/A |
| St. Joseph | 110,000 | Annual | May 1999 | 22,500 D | South | 327,000 |
| South Haven | 47,000 | " | 1998 | 33,300 T | South | 520,600 |
| Holland | 61,000 | " | Apr 1999 | 17,700 D | North | 426,700 |
| Grand Haven | 50,000 | " | Apr 1999 | 42,400 D | South | 270,200 |
| Muskegon | 70,000 | " | Aug 1999 | 55,800 D | South | 465,400 |
| White Lake | 38,000 | " | Jun 1996 | 37,700 D | South | 451,300 |
| Ludington | 66,000 | " | Jun 1998 | 74,500 D | North | 237,900 |
| Harrisville | 8,000 | " | Nov 1993 | 13,600 D | South | (6,000) |
| Port Sanilac | 30,000 | " | Aug 1996 | 19,800 D | South | 401,200 |
| Lexington | 35,000 | " | Jul 1996 | 22,900 D | South | 320,300 |

Note: All quantities are in cubic yards.
Shortfalls as of Jan 2000
D Dredging
T Trucking

PA 43




Figure 11. Detail of the St. Joseph-Shoreham area from the previous map (fig. 8). Difference in depth between NOAA 1945-46 and 1991 surveys. Warm colors show erosion; as much as 4 vertical meters of lake bed have been removed by erosion south of St. Joseph.

PA 44




Figure 11. Detail of the St. Joseph-Shoreham area from the previous map (fig. 8). Difference in depth between NOAA 1945-46 and 1991 surveys. Warm colors show erosion; as much as 4 vertical meters of lake bed have been removed by erosion south of St. Joseph.

PA44.1

EXCERPT FROM
EXHIBIT 33
NOAA/USGS PILOT
STUDY
May, 1992
David S. Foster

# Cohesive Shores

*By*
Robert B. Nairn, Ph.D., P.Eng.
*W.F. Baird & Associates Coastal Engineers*
*221 Lakeshore Rd East, Oakville, Ontario, CANADA L6J 1H7*
*tel: 905 845 5385 fax: 905 845 0698* email: r_nairn@oakville.baird.com

## ABSTRACT

COHESIVE SHORES CONSIST OF consolidated or partially consolidated cohesive sediments, which are usually covered by a thin veneer of sand and gravel, sometimes forming a beach at the shore. These types of shorelines are often, although not always, associated with an eroding bluff or cliff face. The presence of the sand veneer often disguises the underlying cohesive substratum, and therefore at many locations cohesive shores are incorrectly assumed to behave as sandy shores. Cohesive shores compose a large part of the Great Lakes shoreline, parts of the Atlantic, Pacific and Gulf coasts of the U.S., a large part of the North Sea coast of England and sections of the Baltic and Black Sea coasts, among many others. As the awareness of the importance of the distinction of this shore type grows, more examples are identified.

Erosion processes on cohesive shores are fundamentally different from those on sandy shores. The erosion process is irreversible because the cohesive sediment (e.g. glacial till, glacio-lacustrine deposits, ice-bonded sediments, soft rock or other consolidated deposits) cannot be reconstituted in the coastal environment once eroded. Furthermore, since the sand content of these deposits is low (usually less than 20%), erosion is not balanced by an equal volume of deposition of sand in the littoral zone. The eroded fine deposits (silt and clay) are winnowed offshore while the sand is transported alongshore.

Long term shoreline erosion rates on cohesive shores are a function of the rate of lowering or downcutting of the nearshore profile. Therefore, shore-based shore-parallel protection structures placed on these shores will eventually be undermined by the ongoing profile downcutting.

## INTRODUCTION

There are two primary shore types which are susceptible to considerable evolution through erosion — sandy shores and cohesive shores. A recognition of the fundamental differences in the erosion processes for these two shore types is essential for successful planning and engineering in the coastal environment.

A shore is defined as cohesive when the erosion process is directly related to the irreversible removal of a cohesive sediment substratum (such as glacial deposits; soft rock or other consolidated deposits). In other words, beneath the sand beach there lies an erodible surface which plays the most important role in determining how these shorelines erode, and ultimately how they evolve in the long term. Often the only visual distinction of a cohesive shore (above the sea or lake level) is the existence of a backshore bluff or cliff. The bluff may be as low as 0.3 m, in the form of a wave-cut terrace, or as high as 50 m or more. At the base of the bluff there is often a sandy beach, and in the offshore, sand bars may exist with cohesive sediment exposed in the troughs. In some cases, cohesive shores of relatively low profile will not feature an eroding bluff face, as noted by Riggs and Cleary (1993) in their discussion of perched barrier beaches over Pleistocene sediments on the U.S. Atlantic coast.

Cohesive shores make up a large part of the Great Lakes shoreline, parts of the Arctic, Atlantic, Pacific and Gulf coasts of the U.S., a large part of the North Sea coast of England, and sections of the Baltic and Black Sea coasts. Many other examples throughout the world, including erodible rocky coasts, are cited by Sunamura (1992). As the awareness of the importance of the distinction of this shore type grows, more examples are identified.

This paper provides an introduction to cohesive shore erosion processes, presents case studies, and concludes with a discussion of implications for planning and engineering on cohesive shores.

## COHESIVE SHORE PROCESSES

The erosion of hard cohesive soils consists of the destruction of bonds between clay particles and the destruction of the natural structure or framework created through consolidation of the soil matrix. Erosion of a cohesive sediment is irreversible. Once the sediment is eroded, it cannot be reconstituted within the littoral zone. The eroded fine sediments (usually 70 to 90% silt and clay) are winnowed offshore and deposited in deep water, in contrast to the small sand and gravel fractions which remain in the littoral zone. Therefore, the erosion of cohesive sediment is fundamentally different from the erosion of cohesionless sediment. In the latter case, for every volume of eroded sand, there will be an equal volume of sand deposited somewhere in the littoral zone. The erosion process is reversible on sandy shores.

The critical point to understanding the evolution of cohesive shores is that the shoreline recession could not continue without the ongoing downcutting of the nearshore lake bed. The long term average rate at which the bluff or shoreline recedes on a cohesive shore is controlled by the rate at which the nearshore profile is eroded or downcut. The downcutting process is illustrated in Figure 1 for a cohesive shore site located east of Toronto along the Scarborough Bluffs. The bluff face has retreated approximately 30 m in a 37-year period, for an average long term recession rate of 0.8 m/yr. The underlying cohesive profile shape in 1952 is very similar to that in 1989; it has simply shifted shoreward by 30 m. Therefore, the long term bluff or cliff retreat rate is equivalent to the profile retreat rate. This figure also shows that there can be a significant quantity of sand covering an eroding cohesive sediment profile.

Sand moving across a patch of exposed cohesive sediment can act as an abrasive agent, accelerating the erosion of the cohesive material. Referring to Figure 1, the presence of longshore sand bars can have the opposite effect of protecting the underlying cohesive sediment from exposure and subsequent downcutting. As these bars migrate with changing wave and water level conditions, different areas of the underlying cohe-



EXHIBIT

PA 45

GEOLOGICAL SURVEY NO.

MICHIGAN DEPARTMENT OF PUBLIC HEALTH
# WATER WELL AND PUMP RECORD

**PERMIT NUMBER**

**1 LOCATION OF WELL**

| County | Township Name | Fraction | Section Number | Town Number | Range Number |
|---|---|---|---|---|---|
| Berrien | Lincoln | SW¼ NE¼ SW¼ | 29 | 5 N/S | 19 E/W |

Distance And Direction From Road Intersection: 1/2 mi S. of Grand Mere Rd, 1/2 mi W. of Thornton Dr In Grand Mere State Park

Street Address & City of Well Location

Locate with "X" in Section Below: X (1 MILE section grid; N, S, E, W; ½ MI.)

Sketch Map:




**3 OWNER OF WELL:** State of Michigan
Address: Grand Mere State Park Thornton Rd Stevensville MI

Address Same As Well Location? [X] Yes [ ] No

**4 WELL DEPTH:** 34 FT. Date Completed MO. 10 DAY 16 YEAR 90 — [X] New Well [ ] Replacement Well

**5** [ ] Cable tool [ ] Rotary [ ] Driven [ ] Dug [ ] Hollow rod [ ] Auger [X] Jetted [ ]

**6 USE:** [ ] Domestic [ ] Type I Public [X] Type III Public [ ] Irrigation [ ] Type IIa Public [ ] Heat pump [ ] Test Well [X] Type IIb Public [ ]

**7 CASING:** Diameter [X] Steel [ ] Plastic [X] Threaded [ ] Welded
4 in. to 28 ft. depth
in. to ft. depth
Grouted Drill Hole Diameter
in. to ft. depth
in. to ft. depth
Height: Above/~~Below~~ Surface 1 ft.
Weight 11 lbs./ft.
Drive Shoe [X] Yes [ ] No

**2 FORMATION DESCRIPTION**

| FORMATION DESCRIPTION | THICKNESS OF STRATUM | DEPTH TO BOTTOM OF STRATUM |
|---|---|---|
| Top Soil | 1' | 1' |
| Fine Brown Sand | 9' | 10' |
| Med. Brown Sand w/wood | 2' | 12' |
| Soft Gray Clay | 2' | 14' |
| Med To Fine Gray Sand | | 34' |
| Gray Clay | ? | ? |
| | | |
| | | |
| Well Recovers from 27' Pumping Level | | |
| 1 min — 15' | | |
| 2 min — 11' | | |
| 3 min — 5' | | |
| | | |
| | | |

PA 46

USE A 2ND SHEET IF NEEDED

**8 SCREEN:** [ ] Not Installed
Type Wound Stainless Steel Diameter 3¾" O.D.
Slot/~~Gauze~~ #7 Length 6'
Set between 28 ft. and 34 ft.
FITTINGS: [X] K-Packer [ ] Lead Packer [ ] Bremer Check
[X] Blank above screen 1 ft. Other Fittings All Stainless

**9 STATIC WATER LEVEL:** 5 ft. below land surface [ ] Flow

**10 PUMPING LEVEL:** below land surface
26 ft. after 1 hrs. pumping at 10 G.P.M.
27 ft. after 2 hrs. pumping at 10 G.P.M.
Max. Cap. 18 gpm. w/ 4" plunger

**11 WELL HEAD COMPLETION:** [ ] Pitless adapter [X] 12" above grade [ ] Basement offset [ ] Approved pit

**12 WELL GROUTED?** [ ] No [X] Yes From 0 to ? ft.
[ ] Neat cement [X] Bentonite [ ] Other
No. of bags of ~~cement~~ Bentonite 2 Additives

**13 Nearest source of possible contamination**
Type Outside Toilet 4/Pits Distance 500 ft. Direction NE
Well disinfected upon completion? [X] Yes [ ] No
Was old well plugged? [ ] Yes [ ] No

**14 PUMP:** [ ] Not Installed [ ] Pump Installation Only
Manufacturer's name Baker Monitor
Model number 11 HPS HP — Volts —
Length of Drop Pipe 21 ft. capacity G.P.M.
TYPE: [ ] Submersible [ ] Jet Hand Pump
~~PRESSURE TANK:~~ 2" Brass cylinder Set at 21'
~~Manufacturer's name~~ Drain Hole in drop pipe @ 8'
~~Model number~~ Capacity Gallons

**15. Remarks, elevation, source of data, etc.**
Nitrates — 2 ppm
Hardness — 12 grains
Iron — 1.5 ppm

RECEIVED NOV 13 1990 BCHD

**17. Rig Operator's Name:** Thomas Camp

**16. WATER WELL CONTRACTOR'S CERTIFICATION:**
This well was drilled under my jurisdiction and this report is true to the best of my knowledge and belief.

Richcreek Well Drilling Co — 11-410
REGISTERED BUSINESS NAME — REGISTRATION NO.
Address 4068 Case Ct. Waterviliet, MI
Signed Lloyd Richcreek Date 10-29-90
AUTHORIZED REPRESENTATIVE

D67d 2/89

**Authority:** Act 368 PA 1978
**Completion:** Required
**Penalty:** Conviction of a violation of any provision is a misdemeanor.

LOCAL HEALTH DEPT. COPY

## Ground Water Advisory Committee

### Purpose

The Ground Water Advisory Committee (GWAC) assists the Department of Environmental Quality's (DEQ) Well Construction Regulatory Program in the mission to protect the public heath through the development of safe and reliable drinking water wells. The GWAC plays an important role in the implementation of Michigan's Water Well Drilling and Pump Installation Contractor Registration Program. Part 127 of 1978 PA 368 (Public Health Code) establishes the structure and role of the committee.

### Background

When Michigan's Ground Water Quality Control Act was passed as 1965 PA 294, an advisory board was established in the law to give the water well industry a voice in the new Registration Program. The Well Drillers Advisory Board was comprised of nine members, five of whom were registered water well drillers. Four well drillers were from specific geographic regions and one was an at-large member. The remaining board members were governmental officials representing the Department of Public Health, Department of Natural Resources (Water Resources Commission and Geological Survey Division), and local public health departments. The industry representatives were appointed by the Governor with the advice and consent of the Senate. The initial advisory board played an important role in formulating Michigan's first well construction code, which became effective on February 14, 1967. Minimum qualifications for obtaining and maintaining a contractor's certificate of registration, standards for well construction and abandonment practices, minimum setback distances to isolate wells from contamination sources, well performance criteria, water testing, penalties for violating the code and other provisions to protect public health are contained in the well code.

Through a Governor's Executive Order (No. 1994-1), the Well Drillers Advisory Board was abolished and the board's authority, functions, and responsibilities of the Well Drillers Advisory Board were transferred to the Director of the Department of Public Health. Because the state program managers needed the assistance of the industry and valued its input, the public health director reconstituted the committee. The Well Construction Regulatory Program was transferred from the Department of Public Health to the DEQ in 1996. The GWAC performs similar duties as the preceding Well Drillers Advisory Board and the committee structure has changed slightly due to the reorganization of state programs.

GWAC members are ground water industry and governmental professionals who are dedicated to the protection of public health and Michigan's ground water resources. The committee is beneficial to DEQ officials and gives industry participants an insight into statewide groundwater issues and governmental procedures. The GWAC serves as a vital link between government and the regulated industry.

### Committee Functions

1. Evaluate the qualifications of candidates who have applied for registration as water well drilling contractors or pump installers and advise the DEQ as to whether the applicant meets the minimum qualifications. Oral interviews of candidates are conducted before they take the written registration examination.
2. Periodically review the registration examination process and content.
3. Advise the DEQ on technical aspects of well construction, pump installation, abandoned well plugging, and the field application of the well code.
4. Furnish input on proposed well code implementation policies.

PA 47

**Appointments**
Participants in the GWAC are typically appointed for three-year terms by the chief of the DEQ Water Bureau. If you are interested in serving on the committee, please complete the following application and submit it to the Well Construction Unit, Drinking Water and Environmental Health Section, Water Bureau, Department of Environmental Quality, P.O. Box 30273, Lansing, MI 48909-7773. For information, call 517-241-1374.

Current Committee Members

**Meeting Schedule for 2006**
April 7, July 14, and December 1 – Meetings are held at the DEQ, Water Bureau, 2nd Floor North, Constitution Hall, 525 West Allegan Street, Lansing, MI 48933. Business meetings are open to the public. Call 517-241-1374 for an agenda and meeting times.

Page 141

A. That's right.
Q. But you didn't rely on that --
A. No, I didn't.
Q. -- as you were putting together your report.
And is there anything in addition to the documents listed in this on page 22 through 26 that you reviewed in connection with this -- the opinions you're giving in this -- in this litigation?
A. Well, I did read, obviously, Dr. Nairn's report.
Q. The expert report that he submitted in this case?
A. Right. Well, pieces of it.
Q. Okay. And there was a previous expert report -- a previous document that Dr. Nairn drafted --
A. Right.
Q. -- that you reviewed.
A. I reviewed, but I didn't take anything out of that, so I didn't include it in the bibliography.
Q. Okay. How about any of the reports that Dr. Nairn worked on in the 1990s relating to

Page 142

monitoring of the beach nourishment program?
A. No, I have not.
Q. Have you ever reviewed those?
A. No, I haven't.
Q. Was it suggested to you by anyone that you should review those?
A. No, it was not suggested.
Q. Okay. Were there any documents that were specifically suggested to you by either Dr. Nairn or the DOJ attorneys that you should review and consider as part of your opinions?
A. The -- I don't recollect in any phone conversation or oral conversation of any report that I should look at, but I was sent reports. And whenever I was sent reports, sometimes I had no understanding of their bearing.
Q. Um-hmm.
A. I would kind of look through them and see what they were about.
Q. Who would send them to you?
A. I usually got them in a Fed Ex package. And much of the time, I didn't know where they were coming from.
Q. Okay. Do you know whether they were

Page 143

coming from the Department of Justice?
A. Some of them were. And I think some of them came from the Corps of Engineers, and -- yeah, that's true, yes.
Q. Okay. Would they have cover letters? Or would they just have an enclosure?
A. Sometimes it would just be reports. Sometimes there would be a cover letter, but most of the time not.
Q. Okay. And are those reports included in this 22 through 26?
A. I don't believe anything in those reports were included, because I would have included them had they included germane information.
Q. Okay. So they didn't -- they didn't have any germane information as far as what you were doing?
A. Not that I -- no, I don't think so, no.
Q. Is your analysis -- is the issue of the littoral drift that's been discussed at various points in the last few days, did you consider that issue at all in the work that you did in this case?
A. No, I did not.
Q. That just doesn't come into play in what

Page 144

you were doing?
A. That's correct.
Q. Going back to the -- the averages of the historical erosion rate that you came up with, is it fair to say that, by nature, an average is -- that there -- is it fair to say that there may have been blocks during that 7,000 years where the erosion rate significantly differed from what you have as the average over the 7,000 years?
A. That is correct.
Q. So there could have been -- and this is just a very rough example. There could have been a, say, hundred-year period where there could have been no erosion at all. Correct?
A. There's a high probability of that, yes, that there could have been a period of a hundred years, provided no water was at the shoreline that exists today.
Q. Okay. And there's -- and, likewise, over various -- if we took snapshots of various points in time, we might see very different numbers than the 7,000 average that you calculated from the geological time. Is that correct?
A. That's correct. That's why I refer to it





PA 49

as an average.
Q. And you didn't account at all for the harbor structure in coming up with that analysis. Correct?
A. Not at all.
Q. So, the last, say, hundred years, when the harbor structure has been in place, that just gets included in with the rest of the 7,000 years, and the average comes out, and that's what you use as the natural erosion rate. Correct?
A. That's correct.
Q. So even if -- if it were to turn out that the harbor has had some sort of significant impact on the erosion rate south of the harbor, that wouldn't be captured in -- in your analysis. Is that correct?
A. I think I need to go over the wording of your question.
Q. Sure. The -- if it turns out that the harbor structure accounts for significant erosion over the last, let's say, hundred years, your -- your analysis would still just capture that erosion as natural erosion. Is that correct?
A. That's correct, yes.



Q. Dr. Larson, have you been asked to do anything further on this case?
A. No. The only thing that I believe is scheduled is if this goes to trial.
Q. Um-hmm. Did you perform any work in connection with this case that is not -- the results of which are not ultimately included in your report?
A. Would you say that again?
Q. Sure. Your report contains, I'm assuming, a summary of the work you've done and the conclusions that you've reached. Correct?
A. That's right, yes.
Q. And what I'm asking you: Is this a complete -- is there work that you undertook in this litigation that, for whatever reason, did not ultimately make it into your final expert report?
A. No, I don't believe so.
MR. MARROCCO: I think that's everything that I have for right now, Dr. Larson. I'm going to turn you over to Mr. Ehret. I appreciate your time and especially your indulgence in answering phones -- answering questions from a speaker phone.
THE WITNESS: That's fine. Thank you.
MR. MARROCCO: John, I turn it over to you.



MR. EHRET: Thank you, Drew.
EXAMINATION
BY MR. EHRET:
Q. Good afternoon, Doctor. I'm looking at your report, and I'm looking at page 32, and I'm looking at picture G.
As I look at that picture, the profile or outline, perhaps, is a better word, of Lake Michigan, has two lines. What are those two lines meant to represent? Would you elucidate on that?
A. On Map G of Figure 7, Lake Michigan has two lines that are outlining the shape of the lake. The inner line represents the current shoreline, whereas the outer line represents the shoreline at the time of about 5,000 radiocarbon years ago. Actually, that would be 5,000 calendar years ago, I believe. No, it's radiocarbon years. Excuse me. And it represents the outline of a lake that occupied the basin of a lake known as Lake Nipissing.
Q. So there was a period of time when the lake was larger than it is today.
A. That's correct.
Q. And it has been shrinking.



A. It has been shrinking, oh, since the last 5,000 years, with some localized expansion and then contraction over that time.
Q. Isn't that in conflict with the concept of continually eroding natural shore?
A. That -- I don't quite understand your question. Could you --
Q. Well, if the lake is shrinking, how can it be eroding?
A. The shoreline is -- at the time of Nipissing, right at that shoreline, generally coincides in places. The scale of this map makes it difficult to show every little nuance of where the shore was.
But in the area around St. Joseph, the shoreline of glacier Lake Nipissing extended, for example, to Grand Mere Lakes, to the east of the lakes. But in St. Joseph area or, actually, in Shoreham area, it extended west of Shoreham. And then when you got back to St. Joseph, it probably extended slightly east of the current shore, pretty much where the park is at the foot of the bluff fronting St. Joseph.
Q. So when you say that the shoreline was to





PA 50

the east of -- was it Grand Mere or Stevensville?
A. Grand Mere.
Q. That would mean -- that would be the period of time when the embayment was open.
A. That's right.
Q. And since that time, the embayment has been gradually closing. Isn't that correct?
A. That's right.
Q. And the manner of its being closed was by the growth of spits along what is now the present shoreline.
A. That's correct.
Q. So would you call that period of growth of those spits natural erosion or accretion or neither?
A. That would be accretion there. The -- I think I know where you're going. The rates of erosion that I presented is for those headlands. And I think I make it clear in the report that it's at those headlands.
Q. I'm not sure I understand the word "headlands."
A. Okay. It's in the glossary of words. But a headland is a protrudence of land into a body



of water.
Q. So the end -- let's say the end of the south spit, as it's growing northward, the point of that would be called a headland?
A. I don't understand what you mean. What do you mean by --
Q. Well, in the Grand Marais Embayment --
A. Okay.
Q. -- as the spit grew from the south to the north --
A. The -- the -- all right. Go ahead.
Q. -- the -- the lead point of that growth, as it progressed to the north, would be called a headland?
A. No. The headland is the body of land that extends just north of Grand Mere Lake. That's the headland. And I think it's best to refer to Figure 9 of my report, Profile A.
Q. Yes.
A. Okay. The dashed line that you see just north of Grand Mere Lakes, that represents the former headland, and my erosion calculations are based on that headland, not on the area incorporating the Grand Mere Lakes.



Q. So the filling in of the Grand Mere Lakes, which I believe you understand is taking place right now --
A. Um-hmm.
Q. -- is not considered in the calculation of erosion.
A. That's correct.
Q. We've been -- you were mentioning just a little while ago, Foster, David Foster.
A. That's right.
Q. Or was it David Folger?
A. There's two. Both names appear on a report done by the USGS in 1992.
Q. Okay. I have a cover sheet, which I believe is the cover sheet for that report. Do you agree with me?
A. Yes. That's it.
Q. That's the report.
A. Yes.
Q. May I have it back?
A. Um-hmm.
Q. That's been marked as Record Exhibit 33 and has been received by Court.
A. Um-hmm.



Q. And the date on this is May 1992. Do you notice that?
A. I see it's, yeah, 1992, yes.
MR. EHRET: I'm sorry I don't have extra copies of this.
MR. PETRIE: That's fine.
BY MR. EHRET:
Q. This is a page from that report, which I excerpted. Do you recognize that page? I mean, look -- take your time and read it over.
A. Yes. I recognize this.
Q. And it mentions a workshop, does it not?
A. (Indicating.)
Q. And what is the date of that workshop?
A. Where do you -- in what paragraph do you see the workshop?
MR. PETRIE: (Indicating.)
BY THE WITNESS:
A. That's right, yes.
BY MR. EHRET:
Q. Is there a date for the workshop?
A. March 17th, 1992.
Q. You were in attendance at that workshop, weren't you?





PA 51

Page 157

Q. That was your word, "nuts"?
A. Yes. I would not do it.
Q. Like the Battle of the Bulge.
A. Um-hmm.
Q. "Results of these studies" -- I'm reading on now.
A. Um-hmm.
Q. "Results of these studies show that the offshore sand and beach sand that provide protection for the underlying glacial till and for the bluffs along the margin of the lake are thin to nonexistent." I hand that back to you.
A. Um-hmm.
Q. Did I read that correctly?
A. Where did you read from?
Q. The underlined portion.
A. Okay.
That's right. You read it correctly.
Q. Do you agree with that?
A. Not all of it.
Q. But that would indicate that the differences in stratigraphy were sort of -- what is it that -- what difference does it make? That's what Justice Sandra Day O'Connor would say.

Page 158

What difference does the difference in stratigraphy mean -- make when you look at that language?
A. I don't understand your question.
Q. Well, if the sand that covers the glacial till is thin to nonexistent, what difference does it make if there's some interruptions in the continuity of glacial till?
A. I still don't quite understand what you're asking me.
Q. Well, let's look -- let's put that question aside. As you -- as you follow along the shore to the darkest -- through the darkest groups of contour lines --
A. Um-hmm.
Q. -- there are several holes there, aren't there? Some big ones and some little ones. Correct?
A. Yes, there are large residuals.
Q. And so would you expect, that in the period of time between 1991 when this survey was taken, and the present, which is 15 years, that those holes would elongate and join each other and expand?

Page 159

A. I couldn't tell you that.
Q. You couldn't.
A. I -- I would have no basis to make that judgment.
Q. Would you expect that they would get better? The holes would get smaller?
A. I couldn't make that judgment, sir.
Q. What would you want in the way of data to make that judgment?
A. I don't think at this time I could come up with a predictive methodology to know what would happen myself.
Q. But I asked for data. If I were to give you --
A. Um-hmm.
Q. -- a million dollars to go out and collect data, what would you --
A. That's what I meant. All you could do is monitor these over time. That's the only recourse that I could offer at this time. If I was given some time, I might think of some other ways, but the -- at this point, I would take a very basic approach, and I don't think I could predict what's going to happen to those holes. And I don't know

Page 160

quite how I could predict in the future what methodology I would use.
Q. Have you ever heard the term "downcutting"?
A. Yes, I know what downcutting is, based on conversa- -- using the definition that Dr. Chrzastowski introduced on Tuesday.
Q. And do you consider, from what you know of downcutting, that it is erosion?
A. I think in a general sense, that would be true, yes. Downcutting -- the word "downcutting" is erosion.
Q. And why do you come to that conclusion?
A. It's a general term when we refer to fluvial activity, river activity. When a river down cuts, it erodes. I'm not sure if it's applicable to a lake system, but that's how I would interpret the term.
Q. Do you consider littoral drift to be erosion?
A. No.
Q. You do not?
A. No.
Q. What do you consider littoral drift to





PA 52

Page 161

be?
A. It means transport.
Q. Okay. But if the transported material would be sand -- strike the word "if."
The transported material would be sand in the context of the term "littoral drift," would it not?
A. It could be sand. It could be gravel. It depends on the wave energy.
Q. On page 32 of your report -- let's -- may I have all three of those? And can we mark those as exhibits? We'll mark them as one exhibit, and it will be three pages, Exhibit No. 3.
(WHEREUPON, a certain document was marked Larson Deposition Exhibit No. 3, for identification, as of 7/14/06.)
BY MR. EHRET:
Q. Now, the caption at the bottom of that page purports to indicate that this collage of pictures is from Larson and Schaetzl.
A. Schaetzl.
Q. 2001. And looking at your bibliography -- excuse me -- on page 40, I see

Page 162

"Larson and Schaetzl, 2001, "Review: Origin and Evolution of the Great Lakes, Journal of Great Lakes Research, Volume 27, pages 518 to 546."
When I looked for this chart or this collage, in that article, I noticed that there was another -- there was an H picture. And H appears to be G.
A. May I see?
Q. Perhaps I can help you.
A. May I see the document?
Q. You may.
A. Yes.
Q. What's missing there?
A. No. G in the publication of mine and Schaetzl's shown in Figure 8 is from 10,000 years ago. Figure G on my report, page 32, represents lake level 5,000 years ago. The reason the G of my publication with Schaetzl was omitted was because lake level is way below modern day lake level and wouldn't pertain to any erosion going on along the lakeshore.
Q. Okay. Using that same article and referring to page 528, what are all those lines around the outer perimeter of Lake Michigan?

Page 163

A. I am looking at Figure 7, the article that I coauthored with Schaetzl in, I believe, 2001, and I'm looking at Lake Michigan, and there's some lines going around, little squiggly lines. There's actually several sets of them, some of which have a little G next to them. And that refers to the Glenwood stage of glacial Lake Chicago. That is how large the lake was, according to Karrow, 1984.
Q. And "G" means Glenwood.
A. Glenwood.
Q. Is that correct?
A. Glenwood.
Q. And if I refer to page -- or Exhibit -- Larson Exhibit No. 2, which is the Chrzastowski-Thompson chart, would that be Glenwood I or Glenwood II?
A. This doesn't differentiate which Glenwood it is, but that's superfluous, because they have the same elevation.
Q. Okay. What -- what year would that be, approximately, looking at Thompson-Chrzastowski's chart?
A. According to this, we're looking at Glenwood I occurring approximately 14,000 years ago,

Page 164

and Glenwood II occurring about 12,500 years ago.
Q. So during that period of time from those dates that you've just mentioned to the present, the border of the lake has been shrinking. Is that correct?
A. That is correct.
Q. You wouldn't call that erosion, would you?
A. No.
Q. Would you call it accretion?
A. No.
Q. But the lake level is going down.
A. It has gone down in general since that time, yes.
Q. Thank you. On page -- I'll read this to you, and then I'll hand it to you.
A. Um-hmm.
Q. Page 533 of your article, it says, "These events include, among others, a rapid fall in lake level associated with the end of Lake Nipissing, a significant rise in lake levels probably associated with Lake Algoma, and a second significant rise in lake levels centered about 1,700 years ago."
A. Um-hmm.





PA 53

Page 169

St. Clair River Channel caused lake levels to lower, and, eventually, this outlet here was abandoned, south channel -- the channel in Chicago was abandoned, leaving pretty much the kind of drainage that we see today.
Q. And is that still eroding at the St. Clair outlet?
A. My understanding is that it is, by word of mouth. Nobody's published it, but I've heard that it is eroding and it has been eroding since that time.
Q. Well, I've seen a report that was done for the Georgian Bay Association by Dr. Nairn --
A. Um-hmm.
Q. -- in which he says that there is a drop of 2.6 feet --
A. Um-hmm.
Q. -- over and above --
A. Um-hmm.
Q. -- what you would expect to have from natural hydrological -- am I using the right word? -- data.
A. Um-hmm.
Q. You're nodding your head.

Page 170

A. I'm just listening.
Q. Does that mean you hear me --
A. I hear you, yes.
Q. -- or you agree with me?
A. It means your language I understand.
Q. Do you agree?
A. Say that again now? What's the question?
Q. Well, Dr. Nairn's report for the -- for the Georgian Bay Association indicates that he has observed a 2.6 foot drop in excess of what you would expect to have for the hydrological circumstances in the lake basin over -- and I'm looking for the chart now -- over a period from about 1860 to the present.
MR. PETRIE: Read the portion of the report where he apparently has attempted to characterize Dr. Nairn's observations, so --
BY MR. EHRET:
Q. Well, I'll read it to you.
A. In answer, I can't really comment on whether I agree with him or not. I am just privy to your statement. Whether or not it's true or not, I can't assess that.
Q. Whether it's true that he said that or whether --

Page 171

A. No, I believe you quoted it correctly.
Q. Okay.
A. I just don't know if it's right.
Q. Okay. But you have no opinion?
MR. PETRIE: Have you read this to know if, indeed, he's quoted Dr. Nairn correctly?
THE WITNESS: No, I have not read this.
MR. PETRIE: Well, do that first.
BY MR. EHRET:
Q. Well, read that nontechnical part.
MR. PETRIE: Which portion?
BY THE WITNESS:
A. Which portion?
BY MR. EHRET:
Q. Well, the 2.6 feet is highlighted, I think.
A. 2.6 feet.
Q. Read the surrounding ...
A. I'm reading it somewhat out of context. I have to be careful here.
Yes, I've read it. What's your question?
Q. Does my interpretation make sense to you?
A. Yes, what you read is correct, yes.
Q. Okay. But do you agree that -- well,

Page 172

that's a bad question. Let me ask this: Have you had any conversations with Dr. Nairn on this subject?
A. He mentioned to me once over the phone that he believed that the rate of erosion was greater. That's -- that's all.
Q. Greater than --
A. Just --
Q. Or getting greater than the past or --
A. Greater than is estimated right now. That's what -- if I recall it right, the conversation, he said that he -- his estimate, I believe, is that it -- it's eroding faster than predicted.
Q. Are you aware of any efforts by the Corps or any other entity to verify this or disprove it or --
A. No, I do not --
Q. -- or study the matter further?
A. I do not, sir.
Q. You know of nothing.
A. No.
Q. In the section of your paper, which was provided to the Journal of Great Lakes Research in





PA 54

Page 173

2001, it states that "Much of the most serious erosion is occurring along sandy, highly erodible beaches on the eastern coast of Lake Michigan, southern Lake Erie, and Lake Superior. Evidence is mounting, however, that human interference with the hydrologic system has caused it to become imbalanced." Do you remember writing that?
A. Um-hmm. I'm aware -- vaguely remember that. Can I see that?
Q. Oh, certainly. It's highlighted.
A. Whereabouts, if you read --
Q. Down below, this last part.
A. Yes, and you -- you omitted the reference to that.
Q. Oh.
A. There's a reference. That statement is a reference out of a paper.
Q. Reference to Omohundro.
A. That's right.
Q. 1973.
A. Right.
Q. Do you recall what that was about?
A. That's a long time.
Q. On the same page on the left-hand -- on

Page 174

the bottom right-hand corner, would you read that sentence?
A. "The beach -- the beaches are continuously replenished by streams that bring sediment to the lakeshore and by erosion of bluffs and other shorezone sediments, Rukavina and Zeman."
Q. Okay.
A. "1987."
Q. And, frankly, I've got page 537 here, and I think we ought to have your comment about the whole paragraph that starts with, "However."
A. I'm going to read it out loud.
Q. Please.
MR. PETRIE: Would you feel comfortable in understanding the context of the "however" to read the passage in front of it that it's apparently commenting upon and having a "however" response to?
THE WITNESS: Okay. "The sand in the shorezone" --
MR. PETRIE: No, I'm just saying: Do you need to?
THE WITNESS: No.
MR. PETRIE: Okay.

Page 175

BY THE WITNESS:
A. "However, two recent types of human intervention have seriously reduced the supply of sand to the shorezone and facilitated the loss of sand to deeper water: 1, dams on rivers that are tributary to the Great Lakes and, most importantly, jetties and other engineering structures at river mouths." And that is Omohundro, 1973, Shabica and Pranschke, I guess, 1994.
BY MR. EHRET:
Q. That would be our Shabica. Right?
A. That's right.
"The effects of damming tributaries is obvious. Sediment settles out of the relatively still waters of inland reservoirs and is not allowed to be transported to the Great Lakes shores.
"Jetties function differently. They are engineering structures erected at river mouths, resembling two long walls that border both sides of the river and extend from the river banks and mouths -- or mouth, just inland of a harbor to relatively deep waters in the lake proper.
"Jetties affect beach replenishment by diverting sand and other sediments that move along

Page 176

the shore by lake processes into deep water, Bush, et al., 1996. Once there, these sediments can no longer be transported to the beach by waves and are, therefore, permanently lost from the beach system. For this reason, coastal erosion is often most severe near harbor structures, rather than at more open coasts, Folger, et al., 1994, Shabica and Pranschke, I guess, 1994.
"Dredging of river mouths for shipping and boating purposes can facilitate further transport of sand and sediment into deep waters."
Shall I go on to the next paragraph?
Q. Let me see that. Does your description, from what you know of the St. Joseph Harbor --
A. Um-hmm.
Q. You have seen it.
A. Um-hmm.
Q. Does the configuration of the St. Joe Harbor conflict with the description of --
A. No.
Q. It does not?
A. No.
Q. So they would be very similar to what's described here in that paragraph.

A. That's correct.
Q. Yes, I'd like you to read the next paragraph, if you would.
A. "Once the main source of sand to the beach system, river mouths, and harbors have now become" -- there's a word missing. "Once the main source of sand to the beach system, river mouths, and harbors have now become sites of beach impoverishment" -- excuse me.
Q. That's impoverishment?
A. "Impoverishment. Thus shoreline erosion or retrogression, a natural process, has been much more dominant than has shoreline progradation." That's Powers, 1958, "and should be considered when development along the always variable Great Lakes shoreline is contemplated" -- or when development along the always variable Great Lakes shoreline is contemplated," yes.
Q. Did you write that or did your partner write it or did you both write it?
A. My partner did most of the shoreline work in terms of beyond the geology section.
MR. EHRET: So -- would there be any objection to incorporating this entire article as an exhibit?



MR. PETRIE: Deposition exhibit? Of course not.
MR. EHRET: I never know what you're going to say.
(WHEREUPON, a certain document was marked Larson Deposition Exhibit No. 4, for identification, as of 7/14/06.)
MR. EHRET: I wonder if we need the bibliography. Do you think we should put that in? It's a lot of pages.
MR. PETRIE: It's up to you what you want to include as an exhibit.
MR. EHRET: I'd just as soon leave it out. I'll put the first page in.
BY MR. EHRET:
Q. So would you concede or agree with me that, at least since that article was written and the piers were built along the shores of Lake Michigan, that they have affected this so-called 16,000-year period of naturally eroding shore?
A. Can you give me some idea of the territory that you're talking about?
Q. Well, let's just talk about in the throes



of this case here from St. Joe south to Michigan City.
A. Okay. Can you put that -- put that in your question?
Q. Would you like me to -- I'll restate the question.
A. Okay.
Q. Do you think that, for the purposes of your statement that the Plaintiffs' properties have been eroding naturally for 16,000 years, that the phenomena described by you and --
MR. MARROCCO: I don't know what happened, but I can't hear anymore.
MR. EHRET: Okay.
MR. MARROCCO: Thanks.
BY MR. EHRET:
Q. -- that the phenomena described by you and Randall Schaetzl is a deviation from that pattern?
A. Deviation --
Q. From the pattern of erosion for 16,000 years. I'll restate it again.
A. Okay.
Q. Let's go back and set a period of



record --
A. Um-hmm.
Q. -- at 1830 to the present.
A. Right.
Q. Is the erosion that we are presently experiencing the same natural phenomenon that has been occurring for 16,000 years, or has it been affected by human structures as described in that article?
A. For some segment of the shoreline, the rate of natural erosion has been accelerated because of that structure.
Q. Have you decided what segment?
A. No.
Q. No. Have you investigated the volume of sand that's being blocked by the damming of the river and the interruption of the littoral drift?
A. No.
Q. It is possible, then, that the volume is so great that it dominates the erosion. Is it not?
A. Could you repeat the question?
Q. It is possible that there's enough volume of blockage, both in the dams and in the littoral drift category, that the erosion is being caused by





PA 56

Page 181

the absence of sand.
A. For some segment of beach, yes.
Q. Now, you were in attendance at this meeting at --
A. Kalamazoo.
Q. -- Kalamazoo at Western Michigan University. 42 people attended.
A. Um-hmm.
Q. And I'll read again this line. "Results of these studies show that the offshore sand and beach sand that provide protection for the underlying glacial till and for the bluffs along the margin of the lake are thin to nonexistent."
So those sands that we need to protect the glacial till are not there because of the piers. Isn't that correct?
A. That's what that document is stating.
Q. And that's what you stated in your article.
A. I didn't state it. I quoted somebody else's article.
Q. So when you quote, that does not mean you endorse.
A. That's right.

Page 182

Q. I need help.
A. Okay.
Q. Is there any -- any receptacle on the table that's filled with liquid? Let's move this --
MR. PETRIE: That's mine.
MR. EHRET: These are empty. Let's not spill that.
BY MR. EHRET:
Q. Now, will you unroll that for me and hold it?
A. Um-hmm.
Q. Now, have you seen this drawing before?
A. I have not seen this drawing, no.
Q. Do you recognize it?
A. I recognize it, yes.
Q. Do you know what it is?
A. It's the shoreline both to the north and south of St. Joseph.
Q. And it's dated --
A. It's dated 1871.
Q. It's dated 1871, and it's apparently been prepared by the United States Army Corps of Engineers. Correct?
A. That's correct.

Page 183

Q. Major Comstock.
A. That's correct.
Q. Survey by Custer, 1871. Now, if you look along the shore, it appears to me that they have done bathymetry readings all the way out to a depth of around 30 feet, if you would inspect that and verify that that's correct.
A. That looks to be correct, yes.
Q. And let's just -- we have a scale here somewhere.
MR. PETRIE: (Indicating.)
BY MR. EHRET:
Q. There's a scale of 1 to 20,000. So if we -- would you help me measure this, Doctor? Oh, I'm on the wrong end of the tape. Would you say that that's about two inches?
A. Correct.
Q. And so that would be -- if we use the scale, I'm going to provide the computations, two times 20,000 equals 40,000. No problem. Right?
A. Um-hmm.
Q. And we divide that by 12, and we have 3,333 feet. Do you have any problem with that or would you like to run the calculation yourself?

Page 184

A. No. Wait a second. I think you're correct this would be a section or sections bounded by one mile. That would be about a mile, which is 5,280, and you're about two-thirds of a mile.
Q. Do you see the word "sand" there (indicating)?
A. Um-hmm.
Q. And there (indicating)?
A. Um-hmm.
Q. And there (indicating)?
A. Um-hmm.
Q. And there and there (indicating)?
A. Um-hmm.
Q. And all the way up and down. I don't see clay anywhere, do you?
A. No.
Q. So would that lead you to believe that we have sand from the shore out to a distance of over 3,000 feet, pretty much along the whole shoreline?
A. I would want to know what the sampling level was, whether they did just bathymetry, as well as sampling of the lake bottom at every one of these points, or whether this was just an isolated measurement there, an isolated measurement there





PA 57

(indicating). From the map, I can't tell.
Q. Well, you see contour lines, though, on the map.
A. I understand that. But sand means that they physically went down there and collected a sample in order to know whether or not it is sand. And I don't know that they took a sample at each one of these observation points.
Q. Okay. Would you hold the end of that tape for me and set it right on the edge of the shoreline?
A. Beginning where?
Q. At the far end of the paper.
A. Okay. Right there (indicating).
Q. So that's -- we've got a 26-inch distance there, which is almost a straight line, would you say?
A. Um-hmm.
Q. So assuming that there are stratigraphy variations along that shore --
A. Um-hmm.
Q. -- isn't it strange that the shoreline should be so straight?
A. No.



Q. Why?
A. Because the actual stratigraphy in itself doesn't override the -- in this instance, the forces that are effecting erosion. Where the stratigraphy starts to become more dominant is up here where the clay gets thicker. That's why you have a 15-degree turn when you were asking about the straightness of the shore.
We have to also include what we see north of St. Joe. And in that point, you start to see a very distinct turn in the aspect of the shoreline, and that is predominantly due to the thickening of the clay that occurs in this region.
Q. Would you say that the presence of sand would inhibit the erosion of the shore?
A. I think -- I'm going to add to your question in my answer. I think the presence of sand along the beach would prohibit erosion of the shore, not just the presence of sand.
Q. Okay. And wouldn't it be probable, that with all the sand out to 3,000 feet, that the waves would wash it up and form the beaches?
A. If you assume that sand is occurring continuously out to 3,000 feet, you would be



correct.
Q. Even if it weren't all the way out to 3,000 feet, that would be a boon, wouldn't it, to have 3,000 feet of sand?
A. Again, assuming that it occurs or assuming that it occurs for whatever distance you have described.
Q. So your problem is that you're having trouble making the assumption that the word "sand" means there's sand -- that there's -- the word "sand" is used about 12 times over that entire length of shoreline, and you're -- you're assuming that there's a difference between the word "sand" in one place and the word "sand" in another place?
MR. PETRIE: Objection; it mischaracterizes his testimony.
BY THE WITNESS:
A. My objection is that each one of these numbers, which would -- there are many, many numbers here, all in a crossing pattern and in a parallel pattern, representing measurements of depth. I have no indication to believe that there's a -- that it also represents the occurrence of sand.



BY MR. EHRET:
Q. In those days, they didn't have sonar, did they?
A. No, sir.
Q. So somebody -- do you think somebody was out there with a rowboat --
A. I don't know how --
Q. -- and a stick?
A. I don't know how they did this.
Q. But they did do it somehow?
A. They probably used what is called a lead line.
Q. I can't hear you.
A. A lead line. A lead line is a nautical instrument that is used to measure the depth of water. It's basically a lead on the end of a rope that's knotted. And my suspicion is that's what they used.
Q. And the knots are a foot apart or --
A. A foot apart. Or in this case, it would be -- let's see if they use fathoms -- I can't tell you what they used. Yeah, fathoms.
MR. EHRET: Let's go off the record here.





PA 58

Page 189

(WHEREUPON, discussion was had off the record.)
MR. EHRET: Let's go back on the record.
BY MR. EHRET:
Q. And we have described this previously, but I want to give the official description of this drawing. It is East Shore of Lake Michigan, by Henry Custer, 1871, National Archives No. I-502, seven pages.
MR. PETRIE: John, I note on this particular -- the full scale -- full sized rather, sheet, it says I-502, which is, I guess, what you had just read into the record.
MR. EHRET: I think I read I-502, right.
MR. PETRIE: It says, "In two sheets," and that this is sheet No. 1.
MR. EHRET: Yes.
MR. PETRIE: So I just wanted to mention that, so that the record understands that I-502 includes another sheet beyond that portion that you are attaching to the record.
MR. EHRET: If anyone would like -- let's go off the record.

Page 190

(WHEREUPON, discussion was had off the record.)
(WHEREUPON, a certain document was marked Larson Deposition Exhibit No. 5, for identification, as of 7/14/06.)
BY MR. EHRET:
Q. Doctor, one of the blanks in information that I have noticed throughout this case is people say something happens, but they don't say how fast, like littoral transport, and they talk about X cubic yards a year at average. But that can happen all at once, can't it, in one storm?
A. It doesn't happen constantly. Very few things geologically occur at the same rate. A lot of things happen very rapidly during a short interval of time. It's often referred to as extreme events.
Q. I'm looking at an International Association of Great Lakes Conference paper from 1970, "Profile of a Storm on the Southeastern Shore of Lake Michigan." And on -- on page 237 of this article, it talks about longshore current velocity. And it's in excess of three feet per second. But

Page 191

then it reversed and went -- that was in one direction.
A. Um-hmm.
Q. Then it went around to another direction, the opposite direction.
A. Um-hmm.
Q. Do you find that to be abnormal?
A. No. I'm -- I'm not qualified to state that, but in my opinion, I -- I could see that happening.
Q. What amazes me, though, is that a lot of these storms last for several days.
A. (Indicating.)
Q. 80 hours is a common period of time. Just taking my calculator and multiplying one hour, which is 60 minutes, times 60 seconds, equals 3600 seconds, and at three feet per second, that's almost 10,000 feet --
A. Um-hmm.
Q. -- in one hour.
A. Um-hmm.
Q. And it's going for eight hours -- 80 hours. That's like 60 -- that's 160 miles. Does that make any sense to you?

Page 192

MR. PETRIE: Again, I -- the doctor has noted his belief that he's not qualified to answer this line of questions.
BY MR. EHRET:
Q. I'm wondering. Do you know anybody who is? Have you ever seen that sort of thing in a -- a model, a computer model?
A. No. But I imagine if you look at Hurricane Katrina, you might have had conditions like that along the Gulf Shore.
BY MR. EHRET:
Q. We have them here. That's what -- those numbers I'm taking out of Mr. Selegean's storm charts.
A. May I look at that?
Q. Oh, you certainly may. And if you want, I'll run a copy for you.
A. I know Davis. Well, knew of him.
Q. Williams College, that's where Longstreth is from.
A. Um-hmm.
MR. EHRET: Off the record.
(WHEREUPON, discussion was had off the record.)





PA59

of the specific area, say the ten-mile stretch south of St. Joseph Harbor that we've been focusing on?
A. If you turn to Figure 9 --
Q. Yep.
A. -- Cross Section B --
Q. Okay.
A. -- you see where it states, Grand -- where it states "Grand Mere Lakes" --
Q. Um-hmm.
A. -- there are some red dashed lines extending out into Lake Michigan.
Q. Okay.
A. Those are extrapolations of former beaches and spits that are in a previous publication, and I've used that extrapolation just to come up with a very general estimate.
Q. Okay. And how did you come up with that general estimate?
A. Same process as before. I took -- I could have extrapolated those beaches even further, but I was very conservative, just extrapolated them a little way, and then used the distance from those beaches or spits, as the case may be, to the modern shoreline --



Q. Okay.
A. -- and then looked at the time reference. In this case, I think it was -- let's see -- 4,500 years, which is the age of those beaches, according to a publication by Tague.
Q. And would the same qualifications that you mentioned relating to 7,000 years also apply to 4,500 years; namely, that these are -- because of the nature of the estimate you're doing there, these are very rough estimates?
A. The -- there is a similarity in that case. There's a dissimilarity in that the lake level stood continuously for that interval of time at about that elevation, slightly higher than today.
Q. Okay. But would you still say that an estimate based on 4,500 years, by its very nature, is going to be a rough estimate?
A. That is correct.
Q. Okay. And the same issue would apply with taking a snapshot of any particular segment of time within those 4,500 years. You can't automatically apply the .58 number and assume that that number is valid for any particular, say, hundred-year period you pluck out of those 4,500



years. Is that correct?
A. That is correct.
Q. And, similarly, based on your analysis, you don't know one way or the other whether or not that .58 number is applicable to the last hundred years. Is that correct?
A. That is correct.
MR. MARROCCO: That's all the questions I have.
THE WITNESS: Thank you.
MR. MARROCCO: Thank you very much, Dr. Larson. I appreciate your time.
MR. EHRET: I have some follow-up, Drew.
MR. MARROCCO: Sir?
MR. EHRET: I have a follow-up question, and I'm asking it now.

FURTHER EXAMINATION

BY MR. EHRET:
Q. You've been to the Grand Marais Embayment.
A. That's right.
Q. And you've walked up the dune and down the other side.
A. I've walked -- traversed only the property or the pier -- pier lane towards the beach.



I haven't traversed any private property.
Q. Right. Just -- right. But just in a general sense --
A. Um-hmm.
Q. We can verify this from plat maps -- but 5 or 600 feet width is the width of those spits? It doesn't get to a thousand.
A. No.
Q. The spit.
A. Spit or beach, yeah.
Q. So if we're eroding at .58 feet per year --
A. Um-hmm.
Q. -- times 4,500 years, that would be 6,010 feet. Those spits would be done away with, wouldn't they?
A. The eroding is the extrapolation of those spits out into Lake Michigan. Okay? We're not talking about the spits that currently occur within the embayment.
Q. Okay.
A. Okay.
Q. So, then, from the standpoint of the property of the individual plaintiffs, we're not





PA 60

talking about erosion to their property.
A. No, no.
Q. Thank you.
MR. PETRIE: I have a couple.
BY MR. EHRET:
Q. Now --
MR. PETRIE: I'm sorry. Go ahead.
BY MR. EHRET:
Q. Now, Mr. Buckler's name came up again, and I just happen to have an exhibit, which I sort of like, because I know one of the things Mr. Buckler did -- if you don't mind a little rhetoric --
A. Um-hmm.
Q. -- was he interviewed the people, the people who owned the property. And he talked to Mr. William J. Gibbs, and he repeats what he said. And I'm going to read it, because I like it so much, and then ask you if this is the Buckler that you remember.
"William J. Gibbs of Shoreham writes, Being familiar as a boy in 1916, with the beach and bluff along Lake Michigan from the harbor at St. Joseph south to the end of the Grand Mere area,



ten to 12 miles, and having seen the lush growth and high trees on top of and on the bluff slope and the several old wagon trails down the bluff to the beach, these trails lined with 75- to 100-foot white pines, I am convinced there had been no serious erosion of the bluff in this area for many years prior to 1916 and as far back as 1872."
There's a lot more interesting information there which you may like to read, but I'd like to enter those three pages in the record as an exhibit.
A. Yes, this is a dissertation on file at Michigan State University by Roland Buckler.
Q. And so you recognize that.
A. Yes.
MR. EHRET: And you -- it's quite long. These are only three pages. So we'll mark that, please.
I have no further questions.
(WHEREUPON, a certain document was marked Larson Deposition Exhibit No. 7, for identification, as of 7/14/06.)



EXAMINATION
BY MR. PETRIE:
Q. I have a few questions for you, Dr. Larson, if you'd take a look at page 33 of your report, your first report, and I'd call your attention to what appears to be the second chart figure on that page, and it reads as a label, "Lakelevel History of Lake Michigan, (5,000 years ago to Present).
Would you take a look at about 3,000 years along that bottom line axis? And do you have any observations about whether or not the lake level has remained generally constant or level during the last 3,000 years?
A. The lake level appears to have stabilized, but has fluctuated on the order of less than two meters over the last 3,000 years.
Q. Regarding your calculations of the erosion rates, which included the processes that you described --
A. Um-hmm.
Q. -- in response to the questions by Mr. Marrocco, did you calculate those rates with an eye towards whether or not the calculations would



yield higher or lower figures?
A. Could you repeat that?
Q. Sure. In other words, did you have any kind of preconceived notion of trying to generate higher or lower numbers?
A. No, sir.
Q. The imprecision in the process for calculating erosion rates over thousands of years, does that affect your opinion that you have given in your report that the shoreline is a naturally eroding shoreline?
A. No, it doesn't -- it hasn't altered my opinion that it's naturally eroding.
MR. PETRIE: No other questions.
MR. EHRET: I believe that is the end of the deposition, unless you have something, Drew.
MR. MARROCCO: I do not. Thank you.
MR. EHRET: All right. Then the deposition is closed.
AND FURTHER DEPONENT SAITH NOT





PA 61

Page 205

talking about erosion to their property.
A. No, no.
Q. Thank you.
MR. PETRIE: I have a couple.
BY MR. EHRET:
Q. Now --
MR. PETRIE: I'm sorry. Go ahead.
BY MR. EHRET:
Q. Now, Mr. Buckler's name came up again, and I just happen to have an exhibit, which I sort of like, because I know one of the things Mr. Buckler did -- if you don't mind a little rhetoric --
A. Um-hmm.
Q. -- was he interviewed the people, the people who owned the property. And he talked to Mr. William J. Gibbs, and he repeats what he said. And I'm going to read it, because I like it so much, and then ask you if this is the Buckler that you remember.
"William J. Gibbs of Shoreham writes, Being familiar as a boy in 1916, with the beach and bluff along Lake Michigan from the harbor at St. Joseph south to the end of the Grand Mere area,

Page 206

ten to 12 miles, and having seen the lush growth and high trees on top of and on the bluff slope and the several old wagon trails down the bluff to the beach, these trails lined with 75- to 100-foot white pines, I am convinced there had been no serious erosion of the bluff in this area for many years prior to 1916 and as far back as 1872."
There's a lot more interesting information there which you may like to read, but I'd like to enter those three pages in the record as an exhibit.
A. Yes, this is a dissertation on file at Michigan State University by Roland Buckler.
Q. And so you recognize that.
A. Yes.
MR. EHRET: And you -- it's quite long. These are only three pages. So we'll mark that, please.
I have no further questions.
(WHEREUPON, a certain document was marked Larson Deposition Exhibit No. 7, for identification, as of 7/14/06.)

Page 207

EXAMINATION
BY MR. PETRIE:
Q. I have a few questions for you, Dr. Larson, if you'd take a look at page 33 of your report, your first report, and I'd call your attention to what appears to be the second chart figure on that page, and it reads as a label, "Lakelevel History of Lake Michigan, (5,000 years ago to Present).
Would you take a look at about 3,000 years along that bottom line axis? And do you have any observations about whether or not the lake level has remained generally constant or level during the last 3,000 years?
A. The lake level appears to have stabilized, but has fluctuated on the order of less than two meters over the last 3,000 years.
Q. Regarding your calculations of the erosion rates, which included the processes that you described --
A. Um-hmm.
Q. -- in response to the questions by Mr. Marrocco, did you calculate those rates with an eye towards whether or not the calculations would

Page 208

yield higher or lower figures?
A. Could you repeat that?
Q. Sure. In other words, did you have any kind of preconceived notion of trying to generate higher or lower numbers?
A. No, sir.
Q. The imprecision in the process for calculating erosion rates over thousands of years, does that affect your opinion that you have given in your report that the shoreline is a naturally eroding shoreline?
A. No, it doesn't -- it hasn't altered my opinion that it's naturally eroding.
MR. PETRIE: No other questions.
MR. EHRET: I believe that is the end of the deposition, unless you have something, Drew.
MR. MARROCCO: I do not. Thank you.
MR. EHRET: All right. Then the deposition is closed.
AND FURTHER DEPONENT SAITH NOT





PA 61.1


SURVEY OF N. & N.W. LAKES
Major C. B. Comstock Corps of Eng'rs Brv't Brig. Gen'l U.S.A.
EAST SHORE
OF
LAKE MICHIGAN
From S^t Joseph to a point south of Grand Marais
Assisted By
Scale of Metres

PA 62




Figure 11. Detail of the St. Joseph-Shoreham area from the previous map (fig. 8). Difference in depth between NOAA 1945-46 and 1991 surveys. Warm colors show erosion; as much as 4 vertical meters of lake bed have been removed by erosion south of St. Joseph.

PA 44