IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JOHN H. and MARY E. BANKS, et al.,

Plaintiffs,

vs. Civil Action

No. 99-4451 L

Emily C. Hewitt

UNITED STATES OF AMERICA,

Defendant,

and

ERROL L. & SUSAN H. STONE,

as Trustees of the Susan H. Stone Trust,

Plaintiffs,

vs. Civil Action

No. 04-277L (Consolidated)

UNITED STATES OF AMERICA,

Defendant.

/

PAGE 1 TO 94

The Deposition of GAIL L. CHAPMAN,

Taken at 100 Main Street,

St. Joseph, Michigan,

Commencing at 3:08 p.m.,

Thursday, March 16, 2006,

Before Lori S. Johns, CSR 1097

Condensed Copy



EXHIBIT 4

Would that help?
THE WITNESS: No. I don't think there's anything on there, I don't see anything on there.
MR. EHRET: Do you think there could be a date on the back?
THE WITNESS: Nope. I sure learned my lesson to date pictures. Well, here's Karen again, and what's this one say, '69, that says '69. Here we are sitting in front of the wall, that's '69, too. I've even forgotten the question.
BY MR. PETRIE:
Q. I'm trying, we're trying to locate some kind of a picture --
A. Oh. The high water mark.
Q. -- that would be taken somewhere in the vicinity of when you bought the property that, from the content of the picture, it would allow you to apply that definition of ordinary high water mark.
A. Well, you know, the only pictures I have are the pictures that were taken from the lot side. And God help me, I didn't take a picture over the dunes.
Q. What were you thinking, realizing that --
A. Yeah. Here, lookit. Well, this is one.



They were putting the foundation of our house is back here, you can see some vegetation, ta-ta-ta. This is the first road that, roadway the bulldozer first going into building our house in '67. You can see how wooded that part of the property was.
Q. Yes. From the lot side, yes.
A. Yes. And here's some, some, this would be on our neighbor's property, there's vegetation growing there. You know, the stuff that grows on the foredune is beach grass.
Q. Yes, ma'am.
A. And cottonwood trees. We have a giant cottonwood tree down there now that has since grown up that we didn't plant.
Well, this, well, here's some vegetation on the side, see, but we planted dunes grass on all of this.
Q. Okay.
A. Here you can see another, well, see, you can see what this dune looked like, it was dunes grass on it. That's the vegetation that was on there.
Q. Yes, ma'am.
A. Or some cottonwoods, but they're all along the beach.
Q. What year was that picture taken, if you



can tell?
A. This was February -- oh, I have a date on it. February, does it say '69? Can I steal --
Q. Some two, three years after you bought the property?
A. Well, this is '70, but you can see there was vegetation on both sides.
Q. Certainly. Absolutely.
A. Boy.
Q. And I appreciate your efforts to look through here, and I don't want to suggest you stop if you think you might come across something that would help you define that ordinary high water mark contemporaneous.
A. Well, it's kind of an iffy term but who tells you your high water mark when you buy property.
Q. I can appreciate the difficulty in what you're now attempting to do. Okay.
A. It's a moot point. I don't know how to answer that.
Q. Fair enough.
A. Let's see. Here's some people, here's the property next to us. You can see what's on the hillside there.
Q. Yes, ma'am.



A. You're going to get natural grasses, anything that grows in the dunes, you're going to have cottonwood trees.
Q. Let me change gears yet again, if I may. But I don't want to stop you if you'd like to continue to look at those photos.
A. No. Go ahead.
Q. My question goes to what kind of efforts, if any, are you aware of over the years where the Corps has undertaken efforts to address the erosion that's been, that the properties, the shoreline has experienced there south of the St. Joe harbor down through where you live?
A. Seems to me one year they put in something artificial? Was it rocks, in south St. Joe? I don't think that was very effective. I think they moved. Because people were wondering what can you put in the water. Can you put in this artificial grass that Frank Lahr, I think, put in? People were concerned. Land was disappearing, backyards were disappearing, people were losing property, people were moving houses. Why didn't we have the beach that we used to have. Michigan is a resort area, people come here for our beaches. Where are our beaches.
Q. Any other efforts by the Corps that you

remember that they undertook to address erosion being experienced by the shores?
A. You know what, I don't think very much of the Corps, because it seems like what they do is just protect government interests. They don't care about individual property owners. They, the Corps, in quotes, I think they seem to think that the most important thing in the area is the navigation of big boats coming in and out of the piers, and the rest of the people be damned. If it's going to hurt your property, they don't even consider it.
Is there ever a Corps report that tells you what the side effects are going to happen? What about in Louisiana about these levees that are not properly constructed and it's flooded the whole place. The Corps really made a mistake there.
Q. Without --
A. I think so.
Q. Without wanting to either quibble or take exception with your perception, 'cause I respect the opinion you hold, even if I might not see it the same way, do I take your answer to mean that you're not aware of any other efforts by the Corps?
A. To stop erosion?
Q. To address erosion there, yeah. Stop



erosion or to address it in some manner.
A. The only thing I can think of is I think they dropped, put some large boulders or rocks or something in south St. Joe at one time. And I wondered if that, I'm trying to remember where that would have been. If it would have been just south of town where the Mansion Grille is now. I'm not sure. But I don't think it was very effective. I think they were trying to stop -- I don't know what they were trying to do.
Q. Okay.
A. It didn't work, though, I don't think, because we continued to have erosion. 'Cause we don't have any sand, we don't have any sand flowing along the shores. We've got structures that are out there.
Q. Do you recall approximately when the Corps placed those rocks there in the location that you've described?
A. No, I couldn't. I'd have to go back into the newspapers and check and do something. I don't have any date to recall that, but I know that was one of their projects.
Q. When they undertook the placement of those rocks, did the thought cross your mind that as a result of that effort it might in some manner benefit



your property?
A. No. I think people were just wondering what would happen, not in relationship to your own property. And that was quite a few years ago, as I recall.
Q. Yes, ma'am. You and your husband at some point in time decided to bring the lawsuit?
A. Uh-huh.
Q. That we're now asking you questions about, correct?
Would it be fair for me to understand that you and your husband spent some time thinking about whether or not to even bring the lawsuit?
A. Well, we were wondering what we could do to protect our property, and other people were doing the same thing. You know, we have quite an expenditure here.
Q. I noted that when you listed the cost.
A. And it stopped us from completing our house for a long time, because every summer, or every other summer, we were doing something on the front of the property.
Q. Yes, ma'am.
A. On the lakeside.



Q. So, I'm not sure I heard your response to my question, which was: Did you and your husband spend some time thinking about whether or not to bring the lawsuit before you actually did?
A. No. I thought, I think when we heard about it and we were advised that other people were going to enter into it, we decided that would be something that we would undertake, too.
Q. The idea of bringing a lawsuit, had it occurred to you before you heard about other people filing the lawsuit?
A. Well, not really. We were just terribly concerned about what was happening in front of us and where would we get the money each summer to do that. Because, as you know, looking back at our, our total output on this thing, we've got more in that seawall and all the things that we've done over the years than most people have in a home. And we had, we had children to put through college.
Q. I'm doing that now myself, so I can understand what that's like.
A. And we had to go to the bank, and we're still young then. I'll be 69 now, and I've spent so much time climbing over these walls and going down ladders to get into the water. We have, if you could