IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JOHN H. and MARY E. BANKS, et al.,

Plaintiffs,

vs. No. 99-4451 L

THE UNITED STATES OF AMERICA, Judge Emily C. Hewitt

Defendant.

_______________________________________/

STONE, ERROL L. & SUSAN H.,

In their own right and as Trustees of

The Susan H. Stone Trust and the

Errol L. Stone Trust,

Plaintiffs, No. 04-277 L

vs. Judge Emily C. Hewitt

THE UNITED STATES OF AMERICA,

Defendant.

_______________________________________/

EUGENE J. FRETT, individually and

as trustee of the Victor J. Horvath

and Frances B. Horvath Trust, and

DONNA P. FRETT,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

_______________________________________/

Condensed Copy

42

Q. South of you?
A. South of my home.
Q. Do I understand you correctly to think that because the Cook Nuclear Plant installed some form of shore protection that it was their view that the influence of the jetties at St. Joseph Harbor extended that far down?
A. No. I don't know what their views were. The concern was protecting their investment and they actually had to dig in a place once where the ships to come in and unload the heavy equipment and they replaced that. No, I don't know.
Q. Let me go back to the question I was trying to understand your answer to, which is you mentioned that there are some people who have the view that --
A. Have what?
Q. Have the view or the understanding that the influence of the jetties at St. Joseph Harbor extend as far down south in the area where you live, and I was asking you about those views, okay? And in response to my question the first time you mentioned the Cook Nuclear plant. Putting that aside --
A. That's a different subject.
Q. Putting that aside, what other views do people have in that respect about the influence of the

43

jetties at St. Joe Harbor extending that far south?
A. I really -- I really don't know. I think anyone who lives along the lake is aware that things were different when the seal was put up on the pier, but you didn't see the effect right away. I believe I believe someone could have swum across the river back in those days swimming under the piers.
Q. When is those days?
A. Before the piers were encased in steel or cement. I don't know that. You know that better than I do.
Q. Okay. Let me explore that for a second. Have you ever been in a position to have observed whether or not the piers, the jetties are impermeable yourself or not?
A. To this extent of an aerial view showing the sand build-up on the north of the pier far in excess of what it was before, that and on the south the Army has done various things. They've taken sand and dredged the river, put that sand on Silver Beach, which is south of the pier. They've done different things with trying to replace the sand that's lost immediately south of the pier. All I can tell you.
Q. So I take it -- what I was trying to figure out was the basis for your belief, your apparent belief

44

that the jetties at some point in time were not impermeable.
A. Yes.
Q. And what is the basis for your thinking that the jetties were not impermeable at some point in time?
A. The fact that as those steel encasements, encasements of the pier developed, sand piled up on the north side of the pier so it wasn't getting through. In other words it was not permeable to move water from the piers to the piers to the south of the pier.
Q. Do you know for a fact that they were impermeable before?
A. Only to the extent I can tell you that the shoreline reflected the sand coming through the river from the north to the south. And that stopped when -- the pier encasement was done over a period of several years so you weren't all of a sudden one day hey, we don't have any beach and the next day, you know -- I can't. I am convinced that the structure of the piers has affected the littoral drift. I don't think there's much argument on that to the extent where the argument is. The Corps has done numerous studies on this I'm sure.
Q. Do you know the dates in which the Corps encased the jetties?

45

A. I'd just be guessing. The period of time they did certain number of feet one time. You can get that number from the Corps better than I can give it to you.
Q. And I know, and I'm asking what your recollection is?
A. I just remember the sand on the north side of the pier didn't build up right away. It build up before they finished the job. In other words, the early pier work as I recall was done closer to the inland and built out and gradually it went I think all the way out. So the sand built up on the north side of the pier close to the beach and aerial photographs don't really show much of that because it doesn't get the three dimensional effect. You get down there now and look at it you can see how the sand is piled up on the north side of the pier.
Q. Let me ask. So I guess then in response to my question you don't know the dates?
A. I'd be guessing. That's a matter of record. I'm not going to guess at it.
Q. You don't have any recollection of the dates that the Corps encased the jetties?
A. They're strung out.
Q. Okay. I understand that they're strung out.

Michigan.
MR. EHRET: But you didn't study law.
THE WITNESS: No.
MR. EHRET: Thank you.
THE WITNESS: Engineering.
MR. PETRIE: Let's go off the record.
(Whereupon a brief pause was held In the proceedings).
BY MR. PETRIE:
Q. We're back on the record. Mr. Lahr, you've had a chance to read the provision here in this copy of Exhibit Five that I've shown you defining the ordinary high watermark. What's your reaction to that?
A. I did not read the whole document but I read the part you highlighted as it pertains to my property and there's no timeframe mentioned on there because where I live was obviously at one time under water because of the existence of the inland lakes behind my house. So there's got to be a timeframe where you take those factors into consideration and I don't know whether ten years, a hundred years or ten thousand years.
Q. Okay. That's an astute observation on your



point that the definition doesn't include a time, a point in time. I'd like you to take this definition, though, and apply it to the point in time when you bought your property in 1960, okay? And I'll hand that back just so you can see the definition of it. And what I'd like to ask you is is thinking back now, do you have any sense or idea where the ordinary high watermark for your property back in 1960 was located? And again, this is not some kind of an exercise to play hide the ball or anything, so let me give you some thoughts, and that's all they are, and you shouldn't limit your thinking to the thoughts that I mention. Would you have, and I know you brought photos, for instance, but if you had a photograph of your property in 1960 that might show where the ordinary high watermark is. That would be an example.
A. Can I look in here?
Q. Certainly. Absolutely.
MR. PETRIE: And for the record Mr. Lahr is looking through a collection of photographs that he brought with him today.
A. I have no pictures in here before 1980.
Q. Okay. Another idea. Do you know --
A. Let me elaborate on that.
Q. Absolutely. Please.



A. I know that there was not extensive damage to our property until at least 31 years ago because the slope from the bluff to the beach was gradual when my children were little, and that was 38 years ago. After that date I have pictures showing a steep bank. Now that tells me that that occurred because the water came up and took the sand away.
Q. What caused the extensive damage to your property 31 years ago?
A. I could say high water, storm-driven waves, probably the two factors. I don't know what the lake level was at that time, but certainly storm-driven waves showed the eroded shoreline in the 1980s.
Q. Do you have any impression whether or not at that point in time when you suffered the extensive damage to your property that the jetties, the harbor in some sense was contributing to that damage?
A. I have no evidence or even suspicion that that was a factor.
Q. Okay. What was the extensive damage? Can you describe for us?
A. The extensive damage is the removal of the bluff soil and resulting in a sharp bank.
Q. Okay. And back to what we were discussing about the ordinary high watermark, another example of



what might give you some sense of the ordinary high watermark would be if you had some kind of survey accomplished contemporaneous with when you bought the property in 1960. Did you have something like that then?
MR. EHRET: I'm going to object because you have to be more specific, I believe, about what kind of a survey you had.
BY MR. PETRIE:
Q. Just simply did you have a survey and then we can always go from there.
A. I had the real estate agent evaluating my property in 1981. It had been -- I don't have that with me. He cited losses which were not significant due to high water in 1981. That's the closest thing I have to an objective survey in my property, but I'm looking at these pictures here that show -- when we moved out there we put in steps to the beach, I told you we put in railroad ties and terraced it up. These pictures dated '83 show those walls were being torn down and replaced. That's the best I can give you about damage before. There was damage before that date caused by the water erosion.
Q. Okay. Let's talk a little bit further about -- or actually a new subject about something that

66

you mentioned in passing earlier. Efforts by the Corps to address erosion south of the St. Joseph Harbor, do you have any understanding about efforts the Corps made to address erosion south of the St. Joseph Harbor?
A. The only evidence I have is that the Corps would at one point pump the sand from the outflow of the river where it dropped down, pump that sand back to the beaches south of the piers.
Q. Do you remember whether this was an ongoing project or a one-time --
A. It was for a number of years and then it stopped and the Corps now dumps that water or that sand inland where they're trying to build some base up for an airport. I don't know why it stopped. I think the piers were a factor because when the piers were encased, that didn't have that sand blocking the -- well, I don't know. I shouldn't say. I don't know. I haven't seen it done lately.
Q. Where did you hear that the Corps was dumping the sand at some airport?
A. In the local paper, and I don't know whether the Corps was doing it or they took up a point and it was transferred from that point on.
Q. So we're clear then, you've cited this instance of the Corps having pumped sand out and

67

placing it south of the jetties, and this was -- your understanding was that this was something that went on for a number of years?
A. That's my understanding.
Q. I'm going to play the time sort of questions again. Can you recall approximately when this effort was undertaken by the Corps?
A. I think it was both before and after the piers were encased. But the Corps would have that information.
Q. Do you have any idea about the number of years that this project lasted?
A. Well, I think it happened mainly after the piers were encased where there was no littoral drift carrying south of the pier. That would have been what, 15 years ago, ten years ago. I don't know.
Q. Did you have any understanding about whether or not that effort by the Corps was something that would benefit you and your property?
A. At the time probably never thought about it.
Q. Even though you might not have thought about it, did you ever get some sense that, in fact, your property did benefit from it?
A. I was more concerned with I thought it was probably suffering from the -- didn't have the natural

68

littoral drift. That's about it. I live about eight miles south, seven, eight miles south from here.
Q. So you're telling me then that looking back now you don't ever have -- you have not had some kind of an understanding that the Corps's efforts in fact benefitted your property?
A. No.
Q. Did you delay your decision to bring this lawsuit at all because of this project by the Corps?
A. Because of this project where?
Q. Because of the project by the Corps? Did you delay your bringing suit because of the project itself?
A. No, I don't think so. You know, you're talking about a pretty big action through the Corps of Engineers, and until John got into the picture because he lives there got interested in it did it occur to us hey, maybe there's a basis for getting some help here.
Q. Let me show you again Exhibit 105, and as you will recall, sir, this is the document that you provided Mr. Ehret some years back?
A. Yes, I recall it.
Q. Thank you. And we were looking at what is the fourth page in that document, fourth and fifth pages.

69

A. The picture?
Q. No, sir. I was focused more on the pages immediately before the picture. Well, you're right. The pages themselves are marked one and two but in the document the packet as a whole, the forth and fifth pages.
A. Okay. What's your question?
Q. If we can get you on the fourth page back I'll go ahead and ask you a question?
A. This is page four.
Q. Yes, sir. And sir, if I understand the form correctly or the document, the information contained on it suggests that in 1986 you expended some amount of nine thousand dollars for a wooden seawall.
A. Right. That was about a hundred feet. I mentioned that before.
Q. Yes, sir. And what was the nature of the damage or your property that caused you to put up the seawall that cost nine thousand dollars?
A. Well, before the odds and ends we did where the water was just being pissed away or money was just being pissed away and I don't know how we came across Clutchey but, you know, they put up wooden seawalls and that will last about ten years. And nine thousand dollars was a lot of money back then but ten years was