Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JOHN H. and MARY E. BANKS, )
ERROL L. and SUSAN H. STONE, )
as Trustees of the SUSAN H. )
STONE TRUST, et al., )
Plaintiffs, ) No. 99-4451
vs. ) Consolidated with
UNITED STATES OF AMERICA, ) No. 04-277L
Defendant. )

The deposition of GEORGE MORVIS, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before NICOLE SCOLA, CSR No. 084-004524, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said state, 10th Floor, 155 North Wacker Drive, Chicago, Illinois, on the 3rd day of March, A.D. 2006, at 9:02 a.m.

Page 2

PRESENT:

MR. JOHN B. EHRET,
(20860 Greenwood Drive,
Olympia Fields, Illinois 60461,
708-748-8975),
appeared on behalf of the Plaintiffs John H. and Mary E. Banks and the Deponent;

Page 3

PRESENT: (Continued)

UNITED STATES DEPARTMENT OF JUSTICE,
ENVIRONMENT & NATURAL RESOURCES DIVISION,
GENERAL LITIGATION SECTION,
(999 18th Street,
Suite 945, North Tower,
Denver, Colorado 80202,
303-312-7327), by:
MR. TERRY M. PETRIE,
-and-
U.S. ARMY CORPS OF ENGINEERS,
(477 Michigan Avenue, Room 659,
Detroit, Michigan 48231-1027,
313-226-2215), by:
MR. GARY W. SEGREST,
Assistant District Counsel -
Detroit District,
appeared on behalf of the Defendant.

REPORTED BY: NICOLE M. SCOLA, CSR, RPR,
C.S.R. Certificate No. 84-4524.

Page 4

(WHEREUPON, the witness was duly sworn.)
GEORGE MORVIS,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. PETRIE:
Q. Good morning, Mr. Morvis.
A. Good morning.
Q. How are you?
A. Fine. Thank you.
Q. Have you ever been deposed before?
A. Yes, I have.
Q. When was the last time?
A. I belive four to five years ago.
Q. How many times all total would you estimate?
A. This would be the second.
Q. The second time.
The deposition four or five years ago, what was that generally about?
A. A financial services case.
Q. Nothing to do with the matters in this litigation?





EXHIBIT 13

Page 33

(WHEREUPON, discussion was had off the record.)

MR. PETRIE: We're back on the record, and I'd like the record to reflect that on our break, Mr. EHRET voiced his consternation about the definition that is located in the opinion that I've just placed in front of Mr. Morvis, expressing his thought that the term "terrestrial" was not one in which somebody might be able to easily understand. This was all in the presence and the hearing of Mr. Morvis, and we're ready now to go back on and continue with the questioning.

BY MR. PETRIE:

Q. And, Mr. Morvis, as you can see, I've given you the chance to take a look at that definition, and in light of that definition, I'd like you to consider the two points in time, one being when you and your wife acquired the property in December of 1982, and then second, the occasion, the date September of 1996, when the property was placed in the ownership of the trust. And to the extent you can, can you tell me where the ordinary high water mark was located at those two points in time for the property?

Page 34

A. I cannot.

Q. Okay. Thank you. Let's press ahead.

Sir, are you familiar with the term "shore protection"?

A. That's fairly clear, shore, protection.

Q. Okay. Do you have any understanding about whether the sea wall that was located on the property at the time it was first acquired by you and your wife, that's an example what I mean by the term sea protection (sic).

A. Okay.

Q. I'm curious to know if you had any other sea protection --

MR. SEGREST: I'm sorry --

BY MR. PETRIE:

Q. Or, shore protection --

MR. SEGREST: There you go.

BY MR. PETRIE:

Q. -- placed there for the protection of the property besides the sea wall and the efforts associated with the restoration of the property after the dunes were lost?

A. Yes, sir.

Q. Can you describe those for me, please?

Page 35

A. Certainly. On the first occasion, boulders were put in to reinforce the sea wall.

On the second occasion, this would be -- I believe it was '96 that we -- when the permit was -- boulders were put in to reinforce the bluff, and I frankly cannot recall if more boulders were put in to protect the sea wall, because on the second occasion, the sea wall had actually snapped at the north end and fell down into the water.

Q. Any other forms of sea -- shore protection? I have sea protection on the brain here. Shore protection.

A. No, sir, not to my knowledge.

Q. Sir, we mentioned earlier here some of the thoughts about what was causing the erosion there along the shoreline. Do you have -- or, let me put it this way: Have you ever heard that various forms of shore protection themselves cause erosion to properties located down drift or south in this instance? Have you ever heard of that thought?

A. I never heard of that thought, but my assumption is, yes, they do, which is why we have

Page 36

the problem to begin with.

Q. Can you elaborate why your assumption is? What do you base that on? And I don't ask that to challenge, I just want to inquire.

A. It's what we spoke of earlier, any unnatural sources put in to block the natural flow of the lake might be construed as to interfering with that flow and the buildup of sand, et cetera.

Q. Do you have any knowledge about any efforts by the Corps over the -- let me break it up into two periods of time. Let's focus first on the period of time before you and your wife acquired the property in December of 1982, okay?

And I want to know if you are aware of any efforts by the Corps to address erosion problems there in the area in which you owned your property?

A. No, sir.

Q. How about subsequent to that point in time, after the two of you acquired the property?

A. I'm sorry, of the Corps --

Q. Yes, sir. Any efforts by the Corps after the two of you bought the property to address erosion problems?

A. I'm not aware of any.
Q. At what point in time -- let me, I guess, restate that a little bit more or better.
The two of you are in some manner -- let me ask it this way: Who is the trustee of the Carolyn Morvis Trust?
A. Our attorney.
Q. Okay. Who, from your involvement, made the decision to bring the lawsuit here in this case against the United States?
A. My wife and I.
Q. So at some point in time, at least before filing of the suit, the two of you had concluded that, in some manner, the Corps was at fault here?
A. Yes, sir.
Q. Was there a point in time before that -- well, let me break it out.
About when was this decision made to bring the lawsuit?
A. I don't remember.
Q. Was it within a year or two of when this suit was actually filed?
A. I don't remember.



Q. Can you then -- understanding the difficulties in remembering time, can you give me some sense of what point in time the two of you, or yourself in some manner, the thought occurred to you that, you know, the Corps is behind our problems here?
Does that make sense what I'm asking?
A. I'm not sure I understand the inference of the question.
Q. Sure. I understand. Let me see if I could make myself more clear.
In some manner, the erosion problems seem to be greater than just what mother nature does. Then, as evidenced by the fact that a lawsuit was initiated against the Corps after you bought the property years later, at some point in between when you bought the property or when you brought the lawsuit or the lawsuit was brought, in some manner, the two of you or yourself formed some kind of an understanding that the Corps is the cause for the problems that we are experiencing with our property over and beyond what mother nature does.
I'm just trying to get a sense about



when that thought dawned upon you?
A. First of all, I don't know what mother nature does, so that part of your question I can't answer.
Q. The general dissipation of the sand.
A. Yeah. Well, I'm not sure that's mother nature or otherwise.
Q. Okay.
A. I believe it was to -- to the point of your question, I believe it was an, you know, ongoing conversation. I mean, it's not a daily conversation, but an ongoing conversation that the Corps had a -- you know, was responsible for what was happening.
Was there a moment that we --
Q. A eureka moment?
A. Eureka moment? No.
MR. PETRIE: Let's go ahead and take a break.
(WHEREUPON, a short recess was had.)
BY MR. PETRIE:
Q. Just one item to follow up on to clarify for my understanding, please.



The sea wall was in place when the property was first acquired?
A. Yes, sir.
Q. What was your understanding about the Corps of Engineers' involvement with that sea wall?
A. Our understanding was that the Corps had put in the sea wall.
Q. And your understanding was gained from whom?
A. Mr. Chapman.
Q. The neighbor Mr. Chapman that you referred to?
A. Correct.
MR. PETRIE: Thank you. No other questions.
THE WITNESS: Thank you.
EXAMINATION
BY MR. EHRET:
Q. I'd like to show you an aerial photograph which is indicated in the upper left-hand corner, in fact, in every white spot, "AMI," which means Aims Multiimaging, and it's dated April of '05, and it shows your name, Morvis No. 24, and it points to a house.