IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ANDREW C. BODNAR and
CHRISTINE M. ZAHL-BODNAR,

Plaintiffs,

vs No. 05-1381 L
Judge Emily Hewitt

THE UNITED STATES,

Defendant.

The deposition of ANDREW BODNAR, a witness in the above-entitled cause, taken before Kim Sing, Shorthand Reporter and Notary Public in and for the County of Van Buren, State of Michigan, at 728 Pleasant Street, St. Joseph, Michigan, on the 28th of April, 2006, commencing at about 2:15 p.m.

Reported for
Moretti & Murphy Reporting
By
Kim Sing, CSR-2263, CP-RPR



EXHIBIT 17

Page 6

moment? We have an automobile alarm going off, and I think it's Andy Bodnar's, so, we are off the record, okay?
MR. PETRIE: Yes, no problem.
(A short break was taken.)
MR. EHRET: Back on the record.
Q (BY MR. PETRIE): Thank you. Mr. Bodnar --
A Yes, sir.
Q -- the address you live at is what?
A It's now considered 2400 Lake Ridge Path, St. Joseph, Michigan.
Q Is that the property that is involved in this lawsuit that you have brought?
A Yes.
Q When did you buy that property?
A In 1989.
Q Did you have a month or anything like that that goes with the year?
A No.
MR. EHRET: If you hold on a second, I can get it for you. John Ehret speaking. Let's come back to that. I will find it.
MR. PETRIE: That is fine.
Q Mr. Bodnar, has anyone else, for instance, your wife, did she also have title to the property?

Page 7

A She does now or her name is on it.
Q About when did she have her name placed on the title?
MR. EHRET: That, again, I can give you exactly. John Ehret speaking. But I need to do some research.
MR. PETRIE: That is fine.
Q Mr. Bodnar, when you bought the property, were you married at that time?
A No.
Q If I may ask, when did you get married?
A 1998, July 2nd. That I can remember.
Q Okay. Prior to buying the property in 1989, did you live in the area there in St. Joseph?
A Yes, I did.
Q Can you give me some idea of your involvement or familiarity with that area? I mean, is it, for example, where you grew up or you moved there at some point in time? How does that play out?
A I grew up in Niles, Michigan, which is south of here 30 miles or so, and I lived there until approximately 1979, at which point I moved to the Detroit area, and I lived there until almost -- well, 1986, January, when I moved back to the St. Joseph area.

Page 8

Q When you first moved back to the St. Joseph area, did you live on the shore?
A No. I bought a house down off one of the channels off the river.
Q Did you live in that house until you bought this property here on Lake Ridge Path in 1989?
A Pardon me?
Q The place that you bought when you first moved to St. Joseph in 1986, did you live in that place until 1989 when you bought the property on Lake Ridge Path?
A Yes, that's correct.
Q Did you have any kind of awareness of erosion for the shore line south of St. Joseph Harbor before you bought the property in 1989?
A Well, I mean, I knew about it. I knew that the -- you know, what I read in the paper. I didn't really -- wasn't that involved in it or that interested in it at that point, particularly because I didn't live on the lake.
Q I understand. Can you tell me what kind of awareness you did have, even if it was limited? Again, before 1989.
A Well, I knew it was an issue and it was somewhat of a problem. I don't think I knew the degree of the

Page 9

problem at that point.
Q When you said you knew it was an issue and a problem, can you give me some sense of what you understood it to be then?
A Well, I -- I knew that there were people that for one reason or another were losing some of their property. I really didn't -- you know, until I actually lived there, I really didn't give it too much thought.
Q Okay. And, again, these questions are focused on what your knowledge was before you bought the property.
MR. EHRET: That is a telephone going off. This is John Ehret, so, we are fixing that.
MR. PETRIE: Can we go off the record?
(A discussion was held off the record.)
MR. PETRIE: Let's go back on the record.
Q Mr. Bodnar, you mentioned that you had some understanding people were losing property before you bought yours in 1989. Did you have any awareness that some people had lost homes to the shore?
A Uh, I don't think I realized that it was to that extent until, actually, I had bought my house. Didn't do very much research, I guess.

Page 10

Q When you bought your property, did you do any kind of research into erosion problems that the property had itself experienced?
A Not much because when I bought that house the sea wall was fully intact in the back, and there was mature growth and grass and it looked like it wasn't a problem.
Q What did you -- did the fact that there was a sea wall, did that suggest anything to you about the possible problem of erosion?
A Well, yes, obviously, it was a problem at some point, and I didn't really know at that point if it was related to trends or -- or, you know, what exactly required the sea walls over the years. You know, it's hard to remember what you thought about back 17 years ago.
Q Did you at some point in time come to understand why the sea wall was required?
A Uh, within -- after a few years of living there, I did, yes.
Q And what happened after a few years?
A Well, the sea wall started deteriorating, and it was a little hard to tell because you couldn't get down to it, but it was apparent that it was starting to lean back, and my neighbor's sea wall

Page 11

was being slowly taken down by the water.
Q Who were those neighbors?
A At that point, Craig Okonski had part of his sea wall that was still there.
Q At the time that you bought the property, sir, did you have any discussions with either the people you bought the property from or perhaps a real estate agent about any issues or problems with erosion?
A No. The house was empty. It was -- someone had been transferred. It had been empty for a long time, and I don't recall talking to the realtor about the erosion issue.
Q You mentioned, sir, that you did not know exactly at the time you bought the property why the sea wall was required but then, again, after several years you came to understand why. Did you ever form any kind of an understanding about what was required or what was causing the erosion?
A Well, as the sea wall was getting worse, I think we started -- I started doing some research on it. My situation is that running a business on a hands-on basis, my time outside of that business is very limited, so, I only had so much time to do that research. Back then, they didn't have the internet like they do now, and, so, basically I

Page 12

just got bits and pieces from what people told me, and I talked to some -- I did try to talk to some people that were familiar with repairing the sea wall. That was my initial thought, was to try to get that repaired, and most of the people said at that point that it was already beyond repair because the water depth on the outside of the sea wall was so deep that there really wasn't too much that could be done at that point.
Q What I would like to do, sir, is to go back to the point in time when you bought the property in 1989, and what I would like us to do is come forward in time through the present. And I would like you to describe for us the -- basically what kind of problems you experienced with your property as it relates to erosion, what, if anything, you did at that point in time to address it, and what kind of understanding you had about what was causing the problem. Does that make sense?
A Okay. That is a long question.
Q I beg your pardon?
A That is a long question.
Q You see, I'm basically wanting to go through chronologically from the time you owned the property to have you relate to us the problems that

Page 13

you experienced with erosion, and at that juncture, at each of those points in time, ask you if you can describe for us what you did to address the problem that had occurred, and also to describe for us what your thoughts were about what was causing the erosion. Maybe you didn't think anything. Maybe you talked to people and they in turn shared ideas with you and so forth. Whatever the facts are is what I am trying to understand there, okay?
A Well, I will try to reconstruct it. I mean, it's hard for me, after knowing what I know now, to go back and remember what I thought at the time but, obviously, at the time I bought the place, I didn't think it was that much of an issue because the sea wall was intact, the greenery was intact. There were trees going almost all the way up to the edge of the -- well, there were trees that went up to the edge of the bluff, and you know, there were other sea walls adjacent to mine that were deteriorated. Mine was fully intact. I guess I looked at that thinking, well, that -- if the sea wall is in good shape, then I should be in good shape.
The -- having lived on the river for three years, I saw cycles up and down of the water level,

Page 14

and I guess at that point I think I probably looked at that as the cause of the erosion, with the cycles going up and down. I didn't really put too much thought into it, I'm sure at that point.
Q Okay. Now, what you have described, sir, suggests to me that later, at some different point in time, you came to think that possibly this was not a matter of just cycles going up and down, is that correct?
A Yes.
Q Okay. When we get to that point in time when you came to some different understanding, please be sure to let us know.
A Well, uh, during the process, as my sea wall was slowly deteriorating and going away, there was some meetings that were held. There was a meeting at the college where one of the -- I don't know what they called it back then, DEQ or DNR or Army Corps or -- I guess somebody from the Army Corps was there to explain and help understand what was going on. I am not sure -- really sure what their goal was; it was so long ago. But what time I had permitted -- obviously, I just bought a business. I was spending, you know, 80, 90 hours a week running the business, so, my time was limited and

Page 15

my information I gathered as I could, bits and pieces. So, I am sure I could have been more diligent in that respect, but my first priority was my business, and that is what I was doing.
Q Okay. May I ask about that meeting at the college. Was that a meeting at Lake Michigan College?
A Yes.
Q And about what point in time do you place that meeting?
A Uh, well, I am not really sure if that was prior to the bluff -- my bluff disappearing or just after it. I am not really -- I don't remember, honestly.
Q And do you -- let me ask you several questions that might help us focus on when that meeting at Lake Michigan College occurred. What years did you start or buy your own business?
A 1986.
Q Okay. So, obviously, I assume this is a meeting that occurred after that then?
A Yes.
Q Do you recall about what year it was that you lost your bluff?
A Uh, I think it was spring of '97.
Q Okay. Do you recall it -- in conjunction with that act that, you're not sure whether this meeting was

Page 16

just -- was before or after?
A I don't remember which direction it was, no.
Q Was it approximately the same time as when you lost your bluff?
A I am really not sure.
Q Okay. That's fine. Well then, do you recall what kind of problems your property had incurred before losing the bluff?
A Well, it was -- it was a systematic deterioration of the sea wall, and it was clear even from above that the water kept digging deeper and deeper in front of the sea wall and the sea wall kept laying down more and more, and then eventually it just -- it fell down; and once it fell down, the water came over; then it made short work of the bluff and --
Q And at what point in time then did you decide or come to some understanding that what was occurring with your property was not just, as you put it earlier, cycles going up and down?
A Well, I don't -- I think I pretty much thought it was cycles even at that point until I started, you know, talking to some of the other neighbors and then also doing a bit more research and reading about it, and then I don't remember huge amounts of the meeting at the college, but I do remember, you

Page 17

know, other people talking about their problems there and that, you know, it was indicated that the lake has its own natural level of equilibrium that it's going to seek, and it's going to keep on coming no matter what you do and was being, you know, discouraged to do anything to prevent the lake coming further into our property, and the only other thing I did remember at the time was that the Army Corps guy made a comment that they admitted that the problem with the erosion was possibly a third of their responsibility that was related to closing up of the piers.
Q Okay. So, if I understand you correctly, at this meeting at Lake Michigan College, somebody from the Corps of Engineers addressed the audience, right?
A Yes, that's correct.
Q And you recall this person in some manner acknowledging that the Corps had some responsibility for the erosion that people's properties were experiencing?
A Yes, I do recall that statement.
Q And you recall him indicating it was somewhere about in the amount of a third?
A That's correct.
Q Okay. And what happened after you lost the bluff

Page 18

to your property, any further erosion?
A Well, up until the point I lost it, I had been trying to figure out or talking to different contractors that could possibly come in to help me repair the sea wall before that happened. As it got progressively worse, that became less and less possible, and then it was almost just a matter of a short week or two when that went down, that a large portion of the bluff went in, and at that point, it was probably within 20, 30 feet of my house, and immediately thereafter I contacted the State to see what I needed to do to get a permit to do some work to try to restore the bluff -- or not restore it but to put something in to prevent the rest of the erosion or to slow down the erosion, I guess.
Q Would it be fair for us to understand, sir, that whenever it was that this meeting at Lake Michigan College occurred, that certainly at least at that point in time you came to an understanding that problems that your property was experiencing was something more than just simply cycles of the lake going up and down?
A Yes, that would -- would be about the time frame that I realized that that was the case, maybe even a little after. I'm not even sure that even before

Page 19

that I knew that there were other issues.
Q Okay. What did you do with that information? Did you do anything as a result of learning that possibly something else other than the cycles of the lake was causing the erosion to your property?
A I didn't do anything with that information other than hire people to bring out riprap and put down to the -- at the bluff to try to protect my property.
Q At this point in time that you're describing where you had people bring out riprap and so forth, had you suffered a fairly significant amount of loss of property in your mind?
A At that point, the distance -- when I bought the property, the shortest point from my house to the -- to the edge of the bluff was a hundred, hundred and five feet, something like that, and that same corner when the erosion really chomped in, in that short amount of time, it was somewhere in the 20 to 30 feet range, so, I lost a large amount quickly.
Q About what point in time is this that you're speaking just so that we've got some understanding of what point of time this is?
A This is spring of '97.
Q I am being silent on my end here just pondering,

Page 20

so, waiting here for a minute.
MR. EHRET: Let me interject here in an effort to assist. We do have some exhibits which show -- are you there?
MR. PETRIE: I am.
MR. EHRET: Show the condition of the bluff at the approximate time of purchase and also a permit, uh, request. Excuse me. I have to consult with my client. We're off the record for a second.
MR. PETRIE: That's fine.
(A discussion was held off the record.)
Q (BY MR. PETRIE): Mr. Bodnar, when you lost the bluff, was that in the spring of '97?
A Yes.
Q Was that as a result of a storm?
A I don't -- I don't believe there was a storm. I don't recall, but I don't think there was anything particularly unusual.
Q You just remember the bluff being lost at that point in time?
A Well, I remember having a tree company out on a Friday because the three trees that -- the three large oaks that were at the end of the property were very close to the bluff and it looks -- they looked like they were undercut, so, I was going to

Page 21

have somebody come out on Monday and cut them down because I thought if -- when that bluff goes, it's going to take a lot of land with it. And, so, I talked to -- I don't remember who it was, but I do remember having somebody out, and then Sunday morning when I got up to look out the bathroom window, those trees were gone, and they had fallen down to the bottom of the bluff and took a large amount of property with it.
Q Sir, this might seem fairly obvious, but it was only after you lost the bluff that you then had the various efforts involving riprap and so forth? Is that a correct understanding on my part?
A Yes.
Q Okay. The meeting at Lake Michigan College, I asked you what you did with that information, and one of the things you mentioned was the idea of going out and getting the riprap. And, so, I am coming back to that to see if that in some manner refreshes your memory as to when that meeting at Lake Michigan College occurred.
A I don't think I said that at the meeting I got the idea of putting riprap down. I said that other people had been talking about losing their bluff, and they were talking about the impact of closing

Page 22

the pier and what that had on the property south of the pier, but I don't know, honestly, when that -- whether that was before or after the trees and the bluff disappeared.

Prior to the bluff disappearing, I was trying to find a contractor that could come out and repair the sea wall, even at the point that it was laying down, because in my mind that was the best solution to protect the bluff. And then once the bluff was down, at that point it was obvious the only thing I could do was to put riprap down to protect from the water further coming into the property. I'm sorry, but I don't know -- I can't pinpoint the time of the meeting at the college.

Q I can appreciate that, and there is certainly no need to apologize. Would you feel comfortable, for example, in placing that meeting as occurring, say within a year, plus or minus a year of when you lost the bluff as an example of trying to place it -- trying to place it in time?

A I would say it's most likely that it would be in that time period, yes.

Q Do you recall -- now this is going to really test your memory. Do you recall the name of the Army Corps of Engineers person who spoke at this meeting

Page 23

at Lake Michigan College?

A Uh, I don't. I --

Q Do you recall anything that the person might have said about the type of work they do for the Corps?

A Well, he was the -- I think the area representative or seemed, if I remember right, a lot of people in the audience knew him, and he was -- if I remember, had pretty long hair, maybe a ponytail or something like that, maybe a beard. I am not a hundred percent sure but that is -- I think he was out subsequently at some point. I wasn't there, but my wife said there was a guy that was out when they were putting the rocks in the hole out by our property, and I think it was -- may have been the same person. I really --

Q I'm sorry.

A I really can't pinpoint that. I am just kind of going by what I thought -- I know he struck me at the point when I saw him that I wouldn't have pictured him in that position, I guess.

Q Sure.

A From his appearance.

Q Sir, are you aware of any effort by the Army Corps of Engineers to address erosion problems in the vicinity there south of St. Joseph Harbor?

Page 24

A Well, if you want to classify me as a lazy homeowner, that is probably most accurate or distracted or busy with other activities that I consider more important because what I know about that is basically my neighbor to my south is -- has got more free time than I do, and on occasions when I had a time to talk with him, he would fill me in on what was going on and, really, my knowledge about what transpired, I guess, really came in the last few years after being more aware of what appears to be the problem.

If you look at the erosion pattern that transpired in front of my house, my neighbor immediately to the north, his sea wall was completely gone. His neighbor to the north still had his sea wall intact. So, the water came in and gouged out his property, continuing to my property. At the south part of my property, where my sea wall was still partially intact, that was the north part of the Wilschke property, and right immediately south of my sea wall, there was another big gouge-in area. And, so, as I put two and two together and you look along the coast line, you can see that every time there's something that sticks out, there is something that gouges out in behind

Page 25

it. And, so, the more I read in the paper and learned from the neighbors, I guess things made more sense to me as far as what's causing the problem.

Q The name of your neighbor to the south, sir?

A Roger Wilschke.

Q I can understand from your description here your recitation about how your knowledge increased. Did you have any understanding of efforts by the Corps to address the problems of erosion that property owners were experiencing there south of the St. Joseph Harbor?

A Well, I really didn't pay attention to it. I know they were pumping sand out of the river into the lake. Whether that had any benefit or not, I didn't really -- it didn't really correlate with me at the point. I have since that time, before getting involved in this, I did go to a number of meetings where John was present and had made presentations and attempted to explain, you know, the importance of the sand being fed down the shoreline, and that makes a lot of sense to me. And just looking back in retrospect and seeing the patterns of erosion and so forth, that seemed to make logical sense to me.

Page 26

Q Sir, you had referred to a gentleman by the name of John. Is that Mr. Ehret?
A Yes, uh-huh.
Q The knowledge that you had about how the Corps was pumping sand out of the lake and, as you put it, that didn't really correlate with you, in light of that, did those efforts by the Corps have any impact on when you decided to bring this lawsuit?
A No. I thought they were just working with dredging the river. I didn't think that there was any point or goal of aiding in the lake restoration.
Q Sir, when we spoke with Dr. Okonski a couple of days ago, he mentioned receiving a letter from Mr. Ehret in December of 1998 talking about a possible lawsuit. Did you receive a similar letter?
A Yes, I believe I did.
Q And do you recall what that letter discussed?
A You know, roughly the issues about the shoreline disappearing and what -- I think what the people on the shoreline felt was the cause and that they felt at that point that this was the closing up of the pier that was largely due to the erosion problems we were having. That is my --
Q You didn't join the lawsuit or any kind of an effort to bring a lawsuit at that point in time,

Page 27

did you?
A No.
Q Why is that?
A Well, I think I got one letter and probably put it on my dresser with piles of other things that I don't have time to read, and I think at that point the water level was lower than normal, and I hate to go back to my business situation, but I am very active in my business and there is high and low spots of the economy, and although -- even though things are high, my work level is generally -- the number of hours makes it very difficult for me to do other things and to follow through.
I think at one point I did talk to my neighbor to the south and he said it was already too late when I asked him about it, I think the following spring. And then subsequent to that, several times, you know, we tried to get into it, but each time I had talked to John he said it was already too late and he was obligated not to add additional people.
Q I see that you filed suit in this case in December of 2005, is that right?
A That's correct.
Q Why did you wait until December of 2005 to bring

Page 28

the lawsuit?
A Well, I am not really sure. I guess I had more time to get involved with it at the time; and as I looked at the situation and the lake, it keeps progressively getting worse and worse, and it appears from the top that there isn't any sand left anymore even at the edge of the bluff, and I just feel like something needs to be done to correct the situation, and I really wasn't sure if -- if my getting involved would help it or not, but I thought that because of the situation of our property was right in the middle of some of the worst areas, it might be beneficial.
Q I have one last question for you, sir. Going back to that meeting at Lake Michigan College, did you attend that meeting with Dr. Okonski?
A I don't remember.
MR. PETRIE: I have no other questions at this time, sir.

EXAMINATION

BY MR. EHRET:
Q John Ehret speaking here, and I would like to ask a few questions, Mr. Bodnar. When discussing the gentleman from the Corps, you said that he came to your property at the time they were putting rocks

Page 29

in the hole. Can you describe what you mean by rocks in the hole?
A Uh, well, they had a big barge out there with some big boulders, and they were placing them in the lake, and later I found out that it was an effort to try and fill an area that had been -- I don't know how that hole was created exactly, washed out or what, but it was -- I believe it was an area of sand that had been washed out and it was just dirt or clay or whatever just below the lake, and they were trying to fill that in so that it would prevent, I would assume, further -- further problems.
Q And you indicated that you had received a letter from me, and did you ever receive a letter from a law firm by the name of Straub, Seaman & Allen?
A Yes, I did.
Q Do you have that letter in your file there?
A Maybe. You can see why I have a secretary.
Q I see now you are looking through your file, and it's just like my file; it's not jumping out at you. Do you remember, while you are looking, who signed that letter?
A Uh, I assume it was John Donahue possibly. I found the envelope. I don't have the letter.

MR. PETRIE: John.
MR. EHRET: Yes.
MR. PETRIE: If -- if that's the survey, that is Exhibit 5.
MR. EHRET: I'm sorry. You're correct.
Q Do you recognize that?
A Yeah, it's -- it was probably part of the survey; I assume probably when I bought the property or somewhere in that neighborhood. It's dated 12-7-88, which would be -- I said I bought the house in '89. It might have been at the end of '88 and then I moved in in '89. I had about six months of work done on it before I moved in. I don't know the exact date.
Q And does that -- does that survey purport to represent the condition of the property or the size of the property approximately at the time you purchased?
MR. PETRIE: Lack of foundation, objection.
Q (BY MR. EHRET): Do you recall having ordered this survey?
A I don't, no.
MR. EHRET: Okay. Since it's a public document, I am going to ask that it be entered and we can take up the authentication later because I



think it will be helpful to you. I am not going to have him identify the remainder of these documents because they're -- they're self-authenticating and having come from the DEQ and the Army Corps; and in the interest of expediting, unless you have some questions of your own, I have no further questions.
MR. PETRIE: The only comment I have, John, is that the mere attaching of an exhibit to the record does not really advance anything unless there is some testimony associated with the contents of the exhibit; but if you don't want to ask questions about the exhibit, that is fine.
MR. EHRET: Well, I believe that we can retrace our steps here and relate these documents to your questions.
MR. PETRIE: Well, you know, ultimately, the testimony has to come from the deponent, so, it's your choice.
MR. EHRET: Well, we can go through this and it's going to constitute nothing more than Mr. Bodnar reading back what is on these documents.
MR. PETRIE: It's your choice how you want to handle it.
Q (BY MR. EHRET): Are all these documents, Exhibits



1 through 8, these are documents that were in your files?
A Yes.
Q Correct?
A Correct.
Q And you brought them here today?
A Yes.
Q And do you remember receiving each and every one of these documents? Well, let's start with Exhibit 1. Did you receive Exhibit 1?
A I am sure I did.
Q Yeah.
A I don't remember to '97 getting the mail but, you know.
Q Okay. But it was in your file?
A Yes.
Q And it is a --
A I am sure I received it.
Q And it's from the Army Corps of Engineers and it is signed by John C. Cramblet. Do you recognize the document now?
A Yes, I -- I remember now that at the time I think we required three different permits to proceed with what we were going to do. This was the permit from the Army Corps of Engineers, and then there is also



one from the State of Michigan.
Q You are referring to what's marked as Exhibit 2?
A Right, from the DEQ.
Q And would you describe Exhibit 2, please.
A Uh, this is the -- it says: "This permit is granted under the provisions of the Natural Resources and Environmental Protection Act 451 PA 1994 specifically Part 325 Great Lakes Submerged Lands," and this describes what we propose to do as far as replace -- or placing riprap at the -- on the bluff to protect the shoreline. Do you want me to read this?
Q Sure. Go ahead and read it.
A "Place approximately 500 cubic yards of clean concrete riprap and large concrete blocks along approximately 280 feet of shoreline below the ordinary high water mark, another 9700 cubic yards of concrete riprap fill will be placed above the ordinary high water mark. All work shall be completed in accordance with the attached revised plans dated July 18th, 1997."
Q So, there are plans attached to this document. Do you recall -- I mean, is that correct?
A Yes.
Q And did you prepare those plans?