IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CRAIG D. OKONSKI and
CHERIE R. OKONSKI,

Plaintiffs,

vs.

File No.
06-72 L
Judge Emily Hewitt

THE UNITED STATES,

Defendant.

---

DEPOSITION OF CRAIG D. OKONSKI, D.P.M.

Taken by the Defendant on the 26th day of April 2006, at Moretti & Murphy Reporting, 711 Pleasant Street, St. Joseph, Michigan, at 5:00 p.m. Reported by Cheryl A. Kirila, CSR-3667.

APPEARANCES:

For the Plaintiffs:

JOHN B. EHRET
Attorney at Law
20860 Greenwood Drive
Olympia Fields, IL 60461
(708) 748-8975

For the Defendant by Telephone Conference Call:

TERRY M. PETRIE
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
999 18th Street, Suite 945 - North
Denver, Colorado 80202
(303) 312-7327

Also Present by Telephone Conference Call:

GARY SEGREST



EXHIBIT 18

Page 6

Q Second thought is that, as you are well acquainted, the court reporter is taking down the testimony today and she needs a verbal response by you to questions.
A Correct.
Q And, finally, if you want to take a break during the course of the deposition, please let me know.
A Okay. Thank you.
Q Certainly. Sir, at the beginning here Mr. Ehret was relating some of the history associated with the property that you own there in St. Joseph. He indicated that you bought the property located at 3090 South Lake Shore Drive, St. Joseph, back in June 3rd, 1986, correct?
A Correct.
Q Do I understand that that address has been changed to 2425 Basswood Path, St. Joseph, Michigan?
A Correct.
Q Sir, he also mentioned that there is a quitclaim deed dated December 5, 2002, in which you and your wife Cherie -- does she pronounce her name Sherry, Cheryl or Shir-ee?
A It is Cherie (Sherry).
Q Okay. -- Cherie Okonski conveyed the deed or the property, a trust that is entitled the Cherie Okonski Trust, is that correct?
A That is correct.
Q Sir, in that chronology that Mr. Ehret recited, and you and

Page 7

I have just now covered, he did not mention some type of transaction in which the property which you bought in 1986 came to include your wife as an owner. Is there some transaction of that sort?
MR. EHRET: I don't have the record.
BY THE WITNESS:
A I guess I'm not exactly sure what you're asking.
BY MR. PETRIE:
Q Let me recite the facts, as I understand it, to date, realizing I may be missing something here. As I understand it, you bought the property in 1986?
A Correct.
Q And when you bought the property it was deeded to you, and not you and your wife?
A Correct.
Q And then we have this transaction in 2002 in which both of you, you and your wife, quit claimed the property through a deed to the Trust. Do you follow where I'm headed?
A Yes.
Q Do you understand?
A Yes.
Q I'm trying to understand what transaction occurs from the time you bought the property in 1986, between that point and 2002 when your wife's name now appears on the deed.
A Sure. I can address that. I was single at the time when I

Page 8

purchased the property in 1986. We were married in 1997. And then after two children were born, on the advice of counsel, a trust was formed, and it was his advice to do the quit claim deed to my wife.
Q Okay. I understand that sequence of events, and I appreciate that.
A Sure.
Q Then, if I'm correct then, there's no separate transaction between the time you bought the property and when it was placed in a trust in which your wife received an ownership interest in the property?
A That's correct, there was no transaction that occurred. It was just on the advice of counsel as far as setting up our trust fund.
Q Okay. I understand.
MR. EHRET: Can we go off the record for a second?
MR. PETRIE: Certainly. Go off the record.
(Discussion off the record)
MR. EHRET: Back on the record.
MR. PETRIE: Back on the record. Thank you.
Q Dr. Okonski, where did you grow up? What part of the country did you grow up in?
A I grew up in the Detroit, Michigan, area.
Q Had you ever lived in the vicinity of St Joseph ever before you bought the property in 1986?

Page 9

A I moved to St. Joseph, Michigan, in 1985, I had been here for one year.
Q Okay. Prior to moving, was it, I assume, employment related reasons that brought you to St. Joe?
A Correct.
Q And prior to that point in moving in 1985, had you ever visited the area, other than perhaps, you know, to find a place to live and work and so forth?
A Just primarily as you mentioned, just to -- you know, prior to moving, just visiting the area maybe on two or three occasions.
Q I want to talk about what your observations were about erosion south of the St. Joseph harbor there in Michigan at the time that you bought the property in 1986. Do you follow the period of time I'm wanting to focus on?
A Correct. Yes.
Q And what I'm trying to get a sense of is what your knowledge is or observations were of erosion along the shoreline there in St. Joseph at the time you bought the property, okay?
A Okay.
Q So we're at that point in time when you bought the property in 1986. At that point in time, sir, did you have any understanding or observations about erosion along the shoreline south of the St. Joseph harbor?
A I knew very little about the erosion. Of course, when

Page 10

you're purchasing land, you know, on the lake, I guess, you know, you listen to what various people say in the area, and seemed like they were kind of mixed signals.

But I believe this was the first property I had ever owned after, you know, completing school and that. So, you know, kind of, I guess, an exciting time in that sense, and I really didn't know a whole lot about the erosion, per se.

Q What did you know, and again focusing on that point in time?

A You would have to say that I knew erosion was a problem, so to speak, a concern. The lot that I had purchased was, I believe, on record, or on the survey, at least from the east boundary to the shoreline was, I believe, somewhere in the vicinity of 600-feet deep. And I knew that there had been some loss, but I wasn't sure exactly how much, you know, and over what period of time.

So I knew that there was a concern about erosion. You know, you start talking to neighbors and other people and, you know, it was something that I guess my awareness was heightened, obviously, becoming a home owner. And as time went on I have, you know, looked into it, I guess, and sort of studied it a little more. So --

Q Okay. Let's talk again just specifically about your property at the time you bought it, okay?

A Okay.

Page 11

Q You indicated that you knew there had been some loss, and you referred to a survey that suggested that the property went back, or was some 600-feet deep on the east line of the lot you purchased?

A Correct.

Q Now, I want to ask you a little bit more about your notion of when you say there was some loss at that point in time, and realizing that we are now 20 years later.

A Yes.

Q And realizing, too. that -- your ability to estimate what that loss had been. Can you give us some idea, some approximation as to how much loss the property had apparently experienced --

A Sure.

Q -- versus the 600 feet that the survey showed?

A Sure. When I purchased the property there was part of a foundation on the very edge on the west end of the property, so right at the edge of the bluff, and it was just a corner of a foundation.

And as I started asking around I understood that at one point in time there was a home, that that part of the foundation was part of a home that had been present there. And I'm not sure exactly when that home was -- I believe it became abandoned and a portion of that fell into the lake. I'm not sure when that occurred. But there was, like I say,

Page 12

a small corner of the foundation there when I purchased it.

Q When you say you're not sure when that occurred, do you have any idea roughly, approximately, when?

A From what -- I really tried to find that out and find some record of it, to some extent. I was even trying to go back into the local newspaper, and probably just didn't put enough time into it. But I -- as I recall, sort of mentioned they thought it was in the '60s, 1960's.

Q Okay, sir. Now, back on that thought you had that you mentioned about how the, on the east -- how did you put it -- the east line of the survey it indicated that the property went back some 600 feet; the east line of the property?

A Yes. That's where I would consider our property, you know, commencing or starting at is the east boundary, and then extending in a westward direction towards the end of the bluff. That's the longest part of, you know, the property. And then the width is, I believe, 117-feet wide. So --

Q And on the survey you referred to it suggested that the property went from the east boundary westward some 600 feet?

A Correct.

Q And at the time you bought the property it in fact was not 600 feet?

A Well, my understanding with ownership is that with riparian rights that the boundary extends from the, you know, the

Page 13

east most part where it commences, let's say --

Q Yes, sir.

A -- to the point where it meets the lake.

Q Okay.

A And so I'm not sure what the -- you know, I could tell you what the distance was to the top of the bluff, which I believe was somewhere in the vicinity of 450 feet, but I'm not sure what then the distance to the lake would be from that point.

Q Of the bluff to the lake itself?

A Pardon me?

Q From the bluff?

A Yes. Correct. From the bluff, from the top of the bluff where I would consider, you know, the usable property ending, in a sense, to where the lake starts.

Q Do you have any sense of whether it was another 150 feet?

A At one point in time, you mean?

Q Well, I understand that perhaps it was at one point in time. But what it was at the time you bought it.

A Oh, I see what you're saying. I would say that would probably be reasonable that it might have been, I guess, maybe an estimation, maybe 100 feet.

Q Okay.

A One hundred feet, something like that.

MR. EHRET: Let me interrupt here, Terry, please.

Page 14

It's John Ehret speaking. Do I have your permission?
MR. PETRIE: You sure do, John.
MR. EHRET: There is a survey which is by Wightman & Associates and signed by John G. Kamer who is the elected county surveyor at this time, and it's dated May 22nd, 1986. It was done for the NBD Mortgage Company.
BY MR. PETRIE:
Q Would that be the survey you are referring to, Dr. Okonski?
A Yes, I believe so.
MR. EHRET: And I think this is on legal size and it indicates a scale of one inch equals 200 feet. And I think that the best way to answer your questions is for you to have a copy of this survey.
MR. PETRIE: I appreciate that offer. I think I may just muddle through the line of questioning that I have.
MR. EHRET: Right. I'm not suggesting you give that up, I'm just saying that it would be -- if you had this it would help.
MR. PETRIE: Yes, I agree. Thank you.
Q Let me ask, Dr. Okonski, at the time you bought the property were there any sort of shore protection devices or structures in place such as sea walls?
A Yes, there was, sir.
Q What would you say was in place at the time you bought it?
A There was a metal seawall that was -- that spanned the

Page 15

entire distance across the property. It was joined intact from the -- both the north and south properties.
Q When you bought the property, sir, did you ask any questions of perhaps the person or the owner that you bought it from? Or if you were working through a realtor, did you ask the realtor any questions about erosion?
A I did discuss it some with the realtor, and very little with the owner. She was a very elderly lady who was moving to Arkansas, I believe, and was sort of in poor health. But, I mean, there was some discussion; I don't recall the exact exchange.
But, you know, again, in talking with one or both of them, you know, this was an area that's historically had some erosion present, and I don't think, being in the position probably either of them were in, they probably didn't make it seem too -- too overly cautionary.
Q Sir, did you ask either of them, or perhaps did they volunteer any information about any thoughts about what was causing the erosion?
A That I do not recall specifically with them, other than the fact I recall speaking with the owner's son on occasion, who also lived there, just talking to him about the seawall and when the seawall was put in place. And I think if, you know, they had had any erosion from that point in time of any considerable amount.

Page 16

And, as I recall, the answer was there had not been any considerable erosion from the time the seawall was in place.
Q Did the gentleman, the owner's son, volunteer or offer any observations about what had caused the erosion?
A Not that I recall.
Q Since you bought the property in 1986, sir, has the property experienced any further erosion?
A Yes, it had.
Q Can you tell us about that?
A Sure. I don't know exactly when, but the -- over a period of time, I would guess maybe over ten years, the seawall deteriorated to a point where maybe we had -- we have, oh, ten percent of the seawall standing and the rest has now fallen, you know, either towards the lake or to the shoreline.
And there was -- let's see, I believe I would say maybe 12 years ago we had a rather significant storm in December. And the vegetation that was on, present on the bluff at that time, which there was full vegetation -- in other words, we had a covering of green, I would say, you know, whether it was grasses, trees, plants, all the way across -- and after that storm the entire vegetation slid down to the edge of the lake. So over, I guess, in maybe, gosh, within a week's time or so.

Page 17

Q Any way of estimating or describing the quantity, either in feet or volume of the --
A I would say at the furthest point that the erosion carried from the edge of the bluff, I would estimate, maybe 20 to 25 feet.
Q How about any other loss to erosion besides the one that you've described for us that came on the heels of that storm 12 years ago in December?
A There was some erosion prior to that time. The part of the foundation that I had mentioned earlier did fall into the bluff, you know -- or down the bluff, I should say.
And after that point there has been some erosion. We have some edging that was put in all the way to the edge of the bluff just for a flower bed, and that edging is now exposed. So it's aluminum edging that you'd put in to distinguish between your plant beds, you know, where you would place mulch, and then your lawn. And that was -- it was not quite to the edge of the bluff at that time, I would guess back by maybe five feet or so, and now that is actually hanging over the bluff. So it is -- the aluminum edging is kind of suspended, in a sense.
Q So -- and I'm offering this to make sure I'm correct, but if I'm wrong you tell me.
A Okay.
Q You're describing approximately another five feet of loss of

Page 18

land?
A I would say five to maybe eight feet possibly, yes.
Q Had any other loss to your property?
A That has been it pretty much that I can -- that I would say, yes, as far as the erosion is concerned.
Q The erosion that you've described, sir, do you consider that a significant loss of property to erosion?
A The erosion that occurred as a result of the storm, I would say yes.
Q How about the erosion that you described both prior to the storm as well as afterwards, do you consider that significant erosion?
A Well, I understand when we built the house the DEQ, we had to have some kind of sign off letter, and I understand that historically in that area it's -- I'm not sure what time frame they are talking about -- but maybe four feet a year, which I found out when we built the house. And I'm not sure if that's accurate or not. But I guess any erosion I feel is, you know, disturbing in one sense, I guess.
Q Sure. Relate to me again, please, what your understanding was at the time you bought the property regarding the loss of about four feet a year?
A That I didn't find out until we actually -- we built a new home in -- it was completed in 2000, January of 2000.
Q Okay.

Page 19

A So that was when I -- or just prior to, you know, the completion of that, that was when -- I believe it was through someone in the DEQ that had mentioned the historical erosion. Prior to that time I was not aware of that.
Q Okay. And just -- and I apologize, it may be very apparent once I hear it, but what is DEQ?
A That's the Department -- it was the -- what was the former name? It was the Department of DNR, the Department of Natural Resources.
Q That's a state agency?
A It is a state agency. And now it's the Department of Environmental Quality.
Q Do you have any sense of whether the erosion that you had experienced -- that your property has experienced -- is permanent? That you're going to never get it back, that land that you lost?
A I would say that's permanent, yes.
Q Sir, this lawsuit that you brought against the United States alleges that the erosion your property has experienced the Corps of Engineers is responsible because of the jetties that they have constructed there in the St. Joseph harbor, is that right?
A Yes.
Q At what point in time did you reach some kind of an understanding, or the thought crossed your mind that

Page 20

something other than the lake was responsible for the erosion your property was experiencing?
A I would have to say it was just prior to the time of building. As we were considering, you know, building a new home and investing a fair amount of money, I guess we started, you know, talking to more individuals.
A neighbor of ours who's a good friend, and he's the neighbor immediately to the south, we conversed, and so some of his knowledge or experience we, you know, would discuss. And I guess, you know, it was really around that time, I would say, that we started, you know, looking more heavily into, you know, what -- if we do build, what kind of erosion we can expect. And, you know, what can be done to try and -- and maybe not stop, but to prevent it.
In fact, the neighbor and I, Mr. Bodnar, Andrew Bodnar who I think is scheduled to be deposed on Friday --
Q Yes, sir.
A -- we did hire a company to dump some rip rap over the bluff, actually it was placed because they used an excavator to try and place it strategically to try and -- I wouldn't say stop erosion, but to try and reduce the effect of the erosion. And I believe that was done in -- boy, I'm going to have to say somewhere around 1995 or so.
Q Okay.
A I don't have that information at my fingertips, but I'd say

Page 21

somewhere around '95 we did hire a company to place a great deal of the rip rap, or broken concrete, strategically in the bluff to try and reduce the effect of erosion.
Q Now, sir, I want to go back to a question I asked because --
A Yes.
Q -- I think we got ourselves off track just a bit.
A Okay.
Q Not your fault. I had asked you to see if you knew at some point in time in which you started thinking that something other than the lake and what the lake does, might be behind or explain or cause the erosion your property was experiencing.
And in responding to that question you then began to describe the conversation and the experiences that you had with Mr. Bodnar.
A Sure.
Q Is that, that relationship, that friendship, that talking together, that the idea came to you that perhaps something else was responsible?
A Yes. I brought a packet with me, and one of my -- I started collecting different articles that dealt with erosion, and I have several with me, one actually by the Army Corps of Engineers from the Detroit District, but there's one that is called a Great Lakes Erosion Fact Sheet.
Q Yes, sir.

Page 22

A And it's through the Great Lakes H&H Branch in the Detroit District. That is dated -- let's see -- February of '97. And that was probably one of the -- I'm just, in answer to your question -- one of probably the first articles I guess that really discussed the erosion.

You know, you, obviously, when you live on the lake you talk with different people, whether neighbors or others that find out you live on the lake. But this was one that addressed the different causes or types of erosion.

Q Okay. And is it something within that article that made you, along with other information, begin to believe that maybe something else explained the erosion?

A Yes. Yes. There's a part in this -- again, this article which Mr. Ehret I'm sure could fax to you, if that's something you wanted at some point, but there's an article that talks about littoral transport and sand supply.

Q Yes.

A And just reading part of the article here it says; "Coastal erosion is part of a larger process known as littoral transport." And then it describes what littoral transport is.

But it says; "Littoral transport occurs both along the shoreline as well as into the lake and on the shore. With respect to sand supply, a given length of coastline may have a surplus, be in balance, or have a deficit in its sand

Page 23

supply budget."

And so, I guess, through some articles that I read concerning the erosion process that -- and I guess in terms of, you know, what I think your question was was when I became aware of possibly of causes of erosion? Is that what you were asking specifically? Or --

Q Yes. I am trying to place you back in time to where you're sitting there, living there, and you go out and you see what's happening to your property. And whether or not the wheels started turning in your head to say, hmm, I wonder if there's something else other than things like storms and what the lake does day in and day out that explains or is causing why my property is experiencing the kind of erosion it has.

A Sure. I would say, in answer to your question, from probably the time that that storm occurred and we started the bluff preservation project that we did with the rip rap, up until the time that we started building there was certainly probably a more earnest or heightened awareness. And, as I mentioned, I started a file on different articles, some from the Army Corps. I have a paper of somebody who's a Ph.D. that wrote an article on erosion in the Great Lakes. She happens to live in Chicago now and is an attorney as well as an environmental engineer.

And so I just started collecting articles on this,

Page 24

and I think that was that time period maybe in several years where my awareness was heightened as far as what are possible causes of erosion, and why our area was eroding somewhat more than maybe other areas.

We have friends that live north of the north pier and I know from discussing with them, and they've been in the house for probably close to 20 years, their beach has been increased. So the sand supply or beach area in front of their home has been increased, whereas ours has been -- has continued to diminish over time.

Q So you place this heightened awareness where you started to contemplate other possible explanations for the erosion that your property experienced back to this December storm some 12 years ago, and you started to then collect articles and things of that nature?

A Correct.

Q So the December storm 12 years ago -- and I'm trying to think, does that mean 12 years ago from this coming December? Or is that 12 years from December 2005 going back?

A I would say from the storm, which I would guess was in 1994, and maybe Andrew Bodnar could substantiate that time period, but I'd say from that time, 1994, until we started building -- let's see, we started our home in 1999 and then it was completed in 2000. So I would say, yeah, in those

Page 25

four or five years probably preceding the building of our home, because we were, you know, building a, you know, which we thought and still feel a rather nice home, we were putting the money into it, that we had some obvious concerns about the erosion that was going to take place and had taken place and, you know, may continue certainly in the future.

Q So starting in approximately December 1994 coming forward in time, when did you -- and I'm focusing on that heightened awareness on your part where you are over time becoming more aware of what is possibly causing erosion, the different possibilities.

So if we come forward from December 1994 when this heightened awareness on your part came into existence, at what point in time did the idea of the Corps possibly being a player, or involved in this come to your attention?

A At what time did the -- I'm sorry.

Q The possibility of the Corps.

A Oh, I see. Yes.

Q When did that come to your attention?

A Boy, I don't know, you know, exactly what year. But I have, for instance -- let's see. I have a U.S. Army Corps of Engineers Great Lakes Water Level Fact Sheet dated January of 1987. I have the article I mentioned before that was from '97. But this last one I said, Great Lakes Water Level Facts was 1987. I have a U.S. Army Corps of Engineers, it's

Page 26

called Help Yourself, a Discussion of Erosion in The Great Lakes.

You know, again, I don't know exactly when I started or became aware. You know, I think what happened primarily -- oh, this one article was, let's see, their printing was in 1973, and that was the Army Corps of Engineers Help Yourself, Discussion of Problems in The Great Lakes --

Q Yes, sir.

A -- and the revised edition was 1978. So I think what happened, I guess, is when we saw the seawall deteriorate, slowly deteriorate, and then that storm occurred, it was kind of a shock. And, you know, even though I did understand that erosion occurs, you know, we saw the seawall erode, we saw this huge storm that took all the vegetation, and, you know, my original intention in purchasing the property was some day to build a home on this because the house that was present was a very small old home, but obviously the property there was desirable because of the view and that.

So over time we, you know, had to contemplate what we thought, if anything, we could do to diminish the effect of erosion, and what the effect of erosion was going to have or impact on us in the future, you know, in the near future and even in the, you know, far, the more extended future.

Page 27

Q Yes, sir. And I understand that you completed the home in January of 2000?

A Correct.

Q Sir, and let's use that event as perhaps a point in time that will assist us in you perhaps placing at what point in time the idea crossed your mind that perhaps the Corps had something to do with the erosion your property was experiencing.

Do you have some sense of whether that idea, that possibility occurred to you before the new home was completed in January 2000? Or is it the understanding on your part that occurred after the home was completed?

A I would have to say it was prior to that time.

Q Did you have an opportunity, sir, to ever approach the Corps and ask them in some manner, in writing or perhaps in person, about the erosion problems the area was experiencing, and certainly your property specifically?

A There were -- let's see. There was a, I don't know if you want to call it a symposium, but there was a meeting held at, I believe it was Lake Michigan College which is in Benton Harbor, I'm not sure when the date of that meeting was. That was prior to our building the home in 2000.

And that was attended, I believe, by a representative from the Army Corps of Engineers. I think there were three groups in attendance, and there might have

Page 28

been, let's see, a couple of professors from Western, as I recall, who were doing some type of research on bluff preservation. And both Andrew Bodnar and myself attended that meeting, and I would maybe defer to him if he has some idea of exactly when that was. But it was definitely prior to our building the home. So I would say that was -- would have been maybe in 1996, something like that.

And it was -- so it was held in our area, and it was a request for, you know, to home owners as an informational meeting on erosion. I do also get the monthly -- either monthly or maybe quarterly mailing from the Army Corps as far as the lake levels. There's a pamphlet that I do receive.

Q Okay. I appreciate your advising me of all of that information. At this meeting that you and Mr. Bodnar attended at Lake Michigan College, did the -- did any personnel from the Corps of Engineers address the attendees?

A Yes.

Q What was the topic? Or what kind of presentation did they provide?

A As I recall the -- as I mentioned, I'm trying to think of what the third agency or group represented would have been. But there was a representative from the Army Corps. I believe there was a representative from -- whether it was DNR or DEQ at that time, they were present. And then these

Page 29

professors from Western Michigan University. And what they were talking about is, you know, as a broad category, erosion of the Great Lakes and erosion in our specific area in St. Joe. And the professors from Western were involved in some type of project where they were, as I recall, burying some types of rock or something that would be buried out into the lake to see if that would change the wave action.

And so I guess that my take from the meeting was more involving the discussion that they presented, whereas I didn't -- I don't know that I gained a lot of insight from the Army Corps or from the DEQ, I think most of that was things that I had already read or heard of.

Q Was the focus of the meeting to discuss ways that people could try to preserve their property?

A It was sort of an informational meeting, and I believe there was, yes, there was some discussion on, you know, preservation techniques. There may have been a pamphlet that was handed out. And I'm not sure, I have one pamphlet in my file also called Low Cost Shore Protection, and I don't know if that was one I had gotten or received at that time, but it was -- I do have that in my possession, and I can't say for sure.

Q Do you recall what the Corps of Engineers personnel, what they offered for the attendees? What was their talk about?

Page 34

December 1st of 1998 I was made aware of the potential litigation.
And then also we explored it again. In September of 2003 both Mr. Bodnar and myself did receive a letter from Attorney Donahue and because we were looking at that time to -- he has September 26th of 2003.
Q Okay.
A I think my recollection was when we received the December 1st, 1998 letter from Mr. Ehret, my recollection was that we had sent back because he had asked for a signed -- it says; "Please include me as a co-plaintiff. I agree to contribute to the cost of experts and so forth." And I had signed that dated December 28th of '98, but either the letter, I never sent it, or possibly a copy was sent, because I added a personal note about the -- when the meeting might be scheduled.
But it was around the time that we were starting to look into building our home, and discussion with builders, and just a busy time, and I'm not sure what occurred. I later found this letter in my file and I hadn't seen this letter probably for, you know, six-, seven years or so.
Q When you -- the letter that you're referring to, the December 1st, 1998 letter, do you have that there with you?
A I do, yes.

Page 35

Q If I could trouble you, please, to read that to us and out loud?
A Sure. Dated December 1st, 1998. Addressed to me. The Subject: Shoreline Residents versus U.S. Army Corps of Engineers. "Some local riparian property owners are preparing to sue the Army Corps of Engineers for compensation for property losses and for the cost of prudent measures taken to protect property from further erosion.
"The Corps activity in blocking (St. Joe piers) dredging (Channel), and disposal of sand causes riparian owners to lose beaches, dunes and bluffs to erosion. These activities constitute a Fifth Amendment taking of private property without just cause."
Q Okay. And is that from Mr. Ehret?
A "Without just compensation." I said cause. "Private property without just compensation."
Q Okay.
A I said cause and I was mistaken. That is from Mr. Ehret, yes.
Q I think you indicated a minute ago that you signed something?
A I signed this letter, yes. I don't know if you want me to read, there's probably about another paragraph and then there's a place to sign it.
Q I'm sorry, I cut you off, you had not read the --

Page 36

A I hadn't read the complete letter.
Q Okay. There's another paragraph there?
A Yes.
Q Which you then signed?
A Yes.
Q Can you read that for us, please?
A The part where I signed the letter?
Q Yes, sir.
A Okay. It says; "Please include me as co-plaintiff. I agree to contribute to the cost of experts, printing, mailing and court costs in an amount not to exceed $100 annually." And then I signed it. And I have dated 12-28-98.
And then I wrote a personal note down at the bottom of it. It's a two-page letter. And it says; "Look for notice of a plaintiffs meeting." It has "Schulers" with question marks. "January" question marks.
And I just wrote a personal note; "Please let me know about the meeting by phone if necessary, my phone number is 616-428-2970."
Q Sir, it sounds to my ears way out here in Denver that you planned to join the lawsuit or to participate in a lawsuit back in December of '98, yet we didn't see you join the lawsuit, and actually file a lawsuit until this past January 2006. What happened? How come you didn't bring the actual lawsuit sooner?

Page 37

A It was -- I know it was around the time when we were starting to make plans to build our home. I had been married just about a year at that point. I don't know if it was being newly married that changed some of our activities and we -- for some reason, I don't know if I just wasn't aware at the time of what was transpiring. That's my perception that I thought I had mailed this letter, and evidently I have the original in my hand, but I usually make copies of things and usually mail the original as we just do in our office as far as letters are concerned.
Q Yes, sir.
A And I thought that's what I had done, that I had signed the letter, made a copy and sent the original. But yet I have the original, it appears to be, in my hands and not a copy. It was to be mailed to John E. Dewane at Butzbaugh & Dewane at 811 Ship Street, P.O. Box 27, St. Joseph, Michigan. And I -- to my understanding, the copy had been mailed there. But I didn't hear of anything else, any correspondence regarding that, so I wasn't sure what had happened, if the lawsuit had been filed or if it was still in the discussion stages or what.
And then as time went on, from that point we started getting pretty heavily into house plans, you know, with the builder.
Q Yes, sir. You mentioned earlier here that you explored the

idea of a lawsuit again in September of 2003, and you mentioned an attorney by the name of Donahue?
A Yes, John M. Donahue. He's with Straub, Seaman & Allen.
Q And do you have some kind of a letter there with you related to that?
A I do. That's a rather lengthy letter. But at that point we had sent in a check for $500 to Straub, Seaman & Allen regarding the lawsuit. I have a file number of 500.35567.
Q Yes, sir.
A And I can read -- would you like me to read the first part of it maybe, and it might just --
Q How about can you tell me, apparently you decided not to actually bring the lawsuit at that point in time either, is that right?
A Yes.
Q Why is that?
A Well, if I can just read a very small portion of the letter.
Q Absolutely.
A Okay. It's addressed to myself and my wife. "Dr. and Mrs. Okonski, we have recently received a check from you made payable to Straub, Seaman & Allen, P.C., in the amount of $500. With that was your completed Prospective Client Intake Form. Please be advised that we did not request these funds and the Prospective Client Intake Form is only that, 'Prospective.'"



He mentions that he is assisting Mr. Ehret on certain cases related to this. Again, this is a fairly lengthy letter. He says; "I am hesitant to file any claims at this time, given the fact that the matter is currently on appeal. If the Supreme Court takes this appeal and reverses the lower appellate court, than any additional claims filed would ultimately -- would be untimely, as outside the statute of limitations."

As I read this, and again it's a rather lengthy two-page typed letter, he mentions, let's see, "The law firm may be able to represent us and would require a $5,000 retainer fee." But, again, what I got from the gist of the letter at that time was to kind of sit tight and information would be forthcoming, whether a lawsuit -- or whether we could join the lawsuit. And it says; "In fact, please feel free to contact me from time to time, should you desire to do so, as to the status of such continued interest you may have or the status of the pending appeal."

This was something that both Mr. Bodnar and myself had filed or -- you know, had sent a check with our Prospective Client Intake Form. And my discussion was with Mr. Bodnar, he had spoke with Mr. Donahue and I was kind of getting secondhand information from Mr. Bodnar regarding this. And my -- again, my take on this was, well, we're not sure where this is at and whether you can join; my feeling



was whether you can actually join the lawsuit at that point. So I didn't proceed any longer because that was my take on it at that time, correct or incorrect.
Q I understand. Now, you brought Mr. Bodnar back into the picture here, and I was curious to know if you know whether Mr. Bodnar also had expressed an interest in filing a lawsuit back in towards the end of 1998 when you had received that letter from Mr. Ehret?
A That I don't know. I can't speak to that time. I know that we both sent a check to the attorneys, you know, Straub, Seaman & Allen --
Q Yes, sir.
A -- in 2003. We are personal friends, and so we, you know, would talk about this, as well as other matters, from time to time. But I don't recall specifically what the -- what his take was on this in '98.

Like I say, that was -- that became a very busy time for us because we were starting to get pretty heavily into the planning of a house and an upcoming birth of a first child.
Q Okay. Well, I understand that. Let me ask this. Why did you file the lawsuit here in January of 2006? What prompted you to do that?
A My feeling was, you know, we had been looking into the causes of erosion, you know, as I had mentioned, probably



more heavily since this storm which took, what I feel, is a fairly major portion of our bluff, and I'm going to say in 1994 up until the time we were building. And, you know, we weren't sure what our -- what actions we could take as far as, you know, legally.

What we, you know, had looked into with Mr. Bodnar again, as I keep bringing him up and he'll probably do the same to me on Friday, unfortunately, but was that we would talk about, you know, what we can do to try and protect the shoreline. And when we initially explored different options when, after that storm, we found that the cost was very significant. We looked into several different methods of bluff preservation and, you know, I think to repair the seawall was extremely costly at the tune of, boy, 800 to a $1,000 a linear foot, and so we were looking at, you know, a really substantial cost.

So I think in the back of my mind, at least, when we started looking at what was -- what options were available to us, when we knew that there was the possibility of a lawsuit, and then the lawsuit, you know, had been filed, and it was more a matter of I'm not a litigious person by nature, partly from personal, just my personal perspective and also being in the profession I'm in, as you might anticipate. But we were not interested in some type of procuring a huge settlement, what we wanted was really

Page 42

the interest in trying to really pursue funding just to protect the shoreline. You know, I think we would be happy if we had an intact seawall or some other type of preservation project. Again, we're not looking for a windfall, you know, as in winning the lottery, we're looking at just trying to preserve our home to pass this on, I guess, to our children and that sort of thing.
Q Sir, let me change gears for a second here --
A Sure.
Q -- and talk about what kind of understanding you have about any efforts by the Corps of Engineers to address erosion problems south of the St. Joseph harbor. Do you have any kind of awareness of those kinds of efforts by the Corps?
A I do not, with the exception of my understanding there's dredging that occurs annually of removing sand from somewhere out in the lake and bringing it in to replenish the Silver Beach area, and I'm not sure how far that extends south, but I know it extends like into what is called Lions Park area.
I know that the washing out of sand -- I had a -- had a friend, and have friends that live down in the Lions Park area now, and I know it seems like in the winter a considerable amount of sand becomes washed out, and then my understanding was there was some type of contract or commitment by the Corps to replenish that sand. And so they

Page 43

would -- I think currently are dredging actually and replenishing some of the sand for the beach area.
Q Have you ever believed that those dredging efforts and the placement of the sediment, the sand on the Silver Beach, ever benefitted you and your property?
A No. I would say probably the contrary. Just, you know, in thinking that, you know, sand is being removed from one location -- I thought it was nice for the home owners that are down in the Silver Beach and the Lions Park area, but probably wasn't a benefit to us, maybe detrimental.
Q Did that kind of activity by the Corps, dredging and so forth, and placing of the sand and the sediment on the Silver Beach, did that ever cause you to hold up in bringing your own lawsuit?
A I don't think I looked at it from that perspective. I think, you know, I had thought -- you know, again, I'm not typically a litigious person and had hoped that there might be some type of federal grant or something on that order, a mandate that would occur that would resolve in some type of bluff preservation project. And maybe that was being too simple. But I think in my mind I -- you know, you kind of think, well, maybe things will sort of take care of themselves somehow without personal involvement.
Q Yes, sir.
A If that makes sense.

Page 44

Q Sure does. I understand that. Sir, I'd like to take a break at this point and go off the record.
A Okay.
(A short break was taken)
MR. PETRIE: Back on the record.
Dr. Okonski, I have no other questions for you at this point. I would like to, if I could, please, John, for him to make a copy of that December 1998 letter that he has read and described for us, as well as the September 2003 letter that he described from the attorney Mr. Donahue; may we receive those?
MR. EHRET: You certainly may.
MR. PETRIE: Thank you. And with that, I will turn it over to you, John, if you have any questions for him.
MR. EHRET: I do have some questions.
CROSS EXAMINATION
BY MR. EHRET:
Q Okay. Dr. Okonski, you mentioned this Detroit District Great Lakes H&H Branch Fact Sheet, Erosion Fact Sheet, and it has a date of 2/97, and it appears to have four printed pages and a cover sheet, but there's no author.
Are you aware of any author of this, other than the Detroit District Corps of Engineers?
A No, I'm not. In fact, I'm not sure how I procured that, but

Page 45

I do have it in my possession.
Q And you seem to focus on one particular sentence, and I'll repeat it. And, if you would, please explain why it is that you focus on this -- well, it's two sentences.
"Littoral transport occurs both along the shoreline as well as into the lake and onto the shore. With respect to sand supply a given length of coastline may have a surplus, be in balance, or have a deficit in its sand supply budget."
Could you explain what it is about that two sentences that seemed to draw your attention during your deposition testimony?
A Yes. I think when Mr. Petrie asked, I believe the question was, I think, about my awareness of erosion and maybe why consideration to filing the suit, and, as I believe I mentioned, I had collected a lot of information over a period of years regarding the erosion in the Great Lakes, and some specifically to this area, St. Joseph, or the, you know, southeast corner of Lake Michigan. And when I read that fact sheet talking about the littoral drift and that, that was something that I guess drew me to, or made some connection with the lawsuit in its claim of the change in the littoral drift as a result of the construction of the jetties or piers, and its effect on the erosion in our area.
Q Now, at one point you mentioned erosion of four feet per