# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 99-4451 L
c/w 04-277 L, 05-1353 L, 05-1381 L, 06-72 L

| | | |
|---|---|---|
| JOHN H. BANKS, MARY E. BANKS, et. al.<br><br>Plaintiffs,<br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | ) | NO. 99-4451 L<br>Judge Emily C. Hewitt |
| STONE ERROL L. & SUSAN H.<br>as trustees of the Susan H. Stone Trust,<br><br>Plaintiffs,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-277 L<br><br>Consolidated |
| EUGENE J. FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 05-1353 L<br><br>Consolidated |

PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION TO PARTIALLY DISMISS AND MEMORANDUM IN SUPPORT THEREOF

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| 1. | Background Law and Facts with Argument | 1. |
| 2. | Section 11 of the River & Harbor Act with Argument | 3,5 |
| 3. | Effectiveness of Beach Nourishment Program with Argument . . . . . . . . . . . . . . . . . . . . | 6 6,7 |
| 4. | 5th Amendment or Section 111 . . . . . . . . . . . . . | 8 |
| 5. | Constitutional Rights Depend on Which Way the Wind Blows . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| 6. | The Corps Acts in Secret | 10 |
| 7. | The Unknowables with Argument . . . . . . . . . . . . | 11 |
| 8. | What Beach Nourishment? . . . . . . . . . . . . . . . . | 11 |
| 9. | Blowing in The Wind with Argument . . . . . . . . . . . | 12 |
| 10. | Underwater Slurry Pipe with Argument. . . . . . . . . | 13 |
| 11. | Summary . . . . . . . . . . . . . | 14 |
| 12. | Conclusion . . . . . . . . . . . . . . . | 15 |


## TABLE OF AUTHORITIES CITED


| | | |
|---|---|---|
| 1. | Banks v. United States 314 F.3d 1304 (1/2/03) . . . | 1 |
| 2. | United States v. Dickinson 331 U.S. 745 (1947 . . . | 6 |


STATUTE


| | | |
|---|---|---|
| 3. | River and Harbor Act of 1968 Section 111 PL 90-483 Now PL106-53, 33 U.S.C. 426i raised spending limit to $5,000,000 without authorization. . . . . . . . . | passim |

PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION TO PARTIALLY DISMISS AND MEMORANDUM IN SUPPORT THEREOF
(DOCKET 172)

NOW COME "dismissal" plaintiffs by their attorney, John B. Ehret, and for their RESPONSE TO DEFENDANT'S MOTION TO PARTIALLY DISMISS AND MEMORANDUM IN SUPPORT THEREOF state as follows:

BACKGROUND LAW AND FACTS

1. On January 2, 2003, the United States Court of Appeals Federal Circuit decided Banks v. United States 314 F.3d 1304 at 1310 stating:

> With the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report and 1999 Report collectively indicated that erosion was permanent and irreversible. We are satisfied that the plaintiffs met their jurisdictional burden before the Federal Court of Claims on the basis of the justifiable uncertainty of the permanence of the taking caused by the actual mitigation efforts of the Corps. The statute of limitations did not begin to run until the Corps issued the 1996, 1997, and 1999 Reports.

The above result "represents an application of general accrual principles, rather than a broad exception to them." Id at 1309. The Court goes on to say that the question is as to the "predictability (and permanence) of the extent of damage to the plaintiffs' land."

ARGUMENT: The 1997 and 1999 Reports will be shown later herein to make clear the the Section 111 program was abandoned. The extent of damage became predictably total.

2. The Federal Circuit mandate was not issued until May 23, 2003 due to the United States having filed a petition for panel rehearing, and a petition for rehearing en banc, both of which were denied. (Exhibit 1 hereto).

3. After two applications to extend the time to file a Petition for a writ of certiorari, the United States filed their Petition on September 15, 2003. (Supreme Court Docket No. 03-402)(Exhibit 2 hereto).

4. Plaintiffs waived their right to Respond on September 24, 2003, and the Petition was denied on November 3, 2003. (Exhibit 2)

5. The three reports listed by the Federal Circuit at 314 F.3d 1307 were:

a. June 1996 Technical Report on Geologic Effects on Behavior of Beach Fill and Shoreline Stability for Southeast Lake Michigan (Exhibit 3.1)

b. July 1997 Technical Report on the Effectiveness of Beach Nourishment on Cohesive Shores, St. Joseph, Lake Michigan (Exhibit 3.2)

c. January 2000 FY-1999 Annual Report on Section 111 Beach Nourishment Monitoring Program. (Exhibit 3.3)

6. The evidence in these three Reports was not supplied to any plaintiff property owners individually. By issuing their order in this fashion, the Federal Circuit triggered accurual universally within the plaintiffs' zone. Had the Federal Circuit panel triggered individually - plaintiff by plaintiff

upon their gaining knowledge- then the door would be open for everyone in the plaintiffs' zone to bring their claims as they became aware, one by one.

7. As the Federal Circuit has written the opinion, they have created a simultaneous constructive notice on all property owners in the plaintiffs zone from Shoreham to the Grand Mere Natural National State Park, saying "each complaint was timely." Id 1310

8. There is an important distinction between the three Reports. The 1996 and 1997 cover pages state: "Approved For Public Release; Distribution is Unlimited". The FY 1999 Reportwas obtained through the discovery deposition of David Schweiger on 10/26/00. That "Annual Report on the Section 111 Beach Nourishment Monitoring Program" is not for Public Release. It was filed with the Clerk of the Court as Exhibit 41, Docket Number 58 Dated 1/10/2001, COFC # 1:99-cv-0445-ECH by Court Order Docket Number 67 dated 2/22/2001. Accrual would be universally dated 6 years later or 2/22/ 07.

SECTION 111 of the 1968 River and Harbor Act

9. The 1973 Detroit District Sec. 111 Detailed Project Report (DPR) states at least three times that mitigation of 110,000 cy/yr was meant to replace net littoral drift (or 30%)

interrupted by the St. Joseph Federal Structures. (Exhibit 4). Therefore until 1989, 70% of the Littoral Drift was getting to the downdrift plaintiffs. (See Ex. 4.1,4.2,4.3 & 4.4).

10. The 1973 DPR defines the Zone of Influence of the navigation structures and the Erosion Zone as ending near Brown School Road, about 20,900 feet south of St. Joseph Peirs. (Ex. 5)

11. The 1986 DDC (EX. 6.1) Monitoring Report for the St. Joseph Harbor covers 1975 -1984. It makes several findings:

a. "annual wave energy towards the south is about twice that directed towards the north." (Ex. 6.2)

b. "The Section 111 DPR determined the net littoral transport interrupted by the harbor structures to be 110,000 cy/yr" based on 1907 to 1971 data. (Ex. 6.2)

c. "For the entire period 1975 to 1984, the net direction of sediment transport was to the north". (Ex. 6.3)

d. The monthly hindcast sediment movement is generally southward from January to April, with no movement from May to October. Nov. and Dec. movement is generally to the north. Nourishment material placed in May through August may move northward before moving southward. Depending on the magnitude of the northward movement, some or all of the nourishment material may not be effectively utilized to fullfill the southward transport demand. If this trend were to continue, it might suggest a change in when the nourishment material is placed. (Exhibit 6.4)

12. In 1989 the steel encasement of the jetties was completed at St. Joseph. (Exhibit 7.1 and 7.2)

13. June 8, 1994 a public meeting was held at Shoreham Village Hall. (Exhibit 8.1) . The Detroit District Corps was represented by:

C. Thompson Eng. Div.
J. Karmo Planning Division
D. Zande C-O Div.
D. Schweiger Chief, Riverine & Coastal Sec.
R. Kittleman Grand Rapids Office

14. The Question and Answer session included the following exchange: ((Ex. 8.2)

Question: Does the Corps feel that 110,000 cy/year is addressing 30 % of the erosion?

Answer: There is really no way of knowing. (Argument!! Defendant's motion says plaintiffs' should know.) The only answer that can be given is that the DPR stated that the Harbor structure is blocking 30% of the littoral material coming from the north and that placing 110,000 cy/yr would replace that lost material. (Argument!! This answer is wrong on its face because the steel encasement had been installed for 5 years by the time of this meeting).

Please note that the Shoreham lake paving - stone placement was announced at this meeting, but no further information has been given to property owners as to its success. Stone placement is not beach nourishment.

15. The 1997 Report stated at page 27: (Exhibit 9.1)

> Landward of the channel entrance, the harbor jetties due to their sheetpile construction, were considered to be complete barriers to alongshore transport.

Argument: This constitutes a refutation of the effectiveness of the so called nourishment program. With total interruption, the 110,000 cy/yr (30%) should be 366,666 cy/yr, but instead the Corps was cutting back as will be seen later herein.

and at page 79 (Ex.9.2)

> ... the combination of the long jetties and the deep navigation channel acts as a total littoral barrier, trapping all sediment reaching this area from either the north or the south.

Argument: By 1997 the government consultants were telling the Detroit District (but not the property owners) that the piers were trapping "gross" not "net" littoral drift. In United States v. Dickinson 331 U.S. 745 at 750 (1947) the Supreme Court stated that "... payment need only be made for what is taken, but for all that the Government takes it must pay." Ultimately the government's answer was and is to not mitigate - to not nourish beaches south of St. Joseph.

16. The 1999 Report on Section 111 Beach Nourishment Monitoring Program states:

EFFECTIVENESS OF THE BEACH NOURISHMENT PROGRAM

> In simple terms, any adverse effects associated with the federal harbor structures is the result of the disruption of littoral processes, specifically the removal of material from the littoral system. The beach nourishment program is designed to mitigate this disruption by replacing that material. The effectiveness of the beach nourishment program is dependent on how well it duplicates the normal littoral processes.

Argument: The Corps was recognizing slowly that it was not meeting Sec. 111 dictates but had no idea that the 5th Amendment

was also being violated.

ARGUMENT

17. The defendant's questions as to whether individual plaintiffs were aware of the Corps' beach nourishment program have to do with Section 111 of the 1968 River and Harbor Act, not the 5th Amendment Right to Just Compensation for appropriation of private property.

18. The answer depends on whether any sand of the proper natural size was known to be dredged/pumped or trucked/dumped or otherwise arriving on some individual property of some individual plaintiff as a result of the Corps having a flunking program to nourish.

19. The only way to answer "yes" is to know that the property loss is the result of the Corps jetties which the Corps denies (Please see Exhibit 5 Zone of Influence) miles away.

20 The only way to answer "yes" is to know more than all the studies, of all the engineers and scientists of NOAA, USGS, Vicksburg Corps, Detroit Corps, Michigan University, Purdue University etc. etc whose combined knowledge says they didn't know and needed more studies and those studies must be kept secret from such shoreline residents as plaintiffs.

21 In actuality, the DDC leaders declared that (1994) there was "no way of knowing" if 110,000 cy/year was mitigating for 30% of the erosion when they must have known that the steel encased piers must have been blocking 100% of the littoral drift. (Ex. 8.2)

5TH AMENDMENT OR SEC. 111

22. The 1999 Report inadvertently sheds light on the difference between the 5th Amendment and Section 111 of the 1968 River & Harbor Act. Until the three Reports relied upon by the Federal Circuit, the DDC considered it their Sec. 111 mandate to replace only 30% of what the federal structures interrupted.

23. This continued to be so even after 1989 when the 70% which had been going uninterruptedly along the shore was block by steel encasement.

24. But in 1999 the FY monitoring report suddenly recognized that "any adverse effects (ie a taking) associated with the federal harbor structures is the result of the disruption of the littoral processes, specifically the REMOVAL (or taking ie) of material from the littoral system."

25. The Federal Circuit astutely recognized that the DDC had recognized their 5th Amendment obligation was greater by far than their perceived mandate under Section 111 of the 1968 River & Harbor Act.

26. Up to that point in time the Corps studies all manifest an uncertainty as to the socalled program of Sec.111 mitigation. For examples:

a. Ex. 8.2 "There is really no way of knowing"

b. Ex. 9.3 "Whether the beach nourishment is having any positive impact further south will be investigated in the next phase of this project."

c. Ex. 9.4 (Presumably the next phase) "If the feeder beach sand simply ends up slowly filling the large lake bed depression that has developed in Sections D to F, the shore, further downdrift will continue to be denied the historic levels of sediment supply".

and

Ex. 9.4 "...the focus of lake bed lowering (ie that led to the development of the depression offshore of Section E to F) has shifted to the south."

27. By then, 1999, the Corps had already cut mitigation quantities from 88,314 $m^3$/yr (115,515 cy/yr) to 40,852 $m^3$/yr (53,434 cy/yr) which representents a cut back of over 54% in the period 1991 to 1995 as compared to the period 1976 to 1991. (Exhibit 9.5)

28. The DDC further flunks both Sec. 111 and the 5th Amendment by adopting the use of very coarse cobble/rocks material for mitigation. This material created additional uncertainty as exhibited by their plan to use tracer materials to evaluate the "benefits downdrift." (Exhibits 9.6 & 9.7). Mitigation in kind is the only mitigation.

CONSTITUTIONAL RIGHTS DEPEND ON WHICH WAY THE WIND BLOWS

29. The uncertainty of the degree of effectiveness of the mitigation is spelled out in the FY 1999 Sec. 111 Monitoring Report relied upon by the Federal Circuit. (Ex. 10). At page 4 Subparagraph 3) states (facetiously we suspect) "accurate forecasting the wind/wave conditions a year in advance is not yet feasible"

30. That same 1999 Report relied upon by the Federal

Circuit shows on page 4 Subparagraph 5) that St. Joseph was still considered to be authorized for 110,000 cy/yr, but that there was a shortfall of 327,000 cy. This amounts to abandoning the beach nourishing program for 3 years. The DOJ question should have been "Did you know the attempted program had been jettisoned?"

31. Summing up the shortfall column of figures on the same page 4, confirms the abandonment of all Section 111 Harbors in the amount of 3,420,600 cubic yards of beach sand. The Corps was not nourishing like mother nature does.

## The Corps Acts In Secret

32. The plaintiffs were not privy to this abandonment of the program any more than they had been individually informed of the taking they were victims of. The DDC has been taking by underwater stealth, the subjacent support for the plaintiffs' individual properties. The scheme then culminates in this Motion for Dismissal because the plaintiffs don't know enough to disbelieve the DDC.

33. Solicitor General Theodore B. Olson exposed the whole matter in his Petition for Writ of Certiorari dated September 2003. He exposes the previously unknown information that only 14 out of 83 Section 111 programs were being funded nation-wide. (Please see Exhibit 11 herein).

THE UNKNOWABLES

34. Dr. James P. Selegean P.E. Ph.D was presented for deposition by the government as their Rule 30(b)(6) witness on June 2, 2006. (Exhibit 12.1 & 12.2). He testified that he had been working at the Detroit District for 15 years ie since 1991. His undergraduate degree is in Civil Engineering.

35. Dr. Selegean testified (Ex. 12.2 pages 36:15 through 37:2) that during his formal education school years he had not studied littoral drift, depth of closure or wave hindcasting.

36. ARGUMENT: It is unjust to impute such knowledgeability upon laymen and women who are not likely to have scientific or engineering training. And yet, pumping (by dredge pipe) or dumping (by truck) sand somewhere, four to eight miles north of plaintiffs' zone is supposed to be known and its littoral drift effect is supposed to be understood in order to qualify for "just compensation" under the 5th Amendment.

WHAT BEACH NOURISHMENT?

37. Exhibit 13.1 is a 5-28-03 photo of a contractor's dredge working over a shoal just off the end of the south pier. Her flag is blowing firmly to the north. Exhibit 13.2 shows the underwater dredge slurry pipe about 0.70 mile south of the dredge pumping sand onto Flo Larson's wannabe beach on

on 5-28-03. Exhibit 13.3 dated 11-7-04 shows Flo Larson's beach sand is gone.

## BLOWING IN THE WIND

38. ARGUMENT We all know it does nothing to blow in the wind. But the Corps does the dredging equivalent by hiring contractors at the piers to pump south against waves that drive sand to the north. There is no dispute that while the dominant direction of wave energy is from the north, the dominant direction of waves is from the south. The south fillet is only a few hundred feet to the north (Exhibit 13.5)

39. ARGUMENT Exhibit 13.4 (5-5-05 Herald Palladium) shows the futility of this dredging scenario. The piers cause reshoaling within days and the redredging contract has to start all over. Wayne Schloop is Chief of Operations for the DDC. His comment to the Herald Palladium was that "We're starting again from ground zero, almost. It's unfortunate..."

## UNDERWATER SAND SLURRY PIPE

40. Exhibit 13.5 shows that it is 3750 feet from where the underwater sand slurry pipe submerges at the dredge to the Larson house where it emerges onto the shoreline. The University of Wisconsin Terra Modus satellite camera caught Chief Schloop's storm as it was diverted lakeward by the

south pier. Although some sand undoubtedly settled out into the shoaling area off the end of the pier, the vast majority of the sand can be seen being transported lakeward. (Please see Exhibits 13.6 and 13.7)(dated 4-26-05 & 11-3-54).

41. ARGUMENT Yes, it is unfortunate! That sand belongs to the Lake Michigan shore. If it were not for the Corps' damming the river mouth and building the piers, the sand, no matter how fine, would end up on the beaches to the south. Exhibit 13.7 is from the Detroit District Corps photographic library. The shoal seen formed from the south pier measures about 3,600 feet by scaling from the known pier length. "Seeing is believing." This loss of sand to the littoral zone has been going on for over a hundred years - even before encasement of the piers was anywhere near completion. The "dismissal plaintiffs" have no way of knowing. The DDC obviously knew.

41a. Plaintiffs add Exhibit 14 to show without words the Corps "beach nourishment" pictures dated 10-7-98 which is called "coarser sediment" by the defendant at page 5 of their MEMORANDUM OF LAW.

SUMMARY

42. The basic thrust of defendant's motion is that if the government can secretly take private property without the owners' knowledge, then the government should not have to pay just compensation.

or

43. If the government itself does not know that it is taking private property, that does not relieve the property owner from knowing. Nor is the property owner relieved of the accrual of the Statute of Limitations just because he or she does not know that the government is the cause of the property loss.

or

44. The government can nourish property many miles away out of sight of the plaintiffs, and through submerged piping, and the plaintiffs must know about it somehow in order to stop accrual. In fact, the Corps' sand depositions were not only miles away, but whether those depositions were effective was in serious doubt. Not knowing whether the pumping of sand onto the northern extreme of Lions Park was having any nourishing effect is what precipitated the 1996, 1997 and 1999 Reports relied upon by the Federal Cirsuit.

45. The Federal Circuit did not condition their reliance on those 3 Reports on whether the property owners knew about beach depositions North of Lions Park, or whether such Lions Park pumpings were having any nourishing (beneficial) effect

in Shoreham, Marquette Woods or Grand Mere, or whether the Corps knew they caused any or all the property loss by interrupting and diverting the littoral and river sand with the jetties. Defendant's use of the word nourishment begs the question which the Corps itself was asking, that is, was the sand being pumped at Lions Park having any effectiveness and specifically, where was the sand going? Since the Corps did not know, then individual property owners could not be expected to know.

## CONCLUSION

45. Based on the information provided at paragraph 8, the accrual date was October 26, 2000 when Schweiger's deposition was taken with Attorney Segrest present for the Corps. This would make the Okonski and Bodnar complaints timely. Defendant's motion as to those plaintiffs should be denied.

46. Attorney Petrie has communicated to the writer that he did not intend to include Cosgrove in his motion. I expect him to remove that name.

47. For the reasons given above, the Motion to Dismiss as to all plaintiffs based on their knowledge or opinions of beach nourishment and its effectiveness should be denied.

Respectfully submitted.

Dated: March 21, 2007

John B. Ehret
For Plaintiffs
20860 Greenwood Drive
Olympia Fields, Il. 60461
P. 708-748-8975
F. 708-748-7661
Email: jbehret@covad.net

CERTIFICATE OF SERVICE

I, the attorney, John B. Ehret do hereby certify that on the 21 day of March, 2007 I coused to be electronically filed the PLAINTIFFS' RESPONSE TO DEFENDANT"S MOTION TO PARTIALLY DISMISS AND MEMORANDUM IN SUPPORT THEREOF ON THE below listed attorneys of record:

Terry M. Petrie
Trial Attorney
U. S. Dept. of Justice - ENRD
1961 Stout Street 8th Floor
Denver, CO 80294
P. 303-844-1369
F. 303-844-1350
Terry.Petrie@usdoj.gov

Eugene J. Frett
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, Il 60603
P. 312-641-3200
F. 312-641-6492

Drew W. Marrocco
SONNENSCHEIN, NATH & ROSENTHAL
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
dmarrocco@sonnenschein.com

Attorney Heide L. Herrmann
U. S. Dept. of Justice
P. O. Box 663
Washington, D. C. 20044-0663
P. 202-305-3315
F. 202-305-0274
Heide.Herrmann@usdoj.gov

Dated: March 21, 2007

John B. Ehret
Attorney for Plaintiffs
John H. Banks et al