# ANNUAL REPORT ON THE SECTION 111 BEACH NOURISHMENT MONITORING PROGRAM

FY-1999

January 2000

SCHWEIGER
EXHIBIT NO. 2
10/26/00 K

EXHIBIT
10

EXHIBIT
41

# ANNUAL REPORT ON THE SECTION 111 BEACH NOURISHMENT MONITORING PROGRAM

## FY-1999

Table of Contents


| | Page |
|---|---|
| Purpose | 1 |
| Authority | 1 |
| Data | 1 |
| Lake Levels | 2 |
| Cohesive Coastlines and Lakebed Downcutting | 2 |
| Effectiveness of the Beach Nourishment Program | 3 |
| FY 2000 Monitoring Program | 5 |
| Recommendations | 5 |
| Related Issues | 7 |
| Future Placement Recommendations | 7 |

# ANNUAL REPORT ON THE SECTION 111 BEACH NOURISHMENT MONITORING PROGRAM

## FY-1999

## PURPOSE

This report summarizes the results of the Detroit District's Section 111 Beach Nourishment Monitoring Program for the following harbors during FY99:

| | | |
|---|---|---|
| New Buffalo | Muskegon | St. Joseph* |
| White Lake | South Haven* | Ludington* |
| Holland* | Port Sanilac* | Grand Haven* |
| Lexington* | | |

* Funded for FY99.

Note: New Buffalo's beach nourishment program is not conducted under Section 111 authority, but is so similar to the Section 111 harbors that it is included in this report.

Monitoring activities were conducted by the Great Lakes Hydraulics and Hydrology (GLH&H) Office, Hydraulic Engineering Branch. This report contains a summary of the monitoring conducted during FY99, effectiveness of the nourishment program, coastal engineering issues related to the beach nourishment program, and recommendations for future nourishment and monitoring.

## AUTHORITY

Section 111 Monitoring Programs were established as part of the beach nourishment erosion mitigation plan for each of the harbors. Each monitoring program is conducted under guidelines documented in the Operations and Maintenance Manual for each harbor. The guidelines mandate that the Operations Technical Support (OTS) Office be apprised of the results of the monitoring program, to include the effectiveness of the nourishment program and recommendations for improvement.

## DATA

Field data collected, or scheduled to be collected, as part of the FY99 monitoring program consist of color vertical aerial photographs, aerial video photography, limited sediment surveys, and numerous site inspections. Table 1 summarizes the data collected during FY99. In addition to the data collected under the Section 111 Monitoring Program, bathymetric data was collected as part of the Lake Michigan Potential Damages Study that is relevant to the Monitoring Program.

Table 1
Summary of Data Collected
FY 1999

| Monitored Harbor | Aerial Photos | Sand Probing | Site Visit |
|---|---|---|---|
| New Buffalo | Apr 99 | x | x |
| St. Joseph | Apr 99 | | x |
| South Haven | Apr 99 | | x |
| Holland | Apr 99 | | x |
| Grand Haven | Apr 99 | | x |
| Muskegon | Apr 99 | | x |
| White Lake | Apr 99 | | x |
| Ludington | Apr 99 | | x |
| Port Sanilac | Apr 99 | | x |
| Lexington | Apr 99 | | x |

## LAKE LEVELS

During Fiscal year 1999, Great Lakes water levels were lower than they have been for about 30 years. This water level regime is expected to continue into next year. As a result of the lower lake levels, sub-aerial (bluff and beach) erosion has lessened along much of the Great Lakes coastline.

A rise or fall in lake level changes, at least for a time, the location on the profile where wave energy is expended. This may result in erosion or accretion to those portions of the profile visible to land based observers. As such, the relative importance of lake levels to erosion can be perceived to be overly significant. Because much of the public perception is based on observable erosion which has lessened over the past year, there appeared to be little widespread public interest in erosion issues or the beach nourishment program.

## COHESIVE COASTLINES AND LAKEBED DOWNCUTTING

The geology of the Great Lakes coastline is glacial in origin. In most areas, the original formations have been altered by erosional and depositional processes. The Great Lakes coastline has been generally considered as a "sandy" coastline, in other words, one in which sand sized material is predominate on the bluff/dune, beach and nearshore. Field observations at a variety of sites where clay, till or bedrock were exposed began to suggest that, at least in some areas, the concept of a sandy coastline may be incorrect and that further investigation was warranted.

Since these initial field observations, several studies by the United States Geological Survey (USGS), International Joint Commission (IJC), Coastal Engineering Research Center (CERC), Canadian Center for Inland Waters (CCIW), Purdue University, University of Michigan, and Western Michigan University have been completed that confirm the existence of extensive till/clay/rock formations at or near the surface along the Great Lakes coastline. In addition, monitoring activities by the GLH&H Office including observations, interviews with recreational SCUBA divers, sediment sampling techniques and underwater video camera observations have also identified extensive till/clay formations. The till/clay/rock materials are referred to as "cohesive", as opposed to the non-cohesive sand, gravel materials present on sandy coastlines. Coastlines where these cohesive materials are present have been referred to as "cohesive coastlines". In a few areas, the underlying cohesive material is exposed to erosional processes for varying lengths of time. However, in most areas, the cohesive material is covered by a protective layer of non-cohesive material. The thickness of this cover varies considerably both in the alongshore and cross shore directions. In addition, the gradation of the non-consolidated material can vary from very fine sand to rocks, cobbles and boulders. The large rock and boulders are usually found as a lag deposit laying directly on the top of the consolidated layer.

Much more work remains to be done to quantify the extent of cohesive coastlines. However, the results of our monitoring and the studies completed thus far by others, suggest that much, or perhaps most, of the coastlines of Lake Michigan and Lake Huron consist of an underlayer of consolidated material (usually clay or till) covered by a layer of non-consolidated material (usually sand).

Cohesive coastlines on the Great Lakes are characterized by the following:

1) Wide variation in physical properties such as composition, density, formation.
2) A finite and usually limited sand supply.
3) A generally thin layer of protective sand cover.
4) The intermittent exposure of the underlying consolidated layer as the result of natural events such as storms.

5) Susceptibility of the consolidated underlayer to exposure in areas where the sand supply is interrupted or where the protective sand cover is removed or reduced.

6) Susceptibility of the consolidated underlayer to erosion when exposed.

7) Wide variation in erosion rates.

8) The irreversible nature of the erosion of the consolidated layer.

Erosion of the consolidated layer is generally irreversible and may result in the permanent lowering of the lake bottom, a process referred to as "lakebed downcutting". A lower lakebed elevation has the same effect as increasing the water depth at that location which results in a higher energy wave and increased erosion landward of that location. This process of profile readjustment by erosion continues along the profile, eventually reaching the shoreline and bluff/dune.

Recognizing the concept of cohesive coastlines is fundamental to understanding erosional process on the Great Lakes. Existing profile response models and shoreline change models in use by the Corps of Engineers have limited value for cohesive coastlines since one of their basic assumptions is that of a sandy coastline with an unlimited sand supply. The presence of cohesive coastlines on the Great Lakes has profound implications for the beach nourishment program. Speaking in the most general terms, anything which disrupts the normal movement of sand along the coastline may have adverse effects on cohesive coastlines. The federal harbor structures are very effective barriers to alongshore transport as evidenced by the large accretion fillets. Although not directly related to the beach nourishment program, the construction of shore protection structures has also had an adverse effect on sand supply. For a sandy "natural" coastline the removal of this material might have an adverse effect, but the effect would be reduced somewhat by sand transported in from other sources or a rearrangement of available sand. For a cohesive, "developed" coastline on the other hand, the removal of perhaps even a small amount of sand for a relatively short period of time may expose the underlying cohesive layer to erosion --irreversible erosion in nearly all cases, since there is no surplus of sand available nearby to make up for the loss of cohesive material.

The necessary data are unavailable to determine what the nearshore stratigraphy was prior to the development of the coastline and construction of the federal harbors (elevation of cohesive layer, depth of sand cover, etc). Therefore it is not possible to quantify the effect of these structures on the pre-harbor coastlines. However, there is observational evidence and information contained in several formal studies (USGS, IJC, CERC) that indicate that the presence of large harbor structures have contributed to adverse erosional effects on their downdrift cohesive coastlines.

For most of the federal harbors, the removal of sand from the littoral transport system has been occurring from the time of construction; in some cases for over one hundred years. Mitigation programs only began several decades ago. At several of the older harbors, it is <u>theorized</u> that this long period of sand removal from the littoral system <u>may have</u> created an enormous deficit in the sand supply, triggering lake bed downcutting that may have contributed to the creation of areas of severe and continuing erosion.

## EFFECTIVENESS OF THE BEACH NOURISHMENT PROGRAM

In simple terms, any adverse effects associated with the federal harbor structures is the result of the disruption of littoral processes, specifically the removal of material from the littoral system. The beach nourishment program is designed to mitigate this disruption by replacing that material. The effectiveness of the beach nourishment program is dependent on how well it duplicates the normal littoral processes. The degree of effectiveness depends upon:

1) The length of time between harbor construction and the beginning of mitigation. For most of the Section 111 harbors a considerable length of time had passed before mitigation was begun. For the harbors located along cohesive coastlines in particular this has likely contributed to sand loss and downcutting. While any adverse effects due to this interval prior to the start of mitigation is not a shortcoming of the beach nourishment program, it is a situation that affects the nourishment program. At St. Joseph, for example, the transport of the beach nourishment material is hampered by the downcutting that had occurred prior to the start of the nourishment program.

2) The accuracy of the sediment budget. At the present time there is no evidence to suggest that the long-term, average alongshore transport rates as calculated in the original Section 111 Detailed Project Reports of the individual harbors (DPRs) are inaccurate. However, it may be of benefit to refine the sediment budget for each of the harbors, particularly the alongshore transport rate. Further study is recommended at each harbor and would cost approximately $70K for modeling efforts.

3) Forecasting alongshore transport direction. The placement location for each of the harbors was originally determined based on the statistical wind and wave climate. Conditions for any year, however, can change significantly. An ability to forecast the alongshore transport direction for the upcoming nourishment cycle would increase effectiveness; however, accurate forecasting of wind/wave conditions a year in advance is not yet feasible.

An alternative to forecasting the transport direction would be to place a surplus of nourishment at a stockpile location(s). The stockpile would be closely monitored and renourishment scheduled such that the stockpile would not become completely depleted. This alternative would eliminate the need to forecast as material would always be available regardless of which direction the transport would occur.

4) Identifying physical properties and conditions. The beach nourishment material should have the same physical characteristics (composition, gradation, etc.) as the natural material found on the beach and nearshore. In addition, the stockpile sites must be located such that the nourishment material is most effectively introduced into the littoral system.

5) Execution of the program. The District has successfully identified and determined the design parameters for the beach nourishment programs. However, its past efforts have been marginal at executing and maintaining a consistent nourishment plan, as evidenced by the shortfalls in quantities and the intervals between nourishments. Table 2 summarizes the Section 111 dredging/placement during FY99:

Table 2
Section 111 Dredging/Placement for FY99

| Harbor | Authorized Average Quantity | Authorized Ave. Placement Interval | Last Placement | Quantity Placed | Placement Location | Cumulative Shortfall |
|---|---|---|---|---|---|---|
| New Buffalo | N/A | N/A | May 1999 | 18,600[D] | South | N/A |
| St. Joseph | 110,000 | Annual | May 1999 | 22,500[D] | South | 327,000 |
| South Haven | 47,000 | " | 1998 | 33,300[T] | South | 520,600 |
| Holland | 61,000 | " | Apr 1999 | 17,700[D] | North | 426,700 |
| Grand Haven | 50,000 | " | Apr 1999 | 42,400[D] | South | 270,200 |
| Muskegon | 70,000 | " | Aug 1999 | 55,800[D] | South | 465,400 |
| White Lake | 38,000 | " | Jun 1996 | 37,700[D] | South | 451,300 |
| Ludington | 66,000 | " | Jun 1998 | 74,500[D] | North | 237,900 |
| Harrisville | 8,000 | " | Nov 1993 | 13,600[D] | South | (6,000) |
| Port Sanilac | 30,000 | " | Aug 1996 | 19,800[D] | South | 401,200 |
| Lexington | 35,000 | " | Jul 1996 | 22,900[D] | South | 320,300 |
| | | | | | | 3,420,600 TOTAL SHORTFALL |

Note: All quantities are in cubic yards.
Shortfalls as of Jan 2000
[D] Dredging
[T] Trucking

6) Monitoring. The present effectiveness of the nourishment program is due in large part to the changes that have been made as a result of the monitoring program. Inconsistent funding remains a significant issue.

FY99 funding amounts precluded an evaluation of individual harbors. Therefore, we are not recommending specific changes at any of the monitored harbors. In general, the effectiveness of the Section 111 Nourishment Program still suffers from shortages in placement volumes and from the extended periods between nourishments. To some extent the effectiveness has been increased by the use of coarse graded nourishment material, but these benefits are largely limited to the area near the nourishment stockpile(s).

We recognize the constraints under which the nourishment program operates. However, as we have stated in the past, the nourishment programs cannot be considered fully effective as long as they do not meet the design parameters established for them. In addition, as time passes, the adverse effects that may occur as a result of shortcomings in the programs may be difficult to mitigate for.

## FY2000 MONITORING PROGRAM

The Great Lakes Hydraulics and Hydrology Office has recently formulated the FY2000 monitoring program. The following paragraphs summarize the work efforts planned for the FY2000 monitoring program which will be provided as a separate document.

1. Bathymetry mapping using SHOALS, and periodic beach profiling at site specific locations.

2. Site visits including documentation of conditions using aerial video and underwater video.

3. Measurement of sand cover thickness and elevation of the till underlayer along the cohesive coastlines.

4. Vertical aerial photography.

## RECOMMENDATIONS

Increased Funding for Annual Monitoring. Funding has been level for several years. Increased costs of doing business (labor, contracting, etc.) means less work can be done. The dollar amounts for basic, annual monitoring should be increased by $10,000 - $15,000 per monitored harbor.

Annual Funding for Each Harbor. Monitoring funds should be provided annually for each Section 111 harbor, regardless of the dredging cycle. Slightly less funding could be provided for those harbors where nourishment material would not be placed for that year to maintain continuous annual monitoring.

Table 3
Required Monitoring Funds
FY2000 - FY2005

| Harbor | FY2000[1] | FY2001[2] | FY2002[3] | FY2003[3] | FY2004[4] | FY2005[4] |
|---|---|---|---|---|---|---|
| New Buffalo | 0 | 0 | 60 | 60 | 65 | 65 |
| St. Joseph | 55 | 55 | 60 | 60 | 65 | 65 |
| South Haven | 0 | 0 | 60 | 60 | 65 | 65 |
| Holland | 50 | 50 | 60 | 60 | 65 | 65 |
| Grand Haven | 50 | 50 | 60 | 60 | 65 | 65 |
| Muskegon | 0 | 0 | 60 | 60 | 65 | 65 |
| White Lake | 0 | 60 | 60 | 60 | 65 | 65 |
| Ludington | 0 | 51 | 60 | 60 | 65 | 65 |
| Port Sanilac | 0 | 0[5] | 60 | 60 | 65 | 65 |
| Lexington | 55 | 0[5] | 60 | 60 | 65 | 65 |

Note: All funds in thousands of dollars.

[1] Funding actually received.
[2] Funding approved in budget.
[3] Under current funding procedures, a minimum of 30K for non-dredged harbors would be required.
[4] Under current funding procedures, a minimum of 35K for non-dredged harbors would be required.
[5] Minimum funding of 10K is required for aerial photography.

New Work. Additional funds should be provided on a harbor by harbor basis for new modeling work. This work would verify transport rates, sediment budgets, stockpile locations and other factors influencing the effectiveness of the nourishment program. This would cost approximately $70,000 per harbor.

Table 4
Requested Funding for New Work
FY2000 - FY2005

| Harbor | FY2000 | FY2001 | FY2002 | FY2003 | FY2004 | FY2005 |
|---|---|---|---|---|---|---|
| New Buffalo | 0 | 70 | 0 | 0 | 0 | 0 |
| St. Joseph | 0 | 70 | 0 | 0 | 0 | 0 |
| South Haven | 0 | 0 | 70 | 0 | 0 | 0 |
| Holland | 0 | 0 | 70 | 0 | 0 | 0 |
| Grand Haven | 0 | 0 | 0 | 75 | 0 | 0 |
| Muskegon | 0 | 0 | 0 | 75 | 0 | 0 |
| White Lake | 0 | 0 | 0 | 0 | 75 | 0 |
| Ludington | 0 | 0 | 0 | 0 | 75 | 0 |
| Port Sanilac | 0 | 0 | 0 | 0 | 0 | 80 |
| Lexington | 0 | 0 | 0 | 0 | 0 | 80 |

Note: All funds in thousands of dollars.

Independent Project Status. The Section 111 placement and monitoring program needs to be independent of the dredging program. In order to meet the authorized quantities and placement schedule, funding needs to be provided annually. Any annual shortfall quantity not provided by dredging must be made up from other sources each year. Disassociating the Section 111 placement and monitoring from the dredging program is critical to its success.

We have identified several additional monitoring work items that are beyond the scope of the annual monitoring effort.

1. SHOALS bathymetry surveys. A baseline SHOALS survey should be conducted for Muskegon and Mason counties for Muskegon, White Lake and Ludington harbors.

2. Nearshore stratigraphy sampling. Borings and/or ground penetrating radar surveys at selected locations along the cohesive shoretype coastlines would identify those coastlines most affected by disruptions in sand supply and transport processes.

RELATED ISSUES

During FY99 a lawsuit was filed on behalf of a number of property owners along the southeastern coastline of Lake Michigan. Central to the lawsuit was the issue of the disruption of littoral transport processes by the federal harbor structures and how that disruption and beach nourishment and dredging/placement operations affect erosion processes.

Regulatory Office has required erosion mitigation for several shore protection projects along eastern Lake Michigan that were determined to adversely affect sand supply. This has generated congressional interest regarding the issue of sand supply and Corps of Engineers harbor structures and nourishment/dredging activities.

These two issues are tied directly to the District's dredging/placement programs. They also demonstrate the need for the District to maintain a credible monitoring effort and to investigate those issues that affect the nourishment program.

FUTURE PLACEMENT RECOMMENDATIONS

The following recommendations are provided for Section 111 beach nourishment for future years.

Table 5
Placement Recommendations
FY2000 - FY2005

| Harbor | Placement Quantity | Placement Location |
|---|---|---|
| New Buffalo | 32,800 | South |
| St. Joseph | 110,000 | South |
| South Haven | 47,000 | South |
| Holland | 61,000 | South |
| Grand Haven | 50,000 | * |
| Muskegon | 70,000 | * |
| White Lake | 38,000 | * |
| Ludington | 66,000 | * |
| Harrisville | 8,000 | South |
| Port Sanilac | 30,000 | South |
| Lexington | 35,000 | South |

* Location to be determined prior to placement, coordinated with Area Offices.

Nourishment quantities are based on the recommended average annual quantity for each harbor (New Buffalo is based on the average annual placement). The forecast lower lake levels for FY00 and general beach recovery are not considered sufficient cause to reduce the placement quantity, particularly in view of the shortfalls. The location is generalized as either north or south of the harbor. The actual stockpile location will be selected in consultation with the Area Offices during the planning stage of the project. It is anticipated that nearshore placement may be an option for many of the harbors given the increase in the beach widths at many locations.

No.

# In the Supreme Court of the United States

UNITED STATES OF AMERICA, PETITIONER

*v.*

JOHN H. BANKS, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

ROBERT M. ANDERSON
*Chief Counsel*
LOUIS A. PELLEGRINO
*Attorney*
*U.S. Army Corps of Engineers*
*Washington, D.C. 20314*

THEODORE B. OLSON
*Solicitor General*
*Counsel of Record*
THOMAS L. SANSONETTI
*Assistant Attorney General*
EDWIN S. KNEEDLER
*Deputy Solicitor General*
JEFFREY BOSSERT CLARK
*Deputy Assistant Attorney General*
AUSTIN C. SCHLICK
*Assistant to the Solicitor General*
MARC A. SMITH
ALAN BRENNER
*Attorneys*
*Department of Justice*
*Washington, D.C. 20530-0001*
*(202) 514-2217*

EXHIBIT 11

ıent of Justice had
nore than 100 cases
rosion (or, in a few
ps activities. As in
multi-party actions
fs whose ownership
ground.
erosion-based takings
s case, for instance,
ned that the value of
re than $25 million at
42. Other cases have
rosion-based takings
ıagnitude. See, *e.g.*,
wners of property on
da's Atlantic coast);
*ist. No. 3* v. *United*
3) (drainage districts
inois and Missouri,
opi River navigation
*s*, 8 Cl. Ct. 201, 203
ts of land along Ohio
ıstruction and opera-
F.2d 93 (Fed. Cir.),
86); *Dauphin Island*
*States*, No. 00-115L
6, 2000) (complaint
rs.com/practice/Daup
on involving approxi-
on Gulf of Mexico,
o dredging of Mobile

decision in this case,
aps even study) of a
finitely the accrual of



erosion-based takings claims. At the time it commences such efforts, the Corps cannot know how long the Tucker Act's limitations period—and thus the government's takings liability—will be extended as a result. The open-ended extension of liability in turn creates a powerful disincentive to plan or undertake mitigation projects that otherwise might benefit the public and the environment. That disincentive is contrary to the congressional policy of providing federal support for "the prevention or mitigation of shore damages attributable to Federal navigation works and [waterways]" through the Section 111 program. 33 U.S.C. 426i(a); see H.R. Rep. No. 1709, 90th Cong., 2d Sess. 59 (1968) (Section 111 "affirms" Corps' policy of recommending remedial measures to address damages due to new navigation projects, and extends policy to existing projects). The long-term, nationwide impact could be great in light of the scope of the Section 111 program, which includes 14 currently funded and 69 previously funded mitigation projects.[5]

The planning and operation of Corps navigation projects may be affected in other ways as well. The Court of Federal Claims already has extended the "uncertainty" rationale of the instant Federal Circuit decision beyond Section 111 mitigation efforts, to maintenance of a Corps project. See *Henderson County Drainage Dist. No. 3*, 55 Fed. Cl. at 340 (determining, under Federal Circuit's decision in this case, that "the Corps' shifting and uncertain policy on levee maintenance" may have prevented accrual of takings

[5] We are advised by the Corps that the Section 111 projects on which appropriated funds currently are being spent are in California, Florida, Georgia, Maine, Maryland, Michigan, Ohio, Oregon, Puerto Rico, and Washington State.

claims). It therefore appears that virtually any uncertainty surrounding the operation of a Corps navigation project might be cited as grounds for extending the government's potential takings liability.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

THEODORE B. OLSON
*Solicitor General*

THOMAS L. SANSONETTI
*Assistant Attorney General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

JEFFREY BOSSERT CLARK
*Deputy Assistant Attorney General*

AUSTIN C. SCHLICK
*Assistant to the Solicitor General*

MARC A. SMITH
ALAN BRENNER
*Attorneys*

ROBERT M. ANDERSON
*Chief Counsel*

LOUIS A. PELLEGRINO
*Attorney*
*U.S. Army Corps of Engineers*

SEPTEMBER 2003

UNITED ST
FOR TI

NOS

JOHN H. BANKS,
JUNE M. CUN
GREENBRIAR DE
JR., ROBERT J. KA
LAHR, CHARLOT
ASSOCIATION, TI
PANCOAST, PAI
RENNER, YOI
WINEBERG, RICHA
GAIL L. CHAPI
RICHARD MARZKI
BOVEE, CANDAC
TRUST, JAMES W. F
TRUST, MARC DI
RICHARD R. CART
ANDERSON, JAI
MORVIS TRUST
MILLER, RUTH C. (
LEONARD J. SMIT
WILSCHKE, AN
MARGARET WEF
VARGA AKA KAY
HYUN S. JYUNG
MARIA MELC

UNITED ST.

DEPONENT: JAMES P. SELEGEAN, P.E., Ph.D
DATE: Friday, June 2, 2006
TIME: 10:00 a.m.
LOCATION: 477 Michigan Avenue
Detroit, Michigan
REPORTER: Angela E. Broccardo, CSR 4679

APPEARANCES:

JOHN EHRET
20860 Greenwood Drive
Olympia Fields, Illinois 60461
(708) 748-8975
Appearing on behalf of Plaintiff Banks.

DREW W. MARROCCO (Present Telephonically)
Sonnenschein, Nath & Rosenthal, LLP
1301 K Street
Suite 600 East Tower
Washington, D.C. 20005
(202) 408-6387
Appearing on bchalf of Plaintiff Stone.

(Appearances continued on page 3.)



TABLE OF CONTENTS


| WITNESS | PAGE |
|---|---|
| JAMES P. SELEGEAN, P.E., Ph.D., | |
| EXAMINATION BY MR. EHRET: | 5 |
| EXAMINATION BY MR. MARROCCO | 118 |
| EXAMINATION BY MR. EHRET | 141 |

| EXHIBIT | PAGE |
|---|---|
| Exhibit No. 1 | 27 |
| Exhibit Nos. 2 and 3 | 30 |
| Exhibit No. 4 | 34 |
| Exhibit No. 5 | 41 |
| Exhibit No. 6 | 84 |
| Exhibit No. 7 | 90 |




APPEARANCES (CONTINUED):

TERRY M. PETRIE
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
1961 Stout Street, 8th Floor
Denver, Colorado 80294
(313) 844-1369
Appearing on behalf of Defendant.

GARY W. SEGREST
US Army Corps of Engineers
Detroit District
477 Michigan Avenue, Room 659
Detroit, Michigan 48231-1027
(313) 226-2215
Appearing on behalf of Defendant.



Detroit, Michigan
Friday, June 2, 2006
10:00 a.m.
* * *
MR. EHRET: This is the deposition of Dr. James P. Selegean of the U.S. Army Corps of Engineers being taken pursuant to a notice given in accordance with rule 30(b)(6) of the United States court of federal claims.
JAMES P. SELEGEAN, P.E., Ph.D., having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. EHRET:
Q. Dr. Selegean, I have a resume which I'm showing you for people who have signed off on requests for production of documents in answer to interrogatories.
Does that look familiar to you?
A. Yes.
Q. Is it correct in terms of your educational background?
A. My eight years of experience with the Corps of Engineers is now 15 years.
Q. So why don't you just tell us when you started





EXHIBIT
12.1

34

document as to St. Joseph?
A. No.
Q. Do you know who from the Corps of Engineers did participate as to St. Joseph?
A. I'm not aware of anybody in Detroit who participated in this study.
MR. EHRET: Let's call it record Exhibit 4.
(Marked for identification Deposition Exhibit No. 4.)
BY MR. EHRET:
Q. That also has a Detroit H & H -- that's your group, isn't it, H & H?
A. Yes.
Q. -- Bates number 0112.
Now, the 1958 Berrien County, Michigan, Beach Erosion Control Study which has been marked as Exhibit Number 1, were you familiar with that document prior to my showing it to you in this deposition?
A. Yes.
Q. From whence was your familiarity obtained?
A. I read it for the first time probably a couple of weeks ago.
Q. Were you aware of its existence a couple of

35

weeks ago?
A. I had heard about it, but I had never obtained it and had never read it.
Q. When you did obtain it, where did you obtain it from?
A. One of the lawyers on our staff brought me the -- this is -- I believe it is the Reports to Congress -- brought me the volume of the Reports to Congress, and I had somebody make a photocopy of it for me.
Q. Are you aware that in 1992 there was a meeting at Western Michigan University in Kalamazoo conducted by NOAA/USGS concerning the area from St. Joe to Michigan City and the condition of the lake bed?
A. This is a meeting in 1992 at Western Michigan?
Q. Yes.
A. No, I'm not aware of that meeting.
Q. Are you aware of some other meeting at Western Michigan University around that time?
A. No.
Q. You are not aware of any report that they did about the condition of the bottom of the lake?
A. I have read a report or parts of a report by NOAA on the condition of the lake bed in the St.

36

Joe area, but I'm not aware of any meeting that took place.
Q. So that at least tells us you weren't there, if there was a meeting.
A. That's correct.
Q. If I told you that David Schweiger was there, would that help your memory?
A. Help my memory with respect to whether I was present?
Q. Whether there was a meeting.
A. Boy. If Dave Schweiger was at a meeting in 1992, no, that would not help my memory.
Q. You were working for the same group in 1992, were you not?
A. I was working for the same Hydraulics and Hydrology Office, but I was not working for Dave Schweiger in 1992.
Q. Okay. When you look at your educational background, was there anything in your studies concerning littoral drift before you came to work for the Corps, that you can recall?
A. No, I don't believe there was.
Q. So I don't suppose you would have ever studied depth of closure?
A. I did not study depth of closure in school.

37

Q. Or wave hindcasting?
A. That is correct.
Q. When you came here to the Detroit District, did you become involved in the study of those --
A. Of those topics?
Q. That's a good word, topics. Thank you.
A. Not initially.
Q. They weren't an issue initially, were they?
A. An issue with respect to what?
Q. With respect to erosion.
MR. PETRIE: Objection. Vague and ambiguous question.
BY MR. EHRET:
Q. You were concerned with erosion, weren't you --
A. I was not.
Q. -- when you first came to work here?
A. I was not.
Q. But the Corps was?
A. I'm sure the Corps was.
Q. And you are sure because you are aware from what was happening around you; correct?
A. Well, you have in front of me documents where the Corps was obviously interested in and concerned with erosion.
Q. Back in 1958.



EXHIBIT 12.2