# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 99-4451 L
c/w 04-277 L, 05-1353 L, 05-1381 L, 06-72 L

| | | |
|---|---|---|
| JOHN H. BANKS, MARY E. BANKS, et. al.<br><br>Plaintiffs,<br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | ) | NO. 99-4451 L<br>Judge Emily C. Hewitt |
| STONE ERROL L. & SUSAN H.<br>as trustees of the Susan H. Stone Trust,<br><br>Plaintiffs,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-277 L<br><br>Consolidated |
| EUGENE J. FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 05-1353 L<br><br>Consolidated |

PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

PURSUANT TO COURT ORDER DATED:1-19-07 DOCKET 167

# TABLE OF CONTENTS


| | | |
|---|---|---|
| 1. | Plaintiffs Memorandum of Law and Facts Pursuant to Order Docket No. 167 dated Dated 1-19-07 | 1 |
| 2. | Loss of Lake Access | 2 |
| 3. | Ridge Line | 3 |
| 4. | No Nexus - No Proportionality | 5 |
| 5. | High Risk Setbacks - MDEQ - Michigan Department of Environmental Quality | 7 |
| 6. | Littoral Drift | 9 |
| 7. | The Corps and Takings | 10 |
| 8. | Downcutting - Lakebed Lowering - 17'6" | 11 |
| 9. | Summary and Conclusion Arguments | 12 |
| 10. | Conclusion | 13 |
| 11. | Signature Page | 14. |
| 12. | Certificate of Service | 15. |
| 13. | Appendix List of Exhibits | 16. |

## TABLE OF AUTHORITIES CITED


| | | |
|---|---|---|
| 1. | United States v. Dickinson 331 US 745 (1947) | passim |
| 2. | Banks v. United States 314 F3d 1304 (Jan.2, 2003) | passim |
| 3. | Ridge Line Inc. v. United States 346 F3d 1346 (2003) | 3,7 |
| 4. | Nollan v. California Coastal Commission 483 US 825 (1987) | 5,11 |
| 5. | Dolan v. City of Tigard 512 US 374 (1994) | 5,6 |
| 6. | United States v. General Motors Corp. 323 US 373 (1945) | 7 |
| 7. | Tahoe-Sierra Preservation Council v. Taho Regional Planning 535 US 302 (2002) | 8 |
| 8. | Owen v. US 851 F2d 1404 (1988). . . . . . . . . . . . . . | 9 |
| 9. | Pitman v. US 457 F2d 975 (1972). . . . . . . . . . . . . . | 10 |

PLAINTIFFS' MEMORANDUM OF LAW AND FACTS

NOW COME the consolidated case plaintiffs in this case, by their attorney, John B. Ehret, and for their MEMORANDUM OF LAW AND FACTS state as followes:

1. The United States Supreme Court made four rulings in United States v. Dickinson 331 US 745 (1947) which bear upon the facts of this case.

2. At page 750 the Court states: "...payment need only be made for what is taken, but for all that the Government takes it must pay." The holding directs that all the material removed from the littoral system must be compensated for. The net littoral drift which the Corps uniformily acknowledged was 110,000 cy/yr (84,000 $m^3$/yr) for 163 years until this litigation. Nairn's July 2, 2004 did not include the gross combination of updrift fillet and downdrift fillet retention and diversion. In addition, it ignores the river sand which is the major source of sand for the beaches.[1] The St. Joseph River valley is uncontestedly loaded with glacial outwash sands![2] If the dam gates were judicially operated to untrap sand, the flow of sand would be even greater than 90,000 cy/yr experienced for dredging by the Corps.[3]

3. If the Corps had not dammed the natural southward river debouch at St. Joseph, all river sand regardless of fineness or coarseness, would have been delivered southward to plaintiffs' shore where it would wash up on the shore, blow up on

the foredunes and main bluffs making the entire shore continually accreting.

4. Also at page 750, the Dickinson Court announced as part of its holding that reclamation of land previously taken by the Government did not disentitle him. The Court said: "...the land was taken when it was taken, and an obligation to pay for it then arose."

5. The Court instituted the doctrine of prudent prevention, saying that "If...part of the taking was in fact preventable by prudent measures, the cost of prevention is a proper basis for determining the damage, as the courts below held." Thus, the Corps is liable for all the costs of prevention necessary to save the land and to protect access to the waters of Lake Michigan.

LOSS OF LAKE ACCESS

6. This aspect of liability (loss of lake access) is also addressed by the Dickinsen Court at 750 saying "...but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be itself of less value than before, the owner is entitled to additional damages on that account." This would include latent defects such as loss of subjacent support and cobble/rock beaches as a substitute for sand.

7. The Court reinvoked the oft-held principle that "When the part not taken is left in such shape or condition

as to be itself of less value than before, the owner is entitled to additional damages on that account."

8. The Court in Dickinson also rejected the defense by the Government that reclaimation of the land "does not disentitle Dickinson to be paid for the original taking." This means that the property owners in Banks can, if they like, retake their property to the original fast land location to build a headlands type bay beach with access and permanent shoreline protection. 9.

9. Thus, the Nairn doctrine that use of coarse cobble/rock mitigation justifies the use of a new longshore sand transport model is inapposite to the Dickinson Court's ruling.[4] The famously Michigan wide sandy beaches should not be destroyed with impunity by junk mitigation cobble/rocks masquerading as the ultimate answer to downcutting, lake bed lowering and bluff line resession.

10. Instead of justifying Nairn's use of a modified COSMOS model, the Supreme Court is saying that the use of coarse material by the Corps, is not only unacceptable mitigation under Section 111, its effect on the value of property entitles the owner to additional compensation under the 5th Amendment to the Constitution.

RIDGE LINE

11. In Ridge Line Inc. v. U.S. 346 F3d 1346 at 1356

(2003), the Federal Circuit identifies an indicia which is applicable to this case, namely that the "appropriation of a benefit to the government at the expense of the property owner" is a compensable taking.

12. In this case the Corps built the jetties because they perceived that the jetties made it easier to dredge. The jetties do not create navigability. That can be accomplished by dredging alone. The fan shaped, 24 foot deep outer harbor where the waves are biggest, has no piers and is maintained by dredging only. [5]

13. The channel between the piers is not a harbor. It cannot harbor boats. The channel bounces the incoming waves back and forth to be accentuated by new waves coming into the entrance. The so-called channel is made dangerous by the steel hardened piers. Seven other Lake Michigan harbors are being fit with wave absorbers, but not St. Joseph. [6]

14. The Corps may tink it saves a few hundred thousand or a million dollars a year in dredging by these piers blocking all sand, but this loss of littoral sand and river sand is the direct cause of potentially 3 BILLION DOLLARS in Berrien County property losses over the next 60 years by total shoreline destruction. [7] (Please note:Plaintiffs emphasis is now on prospective damage liability. Per se rules should apply. Seven exhibit pages are enclosed under Ex. 7 herein. MDEQ letter of February 9, 2007 to most all Berrien Cty. sholeline property owners and township by township high risk erosion area (HREA)

shoreline mapping. Website - http://www.michigan.gov/deq/0 Click on WATER, GREAT LAKES SHORELANDS MANAGEMENT PROGRAM, BERRIEN COUNTY)

NO NEXUS - NO PROPORTIONALITY

15. There is no nexus and no proportionality between plaintiffs' property losses and the picayune dredge savings the Corps perceives.

16. Both Nollan and Dolan Supreme Court holdings are violated. In Nollan v. California Coastal Commission 483 US 825 (1987) the Court found that the essential nexus did not exist between a legitimate state interest and the permit condition exacted by the city. Id. 837. They found no nexus between visual access to the ocean and a permit condition requiring lateral public access to the ocean along Nollan's beachfront lot.

17. The piers are not necessary at St. Joseph. Navigation can be achieved by dredging alone. Hence there is no navigational sovereignty. But even if there were, there could be no mathematical proportion between navigational sovereignty and total destruction of famously Michigan sandy beaches both public and private. Teaspoon dredging by the Corps with one at a time clam shell bucketing is what costs.

18. The Constitution's public purpose justification for taking does not exist here because the commercial landings served by the large ships which require deep passageways are

privately owned for profit - not public.

19. In Dolan v. City of Tigard 512 US 374 (1994) the city's permit condition required Florence Dolan to dedicate sufficient land area for a greenway, and a pedestrian/bicycle path. Otherwise no expansion permit for her plumbing and electric supply store would be granted. The Supreme Court saw no "reasonable relationship",no rough proportionality or general mathematical extent between the property dedication required and the impact of her proposed development. Id. 391

20. The three commercial landings in St. Joseph don't qualify for federal harbor status (and thus dredging) because they handle much less than the 1 million tons of cargo per year required. One million tons of sand, cement, salt and gravel a year deposit ed in the center of the little tourist town of St. Joseph requires 40,000 incoming (empty) and 40,000 outbound (full) 25 ton trucks per year to pick up the cargo where the ships drop it.

21. As if this weren't enough, the Corps has a 30 year plan to intercept by dredging all sand in the river near the innermost commercial pier. The plan is to pump the sand to a land fill, which would lengthen a runway for the hardly ever used Southwest Regional Airport.

22. This means that if the piers were corrected to prevent loss of river sand, which is the Corps' charge under Section 111, plaintiffs would never see the sand which would otherwise be theirs naturally.

23. This brings Ridge Line Inc. v. U.S. back into focus again, where it quotes Dickinson 152 F2d at 867 aff'd 331 US 745, as saying "just compensation" includes a recovery of "all damages, past present and prospective." 346 F3d at 1359.

24. With the Corps intentionally diverting the natural river sand supply, the prospects of downdrift relief from downcutting and ongoing lakebed lowering resulting in shoreline recession are nil.

HIGH RISK SETBACKS - MDEQ

25. On February 9, 2007, the Michigan Department of Environmental Quality (MDEQ) wrote letters to almost all shoreline property owners in Berrien County, including plaintiffs. The MDEQ assigned prospective 60 year bluff recession distances ranging from 95 to 535 feet on 13 plaintiffs' properties that we know of. This averages about 5 feet per year.

26. The prospective damages are that within 60 years the losses are total. The homes will be gone and the property unuseable.

27. "The term 'property' as used in the Taking Clause includes the entire group of rights inhering in the citizen's (ownership)'. U.S. v. General Motors Corp. 323 US 373 at 378. It is not used in the vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. Instead it denotes the group of rights inhering in the citizens relation to the physical thing, as the

right to possess, use and dispose of it. *** The constitutional provision is addressed to every sort of interest the citizen may posses Id., at 377-378." The Corps is liable for all these PROSPECTIVE losses.

28. The Corps must assume their 5th Amendment responsibility to replace all sand for which it is responsible for taking, or else provide just compensation. In Tahoe-Sierra Preservation Council v. Tahoe Regional Planning 535 US302 (2002), the Supreme Court recognized that physical takings jurisprudence" . . .is as old as the Republic and, for the most part, involves the straightforward application of per se rules.", The duty to compensate is categorical. Id. at 322

29. The Corps will not stop the taking. The Corps can only be judged by what it does. The Corps' liability extends to the full provision of adequate shore protection of a permanent nature. Such protection involves massive steel sheet piling backed by wave energy absorption boulders landward and lakeward. This then entails the loss of beach access and lake access.

30. Alternatively, bay beaches with rock headlands are evidenced to work permanently and still provide beach access.[9] This is probably the most costly option and involves reclaimings or retaking land to the now imaginary natural ordinary high water mark. This would be a line along the shore from promontory to promontory (uneroded) or what's

left of the promontories. This involves the MDEQ and without their cooperation, the only option is total compensation for all property interests.

LITTORAL DRIFT

31. The facts of this Banks case and the law of Owen v. US, 851 F2d 1404 at 1413 explaining the causal relation between littoral drift and erosion seem almost identical at first blush; where Senior Judge Bennett wrote the en banc opinion on July 18, 1988:

> "....existing sand is moved southward by the littoral drift's currents and new sand from the north is deposited in its place. The loss of such shorefront was due to the blocking of the northern "replacement" sand, causing the drift to remove more sand than "it replaced".

32. There are two differences in the facts which have been raised in this case. 1st, there are directionally dominant waves from the south, whereas there are energy dominant waves from the north,[8] thus creating a net littoral drift to the south. In Owen there appears to be no winds or waves from the south. This seems unlikely and leaves the reader to conclude that whatever winds from the south there are, they are not significant to the outcome of the case.

33. The 2nd factual difference with Owen is that there is no mention of loss of river sediment. In Banks there is no dispute that millions of cubic yards have been trapped behind dams which are in the absolute control of the federal government Federal Energy Regulatory Commission (FERC)[10]

34. Dam traps are bad, very bad, for the lakeshore, but redirection of the St. Joseph river mouth out to deep lake waters has double blocking effect. In spite of some conflicting numbers, there has always been substantial river sand to be dredged.[3] Corps numbers vary from 50,000 to 60,000 to 90,000 cubic yards per year removed from the littoral system. Dr. Larson says that the river is the main source of beach sand geologically.[1] There is no question that beach impoverishment is associated locationally with shore perpendicular structures.[1]

THE CORPS AND TAKINGS

35. The Corps 1958 pronouncement of the Berrien County Erosion Control Study Board states that 31% of the shore was public land, and therefore their contribution to providing 50 foot wide and 10 foot high, plus annual sand of about 4cy/ft/yr, would be limited accordingly to 31% ie public land only.[3,11]

36. At that time, this posture was in harmony with the law of Pitman v. US 457 F2d 975 (1972) which involved facts of southerly littoral drift being interrupted as far back as completion of the Canaveral Harbor jetties in 1953 and 1954. Pitman had lost 4 acres of beach-front property by 1972 when he was denied recovery inspite of the Court stating:

> "There is no doubt that plaintiff has sustained damages and that a substantial portion of the damages he claims are due to the construction and maintenance of the Canaveral Harbor Project."

37. But this decision of Pitman's 1972 court was explicity reversed by Owen supra. at 1412 and 1413 and 1416 stating:

> "...we hereby overrule those decisions to the extent that they allow navigational servitude to reach fast land above and outside the bed of the navigable water."
> Id. at 1416

37. The regulatory case of Nollan v. California Coastal Commission 483 US 825 (1987) would seem to support the Owen court, and even though it came a year earlier, it was not cited. Nollan set the requirement of nexus between the government regulation act and the harm done to property. In Banks the failure of nexus lies in the perceived dredging cost savings gained by the government by having piers and the loss of littoral drift dependent properties several miles south resulting in ultimate (prospective) total loss. There is no relationship between the appropriation of dredging cost savings to the government and plaintiffs total loss. In the meantime the law has changed but the Corps has not. They still think they have an absolute right to swallow up private and public property without limit.

DOWNCUTTING - LAKEBED LOWERING 17.6 feet

38. According to Parson, Morang & Nairn[12] and USGS/NOAA[13] there has been lowering of the bed of the lake since 1945/6 in the amounts indicated below.

| | | | | |
|---|---|---|---|---|
| 12 | 19 yrs. | 1945/6 to 1964/5 | .16m/yr=6.3"/yr times 19yrs = 10' | 12 |
| 13 | 45 yrs. | 1945/6 to 1991 | 4m = 3.5"/yr =13' | |
| | 16 yrs. | 1991 to 2007 | Projected 3.5"/yr x 16 yrs = 4.6 feet | |

Using Exhibits 12 and 13 herein it is reasonable to say that the entire plaintiffs' zone may have experienced 17.6 feet of lowering.

SUMMARY AND CONCLUSION ARGUMENTS

38. The piers offer no anchorage or safe harbor to any size boats. Rather, they funnel and enhance the wave action so as to make the piers a detriment to navigation. The navigational purpose from decades ago no longer exists, as large deep draft ships do not frequent the inner harbor (beyond the channel between the piers upstream of the CSX railway bridge) often enough to qualify for federal harbor status. The entities served by deep draft ships are privately owned. Their existence deep in the city results in tens of thousands of 25 ton truck traversings per year. Federal Harbor status requires 1 million tons per year.

39. The reversal of winds and storms makes the piers capture or divert all sand from the north and south, not just the net difference of the two. The gross total amount is equal by the Corps numbers to 110,000 divided by .3 (for 30% interruption) to 366,666 cubic yards per year , plus river sand. (THIS IS A MATTER OF LAW AND NOT FOR THE EXPERTS TO DECIDE OR OPINE). This is the total amount of material taken annually from the downdrift properties, public and private.

40. The numerical quantities are not so important and should not distract from the main issue. The structures do totally and successfully eliminate the entire sand supply from the down drift shore. The only other significant sources of sand are from the very property being eroded or

the lake bed when levels are down. The existence of prudent protection is the right and duty of property owners and is only made necessary by the existence of the piers. The shoreline to the north of the piers has so much sand that the sand itself is the shore protection.

41. The construction of expensive new homes on the north fillet and the periodic bulldozing of surplus sand bespeaks the best argument for the plaintiffs' case.

## CONCLUSION

42. The Court of Claims does not engage in questions of negligence and intent, but here we must examine prospective liability. Examination of future erosion as predicted by the MDEQ requires that plaintiffs take into account the Corps obliviousness to their 5th Amendment liability. The Corps lives in a Section 111 world where they define their own attributability and mitigation obligations based on their own assumptions of absolute navigational sovereignty in all directions (horizontal and vertical) along the shore.

43. Nexus, necessity, proportionality, fast land, littoral drift, littoral zone, equilibrium beach etc. etc. must be made to harmonize with the absolute catagorical, per se rights of private property under the 5th Amendment. This comes as a shock and an anathema to the Corps' sacred hide-bound intransigence.

44. To the Corps its all about sand. Get rid of the sand!! Sand is bad!! Their sand disposal practices caused Katrina flooding of New Orleans and are causing the total destruction of Michigan's famously sandy western shoreline.

45. To the dismissal plaintiffs they say: "You should have known we did it."

46. To the rest of the plaintiffs they say "we did not do it."

47 To the shoreline protection problem they say "it can't be done but if you do it you should help yourself".

48. But if you do it and succeed we should be allowed to tax you on it!

Respectfully submitted,

Dated: April 3, 2007

John B. Ehret
John B. Ehret
Plaintiffs Attorney

20860 Greenwood Drive
Olympia Fields,Il 60461
P. 708-748-8975
f. 708-748-7661
Email: jbehret@covad.net

CERTIFICATE OF SERVICE

I, the attorney, John B. Ehret do hereby certify that on the 3 day of April, 2007 I caused to be electronically filed the PLAINTIFFS' MEMORANDUM OF LAW AND FACTS on the below listed attorneys of record:

Terry M. Petrie
Trial Attorney
U. S. Dept. of Justice
ENRD
1961 Stout Street 8th Floor
Denver, CO 80294
P. 303-844-1369
F. 303-844-1350
Terry.Petrie@usdoj.gov

Drew W. Marrocco, Attorney
SONNENSCHEIN NATH & ROSENTHAL
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
P. 202-408-6387
F. 202-408-6399
dmarrocco@sonnenschein.com

Eugene J. Frett,ESQ.
SPERLING AND SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, IL 60603
P. 312-641-3200
F. 312-641-6492

Heide L. Herrmann, Attorney
U. S. Dept. of Justice
P. O. Box 663
Washington, DC 20044-0663
P. 202-305-3315
F. 202-305-0274
Heide.Herrmann@usdoj.gov

Dated: April 3, 2007

John B. Ehret
John B. Ehret
Attorney for Plaintiffs
John H. Banks et al