# Appendix

# APPENDIX

| Exhibits | | Page |
|---|---|---|
| 1. | 2001 Journal of Great Lakes Research Dr. Grahame Larson Rivers were main source of beach sand | 1, 10 |
| 2. | 2004, 7/16 Nairn deposition 51:8-15 | 1 |
| 3. | 1958 Corps Berrien Cty. Erosion Control P21 Para 63,4,5 PX 132 | 1,10 |
| 4. | 2006, 8/24 Nairn deposition 181:13-25, 182:8-9, 184:18-25 185:1-2, 231:17-19, 232:10-12 | 2 |
| 5. | 2006, 6/2 Selegean 85:13-25, 86:1-25, 87:1-10, 88:23-25 | 4 |
| 6. | 2005, Oct. VOL.161 Corps' Great Lakes Update Seven Pocket Wave Absorbers at Federal Harbors | 4 |
| 7. | 2007, 2/9 MDEQ Letter & Township Map of High Risk Erosion Areas | 4 |
| 8. | 1996 June PX 23 Technical Report WAVE CLIMATE | 9,9 |
| 9. | 1996 Sand Bypass plant by Corps - 3 pages Delaware | 3,8 |
| | 1991 Civil Engineering & Shabica Headland Bay Beaches 2pages | |
| 10. | 1999, September St. Joseph River Assessment, Jay K. Wesley page 35 Federal Energy Regulatory Commission Dams | 9 |
| 11. | 1958 PX. 132 page 5 No public aid for private property | 10 |
| 12. | 1996 Corps Technical Note by Parson, Morang & Nairn About .16meters/year downcutting (6.3 inches/yr.) PX. 23 | 11 |
| 13. | 1992, May PX. 33 USGS-NOAA 45 year survey - 4 meters of lake bed erosion Figure 11 St. Joseph to Grand Mere 4m times 39.37 inches/meter all divided by 45 years equals 3.5 inches per year | 11 |

J. Great Lakes Research 27(4):518-546
International Association of Great Lakes Research 2001
Larson and Schaetzl MSU Departments of Geological Science & Geography


The sand in the shorezone is then moved along the shore by waves and offshore currents in longshore transport (Lawrence 1994).

However, two recent types of human intervention have seriously reduced the supply of sand to the shore zone and facilitated the loss of sand to deeper water: (1) dams on rivers that are tributary to the Great Lakes, and most importantly (2) jetties and other engineering structures at river mouths (Omohundro 1973, Shabica and Pranschke 1994). The effects of damming tributaries is obvious—sediment settles out in the relatively still waters of inland reservoirs and is not allowed to be transported to the Great lakes shore. Jetties function differently. They are engineering structures erected at river mouths, resembling two long walls that border both sides of the river and extend from the river banks and mouth, just inland of a harbor, to relatively deep waters in the lake proper. Jetties affect beach replenishment by diverting sand and other sediments that move along the shore by lake processes, into deep water (Bush *et al.* 1996). Once there, these sediments can no longer be transported to the beach by waves and are therefore permanently lost from the beach system. For this reason, coastal erosion is often most severe near harbor structures, rather than at more "open" coasts (Folger *et al.* 1994, Shabica and Pranschke 1994). Dredging of river mouths for shipping and boating purposes can facilitate further transport of sand and sediment into deep water.

Once the main source of sand to the beach system, river mouths and harbors have now become sites of beach impoverishment. Thus, shoreline erosion or retrogression, a natural process, has been much more dominant than has shoreline progradation (Powers 1958), and should be considered, when development along the always-variable Great Lakes shorelines is contemplated.

## SUMMARY

The basins that contain the Great Lakes are the product of repeated scour and erosion of relatively weak bedrock by continental glaciers that advanced into the Great Lakes watershed beginning perhaps as early as 2.4 Ma. Most of the scouring, however, probably occurred after about 0.78 Ma when episodic glaciation of North America was much more extensive, with ice cover sometimes extending as far south as Kentucky. The number of times the watershed was completely glaciated is not known for certain because of an incomplete terrestrial record. However, stratigraphic evidence from outside the watershed indicates that glacier ice extended over all or part of the watershed at least six times since 0.78 Ma. Information about the environment present between the glaciations is also limited, but in one location within the watershed pollen and fossils have been found that suggest that during the last interglaciation, the climate was probably similar to or warmer than present.

In contrast to earlier glaciations, the last glaciation of the Great Lakes watershed is well documented by glacial sediments, recessional moraines, and buried organic deposits. It shows that the eastern part of the watershed was first glaciated between 65 to 79 ka and that the ice margin oscillated there until about 25 ka. At this time a boreal forest-tundra environment had also established itself in much of the unglaciated part of the watershed. After about 25 ka, the ice margin advanced from both the north and east to cover all of the watershed and by 18 to 21 ka it extended as far south as the Ohio River and as far west as northern Wisconsin and east-central Minnesota. After about 18 ka the ice margin began to retreat, but that retreat was interrupted by several major readvances at about 15.5, 13.0, 11.8, and 10.0 ka. After 10.0 ka the ice margin continued to retreated northward and by about 9.0 ka completely withdrew from the watershed for the last time.

During the retreat of the ice margin large glacial lakes developed within the basins of the Great Lakes. Their surface elevation and extent varied considerably over time as outlets were either blocked or uncovered by glacier ice. Outlets were also subject to isostatic rebound as well as by channel downcutting, which likewise affected the level of the glacial lakes and the lakes that followed. On several occasions lake levels were affected by catastrophic influx of meltwater from glacial Lake Agassiz which developed outside of the Great Lakes basin.

Issues associated with the modern Great Lakes center on lake levels and shoreline configurations. Lake levels are, and have always been, in a state of flux. Today, lake levels have a typical seasonal variation of less than a half meter. However, larger fluctuations of 1 to 2 m happen during extended dry or wet periods and create problems for lake users who expect lake levels to be essentially static.

Great Lakes beaches are widely variable, from bedrock promontories to wide expanses of fine, washed sand. Many of the sandy beaches are backed up by large dunes, and many of the high

PX 101
Page 537
Banks V. U.S. 99-4451-L
1

Page 50

Q. You're nodding your head.
A. I'm not nodding my head. From where to where?
Q. From the center line of the river to the end of the spit?
A. I have to avoid confusion. You may not have read my response to summary judgment, but it has the location of the river mouth on the modern day map right here, where it comes out right here.
Q. And how far south is that?
A. I don't have the scale, but about 2,000 feet or so. I don't know. Maybe 1500, 2,000 feet.
Q. Okay. So what do you mean by -- do you recognize the term drowned river mouth?
A. Yes. Yes.
Q. And what does it mean?
A. It means with the -- that the river once had its outlet at a different location, at a higher water level. In this case, I wouldn't refer to this as a drowned river mouth, because in this case I wouldn't refer to St. Joe -- I would not refer to St. Joe as a drowned river mouth.
Q. So you're in disagreement with whoever it was from the Corps that wrote that note?
A. I don't know who wrote that note, but I

Page 51

guess I disagree with that note.
Q. You disagree with the note, regardless of who wrote it?
A. Correct.
Q. This is Exhibit 8 and it's also record Exhibit 19. This is a reduced version. It's produced by the Department of Geological Sciences at the University of Michigan, Ann Arbor. And it shows that the river, the St. Joe River is loaded with glacial outwash sands, does it not?
A. Are you referring to the river valley?
Q. That's correct. And they're marked -- this is the color. Now --
A. If you're referring to the river valley, I'd agree, yes.
Q. Okay. And Exhibit 9, which was previously on the record Exhibit -- part of Exhibit 77, Geology of Michigan 1946, we again show outwash valleys from the glaciers filling that area with sand?
A. In a very narrow band along the side of the river bank, that's correct.
Q. Have you done any testing of the sediment that's been moving along the St. Joe River?
A. Have I done -- personally done testing of

Page 52

it, no.
Q. Have you directed that any testing be done?
A. No.
Q. Do you know of any testing that's been done?
A. Yes.
Q. Who's done that testing?
A. Corps of Engineers.
Q. This Corps of Engineers in Detroit?
A. That's correct.
Q. And do you know if they've taken sand samples?
A. Yes, they have.
Q. When?
A. Various dates.
Q. Recently?
A. Yes. Well, depends on your term of recently. I know as recently as 1991 is what I recall. I'm sure there are others, many others.
Q. The sand which is coming down the river is collecting at the mouth of the river now, is it not?
A. It's being deposited in various places.
Q. And what are those places?

Page 53

A. Some is being deposited in the inner channel, some is being deposited in the outer channel. Historically some made its way out to -- a little further off shore and some is making its way to the littoral stream. It's explained in our response to summary judgment, Section 23.
Q. Okay. But historically it was dredged and dumped out deep into the lake, right?
MR. SPOHR: Objection, vague, in terms of what you mean by historically, what time you're referring to as historically.
BY MR. EHRET:
Q. This is kind of an aside, but I keep forgetting to ask you. You are a principal of Baird & Associates?
A. That's correct.
Q. What does that mean?
A. In a partnership, a principal is a person with a certain class of shares, like a director.
Q. But I understood this to be a corporation?
A. Yes.
Q. You just said it was a partnership?
A. It's a limited corporation.
Q. So you are one of the owners of Baird &

Case 1:99-cv-04451-ECH Document 180-2 Filed 04/03/2007 Page 5 of 14



58. *South end of State highway protective works to south limit village of Shoreham.*—This section of the shoreline, extending approximately 2 miles, is entirely privately owned. Approximately 22 individual structures built by property owners are in existence and range from typical groin construction to steel sheet-pile seawalls and revetments. The protection provided by a large portion of this work is limited, and erosion is continuing in those intermediate areas not protected. Detailed descriptions of shore protective works in this area are shown on sheet 5 of the drawings.

59. *Lincoln, Lake, and Chikaming Townships.*—The lake shore along this 18.5 mile section of Berrien County is relatively undeveloped. Only 8 shore protective structures are located in the area as shown on sheet 6 of the drawings. Much of the area is fronted by extensive sand dune deposits which provide a source of material to the beaches.

60. *New Buffalo Township.*—The 8-mile shoreline along New Buffalo Township has been developed extensively. Many cottages and homes of year-round residents front directly on the lake. Approximately 36 individual shore protective structures have been noted in the area as shown on sheet 6 of the drawings. No coordination has been noted between works constructed by individual owners, and structures range from wood sheeting and piling to steel sheet-piling groins and seawalls. Those unprotected areas existing between shore protection structures have been eroded with resulting flanking in many cases. The mouth of the Galien River is controlled by the existence of parallel entrance piers, approximately 160 to 260 feet in length, constructed of wood sheet piling.

61. *Profiles.*—The establishment of profiles as surveyed in November 1954 is discussed in appendix A and their locations are shown on sheet 4 of the drawings. The profiles generally extend from 50 to 200 feet landward of the mean lake level shoreline to the 20-foot depth contour in the lake. The bluff slopes south of St. Joseph Harbor were generally from 1 on 1 to 1 on 4. The elevation of the beach at the toe of the bluff averaged 6 to 10 feet above low water datum. Beach slopes were generally about 1 on 15 (table A–1, app. A). Near shore slopes, in water depth from low water datum to the 10-foot depth, averaged approximately 1 on 55. These near shore slopes included a natural bar located approximately 500 to 600 feet offshore. Offshore slopes in depths from 10 to 20 feet averaged approximately 1 on 130.

62. *Volumetric changes.*—Detailed computations of the rate of bluff erosion contained in table A–4 of appendix A indicate that the volume lost from the bluffs in the area south of the St. Joseph Harbor jetties to the southern limits of Shoreham village averaged about 100,000 cubic yards per year during the period 1830–1954. During the period 1872–1954 erosion from the offshore bottom to the 20-foot depth in the same region approximated 160,000 cubic yards per year. (See par. 12 and table A–9 of app. A.) Data given in these tables indicate that for the same periods accretion immediately north of the harbor jetties may have averaged about 25,000 cubic yards per year in the region above low water datum and about 11,000 cubic yards per year in the offshore region. Comparison of a 1907 survey of the St. Joseph Harbor vicinity with the 1954 survey indicates accretion north of the harbor jetties amounting to an average of about 75,000 cubic yards per year for the 47-year period. Before and after dredging surveys indicate that accretion between annual maintenance operations in the St. Joseph Harbor entrance channel averaged about 28,600 cubic yards per year in a 3.5-acre area immediately off the lakeward entrance to the jetty channel during the 6-year period 1950–56.



IV. ANALYSIS OF THE PROBLEM

63. *Shore processes.*—The Lake Michigan shore of Berrien County is of glacial or lacustrine origin, the present shore formations being associated with the extensive variation of the lake level during the glacial era. Existence of the high clayey or sandy till bluffs in the area can be associated with a long term pattern of wave erosion and recession of the shore. Much of the material composing sand beaches fronting the bluffs is supplied by wave erosion of those bluffs. High lake levels in recent years (1943 to 1954) have inundated protective beaches and accelerated the erosion rate of the bluffs. Bluffs in the problem areas contain from about 25 to 50 percent material of sufficient size to remain on the beach, averaging about 32 percent. Material supplied to the beaches by streams and rivers emptying into Lake Michigan within the study area must presently be of an unimportant quantity. The St. Joseph and Paw Paw Rivers probably deposit most of their sediment load within St. Joseph Harbor from which it is removed by dredging. From 1906 to 1915, the harbor dredging averaged about 41,500 cubic yards per year for a 16-foot project depth. Over the 15-year period, 1940–54, dredging from St. Joseph Harbor averaged about 90,000 cubic yards per year for a 21-foot project depth.

64. Littoral drift in the area is predominantly southward as evidenced by the greater accumulation of beach material on the north side of the St. Joseph Harbor piers. Consideration of hindcast wave characteristics shows a preponderence of southward directed wave energy over that directed toward the north, and supports the conclusion regarding southward predominance of littoral drift. However, there is also evidence of northward moving beach material, reversals of direction of drift occurring periodically.

65. The net rate of littoral transport in the area to be considered for improvement may be approximated through consideration of the past volumetric changes in the vicinity of the St. Joseph Harbor jetties. Erosion of bluff and bottom material to the 20-foot depth, in the area south of the harbor jetties to the south limit of Shoreham, has averaged about 260,000 cubic yards per year over the period of record, of which amount bluff recession is estimated to have contributed about 100,000 cubic yards annually. The estimated volume of material annually eroded from the bluffs per mile of shore decreased from about 25,000 cubic yards per mile per year at Shoreham village to about 4,000 cubic yards per mile per year in New Buffalo Township. The average rate of accumulation north of the St. Joseph Harbor jetties during the same period was indicated to be about 36,000 cubic yards per year. However, comparison of surveys for the latter part of this period (1907–54) indicates accretion north of the jetties accumulating at an average rate of about 75,000 cubic yards per year. Also, an average accumulation of 28,600 cubic yards per year was indicated to have occurred during the 6-year period 1950–56, in the area imme-

PX 132
Page 21
Banks V. U.S. 99-4451L
3

property-by-property basis to see whether we could, at that level, discern any impact of these numbers.
Q. Okay. And those property owners -- where are those property owners located? Are they all throughout the plaintiffs' region?
A. Yes.
Q. Okay. Looking on Roman Numeral II again, coastal engineers efforts successfully mitigate harbor impact since 1970. Do you see that?
A. Corps of Engineers efforts successfully mitigate harbor impact since 1970, yes.
Q. It says: Trapping of sand in the fillet beaches has significantly slowed and possibly stopped over the last 30 to 40 years?
A. Yes.
Q. Can you just explain that statement to me and what the basis for that is, what the import of that statement is and the basis for it?
A. One of the ways in which the harbor removes sand from the system and deprives it to the downdrift shores is through accretion within the fillet beach.
And what I'm stating there is that if we look at the various shoreline positions through time from the various photographs and maps, correct



those for water level, we find that the north fillet beach has stopped growing in the last -- stopped growing or almost stopped growing to the measurable extent in the last, say, 10 to 15 years and the south fillet beach stopped growing by about 1950.
Q. Okay. And what's the import of that?
A. So the import of that is for -- at the point at which it stops growing, it's no longer depriving sediment from the downdrift shores.
Q. Okay. What percentage of the sediment was being captured in these fillet beaches, if you know?
A. It varies from -- it varies through time. You can again find that within Table 4.4.
Q. Okay. And what effect has that had on erosion south of the harbor over the last 30 to 40 years?
A. Over the last 30 to 40 years, no effect because the mitigation has been sufficient.
Q. Okay.
A. When I say 30 years, back to 1970.
Q. And prior to 1970, there was some effect?
A. Yes, as we've discussed earlier, some effect to varying degree and varying places, varying in time.



Q. You say, the report will show that there is no evidence of, nor any reasonable explanation for, permanent offshore losses of sand through offshore flows caused by the interaction of wave or wind driven currents with the harbor structures.
A. Yes.
Q. Could you just -- is that just a general statement about your entire report or are you referring to something specific there?
A. No, we're referring specifically to the possibility of the loss of sand effectively out of the littoral system due to the influence of the harbor on the currents.
Q. The currents?
A. The currents generated by the waves primarily, and in addition to the interaction with the river flow.
Q. And you say, in other words, since 1970 the U.S. Army Corps of Engineers has managed the harbor operations in such a way that any impacts to the harbor on the delivery of sand to the downdrift shores were fully compensated. Is that correct?
A. Yes.
Q. And you're referring there to the beach nourishment program?



A. Yes.
Q. And you had a role in monitoring the beach nourishment program in the 1990s, is that correct?
A. In 1996 and 1997, as we've discussed earlier today, I participated in a project that contributed to a program called Monitoring of Completed Coastal Projects.
Q. Do you remember what your conclusions were as a result of that project?
A. Yes.
Q. What were they?
A. At that time -- and the focus of that work was on the coarse sand nourishment that was trucked to the site, and the -- what we found at that time, based on the information and the models we had available to us at that time, was that we had a hypothesis that only 50 percent of the nourishment, of the coarse sand nourishment was making its way south from the feeder beach area. That was one conclusion.
The other conclusion was that there wasn't really much difference between the coarse nourishment and the fine sand nourishment in protecting the profile where there were revetments





4

182

along the shoreline. I'm sure there were other conclusions, but those are two that I recall.
Q. Do you recall any recommendations that were made in that report regarding the nourishment program?
A. The one I can recall was, again, based on the available methods in that hypothesis I mentioned to you, that the nourishment should be placed further south.
Q. Okay. How about the amount of material that should be deposited?
A. We really didn't -- it wasn't within our mandate to evaluate the amount. We simply, at that point in time, accepted the amount that had been calculated by the Corps of Engineers in earlier reports.
Q. Wasn't part of what you were doing to determine whether or not the beach nourishment program that was in place was sufficient or was working?
A. Well, as I said, the focus was on the -- more really on the coarse sand nourishment, so it wasn't -- it didn't complete an overall sediment budget or evaluate the specific requirements of the amount that was necessary. It really was more

183

focusing on the efficacy of the coarse sand in protecting the shoreline and the lake bed.
Q. Do you remember whether in 1996-1997 when you were conducting this report whether you had an opinion one way or the other as to whether or not more sand should have been provided or should be provided to mitigate the erosion caused by the harbor?
A. No, I don't recall having an opinion that the volume should have been changed one way or the other.
Q. That just never occurred to you one way or the other? You never thought about it in the course of conducting any monitoring program on the efficacy of the program?
A. No, because the coarse sand, you see, would have a -- wouldn't necessarily be a one-to-one match on the fine sand.
And secondly, up to that point in time, I would guess at this point in time, from my recollection, that the average rate may have been 80 to 90,000 cubic yards per year, which wasn't far off of what everyone thought the net southerly drift was, so it wouldn't have occurred to me to question it.

184

Q. In your report you state that the Corps never matched the recommendations contained in the Section 111 report for the amount of beach nourishment, is that correct?
A. I don't recall that statement explicitly.
Q. Is that your understanding?
A. As I say, I don't recall making that statement. You'd have to point me to it.
Q. Does the Section 111 report make a recommendation about how much beach nourishment, how many cubic yards of sand should be placed back into the system to address the harbor influence?
A. Yes, it did.
Q. And what was that?
A. 110,000 cubic yards per year.
Q. Does 110,000 sound correct to you?
A. Sorry. Are you asking me whether the 110,000 sounds correct to me now, then or at all?
Q. I'm asking you if that's what was recommended in 1973, in the Section 111 report?
A. That's what was recommended in the 1973 Section 111 report, correct.
Q. To the best of your knowledge, the Corps has never, at least officially, taken a position that it should be some other number, is that

185

correct?
A. That's correct, as far as I know.
Q. Right. And the Corps, as far as you know, has never in any given year met that 110,000 number, is that correct?
A. Oh, yes, I think there were -- there were years where they put more on the beach.
Q. How many? More than 110,000?
A. Yes. There were maybe nine years where they exceeded 100,000.
Q. Are there years where they didn't come close to 110,000?
A. Well, depends what you mean, but didn't come close. There were years where they were as low as, say, 15 to 20,000 cubic yards.
Q. Let me ask you this. Is it true that they have, over the last 33 years, they have fallen substantially below an average of 110,000 cubic yards per year in sand deposited south of the harbor for mitigation efforts? Is that a fair statement?
A. They have fallen below, yes.
Q. Substantially below?
A. Depending on --
Q. More than 25 percent?
A. Yes.





4.1

repeat that, 04101500. And I'm looking at readings that start back in 1979 and go up to 1995.

And I guess my question is, why would you pick one year and use that as the validator when there's so much more information available on their website? I assume that's where we got it.

A. You have to pick a year where the -- you have the land use data and the -- and so it's the land covered data and the precipitation records. And you want to pick a period when you've got some good flow events in it.

So it's -- there's various combinations that go into picking a period. And I think we've used the standard approach here, as we report here, often validation results are not as good as the calibration results.

Let me explain that. You calibrate the model, as I was explaining to Drew earlier, with certain co-efficients within the model that need to be calibrated to give the correct flows and you compare that to data.

And then you take a different data set that's independent from the calibration data set and you compare the results to the validation data set.



So continuing, I'll read it again. Often validation results are not as good as the calibration results. But in this case, the results for the validation period are a bit better than those for the calibration period.

So it's indicating that using standard procedures, we've actually got a very good match with this model and the flow rates.

MR. EHRET: Let's enter those as exhibits and mark them as -- we'll call that 18, that's two sides, and 19. This is two pages.

(Marked for identification:
Exhibit Nos. 18 and 19.)

BY MR. EHRET:

Q. I have one other question. If I, putting all this together, can conclude that the most important or, in magnitude, the most significant data change going from the 1997 report to this report is in terms of the amount of wave information that you were able to obtain and work with?

A. There are many others that's equally as important.

Q. So you made many changes on the parameters that were assumed prior to your stepping into this situation?



A. No, I wouldn't put it that way.

Q. Could you put it -- could you correct me so that I'll understand? Do your best.

A. The focus of our study -- studies in 1996 and 1997 was, first of all, as I mentioned earlier, on the six kilometers south of the harbor, so we weren't looking -- which doesn't come to the plaintiffs. I think approximately to the north end of the plaintiffs.

The -- as I mentioned also earlier, the focus was on the coarse grain size in particular and in the performance of that coarse grain size. We didn't, in that project, complete an assessment of the sediment budget around the harbor.

We did not complete a detailed sediment budget south of the harbor. We completed a -- what I'd say would be a descriptive model or a conceptual approach only.

We did not complete two-dimensional modeling of bypassing around the harbor. We did not complete a spectrowave model that gave the wave transformation and the focusing south of the harbor.

We did not estimate our own recession rates, either north or south of the harbor. And as



you mentioned, we relied on wave data by others for a shorter period of time.

Now I may have left some out, but those are the major additions, to our understanding, between 1996, '97 and 2006.

MR. EHRET: I have no further questions.

MR. MARROCCO: Real quick.

RE-EXAMINATION

BY MR. MARROCCO:

Q. Dr. Nairn, would you look at Figure 1.1 of your report?

A. Yes, I've got it open.

Q. And I went through this with Dr. Larson. And if I recall correctly, you can check, the Stone property is -- and I'm looking at the lower figure.

A. Yes.

Q. -- is right at the end of Section 9, looking at those numbers at the -- the top numbers on the lower figure?

A. Yes. Well, it's right above and just to the right of the 9.

Q. Right above and just to the right of the 9. Okay. And Dr. Larson when he was testifying -- you were at Dr. Larson's deposition, correct?





4.2

90,000 cubic yards per year for a 21-foot project depth.
That means that 90,000 cubic yards per year of sand is coming down the river at that time during that period, does it not?
A. I don't believe that's a correct interpretation.
Q. But that's what it says, doesn't it?
A. That's not what it says.
Q. What does it say?
A. Over the 15-year period, 1940 to 1954, dredging from the St. Joseph Harbor averaged about 90,000 cubic yards per year for a 21-foot project depth.
Q. Where does that 90,000 cubic yards per year come from?
A. It could come from the end of the jetties where we are trying to maintain a navigation channel, which would be littoral material, or it could have come from the inner harbor which would be more likely river material.
Q. So what you are saying is that part of the 90,000 is littoral material?
A. That's correct.
Q. And do you know what part of it it is?



A. I do not know what part, no.
Q. So that would be beyond the navigational structures?
A. What would be?
Q. The littoral material would be beyond, lakeward, of the navigational structures?
A. Some of it would be in between the jetties. Some of it would be right at the end. The Federal navigation channel doesn't end at the end of the jetties, it flares out from there, as I'm sure you know, and we maintain the flare and the channel between the jetties and upstream a ways.
Q. I understand that.
A. Okay.
Q. But what you are saying is that that depression, that fanned area where you have dredged it out, collects littoral material?
A. To some extent, yes.
Q. And that that subtracts from the 90,000 coming down the river?
A. I've never stated that 90,000 comes down the river. I've stated that you incorrectly interpreted that.
Q. The amount dredged is equal to 90,000. That's



pretty clear, isn't it?
A. That's -- between that time period, they dredged 90,000 cubic yards per year.
Q. That's the period of record for that amount?
A. Yeah:
From 1940 to 1954, dredging from the St. Joseph Harbor averaged about 90,000 cubic yards per year.
Q. I'm going to hand you what has not been marked, but which will be marked as Exhibit 6, and it is entitled Study of Alternative Disposal Areas For St. Joseph Harbor, Michigan.
(Marked for identification Deposition Exhibit No. 6.)
BY MR. EHRET:
Q. It is dated September 1968, which is 12 years beyond the 1954 indicated in the board report, and on page L12-6 it states:
Annual maintenance dredging is performed by Government owned and operated hopper and bucket dredges with about 80,000 cubic yards being removed per year.
Disposal is by dumping while the hopper dredge or scows are moving



slowly over 50-foot depth dumping grounds in Lake Michigan, about one and a quarter miles west at 260 degrees.
I'll hand you page L12-6 and the preceding pages. So that would indicate to you, I assume, that approximately 80 or 90,000 cubic yards per year are being dredged, not only from -- not only up until 1954, but all the way through 1968?
A. They are being dredged from the harbor somewhere, yeah.
Q. Okay. The harbor. What do you consider to be the harbor?
A. Any of the Federal channel.
Q. And that is out beyond the piers?
A. Yes.
Q. So it can be considered to be the harbor and yet not have any piers present?
A. Let me restate that then. From the Federal channel, dredged from the Federal channel.
Q. Between the piers?
A. The Federal channel is between the piers. The Federal channel also flares out at the entrance. The Federal channel also goes upstream.





5

Q. But there are no piers out beyond the end of the channel, and you still call it a harbor?
A. Yes, I did.
Q. So it's really not a navigational harbor if it doesn't provide any protection from the waves, is it?
A. In order to maintain the channel so ships can get in and out, you typically dredge a flare so that you can maintain channel depths. If you can't maintain channel depths, it ceases to function as a viable commercial harbor.
Q. And you do that by dredging?
A. We do that by dredging.
Q. You don't need the piers to maintain that channel depth.
A. Oh, we do.
Q. You do need the piers? You need the piers beyond the end of the piers?
A. That's not what I said.
Q. I think it is what you said.
A. What is your question?
Q. The question is, is there any navigational protection beyond the end of the piers --
A. Navigation protection --
Q. -- where you are calling it a harbor?



A. No, there is not.
Q. The only way you maintain that navigational channel beyond the end of the piers is by dredging; isn't that correct?
A. That's correct.
Q. And actually, you could maintain the channel for its entire length without having any piers just by dredging?
A. I'm not sure if we could dredge fast enough if the piers weren't there.
Q. Sir, isn't it true that many harbors do not have shore perpendicular piers, and that they are maintained simply by dredging?
A. There are a lot of harbors on small inland lakes. There are harbors in areas where long-shore transport is not very great and wouldn't fill in a channel very fast. There are many variations of protective structures that aren't perpendicular, but rather oblique to the shoreline.
Q. So the answer to my question is yes?
A. What was your question again?
Q. The question is, aren't there harbors that don't have piers that are maintained by dredging?
A. There are some where it is feasible.



Q. So the feasibility depends upon minimizing the amount of dredging, doesn't it?
A. That's one of the requirements or one --
Q. The basic criteria of navigation is to keep ships from running aground; isn't that true?
A. I would say a second function is also to provide an area of less energetic wave climate so that it is safer for the ships to navigate through there.
Q. So if you wanted to minimize the energetic wave climate, you would pull out all the steel sheet piling at the St. Joe Harbor, wouldn't you?
A. I would not.
Q. Because you don't want to minimize the energetic wave climate?
A. No, because you've interpreted that wrong again.
Q. Are you saying that the presence of the steel sheet piling does not increase the energy of the wave climate?
A. I'm saying that the parallel jetties there block a great percentage of the wave energy from getting in between the jetties.
The wave energy that does make it in there, because the walls are made of steel and are reflective, it bounces back and forth. It



doesn't increase. You can't increase energy in there. What gets in gets in, but a great portion of it is blocked because the jetties are narrow at the opening, and depending on what sort of angle of approach the waves have, only a small portion of that is going to get in there.
Q. Have you ever skippered a boat coming in that channel during a wavy storm?
A. I've skippered a boat in and out of St. Joe a number of times, but not during a storm. I don't go out during storms usually.
Q. What size boat is it?
A. 22-foot Monarch.
Q. Is it inboard? Outboard?
A. It is an outboard.
Q. And is that a Corps vessel?
A. Yes, it is.
Q. What is the name of that vessel?
A. I'm not sure it has a name. It's our survey vessel for H & H.
Q. Is it the Harvey Hodge?
A. No, it's not the Hodge.
Q. Have you used it lately?
A. Last time I was out on it was probably last summer.





5.1

Vol. 161 Oct 2005

US Army Corps
of Engineers
Detroit District

Great Lakes Update

## Wave Absorbers at Federal Harbors on the Great Lakes

Attenuation or reduction of wave action in federal navigation channels has become a pressing issue throughout the Great Lakes region. Wave heights on the Great Lakes can reach well over 20 feet in deep water creating dangerous commercial and recreational boating conditions. Additionally large waves can accelerate erosion, putting both private and public property in jeopardy.



**Figure 1: Wave action at Grand Haven Pier**

Many inlets around the Great Lakes are stabilized by parallel jetty structures, also known as piers. Channel geometry and construction materials contribute a large portion to wave attenuation in federal harbors. The geometry and impermeable material used to construct these piers, allow them to shelter the inner-channel from a large portion of wave energy. These structures were originally built in the mid to late 1800's using stone filled timber cribs. Due to many years of physical, chemical and biological weathering, these structures deteriorated to the point where they became unstable. They were absorbing wave energy, but concurrent with every passing storm, being continually destroyed. The U.S. Army Corps of Engineers was tasked to rehabilitate these structures. The goal of the rehabilitation was to restore them so they would perform in a similar way as they did when the structures were originally installed.

The usual construction method has been to drive steel sheet pile on both sides of the deteriorating jetty and pour a concrete cap over the top. Steel sheet pile was chosen over timber to extend the structures useful lives. While this has proved to be a very durable alternative, it has made the wave climate between the jetties at some harbors more energetic when compared to the climate when the structures were deteriorated.

Because steel sheet pile is vertical and smooth, waves tend to reflect entirely off these structures with little to no energy being dissipated. With waves continually bouncing off the sides of these structures, resonance may occur, and on rare occasions may result in a large standing wave. A standing wave may hamper vessels' ability to gain safety inside a harbor.

To remedy this situation and provide for a safer environment, the Detroit District began installing wave absorber cells in some of their structures. A wave absorber is a pocket cut out of the existing steel sheet pile jetty, where large armor stone is placed. The armor stone size usually ranges from 2.5-10 tons and is normally placed on a slope. The uneven face of the stone configuration allows for much more effective wave absorption, while protecting the integrity of the structure. The armor stone configuration allows for a much more porous structure which absorbs wave energy much more effectively. Figure 1 shows the northern wave absorber at Pentwater Harbor. Figure 2 shows wave action on the lakeside of the wave absorber cell. Figure 3 shows wave action after interacting with the wave absorber cell.



**Figure 2: Wave Absorber Cell (Courtesy of Don Carpenter)**



**Figure 3: Wave action before the cell (Courtesy of Don Carpenter)**



**Figure 4: Wave action after the cell (Courtesy of Don Carpenter)**

Depending on the configuration of the harbor, wave absorbers have been placed in both jetties or just one. The lengths of the absorber cells range from 200 feet to 600 feet, while the widths range from approximately 20 feet to 60 feet. In Figure 5, the 200-foot wave absorber structures on both the north and south jetties at Pentwater harbor are shown.




**Figure 5: Pentwater Harbor**

Currently, wave absorbers have been installed at seven harbors (Figure 6). Five of them are located on the east coast of Lake Michigan: Charlevoix, Portage Lake, Pentwater, White Lake and Saugatuck. Two Rivers is located on the west coast of Lake Michigan. The seventh is at Ontonagon, located on the southern shore of Lake Superior. Grand Haven Harbor is scheduled to have one constructed within the next few years.



**Figure 6: Wave absorber locations.**

In order to examine the efficiency of these structures and possibly improve on them, the U.S. Army Corps of Engineers Coastal and Hydraulics Laboratory (CHL) and Detroit District have undertaken a study at Pentwater Harbor involving ·oth detailed physical and computer modeling. This study is being done under the Monitoring Completed Navigation Projects (MCNP) Program. There were a number of purposes to this study, which are outlined below.

- Experiment with wave absorber length and placement to optimize future designs.
- Provide guidance to future wave absorber designers on how to conduct analyses to determine proper wave absorber size and placement.
- Determine efficiency of each wave absorber configuration and costs associated to achieve various levels of wave energy reduction within the navigation channel.

The bulk of the work effort on this project was on the physical modeling. The physical model was constructed at the CHL in Vicksburg, MS (Figure 7). Several wave conditions were modeled with 9 different wave absorber configurations. The onfigurations were as follows:

1. 200-foot wave absorber on north jetty, 200-foot wave absorber on south jetty (Existing condition at Pentwater)
2. 200-foot wave absorber on north jetty, no wave absorber on south jetty
3. No wave absorber on north jetty, 200-foot wave absorber on south jetty
4. 400-foot wave absorber on north jetty, 400-foot wave absorber on south jetty
5. 400-foot wave absorber on north jetty, no wave absorber on south jetty
6. No wave absorber on north jetty, 400-foot wave absorber on south jetty
7. 200-foot wave absorber on north jetty, 400-foot wave absorber on south jetty
8. 400-foot wave absorber on north jetty, 200-foot wave absorber on south jetty
9. No wave absorbers on either jetty


**Figure 7: Physical Model**

In addition to the physical model built at CHL, a detailed computer model was created using CGWAVE, a state-of-the-art computer program that is capable of predicting wave effects inside a harbor. The purpose of the dual modeling scenarios was to compare results of both the physical and computer models and make conclusions on whether the computer modeling is accurate enough to predict the same wave effects inside the harbor as that of the physical model. Physical modeling is very costly when compared to computer modeling. If the computer model proves to be adequate in predicting harbor

6.2

response then it can be recommended for future studies at a significantly reduced price. All of the configurations listed above were modeled using CGWAVE.

The graphic below shows a model run using an 8.2-ft wave. A wave of this height would most likely be the result of strong northwest winds. Note the intense wave action along the southern pier. The height of those waves along the pier is about 5 ft. After interacting with the wave absorber cells, the waves are drastically reduced.




**Figure 8: CGWAVE Output**

Preliminary results are showing that a wave absorber on both sides of the channel is more effective than just having one. For example, when a 200-foot wave absorber was placed on the north and south side, it generally was more effective in reducing wave energy than just one 400-foot wave absorber on the north or south side. These preliminary results are very positive considering that Pentwater was built with two 200-foot wave absorbers.

The idea for the two-wave absorber configuration came from a field experiment in Charlevoix Harbor. In 1981, during reconstruction of the Charlevoix Harbor north jetty, field engineers attempted to mitigate for the increased wave reflection that was expected at completion of the project. They substituted a 400-ft section of large armor stone for the sheet piling along a portion of the rehabilitated structure, essentially creating a steel sheet pile-rubble mound hybrid structure. The rubble-mound portion was recessed into a pocket so that the toe of the rubble-mound would not encroach into the navigation channel, and these became know as pocket wave absorbers.

The local community found this to work very well in attenuating waves. When the southern jetty was being rehabilitated in 1989, a 200-foot section of rubble mound was placed. From that project forward, the application of a wave absorber at all new rehabilitation projects was examined. The length and placement of the wave absorbers varied from project to project as some harbors only called for small sections of the jetties to be reconstructed. Lengths of 200-foot and 400-foot were traditionally used since they were shown to work at the original harbor.

CHL and the Detroit District have completed all of the physical and computer modeling and are currently analyzing the data. A draft report was completed in September 2005 and the final report should be published sometime in 2006.

Based on the results from this study, the U.S. Army Corps of Engineers hopes to enhance performance of the federal structures and design cost effective improvements in the future. The ultimate goal is to provide safe navigation to all who want to work and play on the Great Lakes.