STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING

JENNIFER M. GRANHOLM
GOVERNOR

STEVEN E. CHESTER
DIRECTOR

February 9, 2007

MARCIA A WINEBERG
9047 N MASON
MORTON GROVE, IL 60053

Dear Property Owner:

SUBJECT: Property Tax Number: 11-43-0003-0035-03-1
Township: VILLAGE OF SHOREHAM
Sequence Number: 17
HREA Status: IS

The Michigan Department of Environmental Quality (MDEQ) is planning meetings with those persons owning property along Lake Michigan, in Berrien County, identified as being located within a high-risk erosion area (HREA) pursuant to Part 323, Shorelands Protection and Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended. The meetings will be held at the St. Joseph High School, St. Joseph, Michigan, and will provide an opportunity to explain the HREA Program and give you an opportunity to ask questions and make comments regarding the program.

Enclosed is a brief summary of the regulations; a map to the high school, and the date and times of the meetings.

Part 323 directs the MDEQ to identify and designate HREAs and regulate new construction activities to minimize future damage to buildings and septic systems. HREAs were originally designated in 1980 in Berrien County. The MDEQ has updated the original erosion studies and determined that changes in the boundaries and setbacks of the HREAs are necessary. Based on these updated studies, the MDEQ is proposing to increase the 30-year projected recession distance from 110 feet to 275 feet, and the 60-year projected recession distance from 205 feet to 535 feet on the property referenced above.



7

1973

Amended 9/80, 05/200

BERRIEN COUNTY
HAGAR TOWNSHIP
T.3S R.18W

WIDE SHADED BAND
DEMARKS HIGH RISK
EROSION AREA

60-year projected recession distance
30-year projected recession distance



1978

Amended December 1990

" May 2000

BERRIEN COUNTY
BENTON AND ST. JOSEPH TOWNSHIPS
T.4S R.18W
T.4S R.19W
~~T.4S R.19W~~
T5S, R19W



Amended 05/2000

BERRIEN COUNTY
LINCOLN TOWNSHIP
T.5S R.19W

60-year projected recession distance
30-year projected recession distance

WIDE SHADED BAND DEMARKS HIGH RISK EROSION AREA



1978
Amended
05/2000

BERRIEN COUNTY
LAKE TOWNSHIP
T.6S R.19 and 20W

WIDE SHADED BAND DEMARKS HIGH RISK EROSION AREA

60-year projected recession distanc
30-year projected recession distanc




7.4

1978
Amended December 1980
Amended 10/1999
P. Hott
Amended 05/2000

BERRIEN COUNTY
CHIKAMING TOWNSHIP
T.7S R.20W, R21W

60-year projected recession distance
30-year projected recession distance



1978

Amended November 1980
March 1981; July 1981
June 1983
May, 2000

BERRIEN COUNTY
NEW BUFFALO TOWNSHIP
T.7 and 8S R.21 and 20W & 22W

60-year projected recession distance
30-year projected recession distance

WIDE SHADED BAND
DEMARKS HIGH RISK
EROSION AREA



Technical Report CERC-96-10
June 1996
Geological Effects on Behavior of Beach Fill by Parson, Morang & Nairn

Plaintiffs Exhibit 23 RECORD

## Shoreline Recession

The shoreline in the vicinity of St. Joseph is in a state of recession. Birkemeier (1980) determined bluff recession rates for areas south of St. Joseph averaging 4.6 m/year during a period of rising lake levels between 1970 and 1974. Evidence has been presented by Buckler (1981) showing a southward progression of increased erosion rates since at least 1829. Further studies by Buckler and Winters (1983) revealed average bluff recession rates for the area between St. Joseph and Shoreham of approximately 0.6 m/year between 1829 and 1977. Using photogrammetric methods, the Michigan Department of Natural Resources (1978) computed the bluff line recession rate for the St. Joseph region to be approximately 1 m/year over a 50-year period. Preliminary studies by Foster et al. (1992) documented between 3 and 4 m of downcutting of the nearshore lakebed south of the Federal structures near the village of Shoreham.

## Wave Climate

Wave hindcasting information (Hubertz, Driver, and Reinhard 1991) representing a 27-year period was used to describe the offshore wave climate for the St. Joseph area. The predominant direction of wave approach is from the southwest, which normally corresponds to periods of low wave energy with mean wave height of 0.8 m (2.6 ft) and mean wave period of 4.0 sec. The maximum wave height from this direction is 4.6 m (15.1 ft). The predominant wave energy, however, approaches from the north and northwest, where the mean wave height is 1.2 m (3.9 ft) with a mean wave period of 4.8 sec. The maximum wave height from these directions, 6.3 m (20.6 ft), occurs during the stormy winter months. The longer fetch distances to the north and northwest across the lake allow larger waves to develop than those that form over the shorter fetches from the south and southwest (USAED, Detroit 1973). This wave climate causes a southward directed net littoral drift as indicated by the accumulation of material and updrift offset to the north of the harbor jetties. Northward transport also occurs and is usually associated with low energy periods, as evident by the lesser accumulation of material against the south jetty (Figure 2).

PX 23
Page 9
Banks V. U.S. 99-4451 L

1992

SAND BYPASSING AT
INDIAN RIVER INLET, DELAWARE

James E. Clausner[1], M. ASCE, Jeffrey A. Gebert[2],
Augustus T. Rambo[3], and Keith D. Watson[4], A.M. ASCE
(3) USACOE Philadelphia District 215-656-6641

**ABSTRACT: To solve a beach erosion problem north of Indian River Inlet, Delaware, the US Army Corps of Engineers Philadelphia District and the State of Delaware have constructed a fixed plant sand bypass system. The system uses a jet pump deployed from a crawler crane to mine the accretion fillet.** During the first year of operation, the plant has bypassed over 100,000 cubic yards, the design bypass volume. Up to 600 ft south of the inlet, the bypass operation has probably reduced beach width sightly from what would have been expected.

## INTRODUCTION

Sand bypassing to reduce the impacts of interruption of longshore transport caused by navigation improvements at inlets and harbors is becoming more popular. While the majority of sand bypass operations are conducted by conventional dredges, several fixed bypass plants have been conducted since 1986 (Clausner, Patterson, and Rambo 1990). This paper describes the most recently constructed fixed plant, located at Indian River Inlet, Delaware.

Indian River Inlet, Delaware, is located on the Atlantic Coast of the USA, approximately 10 miles north of Ocean City, MD (Figure 1). The 500-ft-wide inlet, constructed in the late 1930's, is stabilized by two parallel, rubble-mound jetties. Trapping of the net northerly littoral drift has resulted in a significant fillet on the south side of the inlet, and continued buildup of the ebb and flood tidal shoals. This deficit of sand on the north side of the inlet has caused beach erosion which threatens a state highway. To

1) Research Hydraulic Engineer, USAE Waterways Experiment Station, Coastal Engineering Research Center, 3909 Halls Ferry Rd, Vicksburg, MS 39180-6199; 2) Oceanographer; 3) Civil Engineer; 4) Hydraulic Engineer, US Army Engineer District, Philadelphia, US Custom House, 2nd & Chestnut Sts., Philadelphia, PA, 19106-2991




Figure 1. Indian River Inlet Bypass System

mitigate the beach erosion, a fixed plant sand bypassing system using jet pumps was constructed adjacent to the south jetty. The system was designed to bypass 100,000 cubic yards per year (cy/yr) to the beach north of the inlet. The US Army Engineer District, Philadelphia, maintains the inlet and has overall responsibility for the project construction. Construction and operating costs are being shared by the State of Delaware and the Federal Government. The State of Delaware has responsibility for plant operations.



9.1

Following a description of the coastal processes at the site, engineering alternatives considered to solve the erosion problem are discussed. Details of the fixed plant sand bypass system selected are then described. Performance of the bypass system is presented next followed by a discussion of the impacts of the bypass operation on the beaches north and south of the inlet.

Inlet History - Coastal Processes

Pre-jetty conditions. Detailed surveys dating to 1847 and showing inlet positions back to 1800 indicate that Indian River Inlet provided an ephemeral connection between Indian River Bay and the Atlantic Ocean. Between 1800 and 1928, the inlet was unstable and tended to close, reopen, and migrate through a two mile-long zone approximately centered on its present location. The inlet regime was dominated by littoral processes which tended to deliver more sediment to the inlet than could be scoured by tidal flow to maintain a stable channel. Between 1928 and 1938, local interests attempted to open and maintain a stable channel with several dredging operations. None of these efforts was more than temporarily successful in establishing a navigable channel from the bay to the ocean.

Post-jetty conditions. The Federal navigation project, including jetties and a dredged channel, was constructed between 1938 and 1940. Surveys and aerial photography indicate that immediately following project construction the ocean shoreline adjacent to the inlet began significant reorientation. The south ocean beach accreted while the north ocean beach eroded. This change occurred as a result of the predominant northward littoral transport being interrupted by the jetty structures, which extended about 600 ft seaward of the 1938 shoreline position. Persistent erosion of the north ocean beach led to a number of beachfills, the first in 1957, and the most recent of which was being placed at the same time the sand bypass plant was completed (1990). The volumes of beach fill placed on the beach since 1957 averaged 105,000 cy/yr.

Coastal Processes. Longshore transport is predominantly northward at Indian River Inlet, as well as along the 14 miles of ocean shoreline north to Cape Henlopen, Delaware. At Ocean City Inlet, Maryland, a distance of 20 miles south of Indian River Inlet, net transport is southward. Thus a sediment transport nodal zone, with a net long-term transport rate of zero, is located within the reach bounded by Ocean City and Indian River Inlets. A number of approaches were applied to quantify longshore transport rates at Indian River Inlet. These included application of the Wave Information Study nearshore hindcast wave data (Jensen 1983) to a longshore transport equation, analysis of historic beach profile and hydrographic survey data to quantify inlet vicinity morphological changes, as well as analysis of beachfill and shoreline survey data for the eroding north beach. A synthesis of these analyses led to the adoption of the value of 110,000 cy/yr as the net northerly



9.3

Charles W. Shabica, Ph.D.
*President*
PROFESSOR OF COASTAL Eng
**Shabica & Associates, Inc.**
*Coastal Consulting / Beach & Shore Stabilization*
THE [illegible] UNIVERSITY

550 Frontage Road
Suite 3400
Northfield, Illinois 60093

(847) 446-1436
FAX (847) 446-5976
E-mail charles@shabica.com



9.4

Michigan DNR

STATE OF MICHIGAN
DEPARTMENT OF NATURAL RESOURCES

Number 24

September, 1999

# St. Joseph River Assessment

Jay K. Wesley
and
Joan E. Duffy



PX 90
Page COVER + 35
Banks V. U.S. 99-4451-L

FISHERIES DIVISION
SPECIAL REPORT

10

**Dams and Barriers**

There are 190 dams in the St. Joseph River basin registered with MDEQ and IDNR, with 17 on the St. Joseph River mainstem (Table 6; Figure 25). Some of these dams are classified by MDEQ Dam Safety Section and IDNR Dam and Levee Safety Section according to their purpose: 18 for hydroelectric power generation, 11 retired hydroelectric dams, 5 for irrigation, 105 for recreation (including lake-level control structures), 9 flood-control dams, 4 for water supply, and 19 for other reasons (private ponds, county park ponds, hatchery ponds etc.). It is not known how many small unregistered dams exist in the basin.

The first dam in the watershed on record was built in 1826 on Dowagiac Creek. Early dams were built across small creeks at high gradient locations to power grain mills. Construction of mill dams continued until 1900. From 1890 to 1940, several large dams were constructed to generate electricity. The last phase of dam building was between 1945 and 1980; these dams were built to control lake levels for recreation and waterfront development.

Dams are regulated under Michigan's Dam Safety, Part 315 of the Natural Resources and Environmental Protection Act, 1994 P.A. 451 as amended; Indiana's Chapter 84, Acts of 1961, Indiana General Assembly; and the Federal Energy Regulatory Commission Regulation 18 of Part 12 of the Code of Federal Regulations. Most existing hydroelectric dams are under FERC authority. The Berrien Springs Dam on the St. Joseph River is not regulated under FERC; it has a permit issued by an Act of Congress in 1906. Dams not regulated under FERC operate without licenses and have limited regulation toward operation of the dam; therefore, no control is offered for the protection of aquatic resources above and below such dams.

All dams in the Michigan portion of the basin are considered safe by the Dam Safety section of MDEQ, LWMD. Thirteen dams are of hazard type 1 (dam failure would cause the loss of life), 12 are of hazard type 2 (dam failure would cause severe property damage), and the remaining 97 dams are of hazard type 3 (have low heads in remote areas). Most of the high hazard dams have a head of over 12 ft and are hydroelectric or retired hydroelectric facilities on the mainstem.

Dams have many detrimental effects on aquatic communities in rivers. They impede fish movements to refuge habitats causing segmented fish populations and block spawning migrations (Goldman and Horne 1983; Schlosser 1991). Dams fragment river systems, and turn high quality river habitat into lentic habitat. Some fish and aquatic insects migrate up or downstream to reach different feeding and temperature habitats throughout the year. Mortality or injury can result while passing through dams, especially with hydroelectric turbines. Entrainment often causes mortality or injury as a result of fish being struck by turbine blades, pressure changes, sheer forces in turbulent flows, and water velocity accelerations (Cadwallader 1986; Cada 1990). Potamodromous fish can migrate up river from Lake Michigan to Twin Branch Dam through the use of fish ladders at the Berrien Springs, Buchanan, Niles, South Bend, and Mishawaka Dams. Salmonines comprised 99.6% of all fish passed at the ladders (Dexter and Ledet 1995). The remaining use of ladders is by warm and coolwater species. Both up and down river movements of walleye, smallmouth bass, channel and flathead catfish, and white and redhorse suckers frequently occur between June and August.

Impoundments that draw water from the surface typically increase downstream water temperatures by spilling warm surface waters. This is especially critical in the warm summer months. Increased water temperatures can lead to elimination of certain aquatic species including fish (Ward 1984). Evaporation rates increase with higher temperatures and much greater impoundment surface area. Dissolved oxygen levels in impoundments are usually lower than those in moving streams, and this change can alter fish populations in impounded portions of the river system. Impoundments also act

since 1900 was 4.2 feet above low water datum. Short period fluctuations up to about 1.8 feet, caused by winds and differences in barometric pressures, occur with annual frequency. The design lake stage is 5 feet above low water datum. Of winds which generate waves affecting the area, those from the north have the greatest fetch, about 225 miles. Those from the southwest have a fetch of about 50 miles. During severe storms with a frequency of about once a year, waves may range up to 11 feet in height in deep water, but ordinarily waves of this height break before reaching the shore structures. Waves from both the northwest and southwest quadrants cause movement of beach material, but as evidenced by the much greater accumulation of material north of the St. Joseph Harbor structures, the predominant direction of littoral transport is southward. The navigation channel at St. Joseph Harbor is dredged annually to maintain project depth, and for this reason little or no beach building material is believed to pass the harbor entrance and reach the downdrift shore. The rate of littoral transport is estimated at 100,000 cubic yards per year.

5. The district engineer has considered the desires of the cooperating agency, has determined the sources and movement of beach material, the changes in the shoreline, the effects of winds, storms, and of existing structures, has developed a plan for protecting and improving the shore in the principal problem area, and has made an economic analysis of proposed protective measures. He concludes that the most suitable plan of preventing erosion and stabilizing the bluffs and shores of the study area consists of providing, by direct placement of sand fill, a protective beach with berm elevation 10 feet above low water datum at the base of the bluff and 50-foot width at elevation 8 feet, to be maintained by periodic replenishment of the material in the northernmost mile of the sand fill area.

6. The district engineer finds that protection of a 13,360-foot reach of shore in the city of St. Joseph by placement of a protective beach is justified by evaluated benefits. The estimated first cost of the plan is $1,000,400. Annual charges are $69,770 including $34,500 for periodic nourishment. Annual benefits are estimated as follows:

| | |
|---|---|
| loss of land | $3,610 |
| f need of relocating existing improvements | 49,130 |
| f need of maintaining existing protective works | 72,000 |
| benefits | 38,900 |
| | 163,640 |

-cost ratio is thus 2.3. The estimated annual public and efits for the several sections included in the plan are as

| Section | Percent of total length | Estimate annual benefits | | |
|---|---|---|---|---|
| | | Public | Private | Total |
| | 8.98 | $10,340 | $760 | $11,100 |
| O. Ry. | 31.89 | 36,400 | 1,800 | 38,200 |
| | 30.69 | | 58,100 | 58,100 |
| | 28.44 | 54,230 | 2,010 | 56,240 |
| | 100.00 | 100,970 | 62,670 | 163,640 |

PX 132
Page 5
Banks V. U.S. 99-4451L



Based on the public ownership of one section of the shore, and public use and protection of nearby public property in other sections, the district engineer finds that Federal aid is warranted under the provisions of Public Law 826, 84th Congress. For the publicly owned shore, 31.89 percent of the total length of shore involved in the plan, Federal aid would be one-third of the costs. For two sections of privately owned shores amounting to 8.98 and 28.44 percent of the shore, respectively, public benefits amount to 93.2 percent and 96.4 percent, respectively, of total benefits, thus justifying Federal aid for the respective sections amounting to those percentages multiplied by one-third of the costs. Combining the percentages of Federal aid for the sections results in a composite percentage of Federal aid amounting to 22.6 percent applicable to the 13,360-foot reach of shore to be protected. The district engineer further finds that Federal participation in the cost of periodic nourishment of the beach fill is warranted for a 10-year period at an amount also equal to 22.6 percent of the costs thereof. He recommends Federal participation, subject to certain conditions, in the plan of improvement of the shore at St. Joseph to the extent of 22.6 percent of the first costs thereof and of the costs of subsequent periodic nourishment for a period of 10 years. The district engineer finds no public benefits or justification of Federal aid for protection of the shore in private ownership south of the State Highway protective works. The division engineer concurs in the views and recommendations of the district engineer.

7. Local interests were informed of the findings and recommendations of the district and division engineers and invited to present additional information for the consideration of the Beach Erosion Board. Careful consideration has been given to all communications received.

## VIEWS AND RECOMMENDATIONS OF THE BEACH EROSION BOARD

8. The Board has carefully considered the reports of the district and division engineers and concurs in the method of improvement proposed. The Board notes that the plan for periodic nourishment assumes that half the material will be obtained in maintaining the navigation channel and half from a borrow area just north of the harbor entrance. Removal of material from this borrow area may reduce the amount of material shoaling the channel, thus increasing the volume that must be taken from the borrow area and the cost of nourishment. In the event that the entire annual nourishment requirement of 100,000 cubic yards must be so obtained, the cost of nourishment would be increased from $34,500 to $49,000, and the benefit-cost ratio would be decreased from 2.3 to 1.9. The Board therefore finds that the project is adequately justified even under the circumstances described above. The Board desires to point out the importance of the periodic nourishment to stabilize the restored shore, in view of lack of natural supply. The nourishment program should therefore be initiated at the earliest practicable date to prevent material reduction in width of the protective beach.

9. With respect to construing periodic beach nourishment as construction eligible for Federal aid, the Board concurs in the opinion that periodic nourishment is the most suitable and economic remedial measure available to provide stability of the restored shore of the

**Table 4**
**Typical Wave Conditions and Associated Peak Shear Stresses**

| Wave Characteristics | | | Shear Stress (Pa) | |
|---|---|---|---|---|
| Hs (m) | T (s) | Duration (hrs per yr) | d = 2m | d = 5m |
| 0.3 | 3.0 | 240.0 | 0.7 | 0.1 |
| 0.5 | 4.0 | 360.0 | 2.7 | 0.6 |
| 1.0 | 5.0 | 190.0 | 17.4 | 2.6 |
| 1.5 | 6.0 | 90.0 | 39.6[1] | 6.4 |
| 2.0 | 6.5 | 50.0 | 39.9[1] | 19.8 |
| 3.0 | 7.0 | 10.0 | 40.4[1] | 47.0 |

[1] Breaking wave conditions.
Note: Bottom roughness of 0.0025 m was assumed.

Laboratory tests revealed that the threshold for erosion varied between a low of less than 0.5 Pa with sand in the flow to a high of 2 to 4 Pa under the clear-water conditions (for the light and dark sediment, respectively). Based on the laboratory results given in Table 3, an average downcutting rate under erosive conditions is about 2 mm/hour. If a section of till on the lake bed was exposed for the entire year, the downcutting could be up to 0.7 m at the 2-m depth and 0.35 m at the 5-m depth (this calculation assumes the average downcutting rate and considers that the peak wave shear stresses are only instantaneous). It is unlikely that this magnitude of downcutting is sustained at any one location over a year, because for a significant amount of time the till will be buried under a sandbar (or a sufficient protective cover layer will exist). Laboratory tests of profile downcutting in a wave flume (reported by Nairn (1992) and Skafel and Bishop (1994)) showed that only a very thin cover would protect the underlying till from erosion (perhaps as little as 2-5 cm, depending on the wave conditions).

For the lake bed in the study area, the preliminary findings of Foster et al. (1992) show that between the 2-m and 5-m contours, up to 3 m of downcutting was experienced over a large area between 1945/6 and 1964/5, which gives an average annual downcutting rate of about 0.16 m/year. The annual drop in the lake bed could occur over a period of 80 hr at a downcutting rate of 2 mm/hr. This 80-hr duration is in the same order of magnitude as the number of hours of storm wave conditions each year.

## Comparison to Other Studies

The unidirectional flow flume apparatus has been used at both the National Research Council of Canada Hydraulics Laboratory and at the Queen's University Coastal Engineering Laboratory to test the erosion resistance of cohesive



PX 23
Page 33
Banks V. U.S. 99-4451L

12




Figure 11. Detail of the St. Joseph-Shoreham area from the previous map (fig. 8). Difference in depth between NOAA 1945-46 and 1991 surveys. Warm colors show erosion; as much as 4 vertical meters of lake bed have been removed by erosion south of St. Joseph.

PX 33
Page 23
Banks V. U.S. 99-4451 L



13