IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 99-4451 L
c/w 99-4453L, 99-4454L, 99-4455L, 99-4456L, 99-4457L, 99-4458L, 99-4459L, 99-44510L, 99-44511L, 99-44512L, 00-0365L, 00-379L, 00-380L, 00-381L, 00-382L, 00-383L, 00384L, 00-385L, 00-386L, 00-387L, 00-388L, 00-389L, 00390L, 00-391L, 00-392L, 00-393L, 00-394L, 00-395L, 00-396L, 00-398L, 00-399L, 00-400L, 00-401L, 04-277L, 05-1353L, 05-1381L, 06-72L

| | |
|---|---|
| JOHN H. BANKS, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 99-4451 L |
| STONE, ERROL L. and SUSAN H.<br>As Trustees of Susan H. Stone Trust,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 04-277 L |
| EUGENE J. FRETT, Individually and<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 05-1353 L |

Pursuant to the Court's January 4, 2007 Order, Stone plaintiffs submit their Memorandum of Fact and Law. In a status conference with the parties, the Court indicated that the liability trial would focus on the government's liability for erosion experienced generally by plaintiffs south of the harbor and that the trial would not address liability on a parcel by parcel or plaintiff by plaintiff basis nor involve the specific damage suffered by any individual plaintiff. Such inquiries will be addressed, if necessary, in the quantum phase of the litigation. As such, Stone plaintiffs plan to present evidence on the government's general liability for erosion to property extending several miles south of the St. Joseph Harbor. Pursuant to Appendix A paragraphs 14, 15 and 16, attached as Exhibit A to this Memorandum is a list of witnesses and exhibits Stone plaintiffs may present at trial. This list was previously provided to the government.

## Background and Introduction

Since at least 1950 the government has been aware of and monitoring the severe erosion to the shore south of St. Joseph Harbor caused by the construction and maintenance of federal navigational structures in the harbor ("jetties"). From the date of their construction in the 1830s to the present, the jetties have acted as a blockade to sand moving south down the shore to plaintiffs' property seriously exacerbating erosion to that property. In some years, the harbor induced erosion was as much as five feet per year. This erosion caused property owners directly south of the harbor such as the Michigan Department of Transportation ("MDOT") and the Chesapeake & Ohio Railroad ("C&O") to armor their property's shoreline with revetments. The revetments, further exacerbated erosion to the south causing private land owners to build their own revetments setting off a domino effect of increased erosion causing activities. The government's blockade of sand and the resultant armoring of the shoreline have caused a taking of plaintiffs' property by the government.

In 1973, recognizing that its actions in constructing and maintaining the harbor was causing plaintiffs to lose their property, the government developed a mitigation plan. That plan was encompassed in the Army Corp of Engineers' 1973 Section 111 Report. Despite recognizing the seriousness of the problem and despite consistent monitoring by the government that indicated that it was not doing enough to mitigate the damage caused by the jetties, the Section 111 mitigation plan was never implemented nor were the numerous recommendations made over the next 30 years by Dr. Robert Nairn and other government representative for steps to improve the government's beach nourishment efforts. Prior to this litigation, the erosion caused by the jetties; the detrimental effects to plaintiffs' property and the insufficiency of the government's mitigation efforts were thoroughly studied, understood and documented by the Army Corp of Engineers.

However, in the face of this litigation and the possibility of having to compensate plaintiffs for its actions, the government now disavows over 30 years of analysis, monitoring and reporting on the effects of the jetties to the plaintiffs' property and the effectiveness (or lack thereof) of the government's mitigation efforts. The government's litigation position is that many of the key conclusions and analysis regarding the cause and extent of erosion and the government's mitigation arrived at by the Army Corp of Engineers over the past 30 years were simply wrong – and materially so. The government now claims that the plaintiffs have, in fact, suffered no compensable loss of property. Remarkably, the government now claims that, although it, allegedly, fundamentally misunderstood the cause and extent of the erosion and even though it failed to follow the Section 111 mitigation plan or make recommended adjustments to the beach nourishment program, fortuitously, the little the government did – without a coherent understanding of the problem or of the necessary mitigation steps required – turned out to be exactly enough. The government now rejects its 30 year history of analysis, study and

monitoring of the erosion experienced by plaintiffs in favor of a post hoc computer model prepared by a paid consultant for the sole purpose of litigation against the plaintiffs. The government's revisionism and litigation driven computer modeling and data generation flies in the face of the consistently held pre-litigation position of the Army Corp of Engineers and belies the very real situation on the ground.

**Statement of Facts**

1. The Stone plaintiffs are the owners of property located at 2845 Lake Pines Path, St. Joseph, Michigan (the "Property"). The Stone plaintiffs purchased the property in 1981 and have held it continuously to the present date.

2. The Property is located approximately five miles south of the St. Joseph Harbor.

3. In approximately 1836, the United States government began construction of navigational jetties in St. Joseph Harbor. The navigational jetties reached their current length in 1903.

4. From their inception, the jetties have always been almost completely impermeable to sand transport whether in their original construction form, consisting of rock-filled timber cribs or in the more recent form of steel sheet piling. This impermeability over the length and height of the jetty structures contributes to the ongoing growth of the fillet beaches over time. The loss of sand from the littoral system, associated with the trapping in the fillet beaches and the dredging and offshore disposal, caused exacerbated erosion south of the harbor.

5. In June of 1952, the government was already aware of significant damage caused by the jetties.

6. Beginning in the early 1970s, with the Section 111 Report, the U.S. Army Corp of Engineers began to attempt to mitigate the exacerbated erosion to the properties south of the harbor caused by the jetties.

7. Prior to the government's efforts in the early 1970s no mitigation efforts were taken to address the exacerbated erosion caused by the jetties. Thus, from approximately 1836 to the early 1970s the area south of the St. Joseph Harbor experienced extensive erosion attributable to the jetties without any mitigation.

8. The Chesapeake and Ohio (C&O) railway line was constructed south of St. Joseph Harbor in the late 1800s and was later moved inshore by the railroad. The railway installed some form of shore protection along 0.7 miles of coastline just south of the harbor in approximately 1929. The protection was upgraded to steel sheet piling by 1940. Prior to the erection of this protective structure, that coastal stretch had experienced at least 90 years of uninterrupted harbor induced erosion.

9. Directly to the south of the C&O shoreline protection, the Michigan Department of Transportation (MDOT) constructed a one mile long revetment in 1960 to replace a groin system that had been implemented in the 1940s to protect Lakeshore Road. Prior to the erection of the revetment in 1960, that one mile stretch along the shore had experienced at least 100 years of harbor induced erosion.

10. The armoring of the 1.7 miles of shoreline by C&O and MDOT resulted in the steepening of the profile in these areas and reduced the supply of sand to the shore to the south and effectively set off a domino effect of shore protection further down the shore.

11. According to analysis by the government's expert, prior to the armoring of the shoreline, the property which was later protected by the C&O and MDOT revetments experienced severe harbor-induced erosion. In some years the harbor induced erosion was as much as five feet of shoreline.

12. Absent the 90 plus years of unimpeded erosion caused by the harbor jetties, there would have been hundreds of feet of land between the site of the railroad in 1929 and the

shoreline and between the site of Lakeshore Drive in 1940 and the shoreline. Thus, absent the harbor induced erosion no revetment structures would have been necessary for many decades if not centuries.

13. The government estimates that the shoreline protection constructed south of the harbor prevents approximately 70,000 cubic yards of sand from reaching the littoral zone each year. That deprivation in sand causes continued exacerbated erosion to plaintiff's property.

14. In 1973, the government issued its Section 111 report assessing the damage caused by the presence of the jetties in St. Joseph Harbor and to develop plans for the mitigation of shore damage attributable to the structures.

15. The Section 111 Report prepared by the Army Corp of Engineers estimated that approximately 30 percent of the erosion experienced by plaintiffs was the direct result of the harbor jetties. Further erosion was caused by the revetments constructed by C&O and MDOT and by private home owners to the south of those structures.

16. The Section 111 Report estimated that 110,000 cubic yards of sand was being blocked annually by the jetties and that at least that amount was necessary to mitigate future erosion.

17. The government's mitigation proposal did not address remediation for erosion that had occurred prior to 1973.

18. In the Section 111 Report, the government also concluded that the jetties block wave energy that otherwise would transport sand to areas south of the harbor.

19. In the Section 111 Report the government also concluded that the jetties blockade of sand prevents the formation of sand bars which are an abundant supply of sand sediment for beach nourishment south of the jetties.

20. In the Section 111 Report, the government concluded that the capacity and application of littoral forces for erosion and transportation of materials alongshore in the littoral zone are similar on the north and south sides of the harbor and noted that erosion rates south of the harbor were significantly higher than north of the harbor.

21. The erosion rates south of the St. Joseph Harbor continue to be significantly greater than the erosion rates north of the harbor.

22. The Section 111 Report concluded that in order to mitigate damages caused by the jetties it would be necessary to restore the littoral drift which is being interrupted.

23. The government concluded that 110,000 cubic reports of sand needed to be reintroduced annually south of St. Joseph Harbor in order to mitigate erosion damages caused by the jetties.

24. The government failed to implement the Section 111 mitigation plan. It fell far short of the required 110,000 cubic yards for the vast majority of the years between 1973 and the present.

25. The O & M Manual for the Section 111 Beach Nourishment at St. Joseph states that, on an average basis, 110,000 cubic yards of sand nourishment should be placed annually at the St. Joseph nourishment area, unless monitoring shows the maintenance quantity should be changed. Prior to Dr. Nairn's litigation report, the government's monitoring had not indicated any change should be made in the annual quantity of sand necessary to mitigate erosion damage.

26. The Army Corp of Engineers monitored the beach nourishment program and its effect on harbor induced erosion and conducted further studies on the erosion caused by the jetties in 1996 and 1997. Neither the government's quantification that 30% of erosion was directly attributable to the jetties nor the quantification of 110,000 cubic yards of sand blocked

annually by the jetties, were revised in any of the government's pre-litigation monitoring reports or its 1996 and 1997 or 2000 reports on the beach nourishment program.

27. In June 1986 the government issued an Interim Monitoring Report for St. Joseph Harbor, Michigan for the period 1975 – 1984.

28. In 1986 interim report recommended use of the Shoreham feeder beach – further south of the harbor – alternately with the St. Joseph nourishment area – directly south of the harbor to help mitigate damage to the Shoreham area. The recommendation was never implemented by the government. (GOV001413).

29. The government's 1986 interim report concluded that from 1977 to 1984 the beach nourishment program at St. Joseph's "only partially mitigated harbor induced erosion of the shoreline. The program is only partially effective because of the variable magnitude and direction of the littoral drift and placement only south of the harbor." (GOV0014343).

30. In the Army of Corp of Engineers' 1997 Report on beach nourishment and St. Joseph Harbor, the government and Dr. Nairn, who was hired by the Army Corp of Engineers to study the effectiveness of the government's mitigation efforts, concluded that approximately 50% of the sand placed in the feeder beach area in connection with the beach nourishment program ends up back in the navigation channel from where it was originally removed and is unavailable for beach nourishment.

31. The government and Dr. Nairn further concluded that from 1986 to 1995 portions of the shoreline received only 50% of the coarse sediment eroded from the feeder beach and experienced a deficit compared to the historic sediment supply.

32. The government and Dr. Nairn concluded that the "greatest flaw in the [mitigation program] is that the area where a supply of sediment is, most urgently required is only receiving 50 percent or less of the historic supply rate of coarse sediment.

33. The government and Dr. Nairn recommended that beach nourishment be placed further downdrift "so that 100 percent of the fill could reach the area where it is required, (i.e. versus the current situation where perhaps 50 percent or less of the coarse beach nourishment is deposited in areas further south of the harbor without any apparent benefits). The nourishment should consist of both fine and (dredged) and coarse grain components. By moving the feeder beach to the south, the sedimentation rate experienced in the navigation channel should be significantly reduced." The government did not implement these recommendations.

34. In its January 2000 Annual Report the government acknowledged that its execution of the Section 111 program at St. Joseph Harbor has been "marginal at executing and maintaining a consistent nourishment plan, as evidenced by the shortfalls in quantities and the intervals between nourishments."

35. In its January 2000 Annual Report of the Section 111 Beach Nourishment Monitoring Program the government continued to recommend placement of 110,000 cubic yards south of the St. Joseph Harbor. In FY-1999 the government placed only 22,000 cubic yards of sand into the littoral system. The rates for 2000 to the present are comparably low.

36. In its 2004 Guidance and Lessons Learned from Monitoring Completed Navigation Projects, the Army Corp of Engineers concluded that between 1991 and 1995 an acceleration of lake bed erosion occurred to the shoreline south of St. Joseph Harbor. The report stated that "[D]uring this period, annual nourishment volume decreased by 50 percent …."

37. The 2004 Guidance and Lessons Learned Report also reiterated the recommendation to place nourishment fill further south of the harbor. The recommendation was not implemented.

**Legal Argument**

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. A physical taking occurs "when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). In order to warrant compensation as a taking…, the governmentally induced invasion must meet a two-part test. First, a property owner must prove that the asserted government invasion of property interests allegedly effecting a taking, "was the predictable result of the government action," either because it was "the direct or necessary result" of the act or because it was "within contemplation of or reasonably to be anticipated by the government." Second, the property owner must show that the government's interference with any property rights of [the plaintiff] was substantial and frequent enough to rise to the level of a taking." *Vaizbud v. United States*, 384 F.3d 1278, 1282-1283 (Fed. Cir. 2004). The Fifth Amendment does not require that the government itself physically appropriate land to give rise to a taking; it is sufficient that the government's action set in motion the forces that cause the damage. *Kingsport Horizontal Property regime v. United States*, 46 Fed. Cl. 691, 695 (2000). Rather, where the government creates a condition that would not otherwise have existed that results in damage to the landowner, the government is liable. *Id.*

The Supreme Court and Federal Circuit have held that "just compensation" for a Takings includes recovery for all damages "past, present and prospective." *Ridge Line, Inc. v. U.S.*, 346 F.3d 1346 (Fed. Cir. 2003), *citing United States v. Dickson*, 331 U.S. 745 (1947). The Federal Circuit has expressly stated that erosion caused by government action is a compensable taking under the Fifth Amendment to the United States Constitution. *Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988); *see also Applegate v. United States*, 35 Fed. Cl. 406, 415 (1996). As a result of the federal harbor jetties interference with the natural littoral flow of sand and river

sediment, plaintiffs' property has been and continues to be exposed to significant erosion. *Banks v. United States*, 314 F.3d 1304, 1306 (Fed. Cir. 2003).

The government is also responsible for all erosion attributable to the shore protection put in place by C&O, MDOT and individuals residing between the harbor and plaintiffs' property. In a takings case, the government must provide just compensation for damage to a plaintiff's property that is the "direct, natural, or probable result" of the government's activity. *Hansen v. United States*, 65 Fed. Cl. 76, 97 (2005) (quoting *Ridgeline v. United States,* 346 F.3d 1346 (Fed. Cir. 2003)). Thus, damage is attributable to the government even if the damage occurs through a chain of events set into motion by the government. *Cotton Land Co. v. United States*, 75 F. Supp. 232, 233 (Ct. Cl. 1948) (analogizing the scope of liability in takings cases to proximate cause in torts law). Here the government's construction and maintenance of the jetties caused the C&O and MDOT revetment and other property owners south of the harbor to construct protective revetments in response to erosion caused by the harbor jetties and were the direct, natural and probable result of the government's actions. As such the government must compensate plaintiffs for erosion attributable to those revetments. *Banks v. United States,* 69 Fed. Cl. 206, 215 (2006).

**CONCLUSION**

Consistent with the facts as understood and acknowledged by the government prior to this litigation, plaintiffs have experienced severe erosion directly attributable to the harbor structures and the subsequently constructed revetments which were the predictable result of the government's action. As such, plaintiffs are entitled to just compensation for the government's taking of their property.

Dated: April 4, 2007

Respectfully submitted,

/s/ Drew W. Marrocco
Drew W. Marrocco
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
(202) 408-6400 (Telephone)
(202) 408-6399 (Facsimile)
dmarrocco@sonnenschein.com

*Attorney for Stone Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the Stone Plaintiffs' Memorandum of Law and Fact by Federal Express and Facsimile, on the 4th day of April, 2007 on:

Terry M. Petrie
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294

*Counsel for Defendant*
*************************

John Ehret, Esq.
5986 Dunham Avenue
Stevensville, MI 49127

*Counsel for Banks Plaintiffs*
************************

Eugene J. Frett, Esq.
Sperling & Slater, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603

*Counsel for Frett Plaintiffs*

/s/ Drew W. Marrocco
Drew W. Marrocco