**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **JOHN H. and MARY E. BANKS, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **No. 99-4451 L**<br>**Judge Emily C. Hewitt** |
| **STONE, ERROL L. & SUSAN H.,**<br>**In their own right and as Trustees of the Susan H. Stone Trust and the Errol L. Stone Trust,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **No. 04-277 L**<br>**Judge Emily C. Hewitt** |
| **EUGENE J. FRETT, Individually and as trustee of the Victor J. Horvath and Frances B. Horvath Trust, and**<br><br>**DONNA P. FRETT,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **No. 05-1353L**<br>**Judge Emily C. Hewitt** |

**DEFENDANT'S MEMORANDUM OF**
**CONTENTIONS OF FACT AND LAW**

**TABLE OF CONTENTS**

I. Contentions of Fact . . . . . . . . . . 1

A. Background History . . . . . . . . . . 1

B. Geology . . . . . . . . . . 2

C. Lake Levels . . . . . . . . . . 5

D. Erosion . . . . . . . . . . 5

E. Jetties . . . . . . . . . . 8

F. Nourishment . . . . . . . . . . 8

G. Shore Protection . . . . . . . . . . 9

H. Sediment Budget . . . . . . . . . . 13

II. Contentions of Law . . . . . . . . . . 15

A. Introduction . . . . . . . . . . 15

B. Analysis . . . . . . . . . . 16

1. General . . . . . . . . . . 16

2. Plaintiffs Proposed Evidence Fails to Evidence Ownership . . . . . . . . . . 17

3. No Taking Has Occurred . . . . . . . . . . 19

4. Miscellaneous Arguments Raised by Plaintiffs . . . . . . . . . . 21

(a) Corps Properly Exercises Federal Navigational Servitude at St. Joseph Harbor . . . . . . . . . . 21

(b) The Supreme Court Decisions in Dolan and Nollan Do Not Apply . . . . . . . . . . 23

(c) The Corps' Use of St. Joseph Harbor Constitutes a Public Purpose . . . . . . . . . . 25

# TABLE OF AUTHORITIES

CASES

99 Cents Only Stores v. Lancaster Redevelopment Agency, 237 F. Supp. 2d 1123 (C.D. Cal. 2001) . . . . . 26

Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206 (Fed. Cir. 2005) . . . . . 17

American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363 (Fed. Cir. 2004) . . . . 16, 21

Applegate v. United States, 35 Fed. Cl. 406 (1996) . . . . . 19

Banks v. United States, 69 Fed. Cl. 206 (2006) . . . . . 20

Berman v. Parker, 348 U.S. 26 (1954) . . . . . 26

Casitas Mun. Water Dist. v. United States, ___ Fed. Cl. ___, 2007 WL 968154 . . . . . 24

Cavin v. United States, 956 F.2d 1131 (Fed. Cir. 1992) . . . . . 17

Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003) . . . . . 18

Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) . . . . . 16, 17

City of Gettysburg, S.D. v. Unites States, 64 Fed. Cl. 429 (2005) . . . . . 22

Colvin Cattle Co., Inc. v. United States, 468 F.3d 803 (Fed. Cir. 2006) . . . . . 21

Conti v. United States, 291 F.3d 1334 (Fed. Cir. 2002) . . . . . 18, 21

Dolan v. City of Tigard, 512 U.S. 374 (1994) . . . . . 23, 24, 25

Gibbons v. Ogden, 22 U.S. 1, 9 Wheat 1 (1824) . . . . . 22

Hawaii Housing Auth. v. Midkiff, 467 U.S. 229 (1984) . . . . . 26

Karuk Tribe v. United States, 209 F.3d 1366 (Fed. Cir. 2000) . . . . . 18

Kelo v. City of New London, Conn., 545 U.S. 469 (2005) . . . . . 25, 26

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) . . . . . 22

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . 24

M & J Coal Co. v. United States, 47 F.3d 1148 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 17, 18

Maniere v. United States, 31 Fed. Cl. 410 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Maritrans Inc. v. United States, 342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 17

Nollan v. California Coastal Commission, 483 U.S. 825 (1987) . . . . . . . . . . . . . . . . . . 23, 24, 25

Owen v. United States, 851 F.2d 1404 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Palm Beach Isles Assoc. v. United States, 208 F.3d 1374 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . 22

Ridge Line, Inc. v. United States, 346 F.3d 1346 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 18

Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . 18

Stearns Co. Ltd. v. United States, 396 F.3d 1354 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 20

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Members of Estate of Boothby, 16 F.3d 19 (1st Cir. 1994) . . . . . . . . . . . . . . . 26

United States v. Republic Steel, 362 U.S. 482 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Sasser, 738 F. Supp. 177 (D.S.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Webb's Fabulous Pharmacies v. Beckwith, 449 U.S. 155 (1980) . . . . . . . . . . . . . . . . . . . . . . . . 21

Wyatt v. United States, 271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

STATUTES

33 U.S.C. § 426i . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Pursuant to the Court's order filed January 19, 2007, defendant respectfully submits its Memorandum of Contentions of Fact and Law.

I. Contentions of Fact

Through testimony from expert witnesses and U.S. Corps of Engineers ("Corps") employees, current and retired, as well as documentary evidence, defendant will establish the following facts:

A. Background History:

Witnesses from the Corps will testify that:

1. The Corps initially modified the harbor entrance of the St. Joseph River in the 1830s to better accommodate commercial shipping into Lake Michigan.

2. Beginning in the 1830s through 1903, the Corps built and gradually extended jetties from the St. Joseph harbor into Lake Michigan to their present day length.

3. In a project that began in the 1950s and was completed in 1989, the Corps incrementally encased the jetties in steel sheet piling.

4. In 1973, the Corps issued a report acknowledging that the jetties caused an average of 30 percent (about 96,000 cubic yards per year) of the nearshore erosion due to all causes south of the St. Joseph harbor. The zone of adverse impact was determined to begin approximately 2,600 feet on the south side of the harbor and extend approximately 18,400 feet, ending about 21,000 feet south of the harbor. It is believed to be the first time

such a quantitative assessment had been made of damages caused by a federal navigation structure. In response, the Corps undertook a beach nourishment program to mitigate the erosion caused by the jetties. The beach nourishment program was designed to mitigate only that portion of the total erosion attributable to the jetties at St. Joseph harbor. It was not intended to mitigate the effects of wind and wave action, violent storms, high water levels, normal erosion processes, as well as possible adverse effects from shore protection structures.

B. Geology:

Dr. Grahame J. Larson, defendant's expert glacial geologist, will testify that:

1. The City of St. Joseph sits atop a moraine built during retreat of the last advance of glacier ice about 16,700 years ago and overlooks a prominent scarp cut in to the moraine by waves of ancient glacial and post-glacial lakes that once occupied the Lake Michigan basin. To the north and south of the city are modern eroding lake bluffs as well as large coastal dunes that have developed over many centuries to thousands of years.

2. The shoreline north and south of St. Joseph harbor is composed of a highly variable sequence of glaciolacustrine sand, lacustrine clay, till, and dune sand.

3. Glaciolacustrine sand, silt and dune sand are generally non-cohesive whereas till and lacustrine clay are cohesive.

4. The lake bluffs north and south of St. Joseph are the result of long-term

lakeshore erosion since deglaciation approximately 16,700 years ago.

5. The bluffs are up to 89 feet high and composed mainly of till and glaciolacustrine sand.

6. The till is as much as 50 feet thick, often occurs only at the top of the bluffs, and consists of a cohesive mix of sand, silt, and clay with random pebbles, cobbles and boulders.

7. The glaciolacustrine sand underlying the till in the bluffs is up to 100 feet thick, stratified, and consists mainly of non-cohesive fine-to-coarse sand with occasional layers or lenses of cohesive silt or clay measuring 0.3 to 2.0 feet thick.

8. Beneath the glaciolacustrine sand in the bluffs and located mostly below lake level is another till. It is about 150 feet thick and discontinuous and, where exposed, it consists of a cohesive matrix of sand, silt and clay with scattered pebbles and cobbles and grades upward into bedded silt and clay.

9. Beneath this lower layer of till is another non-cohesive glaciolacustrine layer of sand. Located well below the level of Lake Michigan, it measures up to 165 feet thick.

10. The Grand Marais Embayment is located about 5 miles south of St. Joseph and it stretches for about 11.2 miles and lies roughly parallel to the Lake Michigan shoreline. Its widest point is about 1.1 mile wide.

11. The Grand Mere Lakes are located at the northern end of the Grand Marais Embayment.

12. Large coastal dunes as high as 230 feet are located at the center and southern end of the Grand Marais Embayment.

13. Well-log records show that near-shore lacustrine sand lies beneath most of the Grand Marais Embayment.

14. It is not unusual to find ancient wood and peat rafts washed up along the shore of the Great Lakes. They are usually derived from offshore organic beds of peat and wood that have been unearthed by natural subaqueous erosion and subject to disintegration by waves and wave-induced currents.

15. Ancient wood and peat rafts are being eroded and washed up along the Lake Michigan shore near Grand Mere Lakes.

16. The fact that ancient wood and peat rafts are being eroded and washed up along the Lake Michigan shore near Grand Mere Lakes may have little to do with irreversible lakebed downcutting. It is just as likely that the wood and peat rafts are the result of natural erosion of the lakeward edge of the submerged organic bed by waves and wave-induced currents, especially since the coast in the vicinity of St. Joseph is naturally eroding.

17. The geology of the bluffs and lakebed south of the St. Joseph Harbor feature a mixture of sandy and cohesive sediment layers.

18. Within the zone of plaintiffs' properties, with the exception of a short section which lies largely at the northern end (closest to the harbor), the shoreline is not a predominantly cohesive shoreline. South of this section, the shoreline quickly transitions and remaining plaintiffs' properties are

located in a mostly sandy zone of the shoreline.

C. Lake Levels

Witnesses from the Corps will testify that:

1. The mean lake level of Lake Michigan since lake-level records have been kept is 579.1 feet (IGLD 1985).

2. Highest lake levels for Lake Michigan usually occur during periods of higher than normal precipitation and/or cooler than normal temperatures.

3. High lake levels have occurred from 1853 to 1862, 1882 to 1887, 1928 to 1931, 1943 to 1955, in the early and late 1970s, and again in the mid-1980s.

4. Low lake levels have occurred in 1926, 1934, 1964, and from 1999 to the present.

D. Erosion

Dr. Robert B. Nairn, defendant's expert coastal engineer, and Dr. Larson, defendant's expert glacial geologist, will establish through their testimony that:

1. The Lake Michigan shoreline in the vicinity of St. Joseph, Michigan, erodes naturally.

2. Deglaciation occurred approximately 16,700 years ago. For the last 7,000 years the lake level in the Lake Michigan basin has been near or above modern levels since deglaciation.

3. The long-term erosion rate of natural erosion is an estimated 0.80 feet to 1.87 feet per year for the last 7,000 years.

4. The lake bluffs north and south of St. Joseph are eroding and have been periodically eroding for a long time.

5. The net direction of longshore sand transport is generally from north to south along the southeast shore of Lake Michigan in the vicinity of the St. Joseph Harbor.

6. The characteristics of the local wave climate and the shape of the shoreline and nearshore lakebed contribute to a condition whereby the ability for waves to move sand toward the south increases, moving from north of the St. Joseph Harbor toward the Grand Mere Lakes area to the south.

7. The nearshore lakebed rises in a gentle and widespread pattern from the north to the south along the vicinity of the St. Joseph shoreline, with the shallowest area located just north of the harbor.

8. This rise in the lakebed causes focusing of north and northwest waves and creates a high energy zone over an approximately 10 mile long reach south of the harbor.

9. This wave-focusing zone, resulting from the rise in the lakebed, begins in the vicinity of the St. Joseph Harbor and causes the longshore sand transport rate south of the harbor to be considerably higher than the rate north of the harbor.

10. Consequently, the longshore sand transport erosion gradient south of the harbor is naturally much larger than the gradient north of the harbor. This

explains why the shoreline south of the St. Joseph Harbor eroded at a much higher rate than the shoreline north of the harbor in pre-harbor times. It also partly explains the higher erosion rates south of the harbor since the construction of the harbor.

11. Therefore, even before construction of the St. Joseph Harbor, more sand was naturally removed from the area downdrift (south) of the St. Joseph River mouth than was supplied, leading to higher natural erosion rates south of the river mouth than to the north.

12. The construction of the St. Joseph Harbor has influenced the natural erosion processes south of the harbor. Sand was trapped and removed from the littoral system through deposition in the fillet beaches that grow on either side of the harbor. Sand is also removed from the littoral system through sedimentation in the navigation channel and subsequent dredging and, prior to 1970, offshore disposal of the dredged sediment in deepwater beyond the littoral zone. The loss of sand from the littoral system, associated with the trapping in the fillet beaches and the offshore disposal, prior to 1970, of dredging, exacerbated the natural erosion over some time periods and at some locations south of the harbor.

13. There is evidence that the rate of erosion downdrift of the St. Joseph Harbor has increased, particularly over the last 50 years. This increase is related to the steepening of the nearshore profile (i.e., the water has become progressively deeper over time for any given location offshore of

the shoreline) and the subsequent increase in the ability of waves to move sand towards the south.

14. The steepening of the nearshore profile is a direct result of placing shore protection along a naturally eroding shore.

E. Jetties

Dr. Nairn and Corps employee, James Selegean, will establish through their testimony that:

1. The jetty structures have always been almost completely impermeable to sand transport whether in their original construction form, consisting of rock-filled timber cribs, or in the more recent form of steel sheet piling.

2. The impermeability of the jetty structures contributes to the growth of the fillet beaches through time.

3. The trapping of sand in the fillet beaches has significantly slowed and possibly stopped over the last 30 to 40 years.

F. Nourishment

Dr. Nairn and Corps employee, James Selegean, will establish through their testimony that:

1. Starting in 1970, the Corps has placed a quantity of sand approximately equal to or greater than the amount of all sand intercepted by and dredged from the outer navigation channel back into the littoral system on the south side of the St. Joseph Harbor.

2. Between 1970 and 1991, on average, the Corps has nourished the shores

downdrift of the St. Joseph Harbor with 90,000 cubic yards of sand per year. Since 1992, the Corps has placed an average of 42,000 cubic yards of sand per year.

3. The nourishment came from sediment dredged from the navigation channel and also upland sources which was trucked in for placement.

G. <u>Shore Protection</u>

Dr. Nairn will testify that:

1. Although shore protection holds the shoreline position, the natural erosion processes continue to work on eroding and deepening the submerged areas offshore of the toe of shore protection. This causes the natural erosion from the protected areas of the shore to be transferred downdrift (south), increasing the natural erosion in these areas.

2. Early maps of the settlement at the mouth of the St. Joseph River and subsequent maps through time show that the center of urban development is located south of the river mouth and that it has spread further south with time.

3. Urban areas and infrastructure are more likely to be protected than rural and agricultural areas (such as those that existed to the north of the St. Joseph Harbor).

4. Older development is more likely to require protection as the buffer between Lake Michigan and the buildings or infrastructure is continually reduced through natural erosion.

5. South of the south fillet beach, efforts have been ongoing for approximately 75 years to protect a railway line and a road that later became a highway.

6. The Chesapeake and Ohio (C&O) railway line was constructed south of the St. Joseph Harbor in about 1870, close to the shore, and was built initially on the eroding slope above the receding shoreline. The berm for the railway bed was terraced into a bluff face.

7. The rail line was moved inshore sometime between 1871 and 1938 and again terraced into the eroding bluff face.

8. Though it might be true that the erosion rate of the slope was increased by the presence of the St. Joseph Harbor, it is also true that even under the natural pre-harbor erosion rate, the railway line would have required immediate protection, both in its initial and later position due to site selection.

9. By 1929, the full 0.7 mile length of the railway was protected in some manner, and by 1940, the railway was protected by steel sheet piling over the full length of the shoreline.

10. Directly to the south of the C&O shoreline protection, the Michigan Department of Transportation (MDOT) constructed a 1 mile long revetment in 1960 to replace a groin system that had been implemented in the 1940s to protect Lake Shore Road (now I-94 Business).

11. The shore protection of the MDOT road would have been required

whether or not the St. Joseph Harbor exacerbated the natural erosion in this area of the shore line.

12. The C&O rail line and the MDOT road were built too close to the shore. An accepted coastal engineering standard for a stable slope allowance adjacent to infrastructure at the top of a bluff is 2.5 times the height of the bluff. In other words if the toe of a 100 foot high bluff is located within 250 feet of the edge of the infrastructure, protection is required. Therefore, it was not increased erosion rates due to the harbor but instead the proximity of these two structures to a naturally eroding bluff that required they be protected.

13. The shore protection of the 1.7 mile section of the shoreline by C&O and MDOT not only resulted in steepening of the nearshore profile in these areas, it also reduced the supply of sand to the south (by eliminating supply through natural erosion) and effectively set off a domino effect of shore protection further down the shore to the south.

14. Plaintiffs' properties are located south of the shoreline protected by the C&O and MDOT.

15. South of the C&O and MDOT revetments, the shoreline has been subjected to: (a) natural erosion, (b) the natural erosion partly transferred south from the area protected by the C&O and MDOT revetments, and (c) transfer of some of the harbor impact further south.

16. Prior to 1970, the two long sections of protection installed by the C&O

and MDOT represented approximately 80 percent of the 2.1 miles of protected shoreline over the 8.4 mile sector south of the St. Joseph Harbor and encompassing all of the Plaintiffs' properties.

17. Combined, the C&O and MDOT shore protection structures remove or prevent approximately 25,000 cubic yards of sand from entering the littoral system each year.

18. The C&O and MDOT shore protection are primarily responsible for causing the steepening of the nearshore profile that, in turn, caused the related increase in longshore sand transport gradient (that is, an increase in the longshore sand transport rate between two points along the shore) which leads to an increase in erosion rates downdrift of the St. Joseph Harbor.

19. Subsequently, shore protection has been installed by property owners along much of the shoreline between the south side of the MDOT revetment and the south end of plaintiffs' properties.

20. At present, about five miles of the shoreline from the St. Joseph Harbor to the south end of the plaintiffs' properties are protected (including the C&O railway and MDOT revetments). This represents 60 percent of the total shoreline length in this reach. On average, this shore protection prevents about 70,000 cubic yards of sand per year from reaching the littoral zone each year.

H. Sediment Budget

Dr. Nairn will testify that:

1. A sediment budget is a standard engineering technique employed in the field of coastal engineering.

2. A sediment budget is an account or balance of the rate of sediment supply from all sources and the rate of all sediment losses to all sinks for an area of coastline.

3. A sediment source is a term used to describe an area that supplies sediment in a sediment budget. This could include, for example, the longshore sediment transport into an area, beach nourishment, fluvial sediments from rivers, or sand from bluff and lakebed erosion.

4. A sediment sink is a term used to describe an area where sediment is permanently lost in a sediment budget. This could include, for example, sand that accumulates in a fillet beach or a bypassing shoal as well as dredging practices that dispose of dredged sediment offshore or upland.

5. Longshore Sand Transport is a term that describes the movement of sand and coarser sediment parallel to a shoreline due to the action of waves arriving at an angle to the shoreline and their resulting longshore currents.

6. Longshore Sand Transport Rate is a term that describes the rate at which sand is moved along the shore (often represented in cubic yards or cubic meters for an average year). It is dependent on many factors that change in time and space including but not limited to: wave energy, wave

direction, shoreline orientation relative to wave direction, nearshore slope, gain size of the sand being transported, wave period, and presence or absence of ice.

7. Net Longshore Transport Rate is a term that describes the difference between sand transported in the two possible longshore directions at a given location, usually represented in cubic yards or cubic meters per average year.

8. In the 1973 Detailed Project Report, the Corps calculated the net longshore transport rate at approximately 110,000 cubic yards per year.

9. Dr. Nairn's calculation of the net longshore transport rate places the figure at approximately 50,000 cubic yards per year. Dr. Nairn arrived at this calculation after using five different approaches or methods. Four of those five methods yielded results that ranged from 40,000 to 50,000 cubic yards/year with one calculating the rate at 71,000 cubic yards/year. He settled upon 40,000- 50,000 cubic yards/year as the best estimate based upon the collective results of these approaches.

10. Dr. Nairn's calculation of 50,000 cubic yards per year is corroborated by the work of Dr. Meadows, plaintiffs' own expert. Work performed by the University of Michigan's Ocean Engineering Laboratory, under Dr. Meadows's direction and approval as a project director, from 1988 until approximately 2004 calculated a long shore transport rate of 50,000 - 60,000 cubic yards for the St. Joseph region.

11. The sediment budget calculated by Dr. Nairn, defendant's coastal engineering expert, concludes that the Corps provided a sufficient volume of beach nourishment over the years to offset the erosion caused by the jetties since 1970.

12. Plaintiffs have attempted to cast doubt upon Dr. Nairn's veracity because his expert report concludes differently for some features of the work he performed in conjunction with the Corps' 1996 and 1997 reports. These features focus on the calculation of the net longshore transport rate and the question of whether the shoreline is cohesive or sandy. Dr. Nairn very carefully and fully addresses these issues in his expert report, explaining the differences in available information, scope of his charge in each situation, the additional work undertaken to conduct his analysis, and the corroboration through peer-review of different elements of his work today. Further, both of plaintiffs' experts testified at their depositions that they believe that Dr. Nairn approached his work on this case in a fair and objective manner.

II. <u>Contentions of Law</u>

A. <u>Introduction</u>

Plaintiffs allege a Fifth Amendment takings claim, contending that jetties built and maintained by the U.S. Army Corps of Engineers in the harbor at St. Joseph, Michigan, have blocked sand and sediment from reaching their properties located to the south of the harbor along Lake Michigan. They allege the deprivation of sand caused their shoreline properties to

erode.

The Corps modified the harbor entrance of the St. Joseph River in the 1830s to better accommodate commercial shipping into Lake Michigan. Beginning in the 1830s through 1903, the Corps built and gradually extended jetties from the harbor into Lake Michigan to their present day length. In a project that began in the 1950s and was completed in 1989, the Corps incrementally encased the jetties in steel plating. In 1973, the Corps issued a report acknowledging that the jetties cause 30 percent of the shoreline erosion south of the harbor and undertook a beach nourishment program pursuant to Section 111 of the Rivers and Harbors Act of 1968, 33 U.S.C. § 426i, to mitigate the erosion caused by the jetties. Defendant contends the volume of nourishment provided by the Section 111 program offsets the amount of erosion attributable to the jetties.

B. Analysis

1. General

The Takings Clause is not implicated unless the government conduct affects "property" cognizable under the Clause. See, e.g., American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004), cert. denied, 125 S. Ct. 2963 (2005). As mentioned above, plaintiffs allege that jetties built and maintained by the United States Army Corps of Engineers in the harbor at St. Joseph, Michigan, have caused their properties to erode and that they are entitled to just compensation for that taking under the Fifth Amendment. All real property interests are cognizable under the Fifth Amendment. See Cienega Gardens v. United States, 331 F.3d 1319, 1329 (Fed. Cir. 2003) ("'[e]very sort of [real property] interest the citizen may possess' counts as a property interest under the Fifth Amendment") (quoting United States v.

Gen. Motors Corp., 323 U.S. 373, 378 (1945)).

The Federal Circuit has developed a two-part test to evaluate whether a governmental action constitutes a taking of private property without just compensation. See Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003); Cienega Gardens, 331 F.3d at 1328; Chancellor Manor v. United States, 331 F.3d 891, 901-02 (Fed. Cir. 2003); M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995). Under the first prong of this test, the court must evaluate whether the claimant has a “property interest” that was affected by the government action. See Maritrans, 342 F.3d at 1351. Second, once the court has determined that a property interest exists, it must determine whether a taking has occurred. Id. Plaintiffs' evidence fails to meet the test.

2. Plaintiffs' Proposed Evidence Fails to Evidence Ownership

First, plaintiffs have the burden of proving this claim. Before a plaintiff can pursue a takings claim against the United States, he or she must first prove that they owned the property allegedly taken. See Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212 (Fed. Cir. 2005); Wyatt v. United States, 271 F.3d 1090, 1096-97 (Fed. Cir. 2001), cert. denied, 535 U.S. 1077 (2002). A plaintiff who fails to establish that he or she had an ownership interest in the property allegedly taken on the date of taking has no standing to assert a takings claim against the United States. See Wyatt, 271 F.3d at 1097 (holding that a plaintiff who no longer owned an interest in certain property on the date of the alleged taking "cannot legally assert a permanent takings claim"); Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992) ("Without undisputed ownership of the [subject] property at the time of the takings, [plaintiffs] cannot maintain a suit alleging that the Government took their property without just compensation");

Maniere v. United States, 31 Fed. Cl. 410, 420-21 (1994) (holding that the plaintiff had no standing to bring suit for a taking where it failed to meet its burden of proving that it owned the subject property on the date of the alleged taking).

This feature of establishing ownership converges, under the facts here, with the requirement that plaintiffs must establish that they possess a compensable property interest. This requirement applies to both physical and regulatory takings claims. See Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003); Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1580 (Fed. Cir. 1993). This inquiry focuses on whether the plaintiff has established he or she owns a property interest which is recognized by the law as being compensable. Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003) (holding court must first consider "the nature of the interest allegedly taken to determine whether a compensable property interest exists"); Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002) (court must first evaluate whether claimant has established a "'property interest' for purposes of the Fifth Amendment"); M & J Coal Co., 47 F.3d at 1153-54 (threshold inquiry must be to "determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with"); Karuk Tribe v. United States, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (first a court must determine whether plaintiff possessed a "stick in the bundle of property rights"), cert. denied, 532 U.S. 941 (2001).

A review of the proposed exhibits and witnesses for the Banks plaintiffs suggests that they have not prepared to make a prima facie showing to meet that burden for all individual plaintiffs. Counsel for Banks plaintiffs has submitted the required Memorandum of Contentions of Fact and Law ("Banks Plaintiffs MCFL"), along with the lists of witnesses and exhibits

contemplated by the Court's Rules at Appendix A, paragraphs 13, 14, and the Court's order filed January 19, 2007. Counsel for Stone plaintiffs submitted a separate Memorandum of Contentions of Fact and Law and accompanying list of witnesses and exhibits. Though the witness lists do identify eight potential witnesses who are plaintiffs among the larger group, those lists and other submissions (with the exception of the Stone plaintiffs) do not include factual averments or exhibits to establish ownership for all individual plaintiffs. The Court's description of the scope of the trial at a January 19, 2007, status conference does not obviate plaintiffs' burden. In describing the scope of the trial, the Court stated that it "should leave the Court with a general view, assuming some taking, a general view about the taking, the nature of the taking, across the entire length of the properties that are owned by the individual plaintiffs." Exhibit 1, Excerpt of January 19, 2007 Status Conference, page 70, lines 10-15.

Here, we do not dispute that plaintiffs' ownership of property, if established, along the shore of Lake Michigan south of the St. Joseph harbor constitutes a compensable property interest if taken through erosion caused by Federal government action under the Fifth Amendment.[1/] See Owen v. United States, 851 F.2d 1404 (Fed. Cir. 1988). Instead, the focus here is whether plaintiffs' offer of proof will suffice. To the extent it does not, then plaintiffs fail to carry their burden.

3. No Taking Has Occurred

Regarding the merits of plaintiffs' allegations, determining whether a taking has occurred

---

[1/] At the same time, however, a plaintiff suffering erosion allegedly due to the Corps' jetties may not bring a claim for land lost prior to his or her purchase of the property. Thus, to phrase it another way, no fast lands eroded away prior to a claimant's purchase of a given subject property is compensable. See Applegate v. United States, 35 Fed. Cl. 406, 418-21 (1996).

is a question of law based on factual underpinnings. Stearns Co. Ltd. v. United States, 396 F.3d 1354, 1357 (Fed. Cir. 2005); Wyatt, 271 F.3d at 1096. Here, the facts will demonstrate – through testimony and documentary evidence – the Corps has provided a sufficient volume of sand and sediment through its Section 111 beach nourishment program over the years to offset the erosion caused by the jetties. The principle means to establish this conclusion will be the use of a sediment budget, which is a standard engineering technique employed in the field of coastal engineering. A sediment budget tracks and quantifies the factors that affect the amount of sediment brought into and out of an area (here the St. Joseph area and the relevant shoreline area). The sediment budget calculated by Dr. Nairn, our coastal engineering expert, concludes that the Corps provided enough sediment to offset erosion attributable to the jetties.

Stone Plaintiffs' Memorandum of Contentions of Fact and Law take exception with that conclusion. The basis for the disagreement appears to spring from their reliance upon the Court's holding that erosion attributable to shore protection which were "installed to address the erosion caused by the Corps" is a "direct, natural or probable result" of the jetties. Banks v. United States, 69 Fed. Cl. 206, 215 (2006). In stating their opposition, Stone plaintiffs fail to note that the Court also placed the burden upon plaintiffs to "establish at trial that the jetties in St. Joseph Harbor caused erosion damage to their shoreline and that plaintiffs' revetments were installed to address the erosion caused by the Corps." Id. Not only do they fail to comment upon it, they also fail to have the evidence to carry their burden imposed upon them by the Court, particularly as it relates to non-party installed shore protection such as the revetments placed upon the shoreline by the C&O Railroad and the Michigan Department of Transportation ("MDOT"). Though it is not defendant's burden, we will adduce evidence to establish that the

C&O Railroad and MDOT protective structures were not installed because of the Corps' jetties in the St. Joseph harbor. Further, this evidence stands uncontradicted as plaintiffs' experts did not address the C&O Railroad and MDOT structures in arriving at their expert opinions.

4. Miscellaneous Arguments Raised By Plaintiffs

Banks plaintiffs assert three principal arguments in their Memorandum of Contentions of Fact and Law. We address each below.

(a) Corps Properly Exercises Federal Navigational Servitude at St. Joseph Harbor

In determining whether a claimant has a legally cognizable property interest, takings law recognizes that a court may "not rely on the Constitution alone because it 'neither creates nor defines the scope of property interests compensable under the Fifth Amendment.'" Colvin Cattle Co., Inc. v. United States, 468 F.3d 803, 807 (Fed. Cir. 2006), (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003)), reh'g and reh'g en banc denied (February 9, 2007). Property interests are not created by the Constitution itself. "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Webb's Fabulous Pharmacies v. Beckwith, 449 U.S. 155, 161 (1980). Federal law is another source. American Pelagic Fishing Co., 379 F.3d at 1376 (the court should look to "'existing rules and understandings' and 'background principles' derived from an independent source such as state, federal or common law") (quoting Lucas, 505 U.S. at 1030). See also Conti, 291 F.3d at 1340.

One of those background principles, for which Banks plaintiffs challenge the characterization of its application for the jetties and the Corps use of the St. Joseph harbor, is the

federal navigational servitude. Under the government's navigational servitude, the United States has the power to invade property rights in lands located below the ordinary high-water mark, without paying compensation, when the purpose of the invasion is to aid in the navigability of the stream. City of Gettysburg, S.D. v. United States, 64 Fed. Cl. 429 (2005). The federal navigational servitude is explicitly "a pre-existing limitation upon the landowner's title." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1028-29 (1992). The federal navigational servitude is a "part of the 'background principles' to which a property owner's rights are subject." Palm Beach Isles Assoc. v. United States, 208 F.3d 1374, 1384 (Fed. Cir. 2000) (explaining the Federal Circuit's understanding of Lucas), aff'd on reh'g, 231 F.3d 1354 (Fed. Cir. 2000).

Banks plaintiffs contend the St. Joseph harbor no longer qualifies for Federal harbor status allegedly because the volume of shipping traffic is not sufficiently high and references, but does not cite the basis for its belief, a requirement of one million tons of commercial cargo per year. Banks plaintiffs' Memorandum of Contentions of Fact and Law ("Banks Plaintiffs' MCFL"), at pages 5 (¶ 17), 6 (¶ 20), and 12 (¶ 38).

Banks plaintiffs' argument fails on two counts. First, they cite no authority that "Federal Harbor" status is a precondition for the United States to exercise its navigational servitude. Plaintiffs do not appear to dispute that the United States has properly exercised the federal navigational servitude in times past in the St. Joseph harbor. Gibbons v. Ogden, 22 U.S. 1, 74, 9 Wheat. 1, 195 (1824) (exercise of the Government's power to regulate navigational uses of "the deep streams which penetrate our country in every direction"). The legislation enacted under various editions of the Rivers and Harbors Act, alone, that relate generally or specifically to the

St. Joseph harbor evidence this truth.

Instead, Banks plaintiffs base their argument in a misplaced belief that the St. Joseph harbor no longer qualifies as a "Federal Harbor." In doing so, Banks plaintiffs fail to mention that Congress designated the St. Joseph harbor as a harbor as a site for conducting activity on behalf of the Federal government.[2] Banks plaintiffs also fail to mention that the one million tons per year figure comes from an Engineering Circular used in the Corps' budgeting process. That is, funding for a Federal harbor in which more than a million tons transit its waterway in a year is defined as a "high-use" project and for a harbor which has less than a million tons transit its waterway is defined as "low use." Exhibit 2, Excerpt of Circular No. 11-2-187, "Corps of Engineers Civil Works Direct Program Development Guidance Fiscal Year 2008," at pages V-8 (defining "High-Use Projects" and V-9 (addressing "Low-Use Navigation Sub-Program").

In short, the Corps exercises the rights of the federal navigational servitude with its activities at the St. Joseph harbor. Second, the St. Joseph harbor remains a "Federal" harbor regardless of the volume of shipping tonnage.

(b) The Supreme Court Decisions in **Dolan** and **Nollan** Do Not Apply

Banks plaintiffs also mount a misplaced argument that the principles enunciated in the Supreme Court's rulings in Dolan v. City of Tigard, 512 U.S. 374 (1994), and Nollan v.

[2] Some examples of the times that Congress has addressed the St. Joseph harbor are found at the following references: H. Ex. Doc. No. 43-160 (1875); Annual Report of the Chief of Eng'rs, U.S. Army, pt. 1 at 162 (1875); Annual Report of the Chief of Eng'rs, U.S. Army at 2030, 2031 and 2049, 2055 (1880); H. Doc. No. 55-307 (1898); Annual Report of the Chief of Eng'rs, U.S. Army at 2496 (1898); Report of Bd. Of Eng'rs for Rivers and Harbors 52 (Comm. Print 1935); H. Doc. No. 76-129 (1939); S. Doc. No. 84-95 (1958).

California Coastal Commission, 483 U.S. 825 (1987), govern the resolution of the facts and issues of this case before this Court. Banks Plaintiffs' MCFL at pages 5-7, 11 (¶ 37), 13 (¶ 43). Plaintiffs confuse the type of takings claim before the Court and misapply the holdings from two regulatory takings cases. Fifth Amendment takings claims generally are divided into two broad categories: physical takings and regulatory takings. The liability considerations differ markedly for these two categories, and it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 323 (2002); see also Casitas Mun. Water Dist. v. United States, ___ Fed. Cl. ___, 2007 WL 968154 (same).

Dolan and Nollan addressed the special circumstance of permit conditions that undoubtedly would have constituted physical takings (under the rule of Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982)), had they been required outside of the permit context. In Nollan, the State of California required a coastal landowner to dedicate a public easement for beach access. See Nollan, 483 U.S. at 831. In Dolan, a municipality (acting under State law) likewise required a landowner to dedicate land for a "greenway" and a pedestrian/bicycle path. See Dolan, 512 U.S. at 379-80. In both cases, the Supreme Court began with the proposition that the required dedications for public use would have been takings if not imposed as permit conditions. Id. at 384; Nollan, 483 U.S. at 831.

The issue in both cases was whether the State could be excused from the obligation to pay just compensation for these physical appropriations, on the grounds that the dedications were exacted in exchange for building permits. See Dolan, 512 U.S. at 385-6; Nollan, 483 U.S. at

831. In Nollan, the Supreme Court held that the Government may require the dedication of property as a condition of a building permit without violating the Fifth Amendment Just Compensation Clause, if there is a "nexus" between the condition and the purpose of the regulation. See 483 U.S. at 836-7. The Court reasoned that if the Government by regulatory action can deny a permit without causing a per se taking, the government can likewise provide an "alternative" – i.e., a permit conditioned on a dedication – without causing a per se taking, as long as the permit condition serves the same regulatory purpose as would the permit denial. Id. at 836-7. In Dolan, the Supreme Court expounded on the Nollan test and held that the Fifth Amendment requires "rough proportionality;" i.e., the exaction of a property interest as a permit condition will not violate the Fifth Amendment (or require just compensation) if the "required dedication is related both in nature and extent to the impact of the proposed development." See Dolan, 512 U.S. at 391. Because the present case does not involve an alleged regulatory taking or the exaction of land incident to the granting of a permit, the Nollan/Dolan cases do not apply.

(c) The Corps' Use of St. Joseph Harbor Constitutes a Public Purpose

In a new argument not previously raised, Banks plaintiffs also contend, in essence, that the Corps' use of the St. Joseph harbor has no "public purpose" justification. Banks Plaintiffs' MCFL at page 5 (¶ 18). In its decision in Kelo v. City of New London, Conn., 545 U.S. 469 (2005), the Supreme Court wrote that the "public use" requirement of the takings clause of the United States Constitution had long been interpreted to require only that a governmental taking have a "public purpose." Id. at 478-80. In turn, the Court found that "public purpose" had been broadly defined, with substantial deference to legislative judgments. Id. at 480. Further, under the federal constitution, courts have "an extremely narrow" role in determining whether the

taking involves a public purpose. Berman v. Parker, 348 U.S. 26, 32 (1954) (citations omitted).

Even accepting, arguendo, plaintiffs' contention that "the commercial landings served by the large ships which require deep passageways are privately owned for profit – not public," the Corps' use of the harbor still passes muster under the Supreme Court's standard. That the alleged taking involved an activity, as plaintiffs view it, that directly benefitted a private party, did not invalidate the taking, the Court explained in Kelo, since "the government's pursuit of a public purpose will often benefit individual private parties." Kelo, 545 U.S. at 485. Further, various editions of the River and Harbors Act, when challenged, have always been deemed to have rested upon a public purpose.[3/] Plaintiffs cite no evidence that the Corps' use of the St. Joseph harbor under the authority of the Rivers and Harbors Act is "palpably without reasonable foundation" (see Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 241(1984) (court should accept the stated public purpose of the condemnation offered by the legislature unless it concludes that it is "palpably without reasonable foundation")) or that it is based upon an improper pretext (99 Cents Only Stores v. Lancaster Redevelopment Agency, 237 F. Supp. 2d 1123, 1129 (C.D. Cal.2001) (courts need not defer to the legislature "where the ostensible public use is demonstrably pretextual.")).

---

[3/] See, e.g., United States v. Republic Steel, 362 U.S. 482, 491 (1960) (challenge to §§10, 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 403, 407, denied as the Act is to be read "charitably" with full consideration for the public purposes to be served); United States v. Members of Estate of Boothby, 16 F.3d 19, 24 (1st Cir. 1994) (challenge to § 10 of the River and Harbors Act, 33 U.S.C. § 403 (1988) denied, finding that the Act has been "transformed into an instrument of environmental policy"); United States v. Sasser, 738 F. Supp. 177, 179 (D.S.C. 1990) (purpose of the Rivers and Harbors Act is to keep open all navigable waters of the United States for all legitimate public purposes and it is of no import if the only probable reason for access is for recreational use because the public has a right to access navigable waters).

In short, plaintiffs argument is without merit or evidence to support it. Defendant respectfully requests judgment in favor of the United States.

Dated: April 25, 2007

Respectfully submitted,

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division

*s/Terry M. Petrie*
TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
Tele: 303-844-1369
Fax: 303-844-1350
Terry.Petrie@usdoj.gov

HEIDE L. HERRMANN
G. EVAN PRITCHARD
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

Attorneys for Defendant

OF COUNSEL
Gary W. Segrest, Esq.
Office of Counsel
U.S. Army Corps of Engineers
477 Michigan Avenue, Room 659
Detroit, MI 48226

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the "**Defendant's Memorandum of Contentions of Fact and Law**" by electronic filing with the Unites States Court of Federal Claims on the 25th day of April, 2007 on:

John Ehret, Esq.
20860 Greenwood Drive
Olympia Fields, IL 60461
Counsel for *Banks* Plaintiffs

****************

Drew Marrocco, Esq.
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
Counsel for *Stone* Plaintiffs

****************

Eugene J. Frett, Esq.
Sperling & Slater, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
Counsel for *Frett* Plaintiffs

****************

*s/Terry M. Petrie*
TERRY M. PETRIE