IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JOHN H. and MARY E. BANKS, et al.,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

Defendant.

No. 99-4451 L
Judge Emily C. Hewitt

STONE, ERROL L. & SUSAN H.,
In their own right and as Trustees of the Susan H. Stone Trust and the Errol L. Stone Trust,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

Defendant.

No. 04-277 L
Judge Emily C. Hewitt

EUGENE J. FRETT, Individually and as trustee of the Victor J. Horvath and Frances B. Horvath Trust, and

DONNA P. FRETT,

Plaintiffs,

THE UNITED STATES OF AMERICA,

Defendant.

No. 05-1353L
Judge Emily C. Hewitt

DECLARATION OF GARY SEGREST
ASSISTANT DISTRICT COUNSEL,
DETROIT DISTRICT
U.S. ARMY CORPS OF ENGINEERS

**Exhibit 3**

In accordance with 28 U.S.C. §1746, I, Gary Segrest, declare as follows:

1. I am an Assistant District Counsel, U.S. Army Corps of Engineers, ("Corps"), Detroit District and have been employed in that capacity since 1991.

2. As part of my responsibilities I have represented the U.S. Army Corps of Engineers in the above-titled matter .

3. After receipt of the Banks Plaintiffs' witness list, received on March 14, 2007, I, with the permission of the Banks Plaintiffs' counsel, John Ehret, have interviewed by telephone twenty-four individuals newly identified as witnesses for Plaintiffs.

4. Below, I have attempted to summarize my interviews with a number of these new witnesses:

a. Stephen Blumer, United States Geological Survey, Lansing, Michigan. I interviewed Mr. Blumer on March 26, 2007. Mr. Blumer reported that he has never been contacted by nor heard of Mr. Ehret. Mr. Blumer stated that he knows the St. Joseph river, but is not familiar with the Lake Michigan shoreline. He informed me that he works the quality control program for river gages and maintains information and data related to the gages. He related to me that the 04101500 gage is many miles (I am informed it is approximately 20 miles) upstream from Lake Michigan and that other than having compiled the data from this gage he is unaware of any other information he could provide.

b. R. J. Burkholtz is identified by Plaintiffs as a member of the St. Joseph Harbor Authority. I attempted to contact Mr. Burkholtz at the number provided by Plaintiffs, 269-925-6347, but discovered that this number had been disconnected.

c. Bruce Ebersole, Chief, River and Estrian Section, Engineering Research Development Center (ERDC) Laboratory, Vicksburg, Mississippi. I interviewed Mr. Ebersole on March 26, 2007. Mr. Ebersole stated that he had not been informed that he was named as a witness by Plaintiffs and had not been contacted by Mr. Ehret. Mr. Ebersole is aware that the Corps has some projects in the area of St. Joseph, Michigan, but had just heard about them and is not familiar with the Lake Michigan shoreline south of St. Joseph, Michigan. He did not know of Plaintiffs' Exhibit 11 and did not understand what "Barbara G. Troost Summary" or "Maud Palenske Library" means. He is very familiar with the LSTF Physical Model, which is a large scale physical model beach at the ERDC laboratory, but does not know how his familiarity would relate to this litigation.

d. Larry LaValley is identified by Plaintiffs as the St. Joseph Harbor Master, Benton Harbor, Michigan. I interviewed Mr. LaValley on March 23, 2007. Mr. LaValley stated that he is a retired dock worker and that he has worked in the past for the St. Joseph Harbor Authority obtaining harbor information. He stated that this work consisted of "once a year" calling the local dock companies and obtaining information about the tonnage they have received and shipped. He would then compile this information and turn it over to the St. Joseph Harbor Authority. While he has met Mr. Ehret "once or twice" and provided him information on shipping "tonnage," he was not aware he had been identified as a witness. Though he has lived in the St. Joseph area since 1961, he is not that familiar with the shoreline south of St. Joseph as he has resided five miles inland and recreates to the north when he goes to the lake (Lake Michigan). While Mr. LaValley is familiar with the shipping tonnage at St. Joseph, and aware that it

is a federal harbor, he does not know what he would testify about "Qualified" or about any harbor dredging.

e. Gary R. Mannesto, Chief, Regulatory, Detroit District, Corps of Engineers, (Retired). I interviewed Mr. Mannesto on March 27, 2007. Mr. Mannesto stated that he does not know Mr. Ehret, has had no communications with Mr. Ehret, and was not aware he had been identified by Plaintiffs as a witness in this litigation. Mr. Mannesto further stated that he would not be available for trial due to a previously scheduled "out of town" trip. Mr. Mannesto informed me that while he is "generally aware" of the issues related to shoreline erosion, that he has no specific familiarity with the area south of St. Joseph, and that he has visited the Lake Michigan shoreline on a few occasions, but those visits were predominately much further south, in the New Buffalo, Michigan area. He stated that the little information he did have about the St. Joseph area would have been from reading the Detroit District Corps of Engineers, Hydraulics and Hydrology technical reports on the matter, and his oversight management of permitting and enforcement of Department of the Army permits. With regard to testimony about the "Fixed OHWM," Mr. Mannesto speculated that this may relate to the Corps' administratively set OHWM for each of the Great Lakes. Mr. Mannesto stated that all he knew on this subject was that the OHWM had been administratively set before his arrival as Chief, was used during his tenure, and was still in place when he retired. Regarding "Taxing Seawalls," Mr. Mannesto stated he was not sure what this could be referring to, other than a proposed draft mitigation policy for private shore protection structures. However, this policy did not move beyond the draft stage prior to his retirement.

f. Carl Platz, Project Manager, Corps of Engineers, Grand Haven, Michigan. I interviewed Mr. Platz on March 28, 2007. Mr. Platz stated that he does not know Mr. Ehret, has not been contacted by Mr. Ehret, and was unaware of having been identified as a witness for Plaintiffs. Mr. Platz is somewhat familiar with the St. Joseph, Michigan area due to the Corps' work in that area, and is familiar with the disposal of St. Joseph inner harbor dredge material at a local airport. He stated that the sediment in the inner harbor is designated by the State of Michigan as unsuitable for open water disposal (unsuitable for beach placement) and has on a few occasions been deposited at the airport as fill.

g. Wayne Schloop, Chief of Operations, Detroit District, Corps of Engineers. I spoke with Mr. Schloop on April 4, 2007. Mr. Schloop informed me that he had never heard of Mr. Ehret, had not been contacted by him, and was unaware that he was identified as a witness for Plaintiffs. Mr. Schloop is familiar with the St. Joseph harbor area due to his supervisory responsibilities with the Corps, but has only been out to the harbor "seven or eight" times due to "various issues," and only "a couple of times" to the shoreline to the south for the purpose of viewing dredge placement. With regard to "Taking River Sand [inner harbor]," Mr. Schloop stated that he is aware that materials dredged from the inner harbor of St. Joseph are placed upland due to the determination that the material is unsuitable for open water disposal.

h. Richard P. Wolf, P.E., Owner, Oselka Construction, Union Pier, Michigan. I interviewed Mr. Wolf on March 28, 2007. At first Mr. Wolf did not recall knowing Mr. Ehret. However, during the interview Mr. Wolf came to recall that he had provided Mr. Ehret an estimate for the construction of a quarry stone revetment in 2004. He stated he

has had no communications with Mr. Ehret since that time and was not aware he was listed as a witness. Mr. Wolf is familiar with the shoreline south of St. Joseph, Michigan due to his work installing shoreline protective structures in Lake Michigan. Mr. Wolf stated that due to his work he has knowledge of shoreline protective structures, use of boulders, maintenance of such structures, but is not sure what "Permanency" means.

i. Stephen Davis, Indiana Department of Natural Resources, Michigan City, Indiana. I spoke with Mr. Davis on March 26, 2007. Mr. Davis informed me that he had spoken with Mr. Ehret in late December 2004, at which time he explained to Mr. Ehret the coastal processes– "basic wind, wave and sand in Indiana." Mr. Davis emphasized that his discussions were only about processes he was knowledgeable of in Indiana. He stated he was contacted again by Mr. Ehret in early 2007 and informed he may be listed as a witness. Mr. Davis stated that he is not familiar with the shoreline south of St. Joseph, Michigan, and that when informed he might be a witness, he had to look up the area via "Google Earth" on the internet. I questioned Mr. Davis about the areas Plaintiffs listed for his potential testimony. He stated that he was not familiar with the March 1975, INDIANA SHORELINE study (Ex. 106) and that, while familiar with the April 2002 Final Environmental Impact Statement for the Indiana Lake Michigan Coastal Program (Ex 129), that document applied only to conditions in Indiana.

j. Davis W. Folger, United States Geological Survey (Retired), Woods Hole, MA. I spoke with Mr. Folger on April 11, 2007. Mr. Folger stated that he has never been contacted by Mr. Ehret, does not know Mr. Ehret, and was not notified that he was listed as a witness for Plaintiffs. He stated that he only learned about this litigation a "week or two before" when contacted by David Foster, who was his co-author on a

USGS-NOAA paper on a pilot study in Lake Michigan between St. Joseph, Michigan, and Michigan City, Indiana (Plaintiffs exhibits 33 & 100). He stated he was familiar with the shoreline south of St. Joseph, Michigan, "fifteen years ago" when doing the survey work for the aforementioned paper, but that he cannot recall much now. He further stated that when the survey work was done for this study, back in 1991, his role was mostly taking care of "logistics" such as making arrangements for personnel and parts, and does not recall whether or not he was on the boat during survey work in the St. Joseph, Michigan area. With regard to those topics identified by Plaintiffs regarding anticipated testimony, Mr. Folger stated he participated in authoring the pilot study report (exhibits 33 & 100), but that he cannot recall if the report reached any conclusions. With respect to "Rate of Downcutting," Mr. Folger stated he was not sure what this means and speculated that this may have been something that NOAA had done, but was not anything he worked on. With regard to "GENER substrata," he stated he would have measured the substrata in his work, but that he does not know what "GENER" means. Finally, with regard to "(Clay?) Wadworth," Mr. Folger stated he is not sure what this relates to, but that Wadsworth is a type of substrata. He cannot recall if Wadsworth substrata was found in the St. Joseph area.

k. David S. Foster, United States Geological Survey, Woods Hole, Massachusetts. I spoke with Mr. Foster on March 23, 2007. Mr. Foster stated he is unsure if he had ever spoken with Mr. Ehret, though he does recall talking with a property owner in the St. Joseph, Michigan area and providing a copy of the 1992 USGS-NOAA Preliminary Pilot Study Report (Ex 33 & 100) "a few years ago." Mr. Foster stated that he was unaware of any other possible contacts in this litigation, and had not

been informed he was named as a witness for Plaintiffs. He stated that the pilot study he co-authored with David Folger (Ex. 33 & 100) was a preliminary report which did not provide any firm conclusions. With respect to the anticipated testimony identified by Plaintiffs regarding Plaintiffs' exhibits 23 and 24, Mr. Foster stated that he was unsure if he had any knowledge of these reports.

l. Kevin A. Kasischke, Berrien County Health Department, Benton Harbor, Michigan. I spoke with Mr. Kasischke on March 23, 2007. Mr. Kasischke stated that he was unsure if he had been contacted by Mr. Ehret, recalling only that approximately two years ago he had answered some questions of a local property owner who talked about a lawsuit. He stated that he has not been contacted about being a witness for Plaintiffs. Mr. Kasischke stated that he maintains the well digger logs for Berrien County and is familiar with the Unified Soil Classification System, but "Drive Sample Blows" does not mean anything to him, and further, that he does not deal with "Location of Borings," as borings are not related to wells, but to septic systems.

m. Randall Schaetzl, Professor of Geography, Michigan State University, Lansing, Michigan. I interviewed Dr. Schaetzl on April 5, 2007. Dr. Schaetzl informed me that he had not heard of Mr. Ehret, had not been contacted about this litigation, and was unaware that he had been identified as a witness for Plaintiffs. With regard to the anticipated testimony listed by Plaintiffs relating to his co-authorship of a 2001 paper listed as "Origin/Evolution of the Great Lakes," Dr. Schaetzl stated that the article was a review of the geologic history of the Great Lakes over the last 16,000 years and does not address modern processes or time frames.

n. David Schweiger, Former Chief, Great Lakes Hydraulics and Hydrology, Detroit District, Corps of Engineers. I spoke with Mr. Schweiger on April 19, 2007, with regard to Plaintiffs' anticipated testimony from him. Regarding the "Monitoring Program," Exhibit 31 (1997 Monitoring report), and Exhibit 41 (1999 Monitoring report), Mr.Schweiger stated that he supervised Charles L. Thompson, a previously identified witness for both Plaintiffs and Defendant, who was in charge of the Section 111 Monitoring program and who would have written the 1997 and 1999 reports. Mr.Schweiger stated his involvement would have merely been reviewing Mr. Thompson's work and signing off on the reports. Mr. Schweiger further stated that with regard to Exhibit 60 (a 12-page memorandum of meeting) and "6-8-94 Shoreham Village Council Meeting," Mr. Schweiger attended the meeting but did not actively participate. This meeting was a presentation made by Mr. Thompson to discuss shoreline conditions at the time and the placement of stone off of Shoreham Village. Finally, with regard to Exhibits 23 and 24 (CERC 96-10 technical report and CHL 97-15 technical report), Mr. Schweiger believes it is likely that he read those reports at one time, but cannot recall any details of them. Overall, Mr. Schweiger stated that Mr. Thompson was much more familiar with the monitoring program, the Shoreham Village meeting, and the technical reports as he was more actively involved with those matters.

Under the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: April 23, 2007

Gary Segrest
Assistant District Counsel
U.S. Army Corps of Engineers
Detroit District