# In the United States Court of Federal Claims

No. 99-4451 L
c/w 99-4453L, 99-4454L, 99-4455L, 99-4456L, 99-4457L, 99-4458L, 99-4459L, 99-44510L, 99-44511L, 99-44512L, 00-365L, 00-379L, 00-380L, 00-381L, 00-382L, 00-383L, 00-384L, 00-385L, 00-386L, 00-387L, 00-388L, 00-389L, 00-390L, 00-391L, 00-392L, 00-393L, 00-394L, 00-395L, 00-396L, 00-398L, 00-399L, 00-400L, 00-401L, 04-277L, 05-1353L, 05-1381L, 06-72L

(E-Filed: May 3, 2007)

JOHN H. BANKS, ET AL.,

Plaintiffs, 99-4451 L

v.

THE UNITED STATES,

Defendant.

STONE, ERROL L. and SUSAN H. As Trustees of the Susan H. Stone Trust,

Plaintiffs, 04-277 L

v.

THE UNITED STATES,

Defendant.

EUGENE J. FRETT, Individually and

Takings; Motion for Partial Dismissal; Statute of Limitations; Law of the Case; "Justifiable Uncertainty" Regarding Extent of Damage by Shoreline Erosion; Whether Time of Accrual of Action is Determined by an Objective or Subjective Standard

as Trustee of the Victor J. Horvath )
and Frances B. Horvath Trust, )
)
Plaintiff, ) 05-1353 L
)
v. )
)
THE UNITED STATES, )
)
Defendant. )
)
_________________________________ )

John B. Ehret, Olympia Fields, IL, for plaintiffs in Nos. 99-4451 L, 05-1381 L, and 06-72 L. Drew W. Marrocco, Washington, DC, for plaintiffs in No. 04-277 L. Eugene J. Frett, Chicago, IL, pro se in No. 03-1353 L.

Terry M. Petrie, Denver, CO, with whom was Kelly A. Johnson, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

The court has before it defendant's Motion to Partially Dismiss and Memorandum in Support Thereof (Motion or Def.'s Mot.), filed on February 26, 2007, Plaintiffs' Response to Defendant's Motion to Partially Dismiss and Memorandum in Support Thereof (Response or Pl.'s Resp.), filed on March 21, 2007, and Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Partially Dismiss (Reply or Def.'s Reply), filed on April 9, 2007. Defendant moves the court to dismiss seventeen "of the claims brought by the plaintiffs for failure to file complaints timely before this [c]ourt as required under 28 U.S.C. § 2501 [(2000)]." Def.'s Mot. 1.

By Order on April 20, 2007, the court directed the parties "to provide the court the date of publication of the 1999 Report" referred to in Banks v. United States (Banks II), 314 F.3d 1304, 1310 (Fed. Cir. 2003) "to facilitate the court's ruling on defendant's Motion." Order of Apr. 20, 2007. On April 27, 2007, the parties filed a Joint Response to Court Order April 20, 2007 RE: Date of 1999 Report (Joint Response or J. Resp.). The court considers the Joint Response along with defendant's Motion, plaintiff's Response, and defendant's Reply.

I. Background

The St. Joseph River enters Lake Michigan between St. Joseph, Michigan, and Benton Harbor, Michigan. Def.'s Mot. 5.[1] In the 1830s, the United States Army Corps of Engineers (Corps) re-constructed the mouth of the St. Joseph River and began constructing jetties that jutted generally westward into Lake Michigan in order to accommodate commercial shipping traversing the St. Joseph River into Lake Michigan. Id. The Corps lengthened the jetties periodically until they reached their present-day length in the year 1903. Id. From the 1950s to 1989, the Corps incrementally encased the jetties in steel. Id.

In the 1970s, the Corps instituted a beach nourishment program to mitigate erosion along the shoreline south of the harbor jetties. Banks II, 314 F.3d at 1306-07. "The Corps has provided fine sand nourishment for more than [fifteen] years on feeder beaches, deposited coarser sediments along the shoreline at least five times between 1986 and 1993, and placed barge-loads of large rocks into Lake Michigan in 1995." Def.'s Mot. 5-6. The Corps issued three technical reports in 1996, 1997, and 1999 (Reports), which "addressed the Corps' mitigation efforts and collectively concluded that the erosion was permanent and irreversible." Def.'s Mot. 6; Banks II, 314 F.3d at 1307.

Plaintiffs are the owners of property along approximately four and a half miles of the eastern shore of Lake Michigan, south of St. Joseph Harbor. Def.'s Mot. 6; Banks II, 314 F.3d at 1306. In July 1999, sixteen of the current plaintiffs filed suit claiming that the Corps' construction and maintenance of the jetties from 1950 to 1989 caused erosion of their shoreline property. Def.'s Mot. 2, 6; see also Original Complaint of July 9, 1999 (Orig. Compl.), 2 ("Plaintiff[s] . . . are riparian landowners who have and are continuing to suffer loss of property without just compensation arising out of deprivation of sand caused by the U.S. Army CORPS of Engineers Federal project jetties at St. Joseph Harbor, Michigan, and fourteen other similar harbor jetties to the north."). By February 2000, the number of plaintiffs had increased to thirty-seven. Banks v. United States, 49 Fed. Cl. 806, 808 (2001) (Banks I). The court consolidated the claims of all plaintiffs for the limited purpose of a trial of liability. See Order of Jan. 4, 2007; Order of Mar. 15, 2005; Order of Mar. 17, 2006, Frett v. United States, No. 05-1353 (Fed. Cl. filed Dec. 22, 2005). Currently, there are thirty-eight plaintiffs in the consolidated action. Def.'s Mot.

[1]Facts relied on in this Opinion and cited to as statements of fact from the filings of only one of the parties do not appear to be in dispute for the purpose of the pending Motion to Partially Dismiss and Memorandum in Support Thereof (Motion or Def.'s Mot.). Except as to jurisdictional facts necessary to the decision of defendant's Motion, facts stated in the Opinion are provided for context and shall not be deemed to be established or conceded by any party.

2, 6.

The United States moved to dismiss in February 2001, claiming that plaintiffs' actions were time-barred under 28 U.S.C. § 2501, which states that claims of which the Court of Federal Claims has jurisdiction must be filed within six years of accrual. Def.'s Mot. 2. The court granted the motion and dismissed plaintiff's claims in July 2001. Banks I, 49 Fed. Cl. at 826. The court reasoned that plaintiffs' takings claims accrued no later than 1989 because the "gradual process of shoreline erosion set into motion by the government had resulted in a permanent taking and the extent of the damage had become reasonably foreseeable." Id. at 825.

The United States Court of Appeals for the Federal Circuit (Federal Circuit) reversed and remanded. Banks II, 314 F.3d at 1305-06. Because a claim cannot accrue while the damages remain justifiably uncertain, the Federal Circuit stated that "the question is whether the 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain by the Corps' mitigation efforts." Id. (citing Applegate v. United States, 25 F.3d 1579, 1583 (Fed. Cir. 1994)). The Federal Circuit held that "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." Banks II, 314 F.3d at 1310. These Reports "brought to an end plaintiffs' 'justifiable uncertainty' which had been created by the Corps's mitigation efforts about the permanency of erosion." Def.'s Mot. 4 (quoting Banks II, 314 F.3d at 1310). The statute of limitations began to run only after these Reports had been issued, and "[b]ecause the [R]eports were issued less than six years before plaintiffs filed their complaints, the Federal Circuit viewed each complaint as timely." Def.'s Mot. 4.[2] Trial on the matter of liability is set to begin on Monday, June 4, 2007. Order of Jan. 19, 2007.

Defendant filed this Motion on February 26, 2007. Def.'s Mot. 1. Defendant argues that "[d]iscovery taken through depositions subsequent to the Federal Circuit's Banks II decision shows plaintiffs had no justifiable uncertainty regarding the erosion to their property." Def.'s Mot. 12. Defendant argues that evidence that has come to light since Banks II makes the Federal Circuit's legal analysis inapplicable to the seventeen plaintiffs who are the subject of the Motion. Def.'s Mot. 1. Additionally, defendant argues that plaintiffs Bodnar and plaintiffs Okonski, who filed after the Banks II decision, are barred by the statute of limitations because they were "on inquiry notice" of their claims and failed to file within the six-year limit. Def.'s Mot. 19, 22.

---

[2]For additional background, see Banks v. United States, 49 Fed. Cl. 806, 807-08 (2001) (Banks I).

Plaintiffs submitted their Response but, as defendant points out in its Reply, "plaintiffs muster not a word in opposition to defendant's Motion about either the facts . . . or the law, applying those facts, on the question of 'justifiable uncertainty.' Nor do plaintiffs challenge or disagree with the import of those facts when applied to the Federal Circuit's reasoning in [Banks II]." Def.'s Reply 3. The court therefore focuses on the arguments made in defendant's Motion.

## II. Discussion

### A. Plaintiffs who Joined the Case Before Banks II

Defendant argues that fifteen of the plaintiffs subject to this motion "had no justifiable uncertainty regarding the erosion to their property." Def.'s Mot. 12, 14-15. As defendant acknowledges, those fifteen plaintiffs (Banks II plaintiffs) have already been the subject of several previous decisions by this court and the Federal Circuit. See Def.'s Mot. 14-15; Banks I, 49 Fed. Cl. at 826; Banks II, 314 F.3d at 1305.

#### 1. Law of the Case Doctrine

It is long established that

> [w]hen a case has been once decided by [a superior court,] . . . . [t]he [lower court] is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it . . . .

In re Sanford Fork & Tool Co., 160 U.S. 247, 255 (1895). "'The law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts.'" Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995) (Gould) (citations omitted); Def.'s Mot. 8.

> The doctrine of law of the case, like stare decisis, deals with the circumstances that permit reconsideration of issues of law. The difference is that while stare decisis is concerned with the effect of a final judgment as establishing a legal principle that is binding as a precedent in other pending and future cases, the law of the case doctrine is concerned with the extent to which the law applied in decisions at various stages of the same litigation becomes the governing principle in later stages.

18 James Wm. Moore et al., Moore's Federal Practice § 134.01[2] (3d ed. 2004) (Moore's). The law of the case doctrine does not apply when there is "[1] discovery of new and different material evidence that was not presented in the prior action, or [2] an intervening change of controlling legal authority, or [3] when the prior decision is clearly incorrect and its preservation would work a manifest injustice." Intergraph Corp. v. Intel Corp., 253 F.3d 695, 698 (Fed. Cir. 2001) (Intergraph).

Defendant states that all "three criteria for reconsidering a prior determination apply as well to a trial court when acting upon a mandate received from an appellate court." Def.'s Mot. 9. The court believes that defendant has misinterpreted AFG Industries, Inc. v. Cardinal IG Co., Inc., 375 F.3d 1367, 1372 n.2 (Fed. Cir. 2004) (AFG), when defendant asserts that the Federal Circuit "comment[ed] that a trial court could under appropriate circumstances refine an issue addressed earlier in the litigation by the Federal Circuit." Def.'s Mot. 9-10. The "circumstances" referred to by the Federal Circuit in AFG are not analogous to the circumstances in this case. In the case to which AFG refers, Utah Medical Products, Inc. v. Graphic Controls Corp., 350 F.3d 1376 (Fed. Cir. 2003) (Utah Med.), "the district court clarified its [own] construction" of the claim, rather than a construction from the appellate court. Utah Med., 350 F.3d at 1380. Indeed, AFG makes a note that a district court may refine "an ambiguous claim construction," 375 F.3d at 1372 n.2, rather than "refine an issue addressed . . . by the Federal Circuit," as defendant asserts, Def.'s Mot. 9-10. See also Utah Med. 350 F.3d at 1382 ("Recognizing the shortcomings of its original attempt to define the scope of the claims, the district court admirably amended its construction to supply a better definition before trial.").

Defendant also urges an interpretation of comments in DeLong Equipment Co. v. Washington Mills Electro Minerals Corp., 990 F.2d 1186, 1196 (11th Cir. 1993) (DeLong), to suggest that "the most cogent of reasons" would allow a district court to revisit a holding by an appellate court. Def.'s Mot. 10 (quoting DeLong, 990 F.2d at 1196). Nevertheless, the appellate court in DeLong was reviewing its own prior decision, not a decision from a higher court. DeLong, 990 F.2d at 1189, 1197. In fact, DeLong explicitly held that "[t]he district court must follow the appellate decision as to these issues on remand, and generally speaking the appellate court must do so in future rulings in the case as well." DeLong, 990 F.2d at 1196 (citation omitted) (emphasis added).

Other cases follow this pattern. In Gould, the court cited the rule that "a court adheres to a decision in a prior appeal in the same case unless one of three exceptional circumstances exist: (1) the evidence in a subsequent trial is substantially different; (2) controlling authority has since made a contrary decision of the law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice." Gould, 67 F.3d at 930 (citation omitted); see also Terrell v. Household Goods

Carriers' Bureau, 494 F.2d 16, 19-20 (5th Cir. 1974) ("[T]he general rule that an appellate court's decision of issues must be followed in all subsequent trial or intermediate appellate proceedings in the same case is waived for only the most cogent of reasons and to avoid manifest injustice.") (citations omitted). Nevertheless, as with DeLong, the appellate courts in Terrell and Gould were not reviewing decisions from a higher court, but rather their own prior decisions. Gould, 67 F.3d at 927-28; Terrell, 494 F.2d at 19. This court is not aware of a case where a trial court actually reviews a higher court's decision to prevent "manifest injustice."

The binding nature of a higher court's decisions is clearly reflected in case law. See, e.g., Gines v. United States, 740 F.2d 947, 950 (Fed. Cir. 1984) ("[T]he law of the case [is] the rule that 'a decision by the court on a point in a case becomes the law of the case unless or until it is reversed or modified by a higher court.'") (citation omitted).

> Like stare decisis, the law of the case doctrine is quite rigidly applied to force obedience of an inferior court, but more flexible in its application to reconsideration by the court that made the earlier decision. Thus, "the doctrine of the law of the case, unlike res judicata but like stare decisis, does not preclude reconsideration of erroneous decisions" by the court that rendered them.

Moore's § 134.01[2] (footnotes and citations omitted) (emphasis added).

That is not to say that a district court may never revisit an issue decided by an appellate court. If a change in circumstances – be it in the law or the available evidence – occurs subsequent to the higher court's decision, the law of the case doctrine is inapplicable not because the analysis of a higher court is subject to questioning, but rather because it is inapposite. See Intergraph, 253 F.3d at 698. Without a change in law or the available evidence, only the same court or a court with appellate jurisdiction can revisit a decided issue to correct a mistake or an unjust decision. See In re Sanford Fork & Tool Co., 160 U.S. at 255 (holding that a lower court is bound by the decrees of higher courts); see also Roane v. United States, 231 F.3d 1348, 1349 (Fed. Cir. 2000) (holding that published decisions of the Federal Circuit constitute binding precedent on the Court of Federal Claims); W. Seattle Gen. Hosp., Inc. v. United States, 1 Cl. Ct. 745, 746 (1983). Because the Federal Circuit is the appeals court for the Court of Federal Claims, see Roane, 231 F.3d at 1348-49, this court will revisit an issue decided by the Federal Circuit only if changed circumstances in law or evidence make the Federal Circuit's decision

inapposite.[3]

2. Accrual of a Gradual Taking

The Fifth Amendment guards against the taking of private property by the federal government without just compensation. U.S. Const. amend. V. "The Amendment recognizes both the [f]ederal [g]overnment's right to take private property for public use and a property owner's right to just compensation." Applegate, 25 F.3d at 1581. When the government fails properly to compensate private property owners for a taking, this court has jurisdiction to enforce the owners' right to just compensation. Tucker Act, 28 U.S.C. § 1491; Applegate, 25 F.3d at 1581. Plaintiffs have six years from the moment that an action accrues to file their claims; otherwise, they are barred from litigating their claims by the statute of limitations. 28 U.S.C. § 2501. "A claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994). In taking situations, the alleged liability of the government "accrues when that taking action occurs." Id.; see also Benchmark Res. Corp. v. United States, 74 Fed. Cl. 458, 469 (2006).

A gradual taking is a taking that does not take place in one moment in time – for example, when the government condemns land – but rather over a prolonged period via a process of physical events. United States v. Dickinson, 331 U.S. 745, 747-48, 749 (1947) ("The source of the entire claim . . . is not a single event; it is continuous."). In Dickinson, the Supreme Court held that a plaintiff's cause of action in such cases does not accrue until "the situation becomes stabilized." Id. at 749. The Federal Circuit has interpreted this decision to mean that "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." Boling v. United States, 220 F.3d 1365, 1370-71 (Fed. Cir. 2000); see also United States v. Dow, 357 U.S. 17, 27 (1958) ("The expressly limited holding in Dickinson was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become

---

[3]Defendant mentions the test of "manifest injustice" in its briefing, Def.'s Mot. 9, but does not argue it, id. passim; see also Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Partially Dismiss (Reply or Def.'s Reply) passim. The court has explained in Part II.A.1 of this Opinion why it does not believe that a lower court has the authority to review a higher court's decision for manifest injustice. Furthermore, the fact that defendant failed to argue manifest injustice in its opening brief precludes it from later arguing the point. See Walcek v. United States, 303 F.3d 1349, 1355 (Fed. Cir. 2002).

appropriated to public use."); Applegate, 25 F.3d at 1582 (quoting Dow). The point is restated by the Federal Circuit in Boling:

> Thus, during the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue, but once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run.

Boling, 220 F.3d at 1371. As defendant correctly states,

> Through its opinions in Applegate and Banks[II], the Federal Circuit, in commenting further upon the "permanence" element of a "stabilized" gradual claim, has introduced the notion of "justifiable uncertainty." That is, a gradual taking claim does not reach a stabilized condition, and hence the claim has not accrued, if the property owner has "justifiable uncertainty" about whether his or her loss is permanent or irreversible. In Applegate, that "justifiable uncertainty" arose by the government's promises to build a sand transfer plant (Applegate, 25 F.3d at 1582) and, in Banks[II], by virtue of the Corps['] mitigation efforts to nourish the shoreline along Lake Michigan (Banks[II], 314 F.3d at 1309-10). See Boling, 220 F.3d at 1372 ("critical element that delayed stabilization in Applegate [is] the justifiable uncertainty about the permanency of the taking.")

Def.'s Mot. 11.

Defendant argues that the fifteen Banks II plaintiffs "had no justifiable uncertainty regarding the erosion to their property, " id. at 12, because of one of two reasons: (1) "Some plaintiffs had no knowledge whatsoever of the Corps' efforts" to mitigate the loss, id., that is, they had no reason to believe that the clearly visible "permanent taking," Banks I, 49 Fed. Cl. at 825, was not permanent, see Banks II, 314 F.3d at 1304 ("[T]he question is whether the 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain by the Corps' mitigation efforts.") (quoting Applegate, 25 F.3d at 1583); and (2) "Others, while aware of the Corps' efforts, did not believe it would benefit their property," Def.'s Mot. 12, that is, they were not uncertain at all as to the permanency of the damage. Implicitly, defendant argues for a subjective standard: According to defendant, plaintiffs' actual knowledge and actual beliefs are the dispositive factors on which this case turns. See id.

The court believes that the approach to the date of accrual taken by the Federal Circuit in gradual takings claims is an objective one. The language of the test –

"justifiable uncertainty" – indicates the objective nature of the test. The test of "justifiable uncertainty" does not merely turn on whether or not a plaintiff is uncertain – a subjective standard that is defined by a plaintiff's actual perception – but rather turns on whether a plaintiff's uncertainty is "justifiable." Applegate, 25 F.3d at 1583; Boling, 220 F.3d at 1372; Banks II, 314 F.3d at 1309-10. "Justifiable" is defined as "[h]aving sufficient grounds for justification." American Heritage Dictionary 951 (4th ed. 2000). In other words, a plaintiff's certainty or uncertainty in the context of a takings claim is to be assessed for its reasonableness. Cooper v. United States, 827 F.2d 762, 764 (Fed. Cir. 1987) ("In this case, the trees on [plaintiff's] farm began to die in 1979, but the extent of the destruction was not ascertainable until 1984, when [plaintiff] filed suit."); Kingsport Horizontal Prop. Regime v. United States, 53 Fed. Cl. 556, 558-59 (2002) ("[W]e believe that 10 feet of erosion is sufficient to alert the reasonably diligent landowner (as all property owners are expected to be) of the existence and enduring nature of the erosion . . . ."). The Federal Circuit has explicitly held that "[w]hether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995) (citations omitted); see also Coastal Petroleum Co. v. United States, 228 Ct. Cl. 864, 867 (1981) ("The objective criteria – concealment and inherent knowableness of the facts – determine the commencement of running of the statute; whether plaintiff knew, or by due diligence should have known, of its injury is not an issue in these circumstances.").

The court notes that some language in case law, when viewed in isolation, appears to suggest a subjective standard. In some instances, courts refer to what appears to be the plaintiffs' actual knowledge without entering into a discussion of whether that knowledge is reasonable. See, e.g., Banks II, 314 F.3d at 1307 ("The plaintiff landowners argued that their cause of action for a continuing taking did not accrue until the late 1990s, when they learned that the observed shoreline erosion was permanent and irreversible.") (citing Banks I, 49 Fed. Cl. at 812); Applegate, 25 F.3d at 1582 ("the landowners did not know when or if their land would be permanently destroyed" because of their awareness of the government's activity). Defendant argues that "the Federal Circuit in both [Banks II and Applegate] relied upon the fact that the landowners were aware of the Government's activity to find justifiable uncertainty existed." Def.'s Mot. 15.

The court believes that defendant's focus on what "the landowners were aware of" results in a misreading of Banks II and Applegate. Although both Banks II and Applegate refer to the landowners' knowledge, and neither specifies in terms whether it is relying on an objective or subjective standard, the analyses in both cases are not only consistent with – but indeed support – an objective standard. The discussion in Applegate refers to the fact that the "physical process" was "imperceptible," not whether the plaintiffs had

actually perceived the process. Applegate, 25 F.3d at 1582. The key issue in Applegate was an objective determination of the date when the physical process of erosion had reached a point of "stabilization," not whether the landowners had believed the situation to be stable. See id. Similarly, Banks II held that the technical Reports issued by the Corps "collectively indicate that the erosion was permanent and irreversible" without entering into a discussion about whether each and every one of the numerous plaintiffs had received notice of these Reports. Banks II, 314 F.3d at 1307. Taken in this broader context, it is reasonable for this court to conclude that if a court refers to a plaintiff's knowledge without discussing the reasonableness of that knowledge, it is presumably because what the court perceives to be the plaintiff's actual knowledge coincides with what is reasonable. This is in keeping with the cases that explicitly articulate a standard, which – so far as this court can ascertain – is always an objective one. See, e.g., Fallini, 56 F.3d at 1380 ("[W]hether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."); Coastal Petroleum Co., 228 Ct. Cl. at 867 ("The objective criteria – concealment and inherent knowableness of the facts – determine the commencement of running of the statute; whether plaintiff knew, or by due diligence should have known, of its injury is not an issue in these circumstances.").

Defendant relies on Boling to argue "the importance of knowledge by the landowners of the Government's activity." Def.'s Mot. 15. In that case, the Federal Circuit held that no justifiable uncertainty existed for the plaintiffs when the government's plans to mitigate the damages were not known by the plaintiffs. Boling, 220 F.3d at 1372 ("[T]he plaintiffs in this case were not aware of the plans [to build revetments to protect plaintiffs' property] until after they filed this lawsuit."). "Thus, the critical element that delayed stabilization in [Applegate] – the justifiable uncertainty about the permanency of the taking – is simply not present in this case." Boling, 220 F.3d at 1372.

The court disagrees with defendant's suggestion that its interpretation of Boling applies to plaintiffs in the circumstances of this case. A landowner is deemed to have acted as a reasonably diligent person in detecting the alleged taking. See Fallini, 56 F.3d at 1380; Coastal Petroleum Co., 228 Ct. Cl. at 867; Cooper, 827 F.2d at 764; see, e.g., Banks II, 314 F.3d at 1310. To impose a subjective standard on plaintiffs' awareness of proposed or ongoing mitigation efforts would be inconsistent with a determination of objective reasonableness because mitigation efforts are part and parcel of the determination of the permanency of an alleged taking. See Fallini, 56 F.3d at 1380; Coastal Petroleum Co., 228 Ct. Cl. at 867. A subjective approach would also explicitly contradict the standard articulated in Boling itself. Boling, 220 F.3d at 1373 ("Thus, we hold that the taking claims accrued when the erosion had substantially encroached the

parcels at issue and the damages were reasonably foreseeable.") (emphasis added). The disposition in Boling appears to the court to have turned not, as defendant suggests, on the Boling plaintiffs' subjective ignorance of the mitigation plans, Def.'s Mot. 15-16, but rather on the court's view that any reasonable plaintiff in that position would have been similarly ignorant. Unlike the situation here, the Corps in Boling never followed through with its mitigation plans and, instead, "later rescinded" them. Boling, 220 F.3d at 1372. "In fact, the Corps [in Boling] denied the only request that was made for erosion protection." Id. A reasonable plaintiff could not have been expected, under such circumstances, to be aware of the government's plans to mitigate the damage. See id.

An objective standard is consistent with the Supreme Court's approach to takings cases. In Dickinson, Congress authorized the construction of a dam in order to improve the navigability of the Kanawha River. 331 U.S. at 746. As a result of the construction of the dam, land belonging to the plaintiffs was permanently flooded and erosion further damaged the new bank of the pool. Id. at 747. The Court had to decide when this gradual physical takings accrued so as to determine whether the statute of limitations had run. Id. In reaching its decision, the Court discussed how the government "left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy." Id. at 748. Noteworthy is the fact that, even though "the onus of determining" when the taking took place is on "the owner," the gauge by which that owner is to measure the moment of accrual is "when the fact of taking could no longer be in controversy," that is, when the average observer would not dispute the existence of the taking. Id. Accordingly, "[a]n owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck." Id. at 749 (emphasis added).

Dow involved a physical taking, albeit not a gradual physical taking.[4] In Dow, the Court was faced with the issue of determining whether a takings claim accrued when the government entered possession of plaintiff's property in 1943 or at the time of the declaration of taking in 1946. 357 U.S. at 22. In ruling that the claim accrued at the time of physical possession, the Court reasoned: "[C]ertainty is not lacking under the rule advocated by the Government, which fixes the 'taking' at the time of the entry into physical possession – a fact readily ascertainable whether or not the Government makes

[4]Dow involves a pipeline easement over plaintiffs' land and an interpretation of § 1 of the Declaration of Taking Act, 40 U.S.C. §§ 258a-258e. See United States v. Dow, 357 U.S. 17, 18 (1958). Nevertheless, insofar as Dow explicates the analysis of a physical takings claim, the court finds it useful here.

use of condemnation proceedings . . . ." Id. at 25 (emphasis added). The court believes that implicit in the foregoing is the court's conclusion that the time of taking is fixed at the moment when the reasonable observer would have detected the actual physical taking prior to the declaration. See id.[5]

---

[5]Takings can be divided roughly into two categories: physical and regulatory. Physical takings occur when "the government encroaches upon or occupies private land for its own proposed use." Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982) (holding that "a permanent physical occupation authorized by government is a taking"). Regulatory takings, on the other hand, occur "when government action, although not encroaching upon or occupying private property, still affects and limits its use to such an extent that a taking occurs." Cienega Gardens v. United States, 265 F.3d 1237, 1244 (Fed. Cir. 2001) (citations omitted).

The court's analysis in this case is confined to the rubric of physical takings, mostly within the subcategory of gradual physical takings. This is partly because takings cases are "essentially ad hoc, factual inquiries" that are often difficult to categorize. Penn Cent. Transp. Co. v. New York City (Penn Central), 438 U.S. 104, 124 (1978). Factually focused though these inquiries may be, they are nevertheless "not standardless." Loretto, 458 U.S. at 426. Given the sometimes ambiguous nature of takings claims, the court has found it productive to focus on cases with factual circumstances closely analogous to the circumstances in this case.

Additionally, the approach to determining the date of accrual generally differs between regulatory and physical takings. Goodrich v. United States, 63 Fed. Cl. 477, 480 (2005) (holding that the determination of the date of accrual of a Fifth Amendment takings claim "hinges on the type of taking," that is, whether the taking was regulatory or physical). In the regulatory context, Penn Central discussed the need to evaluate "the economic impact of the regulation, the extent to which it interferes with the investment-backed expectations, and the character of the government action" to determine whether an alleged taking occurred, Loretto, 458 U.S. at 432 (citing Penn Central, 438 U.S. at 124), and by extension, when it accrued, Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994) ("[T]his court must examine the[] criteria [from Penn Central] to discern the events triggering the six-year statute of limitations."); see also Caldwell v. United States, 57 Fed. Cl. 193, 200 (2003) (citing Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996)). In a physical taking, on the other hand, the determinative issue is whether – and in the accrual context, when – the property was physically invaded. See Loretto, 458 U.S. at 432 (citing Penn Central, 438 U.S. at 124).

Nevertheless, the court notes that, insofar as both physical and regulatory takings cases involve the government's encroachment upon private owners' rights in their property, there is some basis for arguing that an objective analysis is common to all takings cases. For example, in Creppel, the Army Corps of Engineers (Corps) engaged in a flood control project that would have improved plaintiffs' land, which was subject to annual flooding. 41 F.3d at 629. An order

The court also notes that an objective standard is acknowledged by defendant in a section of its Motion not dealing with the Banks II plaintiffs. Def.'s Mot. 20 ("By this time in the spring of 1997 . . . , Mr. Bodnar can fairly be said to have been on inquiry notice of his claims."); see also, Def.'s Reply 2 ("Plaintiffs Bodnar and Okonski should also have their claims dismissed because we established that each was placed on inquiry notice . . . ."). The test of "inquiry notice" urged by defendant is an objective test.

3. Accrual of Plaintiffs' Claims

In the circumstances of this case, the court concludes, neither plaintiffs without actual knowledge of the Corps's efforts to mitigate their alleged loss nor plaintiffs who actually knew of the mitigation undertaken by the Corp are barred by the statute of limitations. In Banks II, the plaintiffs in this action sought review of this court's decision dismissing their complaints as barred by the statute of limitations. Banks II, 314 F.3d at 1305 (citing Banks I, 49 Fed. Cl. 806). The issue of whether the fifteen Banks II plaintiffs filed timely, pursuant to 28 U.S.C. § 2501, currently before this court, was the same issue before the Federal Circuit in Banks II. Compare Def.'s Mot. 1 with Banks II, 314 F.3d at 1305, 1310 ("[T]he question is whether the 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain by the Corps' mitigation efforts.") (quoting Applegate, 25 F.3d at 1583). Defendant does not dispute this; rather, defendant argues that "discovery conducted by the United States reveals new and different facts" that make Banks II inapposite. Def.'s Mot. 1; see also Intergraph, 253 F.3d at 698. These different facts concern plaintiffs' knowledge of the

---

subsequently issued by Brigadier General Drake Wilson, with the Environmental Protection Agency concurring (Wilson Order), "eliminated the landowners' expectation of land reclamation, causing the property's value to plummet." Id. at 632. In its analysis, the Federal Circuit held that "the alleged . . . taking began when the Wilson Order issued" without discussing notice to or the knowledge of individual plaintiffs. Id.

Beyond the context of takings cases, there is some basis for concluding that the determination of accrual of all cases before the Court of Federal Claims follows an objective standard. In Hopland Band of Pomo Indians v. United States, 855 F.2d 1573 (Fed. Cir. 1988) (Hopland Band), a case that approaches iconic status in discussions of the accrual of claims, plaintiffs brought a claim against the United States for breach of trust by unlawful conveyance of property held by the government for the benefit of the Hopland Band of Pomo Indians. The court held that "for the purposes of [28 U.S.C. § 2501], it would appear . . . accurate to state that a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." Hopland Band, 855 F.2d at 1577 (citation omitted) (second emphasis added).

Corps' mitigation efforts and, for those who had knowledge of those efforts, their belief as to the effect of those efforts. Def.'s Mot. 12. However, given that the standard for determining the accrual of a gradual taking is objective, the issue in this case is neither whether plaintiffs knew of the Corps' mitigation efforts nor whether they believed that such efforts, if they did know about them, would help their situation. Cf. Def.'s Mot. 12. The issue is whether a reasonable and diligent plaintiff should have known of the mitigation efforts and interpreted them in such a way as to be justifiably uncertain about the permanency of the alleged taking until the issuance of the Reports. This was decided in Banks II when the Federal Circuit held that "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." 314 F.3d at 1310. Thus "the claims were not time-barred." Id. Plaintiffs' subjective knowledge may be new evidence, but defendant has failed to show how it is "material" to the question at hand. See Intergraph, 253 F.3d at 698. This court is bound by the law of the case as set forth in Banks II. Defendant cannot relitigate the issue of the statute of limitations at this juncture and before this court. See In re Sanford Fork & Tool Co., 160 U.S. at 255; Intergraph, 253 F.3d at 698; see also W. Seattle Gen. Hosp., Inc., 1 Cl. Ct. at 746.

B. Plaintiffs Bodnar and Okonski

Neither the Bodnar nor the Okonski plaintiffs had filed their complaints before the Federal Circuit issued its Banks II decision. Def.'s Mot. 19. Therefore, the Federal Circuit did not actually rule on the issue of claim preclusion as applied to these plaintiffs.

The factual circumstances surrounding the Bodnar and Okonski plaintiffs are such that they fall within the reasoning of Banks II. Defendant asserts that the Bodnar plaintiffs bought their property in December 1988, Def.'s Mot. 19, and it is undisputed that the Bodnar plaintiffs became owners of the eroding land by 1989, id. at Ex. 17 (Deposition Testimony of Andrew Bodnar at 8:8-9:9). The Bodnar plaintiffs are in the same position as the other plaintiff owners who were held to be justifiably uncertain of the alleged takings until the issuance of the Reports. See Banks II, 314 F.3d at 1310. Even though the 1997 Report "acknowledged the irretrievable nature of the erosion," id. at 1307, the Federal Circuit explicitly found that these Reports "collectively indicated that erosion was permanent and irreversible," thereby indicating that all three of the Reports were collectively determinative of the court's conclusion, id. at 1310. The court interprets the Federal Circuit's decision to indicate that the claims did not accrue until the issuance of the last of the Reports. It appears uncontested that the so-called 1999 Report was issued no earlier than January of 2000. J. Resp. 2; Banks I, 49 Fed. Cl. at 823; see also Banks II, 314 F.3d at 1310. The Bodnar plaintiffs' filing of their complaint on

December 28, 2005, is therefore within the six-year statute of limitations. See 28 U.S.C. § 2501.

The Okonski plaintiffs purchased their property in June 1986. Def.'s Mot. 21. As landowners when the Reports were issued, the Okonski plaintiffs are in the same position with respect to ownership of their property as the other plaintiffs who are subject to this Motion, that is, they purchased their property when the extent of the damage remained "justifiably uncertain." See Banks II, 314 F.3d at 1309. The Okonski plaintiffs filed their complaint on January 27, 2006. Def.'s Mot. 19. Both parties appear to believe that the last of the Reports was completed in January 2000. See J. Resp. 2. Mr. James P. Selegean, a Hydraulic Engineer employed by the U.S. Army Corps of Engineers, declared that he was "not able to find anything beyond the 'Jan 2000' that appears on the cover of the report." Id. "Plaintiffs state additional information might be forthcoming from testimony at trial by Charles L. Thompson and David L. Schweiger[,] who are both listed for subpeona to appear." Id.

The court notes that plaintiffs bear the burden of proving jurisdiction once jurisdiction is challenged. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936). "Section 2501 constitutes a jurisdictional limit on the authority of the Court of Federal Claims. . . . As such, § 2501 must be strictly construed." Frazer v. United States, 288 F.3d 1347, 1351 (Fed. Cir. 2002).

Plaintiffs argue, in the parties' Joint Response, "that in the context of a 'seeking for just compensation,' it would be per se unjust to impute knowledge of an undated Corps Report which 'in the normal course of business, is retained within [the Great Lakes Hydraulic and Hydrology Office (H & H)]' as stated by declarant." J. Resp. 2. Indeed, Mr. Selegean declared that the 1999 Report is normally retained within H & H. Id. at Ex. 1. One possible inference to be drawn from Mr. Selegean's declaration is that the 1999 Report was never published in a public forum such that plaintiffs could be deemed to have had constructive notice of it. Cf. Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.") (citation omitted); Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002) ("[I]t is not unfair to charge [plaintiff] with constructive notice of pertinent regulations published in the Federal Register.") (citations omitted). The Federal Circuit does not discuss publication of the 1996 Report, 1997 Report, and 1999 Report (Reports) on which accrual turns in this case. Banks II, 314 F.3d 1304, passim. In Banks II, the Federal Circuit does not address the question of constructive or actual notice to plaintiffs of the Reports. Id. Given the objective nature of the determination of the date of accrual of a taking, the

court reads the Federal Circuit's holding – that "the accrual of plaintiffs' claims remained uncertain until the Corps' [Reports] collectively indicated that erosion was permanent and irreversible," Banks II, 314 F.3d at 1310 – to assume some sort of public circulation of the Reports such that plaintiffs could be said to have had constructive notice of them.

III. Conclusion

For the foregoing reasons, defendant's Motion is DENIED-IN-PART. The Banks II plaintiffs[6] and the Bodnar plaintiffs are not time-barred and will be allowed to proceed to trial. A decision on defendant's Motion as to the Okonski plaintiffs is DEFERRED. At a Telephonic Status Conference (TSC) held on May 2, 2007, the court requested that the parties undertake further exploration of the factual circumstances surrounding the completion and dissemination of the so-called 1999 Report. There will be a TSC on May 7, 2007, at 4:00 p.m. Eastern Daylight Time to discuss further proceedings with respect to the Okonski plaintiffs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge

---

[6]Anderson, et al., Bunker, Chapman, et al., Concklin, Country Day, L.L.C., Del Mariani, et al., Kane, et al., Lahr, et al., Marzke, et al., Miller, et al., Morvis, Renner, Smith, and Wilschke, et al. See Def.'s Mot. 14-15; id. at Ex. 1 (Plaintiffs for Whom Defendant Moves to Dismiss); id. at 25 (List of Exhibits); Banks I, 49 Fed. Cl. at 826; Banks v. United States (Banks II), 314 F.3d 1304, 1305 (Fed. Cir. 2003). It was initially unclear whether the Cunat plaintiffs or the Cosgrove plaintiffs or both were included as subjects of this Motion because defendant refers to "17 of the claims." Def.'s Mot. 1. The Cunat and Cosgrove plaintiffs together would bring the total to eighteen. Furthermore, the Cunat plaintiffs are included on the list on page 14 of the Motion but not in Exhibit 1 of the Motion; the Cosgrove plaintiffs are included in Exhibit 1 but not page 14 of the Motion. Def.'s Mot. 14; Def.'s Mot., Ex. 1 (Plaintiffs for Whom Defendant Moves to Dismiss). Defendant later clarified that "it was plaintiff Cunat, not plaintiff Cosgrove, whose case we were seeking to dismiss" on defendant's Motion. Def.'s Reply 2 n.1.