# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 99-4451 L
c/w 04-277 L, 05-1353 L, 05-1381 L, 06-72 L

| | | |
|---|---|---|
| JOHN H. BANKS, MARY E. BANKS, et. al.<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | ) | NO. 99-4451 L<br>Judge Emily C. Hewitt |
| STONE ERROL L. & SUSAN H.<br>as trustees of the Susan H. Stone Trust,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-277 L<br><br>Consolidated |
| EUGENE J. FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 05-1353 L<br><br>Consolidated |

## PLAINTIFFS REPLY TO DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (DOCKET 191 - 4/25/07)

TABLE OF CONTENTS


| | | Page No. |
|---|---|---|
| 1. | PLAINTIFFS'REPLY TO DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (DOCKET 191 - 4/25/07) | 1 |
| 2. | Most Important Various Facts | 1 |
| 3. | Law . . . . . . . . . . . . . . . . . . | 2 |
| 4. | If the Shoe Fits - Wear It | 2 |
| 5. | Removing the Structures | 3 |
| 6. | Government Appropriates a Benefit to Itself | 4 |
| 7. | Evidence of Ownership | 5 |
| 8. | Taking Has Been Ongoing for 170 Years | 5 |
| 9. | State Law and Property Interests | 7 |
| 10. | General Lack of Logic . . . . . . . . . . . | 8 |
| 11. | Shore Protection by Order of Magnitude without $$$ | 10 |
| 12. | Coup De Grace | 10 |
| 13. | Signature Page . . . . . . . . . . . . . | 11 |
| 14. | Certification of Service | 12 |
| 15. | APPENDIX (Cover) | 13 |
| 16. | Appendix Index . . . . . . . . . . . . . . | 14 |

## TABLE OF AUTHORITIES


| | | Page No. |
|---|---|---|
| 1. | Owen v U. S. 851 F2d 1404 (1988) . . . . . . . . | 2,3,7,8 |
| 2. | Banks v. U. S. 314 F3d 1304 (2003) . . . . . . . . | 2,3 |
| 3. | Nollan v. California Coastal Commission 483 US 825 (1987) | 2,3 |
| 4. | Dolan v. City of Tigard 512 US 373 (1994) | 3 |
| 5. | Peterman v. Michigan Dept. of Natr'l Resources (MDNR) | 7,8 |
| 6. | Kaiser Aetna v. U.S. 444 US 164 (1979). . . . . . . | 7 |
| 7. | U. S. v. Virginia Electric & Power 365 US 624 (1961) . | 7 |
| 8. | Pitman v. US 457 F2d 975 (1972) . . . . . . . . . | 7,8 |
| 9. | Tamulion v. State Waterways Commission 50 Mich.App. 60 (1973) | 8 |
| 10. | United States v. Dickinson 331 US 745 (1947) | 9 |


## STATUTES


| | | |
|---|---|---|
| 1. | 1968 River and Harbor Act P.L. 90-483 Section 111. . . . | 1,3 |

PLAINTIFFS REPLY TO DEFENDANT'S MEMORANDUM
OF CONTENTIONS OF FACT AND LAW (DOCKET 191 - 4/25/07)

NOW COME Plaintiffs, by their attorney, John B. Ehret, and for their REPLY TO DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW, state as follows:

MOST IMPORTANT VARIOUS FACTS

1. These most important facts that are undenied by the government are that the piers were interrupting 30% in 1973,[1] that 30% was replaced by 110,000 cy/yr mitigation,[2] that removing the piers allows resumption of littoral drift (not just 30% but all littoral drift),[3] that wave energy from the north was 2 times wave energy from the south,[4] and that littoral material was not accumulating but was being diverted to deep water.[5]

2. This combination of facts means that 30% equals 110,000 cy/yr, that total loss caused by the piers including diverting equals 110,000 divided by .3 (for 30%) and that the amount of erosion equals the amount of material being removed by the piers. 110,000/.3 = 366,666 cy/yr. Page 37 of the 1973 Detailed Project Report (DPR) shows calculation of erosion was 368,000 cy/yr land loss and 366,660 cy/yr removal of sand (north and south of the piers) from the littoral systen by interrupting, diverting and dredging. [6] A NICE MATHEMATICAL COINCIDENCE!

LAW

3. Defendant's anaylsis suggests that Owen v. U.S. 851 F2d 1404, at 1412 (1988) be ignored where the Court states, "it is not the location of the cause of damage that is relevant, but the location and permanence of the effect of the government action causing the damage that is the proper focus of the taking analysis". The locational focus of erosion has taken time to move south and will continue to take time to eventually destroy the entire shore of Berrien County, Michigan. Paraphrasing slightly for the Federal Circuit, it should not be the time of causation, but the time of effectuation of the damage that is the proper focus of the taking analysis.

4. In Banks v. U. S. 314 F3d 1304 (2003), we have plaintiffs' properties being effected slowly over all the years from the beginning when the piers were started out into the lake, ie 1837. The cause is the piers which were never really necessary for navigation in the first place. They were built to block (interrupt) the sand, which would prohibit[7] erosion of the Lake Michigan shore. From the beginning they had to dredge, and they still do now.

5. The taking is clear from plaintiffs' assertion of Owen at 1413. Plaintiffs have a property right in the replacement sand coming from the north - updrift.

IF THE SHOE FITS - WEAR IT

6. The defendant complains about reference to the Nollan

v. California Coastal Commission 483 US 825 (1987) and the Dolan v. City of Tigard 512 US 373 (1994) cases as being regulatory cases, not to be relied upon for constitutional taking cases. While plaintiffs do not dispute that principle, the mirror image similarities in logic between the Banks and Nollan/Dolan cases offer substantial comfort. Here, the defendant would have navigational sovereignty arising out of a dredging/damming operation in the St. Joseph River mouth several miles away extend to plaintiffs properties above the Ordinary High Water Mark/High Water Mark (OHWM/HWM) where it never existed before. There is no nexus.

7. Here, "justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionallly concentrated on a few persons" (please see Owen id at 1415). Thus the issue of proportionality comes to the surface in the takings context - similarily as in Dolan.

## REMOVING THE STRUCTURES

8. "Removing the navigation structures would allow a resumption of littoral drift and would result in a significant adjustment in the littoral zone north of the harbor. The shoreline would move landward a considerable distance, and the nearshore zone would deepen as littoral materials moved downdrift to establish equilibrium bottom profiles." [3] (1973 Section 111 Detailed Project Report on Shore Damages at St. Joseph - PX93, page 41 paragraph 68).

9. By removing the anti-navigation structures, all the previously captured sand would be released into the littoral zone as originally intended by nature. Of course, the deep water diversion and dredge dumping have been lost forever and ever!! The river sand would now be supplied to the littoral zone causing the presence of sand along the beach to PROHIBIT erosion of the shore per Grahame J. Larson's deposition dated July 14, 2006 186:18. [7] Doctor Larson is defendant's Ph.D. geologist from Michigan State University who has replaced Dr. Nairn in his geologist functioning.

GOVERNMENT APPROPRIATES A BENEFIT TO ITSELF

10. In their Motion for Summary Judgment on Liability dated 12-15-03, plaintiffs posited:[8]

> 17. The original ABC spit extension plan by Lt. Berrien would have had the effect of keeping littoral sand and river sand within the littoral zone.

Defendant's expert, Dr. Robert B. Nairn's answer did not disagree but rather complained that the Berrien plan ... "would have resulted in much more dredging." The government offers no proof of this - especially in light of modern day dual cutter suction hopper dredges as compared to 1860s single bucket by bucket approach. This wastefull approach is an unnecessary exchange of huge public and private property value for perceived pennies in shipping costs.

EVIDENCE OF OWNERSHIP

11. Plaintiffs have not presented their ownership evidence here because:

a. Deeds, Tax IDs and legal documentation have already been provided to defendant by original Complaint and subsequent depositions of each and every plaintiff.

b. This detail seems not necessary to a trial based on liability only.

c. A general, as opposed to a property-by-property approach, has been declared by the Court.

d. The presentation of deeds and depositions suffice to meet plaintiff's burden to prove ownership. The burden therefore shifts to defendant to chall nge ownership based on documentation already provided. That can be done on a property by property basis during damage phase. To prove ownership issues would not be in harmony with efficiency, bifurcation, the general approach and anti-redundancy.

TAKING HAS BEEN ONGOING FOR 170 YEARS

12. Defendant has a fundamental flaw in reasoning. It does not include all material disrupted or interrupted by the piers, but only some imaginary amount which it claims to collect by dredging at the end of the piers. Defendant ignores the sand diverted off the end of the piers in the past. Defendant ignores the wounded natural equilibrium beach contour

caused by sand deprivation for close to 170 years. Defendant ignores the 7 millions of cubic yards already admitted to be dredged and deep dumped. Defendant ignores the river dams it permits and sustains for over 100 years were designed to starve the shore. Defendant ignores the sediment budgets already in evidence for locations north and south of the St. Joseph Harbor where defendant's modeler, Dr. Nairn, found 80,000 cubic meters longshore sand transport southbound at Grand Haven/Saugatuck to St. Joseph to New Buffalo. Those calculations were numerical round-offs from 84,000 cubic meters per year, for sources and sinks(called here a sediment budget). 84,000 cm/y X 1.308 cy/cm = 110,000 cy/y. Defendant ignores the new plan to intercept the plaintiffs' river sand and pump it to a never-to-seldom-used airport updrift on the PAW PAW River.[12,13] Defendant ignores the entire concept of the Bruun rule and the equilibrium beach where underwater sand starvation must ultimately be replenished by landward movement of the shore. Defendant's greatest flaw is in only calculating net littoral drift into shoreline losses when elimination of the piers would :

a. put all accumulated sand back into play in the littoral zone.

b. stop diversion of any and all sand beyond the end of the piers

c. return the river sand to the shore

STATE LAW
AND
PROPERTY
INTERESTS

13. Defendant invites plaintiff into the realm of Michigan State Law to establish its property interests. The Supreme Michigan Court makes itself very clear in Peterman v. Michigan Department of Natural Resources (MDNR) 446 Mich 177 (1994), while at the same time fitting into the concepts of Federal Law which are to prevail in this case. Quotes below are from pages 198, 199 of Peterman.

> Indeed, neither this Court nor the U. S. Supreme Court has ever "held that the navigational servitude creats a blanket exception to the Taking Clause" Kaiser Aetna v. U.S. 444 US 164,172 (197). To the contrary, Michigan law has long held that "the limit of the public's right in the OHWM of the river. This means that the ownership of fast land is unqualified and not burdened with a public right.

14. Peterman goes on to say in FN31 citing U.S. v. Virginia Electric & Power Co. 365 US 624, 628 (1961)

> Since the privilege of servitude only encompasses the exercise of federal power with respect to the stream itself and the land beneath and within its high water mark, the Government must compensate for any taking of fast land which results from the exercise of the power.

15. But Federal law did not protect against interruption of littoral drift until Owen v. US, 851 F2d 1404,1413 (1988) reversed Pitman 457 F2d 975 (1972) saying:

> ... existing sand is moved southward by the littoral drift's currents and new sand from the north is deposited in its place. The loss of such shorefront was due to the blocking of the northern "replacement" sand, causing the drift to remove more sand than it replaced.

After ruling for Pitman as to loss of land located above the oceans high water mark (therefore fast land) the Owen en banc Court went on to limit the horizontal taking of fast land and that language was adopted by Peterman at 199.

> In fact, "an actual taking of fast land which is in part accomplished or accompanied by erosion and deprivation of access is no less demanding of compensation because of these methods or incidents of taking" Tamulion v. State Waterways Commission, 50 Mich,App.60,69 (1973)
> This is so because "there must also be horizontal limits to the bed of a waterway, otherwise, the navigational servitude would extend infinitely in all directions and swallow up any claim for just compensation Owen v. US, 851 F2d 1404, 1410 (1988) .

With this language in mind the Corps cannot forever take shoreline land horizontally after downcutting (or lakebed lowering) as is predicted by the Michigan Department of Environmental Quality (MDEQ) in its recent release of new high risk erosion 60 year set back distances. (Please see Plaintiffs' Memorandum of Contentions of Fact and Law Exhibit 7).

GENERAL LACK OF LOGIC

16. Defendant has two problems (at least) with logic:

a. If there were 30% of the sand returned to plaintiffs, that would not be enough to reestablish sand as shoreline protection because of the lakebed downcutting determined from other Government scientific agencies such as USGS, NOAA and the Waterway Experiment Station in Vicksburg, Mississippi.

b. 30% is not enough to satisfy Dickinson which requires that the government pay for all that it takes. Ownership at the time of the taking in St. Joseph is not the same as ownership at the time of invasion of "fast land" above the OHWM/HWM due to subjacent sand deprivation which has been going on for 170 years. Defendant's Memorandum Docket 191 at page 14 paragraph H8 admits to 110,000 cy/y net littoral drift, but tries to get around that figure by going around its own organization to Canada for low credibility modeling of no better than a factor of TWO (2). Nairn's 50,000 needs only to be multiplied by 2.2 and the longshore transport rate is right back at net 110,000 cy/y. This doesn't take into consideration the fact that if the piers were removed, the entire two fillets (both north and south) would eventually move back south. (Please See Defendant's Memorandum of Contentions of Fact and Law and the 1973 DPR page 59 para. 101 & 102 Gov. 0994).[9,10]

17. If, as Dr. Nairn thinks, the plaintiffs' shoreline protection (SP) is working (if only for now), then the taking of "fast land" has stopped with the extension of SP to Bunkers in 1986/7. The new COSMOS modeling after that is not a fact of consequence. It is not relevant to a takings claim.

According to Dr. Nairn the SP will eventually succumb to downcutting (in the case of glacial till) or lakebed lowering in the case of sand deprivation. This means a total loss on a prospective basis.

## SHORE PROTECTION BY ORDER OF MAGNITUDE WITHOUT $$$

18. Types of SP.
a. Chicago Style 20 to 30 foot wide reenforced poured concrete [11]
b. Bay beaches with rock headlands
c. Steel Sheetpiling with boulders lakeward and landward
d. Boulders only

If cost of "d" is X then "c" costs about 3X and "b" costs about 10X but has the advantage of being permanent and having lake access. "a" costs about 20X and offers no lake access. Both "c" and "d" deny lake access which has about a 50% loss to value of the property and are not permanent. Lake access is in the eye of the purchaser or appraiser or experienced real estate agent.

## COUP DE GRACE

19. The government's defiance of the takings clause of the 5th Amendment couldn't be exemplified more clearly than their new program to dredge river sand at the junction of the PAW PAW/St. Joseph rivers and pump it inland 15,000 river feet. It would have naturally flowed to the shores of Lake Michigan, only 5,000 feet away.[12,13]

Respectfully submitted,

Dated: May 7, 2007

John B. Ehret
Plaintiffs Attorney

20860 Greenwood Drive
Olympia Fields, Il 60461
P. 708-748-8975
F. 708-748-7661
Email: jbehret@covad.net

# Appendix

APPENDIX

| EXHIBIT NUMBER | | PAGE NUMBER |
|---|---|---|
| 0. | MAY 1973 SECTION 111 Detailed Project Report (DPR) On Shore Damage At St. Joseph Harbor Michigan (Cover 0897) | |
| 1. | 1973 DPR Para. 101 & 102 re 110,000 cy/yr, interruption, 30% (Page 59 - Gov0994) | 1 |
| 2. | 1973 DPR Para 10 & 11 re Interruption abt 110,000cy/y (Page A-4 - 1002) | 1 |
| 3. | 1973 DPR Para. 68 Removing the structure allows resumption of littoral drift (P. 41 - 1053) | 1,3 |
| 4. | 1973 DPR Para. 29 re Ratio of southbound wave energy to northbound wave energy is 2 to 1 (p. 12 0922) | 1 |
| 5. | 1973 DPR Para. 88 re 110,000cy/yr interrupted per yr. (P. 49 - 1059) | 1 |
| 6. | 1973 DPR Para. 57 re 368,000 c.y. x 30% = 110,000cy/y (P. 37 - 0958) | 1 |
| 7. | July 14, 2006 Deposition of Grahame J. Larson 186:18 "...presence of sand along the beach would prohibit erosion of the shore." | 2,4 |
| 8. | July 2, 2004 Response to Plaintiffs' Motion for Summary Judgment (page 17 Para. 17. 8.1 is attached to show Lt. Berrien ABC design. | 4 |
| 9. | April 25, 2007 Defendant's Memorandum of Contentions of Fact and Law Page 14 para. 8 & 9 | 9 |
| 10. | 1973 DPR para. 101 & 102 re 110,000 cy/y, interruption and 30% of annual loss (Page 59 - Gox 0994). | 9 |
| 11. | February 19, 2004 Chicago Tribune re seawalls 8miles | 10. |
| 12. | Benton Harbor/St. Joseph Map shows PAW PAW Junction | 6, 10 |
| 13. | April 30, 2007 Color Photos of Corps taking river sand upland to airport by dredge-pipe - 3 times distance to lake shore | 6, 10 |

77

# SECTION 111 DETAILED PROJECT REPORT ON SHORE DAMAGE AT ST. JOSEPH HARBOR, MICHIGAN



U.S. ARMY ENGINEER DISTRICT, DETROIT
CORPS OF ENGINEERS
DETROIT, MICHIGAN
**MAY 1973**

O

GOV000897

101. The plan of improvement considered most suitable for mitigation and prevention of shore damages attributable to the Federal navigation structures at St. Joseph, Michigan, consists of providing feeder beaches for dissipating wave energy which attacks the adjoining backshore areas. Three feeder beaches would be initially provided to prevent the uprush of storm waves from reaching and eroding the bluff and would be located from (a) Park Street to the St. Joseph pumping plant, (b) from the south end of the Michigan State Highway business loop I-94 protection to Hawthorne Avenue, and (c) 1,400 feet of shoreline within the village limits of Shoreham. These sites are selected so that beach material would be distributed by natural shore processes to provide the nourishment required for the unprotected portions of the shore damage area. Since the navigation structures would continue to interrupt the natural littoral drift in the vicinity of St. Joseph, periodic nourishment of the St. Joseph feeder beach at the rate of 110,000 cubic yards per year is also considered necessary to prevent future damages due to the Federal navigation project. Other methods of improvement have been considered and found to be less effective or provide a degree of protection which is normally associated with a regular beach erosion control project.

102. The recommended mitigation measures would eliminate the tangible and intangible losses caused by the interruption of the littoral drift by the St. Joseph navigation project which is estimated to be 30% of the total annual loss. The estimated average annual benefits for 18,400 feet of shoreline affected by the navigation structures is conservatively estimated at $230,000 based on the Berrien County report. The restoration of littoral drift along the Lake Michigan shore would not completely eliminate erosion within the project area. The effects of wind and wave action, violent storms, high lake levels, bluff drainage problems and the normal erosion processes will continue in the project area and other areas. These factors have been considered in the analysis to insure that the proposed plan mitigates damage attributable



R 11/9/73 1

erosion plus erosion due to interruption of the littoral drift. Table A-7 is a summary of the volumetric changes for both the north and south areas due only to interruption of the littoral drift by the navigation structures. The nearshore area south of the harbor has a greater erosion rate than the area north of the harbor.

9. Shore Characteristics. Table A-1 gives the shore characteristics developed for 1954 and for 1971.

10. Determination of Erosion Limits (South Area). The southern limit of the erosion due to interruption of the littoral drift was determined by observing on Figure 6 of the Main Report, nearshore area graph, the distance at which the erosion rate of a section had dropped to 12.00 c.y./yr./l.f. This was determined to occur at a distance of 21,000 feet south of the South Pier. The erosion in the south area was determined to start at a distance of 2,600 feet south of the South Pier. The erosion area, therefore, is 18,400 feet in length or 21,000 - 2,600 feet. The total amount of erosion due to interruption of the littoral drift was determined to be 110,000 cubic yards (see Main Report). This gives 110,000/18,400 or 6.0 c.y./yr./l.f.

11. Feeder Beaches. The loss of material to the south area because of interruption of the littoral drift by the Federal navigation structures has been determined to be approximately 110,000 c.y./yr. This amount of material is to be replaced yearly. The initial placement is to be 278,000 cubic yards and is to be placed in three feeder beaches: the St. Joseph feeder beach, the Hawthorne feeder beach, and the Shoreham feeder beach. The area of influence has been determined to be between 2,600 and 14,000 feet south of the South Pier; the Hawthorne area of influence has been determined to be between 14,000 to 17,800 feet south of the South Pier and the Shoreham area of influence has been determined to be between 17,800 and 21,000 feet south of the South Pier. The 110,000 cubic yards of annual nourishment is divided among the three areas on the basis of the length of the area of influence of each area.



2

GOV001002

such as coal, petroleum products, cement, limestone, and sand and gravel. It was estimated that for the period 1961-1966 these benefits amounted to about $665,000 annually, based on average annual commerce of 452,506 tons. For the period 1960-1969 an average of 490,710 tons of commodities passed through St. Joseph Harbor. This increase in average annual tonnage makes it reasonable to assume that benefits far exceed $665,000. (Up-to-date figures are not available). Removal of the navigation structures would also result in a significant reduction in the number of recreational small craft passages through the harbor. Based on an actual count survey during 1963, the average number of small craft passages through the project was 16,297 and 126,805 sightseers or fisherman used the navigation structures.

68. Removing the navigation structures would allow a resumption of littoral drift and would result in a significant adjustment in the littoral zone north of the harbor. The shoreline would move landward a considerable distance and the nearshore zone would deepen as littoral materials moved downdrift to establish equilibrium bottom profiles. Loss of the area of accretion north of the harbor would eliminate prime recreational beaches and shore developments. Erosion for a considerable distance updrift would occur as beach material moved downdrift to establish natural bottom profiles. The mouth of the St. Joseph River would shoal, eliminating all commercial traffic and significantly reducing recreational boat activities.

69. Shoreland regulation and management techniques which might be applied include zoning, subdivision regulation, building codes, ordinances, permits, acquisition, taxes, condemnation, and evacuation. The zoning regulations for the city of St. Joseph, as furnished by the city, do not contain rules for development of high risk erosion areas. However, the shoreline from the vicinity of 4th Street to Hilltop Road, a distance of 8,500 feet, is zoned for recreational or cultural use. Residences are prohibited. Buildings or premises in this area are for recreational facilities such as amusement parks, beaches, marinas, and cultural facilities including zoological and

3

GOV001053

Their hindcasting procedure assumed the following; (a) wind of less than 10 knots produces waves with negligible wave heights (i.e. < 0.5 feet); (b) all waves were deep water waves with no correction for shallow water; and, (c) the existence of ice cover was ignored.

29. Total hours duration of waves from each quadrant was found to determine the predominant direction of incident wave energy at Muskegon, Michigan. Wave data plotted according to direction and duration at Muskegon, figure 1, represent the closest available data for the St. Joseph area, Muskegon being about 75 miles north of St. Joseph. These data indicate that the ratio of wave energy directed downcoast (to the south derived from waves WNW through NNE) to wave energy directed upcoast (to the north from waves SSW to W) is about 2 to 1 for the full year.

30. The beach erosion control study of Berrien County noted in paragraph 5 presented a table indicating frequency of occurrence of significant deep water wave heights off of Berrien County. That information is reproduced herein as table 1 and presents significant deep water wave heights with no reduction in height for shallow water and refraction. Their frequency of occurrence and incidence of the stated wave heights at the breaking zone would therefore be expected to be less than indicated.

TABLE 1
FREQUENCY OF OCCURRENCE OF DEEP WATER WAVE HEIGHTS OFFSHORE FROM BERRIEN COUNTY

| Frequency | Wave Height in Feet: During Full Year 1 January-31 December | Wave Height in Feet: During Ice-Free Period 1 April - 1 December |
|---|---|---|
| Once each month | 6.5 | 5 |
| Once each 6 months | 9.5 | 8 |
| Once each year | 11 | 9 |
| Once each 2 years | 12 | 10 |
| Once each 5 years | 14 | 11.5 |
| Once each 10 years | 15 | 12.5 |

NOTE: Data in this table are interpolated from data given in Beach Erosion Board Technical Memorandum No. 36, for Stations at Chicago, Illinois and Muskegon, Michigan.

4





4

shoreline is protected by a groin system constructed by individual property owners. These structures appear to have afforded only minimal protection. The shoreline behind these groins would not receive an initial placement of beach fill. However, when the Hawthorne feeder beach and the Shoreham feeder beach immediately to the south dissipate, these groins would retain fill material which would protect the toe of the bluff.

SHOREHAM FEEDER BEACH

87. This proposed feeder beach would extend for a distance of 1,400 feet and consist of about 41 cubic yards of sand per linear foot. As for the Hawthorne feeder beach, material would be delivered to the site by truck where it would be placed in a hopper-conveyor system and transmitted over the bluff's edge and accumulate at the toe of the bluff, as shown on plate 20.

PERIODIC NOURISHMENT

88. Natural losses of the fill material would necessitate periodic replenishment of the beach to insure mitigation of shore damage through restoration of littoral drift. Existing groins in the area will serve to retard losses from the initial feeder beach due to longshore drifting. Losses of feeder beach material would be compensated by providing periodically, through sand bypassing, the material interrupted by the navigation works. The amount of material interrupted annually is estimated to be about 110,000 cubic yards. The provision of 110,000 cubic yards of suitable beach building material would replenish the St. Joseph feeder beach area and would be accomplished by pumping unpolluted material dredged from the harbor entrance channel and a lake borrow area to its north. This unpolluted material would be provided periodically in coordination with maintenance of channel depths within the harbor and would be pumped on the beach from a hopper-type dredge. Natural littoral forces will distribute the material southerly along the shore. The alternatives of bypassing the littoral drift interrupted by the piers by land-based dredging plants and mobile land-based vehicles for the periodic nourishment were also considered. The main objection to land-based plants and vehicles

5

57. To determine total erosion it was assumed that quantities for the foreshore and bluff should relate to the computed nearshore erosion quantity as the ratio of their erosion rates to the nearshore rate.

$$\text{(Total Annual Nearshore Erosion)} \times \left[\frac{\text{(Nearshore)}}{\text{(Nearshore)}} + \frac{\text{(Foreshore)}}{\text{(Nearshore)}} + \frac{\text{(Backshore)}}{\text{(Nearshore)}}\right]$$

$$=(316{,}000 \text{ c.y.}) \times \left[\frac{(17.2)}{(17.2)} + \frac{(0.62)}{(17.2)} + \frac{(2.20)}{(17.2)}\right]$$

$=(316{,}000$ c.y.$)$ $(1 + 0.360 + 0.1279)$

= 367,792 c.y. Total Annual Erosion

Say 368,000 cubic yards

It has been determined, using the information given in table 5, that about 30 percent of the nearshore erosion is due to the Federal navigation project. It is reasonable to assume that an equal percentage of foreshore and backshore erosion would also be due to the project. Accordingly,

368,000 c.y. x 30 percent Attributable to Federal Project

= 110,400 c.y. Annually

Say 110,000 c.y. Erosion Annually Attributable to Federal Navigation Project.

58. LONGSHORE SANDBAR FORMATION

Longshore sandbars are a consistent feature of nearshore topography along the eastern shore of Lake Michigan due to an abundant supply of sand size sediment. The stability and permanency of these features have been noted by numerous investigators. Shore erosion occurs depending upon the effectiveness of longshore bars in dissipating incident wave energy.

59. Profiles 1-5 on plate 7 show well developed bars and troughs on the updrift (north) side of St. Joseph Harbor. (Littoral drift is predominantly north to south). Profiles 1, 2, 3, and 5 show two well developed sandbars. The first bar varies from 6 to 10 feet from trough to crest,

6

Page 185

(indicating). From the map, I can't tell.
Q. Well, you see contour lines, though, on the map.
A. I understand that. But sand means that they physically went down there and collected a sample in order to know whether or not it is sand. And I don't know that they took a sample at each one of these observation points.
Q. Okay. Would you hold the end of that tape for me and set it right on the edge of the shoreline?
A. Beginning where?
Q. At the far end of the paper.
A. Okay. Right there (indicating).
Q. So that's -- we've got a 26-inch distance there, which is almost a straight line, would you say?
A. Um-hmm.
Q. So assuming that there are stratigraphy variations along that shore --
A. Um-hmm.
Q. -- isn't it strange that the shoreline should be so straight?
A. No.

Page 186

Q. Why?
A. Because the actual stratigraphy in itself doesn't override the -- in this instance, the forces that are effecting erosion. Where the stratigraphy starts to become more dominant is up here where the clay gets thicker. That's why you have a 15-degree turn when you were asking about the straightness of the shore.
We have to also include what we see north of St. Joe. And in that point, you start to see a very distinct turn in the aspect of the shoreline, and that is predominantly due to the thickening of the clay that occurs in this region.
Q. Would you say that the presence of sand would inhibit the erosion of the shore?
A. I think -- I'm going to add to your question in my answer. I think the presence of sand along the beach would prohibit erosion of the shore, not just the presence of sand.
Q. Okay. And wouldn't it be probable, that with all the sand out to 3,000 feet, that the waves would wash it up and form the beaches?
A. If you assume that sand is occurring continuously out to 3,000 feet, you would be

Page 187

correct.
Q. Even if it weren't all the way out to 3,000 feet, that would be a boon, wouldn't it, to have 3,000 feet of sand?
A. Again, assuming that it occurs or assuming that it occurs for whatever distance you have described.
Q. So your problem is that you're having trouble making the assumption that the word "sand" means there's sand -- that there's -- the word "sand" is used about 12 times over that entire length of shoreline, and you're -- you're assuming that there's a difference between the word "sand" in one place and the word "sand" in another place?
MR. PETRIE: Objection; it mischaracterizes his testimony.
BY THE WITNESS:
A. My objection is that each one of these numbers, which would -- there are many, many numbers here, all in a crossing pattern and in a parallel pattern, representing measurements of depth. I have no indication to believe that there's a -- that it also represents the occurrence of sand.

Page 188

BY MR. EHRET:
Q. In those days, they didn't have sonar, did they?
A. No, sir.
Q. So somebody -- do you think somebody was out there with a rowboat --
A. I don't know how --
Q. -- and a stick?
A. I don't know how they did this.
Q. But they did do it somehow?
A. They probably used what is called a lead line.
Q. I can't hear you.
A. A lead line. A lead line is a nautical instrument that is used to measure the depth of water. It's basically a lead on the end of a rope that's knotted. And my suspicion is that's what they used.
Q. And the knots are a foot apart or --
A. A foot apart. Or in this case, it would be -- let's see if they use fathoms -- I can't tell you what they used. Yeah, fathoms.
MR. EHRET: Let's go off the record here.



7

The net implication of these various components of net impact to the sediment supply to the shoreline downdrift of the harbor are discussed further and integrated under our response to Point 23.

17. *The original ABC spit extension plan by Lt. Berrien would have had the effect of keeping littoral sand and river sand within the littoral zone. (See EX. 10 B and C.)*

At the time, Lt. Berrien could not have anticipated two future developments: 1) the large increase in the load of river sediment related to the development of logging and agriculture; and 2) the increase in the draft of vessels using the harbor. With these two developments, the layout proposed by Lt. Berrien would have been ineffective in preventing very high sedimentation rates across the proposed harbor mouth. It is likely that the harbor would have often been inaccessible due to sedimentation across the mouth. Furthermore, to keep the harbor open, there would have been much greater dredging requirements (with offshore disposal and loss from the system). Therefore, the plan by Lt. Berrien would have become ineffective through the late 1800's and would have resulted in much more dredging (balancing the reduced fillet beach trapping).

18. *In June 2001 the CORPS' Regional Sediment Management Program (RSM) (EX. 17, p. 14) sets forth as "Overarching goals" — "Wider beaches" and KEEP SAND IN THE LITTORAL ZONE."*

The quoted Ex. 17 does indeed make this statement. The Baird investigation has shown that the Corps has compensated for all sand lost in relation to the harbor since 1971 at the latest.

## CASE LAW AND ARGUMENT

19. *In Banks v. USA 314 F. 3d 1304, January 2, 2003, the Federal Circuit found even greater uncertainty than that caused by the CORPS' mere promises of mitigation in Applegate.*


LAKE MICHIGAN
840 Yd
350 yd
ST JOSEPH
SURVEY
of the
MOUTH OF THE RIVER ST JOSEPH,
MICHIGAN.
1834
8.1
EXHIBIT
10 B
EXHIBIT
68

8.1

direction, shoreline orientation relative to wave direction, nearshore slope, gain size of the sand being transported, wave period, and presence or absence of ice.

7. Net Longshore Transport Rate is a term that describes the difference between sand transported in the two possible longshore directions at a given location, usually represented in cubic yards or cubic meters per average year.

8. In the 1973 Detailed Project Report, the Corps calculated the net longshore transport rate at approximately 110,000 cubic yards per year.

9. Dr. Nairn's calculation of the net longshore transport rate places the figure at approximately 50,000 cubic yards per year. Dr. Nairn arrived at this calculation after using five different approaches or methods. Four of those five methods yielded results that ranged from 40,000 to 50,000 cubic yards/year with one calculating the rate at 71,000 cubic yards/year. He settled upon 40,000- 50,000 cubic yards/year as the best estimate based upon the collective results of these approaches.

10. Dr. Nairn's calculation of 50,000 cubic yards per year is corroborated by the work of Dr. Meadows, plaintiffs' own expert. Work performed by the University of Michigan's Ocean Engineering Laboratory, under Dr. Meadows's direction and approval as a project director, from 1988 until approximately 2004 calculated a long shore transport rate of 50,000 - 60,000 cubic yards for the St. Joseph region.



9

9

101. The plan of improvement considered most suitable for mitigation and prevention of shore damages attributable to the Federal navigation structures at St. Joseph, Michigan, consists of providing feeder beaches for dissipating wave energy which attacks the adjoining backshore areas. Three feeder beaches would be initially provided to prevent the uprush of storm waves from reaching and eroding the bluff and would be located from (a) Park Street to the St. Joseph pumping plant, (b) from the south end of the Michigan State Highway business loop I-94 protection to Hawthorne Avenue, and (c) 1,400 feet of shoreline within the village limits of Shoreham. These sites are selected so that beach material would be distributed by natural shore processes to provide the nourishment required for the unprotected portions of the shore damage area. Since the navigation structures would continue to interrupt the natural littoral drift in the vicinity of St. Joseph, periodic nourishment of the St. Joseph feeder beach at the rate of 110,000 cubic yards per year is also considered necessary to prevent future damages due to the Federal navigation project. Other methods of improvement have been considered and found to be less effective or provide a degree of protection which is normally associated with a regular beach erosion control project.

102. The recommended mitigation measures would eliminate the tangible and intangible losses caused by the interruption of the littoral drift by the St. Joseph navigation project which is estimated to be 30% of the total annual loss. The estimated average annual benefits for 18,400 feet of shoreline affected by the navigation structures is conservatively estimated at $230,000 based on the Berrien County report. The restoration of littoral drift along the Lake Michigan shore would not completely eliminate erosion within the project area. The effects of wind and wave action, violent storms, high lake levels, bluff drainage problems and the normal erosion processes will continue in the project area and other areas. These factors have been considered in the analysis to insure that the proposed plan mitigates damage attributable

Chicago Tribune - February 19, 2004

# Alderman urged to back plan for seawall

By Hal Dardick
Tribune staff reporter 2-19-04

Frustrated by yet another delay in plans to reconstruct the Lake Michigan wall at Promontory Point, a group of Hyde Park residents urged their alderman in an open letter Wednesday to accept a Chicago Park District compromise plan for the project.

More than 140 residents signed the letter to Ald. Leslie Hairston (5th), which came after the Community Task Force for Promontory Point recently rejected the plan.

Not accepting the plan would be "irresponsible," because federal funding for the project could dry up, said Peter Rossi, a University of Chicago professor who led the letter effort.

Rossi said the task force, of which he is a former executive committee member, has failed to reach an agreement with the district after nearly three years of discussions and months of mediation that last month came to an impasse.

If the two sides fail to agree in the next year or so, the project—part of a federally funded, ongoing $301 million project to rebuild eight miles of walls along the lake's shoreline—could be washed away by the dispute, district officials said.

"By 2005, we could be looking at the project possibly not happening," district spokesman Julian Green said. "It's possible, with these delays, that congressional funds will be lost."

The project was first scheduled to start in fall 2001. Activists in January of that year publicly panned the city's preliminary $22 million plan, which called for replacing the limestone revetment, a set of four large stairs that serves as a seawall, with a cement structure.

The district, city Department of Environment and the U.S. Army Corps of Engineers then placed the project on hold, hoping for a consensus.

After nearly three years of debating the issue, mostly through the media, all sides agreed last year to mediation proposed by the not-for-profit South East Chicago Commission, a group funded largely by the University of Chicago.

Hairston last week called together engineers from the city, the task force and a mediator and asked them "to make an earnest and honest effort" to evaluate the costs of an all-limestone revetment. She said she plans to meet Thursday with Park District General Supt. Timothy Mitchell to discuss the issue.

$301,000,000 over 8 miles equals $37,625,000 per mile

or

$7,125 per foot

11

11


BENTON HARBOR
&
ST. JOSEPH
APPROXIMATE SCALE
INSET A
LAKE MICHIGAN
SOUTHWEST MICHIGAN REGIONAL AIRPORT
BENTON HARBOR
ST. JOSEPH
49085
49022
BENTON
12



APRIL 30, 2007 JUNCTION OF PAW PAW & ST. JOSEPH RIVERS
U. S. ARMY CORPS TAKING SAND INLAND FOR NEW RUNWAY EXT.

LOCATION: About 5,000 feet to Lake Michigan Shore
About15,000 river feet to SWMRA

Carole



13

CERTIFICATE OF SERVICE

I, the attorney, John B. Ehret, do hereby certify that on the 7th day of May, 2007 I caused to be electronically filed the PLAINTIFFS' REPLY TO DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (DOCKET 191 - 4/25/07) on the below listed attorneys of record:

Terry M. Petrie
Trial Attorney
U. S. Dept. of Justice
ENRD
1961 Stout Street 8th Floor
Denver, CO 80294
P. 303-844-1369
F. 303-844-1350
Terry.Petrie@usdoj.gov

Eugene J. Frett,ESQ.
SPERLING AND SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, IL 60603
P. 312-641-3200
F. 312-641-6492

Drew W. Marrocco, Attorney
SONNENSCHEIN NATH & ROSENTHAL
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
P. 202-408-6387
F. 202-408-6399
dmarrocco@sonnenschein.com

Heide L. Herrmann, Attorney
U. S. Dept. of Justice
P. O. Box 663
Washington, DC 20044-0663
P. 202-305-3315
F. 202-305-0274
Heide.Herrmann@usdoj.gov

Dated: May 7, 2007

John B. Ehret
Attorney for Plaintiffs
John H. Banks et al