**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
No. 99-4451 L
c/w 04-277 L, 05-1353 L, 05-1381 L, 06-72 L

| | | |
|---|---|---|
| JOHN H. BANKS, MARY E. BANKS, et. al. | ) | |
| | ) | No. 99-4451 L |
| Plaintiffs | ) | |
| v. | ) | Judge Emily C. Hewitt |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| EUGENE J. FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust and DONNA P. FRETT, | ) | |
| | ) | No. 05-1353 L Consolidated |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPENING POST TRIAL BRIEF**

# TABLE OF CONTENTS

Page


ACRONYMS OR ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF QUESTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF CASE – GENERAL

ZONE OF INFLUENCE OF THE NAVIGATIONAL STRUCTURES. . . . . . . 1

WAVES, ENERGY, LITTORAL DRIFT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SHELTERING EFFECT OF PIERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

THE PIERS (IM) PERMEABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

REMOVAL OF MATERIAL FROM THE LITTORAL SYSTEM . . . . . . . . . 11

EFFECTIVENESS OF BEACH NOURISHMENT PROGRAM . . . . . . . . . . 11

SIX PLAINTIFFS TESTIFIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Marsha Wineberg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Dick Marzke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Don Miller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Gail Chapman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Bob Melcher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Carole Ehret . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

PLACEMENT OF DREDGED MATERIAL . . . . . . . . . . . . . . . . . . . . . . . . 19
DREDGING, POLLUTION AND MITIGATION . . . . . . . . . . . . . . . . . . . . 22
LAKE MICHIGAN IS RECEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
DAMS, JETTIES AND SAND SUPPLY . . . . . . . . . . . . . . . . . . . . . . . . . 26
ST. JOSEPH RIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
WHAT DIFFERENCE DOES IT MAKE? . . . . . . . . . . . . . . . . . . . . . . . . 28
SUMMARY STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . 31

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**ACRONYMS OR ABBREVIATIONS**
**USED IN PLAINTIFFS' POST TRIAL BRIEF**

| | | |
|---|---|---|
| ACOE | .................................. | Army Corps of Engineers |
| CERC | ................................... | Coastal Engineering Research Center |
| CHL | .................................. | Coastal Hydraulics Lab |
| CSEB | .................................. | Coastal Structures and Evaluation Board |
| DDC-DPR | .................................. | Detroit District Corps Detailed Project Report |
| DPR | .................................. | Section 111 Detailed Project Report |
| FERC | .................................. | Federal Energy Regulatory Commission |
| HQUSACE | .................................. | Headquarters U. S. Army Corps of Engineers ("Sponsored" PX24) |
| LZ | ................................ | Littoral Zone |
| MCCP | .................................. | Monitoring Completed Coastal Projects |
| MDEQ | .................................. | Michigan Department of Environmental Quality |
| NOAA | .................................. | National Oceanic and Atmospheric Administration |
| OHWM | ................................. | Ordinary High Water Mark |
| PZ | ................................. | Plaintiffs' Zone |
| PX23 | .................................. | Technical Report CERC-96-10 June 1996<br>Geological Effects on Behavior of Beach Fill and Shoreline Stability for Southeast Lake Michigan |
| PX24 | ................................... | Technical Report CHL-97-15 July 1997<br>Effectiveness of Beach Nourishment on Cohesive Shores, St. Joseph, Lake Michigan |
| SSP | ................................. | Steel Sheet Piling |
| USGS-NOAA | ............................ | United States Geological Survey<br>National Oceanic and Atmospheric Administration |
| WES | ................................ | Waterways Experiment Station ("Conducted" PX94) |
| ZOI | .............................. | Zone of Influence |

## TABLE OF AUTHORITIES

Page No.

Banks v. U.S., 314 F.3d 1304 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Dolan v. City of Tigard, 512 U.S. 373 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Kaiser Aetna v. U.S., 444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Nollan v. California Coastal Commission, 483 U.S. 825 (1987) . . . . . . . . . . . . . . . . . . . 35-36

Owen v. U.S., 851 F.2d 1404 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Peterman v. Michigan Dept. of Natr'l Resources,446 Mich 177, 521 N.W. 2d 499 (1994) . . 44

Pitman v. U.S., 457 F.2d 975 (Ct. Cl.1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Ridge Line Inc. v. U.S., 346 F.3d 1346 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Tamulion v. State Waterways Commission, 50 Mich. App. 60, 212 N.W. 2d 828 (1973) . . 45

Tahoe - Sierra Preservation Council v. Tahoe Regional Planning, 535 U.S. 302 (2002) . . . 38

United States v. Dickinson, 331 U.S. 745 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. General Motors Corp., 323 U.S. 373 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Virginia Electric and Power Co., 365 U.S. 624, 628 (1961) . . . . . . . . . . . . 44

## STATUTES

River and Harbor Act P.L. 90-483 Section 111

Navigation & Navigable Waters P.L. 106-180 33 USCA 426i

U.S.C.A. Constitutional Fifth Amendment

Title 28 U.S.C. 1491 Tucker Act

## QUESTIONS

1. Did the piers at St. Joseph Harbor remove some or all littoral material from the littoral zone?

2. Did the dams on the St. Joseph River block river sand from the littoral zone?

3. Did the configuration of the shore perpendicular structures at St. Joseph direct the river sand out of the littoral zone?

4. Did Section 111 River and Harbor Act of 1968 effectively place beach sand in the littoral zone?

5. If the PX68 1834 survey recommendation of Lt. Berrien for the configuration of the harbor had been followed, would all the littoral material and all the river sediment have stayed in the littoral zone?

6. Is the net littoral drift in the area south of St. Joseph in the plaintiffs' zone from the north to the south?

7. Is the lake bed south of St. Joseph in the plaintiffs' zone composed of cohesive material (clay) covered by glacial till?

8. Does it really make any difference if it (lake bed) is clay or sand as long as the navigational structure at St. Joseph is a total barrier to littoral drift?

9. Does downcutting have the same effect as lake bed lowering on the prospective erosion along the shore?

**ZONE OF INFLUENCE OF THE NAVIGATIONAL STRUCTURES**

1. Charles Lyle Thompson, Ron Erickson and Larry Parson led a two-day tour of invitees. Their brochure describes "the reach of coastline under the influence of the federally maintained navigation structures at St. Joseph Benton Harbor" PX 113-2 Great Lakes Coastal Geology and Coastal Engineering , Southeastern Lake Michigan.

2. The 1973 Detroit District Corps Detailed Project Report (DDC-DPR) (PX 93 Plate 17 - GOV0976) definition of zone of influence shows the erosion zone extends to 20,900 feet south from the St. Joseph Harbor.

3. PX 113-2 of day two dated 1 May 1994 extends this definition to the Warren Dunes on the south, saying that, "Day two . . . we will focus on the reach of coastline under the influence of the federally maintained navigation structures at St. Joseph Harbor." Earlier the field trip is laid out as being . . . "from about two miles north of St. Joseph to the vicinity of Grand Mere Lakes." The southerly boundary is about the same as that covered by the USGS-NOAA Bathymetry Difference Map shown in PX33-23 Figure 11, namely 42° north latitude.

4. The caption on Figure 11 states:

> Difference in depth between NOAA 1945-46 and 1991 surveys. Warm colors show erosion; as much as 4 vertical meters of lake bed have been removed by erosion south of St. Joseph.

5. PX33 is a Cooperative Undertaking by the USGS-NOAA Office for Mapping and Research dated May 1992. The body of the MAPPING PROJECT at PX33-10 states as follows

> We suggest that the wave-induced currents scour the lake floor resulting in erosion of the till * and generation of coarse lag deposits. This process appears to be more active off Shoreham, where historically coastal bluff (Buckler 1981) and lake bed (fig. 11) erosion have been severe. The harbor jetties to the north of this area have effectively trapped some of the southerly littoral drift which

has resulted in a sediment starved nearshore area to the south; sand cover, therefore, is not sufficient to protect the till * from erosion.

* USGS-NOAA considers the shore is till from St. Joseph to New Buffalo.

6. All three of the authors of the PX 113 (30 April 1994 - Great Lakes Coastal Geology and Coastal Engineering, Southeastern Lake Michigan) attended the PX 33 (May 1992 U.S. Great Lakes Shoreline Mapping Project WORK SHOP on March 17, 1992 - Undertaken by USGS and NOAA).

| | |
|---|---|
| Ron Erickson | PX33-39 |
| Charles Thompson | PX33-41 |
| Larry Parson | PX33-41 |

The WORKSHOP was a one day event held March 17, 1992 at Western Michigan University at Kalamazoo, Michigan.

7. It is significant that Larry Parson co-authored both PX23 and PX24 with Dr. Robert B. Nairn. PX23 page vi (Preface) identifies Larry E. Parson as being employed by the Coastal Structures Evaluation Branch (CSEB) of the Waterways Experiment Station's (WES) Coastal Engineering Center (CERC) located at Vicksburg, Mississippi (described in PX23 on Back of Cover Page). The Preface page vi states that "The Investigation summarized in this report was conducted by the U. S. Army Engineer Waterways Experiment Station's (WES's) Coastal Engineering Center (CERC) and was selected for study and funded by the Monitoring Completed Coastal Projects (MCCP) program.

8. WES, CERC, Larry E. Parson and Dr. Andrew Morang (also CSEB and co-author with Dr. Nairn of PX23) are not shown to have joined with Dr. Nairn in his May 2006

litigation report. Nor was WES involved in the funding. According to his testimony 1327:1 - 18 Dr. Nairn was paid $1,000,000 by the Department of Justice.

9. During Dr. Guy Meadows' expert trial testimony (51: 21through 54:22) he answered questions about the USGS-NOAA depth difference map shown on PX33-23 Figure 11. That map showed as much as 4 meters vertical removal of lake bed between 1945-46 and 1991 in certain areas south of St. Joseph to Grand Mere.

10. Dr. Guy Meadows testified that he considered the erosion rate would have continued in the years from 1991 to the present (15 years). The rate was calculated at 4 meters divided by 45 years to be 3.5 inches per year or about 53 inches. That amount of erosion would be added to existing erosion. At 54: 17

> And if those areas - if the sediment is continued, not to be supplied from the north, then the length of the area that is eroding will continue to expand because the only source is eroding of the bottom once the sediment supply from both the north and from the shoreline is shut off.

**WAVES, ENERGY, LITTORAL DRIFT**

11. The 1973 Detail Project Report, PX93, page 12, paragraph 29, states:

> Wave data plotted according to direction and duration at Muskegon, figure 1, represent the closest available data for the St. Joseph area, Muskegon being 75 miles north of St. Joseph. These data indicate that the ratio of wave energy directed downcoast (to the south derived from waves WNW through NNE) to wave energy directed upcoast (to the north from waves SSW to W) is about 2 to 1 for the full year.

12. Meadows transcript 47:13 to 47:18

> There is also a significant fraction that moves a substantial distance away that is not accounted for. There is no practical way. If you take a large quantity of sand and distribute it over a large part of the bottom of Lake Michigan, it is indistinguishable with any surveying technique.

PX115 and PX93-39a Figure 7 demonstrate Dr. Meadows' point.

13. The 1975-1984 U.S. ACOE Interim Monitoring Report, St. Joseph Harbor (PX32) was prepared as a supplement to the Section 111 Detailed Project Report (DPR) dated May 1973 (per PX32, page 1, paragraph "Purpose"). It adopted the Section 111 DPR determination "that the annual wave energy towards the south is about twice that directed toward the north" (PX32, page 5).

> The net southward direction of drift would also be expected from the Section 111 DPR conclusion that annually twice as much wave energy is directed south as compared to wave energy directed north . . . . . The Section 111 DPR determined the net littoral transport interrupted by the harbor structure to be 110,000 cubic yards per year based on available topographic and hydrographic data for the period of 1907 to 1971.

(<u>Note:</u> The above is a mathematical statement that Southbound Wave Energy $S_B$ equals 2 times Northbound Wave Energy $N_B$ . It also states that $S_B$ - $N_B$ = 110,000 cy/year. Detroit District Corps documentation adheres to this principle as late as January 2000 in the Section 111 Annual Monitoring Report for FY 1999) (PX41 page 4).

14. Table 2 column captioned "Authorized Average Quantity" states 110,000 cubic yards.

Table 2 (PX41) has a last column captioned "Cumulative Shortfall" which shows 327,000 cy for St. Joseph Harbor as of FY 1999.

PX23 page 9 provides WAVE CLIMATE data based on hindcasting information for 27 years in the St. Joseph area. PX32-5 was for a 3-year period.

The predominate direction of wave approach is from the southwest. (PX23-9)

Mean Wave Height ($2.6^2$ ft) times period * 4.0 sec.

2.6 squared x 4.0 = 27.04,

An indication of relative wave energy (PX23-E1)

* A period is the time period from wave to wave.

The predominate wave energy approaches from the north and northwest. (PX23-9)

Mean Wave Height ($3.9^2$ ft.) times period 4.8 sec.

3.9 squared x 4.8 = 73

An indication of relative wave energy (PX23-E1)

This Ratio of Energies calculates to 2.7 with the southbound energy dominating the northbound energy even more than was expressed by the Section 111 DPR (PX93-12) and adopted by the Monitoring Report (PX32-5).

15. PX 24 is the Effectiveness of Beach Nourishment on Cohesive shores, St. Joseph, Michigan "conducted by the U. S. Army Engineer Waterways Experiment Station (WES)." PX2 - v., PX24-17 states that "net transport values . . . fall in the range of approximately 70,000 to 80,00 $m^3$/yr (91,555 cy/yr to 104,640 cy/yr.)."

16. Further on Page 17, "the southward directed transport component ranges from 375,328 $m^3$ (490,929 cy/yr) at Line R8 (PX24-18 and 19) to 170,794 $m^3$/yr (223,398 cy/yr at R14."

17. Still on PX24-17 the Effectiveness Report settled on using values for the important southward directed transport component which ranged from 159,500 $m^3$/yr (208,626 cy/yr) at line R9 to 79,900 $m^3$/yr (104,500 cy/yr at Line R14. This range of values corresponds more closely to the 84,000 $m^3$/yr (110,000 cy/yr) which was estimated by USACE

(1973) to be trapped on the north side of the harbor. One would expect similar values for profiles located north of the harbor.

(R8 is just south of the jetties. PX24-19)

**SHELTERING EFFECT OF PIERS**

17a. PX94-19, PX Summary Tab 7.3 shows 110,000 cy/y southbound at St. Joseph 1322:3 - 22.

17b. PX Summary TAB 7.4 (1322: 3-22) shows uniform southbound “net beach drift” on the southeastern Lake Michigan shore based on E. B. Hands ‘ actual observations of displaced river mouths and sand accumulations updrift.

18. PX24-17 states “Sediment trapped on the north side of the harbor is derived entirely from the southward directed transport component (i.e., waves from the south have little or no effect on the sediments trapped in the shadow of the north jetty).”

19. PX24-60 states . . . bathymetry comparison showed that the lake bed north of R8 (about 1575 feet south of piers) was stable or accretional. This area is in the lee of the harbor jetties and any sand transported into this zone is effectively trapped (i.e., because of sheltering from northerly wave attacks).

**THE PIERS (IM) PERMEABLE**

20. Dr. James P. Selegean (647:10-15) testified from PX132 -18 Paragraph 50 which states:

> The initial section of the north pier constructed in 1836 was the first structure built in the area. This pier consisted of an impermeable wooden crib and extended for a distance of 1,023 feet, from the United States Coast Guard Station lakeward to what is now the angle point in the north pier.

21. During cross examination by attorney Ehret, Dr. Selegean testified from PX 136 as to the condition of the pier in 1865 (29 years later)

**<u>COMMENTS PROCEEDING FROM LAKEWARD TO LANDWARD</u>**

| | | |
|---|---|---|
| Partially decayed | ↕ | |
| Decayed | | |
| Considerably decayed | | |
| Decayed | | |
| Very badly decayed | | |
| Badly decayed | | 24' wide |
| Very badly decayed | | |
| **Halfway or 450 feet** | | |
| New pier | | 30' wide |
| New pier | | 14' wide |
| **About 200 feet** | | |
| Very much decayed and broken | | 12' wide |
| Considerably decayed | | |
| Considerably decayed and very little stone | | |
| Decayed - very little stone | | |

Lake bottom on south about 1 ft. above lake bottom on north for 1/2 the length measured from lakeward to landward.

22. Based on Dr. Selegean's advice during trial plaintiffs have focused on the alphabetically dimensioned pier drawing provided as part of PX93 - Plate 2 and the PX93 - Plates 3, 4 and 5 which show stone filled crib substructure along the entire length of both piers with dimensions and dates of modifications or repairs. Drawings are dated 1968, 1963 and 1962 respectively (i.e., 3, 4, 5)

# Table of Pier Sections

| | ALPHABETICAL | Feet Length | *1* SUB STR | *2* SUPER STR | *3* REPAIR SSP ENC | WIDTH | COMMENTS |
|---|---|---|---|---|---|---|---|
| | A1 | 40 | 1903 | 1931 | 1952 | 35' | |
| | A3 | 161 | 1903 | 1931 | 1961 | 36' | |
| | A2 | 107 | 1903 | 1931 | 1953 | 35' | |
| | A3 | 401 | 1905<br>1903 | 1931 | 1961 | 36' | |
| | A4 | 171 | 1884<br>1893 | 1931 | 1963 | 36' | |
| | A | 576 | 1880.1<br>1893 | 1931 | X | 30' | |
| | B | 354 | 1903 | 1825.9<br>1931 | | 24' | |
| Elbow or Angle Point | *SUBTOTAL* | 1,810 | | | | ➜ | Elbow or Angle Point |
| | C | 96 | | 1836<br>1836<br>1927 | 1961 | 24' | OLD CRIB |
| | D | 279 | | 1836<br>---<br>1927 | 1961 | 50' | OLD CRIB |
| | E | 573 | | 1836<br>---<br>1919 | 1961 | 24' | |
| SOUTH PIER | | | | | | | |
| | $F_1$ | 385[1] | | 1903 | 1963 | 36' | |
| | F | 597[1] | | {1934<br>“ | X | 36' | UNREPAIRED |
| | G | 376[1] | | 1903<br>1934 | X | 24' | UNREPAIRED |
| | H | 426[1] | | 1903<br>1925 | X | 24' | UNREPAIRED |
| | I | 319[1] | | 1900<br>1927 | X | NA | UNREPAIRED |
| | J | 287 | | 1899<br>1941 | X | NA | UNREPAIRED |
| | K | 35[1] | | 1899<br>1941 | X | NA | UNREPAIRED OLD CRIB |
| | L | 170 | | 1924<br>1941 | X | NA | UNREPAIRED OLD CRIB |

***NOTE:*** ***1 = SUBSTRUCTURE*** ***2 = SUPER STRUCTURE***
***3 = REPAIRED STEEL SHEET PILING ENCASEMENT***

23. PX24-27. The investigations conducted by Waterways Experimental Station (WES) and the Coastal Hydraulics Lab (CHL) touches the permeability issue and was discussed in Dr. Nairn's trial testimony (1291, 2) cross examination. His testimony seemed to raise a question as to when the steel encasement took place. The afore going sectional tabulation is an attempt to consider that.

24. Based on Nairn's statement at PX24-27 page 8 that:

> Landward of the channel entrance, the harbor jetties due to their sheet-pile construction, were assumed to be complete barriers to alongshore transport.

On its face the quote would seem to give us an end point in time at which we can assume as Nairn did that the jetties were effectively complete barriers to alongshore sand transport. That leaves a large gap in time from May 1973 when the DDC-DPR was dated and the time when PX24 was released.

25. There is a PX58, however, which has been admitted into evidence as an Environmental Impact Statement for

> rehabilitation of the north and south piers along sections A, B, and H by installing steel sheet piling on both sides of the existing structures, backfilling with stone, placing a concrete cap with new handrails, and placing toe stone

26. A is 576 ft., B is 354 ft. and H is 426 ft. Based on A1, A2 and A3 which were 30 feet wide, before encasement and were 36 feet wide afterwards, we would expect the encased A, B and H to have put on 6 feet in width after steel encasement.

27. Retired Corps Physical Scientist Charles L. Thompson testified on June 5, 2007. His PX113 Figure 9 still shows no steel encasement of Section A, but at PX113-4 the tour

guide authors offer some helpful information, dated 30 April 1994.

> "In the past, the jetties were wooden, rock-filled cribs that transmitted a significant amount of wave energy. In addition, the lower crest elevation of the original jetties allowed wave overtopping, further reducing wave energy."

28. Richard A. Voss testified that as a 10 - year old (1946-1956) he used to swim under the north pier. (789:9, 790:10).

29. Plaintiff Carole L. Ehret, Page 29, presented a PX Summary TAB 1, pages 29-30, showing rotted/shattered wooden seawall shore protection dated 4-15-98 after only 12 years in service.

30. Physical Scientist Charles L. Thompson testified (446-451) that he typed the 21 June 1994 MEMORANDUM FOR RECORD (PX 61-2) which recorded a panel answer to a Shoreham, MI resident's question.

> Q. "Does the Corps feel the 110,000 cubic yards per year is addressing 30% of the erosion?"
>
> A. "There is no way of knowing. The only answer that can be given is that the DPR stated that the harbor structure is blocking 30% of the littoral material coming from the north and that placing 110,000 cubic yards per year would replace the lost material."

31. During his testimony (467:10 - 468: 25) Charles L. Thompson indicated that steel encasement of jetties would be a form of sand sealing (468:4-9). PX114 - 1 through 8 addresses at least a dozen sand sealing successes.

**<u>REMOVAL OF MATERIAL FROM THE LITTORAL SYSTEM</u>**

32. Charles Thompson testified (436:15- 438:18) that he authored PX41 which is the

FY 1999 Monitoring Report. That report states as follows at the last two paragraphs of PX 41 Page 3.

> For most of the federal harbors, the removal of sand from the littoral transport system has been occurring from the time of construction; in some cases for over one hundred years. Mitigation programs only began several decades ago. At several of the older harbors, it is theorized that this long period of sand removal from the littoral system may have created an enormous deficit in the sand supply, triggering lake bed downcutting that may have contributed to the creation of areas of severe and continuing erosion.

**EFFECTIVENESS OF BEACH NOURISHMENT PROGRAM**

> In simple terms, any adverse effects associated with the federal harbor structures is the result of the disruption of littoral processes; specifically the removal of material from the littoral system. The beach nourishment program is designed to mitigate this disruption by replacing that material.

32a. Charles L. Thompson testified 418: 2-4 that he authored most or all of PX32 entitled INTERIM MONITORING REPORT for St. Joseph Harbor Michigan FOR THE PERIOD 1975 - 1984. PX32-17 states:

> For the entire period 1975 to 1984, the net direction of sediment transport was to the north. The result indicates the combined effort of wind direction and wind energy was more out of the southwest than for the long-term average which indicates a long-term net drift to the south.

PX32-21 states:

> Based on the hindcast sediment transport, the net drift for April 1977 to November 1984 period was 1,850 cy/yr to the north.

**<u>ARGUMENT - COMMENT</u>**: This indicates a total lack of effectiveness of the nourishment program. None of the sand would have reached the plaintiffs' zone.

Even worse is the fact that all the sand would be <u>removed</u> from the littoral system because of the presence of the piers in their shore perpendicular position as opposed to the

PX68 position planned by Lt. Berrien in 1834. That would have been about 80° south of the present azimuth of 290°.

The CORPS REPORT PX24 - 79 says that the jetties at St. Joseph act ". . . as a total littoral barrier, trapping all sediment reaching this area from either the north or the south.

33. PX24 -79 Nairn states:

> . . . the combination of the long jetties and the deep navigation channel act as a total littoral barrier, trapping all sediment reaching this area from either the north or the south.

34. PX24-27 Nairn states:

> Landward of the channel entrance, the harbor jetties due to their sheet - pile construction were assumed to be complete barriers to alongshore transport.

35. During his testimony 1332:3-10 Dr. Robert B. Nairn was asked to review the 1834 Survey of St. Joseph Harbor by Lt. Berrien showing the river discharge about 80° south of its present location (PX68) and an A, B, C pier extended off the sand spit:

> Q. If the southward plan by Lt. Berrien had been adopted, then all of the river sediment and all of the littoral drift would have remained in the littoral zone. Isn't that true?
> A. Yes.

36. Dr. Guy A. Meadows of the University of Michigan testified as follows:

Pages 161-4 through 162-21

> Q. Would you turn to Exhibit Number 24, page 79 please. The second from the last - second from the bottom paragraph, the last sentence, would you read that please.
> A. 'The bypassing analysis showed that the combination of the long jetties and the deep navigation channel x is a total littoral barrier trapping all sediment reaching the area from either the north or the south.'
> Q. Would you refer to paragraph or to page 18 and Table 3.
> A. Yes, sir.
> Q. And the nearest profile to the jetty would be Number 8. Is that correct?

A. That's correct.
Q. And the transport positive-the note at the bottom of the table says the positive number is transport to the south. Positive transport is south.
A. That's correct.
Q. So the south transport at Profile 8 is 375,328, is that correct?
A. That's correct.
Q. And what is the transport from the north, which is the minus number?
A. Minus 306,278.
Q. So if Dr. Nairn, if you follow his indication that this would be trapping all sediment reaching this area from the north or south, in order to get the total amount of trapping you would add those two numbers together, wouldn't you?
A. Yes.
Q. And just using the first three digits, what would you come up with?
A. 681,000 cubic yards.
Q. So that would be the amount trapped at the piers?
A. Yes.
Q. And that would be taken out of the littoral system, would it not?
A. Yes.
Q. And is there any reason to believe that this report is any worse than the post -litigation report, or any better?
A. No, sir.
Q. So that you would look at them both as being equal?
A. Yes.

**SIX PLAINTIFFS TESTIFIED**

37. The six Plaintiffs who testified are listed below, arranged as their property is located from north to south with approximate distances in feet from the St. Joseph piers. Also shown are the PSummary Tab Ames Aerial Photo Number used to identify the individual plaintiffs' property.

| **Plaintiff's Name** | **Distance to Piers** | **Identification Number of Ames Aerial Photo** |
|---|---|---|
| Marsha Wineberg | 19,200 ft. | 61/60 |
| Dick Marzke | 24,400 ft. | 50/49 |
| Don Miller | 33,200 ft. | 32/31 |
| Gail Chapman | 34,000 ft. | 30 |
| Bob Melcher | 38,000 ft. | 18 |

| Plaintiff's Name | Distance to Piers | Identification Number of Ames Aerial Photo |
|---|---|---|
| Carole Ehret | 41,600 ft. | 12 |

38. Marsha Weinberg was the first and northernmost plaintiff to testify. She testified (241:15 through 255:16) that she and her husband (now deceased) had purchased the property in about 1975. Since purchase, she has lost about 210 feet of lakefront, about 100 feet deep and 85 feet in elevation including about 10 mature trees. Ms. Wineberg is about 19,200 feet from the piers in St. Joseph. She is located within the Section 111 Corps designated erosion zone and zone of influence (Z0I) PX93 Plate 17 GOV0976. (Please note: Plate 17 shows the Z0I ends south of the St. Joseph piers by the sum of 6000', 5500', 4100', 2800', and 2500', equaling 20,900 feet.)

39. Ms. Wineberg used PX Summary Tab 4 photos 61 and 60 to identify/locate her property and describe the Corps Section 111 feeder beach and her own shore protection consisting of 52/54 four-foot cube concrete blocks. The Corps feeder beach was gone in two years and the erosion has continued with the Michigan Department of Environmental Quality (MDEQ) (P X Summary Tab 8 - PX135) establishing new setback requirements by their February 9, 2007 letter. The MDEQ has not responded to her request to reduce the 30-year setback from 275 feet and the 60-year setback from 535 feet.

40. Dick Marzke (Transcript dated June 7, 2007 - 886:1-25 through 893:16 ) identified his property through PX Summary Tab 4 page 50 and a supplemental aerial photo from 1977.

a. he recently sold his property (about 2003) which he bought in 1969. At that time there was a complete bluff with trees to the bottom, intact seawall and stairs to

the beach with sand.

b. he now lives about a mile north of the jetties on the shoreline. There are no shore protections for his property. His neighbors also have no shore protection.

c. he had moved his 1969 house back from the bluff. This required that he tear down two other smaller houses which blocked the way. The house he moved was identified by the red roof. There was no pool as there is now.

d. the original full width of his bluff had vegetation and trees to lake level. A clear line of trees marked the southerly parcel line for his property.

e. The PX Summary Tab 4 Page 50 showed that he had lost the majority of the vegetated bluff during his ownership.

f. he had no beach and no lake access at the time he sold.

41. Don Miller testified that:

a. he had owned his property since the sixties.

b. he had a 200-foot wide beach in those days.

c. his home was originally about 50 feet from the edge of the bluff `which had about 70 very tall trees between the house and the bluff. The trees are gone. He has a large photo in his living room where he could count the trees.

d. he tried numerous shore protection systems, including steel sheet piling, back filling, landscaping and boulderizing.

e. he worked his systems with neighbors to the south.

f. PX Summary Photo Tab 4 Numbers 32/31 shows his property condition in September of 2005 by Aerial Photo. Mr. Miller referred to Tab 4 Photos 32/31 to identify his property and show his shoreline boulderization.

g. Miller still owns his property.

42. Gail Chapman referred to PX Summary Tab 3 Pages 1-25:

a. first located her property just south of Miller - PX Summary Tab 4 Page 30.

b. PX Summary Tab 4 - 30 showed the present inundated boulderized condition of her property.

c. PX Summary Pages Chapman 2 through 21 showed the various stages of shore protection attempted by Don and Gail Chapman, including poured stepped concrete wall, Z wall, bulldozer , backfilling, steel sheet piling, Polyx filter cloth, wood pilings, and 3 to 4 ton boulders.

d. showed even currently having no sand beach with the lake at near all time low conditions.

e. explained having a Masters in Library Science from the University of Michigan and assisting Ehret in researching the early history of the St. Joseph Harbor including the piers and the button factories upstream of St. Joseph on the river.

f. being an inveterate beach comber in hunt of fossils and Indian artifacts of all ages and button factory debris uncovered by the disappearing littoral sand.

43. Bob Melcher by use of his photos and tabulated HISTORY OF EROSION ACTIVITIES PX Summary Melcher Cover 1 through photos 1 - 16 showed:

a. Aerials he purchased from 1971 when he bought his land and built on his property. Photos 1 & 2.

b. sand bag protection 1989

c. wood wall protection 1983

d. 2nd wood wall 1985 and 1986

e. destroyed wood wall 1997 (Photos 11 and 12)

f. new vinyl wall in 1997 (Photos 13 and 14

43a. AT THE REQUEST OF EHRET, Melcher photos 15-20 show annual sand piles east of Lake Street which borders Silver Beach (south fillet). Winter blown sand.

44. Carole Ehret testified (738:6). She presented family beach photographs (almost all taken by her) PX Summary pages 1 through 40. The object of her presentation was to document the condition of the beach from 1925 to the present.

a. Pages 1, 2, 3 (1948), 4 (1948), 5, 6 (1952) 7 (1952 high lake level chart), 8 (1958), 9 (1960) with loss line drawn in), 10 (1968) 11 (Lake levels graph), 12 (Julie Ehret on pump house cover - now all gone) (1970), 13 (1972) 14 (1973 - foredune largely gone), 15 (1984) shows new wood wall - large tree down), 16 (1985-foredune all gone, main dune about 30% gone), 17 (1986 - Cunat/Gregule cottages teetering ), 18 (1987 - Elms at brink), 19 (2-8-87 Chicago), 20 (lake level chart), 21 (1987 - looking south from Ehret to Cunat, Gregule and Dr. Bunker), 22 (1988 - same seawall back stays added), 23-27 (1994 - 1997 shows same wood seawall, 29 (4-15-1998 — 5' x 10' sand bags behind wall , very badly decayed wood wall), 30 (9-13-98, new stairs, main dune slumping, sand bags in front of decayed wood wall), 31 (old well head/point — cobble/rock lake bed), 32, 33 (cobble rock beach — 5-16-06), 34, 35 (till like compressed clay — 11/18/06 — looks like PX 113 - Figure 14), 36, 37, 38 (10-3-05 — tree root incased in compressed clay - root carbon dated by Carole Ehret - 6000 years through Geologist Shabica Ph.D) and 39, 40 (10-8-05 shows attempt by Carole to ignite - beach stuff (755:15).

b. Carole testified to being a 1953 University of Michigan graduate with basic

geology education.

c. Carole Ehret presented a few fossils, pearl button factory debris and Indian artifacts from her large collection. She stated her recent findings along the shoreline are much more frequent since the sand has disappeared.

d. Carole ascribed the new fossiliferousness of the Grand Mere shoreline to the loss of Grand Mere foredune(s) described in PX77-68 which was largely read into the record.

> <u>A modern foredune ridge (pl. V.A.; pl. XIX, A) can be traced almost continuously from the Covert Ridge headland on the north to the southern extremity of the embayment. In places it reaches an elevation of 610 feet or about 30 feet above the lake, but on the whole it stands a little above or a little below the 600 foot contour</u> (pl. 1). The windward slope (pl. IV. A) is generally between 10 and 15 degrees, except where cut by waves. Nearly everywhere on the lee side of the foredune the slope is between 20 and 30 degrees passing into a depression which may be as much as 10 feet deep. However, in many places the foredune is built against the base of a bluff cut in higher and older dunes to the landward, and the depression and lee slopes are absent.
>
> A double foredune ridge is in several places along the embayment. The most notable example is between the outlet (North Lake to Lake Michigan) and the Nipissing beach on the north. There, two well developed foredunes parallel each other having a maximum depression of 15 feet between them (pl. 1). The older, landward foredune shows a distinctly older and more continuous covering of vegetation.
> The foredune stands as a distinct ridge where it crosses the mouths of modern blow-outs. Examples are the bar west of North Lake, and in the areas of modern blowing (pl. XX, B; pl. XIX, A) between Weco beach and the State Park entrance. However, the foredune ridges tend to bend landward wherever they cross these openings. Dunes, other than foredunes, are forming on a large scale at several places in the embayment at the present time.

At 766:5 Carole testified that the foredune is gone.

e. PX77 is entitled State of Michigan Department of Conservation, Geological

Survey Division, Occasional Papers for 1946. It was published "in compliance with Act No. 65 of 1869 as amended by Act No. 179 of 1871 as Part of the Annual Report of the Geological Survey Division. It is authored by Dr. Glenn C. Tague of Western Reserve University.

f. Carole Ehret identified and explained PX74Y, 74Z and 74AA which are Aerial Photos taken by Clete Brummel in 1986. Carole bought the photos from Clete. She explained that the photos show from north to south:

74Z Ehret's with Cunat's two cottages going down (including the Donahue house built in 1917).

74Y Ehret with Cunat, Cunat, Gregule and Gregule just at or over the dune bluff edge.

74AA Bunker's with installation of 30-foot steel sheet piling underway.

**PLACEMENT OF DREDGED MATERIAL**

45. PX 115 is an aerial photo showing a diverted stream of littoral sediment particles northbound from the south pier at St. Joseph. Knowing (from the summation of the alphabetical section lengths) that the north pier is 1,810 feet long from the angle point (or elbow) to the lakeward end, we can scale the length of the visible stream to be about 3000 feet. This would be measured from the end of the south pier to the lakeward end of the visible stream. The lakeward end of the visible stream of sediment particles scales to about 3600 feet from shore.

46. It is reasonable to conclude that the vast majority of the stream of particles does not fall into the dredging zone.

47. Dean King is a dredging contractor who testified at trial on June 5, 2007. PX116

summarizes a blow back instance in April 2005 where the King Company re-dredged the same sand it had dredged and slurry pumped to Lions Park. Northbound weather, which immediately followed the slurry pumping, forced the same area to be re-dredged. King testified that his contracts with the Corps for dredging had no weather provision requiring slurry pipe nourishment of Lions Park only when the waves were southbound.

48. PX23-9, the Corps' 1996 Report, describes the wave climate at St. Joseph as being predominately directed from the southwest.

49. PX41-4 is the Corps' Annual Report on the Section 111 Beach Nourishment Monitoring Program. The Corps admits on paragraph 3 of PX41-4 that it is not capable of forecasting alongshore transport direction for any year.

50. Dr. Chrzastowski testified on June 4, 2007 Page 171:18-25 that the coastline at St. Joseph was a wave dominated coast, i.e., the waves have the greatest influence on the shore. At 172:6-9 he declares that there is a net southerly direction of sediment movement.

51. Dr. Chrzastowski went on however to explain that a zone of drift divergence exists at Lions Park where the St. Joseph Dredging Records supplied by Dr. Selegean for the Corps, DX 34, show dredged sand deposited every year since 1975. Please see Chrzastowski's June 4, 2007 testimony starting at Page 181, Lines 4-25 where he states:

> . . . That section of shore at the feeder beach actually has better exposure to waves from the southwest. Because, if you stand there at the feeder beach and look in a southwesterly direction you're looking across several miles of open water, If you're looking in a northwesterly direction, you're looking at a relatively short distance and the jetties are right there. So what happens is, is that location, any sediment that's along the shore has a near equal opportunity of moving either northwards or southwards, depending on what the wave approach is at any given time. Using that site as a feeder beach is problematic because the purpose of a feeder beach is to provide sand to the downdrift shore to compensate for any littoral transport that has been blocked by the jetties. To be a hundred percent

effective, in other words, to get all of the sediment to the downdrift shore, that you're intending to put to the downdrift shore, you want to make sure that you get that sediment to a zone that has a net transport in the southerly direction, the feeder beach, as I've just described, doesn't have that because it's in what's called the zone of drift divergence. It's a zone where there's near equal opportunity for sediment going either north or south.

Page 182, Lines 1-25

Now, what's the evidence for sediment going north? Well, that's the first site that we went in on our field trip yesterday. The fillet that has accumulated against the south jetty has a sediment source coming from only one direction . You can't get any sediment from the north because the jetties block transport from the north. The only direction that that fillet on the south jetty can get the sand from is sand coming from the south. The fact that we have a fillet there, the fact that reports have talked about how it has grown with time and also how it's essentially reached an equilibrium indicate that a sufficient supply of sediment has been available from the south to build that beach and create the beach that we see today. If we go southward from the south jetty and look for the source area, where could that sand be coming from. If we go, let's just say three miles to the south, we can identify that clearly is not a source area for the sand coming to the south fillet beach for two reasons: one, it happens to be a revetment, which is — that's one issue. But the other, the important issue is that there's clearly southerly transport when we get far away from the south jetty. If we keep looking for where this change takes place between north transport and south transport, the indicators on the ground of where that occurs is in the area of Lions Park.

Page 183, Lines 1-25

At Lions Park, if we think about our field trip, here we were looking at a place where we know that the Corps has provided multitude inputs of sand. And yet, if you look at the condition of the shoreline there, there's an erosional escarpment along the beach. In other words, the beach comes along at a level, is coming along at a level towards the water, and then there's a near vertical face. We saw that. And there was rock exposure along the shore between the groins. The series of groins is what's called the groin field. <u>And those groin fields weren't holding any sand</u> (emphasis added). So the area is an area of net erosion. That's okay for the purpose of dispensing the sand from the feeder beach. But the problem is that some of that sand is moving north instead of south. We've compromised the effectiveness of the beach nourishment effort. And there's no benefit for any sand from that site moving northwards. As a matter of fact, it may actually be a detriment. Because, as reported in Exhibit 24 and — well, let's just say as reported in Exhibit 24 there's— there's indication that sand from the feeder beach actually goes to the south fillet, moves along the south jetty, and ends up being deposited at the entrance to the harbor. So having any northward transport from the feeder beach potentially, under certain wave conditions has the potential of moving sand back into the harbor entrance and has to be dredged again. If the

Page 184, Lines 1 through 24

beach nourishment program was a hundred percent effective, you would want to be putting all the beach nourishment sand somewhere south of where it's being placed at present. That was my conclusion from my expert report and that's also a recommendation in Exhibit 24.

Q. Would you put your finger on that place where that recommendation is made in 24.

A. I'm looking at Exhibit 24, page 88 of Exhibit 24. At the middle of the page there's a bold heading. Recommendations for Future Monitoring. If we look at the paragraph that just precedes that, the paragraph reads 'It would be much more effective to place the entire annual allotment of beach nourishment, or at least the trucked coarse sediment, south of lines R22 or R23, where it would be 100 percent effective in supplying the downdrift shores.' The paragraph goes on — should I continue?

Q. Please.

A. 'The erosion problems in the study area could be addressed with site specific solutions. With this action the implementation of further shoreline structures to the south of line 22 to counteract the increased erosion may be avoided.'

Q. And you agree with that?

A. I agree fully with that.

**DREDGING, POLLUTION AND MITIGATION**

52. Defendant's dredging records were presented in tabular form going from 1900 to 2004. Ninety-four (94) individual years were recorded. Nine (9) were marked "unknown" as to quantity and placement location. Total (by attorney Ehret) for 94 years was 8,027,781 cy/yr. This gives an average 85,401 cy/yr which when multiplied by 73 years not considered by defendant adds 6,234,273 cy more removed from the littoral zone.

53. Fourteen (14) years show a total of 402,739 cy placed outside the littoral zone on Whirlpool Corp. property located about 3000 feet upstream on the PAW PAW River from its junction with the St. Joseph River (Placement location can be found on PX113 Figure 8).

54. WHIRLPOOL PLACEMENTS — taken from DX34 page 2.

| | |
|---|---|
| 1978 | 38,735 |
| 1979 | 39,279 |
| 1980 | 24,359 |
| 1981 | 25,069 |
| 1982 | 36,036 |
| 1984 | 17,010 |
| 1985 | 15,466 |
| 1986 | 14,564 |
| 1987 | 24,227 |
| 1991 | 10,225 |
| 1992 | 29,464 |
| 1997 | 30,696 |
| 1999 | 23,109 |
| 2001 | 79,498 |
| TOTAL | 407,739 cy |

55. Material washed downstream to the mouth of the flared entrance channel which is used as beach fill is not polluted. All materials lakeward of pier segment "J" shown on PX93 Plate 2 (GOV 0908) are classified non-polluted (PX 93-52 Paragraph 92).

56. Coarse trucked material started to be placed on feeder beaches in 1986. Corps Report PX 24-6 recites the following coarse (abt. 2 mm) non-beach material:

| | |
|---|---|
| 1986 | 120,220 $m^3$ |
| 1987 | 51,527 $m^3$ |
| 1988 | 51,527 $m^3$ |
| 1991 | 63,651 $m^3$ |
| 1993 | 45,821 $m^3$ |
| 1995 | 43,350 $m^3$ |
| | 376,096 $m^3$ = 491,993 cubic yards |

56a. PX32-17 MONITORING REPORT "For the entire period 1975 to 1984, the net direction of sediment transport was to the NORTH."

**DREDGING DATA TAKEN FROM DX 34**

| Year | Volume Dredged Cubic Yards | Cumulative Totals Cubic Yards | Comments |
|---|---|---|---|
| 1975 | 54,378 | | |
| 1976 | 94,105 | 148,483 | BUT FOR the jetties |
| 1977 | 181,097 | 329,580 | placements in the LZ |
| 1978 | 128,227 | 457,807 | would stay there and nourish the beaches. |
| 1979 | 147,412 | 605,319 | BECAUSE of the jetties |
| 1780 | 116,264 | 721,583 | all material is trapped, |
| 1981 | 90,836 | 812,419 | diverted or otherwise |
| 1982 | 152,931 | 965,350 | removed from the LZ |
| 1983 | 128,570 | 1,093,920 | |
| 1984 | 127,010 | 1,220,930 | |

56b. 1997 CORPS REPORT PX24-79, " . . . the combination of the long jetties and the deep navigation channel acts as a total littoral barrier, trapping all sediment reaching this area from either the north or the south.

56c. 1997 CORPS REPORT PX 24-27. "Landward of the channel entrance, the harbor jetties due to their sheet-pile construction, were assumed to be complete barriers to alongshore transport."

ARGUMENT: Dredging placements in the LZ from 1975 to 1984 were not contributions to the net littoral drift to plaintiffs. They were removals from the LZ because of the jetties.

57. Mean size material from the nearshore north and south of the harbor is 0.21mm and 0.233 mm respectively, (PX93-10paragraph 26(a) (2). Coarse material cobble/rock being used is about 10 times as large (i.e., about 2.0 mm) (PX 23-2 and 5).

58. PX41-4 states at paragraph 4) "The beach nourishment material should have the

same physical characteristics (composition, gradation, etc.) as the material found on the beach and nearshore. PX113-5 says "This material is much coarser than natural beach sand, with a gradation that ranges from fine sand to gravel several inches in diameter."

**LAKE MICHIGAN IS RECEDING**

59. Plaintiff Carole Ehret testified that she took elementary geology in her first year at the University of Michigan. She stated that she was taught that the Great Lakes were receding, averaging 20 feet every hundred years (1,000 feet in 5000 years)

60. This comports with what Dr. Grahame Larson testified to at page 1052:9 to 1055:11. Summarizing, since 5000 years ago Lake Michigan has been going down about 10 to 15 feet (1052:19).

61. Receding is further documented by PX93-8 (1973) paragraph 24 Geomorphology.

> The highest beach is 60 feet above the present level of Lake Michigan and can be traced from Sheboygan, Wisconsin, southward around the Lake Michigan Basin and northward to Ludington, Michigan. The waters at this stage and at decreasing stages to about the 18-foot level above present levels drained southwestward through the Chicago Outlet\. Following the 18-foot level, the ice border retreated farther north uncovering the Straits of Mackinac and joined the waters of the Michigan Basin with the lakes of the Superior and Huron Basins as well as exposing a lower outlet to the east. This outlet reduced the level of the Lake Michigan Basin to about 10 feet above the present level. An uplift occurred in the northern portion of the basin at this level during the ice retreat, resulting in an outflow through both the Chicago Outlet and the Straits. However, drainage to the east being in glacial till eroded rapidly and lowered the water level below the Chicago Outlet carrying the discharge of the Superior, Michigan and Huron lake basins. Subsequent stages of rising and falling lake levels reduced the Lake Michigan Basin to present levels and outline. (emphasis added)

62. In 1958 the Receding of Lake Michigan is documented in the same words by PX132-25 (Geomorphology). The words are not repeated here because of redundancy.

63. PX130 dated January 2005 is a Dr. Nairn Report which "established that there has

been a long-term trend toward lower water levels on Lake Huron-Michigan." (PX130-13) At PX130 vii the Report addresses the erosion of the St. Clair River Channel which is the outlet for Lake Michigan-Huron that controls the level of those lakes. He concludes that "the rate of erosion over the last 50 years is unprecedented even on a geologic time scale." The summary section of the Report at PX130 states:

> The reduction in level difference is continuing. Between 1860 and present the drop has been approximately 80 cm (2.6 feet). This drop represents a irreversible decline in the long-term average lake levels without compensation measures.

COMMENT: The lowering of Lake Michigan contradicts the theory of a naturally eroding shore. As does the Dr. Larson statement at 1055: 1-12 that the Grand Mere dune formation is accretion. The geomorphology statements of PX93 and PX132 puts the CORPS' position on record. The plaintiffs cannot rest assured that based on lake level lowering they can escape erosion because the dominant factor is lake bed lowering caused by sand deprivation. This lets the lake advance shoreward even though the lake level is going down.

**DAMS, JETTIES AND SAND SUPPLY**

64. Dr. Grahame Larson - defendant's expert geologist - at 1039: 3-20.

Q. Littoral drift is transport.

A. That's right.

Q. Not erosion. So if you block the littoral drift, the sand keeps going in one direction and no re-supply comes from the other direction. Isn't that true?

A. That is true.

Ehret then asked Dr. Larson to read from PX101 which was an article he wrote in 2001 entitled "Origin and Evolution of the Great Lakes." PX101-537 reads as follows:

> The sand in the shorezone is then moved along the shore by waves and offshore currents in longshore transport (Lawrence 1994)

> However, two recent types of human intervention have seriously reduced the supply of sand to the shore zone and facilitated the loss of sand to deeper water: (1) dams on rivers that are tributary to the Great Lakes, and most importantly (2) jetties and other engineering structures at river mouths (Omohundro 1973, Shabica and Pranschke (1994). The effects of damming tributaries is obvious — sediment settles out in the relatively still waters of inland reservoirs and is not allowed to be transported to the Great Lakes shore. Jetties function differently. They are engineering structures erected at river mouths, resembling two long walls that border both sides of the river and extend from the river banks and mouth, just inland of a harbor, to relatively deep waters in the lake proper, Jetties affect beach replenishment by diverting sand and other sediments that move along the shore by lake processes, into deep water (Bush *et al* 1996). Once there, these sediments can no longer be transported to the beach by waves and are therefore permanently lost from the beach system. For this reason, coastal erosion is often most severe near harbor structures rather than at more "open" coasts. Folger *et al* 1994. Shabica and Pranschke (1994). Dredging of river mouths for shipping and boating purposes can facilitate further transport of sand and sediment into deep water.
>
> Once the main source of sand to the beach system, river mouths and harbors have now become sites of beach impoverishment. Thus, shoreline erosion or retrogression, a natural process, has been much more dominant than has shoreline progradation (Powers 1958) and should be considered, when development along the always variable Great Lakes shorelines is contemplated.

**ST. JOSEPH RIVER**

65. Jay Wesley is fisheries manager of southwest Michigan inland lakes and streams including the St. Joseph River and southern Lake Michigan. He has a masters degree in Natural Resources Management from the University of Michigan.

66. He described the St. Joseph River as starting about 210 miles upstream at Baw Beese Lake which is over 1,000 feet elevation. It discharges 4,598 CFS into Lake Michigan at less than 600 feet elevation. Transcript 900:1-25. The river flows across glacial till moraines made up of sands and gravels. "Most of the St. Joseph River proper flows through old channels that were formed by old glacial river systems . . . through what's called glacial outwash material which is typically sandy."

67. At 907: 9-25 Wesley states that "The Berrien Springs Dam on the St Joseph River is not regulated by the FERC; it has a permit issued by an Act of Congress in 1906." The Army Corps of Engineers exercises jurisdiction for navigation on the St. Joseph River up to Berrien Springs.

68. Wesley had reviewed plans to dredge the St. Joseph River and pump sand to the Southwest Regional Airport, but did not know if the program was operational. If it were, he believes that he would be involved." 911:1-25.

**<u>WHAT DIFFERENCE DOES IT MAKE</u>**

69. Dr. Chrzastowski said "as far as I know it's all glacial till" in plaintiffs' zone. 199:6-11.

70. Lineback and Gross from the Illinois Geological Survey plus Meyer from the University of Wisconsin Geology Department say it is all glacial till in plaintiffs' zone PX96-10 Figure 5. They say further that Wadsworth Till is identical to "onshore till from Lake Border Moraines." PX96-8.

71. PX113-2 was discussed with Charles Thompson at 455:1-8 where he identified a large outcropping of shale near Lakeside Michigan but everywhere else in Berrien County, "the bedrock is covered with a blanket of glacial till and unconsolidated lacustrine and eolian sediments."

72. NOAA-USGS, PX33-10 Figure 11, Charles Thompson 415:18-25 "The harbor jetties to the north of this area have effectively trapped some (*) of the southerly littoral drift which has resulted in the sediment starved near shore area to the south. Sand cover, therefore is not sufficient to protect the till from erosion." At 416:1-8 Thompson agreed with this statement. <u>(*) The use of the word "some" by NOAA-USGS adds to the weight of the idea</u>

<u>that the piers were not trapping large quantities until the steel encasement was completed..</u>

73. Dr. Grahame Larson, however, armed with well diggers logs from an average about 50 feet above the lake and up to 5000 feet inland from shore (1046:6-18 and 1071:1-24) challenges the findings of direct scientific recorded evidence by NOAA-USGS that there is glacial till. He recognized downcutting, however in PX33-10 Figure 11 in his testimony at 1036:19-25.

73A. Dr. Larson could have easily verified the source of the material washing up on the Grand Mere beaches by taking a ride in his 17 foot boat with the "thing that allows me to look down into the water." 871:13-17.

74. In the SO WHAT ? department the downcutting phenomenon associated with the presence of glacial till as opposed to sand make no difference to Charles Thompson. At 461:1-3 he considers lake bed lowering and downcutting to be the same.

75. Dr. Nairn admits that with a total barrier updrift you would lose sand and the result would be lowering of the lake bed 1295:12-16. (WITH OR WITHOUT DOWNCUTTING AND WITH OR WITHOUT GLACIAL TILL).

76. Dr. Meadows says at 54:18-24 "if the sediment is continued, not to be supplied from the north, then the length of the area that is eroding will continue to expand because the only source is to erode the bottom once the sediment supply from both the north and from the shoreline is shut off;"

76A. At 54:25 - 55:6 he considered downcutting and lake bed lowering as related phenomenon.

COMMENT/ARGUMENT So plaintiffs submit the weight of the evidence shows the lake bed in the PZ to be glacial till; in addition:

a. we have held it in our hands. PX Summary 1 pages 34,35.

b. it doesn't burn like peat. PX Summary 1 pages 39, 40

c. it looks like till. PX113 Figure 14.

d. it can be seen under the water. PX Summary Tab 4, Passim aerial photographs.

e. it could easily have been verified by 17' boat with a see through "thing" which Dr. Larson has (871:12-19).

**BUT SO WHAT**?

77. No evidence exists that downcutting and lake bed lowering have a different ultimate effect on the erosion of the shore since the lowering allows the lake to move landward even if it is at almost an all-time low level. Witness the condition at Notre Dame Path where the water is up on the seawalls even with the lake level so low. (Field Trip: June 3, 2007 and PX Summary Tab 4 pages 28, 29, 30 and 31).

Nairn, however, thinks he has to "explain away" his prior admission:

> THE CRITICAL POINT TO UNDERSTANDING THE EVOLUTION OF COHESIVE SHORES IS THAT THE SHORELINE RECESSION OR ASSOCIATED PROBLEMS UNDERMINING OF SHORE-BASED STRUCTURES COULD NOT CONTINUE WITHOUT ONGOING DOWNCUTTING OF THE NEARSHORE LAKE BED. THE LONG TERM AVERAGE RATE AT WHICH THE BLUFF OR SHORELINE RECEDES ON A COHESIVE SHORE IS GOVERNED BY THE RATE AT WHICH THE NEARSHORE PROFILE IS ERODED OR DOWNCUT.

These same words are repeated almost exactly in the following:

PX 23-11 (dated 6-96) PX24-8 (dated 7-97)
PX107-17 (dated 4-97) and 1268:24 - 1269:6

**SUMMARY STATEMENT OF THE CASE**

78. Until this litigation, the Army Corps had repeatedly endorsed the fact that the

structures at St. Joseph had interrupted, dredged or diverted 110,000 cubic yards per year of sand over the years and that amount was considered to be 30% of the total annual loss to the littoral zone (PX 93-32, 43, 44, 46, 58, 59) (PX 115-4) (PX 23-2) (PX24-5, 17) (PX 41-4). This concept was adopted by the Federal Circuit in Banks v. U.S., 314 F.3d 1304 at 1306 (Fed. Cir. 2003).

79. PX61-2 and pages 449, 450 of the Charles Thompson transcript discuss the CORPS' village hall answer that the "harbor structure is blocking 30% of the littoral material coming from the north and that placing 110,000 cy/yr would replace this lost material."

80. Since 1836, the piers at St. Joseph had always been of open top, rock filled wooden crib construction (PX 136 Selegean testimony 677-686, PX93 – plates 3,4, 5). This document has reviewed in detail for the repair history of the piers (Table of Pier Sections - page 8 herein).

81. PX58 indicates extensive (930 feet on the north side and 426 feet on the south side in about 1988) steel sheet pile encasement AND CAPPING WITH CONCRETE.

82. Decay is so prevalent in water-wood construction that PX136, 679:9-12 says "considerably decayed, very little stone" and "decayed, very little stone."

83. Contractor Dean King stated at 338:18-339:6 that wood rots and that's why it is temporary.

84. Carole Ehret's PX Summary pages 29, 30 shows her rotted, shattered wooden seawall.

85. Scaling the piers at the mouth, shows that the south pier is about 200 feet short of the north (PX115).

86. The best explanation for the contradictory information about net littoral drift is that the CORPS felt that only 30% of the sand was being blocked because of the decayed

condition of the piers and that 110,000 cy/yr would make up for it. Plaintiffs have no reason not to accept this explanation.

87. Some time after PX58 was issued, the steel encasement was completed and the CORPS' official position was declared in PX24-79 and 27 to be that the piers were a total barrier trapping all sediment reaching this area from either the north or the south. The CORPS' official position has not changed. PX24 was conducted by the highest CORPS scientific entity (WES-CERC), and sponsored by its highest authority (HQUSACE).

88. The finding by the Monitoring Group of the DDC in PX32-17 was that "For the entire period 1975 to 1984, the net direction of sediment transport was to the <u>north</u>." The Monitoring Group had stated that "annually twice as much wave energy is directed south as energy directed north." Also they found "the net littoral transport interrupted by the harbor structures to be 110,000 cy/yr." PX32-5 and 420:4 through 422:21.

89. DX20 is the best picture of the fillets at St. Joseph. A simple measurement indicated that the south triangle fillet is 2" x 1", whereas the north fillet is 5½" x1 ¾." The plan view areas are 1 square inch to 4.8 square inches.

90. Dr. Meadows, at 44:1 through 45:25 stated that "the transport from the north is far greater than the transport from the south" but did not quantify it.

91. Dr. Meadows stated that to determine how much material was being removed from the littoral zone (LZ), it would be proper to add the northbound littoral transport to the southbound littoral transport. In addition, you would have to add whatever has been moved out beyond the depth of closure - a lost resource. (44:4-45:1 Meadows)

**THE ARGUMENT**

92. The United States Supreme Court made four rulings in United States v. Dickinson, 331 U.S. 745 (1947) which bear upon the facts of this case.

a. At page 750 the Court states: ". . . payment need only be made for what is taken but for all that the Government takes it must pay." The holding directs that all the material removed from the littoral system must be compensated for. The net littoral drift, which the CORPS uniformly acknowledged (until this litigation) was 110,000 cy/yr (84,000 $m^3$ /yr) for 163 years, must be compensated for. Nairn's May 2006 Litigation Report did not include the gross combination of updrift fillet and downdrift fillet retention and diversion. In addition, it ignores the river sand which is the main source of sand for the beaches (PX101-537). The St. Joseph River valley is uncontestedly loaded with glacial outwash sands (900:1-25). If the dam gates were judicially operated to untrap sand, the flow of sand would be even greater than the approximately 90,000 cy/yr experienced for dredging by the CORPS (inner and outer harbor).

b. If the CORPS had not dammed the natural southward river debouch at St. Joseph, all river sand and all littoral sand regardless of fineness or coarseness, would have been delivered southward to plaintiffs' shore (1332:1-10).

c. The Court instituted the doctrine of prudent prevention, saying that "If . . . part of the taking was in fact preventable by prudent measures, the cost of prevention is a proper basis for determining the damage, as the courts below held." Thus the CORPS is liable for all the costs of prevention necessary to save the land and to protect access to the waters of Lake Michigan.

**LOSS OF LAKE ACCESS**

d. This aspect of liability (loss of lake access) is also addressed by the Dickinsen Court at 750 saying " . . . but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be itself of less value than before, the owner is entitled to additional damages on that account." This would include latent defects such as loss of subjacent support and cobble/rock beaches as a substitute for sand.

e. The Court in Dickinson also rejected the defense by the Government that reclamation of the land "does not disentitle Dickinson to be paid for the original taking." This means that the property owners in Banks do not have their claims diminished by CORPS' belated attempts at nourishment by untimely random placement of nonsand or sand material.

93. Thus, the Nairn doctrine that use of coarse cobble/rock mitigation justifies the use of a new longshore model is inapposite to the Dickinson Court's ruling. The famously Michigan wide sandy beaches should not be destroyed with impunity by junk mitigation cobble/rocks masquerading as the ultimate answer to downcutting, lake bed lowering and bluff line recession.

94. Instead of justifying Nairn's use of a modified COSMOS model, the Supreme Court's decision dictates that the use of coarse material by the CORPS, is not only unacceptable mitigation under Section 111, its effect on the value of property entitles the owner to additional compensation under the Fifth Amendment to the Constitution.

**RIDGE LINE**

95. In Ridge Line Inc. v. U.S., 346 F.3d 1346 at 1356 (Fed. Cir. 2003), the Federal Circuit identifies an indicia which is applicable to this case; namely that the "appropriation of a benefit to the government at the expense of the property owner" is a compensable taking.

96. In this case the CORPS built the jetties because they perceived that the jetties made it easier to dredge. The jetties do not create navigability. That can be accomplished by dredging alone. The fan shaped, 24 foot deep outer harbor, where the waves are biggest, has no piers and is maintained by dredging alone. The channel between the piers is not a harbor. It cannot harbor boats.

97. The CORPS may think it saves in dredging by having these piers block all sand, but this loss of littoral sand and river sand is the direct cause of potentially THREE BILLION DOLLARS in Berrien County property losses over the next 60 years by total shoreline destruction. (Please note: Plaintiffs emphasis is now on prospective damage liability. Per se rules should apply. MDEQ letter of February 9, 2007 to many Berrien County shoreline property owners and township by township high risk erosion areas (HREA) shoreline mapping (PX135).

**NO NEXUS – NO PROPORTIONALITY**

98. There is no nexus and no proportionality between plaintiffs' property losses and navigation on the St. Joseph River.

99. Both the Nollan and Dolan Supreme Court holdings are also violated. In Nollan v. California Coastal Commission, 483 U.S. 825 (1987) the Court found that the essential nexus did not exist between a legitimate state interest and the permit condition exacted by the city. Id. at 837. They found no nexus between visual access to the ocean and a permit condition requiring lateral public access to the ocean along Nollan's beachfront lot

100. The piers are not necessary at St. Joseph. Navigation can be achieved by dredging alone. Hence there is no navigational sovereignty. But even if there were, there could be no mathematical proportionality between navigational sovereignty and total destruction of the sandy Michigan beaches.

101. The Constitution's public purpose justification for taking does not exist here because the commercial landings served by the large ships which require deep passageways are privately owned for profit - not public.

102. In Dolan v. City of Tigard, 512 U.S. 373 (1994), the city's permit condition required Florence Dolan to dedicate sufficient land area for a greenway and a pedestrian/bicycle path. Otherwise no expansion permit for her plumbing and electric supply store would be granted. The Supreme Court saw no "reasonable relationship," no rough proportionality or general mathematical extent between the property dedication required and the impact on her proposed development. Id. at 391.

103. The CORPS has a 30-year plan to intercept by dredging all sand in the river near the innermost commercial pier. The plan is to pump the sand to a land fill at Whirlpool Corp. or lengthen a runway for the Southwest Regional Airport (DX911:1 - 912:4).

104. This means that if the piers were corrected to prevent loss of river sand, which is the CORPS' charge under Section 111, Plaintiffs would never see the sand which would otherwise be theirs naturally.

105. This brings Ridge Line Inc. v. U.S. back into focus again, where it quotes Dickinson, 152 F.2d at 867 aff'd 331 U.S. 745, as saying "just compensation" includes a recovery of "all damages, past present and prospective." 346 F.3d at 1359.

106. With the CORPS intentionally diverting the natural river sand supply, the

prospects of downdrift relief from downcutting and ongoing lake bed lowering resulting in shoreline recession are nil.

**HIGH RISK SETBACKS - MDEQ**

107. On February 9, 2007, the Michigan Department of Environmental Quality (MDEQ) wrote letters (PX 135) to many shoreline property owners in Berrien County, including numerous plaintiffs. The MDEQ assigned prospective 60 -year bluff recession distances ranging from 95 to 535 feet on 15 plaintiffs' properties that we know of. This averages about 5 feet per year. The MDEQ data collection did not include volumetric calculations.

108. The prospective damages are that within 60 years the losses are total. The homes will be gone and the property unuseable.

109. The term 'property' as used in the Taking Clause includes the entire group of rights inhering in the citizen's ownership. U.S. v. General Motors Corp., 323 U.S. 373 at 377-78 (1945). It is not used in the vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. Instead, it "denote[s] the group of rights inhering in the citizens' relation to the physical thing, as the right to possess, use and dispose of it. . . . The constitutional provision is addressed to every sort of interest the citizen may possess." Id. at 377-378. The CORPS is liable for all these PROSPECTIVE losses.

110. The CORPS must assume their Fifth Amendment responsibility to replace all sand for which it is responsible for taking, or else provide just compensation. In Tahoe -Sierra Preservation Council v. Tahoe Regional Planning, 535 U.S. 302 (2002), the Supreme Court recognized that physical takings jurisprudence " . . . is as old as the Republic and, for the most part, involves the straightforward application of per se rules." Id. at 322. The duty to compensate is categorical. Id. at 322.

111. The CORPS cannot and will not stop the taking. The CORPS can only be judged by what it does. The CORPS' liability extends to the full provision of adequate shore protection of a permanent nature. Such protection involves massive steel sheet piling backed by wave energy absorption boulders landward and lakeward. This then entails the loss of beach access and lake access.

**LITTORAL DRIFT**

112. The facts of this Banks case and the law of Owen v. US, 851 F.2d 1404 at 1413 (Fed. Cir. 1988), explaining the causal relation between littoral drift and erosion seem almost identical at first blush; where Senior Judge Bennett wrote the en banc opinion:

> ... existing sand is moved southward by the littoral drift's currents and new sand from the north is deposited in its place. The loss of such shorefront was due to the blocking of the northern "replacement" sand, causing the drift to remove more sand than "it replaced."

113. There are two differences in the facts which have been raised in this case. First, here there are directionally dominant waves from the south, whereas there are energy dominant waves from the north, thus creating a net littoral drift to the south. In Owen there appears to be no winds or waves from the south. This seems unlikely and leaves the reader to conclude that whatever winds from the south there are, they are not significant to the outcome of the case.

114. The second factual difference with Owen is that there is no mention of loss of river sediment. In Banks there is no dispute that millions of cubic yards have been trapped behind dams which are in the absolute control of the federal government Federal Energy Regulatory Commission (FERC).

**THE CORPS AND TAKINGS**

115. The CORPS' 1958 pronouncement of the Berrien County Control Study Board states that 31% of the shore was public land, and therefore their contribution to providing 50-foot

wide and 10 - foot high berm, plus annual sand of about 4 cy/ft/yr. would be limited accordingly to 31% in public land only.

116. At that time, this posture was in harmony with the law of Pitman v. US, 457 F.2d 975 (Ct. Cl. 1972) which involved facts of southerly littoral drift being interrupted as far back as completion of the Canaveral Harbor jetties in 1953 and 1954. Pitman had lost four acres of beach-front property by 1972 when he was denied recovery in spite of the court stating:

> There is no doubt that plaintiff has sustained damages and that a substantial portion of the damages he claims are due to the construction and maintenance of the Canaverall Harbor Project. Id. 457 F.2d at 978.

117. But the decision in Pitman was explicitly reversed by Owen, 851 F.2d at 1412, 1413 and 1416 stating:

> . . . we hereby overrule those decisions to the extent that they allow navigational servitude to reach fast land above and outside the bed of the navigable water. Id. at 1416

118. The regulatory case of Nollan v. California Coastal Commission, 483 U.S. 825 (1987), would seem to support the Owen court, and even though it came a year earlier, it was not cited. Nollan set the requirement of nexus between the government regulatory act and the harm done to property. In Banks the failure of nexus lies in the perceived dredging cost savings gained by the government by having piers and the loss to littoral drift dependent properties several miles south, resulting in ultimate (prospective) total loss. There is no relationship between the appropriation of dredging cost savings to the government and plaintiffs' total loss. In the meantime, the law has changed but the CORPS has not. They still think they have an absolute right to swallow up private and public property without limit.

**DOWNCUTTING - LAKE BED LOWERING 17.6 FEET**

119. According to the CORPS (PX-23-33 and USGS/NOAA (PX33-21), there has been

lowering of the bed of the lake since 1945/1946 in the amounts indicated below.

| | | |
|---|---|---|
| 19 yrs. | 1945/1946 to 1964/1965 | .16m/yr=.6.3"/yr times 19 yrs = 10' |
| 45 yrs. | 1945/1946 to 1991 | 4m = 3.5"/yr = 13' |
| 16 yrs | 1991 to 2007 | Projected 3.5"/yr x 16 yrs = 4.6' |

It is reasonable to conclude, looking at the entire plaintiffs' zone, that plaintiffs may have experienced as much as 17.6 feet of lake bed lowering.

120. In Owen, 851 F.2d at 1412, the court states, "it is not the location of the cause of damage that is relevant, but the location and permanence of the effect of the government action causing the damage that is the proper focus of the taking analysis." The locational focus of erosion has taken time to move south and will continue to take time to eventually destroy the entire shore of Berrien County, Michigan. Paraphrasing the Federal Circuit slightly, it should not be the time that the damage is ultimately triggered, but the time the conditions for causing the damage take place that is the proper focus of the taking analysis.

121. In Banks, 314 F.3rd 1304, we have Plaintiffs' properties being effected slowly over all the years from the beginning when the piers were first extended out into the lake, i.e., 1837. The cause is the piers which were never really necessary for navigation in the first place. They were built to block (interrupt) the sand, which would otherwise prohibit erosion of the Lake Michigan shore. From the beginning they had to dredge and they still do now.

122. The taking is clear from plaintiffs' reliance on Owen, 851 F.2d at 1413. Plaintiffs have a property right in the replacement sand coming from the north - updrift. Reference is made to Nollan v. California Coastal Commission, 483 U.S. 825 (1987) and the Dolan v. City of Tigard, 512 U.S. 373 (1994) cases even though they are regulatory cases, not to be relied upon for constitutional taking cases. While plaintiffs do not dispute that principle, the mirror image similarities in logic between the Banks and Nollan/Dolan cases offer substantial comfort. Here,

the defendant would have navigational sovereignty arising out of a dredging/damming operation in the St. Joseph River mouth several miles away extend to plaintiffs' properties above the Ordinary High Water Mark/High Water Mark (OHWM/HWM) where it never existed before. There is no nexus.

123. Here, "justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionally concentrated on a few persons." Owen, 851 F.2d at 1416. Thus, the issue of proportionality comes to the surface in the takings context - similarly as in Dolan.

**REMOVING THE STRUCTURES**

124. "Removing the navigation structures would allow a resumption of littoral drift and would result in a significant adjustment in the littoral zone north of the harbor. The shoreline would move landward a considerable distance, and the nearshore zone would deepen as littoral materials moved downdrift to establish equilibrium profiles." (PX93 - 40, paragraph 63)

125. By removing the navigation structures, all the previously captured sand would be released into the littoral zone as originally intended by nature. Of course, the sand diverted to deep water, the dredged sand dumped in deep water (for over 120 years!), and the dredged sand transferred to Whirlpool or the airport, have been lost forever and ever!! The river sand would now be supplied to the littoral zone causing the presence of sand along the beach to "protect the till from erosion" and lake bed lowering (PX33-10).

> Dr. Nairn agrees that if that configuration of the river north had been left as it is, shown on this exhibit (PX 68), and never changed by the Corps, that all of the littoral drift all the sediment from the river would have continued within the littoral zone and have been available to the Plaintiffs' properties. Is that correct? Answer: Yes. 1332:3-10.

**TAKING HAS BEEN ONGOING FOR 170 YEARS**

126. Defendant has a fundamental flaw in reasoning. It does not include all material disrupted or interrupted by the piers, but only some imaginary amount which it claims to collect by dredging at the end of the piers. Defendant ignores the sand diverted off the end of the piers in the past. Defendant ignores the wounded natural equilibrium beach contour caused by sand deprivation for close to 170 years. Defendant ignores the millions of cubic yards already admitted to have been dredged, deep dumped and lost to the system. Defendant ignores the river dams which it permits and has sustained for over 100 years that effectively starve the shore. Defendant ignores the sediment budgets already in evidence for locations north and south of the St. Joseph Harbor where defendant's modeler, Dr. Nairn, found 80,000 cubic meters (*i.e.*, 105,000 cy/yr) longshore sand transport southbound at Grand Haven/Saugatuck to St. Joseph to New Buffalo. Those calculations were numerical round-offs from 84,000 cubic meters per year, for sources and sinks (called here a sediment budget). 84,000 cm/y x 1.308 cy/cm = 110,000 cy/yr. Defendant ignores the river sand dredged and diverted to Whirlpool, and the new plan to intercept the plaintiffs' river sand and pump it to a never-to-seldom used airport updrift on the PAW PAW River. Defendant's greatest flaw is in only calculating net littoral drift into shoreline losses when the elimination of the piers would:

a. put all accumulated sand in the fillets back into play in the littoral zone.

b. stop diversion of any and all sand beyond the end of the piers.

c. return the river sand to the shore.

**SECTION III IS ABANDONED BY THE CORPS**

127. The Corps has no program currently in place to mitigate the interruption of the littoral drift caused by the St. Joseph piers. Since 1999, all that the Corp has done is have the

sand dredged from the outer harbor placed at Lion's Park (the sand dredged from the inner harbor is permanently lost to the littoral system). No monitoring is done to determine the effectiveness of this dumping, nor is any attempt made to supplement the dredged sand to match the total amount of sand being blocked by the piers. Thus, there is absolutely no basis to conclude that the sand dumped at Lion's Park fairly compensates for the interruption to the littoral drift.

128. On the other hand, there is good evidence, both from (I) the Corps' reports (which showed that prior mitigation efforts had been unsuccessful); as well as (ii) Dr. Chrzastowski's expert opinion (sand placed at Lion's Park, because of the Park's location on the coast, and the Corps' failure to consider wave direction, does not enter the littoral system) that the dumping program at Lions Park is completely ineffective, and does not mitigate the loss of sand to the littoral system downdrift (south) of the piers.

**PURE SCIENCE v. LITIGATION SCIENCE**

129. Nairn purports to criticize the Corps older studies and conclusions regarding the interruption of the littoral drift by the St. Joseph piers (which the Corps has never officially retracted), but has no answer for the fact that the older studies were made without any agenda--purely to learn about the effects of the piers, as opposed to his partisan study, the sole purpose of which was to defeat plaintiffs' litigation claims.

**STATE LAW AND PROPERTY INTERESTS**

129. The Michigan Supreme Court makes itself very clear in Peterman v. Michigan Department of Natural Resources, 446 Mich 177 (1994), as to the nature of plaintiffs' property interest, while at the same time fitting into the concepts of Federal law which are to prevail in this case. Quotes below are from pages 198, 199 of Peterman.

Indeed, neither this Court nor the U. S. Supreme Court has ever 'held that the

> navigational servitude creates a blanket exception to the 'Taking Clause' Kaiser Aetna v. U.S., 444 U.S. 164, 172 (1979). To the contrary, Michigan law has long held that "the limit of the public's right is the OHWM of the river. This means that the ownership of fast land is unqualified and not burdened with a public right.

130. Peterman goes on to say in FN 31 citing U.S. v. Virginia Electric and Power Co., 365 U.S. 624, 628 (1961),

> Since the privilege of servitude only encompasses the exercise of this federal power with respect to the stream itself and the lands beneath and within its high-water mark, The Government must compensate for any taking of fast lands which results from the exercise of the power.

131. But Federal law did not protect against interruption of littoral drift until Owen, 851 F.2d at 1413 reversed Pitman, 457 F.2d 975 saying:

> . . . existing sand is moved southward by the littoral drift's currents and new sand from the north is deposited in its place. The loss of such shorefront was due to the blocking of the northern 'replacement' sand, causing the drift to remove more sand than it replaced.

After overruling Pitman as to loss of land located above the ocean's high water mark (therefore fast land) the Owen en banc court went on to limit the horizontal taking of fast land and that language was adopted by Peterman, 446 Mich. at 199.

> In fact, 'an actual taking of fast land which is in part accomplished or accompanied by erosion and deprivation of access is no less demanding of compensation because of these methods or incidents of taking.' Tamulion v. State Waterways Commission, 50 Mich App. 60, 69 (1973).
> This is so because 'there must also be horizontal limits to the bed of a waterway, otherwise the navigational servitude would extend infinitely in all directions and swallow up any claim for just compensation. Owen v. US, , 851 F.2d 1404, 1410 (1988).

With this language in mind the CORPS cannot forever take shoreline land horizontally after causing excessive downcutting (or lake bed lowering) as is predicted by the Michigan Department of Environmental Quality (MDEQ) in its recent release of new high risk erosion 60 -year set back distances (PX 135). (52-55:10 - Meadows)

**GENERAL LACK OF LOGIC**

132. Defendant has two problems (at least) with logic.

a. If there were 30% of the sand returned to plaintiffs, that would not be enough to reestablish sand as shoreline protection because of the lake bed downcutting determined from other Government scientific agencies such as USGS, NOAA, and the Waterway Experiment Station in Vicksburg, Mississippi.

b. 30% is not enough to satisfy Dickinson which requires that the government pay for all that it takes. Ownership at the time of the taking in St. Joseph is not the same as ownership at the time of invasion of "fast land" above the OHWM/HWM due to the subjacent sand deprivation which has been going on for 170 years.

133. If, as Dr. Nairn thinks, the plaintiffs' shoreline protection (SP)) is working (if only for now), then the taking of "fast land" has stopped with the extension of SP to Bunkers in 1986/1987 (PX74 AA). The new COSMOS modeling after that is not a fact of consequence. It is not relevant to a takings claim.

**NO EROSION MEANS THERE'S SAND**

134. Where there is no erosion, there must be sand because the presence of sufficient sand protects the shore (regardless of composition) from erosion. The 1865 Survey Drawing (PX 136) displays the jetty configuration at that time. The north pier is near total destruction and only extends to an 8 foot depth. The south pier is of little extent. The depth near its end is only 6 feet. The river channel is 22 feet deep by the force of its own flow. There is plethora of sand as shown by the initials "sd" throughout the drawing.

135. The 1871 Survey of the Shore from St. Joseph to Grand Mere (PX 102) shows the shore enjoying a relatively erosion free existence in the presence of a jetty configuration which, at

the time, offered only a moderate inhibition to the natural flow of littoral sand and river sand.

136. The message is clear. For some decades prior to 1871, there was little or no recession in the Larson identified Lake Border Morainic Bluff area because there was sufficient sand. The .8 foot per year average assumed from Dr. Larson's freehand graphic extrapolation of a Lake Border Moraine must have occurred at some other time. It didn't happen in Constitutional Time if it happened at all.

**CONCLUSION**

137. What we are watching here is a slow motion race between lake bed lowering and lake levels decreasing. The lake bed lowering is caused by total blockage of littoral and river sand supplies from the north - an unnatural cause. The erosion of the Lake Michigan and Huron outlet at the St. Clair River - a natural cause - results in the lake levels decreasing.

138. Meanwhile, the littoral law is evolving to defend the shoreline from deprivation of the natural protection which sand was designed to provide to the lake bed.

139. The lack of sand causes the lowering of the lake bed which allows the shore line to advance toward the land. The erosion of the St. Clair River outlet causes the lake level to go down which makes the shoreline move in the opposite direction, away from the land. The lake bed is lowering faster than the water level. The almost imperceptible race is being won by the jetties and dams. THE LAKE IS ADVANCING TOWARD THE LAND.

140. Charles Thompson's tour guide brochure (PX 113-9 and Figure 17) puts it aptly when it says:

> Perhaps strangely, the vast amount of sand visible in dunes (Warren Dunes State Park - Figure 17 - about 82,000 feet from St. Joseph) does not reflect the amount of sand present offshore. Recent USGS surveys, published in 1992, indicate that there is very little sand cover in southern Lake Michigan.

141. Plaintiffs are entitled by the littoral law to claim all the benefits of the sand which has been caused to be lost by the government and all liability which the law affords to protect their property under the Fifth Amendment.

THEREFORE, plaintiffs claim that they be compensated for:

a. all fast land lost above the OHWM;

b. all the beach lost below the OHWM to the water's edge (based on there being no need for blocking the littoral drift if PX68 - Lt. Berrien's sand bar pier extension – had been used);

c. all structures - homes, stairs, water wells, sheds, porches, gazebos, etc., including cost to move structures.

d. all lost rentals;

e. lost access to Lake Michigan whether caused by shore protection or loss of beach;

f. all shore protection installed already;

g. all additional shore protection needed to fortify against ongoing lake bed lowering or downcutting;

h. all loss of value due to the shore protection considered necessary by the plaintiffs;

i. interest as appropriate from the time of loss of any and all of the above items;

j. legal fees and legal expenses (expert fees, etc.).

Dated: July 6, 2007

Respectfully submitted

/s/ John B. Ehret

John B. Ehret
Attorney for Plaintiffs\
John H. Banks, et al
5936 Dunham Ave
Stevensville, MI 49127
Telephone: 269.465.5857

Fax: 269.465.3736
jbehret@covad.net

**CERTIFICATE OF SERVICE**

I, the attorney, John B. Ehret, do hereby certify that on the 6th day of July, 2007, I caused to be electronically filed with the United States Court of Federal Claims **PLAINTIFFS' OPENING POST-TRIAL BRIEF** to be served on the below listed attorneys of record:

Eugene J. Frett, Esq
SPERLING & SLATER, P.C.
55 West Monroe Street, Ste 3200
Chicago, IL 60603
Telephone: 312.641.3200
Fax: 312.641.6492
gfrett@sperling-law.com

Terry M. Petrie
Environmental and Natural Resources Division
U. S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
Telephone: 303.844.1369
Fax: 303.844.1350
Terry.Petrie@usdoj.gov

Heide L. Hermann
G. Evan Pritchard
Environmental and Natural
Resources Division
U. S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: 202.305.3315
Fax: 202.305.0274
Heide.Hermann@usdoj.gov

Dated: July 6, 2007

/s/ John B. Ehret
Attorney for Plaintiffs
John H. Banks et. al.