**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **JOHN H. and MARY E. BANKS, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 99-4451 L**<br>**Judge Emily C. Hewitt** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |
| **EUGENE J. FRETT, Individually and as trustee of the Victor J. Horvath and Frances B. Horvath Trust, and** | ) | |
| **DONNA P. FRETT,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 05-1353L**<br>**Judge Emily C. Hewitt** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division

TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294

HEIDE L. HERRMANN
G. EVAN PRITCHARD
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

OF COUNSEL
Gary W. Segrest
Office of Counsel
U.S. Army Corps of Engineers
477 Michigan Avenue, Room 659
Detroit, MI 48226

## TABLE OF CONTENTS

INTRODUCTION . . . . . 1

BACKGROUND . . . . . 1

ARGUMENT . . . . . 5

I. PLAINTIFFS' HAVE FAILED TO MEET THEIR BURDEN OF PROOF . . . . . 5

A. Burden of Proof . . . . . 5

B. Plaintiffs Established Only That The Jetties Can Cause Erosion . . . . . 6

C. Plaintiffs' Properties Suffer Erosion for Other Reasons . . . . . 7

1. Lake Michigan Shoreline Experiences Natural Erosion . . . . . 7

2. Storms and Lake Water Levels Erode the Lake Michigan Shoreline . . . . . 7

(A) Gail Chapman . . . . . 8

(B) Carole Ehret . . . . . 8

(C) Robert Melcher . . . . . 8

(D) Donald Miller . . . . . 8

(E) Marcia Weinberg . . . . . 9

3. Shore Protection Causes the Lake Michigan Shoreline to Erode . . . . . 10

D. The Corps Has Mitigated Jetty-Induced Erosion Since 1970 . . . . . 11

1. Dr. Nairn's Sediment Budget . . . . . 12

(A) Longshore Transport Rate . . . . . 13

(B) Erosion Caused By Shore Protection . . . . . 15

(1) Plaintiffs Failed to Offer Any Evidence That

Shore Protection Was Installed to Address Erosion Caused By the Corps . . . . . . . . . . . . . . . . . . . . . . 17

(2) Jetty-Induced Erosion Was Not the Reason The C&O and MDOT Revetments Were Built . . . . . . . . 18

(C) Amount of Nourishment Provided by the Corps . . . . . . . . . . . . . 20

2. Plaintiffs Unsuccessfully Attempt to Discredit the Sediment Budget . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## CASES


Banks v. United States, 60 Fed. Cl. 206 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Hale v. Dep't of Transp., 772 F.2d 882 (Fed. Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20

Jazz Photo Corp. v. United States, 439 F.3d 1344 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 5

Ridge Line v. United States, 404 F.3d 1335 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . 5

## INTRODUCTION

From June 4-8, 2007, the Court tried plaintiffs' claims that the jetties situated at the St. Joseph Harbor, Michigan, built and maintained by the United States Corps of Engineers ("Corps"), have caused their properties located south of the harbor along the shore of Lake Michigan to erode. The trial revealed two overarching facts: (1) plaintiffs failed to meet their burden of proof, and (2) the Corps, through the use of a beach nourishment program, provided a sufficient amount of sediment to offset any erosion, properly attributable to the jetties, since 1970. Plaintiffs' failure to meet their burden of proof, by itself, mandates judgment in favor of the United States. Additionally, the Corps' affirmative proof, which established that the nourishment program offset erosion attributable to the jetties, confirms and highlights plaintiffs' failure of proof.

## BACKGROUND

Initially constructed in 1836, over a series of periodic extensions, the jetties in the St. Joseph Harbor reached their final length in 1903. (Trial Record ("TR"), Day 3, Dr. James Selegean, 565:6, 624: 24-625:12; Plaintiffs' Exhibit ("PX") 132, page 18; <u>see</u> <u>also</u> PX-93, pp. 5-6, ¶ 14-21 for history of extensions of the jetties). Built to a rock-filled timber crib design (TR, Day 3, Dr. Selegean, 645:6-646:21), the purpose for the jetties was to help the harbor maintain sufficient depth for commercial shipping to traverse back and forth between the St. Joseph River and Lake Michigan. (TR, Day 3, Dr. Selegean, 644:9-17; 655:2-3). The jetties were essentially impermeable to sediment passing through them (TR, Day 3, Dr. Selegean, 644:13-17; Day 1, Dr. Guy Meadows, 111:4-112:2; Day 1, Dr. Michael Chrzastowski, 202:22-203:13). The Corps began encasing the jetties in steel sheet plating in the early 1950's and the project was completed

in the late 1980's. (TR, Day 3, Dr. Selegean, 644:18-645:5).

Pursuant to a study conducted under the authorization of the River and Harbors Act of 1968, the Corps issued a Detailed Project Report ("DPR") in 1973. (PX-93, page 1). The DPR concluded that the Corps' jetties caused an average of 30 percent (about 96,000 cubic yards per year) of the nearshore erosion due to all causes within a zone of influence south of the St. Joseph Harbor. (TR, Day 3, Dr. Selegean, 650:4-14; PX-93, p. 32). This zone of influence began approximately 2,600 feet (0.492 miles) on the south side of the harbor and extended approximately 18,400 feet (3.484 miles), ending about 21,000 feet (3.977 miles) south of the harbor. (TR, Day 3, Dr. Selegean, 649:8-650:3; PX-93, p. 32). The northern-most property of plaintiffs is located approximately 3.3 miles south of the St. Joseph Harbor.[1/] (Defendant's Exhibit ("DX") 1 at Figure 1.1, Overview of Study Area). The DPR also calculated the net longshore transport rate to be approximately 110,000 cubic yards per year ("cy/yr").[2/] (TR, Day 3, Dr. Selegean, 655:22-656:24; PX-93, p. 26).

The geology of the shoreline south of the St. Joseph Harbor, including the zone which envelopes the plaintiffs' properties, was commonly believed to be cohesive[3/] before this litigation ensued. However, this belief was based upon studies which did not focus specifically upon the

---

[1/] Plaintiffs' properties are all located along the shoreline of Lake Michigan, ranging from approximately 3.3 miles to 7.8 miles south of the St. Joseph Harbor. (DX-1, p.3, Figure 1.1).

[2/] Longshore tranport rate is the rate at which sand is moved along the shore. See also TR, Day 5, Dr. Robert Nairn, 1099:4-9, 1139:19-1140:2).

[3/] Cohesive is defined as a characteristic of natural material that defines its ability to stick together. (DX-3, p. 27; see also TR, Day 4, Dr. Grahame Larson, 1008:18-1009:7).

plaintiffs' zone.[4] Dr. Grahame Larson, an expert in the fields of glacial geology, glaciology, and hydrology (TR, Day 4, Dr. Larson, 976:22-25), and intimately familiar professionally with the St. Joseph area (TR, Day 4, Dr. Larson, 872:4-9, 872:18-873:2, 974:9-13, 974:18-975:24), generated a stratigraphy,[5] which, unlike earlier studies (TR, Day 5, Dr. Nairn, 1108:3-1111:11, 1342:1-11; PX-23 and PX-24), specifically focused upon the geology of the plaintiffs' zone. (DX-3, Figure 9, p. 34; TR, Day 5, Dr. Nairn, 1212:21-1214:9,1342:1-18). Consistent with earlier studies, he determined that the shoreline south of the St. Joseph Harbor was cohesive until approximately the area in which the northern properties for the plaintiffs are located and then it transitioned into a sandy shoreline through the zone in which the great majority of plaintiffs' properties are located. (DX-3, Figure 9, p. 34; DX-28; DX-31; TR, Day 4, Dr. Larson, 1008:18-20; Day 5, Dr. Nairn, 1212:21-1214:9, 1342:12-18).

As a consequence of the 1973 DPR, the Corps undertook a beach nourishment program to mitigate the erosion caused by the jetties. (TR, Day 2, Dr. Selegean, 347:2-19). The beach nourishment program was designed to mitigate only that portion of the total erosion

---

[4] As noted before, the 1973 DPR examined the shoreline only as far as 21,000 feet (3.977 miles) south of the St. Joseph Harbor. (TR, Day 3, Dr. Selegean, 649:8-650:3; PX-93, p. 32). A 1996 study, PX-23, focused upon an area that only went 3.7 miles south of the St. Joseph Harbor. (TR, Day 5, Dr. Nairn, 1111:2-6). Similarly, a 1997 study, PX-24, only focused upon an area that extended about 5.6 miles south of the St. Joseph Harbor and relied upon the data collected in the 1996 study. (TR, Day 5, Dr. Nairn, 1111:2-11). A pilot study conducted by the USGS and NOAA published its "preliminary results" in 1994 and found significant erosion of the lake bed had occurred south of St. Joseph. (PX-33, p. 409). Notably, however, the pilot study, with its "preliminary results," did not consider the erosional influence of shore protection upon the conditions observed. (TR, Day 5, Dr. Nairn, 1112:5-1113:7).

[5] A stratigraphy depicts a geologic cross-section of a section of land; here, the shoreline in the vicinity of the St. Joseph Harbor. (DX-3, Figure 9, p. 34; see also TR, Day 4, Dr. Larson, 870:13-20).

attributableto the jetties at St. Joseph harbor. (TR, Day 2, Charles Thompson, 427:5-20 [PX-31], 446:3-11 [PX-61]; PX-93, page 29, paragraph 50). It was not intended to mitigate the effects of wind and wave action, violent storms, high water levels, normal erosion processes, or possible adverse effects from shore protection structures. Id. Over the years, from 1970 to 1991, the Corps placed an average of 90,000 cy/yr of sediment south of the St. Joseph Harbor to mitigate for erosion attributable to the jetties. From 1992 to 2005, the Corps placed an average amount of 42,000 cy/yr of nourishment. (See DX-25, column viii; DX-34; TR, Day 5, Dr. Nairn, 1324:3-15, 1330:19-1331:17).

The majority of the relevant stretch of the coast line south of the St. Joseph Harbor is armored with shore protection structures. Two lengthy revetments installed by the C&O Railroad and the Michigan Department of Transportation ("MDOT") are contiguous and total approximately 1.7 miles in length. (TR, Day 5, Dr. Nairn, 1218:20-1219:24; DX-1, pp. 4-138 and 4-139). They are located to the north of the northern-most property owned by plaintiffs. (TR, Day 5, Dr. Nairn, 1212:15-20). Prior to 1970, these two revetments represented approximately 80 percent of the 2.1 miles of protected shoreline over the 8.4 mile sector south of the St. Joseph Harbor and encompassing all of the plaintiffs' properties. (TR, Day 5, Dr. Nairn, 1248:13-20; DX-1, p. 4-139). At present, about five miles of the shoreline from the St. Joseph Harbor to the south end of the plaintiffs' properties are protected (including the C&O railway and MDOT revetments). (DX-1, p. 4-139). This represents 60 percent of the total shoreline from the jetties south to the end of the plaintiffs' zone of properties. Id.

## ARGUMENT

### I. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF PROOF

#### A. Burden of Proof

Plaintiffs bear the burden of proof in civil proceedings. Plaintiffs meet that burden only if they establish by a preponderance of the evidence the cause of action for which they have sued. The United States Court of Appeals for the Federal Circuit has "defined preponderance of the evidence in civil actions to mean 'the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it.'" Jazz Photo Corp. v. United States, 439 F.3d 1344, 1350 (Fed. Cir. 2006), citing Hale v. Dep't of Transp., Fed. Aviation Admin., 772 F.2d 882, 885 (Fed. Cir.1985). See also St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763, 769 (Fed. Cir. 1993) (same).

Here, in the case before this Court, plaintiffs must establish that the jetties in the St. Joseph Harbor have caused their properties to erode. In order for plaintiffs to meet their burden of proof, however, it is not enough to establish merely that the jetties can cause erosion. Rather, plaintiffs must establish by a preponderance of the evidence that their properties, in fact, suffered jetty-induced erosion when the evidence also shows: (1) normal background erosion of the shoreline of Lake Michigan occurs; (2) storms and lake water levels, both high and low, cause the shoreline to erode; (3) other shoreline protection structures also cause the shoreline to erode; and (4) the Corps implemented a beach nourishment program to mitigate erosion which the jetties might cause. Besides highlighting plaintiffs' failure to meet their burden of proof, the fact of the Corps' beach nourishment program also proves to be an intervening cause that breaks the cahin of causation between the operation and maintenance of the jetties and the alleged injury of

erosion to plaintiffs' properties. See, e.g., Ridge Line v. United States, 404 F.3d 1335 (Fed. Cir. 2005).

As discussed below, plaintiffs failed to shoulder their burden of proof.

**B. Plaintiffs Established Only That The Jetties Can Cause Erosion**

Plaintiffs relied upon the 1973 DPR as the centerpiece to their case-in-chief. (See PX-93). In that report, the Corps candidly acknowledged that the St. Joseph jetties had caused erosion during the time period examined. (PX-93, page 29, paragraph 50). However, the DPR also recognized other factors that cause erosion. These factors include wind and wave action, violent storms, water levels, normal background erosion, and shore protection. Id. Plaintiffs did not dispute that these other factors cause erosion.

Plaintiffs also had a number of the individual property owners testify. In short, while plaintiffs testified about their property eroding, it was exactly that and no more than that. Moreover, in a number of instances, as discussed below, they attributed the erosion to the effects of storms, lake water levels, and shore protection.

In essence, plaintiffs' evidence boiled down to establishing that the jetties can cause erosion and conceding that other factors have caused their properties to erode. In light of the results of a sediment budget calculated by Dr. Nairn (as will be discussed below), defendant's expert coastal engineer, which concludes that no jetty-induced erosion has occurred since 1970 (because the volume of sediment provided through the nourishment program offsets any erosion caused by the jetties), plaintiffs face a situation where the 1973 DPR by itself does not prove their case. Thus, plaintiffs expended much energy to attempt to undercut Dr. Nairn's sediment budget and the stratigraphy generated by Dr. Larson.

**C. Plaintiffs' Properties Suffer Erosion for Other Reasons**

In contrast to and to be weighed against the evidence of the 1973 DPR, defendant established other reasons for why the shoreline erodes. Those reasons include natural background erosion, storms and water levels (both high and low), and shore protection. The evidence also established that the Corps implemented a beach nourishment program to mitigate any erosion which the jetties might cause. Matching the weight of the 1973 DPR – which only establishes that the jetties have caused erosion during the time period studied by the Corps in compiling the report – against the defendant's evidence that there are other reasons that the shoreline erodes and that the Corps has provided enough sediment since 1970 to offset any jetty-induced erosion, leaves plaintiffs short of meeting their burden of proof.

**1. Lake Michigan Shoreline Experiences Natural Erosion**

Lake Michigan's shoreline experiences natural erosion. Dr. Guy Meadows, plaintiffs' own expert, acknowledges this fact. (TR, Day 1, Dr. Meadows, 112:8-11). Noting the natural tendency of wave activity is to erode the shoreline (TR, Day 1, Dr. Meadows, 95:8-10), Dr. Meadows placed the natural erosion rate at one-and-a-half feet per year. (TR, Day 1, Dr. Meadows, 112:12-21). Aside from a general reliance upon the 1973 DPR, plaintiffs did not make any effort to demonstrate that the erosion their properties may have experienced was due to something other than, or in addition to, natural erosion.

**2. Storms and Lake Water Levels Erode the Lake Michigan Shoreline**

Storms and lake water levels also erode the Lake Michigan shoreline. A number of individual plaintiffs testified very graphically about the power and force of the regularly recurring storms on Lake Michigan and the erosion their properties suffered from these storms.

(A) Gail Chapman:

Ms. Chapman testified to the fact that they had had a "lot of terrible storms" (TR, Day 2, Gail Chapman, 304:2-3), including some notable ones: a storm in February 1973 in which a neighbor lost his cottage (TR, Day 2, Ms. Chapman, 304:10-16); another storm in 1986 in which the deck, stairway, and some of the dunes were lost (TR, Day 2, Ms. Chapman, 305:10-16); and yet another storm in 1995 in which the wave action was so strong that it moved some of the boulders placed in front of her property and prompted the purchase of more. (TR, Day 2, Ms. Chapman, 305:20-309:15).

(B) Carole Ehret:

Ms. Ehret testified that she had seen lots of storms over the years that she has lived on Lake Michigan (TR, Day 3, Carol Ehret, 770:6-7), including "really, really bad storms" in 1948, 1997, and a "humdinger" of one in 1998. (TR, Day 3, Ms. Ehret, 771:16-772:5).

(C) Robert Melcher:

Mr. Melcher testified how the worst storms in his experience occur in the late fall and early spring, with larger wave action regardless of whether the lake is at a high or low level. (TR, Day 2, Robert Melcher, 518:20-25). He also testified that his property has experienced the worst effects of erosion during times of storms. (TR, Day 2, Mr. Melcher, 518:13-16). Finally, he testified that in March 1997 a "large storm washed everything out." (TR, Day 2, Mr. Melcher, 514:10-15; see photographs on pages M-11 and M-12 of PX Summary Exhibit Melcher).

(D) Donald Miller:

Mr. Miller testified about that he has lost a lot of property due to storms over the

years on Lake Michigan. (TR, Day 3, Donald Miller, 785:5-12). He recounted one instance in which a storm took 20 feet of his property, literally hauling away a sailboat that he had chained 20 feet up on the bluff to a tree. The storm took it all - sailboat, chain, and the tree. (TR, Day 3, Mr. Miller, 785:13-23).

(E) Marcia Weinberg:

Ms. Weinberg testified that she noticed in 1975 that storms brought larger waves that would eat away at the bottom of the bluff to her property, that the winter of 1976 was especially severe with a lot of storms, and, again, in 1983 that the water level would reach the bottom of the bluff on especially stormy days. (TR, Day 2, Ms. Weinberg, 266:15-267:8). She also testified that bad storms sped up the erosion process. (TR, Day 2, Ms. Weinberg, 267:9-11).

Further, both high and low lake levels cause the Lake Michigan shoreline to erode. Lake Michigan has a mean lake water level of approximately 579 feet. (TR, Day 4, Dr. Larson, 1003:11-13). Several of the individual plaintiff property owners testified about how their property experienced erosion during years when the lake water levels were high. (See, TR, Day 3, Ms. Ehret, 740:14-741:4; TR, Day 4, Mr. Marzke, 894:3-895:12; TR, Day 2, Mr. Melcher, 519:1-4, 523:3-13; TR, Day 3, Mr. Miller, 783:1-7, 783:21-784:4; TR, Day 2, Ms. Weinberg, 267:12-14). This testimony bears out what the experts have seen happen as well. (TR, Day 1, Dr. Meadows, 94:5-7, 98:15-19; TR, Day 1, Dr. Chrzastowski, 236:19-23; TR, Day 4, Dr. Larson, 1002:17-20). Illustrating clearly how lake conditions significantly correlate to and cause the shoreline to erode, Dr. Meadows further described how low lake levels also lead to further erosion. (TR, Day 1, Dr. Meadows, 106:14-107:8). Plaintiffs' Exhibit 75, containing Corps collected data of water levels on the Great Lakes, chronicles the years when Lake Michigan

routinely whipsawed the shoreline with high and low water levels. This exhibit captures the ebb-and-flow or cyclical nature of conditions that greatly affect Lake Michigan's shoreline.

Again, plaintiffs do not dispute these facts. Aside from a general reliance upon the 1973 DPR, with one exception,[6] the plaintiffs did not make any effort to demonstrate that the erosion of their properties may have experienced was due to something other than, or in addition to, storms and the vicissitudes of lake water levels.

### 3. <u>Shore Protection Causes the Lake Michigan Shoreline to Erode</u>

The experts agree that shore protection devices will cause the shoreline to erode, both at the base of and downdrift of the installed structure. (TR, Day 5, Dr. Nairn, 1217:2-1218:19; TR, Day 1, Dr. Meadows, 133:17-19). Further, testimony from individual plaintiffs disclosed thatthey too, as laymen, understood the erosive effect of shore protection. (See, TR, Day 1, Ms. Chapman, 303:15-22; TR, Day 3, Ms. Ehret, 772:20-773:9; TR, Day 2, Mr. Melcher, 509:19-510:1; TR, Day 2, Ms. Weinberg, 267:15-24). As before with other conditions that cause erosion, plaintiffs made no attempt to demonstrate that the erosion that their properties may have experienced was due to something other than, or in addition to, the deleterious effects of shore protection. Significantly, however, as addressed below in discussing Dr. Nairn's sediment

---

[6] Plaintiffs made a meager attempt to elicit testimony from Mr. Marzke, one of the individualplaintiffs, that would show that something <u>other</u> than the lake conditions caused properties to erode. During cross-examination, Mr. Marzke acknowledged high lake levels and wave action had caused his property to erode. (TR, Day 4, Mr. Marzke, 894:3-895:12). Upon re-direct examination, plaintiffs' counsel and Mr. Miller had the following exchange:

Q Did you have any knowledge of any other cause than the ones you've mention about the waves?
A Not really. I guess it was just basically the cause of the beach leaving us.

(TR, Day 4, Mr. Marzke, 895:21-24).

budget, plaintiffs made no attempt whatsoever to demonstrate that they installed shore protection because of the jetties.

**D. <u>The Corps Has Mitigated Jetty-Induced Erosion Since 1970</u>**

The purpose of the Corps' beach nourishment project was only to mitigate the effects of the jetties on the shoreline south of the St. Joseph Harbor. (TR, Day 2, Dr. Selegean, 347:7-19, 370:5-371:8; TR, Day 3, Dr. Selegean, 697:11-698:6; PX-93, pp. 29 (¶ 50) and 44 ( ¶ 74); PX-41, p. 3). A sediment budget is a common standard method used in the field of coastal engineering. (TR, Day 1, Dr. Meadows, 112:24-113:6; TR, Day 5, Dr. Nairn, 1117:20-21). Dr. Meadows defined a sediment budget as "an accounting procedure to keep track along the shoreline of sediment inputs and sediment losses." (TR, Day 1, Dr. Meadows, 112:24-113:3). A sediment budget is an important tool for understanding the root causes of erosion and sedimentation. (TR, Day 5, Dr. Nairn, 1099:11-14, 1117:20-21). Dr. Nairn has calculated sediment budgets on projects around the world. (TR, Day 5, Dr. Nairn, 1099:11-1100:8). Dr. Meadows has calculated a sediment budget on the order of five to seven times. (TR, Day 1, Dr. Meadows, 113:7-10). The last time he calculated a sediment budget was in 1999. (TR, Day 1, Dr. Meadows, 113:7-12).

Dr. Nairn, defendant's expert, calculated a sediment budget that tracked the sediment gains and losses for the shoreline in the vicinity of St. Joseph. The sediment budget balanced, showing that all erosion attributable to the jetties had been accounted for. (TR, Day 5, Dr. Nairn, 1216:24-1217:1). Plaintiffs' experts did not disagree with Dr. Nairn's data, his methodology, or the computer modeling that was a component in his analysis. Nor did plaintiffs elicit any testimony from their experts that Dr. Nairn's results were incorrect. Though plaintiffs bear the

burden of proof to establish the jetties caused their properties to erode, Dr. Nairn's sediment budget proves that the Corps' nourishment program offset jetty-induced erosion since 1970. Further, as mentioned below and extremely significant is the fact that Dr. Meadows believes that placement of approximately 53,000 cy/yr of sediment on the beach would mitigate for jetty-caused erosion in light of his own estimate of 50,000 to 60,000 cy/yr for the longshore transport rate. (TR, Day 1, Dr. Meadows, 152:19-153:4).

### 1. Dr. Nairn's Sediment Budget

In calculating a sediment budget, Dr. Nairn considered all of the sources of sediment and sinks for the area in the vicinity of St. Joseph. (TR, Day 5, Dr. Nairn, 1120:6-1122:15). Dr. Nairn approached his analysis trying to make no assumptions, trying to err on the side of the plaintiffs, and trying to come to conclusions by using several different approaches to ensure checks and balances. (TR, Day 5, Dr. Nairn, 1114:2-22). He tested the results of the numerical modeling calculations by using at least one method (TR, Day 5, Dr. Nairn, 1126:22-25) Table 4.4 of his expert report sets forth the culmination of his calculations and also reveals the exhaustive consideration he gave to the relationship between the multiple physical conditions presented in this case.[7] (DX- 1, Table 4.4, p. 4-148; see also DX-25).

Dr. Nairn used the sediment budget to determine whether the Corps had provided enough sediment to the shoreline to offset any erosion attributable to the jetties. (TR, Day 5, Dr. Nairn,

[7] The Court recognized Dr. Nairn as an expert in the fields of Coastal Engineering; River Engineering; Coastal Processes; Sediment Transport, specifically for sediment budget and longshore transport rate calculations and then beyond that in the field of numerical modeling, as it relates especially to coastal processes and sediment transport and finally, shore protection, specifically for shore protection design; impacts of coastal structures on shore erosion and beach nourishment. (TR, Day 5, 1107:8-25).

1117:14-21). The sediment budget would identify whether any net erosion is due to the jetties. (TR, Day 5, Dr. Nairn, 1120:12-15, 1122:17-1123:7). He concluded that it did not and that the volume of sediment provided by the Corps to the shoreline south of the St. Joseph Harbor since 1970 is sufficient to have offset any erosion attributable to the jetties. (TR, Day 5, Dr. Nairn, 1116:17-1117:10; DX-1, p. 1-14 (¶ HH)). Several factors, particularly the longshore transport rate, erosion caused by shore protection, and the amount of nourishment provided by the Corps, are central to understanding that result.

**(A) Longshore Transport Rate**

The Corps used the LST rate of 110,000 cy/yr from the 1973 DPR to represent the amount of sediment blocked by the jetties. (TR, Day 2, Dr. Selegean, 370:5-371:8; PX-93, p. 44, ¶ 74; PX-41, p. 3). Thus, that figure became the amount that the Corps believed it needed to provide in the nourishment program. (Id.) While generating his sediment budget, Dr. Nairn calculated a LST rate and determined that the 1973 DPR figure of 110,000 cy/yr was overstated.

The LST rate can be calculated by many different methodologies. (TR, Day 2, Charles Thompson, 420:4-9, 423:21-424:14; TR, Day 5, Dr. Nairn, 1141: 14-22). The passage of time brings changes and improvements in data and procedures. (TR, Day 2, Mr. Thompson, 424:2-6). Dr. Nairn employed no fewer than five different calculations based on three different approaches, analysis that itself both ensures an increased measure of confidence in the results and also reflects the integrity and thoroughness of his work. (TR, Day 5, Dr. Nairn, 1141:23-1143:8, 1144:9-22; DX-1, pp. 3-63 through 3-65). Those methodologies yielded results of 40,500 cy/yr, 71,500 cy/yr, 48,000 cy/yr, 40,000 cy/yr, and 50,000 cy/yr. (DX-1, pp. 3-63 through 3-65). For use in his sediment budget, Dr. Nairn used the average of these calculations

for a LST rate of 50,000 cy/yr. (TR, Day 5, Dr. Nairn, 1144:9-22). Dr. Nairn placed a confidence level of plus or minus 25 percent on his calculation for blind or unverified predictions of the LST rate. (DX-1, p. 2-28; TR, 1333:24-1334:19). He also noted that the rates predicted by his COSMOS model had been tested and calibrated. (DX-1, p. 2-28). Tellingly, plaintiffs' experts took no unimpeached exception whatsoever to Dr. Nairn's five methodologies or the results achieved for each. (TR, Day 1, Dr. Meadows, 143:19-146:14). Indeed, Dr. Meadows believed Dr. Nairn’s work here was extensive and in-depth and that the methods used were sound. (TR, Day 1, Dr. Meadows, 143:24-144:6). Nor did plaintiffs provide any testimony from their experts that took exception with or found a confidence level of plus or minus 25 percent problematic. Moreover, in two ways, the separate and independent work of Dr. Meadows, plaintiffs’ expert, is very important. First, Dr. Meadows confirms the accuracy and legitimacy of Dr. Nairn's LST rate of 50,000 cy/yr. Dr. Meadows, an accomplished coastal engineer in his own right, oversaw a series of studies performed by the Ocean Engineering Laboratory affiliated with the University of Michigan for which he was the project director. He participated in the collection of field data and the writing of the reports. He believes the studies were conducted properly and that the results were valid. These studies calculated the LST rate for the St. Joseph area at 50,000 to 60,000 cy/yr. At trial, Dr. Meadows affirmed the accuracy of that figure. (TR, Day 1, Dr. Meadows, 146:15-151:13). Second, Dr. Meadows believes that with his LST calculation of 50,000 to 60,000 cy/yr, and if the Corps had been placing nourishment on the order of 53,000 cy/yr (based on dredging figures from 1970-1995), then the

Corps would have mitigated for the jetty erosion. (TR, Day 1, 151:14-153:4).[8] Plaintiffs did not offer any evidence whatsoever to distance themselves or Dr. Meadows from his 50,000 to 60,000 cy/yr LST calculation or his conclusion that the mitigation was sufficient.

**(B) Erosion Caused By Shore Protection**

As mentioned above, no one disputes the basic fact that structures installed along the coastline to protect a shore cause further erosion. That additional erosion is manifested at the toe of the structure and to the shoreline downdrift. (TR, Day 5, Dr. Nairn, 1217:2-1218:19; TR, Day1, Dr. Meadows, 133:17-19). Further exacerbating the situation is that shore protection structures deprive the littoral system of an additional amount of sediment which normally – but for the structure which blocks its passage – would migrate from the landward bluffs to the shore. (TR, Day 5, Dr. Nairn, 1218:6-19).

Due to a number of factors, the shore protection installed by the C&O Railroad and the Michigan Department of Transportation ("MDOT") along the shoreline proved to be a significant culprit. The revetments installed by the C&O Railroad and the MDOT are contiguous, totaling approximately 1.7 miles in length combined. (TR, Day 5, Dr. Nairn, 1218:20-1219:24; DX-1, pp. 4-138 and 4-139). Prior to 1970, the two long sections of protection installed by the C&O and MDOT represented approximately 80 percent of the 2.1 miles of protected shoreline over the 8.4 mile sector south of the St. Joseph Harbor and

[8] From 1970 to 1991, the Corps placed an average of 90,000 cy/yr of sediment south of the St. Joseph Harbor to mitigate for erosion attributable to the jetties. From 1992 to 2005, the Corps placed an average amount of 42,000 cy/yr of nourishment. (See DX-25, column viii; DX-34; TR, Day 5, Dr. Nairn, 1324:3-15, 1330:19-1331:17). Calculating the average over the years from 1970 to 2005 ([90,000 cy/yr x 22 years] + [42,000 cy/yr x 14 years] divided by 36 years) yields nourishment amount of approximately 71,000 cy/yr placed by the Corps.

encompassing all of the Plaintiffs' properties. (TR, Day 5, Dr. Nairn, 1248:13-20; DX-1, p. 4-139). At present, about five miles of the shoreline from the St. Joseph Harbor to the south end of the plaintiffs' properties are protected (including the C&O railway and MDOT revetments). (DX-1, p. 4-139). This represents 60 percent of the total shoreline length in this reach. (Id.) The C&O and MDOT revetments are located updrift, or to the north, of the northern-most property owned by plaintiffs. (TR, Day 5, Dr. Nairn, 1212: 15-20).

As explained by Dr. Nairn, these two revetments set off a chain of events much like a falling domino. The revetments steepened the nearshore profile, which, in turn, increased the LST gradient. An increased LST gradient, in turn, causes increased erosion rates with then more and more shore protection inevitably installed downdrift. (TR, Day 5, Dr. Nairn, 1224-1226; DX-1, pp. 4-138 through 4-141). Combined, the C&O and MDOT shore protection structures remove or prevent approximately 25,000 cubic yards of sand from entering the littoral system each year. (TR, Day 5, Dr. Nairn, 1222:19-1223:16; DX-1, p. 4-139; DX-22). Dr. Meadows also testified that these two revetments cause significant problems. (TR, Day 1, Dr. Meadows, 134:12-19). The C&O and MDOT shore protection are primarily responsible for causing the steepening of the nearshore profile that, in turn, caused the related increase in longshore sand transport gradient (that is, an increase in the longshore sand transport rate between two points along the shore) which leads to an increase in erosion rates downdrift of the St. Joseph Harbor. (TR, Day 5, Dr. Nairn, 1224:3-17; DX-1, pp. 4-140 and 4-141). Subsequently, shore protection has been installed by property owners along much of the shoreline between the south side of the MDOT revetment and the south end of plaintiffs' properties. On average, this shore protection prevents about 70,000 cy/yr from reaching the littoral zone each year. (DX-1, p. 4-139).

The significant erosional effect of shore protection represents and introduces another element into this case of determining whether the jetties at St. Joseph can properly be found liable for any erosion suffered by the plaintiffs. This Court decided, in response to a motion by the defendant, that the United States is potentially liable for any erosion caused by efforts of owners to mitigate damages by placing shore protection devices on their properties. See Banks v. United States, 60 Fed. Cl. 206, 214-15 (2006). However, in order for the Court to find the defendant liable for shore protection erosion, the Court made clear that:

> To the extent that plaintiffs can establish at trial that the jetties in St. Joseph Harbor caused erosion damage to their shoreline and that plaintiffs' revetments were installed to address the erosion caused by the Corps, the court concludes that any further erosion caused by the protective structures is properly viewed as a "direct, natural, or probable result" of the activities of the Corps in St. Joseph Harbor.

60 Fed. Cl. at 214 (emphasis added). See also 60 Fed. Cl. at 217.

Two things happened at trial which individually and collectively show that the United States cannot be held liable for shore protection erosion. One was the complete absence of any proof by plaintiffs that shore protection – whether it was their own or anyone else's – was installed to address the erosion allegedly caused by the Corps. The second was the evidence provided by Dr. Nairn that demonstrated that the C&O and MDOT revetments were installed for reasons other than erosion caused by the Corps.

**(1) Plaintiffs Failed to Offer Any Evidence That Shore Protection Was Installed to Address Erosion Caused By The Corps**

Though plaintiffs clearly were on notice that they bore the burden of proof on the issue of erosion caused by shore protection, they provided no evidence – of any kind – to prove that

shore protection along the shoreline south of the St. Joseph Harbor was installed to address erosion that the jetties might cause. The evidence actually showed, as mentioned above, that shore protection was installed by plaintiffs for a number of other reasons, specifically storms and high water levels. Further, John Konik, Chief of the Regulatory Office for the Detroit District Office for the Corps, testified that applications for permits to install shore protection increase generally during times of high water levels. (TR, Day 5, John Konik, 1347:9-20). Plaintiffs scarcely attempted to carry their burden of proof. They certainly did not meet it. For this reason alone, the United States cannot be held liable for erosion caused by shore protection. Moreover, though the burden did not rest upon it, the United States affirmatively introduced evidence that other concerns prompted the building of the C&O and MDOT revetments.

**(2) Jetty-Induced Erosion Was Not The Reason <u>The C&O and MDOT Revetments Were Built</u>**

Dr. Nairn reviewed detailed information received from the current-day successor to the C&O Railroad Company and MDOT in response to subpoenas issued by the United States (TR, Day 5, Dr. Nairn, 1220-1221). Dr. Nairn testified extensively to his conclusions that both the C&O and MDOT revetments had to be installed because they were built too close to the shore. The following evidence is found in his testimony (TR, Day 5, Dr. Nairn, 1219-1248) and exhibits (DX-1 at pp. 4-138 through 4-141and 4-143; DX-2, DX-8, DX-9, DX-22, DX-129, DX-131, DX-140, and PX-102). An accepted coastal engineering standard for a stable slope allowance adjacent to infrastructure at the top of a bluff is 2.5 times the height of the bluff. In other words if the toe of a 100 foot high bluff is located within 250 feet of the edge of the infrastructure, protection is required. Therefore, it was not increased erosion rates due to the

harbor but instead the proximity of these two structures to a naturally eroding bluff that required they be protected. The C&O railway line was constructed south of the St. Joseph Harbor in about 1870, close to the shore, and was built initially on the eroding slope above the receding shoreline. The berm for the railway bed was terraced into a bluff face. The rail line was moved inshore sometime between 1871 and 1938 and again terraced into the eroding bluff face. Though it might be true that the erosion rate of the slope was increased by the presence of the St. Joseph Harbor, it is also true that even under the natural pre-harbor erosion rate, the railway line would have required immediate protection, both in its initial and later position due to site selection. By 1929, the full 0.7 mile length of the railway was protected in some manner, and by 1940, the railway was protected by steel sheet piling over the full length of the shoreline.

Directly to the south of the C&O shoreline protection, the MDOT constructed a one mile long revetment in 1960 to replace a groin system that had been implemented in the 1940s to protect Lake Shore Drive (now I-94 Business). The shore protection of the MDOT road would have been required whether or not the St. Joseph Harbor exacerbated the natural erosion in this area of the shore line.

The shore protection of the 1.7 mile section of the shoreline by C&O and MDOT not only resulted in steepening of the nearshore profile in these areas, it also reduced the supply of sand to the south (by eliminating supply through natural erosion) and effectively set off a domino effect of shore protection further down the shore to the south.

Prior to 1970, the two long sections of protection installed by the C&O and MDOT represented approximately 80 percent of the 2.1 miles of protected shoreline over the 8.4 mile sector south of the St. Joseph Harbor and encompassing all of the plaintiffs' properties. At

present, about five miles of the shoreline from the St. Joseph Harbor to the south end of the plaintiffs' properties are protected (including the C&O railway and MDOT revetments). This represents 60 percent of the total shoreline length in this reach.

In short, the evidence on the question of liability for shore protection erosion shows: (1) plaintiffs did not meet their burden of proof and (2) the United States established a prima facie case – even though the burden of proof lies with plaintiffs – that liability for the shore protection erosion does not rest with the Corps. The result is that the Corps is not liable for shore protection erosion first, and foremost, because plaintiffs failed to meet its burden. Moreover, though, the evidence shows that the United States provided an affirmative prima facie case to disprove liability. Cf., Hale v. Department of Transp., FAA, 772 F.2d 882, 886 (Fed. Cir.1985) (an unrebutted prima facie case amounts to proof by a preponderance of the evidence).

**(C) Amount of Nourishment Provided by the Corps**

Based upon figures provided by the Corps, Dr. Nairn calculated that the Corps placed an average of 90,000 cy/yr of sediment south of the St. Joseph Harbor to mitigate for erosion attributable to the jetties from 1970 to 1991 and 42,000 cy/yr from 1992 to 2005. (See DX-25, column viii; DX-34; TR, Day 5, Dr. Nairn, 1324:3-15, 1330:19-1331:17). Dr. Selegean testified to the meticulous, painstaking manner in which he canvassed Corps records to collect this information. (TR, Day 3, Dr. Selegean, 623:2-626:15). Plaintiffs attempted to undercut the legitimacy of these figures by implying that some portion of this total amount, which was included as nourishment in Dr. Nairn's sediment budget, was actually dumped far out into Lake Michigan beyond the depth of closure. (TR, Day 5, Dr. Nairn, 1330:19-1331:17). Dr. Nairn made it clear, without further challenge, that none of the sediment dumped beyond the depth of

closure was included in the figures for nourishment. (TR, Day 5, Dr. Nairn, 1342:19-1343:9). A comparison between the amount of nourishment provided by the Corps with the amount of erosion attributed to the jetties, as represented by the LST, shows the Corps provided enough nourishment to offset the jetty-induced erosion. Plaintiffs did not controvert the legitimacy or the accuracy of comparing these two numbers.

**2. Plaintiffs Unsuccessfully Attempt to Discredit the Sediment Budget**

With some overlap, plaintiffs attempt to undercut Dr. Nairn's sediment budget in two ways. The first aims to impeach his credibility by pointing to alleged differences in his testimony and his expert report (DX-1) in this litigation and earlier work which he was associated with on behalf of the Corps. Dr. Meadows, plaintiffs' expert, vouched for Dr. Nairn stating that he believed Dr. Nairn undertook his work in this litigation in a fair, objective, and competent manner. (TR, Day 1, Dr. Meadows,115:22-116:3). The second takes exception with some of his specific conclusions or information relied upon. Careful scrutiny dispels plaintiffs' criticism.

With respect to his earlier work and what he has found today in this litigation, plaintiffs have focused upon conclusions reached in technical reports, in which Dr. Nairn participated, that were published in 1996 (PX-23) and 1997 (PX-24) on behalf of the Corps. In those earlier reports, a LST rate of 110,000 cy/yr was used for the St. Joseph area and it was also deemed that the shoreline was cohesive. Dr. Nairn debunked each of these criticisms.

Regarding the contrast between the LST factor of 110,000 cy/yr and his expert report's calculation of 50,000 cy/yr, Dr. Nairn (a) testified that the LST rate used in the 1997 report was the rate arrived at in the 1973 DPR (TR, Day 5, Dr. Nairn, 1155:18-1156:1), (b) testified that he

was not asked to re-calculate the 1973 DPR rate for his earlier work in the 1997 report and that the 1973 DPR rate was provided to him as an assumption (TR, Day 5, Dr. Nairn, 1155:18-1156:1), and © demonstrated that the 1973 DPR figure was flawed and overstated the true LST rate because of issues with insufficient information regarding the shoreline and fillet growth between 1907 and 1954 (TR, Day 5, Dr. Nairn, 1145:2-1150:25).[9] Thus, on its face, plaintiffs'criticism is misplaced. It is further dashed by the thoroughness and the results of Dr. Nairn's five different calculations – which also relied upon more recent data and improved technology (see TR, Day 5, Dr. Nairn, 1123:22-1124:4, 1124:15-1125:18) – to calculate the LST rate in this litigation. Dr. Meadows agreed that Dr. Nairn's LST calculations were extensive, in-depth, and that the methods used were sound. (TR, Day 1, Dr. Meadows, 143:24-144:6). Finally, Dr. Nairn's LST rate was corroborated by the LST rate (50,000-60,000 cy/yr) calculated by Dr. Meadows, plaintiffs' own expert, through his earlier work on behalf of the University of Michigan.

Regarding the earlier conclusion that the St. Joseph shoreline was cohesive versus Dr. Nairn's view in this litigation that a substantial majority of the plaintiffs' properties lie in a

[9] In his testimony, Dr. Selegean also walked the Court through some calculations that showed how a major component of the 1973 DPR's LST figure, which itself derived in good part from the identical method used to calculate the LST rate in a 1958 Berrien County Erosion Control Study (TR, Day 3, Dr. Selegean, 656:15-657:21), was badly in error. In short, the 1973 DPR calculated the LST rate by adding (1) the amount of sediment that the north jetty trapped, and (2) the amount of sediment that worked its way around the north jetty and became trapped in the outer harbor and then ultimately was dredged. (TR, Day 3, Dr. Selegean, 668:18-669:1). Dr. Selegean showed how the amount of sediment trapped against the north jetty, which had been computed to be 75,000 cy/yr, was overstated and should have been more on an order of 40,000 cy/yr. (TR, Day 3, Dr. Selegean, 658:9-669:9, and especially 668:16-17).

sandy stretch of the shoreline,[10] plaintiffs' attacks are again in error. Dr. Nairn testified that the scope of the area studied in the earlier reports did not in one instance include the plaintiffs' zone and, in another instance, only included a small stretch of the shoreline where the northern-most plaintiffs' properties are located. (TR, Day 5, Dr. Nairn, 1108:3-1111:11; 1342:1-11). So, at bottom, the shoreline where plaintiffs' properties are located was not considered in one study and just a portion was considered in another study. What is significant, too, about the second study – in which a portion of the shoreline in which the northern-most properties are located was considered – is that the finding of a cohesive shore is consistent with the stratigraphy performed by Dr. Larson. Dr. Larson found that the shoreline for where some of the northern-most plaintiffs' properties are located is a cohesive shore that then transitions to a sandy shore for the remaining larger group of plaintiffs' properties. (DX-3, Figure 9, p. 34; DX-28; DX-31; TR, Day 4, Dr. Larson, 1008:18-20; Day 5, Dr. Nairn, 1212:21-1214:9, 1342:12-18). Plaintiffs were unable to discredit Dr. Larson's stratigraphy, which relied upon data not used in earlier studies and, moreover, was data related specifically to that portion of the shoreline in which plaintiffs' properties are located.

More specifically related to features of Dr. Nairn's work in this litigation, plaintiffs suggest his calculations of the LST rate of 50,000 cy/yr are imprecise because he estimates that the results are accurate within plus or minus 25 percent for blind or unverified predictions of the LST rate. (DX-1, p. 2-28; TR, 1333:24-1334:19). Importantly, he also noted that the rates

---

[10] While applying his own knowledge of geological matters that intersect with his coastal engineering expertise, Dr. Nairn's opinion here – and it is the one challenged by plaintiffs – looked to and relied upon, in the first instance, the stratigraphy generated by Dr. Grahame Larson, defendant's expert geologist.

predicted by his COSMOS model had been tested and calibrated. (DX-1, p. 2-28). Nonetheless, plaintiffs merely point to that figure and do not muster any supporting evidence to undermine the accuracy of the 50,000 cy/yr calculation. In doing so, plaintiffs ignore (a) that Dr. Nairn's calculation was arrived at using five different calculations using three different approaches, (b) that one of plaintiffs' experts not only took no exception but endorsed Dr. Nairn's work (see TR, Day 1, Dr. Meadows, 143:24-144:6), (c) that Dr. Meadows, their own expert, had previously calculated a LST rate that closely matches the figure used by Dr. Nairn, and (d) that the LST rate of 110,000 cy/yr from the 1973 DPR, which they favor, was badly flawed.

Finally, plaintiffs seem to suggest – without providing any specific cause and effect or quantifying (if they were correct) – that Dr. Nairn's sediment budget is incorrect because they believe that the jetties were permeable to the passage of sediment. Based upon the rock-filled timber crib design of the jetties, Dr. Nairn's analysis assumed that the jetties essentially were atotal barrier to the passage of littoral drift. Plaintiffs attempted to prove the jetties were permeable by introducing testimony about swimming exploits from over 50 years ago. (TR, Day 3, Richard Voss, 788:9-790:10). Examination of that testimony shows, in fact, nothing to support plaintiffs' belief that the jetties were impermeable. (TR, Day 3, Mr. Voss, 788:24-789:3 (he did not actually swim through or under the north jetty nor does he know anyone who did)). Plaintiffs also attempted to prove that the jetties were permeable because portions of the jetties were replaced or in need of repair almost 150 years ago. Such proof, without further evidence of more recent vintage or how, even generally, it adversely impacts the quantification results calculated by Dr. Nairn, avails plaintiffs of nothing. Further, plaintiffs ignore the testimony of their own experts and Dr. Selegean that the jetties were essentially impermeable to sediment

passing through them. (TR, Day 3, Dr. Selegean, 644:13-17; Day 1, Dr. Meadows, 111:4-112:2; Day 1, Dr. Chrzastowski, 202:22-203:13).

## CONCLUSION

For the reasons stated above, plaintiffs failed to meet their burden of proof. Similarly, for the reasons stated above, the defendant has proven it mitigated any jetty-induced erosion after 1970. Therefore, the United States respectfully requests judgment in favor of defendant.

Dated: July 6, 2007

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division

*s/Terry M. Petrie*
TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
Tele: 303-844-1369
Fax: 303-844-1350
Terry.Petrie@usdoj.gov

HEIDE L. HERRMANN
G. EVAN PRITCHARD
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

Attorneys for Defendant

OF COUNSEL
Gary W. Segrest, Esq.
Office of Counsel
U.S. Army Corps of Engineers
477 Michigan Avenue, Room 659
Detroit, MI 48226

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the **DEFENDANT'S POST-TRIAL BRIEF** by electronic filing with the Unites States Court of Federal Claims on this 6th day of July, 2007 on:

John Ehret, Esq.
5986 Dunham
Stevensville, MI 49127

Counsel for *Banks* Plaintiffs

****************
Eugene J. Frett, Esq.
Sperling & Slater, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
Counsel for *Frett* Plaintiffs

****************

*s/Terry M. Petrie*
TERRY M. PETRIE