**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No. 99-4451 L
c/w 04-277 L, 05-1353 L, 05-1381 L, 06-72 L

| | | |
|---|---|---|
| JOHN H. BANKS, MARY E. BANKS, et. al.<br><br>Plaintiffs<br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | ) | No. 99-4451 L<br><br>Judge Emily C. Hewitt |
| EUGENE J. FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust and<br>DONNA P. FRETT,<br><br>Plaintiffs<br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant | ) | No. 05-1353 L<br>Consolidated |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S POST TRIAL BRIEF**

JOHN B. EHRET, ESQ.
Attorney for Plaintiffs
John H. Banks et al.
5986 Dunham Avenue
Stevensville, MI 49127
Telephone: (269) 465-5857
Fax: (269) 465.3736
jbehret@covad.net

EUGENE J. FRETT, ESQ.
SPERLING AND SLATER, P.C.
Attorney for Plaintiffs
Eugene J. Frett, et al.
55 West Monroe Street
Suite 3200
Chicago, IL 60603
Telephone: (312) 641.6492
Fax: (312) 641.6492
gfrett@sperling-law.com

# INDEX


| | | Para. | Page |
|---|---|---|---|
| 1. | GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 1 |
| 2. | DEFENDANT'S BACKGROUND FACTS . . . . . . . . . . . . . | 4 | 2 |
| 3. | ZONE OF INFLUENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 2 |
| 4. | SAND REMOVAL AND PRUDENT PROTECTION . . . . . | 10 | 4 |
| 5. | REVERSE MITIGATION (TAKING) . . . . . . . . . . . . . . . . . . | 12 | 4 |
| 6. | WHAT IF LT. BERRIEN'S PLAN (PX68) HAD BEEN USED? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 | 7 |
| 7. | WHAT IF THE PIERS CAME DOWN? . . . . . . . . . . . . . . . . | 26 | 8 |
| 8. | TOTAL SAND - NOT NET SAND . . . . . . . . . . . . . . . . . . . . | 27 | 8 |
| 9. | DR. MEADOWS and USGS/NOAA . . . . . . . . . . . . . . . . . . . | 28 | 9 |
| 10. | NET LONGSHORE SAND TRANSPORT RATE . . . . . . . . | 29 | 9 |
| 11. | NOT NET - GROSS! . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 | 9 |
| 12. | SAND IS A SEAWALL . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | 10 |
| 13. | THE LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 | 11 |
| 14. | ARGUMENT ABOUT ACCURACY . . . . . . . . . . . . . . . . . . | 34-43 | 12-13 |
| 15. | CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44-48 | 13-14 |


## LEGAL AUTHORITIES


| | | Para. | Page |
|---|---|---|---|
| 1. | <u>Hale v. Department Of Transportation</u> . . . . . . . . . . . . . . . 772 F2d 882(Fed. Cir. 1985) | 29, 32 | 9, 11 |
| 2. | <u>Owen v. U.S.</u> 851 F2d 1404 (Fed. Cir. 1988) . . . . . . . . . . | 22 | 7 |
| 3. | Fifth Amendment to U.S. Constitution . . . . . . . . . . . . . . (PASSIM) | 22 | 7 |

**ACRONYMS OR ABBREVIATIONS**
**USED IN PLAINTIFFS' POST TRIAL BRIEF**

| | | |
|---|---|---|
| ACOE | .................................. | Army Corps of Engineers |
| CERC | .................................. | Coastal Engineering Research Center |
| CHL | .................................. | Coastal Hydraulics Lab |
| CSEB | .................................. | Coastal Structures and Evaluation Board |
| DDC-DPR | .................................. | Detroit District Corps Detailed Project Report |
| DPR | .................................. | Section 111 Detailed Project Report |
| FERC | .................................. | Federal Energy Regulatory Commission |
| HQUSACE | .................................. | Headquarters U. S. Army Corps of Engineers ("Sponsored" PX24) |
| LZ | ................................ | Littoral Zone |
| MCCP | .................................. | Monitoring Completed Coastal Projects |
| MDEQ | .................................. | Michigan Department of Environmental Quality |
| NLSTR | .................................. | Net Longshore Sand Transport Rate |
| NOAA | .................................. | National Oceanic and Atmospheric Administration |
| OHWM | ................................. | Ordinary High Water Mark |
| MDEQ | .................................. | Michigan Department of Environmental Quality |
| PPTB | ................................. | Plaintiffs' Post Trial Brief |
| PX23 | .................................. | Technical Report CERC-96-10 June 1996<br>Geological Effects on Behavior of Beach Fill and Shoreline Stability for Southeast Lake Michigan |
| PX24 | .................................. | Technical Report CHL-97-15 July 1997<br>Effectiveness of Beach Nourishment on Cohesive Shores, St. Joseph, Lake Michigan |
| SSP | ................................. | Steel Sheet Piling |
| USGS-NOAA | ............................ | United States Geological Survey<br>National Oceanic and Atmospheric Administration |
| WES | ................................ | Waterways Experiment Station ("Conducted" PX94) |
| ZOI | .............................. | Zone of Influence |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S POST TRIAL BRIEF

### GENERAL

1. Contrary to defendant's Post Trial Brief, defendant, largely through its own business records, has admitted that since 1836 its piers at St. Joseph Harbor Michigan have blocked or diverted varying percentages of sand available in the littoral system and almost all of the sand from the St. Joseph River. The percentage is a function of the condition of the piers which were wooden, open top, rock filled cribs in varying stages of decay over the years. In 1953 the Corps began to install steel sheet pile encasement which is contrary to the intent of Section 111 of the River and Harbor Act of 1968. By the late 1980s the encasement program was complete and the piers were admitted by the Corps to be a total barrier to the littoral drift, removing all sand from the littoral zone whether from the north or the south. The documents and testimony admitted into evidence during trial prove by an overwhelming preponderance that sand is the best shore protection, that it is a natural resource which flows in a littoral zone measured along the shore to a depth of about 20 feet, that the Michigan shore and owners thereof have a property right in the littoral flow of sand, and that all erosion and shore protection are attributable to varying degrees of sand depletion inevitably and unnecessarily caused by the piers.

2. Defendant's scheme of defense at trial was based on unsupported fillet calculations, "modeling" designed to avoid the long-accepted net longshore sand transport rate, and attempts to recategorize the readily discernible cohesive lake bed geology (not that this matters with respect to the ongoing lake bed lowering/downcutting occurring in the Plaintiffs' zone).

3. Defendant has failed to rebut plaintiffs' prima facie case and the preponderance of its own documentary evidence. Defendant is therefore liable for all damage associated with the continuing erosion of shore and subjacent underwater support for plaintiffs' properties, (past, present and prospectively).

**DEFENDANT'S BACKGROUND FACTS**

4. It is important to draw attention to certain erroneous assumptions regarding Background Facts at page 1 and 2 of defendant's brief.

5. As to pier impermeability of the rock filled timber design (addressed extensively in Plaintiffs' Post Trial Brief ("PPTB") at 6 - 10), PX93 - Plate 2 Gov908 shows Section A2 is 107 feet long located near the lakeward end of the north pier and Plate 3 (Gov909) shows the Section A2 detail of the upper wood structure broken out on the channel[*] side in the 1953 period before steel encasement repair. COMMENT: At this location the pier is exposed to the largest waves from both the north and southwest. Winter waves would be ladened with ice to crash against the wood which had been exposed since completion in 1903.

**ZONE OF INFLUENCE (ZOI)**

6. As to the Zone of Influence (ZOI), it is not configured as defendant describes in page 2 of its brief. PX93 - Gov976 shows the large outer bracket embracing the entire shoreline from 5,200 feet north of the jetties to 20,900 feet south (6,000' + 5,500' + 4,100' + 2,800' equals 20,900').

7. The ZOI is not to be considered fixed according to the Monitoring Report PX32-4

---

[*] The CHANNEL SIDE letters are arranged vertically along the left side of Plate 3 and LAKE SIDE in the same fashion along the right side of Plate 3.

where it is said:

> Topographic maps of the zone of influence, at scale 1" = 100', should be developed annually based on aerial photography. The “zone of influence” is defined in Section 111 DPR as extending 6,600 feet north of the harbor to 22,800 feet south of the harbor.

8. Day two of the field trip brochure by Thompson et al PX113-2 (DAY TWO - 1 May 1994) says:

> Today’s field trip will take us along the coastline of Berrien County, Michigan from about two miles north of St. Joseph to the vicinity of Grand Mere Lakes.
>
> Like yesterday, we will focus on the reach of coastline under the influence of the federally maintained navigation structures at St. Joseph/Benton Harbor.
>
> Please note: Stop #6 Yesterday was Warren Dunes State Park about 82,000' south of St. Joseph where PX113-9 states:
>
>> Perhaps strangely, the vast amount of sand visible in the dunes does not reflect the amount of sand present offshore. Recent USGS surveys, published in 1992, indicate that there is very little sand cover in southern Lake Michigan.

9. PX113-3 states that Rocky Gap Park is located about 8,000 feet north of the St. Joseph/Benton Harbor, harbor structures. The brochure describes the site as dominated by “accretionary processes”/ “The accretion fillet extends about 8,000 feet northward from the harbor jetties. It gradually tapers to an end near Rocky Gap Park. Its presence is primarily the result of about a century of interrupting alongshore littoral drift, which in this area moves predominately north to south.” COMMENT: In Thompson’s testimony (Tr. 451-3), he describes the tour invitees as being about two dozen from Coastal Engineering Research Center (CERC), Western Michigan University, Corps’ personnel and Chrzastowski from Illinois Geologic Survey (456:17-25). This was a tour of professional people being told the ZOI has grown far beyond the original dimensions from 1973, and the fillet was still “accretionary” as opposed to stable as

assumed by Dr. Nairn in his May 2006 litigation report.

**SAND REMOVAL AND PRUDENT PROTECTION**

10. Plaintiffs having proved a prima facie case that defendant blocked all littoral sand and river sand from being supplied to the littoral zone, defendant is liable for all consequences of that removal. While defendant attempted to mitigate, its well intended efforts were totally ineffective and too late to save the plaintiffs from erosion of fast land and the expenditure of funds to prudently protect their properties.

11. In the context of a Fifth Amendment Taking, given that the defendant has not and cannot rebut its own admissions regarding interrupting, blocking, diverting and dredging for permanent removal some 110,000 cy/y of net littoral drift, much less defendant's removal of gross littoral drift calculated to be 681,000 cy/y (PX24-79, and Meadows Tr. 161:4 to 162:20, Meadows Tr. 44:4 to 45:23), the plaintiffs have satisfied their burden of proof.

**REVERSE MITIGATION**

12. Defendants permanent removals from the littoral system include 407,739 cy (Whirlpool Placements - PPTB p. 23, para. 54), 491,993 cy (non beach material - p. 23, para. 56) and 1,220,930 cy (1975 - 1984 northerly drift - PPTB p. 23-24, para. 56a)

| | | |
|---|---|---|
| 407,739 | cy | (Whirlpool) |
| 491,993 | cy | (course nonbeach material not replacement in kind) |
| 1,220,930 | cy | (1975-1984 net northerly transport) |
| 2,120,662 | cy | SUBTOTAL |
| 6,234,273 | cy | (73 years before 1900) (85,401 cy x 73, see PPTB p. 22, para. 52) |
| 768,609 | cy | (defendant's DX34 unknown years (85,401cy x 9) |
| 5,004,426 | cy | (defendant's DX 34 deep dumped dredgings) |
| 14,127,970 | cy | Taking by reverse mitigation |

13. The 1975 to 1984 period of time (when littoral flow was northbound) is a perfect example of wasted attempts at nourishment. In such a time period, when directional reversals

are in play, the presence of the piers diverts replacement sand beyond the littoral zone.

14. The defendant's self-serving assumption is that diverted sand (or at least substantial amounts thereof) are captured in the 24 foot deep flare at the mouth of the piers. Defendant believes the flare acts as a perfect settling basin or catch basin or sink. Aerial photos, PX115 and PX93 - 39a Figure 7 clearly show only a small portion falls fast enough to be captured there. Seeing is believing.

15. Even if the sediment fall velocity were so great that substantial sediment is captured in the fan shaped flare, the fall velocity effect would prevent the sediment from escaping the southbound littoral drift being captured in the depression shown on PX24 - 80 Figure 35. That depression is over 9,000 feet long, where the flare is about 300 feet long.

16. The huge size of the PX24 - 80 depression seems not to deter defendant from concluding that the small flare catch basin captures all sediment whereas the much larger depression catches only about 50% (PX24 - 18, 49, 87).

17. It is clear that the PX24 - 80 Figure 35 depression is directly opposite the CSXRR/MD0T revetments (PX24 - 4 Figure 1), and more likely than not made them necessary. It is also clear that the "Large depression in the Lake Bed Developed between 1945 - 1965," was caused by "Erosion of Overlying Sand Veneer and erosion of Glacial Till." Both foregoing quotes are to be found on PX24 - 80 Figure 35. The period 1945 - 1965 is also related to the beginning of the process of steel sheet pile encasement (sand sealing). Please see PPTB-8 Column 3. The LATIN post hoc ergo propter hoc (after that therefore because of that) cries out here. In any event, the cause is the depletion of sand supply.

18. Continuing to refer to PX24 - 80 Figure 35, the 1997 Corps Report (PX24 - 87)

ascribes erosion to lack of sand:

> It is likely that the shoreline of Sector G, and particularly the shore to the south of the sector, are suffering due to a depletion of the historic sand cover with the associated increased exposure of the underlying till and increased downcutting and shoreline recession rates.

PX24 - 82 Figure 37 contains a similar sentiment on the COSMOS model drawing in notes opposite Section F and G:

> Erosion Associated with Reduction in Sand Cover and Exposure of the Cohesive Substratum.
>
> and
>
> Zone of Rapid Lowering Moving South

19. Thus the existence of the railway (CSX) and the highway (MDOT) revetments can be traced to the exhaustion of the sand supply due to the piers. After all, it has been found by Nairn at PX23 - 49 that: "a covering of sand and/or gravel of only 2 to 5 cm (2 inches) would be enough to protect the till from erosion." (if maintained)

20. ARGUMENT: Mitigation shortfalls and long intervals between nourishments are completely unacceptable, particularly where the ill effects of the piers can be mitigated by maintaining a mere 2 inch layer of sand. These failings are caused by the lack of funding received by the Corps from Congress. Please see Schweiger testimony 710:10 through 711:10.

21. ARGUMENT: Not only were the original Section 111 quantities (110,000 cy/y) under-calculated by using <u>net</u> littoral drift instead of gross littoral drift, but they were abandoned in spite of a Fifth Amendment duty to compensate for erosion caused by taking or blocking or diverting or interrupting plaintiffs' rightful and essential supply of sand.

22. The Fifth Amendment Right to Compensation is a per se right. Plaintiffs' right to compensation exists by virtue of the Constitution, and not just by virtue of its recognition in Owen v. US 851 F2d 1404 at 1413 (Fed. Cir.1988). The 1973 PX93 DDC-DPR gives no indication that the Corps recognized its constitutional obligation, but by the 2000 PX41 - 3 Monitoring Report the Corps shows a better understanding:

> In simple terms any adverse effect associated with the federal harbor structures is the result of the disruption of littoral processes; specifically the removal of material from the littoral system. The beach nourishment program is designed to mitigate this disruption by replacing that material.

COMMENT: "Replacing that material," assuming it fully compensated for all of the material blocked by and permanently removed by the Corps, would be a Fifth Amendment solution. But in the end, the Corps abandoned any such attempt. Without actually saying so, the 2000 PX41 - 3 Monitoring swung the Section 111 program into alignment with the Fifth Amendment where it should have been all along. Unfortunately, the report fell on deaf ears, and no meaningful mitigation has been attempted since.

23. The sand, which plaintiffs' no longer have, came from the littoral drift and the St. Joseph River. Defendant's own expert says so (see PPTB p. 26-27, para. 64). That expert is Dr. Grahame Larson.

**WHAT IF LT. BERRIEN'S PLAN (PX68) HAD BEEN USED?**

24. If Lt. Berrien's plan had been used for the River mouth, there would be no north fillet to trap or divert sand from the north and there would be no south fillet to trap sand from the south. Consequently, there would be nothing removing sand from the littoral system, while we would have the St. Joseph River adding sand to the littoral system. Moreover, the river sand would be in especially large quantities, if some of the dams were removed or "drawn down."

25. Defendant's other expert, Dr. Nairn, admitted at trial (Tr. 1332:3-10) that if the Lt. Berrien plan had been adopted, all the sediment from the river and all the sediment from the littoral drift would have continued within the litoral zone and have been available to Plaintiffs' properties (PPTB p. 41, para. 125).

**WHAT IF THE PIERS CAME DOWN?**

26. If the piers were removed then all the sand trapped at the north fillet and all the sand trapped at the south fillet would re-enter the system. (PX93 - 39, 40, para. 63). The wave domination from the north would force the river discharge to the south. By removing any river dams, the sand impounded by the dams would be released into the littoral system. The system would be sand rich. The whole shore would be natural again and it would be accretional not erosional.

**TOTAL SAND - NOT NET SAND**

27. The sand available to the littoral system would be the total sand trapped, not the net sand trapped. Of course, the total sand trapped does not account for all the sand dredged and permanently removed from the system (by deep dumping in the lake or diverting it to Whirlpool and the Airport) for some 160 years. But surely it would make a significant dent in the shortfall. ARGUMENT: The point here is not to suggest that removal of the piers could be ordered by the Court, but to bring into focus what it would have been like if the piers had never been built. NET LITTORAL DRIFT HAS NO PLACE IN THAT PICTURE.

**DR. MEADOWS AND USGS/NOAA**

28. Instead, we have what Dr. Meadows described at Tr. 54:17 (PPTB - 3):

> AND IF THOSE AREAS, IF THE SEDIMENT is continued not to be supplied from the north, then the length of the area that is eroding will continue to expand

> because the only source is eroding of the bottom once the sediment supply from both the north and from the shoreline is shut off.

Combine with USGS/NOAA PX33 - 10, PPTB p. 2:

> The harbor jetties to the north of this area have effectively trapped some of the southerly littoral drift which has resulted in a sediment starved nearshore area to the south, sand cover, therefore, is not sufficient to protect the till from erosion.

COMMENT: This is what happened to make the depression at the CSXRR and the MDOT revetments.

**NET LONGSHORE SAND TRANSPORT RATE**

29. The net longshore sand transport rate (NLSTR) is not the same as the amount of material removed from the littoral system. The NLSTR is not a measure of the Fifth Amendment Taking. The NLSTR is a mathematical difference arrived at by subtracting the calculated updrift (northbound) sand transport rate from the calculated downdrift (southbound) sand transport rate. That difference is meaningless in the context of a Fifth Amendment Takings case. The entire endeavor by Dr. Nairn is not of consequence to the facts of this Takings Case.

ARGUMENT: Defendant has failed to rebut Plaintiffs prima facie case and therefore the per se takings rule applies. (Hale v. Department of Transportation, 772 F2d 882 at 885 (Fed. Cir. 1985).

**NOT NET - GROSS!**

30. What is of consequence is the updrift sand transport rate added to the downdrift sand transport rate as calculated by the Corps in the regular course of its business and documented in PX24 - 18 Table 3 for Profile 8. (Closest transect to the south fillet). Those numbers are 306, 278 cy/y (updrift - north), plus 375,328 cy/y (downdrift - south). Dr. Meadows

at Tr. 161 and 162 opines that, following Nairn's lead, if all sediment reaching the area from the north and south is trapped by the piers, you should add the numbers. Dr. Meadows got 681,000 cy/y - using the first three digits. That would be the amount of sand trapped by the piers and removed from the littoral system in just one year - not the mathematical net of 69,000 cy/y (i.e., 375,000 minus 306,000). 681,000 cy/y is about 10 times greater than 69,000 cy/y.

**SAND IS A SEAWALL**

31. In 1958 (PX132 - 6) the Beach Erosion Board recommended "a protective beach with berm elevation of 10 feet above low water datum at the base of the bluff and 50 feet in width at elevation 8 feet."

and

"periodic nourishment to stabilize the restored shore in view of lack of natural supply" (PX132-5)

ARGUMENT: The Board is saying that the lack of sand is not "natural." Defendant here is saying that it is "natural" to erode. Plaintiffs submit that the system was balanced until the piers were interposed. This 1958 study is a congressionally authorized and Corps approved document under Section 2 of the River and Harbor Act of July 3, 1930. It constitutes an admission that a protective beach berm with periodic nourishment was required for all of Berrien County because of the lack of a natural supply of sand. (PX132 - 7 Report of District Engineer) (The study area is defined at PX132 - 12 para 21).

## THE LEGAL STANDARD

32. The Plaintiffs have proven their liability case through the Corps' own admissions in its documents prepared in the regular course of its business (PX23, 24, 31, 32, 41, 58, 61, 68, 93, etc.). The defendant failed to rebut this evidence by not even addressing the removal of sand from the natural littoral zone caused by the federal jetties acting as a total barrier. Instead, their expert, Dr. Nairn, focuses on meaningless net longshore sand transport rates. "An unrebutted prima facie case necessarily amounts to proof by a preponderance of the evidence." Hale, 772 F.2d at 885.

33. Without the requisite updrift and downdrift sand transport numbers to justify Dr. Nairn's litigation report, defendant has maintained that the north and south fillets are stable. That conclusion is contradicted by ground truthing from Dr. Chzastowski at Tr. 199:12 through 201:4, Dr. Meadows at Tr. 65:3 - 7 referring to PX93 - 8, 9 para. 25 and further challenged by:

a. Melcher photos PX Summary Tab 2 Photos 15 through 20 showing winter sand blown clear across Silver Beach and Lake St.

b. Ames Aerial Photos PX Summary Tab 4 Photos 96 through 91 showing north fillet and 90 through 88 showing south fillet. Both confirm Chrzastowski's assertions of vertical growth, as cited above.

c. Ames Aerials PX Summary Tab 4 Photos 90 and 91 showing relatively new Parking Lots constructed and leveled.

d. Continued vertical growth of the fillets was further admitted in the Corps 1997 Monitoring Report by Schweiger at PX31 - 5 "The accretion fillets continue to grow, primarily in elevation."

## ARGUMENT ABOUT ACCURACY

34. In 1996 the Corps Technical Report (CERC PX 23-37) declares that: "COSMOS has proven to be an accurate and robust predictive tool that can be applied to any site without need for calibration . . ."

35. In May 2006 the Nairn litigation report for the Department of Justice (DOJ) states:

> It should be noted that blind or unverified predictions of longshore sand transport rates are, regardless of the method applied, expected to be within +/ - 25% of actual rates and sometimes no better than a factor of two from the actual rates. (DX 1-2/28)

36. In order to cure this discrepancy, Nairn tries to test the rates he found in his litigation study against known rates. (DX 1-2/28).

37. There is great disagreement within the defendant's ranks over what is known and what is a guess. Indeed, after characterizing himself as a Coastal Engineer, Nairn then says:

> Coastal Engineering would be I guess the use of science *or art* of using pure science to solve in an applied manner, to solve problems associated with coastlines (Tr. 1080:8-18). (emphasis added)

38. Nowhere does Dr. Nairn elaborate on how Coastal Engineering fits into this Fifth Amendment litigation. In fact, he said that he had never been employed in connection with Fifth Amendment litigation (Tr. 1264: 15-17).

39. He did say that the DOJ was paying him $1,000,000 for his litigation report and that it was proprietary (Nairn Tr. 1327: 17; Meadows Tr. 142:8-13).

40. If property rights determinations under the U.S. Constitution are to be a matter of "art," then compensation became wholly arbitrary.

41. The studies Nairn does are not insured for accuracy. (Tr. 1262:10-12 and Tr.

1263:11-19).

42. Nairn's litigation report (May 2006) depends on "known sand accumulation rate updrift of the north jetty." (DX1-2/28). Nairn doesn't explain how he measures sand that isn't there or how the sand accumulation rate can be known when there is so much disagreement on the subject. (See page 11, paragraph 33, above).

43. Thompson, Erickson and Parsons describe the north fillet as being 8,000 feet long and as being dominated by accretionary processes. (See PX 113-3, and page 3, paragraph 9 above.)

**CONCLUSION**
**NATURAL V. UNNATURAL**

44. Wind, waves, sand and beaches are natural to our environment. We have always had them. Then we had piers followed by shore protection seawalls and boulderization. North of the St. Joseph piers there is no artificial protection. South of the piers there is artificial shore protection. North of the piers the sand is the protection for the shoreline.

45. South of the piers the sand is being depleted. Depletion of sand is not natural. Littoral drift is not erosion. Littoral drift is natural. It transports the sand along the shore. Erosion of the shore is not natural. The piers and the river dams are not natural. They remove the sand which is the shore protection and the result is erosion.

46. The piers, the dams and the dredging are the only things removing the sand. Shore protection is a consequence of that depletion, not a cause. The Corps and its piers, dams and dredging are the cause of the sand depletion, and the resulting erosion, plain and simple.

47. Clearly, the piers, dams and dredging are here to stay. At the same time, the Corps refuses to stop or properly mitigate for the depletion of sand and the resulting erosion.

The Corps wants to blame the waves and the seawalls. If you have the sand nature intended then seawalls would not be necessary.

48. The Corps is liable for all damage that results from its activities.

Respectfully submitted,

Dated: July 18, 2007

/s/ John B. Ehret
John B. Ehret
Attorney for Plaintiffs,
John H. Banks et al
5986 Dunham Avenue
Stevensville, MI 49127

**CERTIFICATE OF SERVICE**

I, the attorney, John B. Ehret do hereby certify that on the 18th day of July, 2007, I caused to be electronically filed with the United States Court of Federal Claims **PLAINTIFFS' RESPONSE TO DEFENDANT'S POST TRIAL BRIEF** to be served on the below listed attorneys of record:

Eugene J. Frett, Esq
SPERLING AND SLATER P.C.
55 West Monroe Street
Suite 3200
Chicago, IL 60603
Telephone: 312.641.3200
Fax: 312.641.6492
gfrett@sperling-law.com

Heide L. Hermann
G. Evan Pritchard
Environmental and Natural
Resources Division
U. S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: 202.305.3315
Fax: 202.305.0274
Heide.Hermann@usdoj.gov

Terry M. Petrie
Environmental and Natural Resources Division
U. S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
Telephone: 303.844.1369
Fax: 303.844.1350
Terry.Petrie@usdoj.gov

Dated: July 18, 2007

/s/ John B. Ehret
John B. Ehret
Attorney for Plaintiffs
John H. Banks et. al.