**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **JOHN H. and MARY E. BANKS, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **No. 99-4451 L**<br>**Judge Emily C. Hewitt** |
| **EUGENE J. FRETT, Individually and as trustee of the Victor J. Horvath and Frances B. Horvath Trust, and**<br><br>**DONNA P. FRETT,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **No. 05-1353L**<br>**Judge Emily C. Hewitt** |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' POST-TRIAL BRIEF**

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division

TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294

HEIDE L. HERRMANN
G. EVAN PRITCHARD
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

OF COUNSEL
Gary W. Segrest
Office of Counsel
U.S. Army Corps of Engineers
477 Michigan Avenue, Room 659
Detroit, MI 48226

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . 1

I. PLAINTIFFS ARGUE IRRELEVANT MATTERS . . . . . . . . . . 1

A. Irrelevant Arguments . . . . . . . . . . 2

B. Efforts to Rewrite the Record . . . . . . . . . . 3

C. Navigability of the St. Joseph Harbor . . . . . . . . . . 4

II. UNITED STATES v. DICKINSON PROVIDES PLAINTIFFS NO RELIEF . . . . . . . . . . 4

III. PLAINTIFFS FAIL TO DISCREDIT DR. NAIRN'S SEDIMENT BUDGET . . . . . . . . . . 6

A. Plaintiffs' Fail to Impeach Dr. Nairn's Credibility . . . . . . . . . . 7

B. Plaintiffs' Mistaken Belief That They Are Entitled to Compensation For All Sediment Removed From the Littoral System Does Not Undermine Dr. Nairn's Sediment Budget . . . . . . . . . . 7

C. Dr. Larson's Stratigraphy Shows that the Shoreline is Sandy . . . . . . . . . . 9

D. Corps Beach Nourishment Program Offset Erosion Attributable to the Jetties . . . . . . . . . . 10

IV. PLAINTIFFS' EXPERTS AGREE WITH DEFENDANT . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . 14

## TABLE OF AUTHORITIES

CASES

Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . 5

Casitas Mun. Water Dist. v. United States, 76 Fed. Cl. 100 (2007) . . . . . . . . . . . . . . . . . . . . . . . 2

Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 5

Conti v. United States, 291 F.3d 1334 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Dolan v. City of Tigard, 512 U.S. 374 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

M & J Coal Co. v. United States, 47 F.3d 1148 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 5

Nollan v. California Coastal Commission, 483 U.S. 825 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 2

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302 (2002) . . . . . . 2

United States v. Dickinson, 331 U.S. 745 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

## INTRODUCTION

Our opening brief demonstrated that (1) plaintiffs failed to carry their burden of proof at trial for both their cause of action as well as their burden to establish that shore protection was installed because of the jetties in the St. Joseph Harbor, and (2) Dr. Nairn's sediment budget proves that the United States Army Corps of Engineers ("Corps") provided enough nourishment to offset any erosion attributable to the jetties since 1970. Plaintiffs' opening brief expends much effort to set forth the opinions of plaintiffs' counsel on scientific and coastal engineering matters; however, plaintiffs say little about Dr. Nairn's sediment budget and nothing about their burden on the issue of shore protection. Buried within their opening brief, plaintiffs raise two legal arguments which we will address below.

Plaintiffs also fill their opening brief with (A) irrelevant arguments based upon inapplicable law or which address issues not before this Court presently, indecipherable arguments, and inconsistent statements; (B) efforts to rewrite the record; and (C) efforts to re-visit the navigability of the St. Joseph Harbor, an issue the Court unmistakably informed plaintiffs was not relevant.

At bottom, when plaintiffs' extraneous offerings are culled from their brief, plaintiffs have failed to establish how they proved their cause of action by a preponderance of the evidence, and fail to undermine the legitimacy of Dr. Nairn's conclusion that the Corps has provided enough nourishment to offset erosion attributable to the jetties since 1970.

## I. PLAINTIFFS ARGUE IRRELEVANT MATTERS

Because it provides a clearer and more distinct perspective of what plaintiffs address, we briefly catalogue some examples of irrelevant matters which are laced throughout their 47-page

opening brief. In turn, plaintiffs' election to address these matters proves telling especially when juxtaposed with their absence of comment upon the key matters before the Court.

**A. Irrelevant Arguments**

Plaintiffs repeatedly advocate two irrelevant arguments before the Court. First, based upon the Supreme Court decisions in Nollan v. California Coastal Commission, 483 U.S. 825 (1987), and Dolan v. City of Tigard, 512 U.S. 374 (1994), plaintiffs knowingly attempt to persuade the Court to apply inapplicable law regarding regulatory takings to this case which involves an alleged physical taking. Plaintiffs' Opening Post Trial Brief ("Pls. Br."), at 35-37 (¶¶ 98-106) and 40-41 (¶¶ 120-123).[1/] Fifth Amendment takings claims generally are divided into two broad categories: physical takings and regulatory takings. The liability considerations differ markedly for these two categories, and it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 323 (2002); see also Casitas Mun. Water Dist. v. United States, 76 Fed. Cl. 100, 105 (2007).

Plaintiffs also argue compensation issues prematurely and allege future loss of shoreline. The case was heard by the Court solely upon the question of liability for the time frame addressed by this consolidated matter. See Pls. Br., at 33 (¶ ¶ 92c and d), 35 (¶ 97), 37 (¶¶ 108-109), 43-44 (¶129), and 47 (¶ 141). Because this is a physical takings claim, valuation issues have no role in the liability analysis and should not be before the Court at this time.

[1/] Inexplicably however, plaintiffs acknowledge that Nollan and Dolan should not be applied here because they "are regulatory cases, not to be relied upon for constitutional taking cases." Pls. Br., at 40 (¶ 122).

Plaintiffs' brief also is rife with inconsistent statements and indecipherable arguments. Two examples capture the flavor of plaintiffs' brief. In one instance, plaintiffs argue that Lake Michigan is receding. See Pls. Br., at 25-26 (¶¶ 59-63). Yet, plaintiffs also argue that the lake is advancing shoreward. Pls. Br., at 26 (¶ 63) and 30 (¶ 77). Another illustration is plaintiffs' argument which features a purported "prior admission" which Dr. Nairn supposedly has to "explain away." Pls. Br., at 30 (¶ 77). From plaintiffs' brief, we cannot ascertain what the "prior admission" is, nor what, if anything, plaintiffs believe it has to do with the issue addressed in the argument. Plaintiffs further confuse matters by failing to link the argument to the ultimate issue of whether the jetties have caused erosion to plaintiffs' properties for which the Corps' beach nourishment program has not been sufficient. Nor do plaintiffs attempt to draw a nexus between the argument and their burden to establish that shore protection was installed because of the jetties.

**B. Efforts to Rewrite the Record**

Plaintiffs attempt to rewrite the record in their opening brief. Two simple examples suffice to demonstrate and necessarily cast doubt upon the assertions made in their brief. First, plaintiffs violate the Court's order filed June 19, 2007 (Docket No. 238) which states, in part, "[n]o exhibit not admitted into evidence at trial shall be introduced for the first time through post-trial briefing." Plaintiffs refer to plaintiffs' exhibits 2 and 58 in support of their argument. Pls. Br., at 5 (¶ 15) and 9 (¶ 25), respectively. Neither exhibit was admitted into evidence at trial. Second, as part of their argument about the permeability of the jetties (Pls. Br., at 6-10), plaintiffs cite the testimony of Mr. Richard Voss to the effect that "he used to swim under the north pier." Pls. Br., at 10 (¶ 28). By citing only that portion of Mr. Voss's testimony, plaintiffs

attempt to rewrite the record when the totality of Mr. Voss's testimony shows a different picture. He specifically also testified that he did not actually swim through or under the north jetty nor does he know anyone who did. Trial Record ("TR"), Day 3, Mr. Voss, 788:24-789:3. Mr. Voss's testimony completely comports with the opinions of plaintiffs' own experts that the jetties were essentially impermeable to sediment passing through them. TR, Day 1, Dr. Guy Meadows, 111:4-112:2; TR, Day 1,Dr. Michael Chrzastowski, 202:22-203:1.

### C. Navigability of the St. Joseph Harbor

Plaintiffs were informed at the May 16, 2007 Pre-Trial Conference that navigability of the St. Joseph Harbor for purposes of the Corps' exercise of authority was not an issue for this trial. May 16, 2007 Transcript of Proceedings at 32:16-33:4. (Docket No. 238). Nonetheless, counsel for plaintiffs attempted to pursue the matter at trial. TR, Day 1, 13:4-9. Now, plaintiffs' counsel persists in elbowing-in side remarks in plaintiffs' brief to espouse his personal opinion. See Pls. Br., at 35 (¶ 96) ("In this case the Corps built the jetties because they perceived that the jetties made it easier to dredge. The jetties do not create navigability.") and 40 (¶ 121) ("The cause is the piers which were never really necessary for navigation in the first place"). Underscoring plaintiffs' counsel's unwillingness to yield to the facts and the Court's direction is the testimony of plaintiffs' own expert, Dr. Chrzastowski, who agreed with no hesitation that the purpose of the jetties is to maintain a navigable channel. TR, Day 1, Dr. Chrzastowski, 202:12-16.

## II. UNITED STATES V. DICKINSON PROVIDES PLAINTIFFS NO RELIEF

Unable to refute factually the conclusions reached by Dr. Nairn's sediment budget, plaintiffs cite United States v. Dickinson, 331 U.S. 745 (1947), for several erroneous

propositions. Pls. Br., at 33-34.

First, plaintiffs argue that the Government should be required to compensate plaintiffs for all material that has been removed from the littoral system for the last 163 years. Pls. Br., at 33 (¶ 92a). In support, plaintiffs quote Dickinson, in which the Court held that ". . . payment need only be made for what is taken, but for all that the Government takes it must pay." Dickinson, 331 U.S. at 750. Plaintiffs' citation is inapposite, because the Dickinson holding applied to compensation for takings of property that was owned by the plaintiff in that case. Id. Here, plaintiffs cannot argue that they have a compensable property interest in all material found in the entire littoral system of Lake Michigan. It is axiomatic that plaintiffs can only claim compensation for the taking of their own property. See Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1215 (Fed. Cir. 2005) (claimant "must, at a minimum, assert that *its* property interest was actually taken . . .") (citing United States v. General Motors Corp., 323 U.S. 373, 379 (1945)) (emphasis in original). See also Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003) (holding court must first consider "the nature of the interest allegedly taken to determine whether a compensable property interest exists"); Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002) (court must first evaluate whether claimant has established a "'property interest' for purposes of the Fifth Amendment"); M & J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995) (threshold inquiry must be to "determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with").

Second, plaintiffs cite Dickinson in support of their argument that "the cost of prevention is a proper basis for determining the damage." Pls. Br., at 33 (¶ 92c), citing Dickinson, 331 U.S.

at 751. Because this matter has been bifurcated, the amount of damages to be awarded, should the Government be found liable, is not here at issue. Any discussion of the appropriate method for determining damages would be premature, especially given that plaintiffs have presented no evidence of the prevention damages to which they refer.

Third, plaintiffs cite Dickinson's holding that the plaintiff's subsequent reclamation of part of his property did not disentitle him to compensation for the taking that had occurred. Pls. Br., at 34 (¶ 92e), citing Dickinson, 331 U.S. at 751. According to plaintiffs, this means that the Corps' nourishment program should not diminish their claims. Again, plaintiffs' argument misses the mark. This Court heard testimony during trial that the Corps' nourishment program replaced all of the sediment that the jetties removed from the littoral system. This is not a case, like Dickinson, where a taking occurred, and the plaintiff later reclaimed his land. This is a case where, because the Corps replenished the sediment that the jetties had captured, no taking occurred at all.

## III. PLAINTIFFS FAIL TO DISCREDIT DR. NAIRN'S SEDIMENT BUDGET

Plaintiffs' brief offers little commentary that directly addresses the merits of Dr. Nairn's sediment budget and how it was calculated. Instead, as reflected best by plaintiffs' "questions" (see Pls. Br., at iv), plaintiffs' approach consists of (1) contending that Dr. Nairn is biased, (2) advancing plaintiffs' view of evidence in support of their mistaken belief that plaintiffs are entitled to compensation for all sediment removed from the littoral system, (3) attempting to take exception with Dr. Larson's stratigraphy, and (4) questioning the Corps' beach nourishment program. None of plaintiffs' efforts succeed.

**A. Plaintiffs Fail to Impeach Dr. Nairn's Credibility**

Plaintiffs attempt mightily to impugn Dr. Nairn and contend that the Corps' position is driven by "litigation science." (Pls. Br., at 43 (¶ 129). However, they have no explanation – and no counter – for the facts (which they did not contradict) that: Dr. Nairn has explained the substantive differences between his earlier work and his work in this litigation that leads to different conclusions today (see Defendant's Post-Trial Brief ("Def. Br."), at 21-22); Dr. Nairn is highly regarded by plaintiffs' experts for his competence (Def. Br., at 22); and that Dr. Nairn conducted his sediment budget analysis in a manner approved and endorsed by plaintiffs' experts (Def. Br., at 22). Plaintiffs also manage to look the other way when their own expert, Dr. Meadows, vouches for Dr. Nairn. Dr. Meadows, who has known Dr. Nairn for twenty years and is familiar with his work (TR, Day 1, 113:13-114:2), testified that he believed that Dr. Nairn tried to do his analysis in a fair, objective, and competent manner. TR, Day 1, 115:22-116:3.

**B. Plaintiffs' Mistaken Belief That They Are Entitled to Compensation For All Sediment Removed From the Littoral System Does Not Undermine Dr. Nairn's Sediment Budget**

Plaintiffs contend they are entitled to compensation for all sediment removed from the littoral system for the last 163 years. Pls. Br., at 33 (¶ 92a). To that end, plaintiffs pose "questions" (see Pls. Brf., at iv)[2/] which they then "answer." Plaintiffs' "answers" to these questions (see, e.g., Pls. Br. at 11-13 (¶¶ 32a - 36), 26-27 (¶ 64), 32 (¶ 87), 33 (¶¶ 92a and b)) are apparently intended to support their mistaken belief that plaintiffs own all sediment removed from the littoral system. As discussed above, plaintiffs incorrectly cite the Supreme Court decision in Dickinson (Pls. Br., at 33 (¶ 92a)) for this erroneous belief.

---

[2/] See, specifically questions 1, 2, 3, and 5. Pls. Br., at iv.

Further, plaintiffs' "answers" do not undermine Dr. Nairn's sediment budget. For example, Dr. Nairn readily agrees that the jetties at the St. Joseph Harbor remove some of the sediment from the littoral zone. See Pls. Br., at iv, Question 1. With his sediment budget, approximately 50,000 cubic yards per year (cy/yr) since 1970, as represented by the net longshore transport rate (using five different calculations), are removed from the littoral system.[3/] Def. Br., at 24. Even the Corps' 1973 Detailed Project Report (Plaintiffs' Exhibit 93), in which plaintiffs place great weight, determined that the jetties did not remove all sediment from the littoral system. Dr. Nairn further testified about an outgoing sediment transport at the southern end of the zone in which plaintiffs' properties are located. TR, Day 5, 1325:5-18. Moreover, as was brought out at trial, the extensive shore protection that armors the coast south of the St. Joseph Harbor also removes sediment from the littoral system. TR, Day 5, Dr. Nairn, 1218:6-19; Defendant's Exhibit 1, p. 149. In any event, as Dr. Nairn's sediment budget makes clear, the Corps' nourishment program has replaced the sediment removed from the littoral system by the jetties since 1970.

Similarly, Dr. Nairn's sediment budget takes into account the fact that dams on the St. Joseph River do block some amount of river sand from the littoral system. TR, Day 5, 1120:6-1121:17; see also Defendant's Exhibit 25, Column XV (showing amount of sand trapped due to

---

[3/] Plaintiffs pursued repeatedly at trial the concept of a gross longshore transport rate. See, e.g., TR, Day 1, 39:16-40:8; TR, Day 2, 371:9-17; TR, Day 2, 421:21-423:6. Plaintiffs appear to be attempting to draw a correlation between the gross longshore transport rate and wave energy (see Pls. Br., at 3-6 (¶¶ 11-17)); however, Dr. Selegean testified that no direct correlation exists. TR, Day 2, 371:9-17. Further, without explaining how it would affect Dr. Nairn's conclusions, they continue to advocate its use here after trial (see Pls. Br., at 33 (¶ 92a) ("Nairn's May 2006 Litigation Report did not include the gross combination of updrift fillet and downdrift fillet retention and diversion")), even though Dr. Nairn testified, without contradiction, that the gross longshore transport rate is not applicable in a sediment budget. TR, Day 5, 1141:1-13.

dams). See Pls. Br., at iv, Question 2. Plaintiffs, however, do not cite any evidence to support their inference that the jetties "direct the river sand out of the littoral system." See Pls. Br., at iv, Question 3.

Plaintiffs cite no evidence for any of their "answers" to plaintiffs' "questions" that either explains how the calculations reached by Dr. Nairn's sediment budget would be different or how his conclusions would differ. Nor do plaintiffs draw a nexus between their arguments and the ultimate issue of whether the jetties have caused erosion to plaintiffs' properties for which the Corps' beach nourishment program has not been sufficient.

**C. Dr. Larson's Stratigraphy Shows that the Shoreline is Sandy**

Defendant established at trial that Dr. Larson's stratigraphy proves that the majority of plaintiffs' shoreline is sandy. Def. Br., at 23. The geology of the shoreline south of the St. Joseph Harbor, including the zone which envelopes the plaintiffs' properties, was commonly believed to be cohesive[4/] before this litigation commenced. However, this belief was based upon studies which did not focus specifically upon the plaintiffs' zone.[5/] Plaintiffs attempt unsuccessfully to controvert Dr. Larson's conclusion by pointing chiefly to one of those studies. Pls. Br., at iv (questions 7, 8, 9) and 28-30 (¶¶ 69-77). The United States Geological Survey and

---

[4/] Cohesive is defined as a characteristic of natural material that defines its ability to stick together. Defendant's Exhibit 3, p. 27; see also TR, Day 4, Dr. Grahame Larson, 1008:18-1009:7.

[5/] The 1973 DPR examined the shoreline only as far as 21,000 feet south of the St. Joseph Harbor. TR, Day 3, Dr. Selegean, 649:8-650:3; PX-93, p. 32. A 1996 study, PX-23, focused upon an area that only went 3.7 miles south of the St. Joseph Harbor. TR, Day 5, Dr. Nairn, 1111:2-6. Similarly, a 1997 study, PX-24, only focused upon an area that extended about 5.6 miles south of the St. Joseph Harbor and relied upon the data collected in the 1996 study. TR, Day 5, Dr. Nairn, 1111:2-11.

National Oceanic and Atmospheric Administration conducted a pilot study that published their "preliminary results" in 1994 finding significant erosion of the lake bed had occurred south of St. Joseph. Plaintiffs' Exhibit 33, p. 409. However, the pilot study is marked with two significant problems. First, the study used a periodic sampling of the surface of the lake bottom, unlike Dr. Larson's use of well logs which consisted of samples that penetrated well below the surface. TR, Day 4, 1057:1-1058:17. Thus, by comparison, Dr. Larson's opinion is better grounded on more solid information for what best reflects the actual condition of the shoreline. Second, the pilot study's "preliminary results" did not consider the erosional influence of shore protection. TR, Day 5, Dr. Nairn, 1112:5-1113:7. Therefore, without considering all relevant factors – which is fundamental to constitute a valid assessment, the pilot study necessarily errs in prematurely concluding that the jetties are responsible for the erosion reported.

**D. Corps Beach Nourishment Program Offset Erosion Attributable to the Jetties**

Defendant established that the Corps beach nourishment program has mitigated any jetty-induced erosion since 1970. See Def. Br., at 11-20. Plaintiffs attempt to suggest otherwise by pointing to Dr. Chrzastowski's theory of a zone of drift divergence (Pls. Br., at 20-21 (¶ 51)), citing evidence that the direction of the littoral drift was to the north for the years 1975-1984 (Pls. Br., at 10-13 (¶¶ 32-36), 23-24 (¶¶ 56a, b, c), and 32 (¶ 88)), and alluding to guidance that beach nourishment material should have the same physical characteristics as material found on the beach and nearshore (Pls. Br., at 24-25 (¶ 58)). None of these efforts detract from the sufficiency of the Corps' beach nourishment program.

Dr. Nairn conclusively refuted the drift divergence theory by explaining how his bypassing analysis, the lack of growth in the south fillet beach, and the amounts of dredging

material all together and individually contradict Dr. Chrzastowski's theory. TR, Day 5, Dr. Nairn, 1174:10-1183:2. See also Defendant's Exhibits 2, 20, and 21. In sum, Dr. Nairn testified how the bathymetry of the lake bed south of the south jetty, the currents that sweep past a bypassing shoal, the fact that the south fillet beach is full, and no appreciable increase in the amounts of dredging from the outer harbor are all inconsistent factually with Dr. Chrzastowski's drift divergence theory. TR, Day 5, Dr. Nairn, 1174:10-1183:2. None of these indicators reflect the added presence of sediment that would be present if the drift divergence theory was operative. Nor did plaintiffs challenge nor contradict Dr. Nairn's evidence on this issue.

Plaintiffs also cite the Corps' monitoring report (Plaintiffs' Exhibit 32) that indicates the direction of littoral drift was to the north for the years 1975-1984. Plaintiffs' use of this kind of evidence illustrates how strained their argument is. On its face, it is difficult to understand how sediment placed in the littoral zone, thus joining all other sediment from other sources, does not eventually – in the ebb-and-flow of currents along the lake shore – become part of the littoral drift that works its way southerly over time. Significantly, plaintiffs simply make the assertion – which runs cross-grain with common sense – and fail to support their theory with expert testimony.

Finally, plaintiffs intimate that the placement of sediment larger in size than what the ambient characteristics of the beach invalidates the Corps' nourishment program results. See Pls. Br., at 24-25 (¶ 57). Plaintiffs base this argument upon a statement found in a Corps' annual monitoring report that states, in relevant part, that:

> The beach nourishment material should have the same physical characteristics (composition, gradation, etc.) as the natural material found on the beach and nearshore.

Plaintiffs' Exhibit 41, at 4. Several points, however, rob plaintiffs' argument of merit. First, and notably, this language reflects, at most, guidance (as opposed to mandatory compliance in order to achieve success) in the form of an opinion by the author. Second, the report cites no study to provide insight as to the legitimacy of the author's opinion. Third, Dr. Meadows testified exactly to the opposite of what plaintiffs attempt to imply with this argument. Dr. Meadows described how larger grain sediment is more difficult to move. TR, Day 1, 40:12-22. One logical consequence from that fact is that sediment larger than the grain found on the beach will remain in place longer once it has settled. The more problematic scenario is if the grain is smaller than the ambient grain size for the shore. In fact, Dr. Meadows testified further that the sediment should be of a coarser grain size so that it would stay on the beach. TR, Day 1, 130:21-131:3. Finally, plaintiffs cite no other evidence to support their argument that using a larger grain size results in failure to nourish successfully.

## IV. PLAINTIFFS' EXPERTS AGREE WITH DEFENDANT

Plaintiffs' case fails on a number of fronts, not the least of which is that their own experts agree with the United States on significant issues.

Dr. Meadows's earlier work – which he did not reject here – established a longshore transport rate of 50,000-60,000 cy/yr (TR, Day 1, 146:15-151:13), which closely matches Dr. Nairn's calculation of 50,000 cy/yr. He also acknowledged – and, again, did not reject it at trial – that he had opined that placement of 50,000 to 60,000 cy/yr of sediment on the beach would have mitigated for jetty-caused erosion in light of his own estimate of 50,000 to 60,000 cy/yr for the longshore transport rate. TR, Day 1, Dr. Meadows, 151:14-153:4. The Corps was placing on average an amount of 71,000 cy/yr of nourishment on the shoreline, an amount well in excess of

that figure. See Def. Br., at 14-15 fn. 8.

Plaintiffs' counsel disagrees with his own experts on the permeability of the jetties. See Pls. Br., at 6-10 (¶¶ 20-31). Both Dr. Meadows and Dr. Chrzastowski testified that the jetties were essentially impermeable to sediment passing through them. Day 1, Dr. Guy Meadows, 111:4-112:2; Day 1,Dr. Michael Chrzastowski, 202:22-203:1.[6]

Plaintiffs' counsel also continues to push the idea that Lake Michigan does not naturally erode (see Pls. Br., p. 26 (¶ 63)), even though Dr. Meadows testified to the contrary. TR, Day 1, Dr. Meadows, 112:8-11. Finally, as mentioned before, Dr. Chrzastowski readily agreed with what plaintiffs' counsel will not accept: that the purpose of the jetties is to maintain a navigable channel. TR, Day 1, Dr. Chrzastowski, 202:12-16.

[6] In support of their position, plaintiffs also misuse the testimony of Charles Thompson in conjunction with Plaintiffs' Exhibit 114. Pls. Br., at 10 (¶ 31). Mr. Thompson's testimony made it clear that the jetties at the St. Joseph Harbor are different than the type of structure addressed in Plaintiffs' Exhibit 114. TR, Day 2, 480:3-481:8.

## CONCLUSION

For the reasons stated above and in our opening post-trial brief, and at trial, the United States respectfully requests judgment in favor of defendant.

Dated: July 18, 2007

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division

*s/Terry M. Petrie*
TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
Tele: 303-844-1369
Fax: 303-844-1350
Terry.Petrie@usdoj.gov

HEIDE L. HERRMANN
G. EVAN PRITCHARD
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

Attorneys for Defendant

OF COUNSEL
Gary W. Segrest, Esq.
Office of Counsel
U.S. Army Corps of Engineers
477 Michigan Avenue, Room 659
Detroit, MI 48226

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the "**Defendant's Response to Plaintiffs' Post-Trial Brief**" by electronic filing with the Unites States Court of Federal Claims on the 18th day of July, 2007 on:

John Ehret, Esq.
5986 Dunham
Stevensville, MI 49127

Counsel for *Banks* Plaintiffs

****************
Eugene J. Frett, Esq.
Sperling & Slater, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
Counsel for *Frett* Plaintiffs

****************

*s/Terry M. Petrie*
TERRY M. PETRIE