# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOHN H. and MARY E. BANKS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 99-4451 L<br>Judge Emily C. Hewitt |
| EUGENE J. FRETT, individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust, and<br><br>DONNA P. FRETT,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 05-1353L<br>Judge Emily C. Hewitt |

## PLAINTIFFS' DAMAGES TRIAL MEMORANDUM

This Memorandum addresses the critical issue of each individual Plaintiff's ability to present specific evidence of damages following a finding of liability in Plaintiffs' favor in a bifurcated trial.

Consistent with the Court's decision, each Plaintiff is required to submit specific damages evidence. While threshold evidence that damage resulting from the construction of St. Joseph's jetties was necessary and submitted in the liability phase to establish a taking by the Army Corps of Engineers under the Fifth Amendment of the United States Constitution, each individual Plaintiff should not be precluded from offering specific evidence of damages to his or her shoreline. The issue of the full nature and extent of

*each* Plaintiff's damages was not before this Court in the liability phase, nor was it necessary for the Court to render its opinion. Notwithstanding the government's position, Dr. Graham Larson's testimony concerned only the *natural* and historical lakeshore erosion. He refused to consider the effects of human intervention on littoral drift in this case. Dr. Robert Nairn merely accepted Dr. Larson's opinion as an assumption in his modeling that the Corps' mitigation was sufficient to make up for the sand (littoral drift) blocked by the piers. The Court rejected Dr. Nairn's opinion on mitigation, thus, the issue of the profile of the shoreline for each Plaintiff after each has suffered a taking without just compensation remains undetermined. Indeed, the Court's opinion establishes that the lakeshore/lakebed has changed due to the Corps' taking.

While each individual Plaintiff cannot now relitigate the 30% taking holding of this Court, the nature and extent of the specific damage as to each individual Plaintiff was not determined by the ruling and is ripe for adjudication by this Court after submission of the proofs on these issues. The government's position to the contrary eviscerates the concept of bifurcation undermining this Court's administration of justice, and stretches the concept of issue preclusion collateral estoppel beyond accepted judicial constructs. This Memorandum will set out the historical procedural status of the trial, the Court's ruling on bifurcation, the Court's judgment in favor of the Plaintiffs, Plaintiffs' proposed damages, and Dr. Nairn's and Dr. Larson's lack of competent evidence on the current lakeshore profile. Plaintiffs' position on the damages evidence necessary to be introduced at this stage of the trial can be completely harmonized with the Court's liability decision.

## I. PROCEDURAL HISTORY

This matter was tried on remand after the United States Court of Appeals for the Federal Circuit held that the statute of limitations did not begin to run "[w]ith the mitigation efforts underway...until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." *Banks v. United States* 78 Fed. Ct. 603, 604, (September 28, 2007), *citing* 314 F. 3d 1304, 1310 (Fed. Cir. 2003). The Federal Circuit had before it as part of the record on appeal the Corps Reports, and relied on the admissions contained therein in confirming that Plaintiffs' claims were timely filed and presented a justible taking claim.

By the government's own admission, the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible, thus, at the liability phase of the trial this Court was "charged with determining the extent of any damages [to plaintiffs] that is "permanent and irreversible." *Id.* at 607, FN 6.

## II. BIFURCATION

The "[c]ourt consolidated the claims of all plaintiffs for the limited purpose of a trial on liability." *Id.* at 604 (citations omitted). Bifurcation of the liability and damages phases of a trial is within the discretion of the trial court and authorized under Rule 42(c) of United States Court of Claims. Therefore, "for the reasons of efficiency, the court...left the questions of specific property ownership and damages to be determined after trial of causation." *Id.* at 616.

In its opinion the Court expressly maintained the bifurcation boundary stating that "arguments from plaintiffs about the scope of damages, therefore, are inapposite." The Court was referring to pages 36 and 37 of Plaintiffs' post trial brief addressing the (i)

Corps interception of sand in the river to pump for an airport runway; (ii) the right to all damages, past, present and prospective under the *Dickenson* and *Ridge Line* United States Supreme Court cases; (iii) current relief necessary from "downcutting and ongoing lake bed lowering," and (iv) the Michigan Department of Environmental Quality (MDEQ) assignment of a prospective 60 year bluff recession distance ranging from 95 to 535 feet on at least 15 of Plaintiffs' properties. *Id.* Similarly, while acknowledging the MDEQ evidence, the Court commented that "[o]f course, future damages are outside the scope of a trial focused solely on liability." *Id.* at 647, FN. 72.

## III. COURT'S DECISION ON LIABILITY

Trial proceeded on liability only from June 4 to June 8, 2007, resulting in a liability judgment for the Plaintiffs' who are owners of property along approximately four and a half miles of the eastern shore of Lake Michigan south of St. Joseph Harbor and all of whom suffered a taking under the Fifth Amendment of the United States Constitution without just compensation. *Banks v. United States,* 78. Fed. Ct. 603 (September 28, 2008).

The Court noted that the parties did "not dispute that St. Joseph Harbor causes erosion and that erosion has occurred in the area of Plaintiffs' zone." *Id.* at 616. Thus, the disputed issue at trial was "whether the government's actions effectively offset the effects of St. Joseph Harbor on Plaintiffs' zone such that the erosion in Plaintiffs' zone [was] not attributable to the government." *Id.* At the conclusion of the trial the Court found that the government's actions did not effectively offset the effect on Plaintiffs' zone.

The Court initially held "that the zone of influence of St. Joseph Harbour includes plaintiffs' properties." *Id.* at 620. The Court noted the admission of the defendant contained within the Corps Reports that, at least as far back as the 1950s, the defendant attributed "30% of the total erosion south of St. Joseph Harbor to the jetties" and that there had been no efforts at mitigation prior to 1970. *Id.* at 621 and 654.

As to the issue of the adequacy of mitigation the Court "deem[ed] defendant to have admitted the necessity for nourishment material to "have the same physical properties" as the natural material on the beach and near shore." *Id.* at 629. The Court concluded that Plaintiffs' argued "persuasively, and with the support of the preponderance of the credible evidence, that the nourishment program needs to provide sediment that has "the same physical characteristics" as the shore that is to be nourished. Sediment that is on average ten times the size of the sediment interrupted at the piers does not appear to the court to have "the same physical characteristics." *Id.* at 630.

After considerable analysis of expert opinions the Court held that the "defendant did not mitigate any of the erosion it admits to having caused prior to the 1970s and is responsible for it. Defendant is therefore responsible for damages for 30% of each plaintiffs' total erosion above the high water mark that occurred after each plaintiffs' acquisition of the property (but in no case earlier than 1950) to 1970." *Id.* at 655.

The Court further held the defendant's mitigation efforts post 1970 (the actual key issue in the liability phase of the trial) was inadequate. The Court "found that coarse material, usually trucked in from outside of the littoral system, is not effective mitigation." *Id.* at 656. The Court held that "[d]efendant is therefore responsible for damages for any portion of 30% of each plaintiffs' total erosion above the high water

mark since 1970, but not prior to acquisition" that was not effective mitigation. *Id.* The Court further held that "[t]he Corps is also liable for damages for 30% of all reasonable foreseeable future loss." *Id.* This damage formula was to be applied to a plaintiff with a sandy shore lakebed profile, if any exists.

Significantly, the Court held that the "erosion of cohesive material is permanent and irreversible." Thus if plaintiffs' property has a cohesive lakeshore, no mitigation is possible, and the "Corps' mitigation in this zone was ineffective, and Defendant is liable for damages for 30% of total erosion above the ordinary high water mark that occurred after any such plaintiffs' acquisition of the property (and in no case earlier than 1950) and for all reasonably foreseeable future loss." *Id.*

Although the Court at almost every point deferred to Dr. Nairn's analysis and opinions,[1] in the end, on the most significant issues, the Court found that Nairn's critical opinions lacked credibility as follows: (i) the Court disagreed with Dr. Nairn that the course material was effective mitigation; and (ii) the Court disagreed with Dr. Nairn that the Corps was not liable for any erosion after 1970. Further discussion of Dr. Nairn's and Dr. Larson's opinions is set forth in Section V *infra*.

## IV. <u>PLAINTIFFS' DAMAGES EVIDENCE IN BIFURCATED TRIAL</u>

Now that the Corps' liability under the Fifth Amendment taking clause of the United States Constitution has been judicially determined, each individual Plaintiff has the opportunity to establish damages. The evidence necessary to meet their individual burdens of proof will include:

---

[1] This notwithstanding that his opinions as a retained expert were prepared only for litigation at the cost of $1,000,000, with the sole purpose of contradicting collaborative efforts of numerous experts (including Dr. Nairn) to provide objective information in the Corp Reports of 1996, 1997 and 1999 which spanned 20 years of scholarship.

(1) Confirmation of ownership including (a) the date of ownership, and (b) legal description;

(2) The identification of the high water mark that existed at the time of each Plaintiff's acquisition of the property;

(3) The actual lakeshore/lakebed profile for each Plaintiff's property.

(4) The application of the Court's damages formula based upon the actual lakeshore profile (cohesive or sandy) for each Plaintiff's property;

(5) The actual cost of shore protection including loss of value of shore access;

(6) All reasonably foreseeable future losses including the potential of a complete loss;

(7) Calculation of interest.

The Plaintiffs and defendant should be able to reach an agreement on Sections (1), (2) and (5) above. As to the actual lakeshore/lakebed profile in Section (3), the parties are in dispute. As shown in Section V *infra*, there is no definitive competent evidence in the record of the profile of each Plaintiff's property, nor should there be. The lakeshore profile of each Plaintiff's property was not a requisite element in establishing whether a taking occurred, and the Court was fully able to fashion a remedy to justly compensate a Plaintiff for a taking under the Fifth Amendment regardless of whether the profile was cohesive or sandy. Moreover, the Court for its own reasons of efficiency "left the questions of specific property ownership and damages to be determined after trial on causation." 78 Fed. Ct. at 616. Thus, the Court refused to consider arguments about the scope of damages which included current relief necessary for "downcutting and ongoing lake bed lowering" which results from a cohesive shore. *Id.*

## V. ANALYSIS OF DR. NAIRN'S AND DR. LARSON'S EVIDENCE

Indeed the Court was equivocal about whether any of the individual Plaintiffs' property had a cohesive or sandy lakeshore profile and for good reason.[2]

Neither Dr. Nairn, nor Dr. Larson was able to establish the exact *current* lakeshore profile of each Plaintiff's property. Dr. Nairn was qualified by the Court "as an expert witness in coastal engineering, river engineering, coastal process processes, sediment transport, including the use of a sediment budget and the calculation of longshore transport rate, numerical modeling, and shore protection, including shore protection design, impacts of coastal structures on shore erosion, and beach erosion." *Id.* at 610. Dr. Nairn was not, however, qualified as a geologist, or in glacial geology, or glaciology. Thus, when Dr. Nairn makes reference to the lakeshore profile of the Plaintiffs' zone, he incorporates Dr. Larson's work into his own to use as an assumption that if a sandy profile existed[3], then his opinion was that mitigation efforts after 1970 by

---

2 In its opinion the Court stated that "*some* property at the northernmost end of plaintiffs' zone *appears* to be located in a cohesive lakeshore area." *Id.* at 656. Emphasis added.

"The trial did not focus on particular properties. If in further proceedings, some or all of a plaintiff's property is determined to be in the northernmost zone characterized by Dr. Nairn and Dr. Larson in their expert reports, as not predominantly sandy, the erosion damage to such property will be analyzed as damage to a cohesive shore." *Id.* at 627.

3 "The surfacial geology and topography of the St. Joseph River area is shown in Figure 2.4(a) developed by Larson (2006). Nairn Report, DX 1, p. 2-18.

"The result of this geology and related topography is significant variability in shore characteristics along the 20 miles (32km) of shore centered in St. Joseph. Larson (2006) has produced a map view of the surfacial geology together with stratigraphic sections for the study area north and south of the harbor based on information collected and interpreted more than 20 years ago (see Figures 2.5 and 2.6)." [Figures 2.5 and 2.6 are Larson's exhibits.] Nairn Report, DX 1, pp 2-21, 2-23, 2-24.

"The stratigraphy for the area south of the harbor is shown together with the locations of the plaintiffs' properties in Figure 4.1. The study area shoreline is also subdivided into four reaches in this figure. The reach divisions were established based on

the Corps were sufficient[4]. Dr. Nairn did not, and could not, provide competent or credible expert evidence that the profile of each Plaintiff's shoreline was either cohesive or sandy.

Further, the trial record shows that Dr. Larson's opinions did not establish the *current* lakeshore profile of the Plaintiff's zone taking into account the acceleration of erosion due to the interruption of the littoral drift from jetties and dams without the benefit of proper mitigation. Dr. Larson's opinion was that the "long-term *natural* erosion" from interpretation of glacial geological maps, lake levels and extropolated from historic well logs, was between .8 to .95 feet a year. The questions posed by the government were very carefully crafted to inquire of "natural" erosion. TR. 998, 1; 1000, 2. Dr. Larson, on cross examination, admitted that his own 2001 article, "Origin and Evolution of Great Lakes" (PX 101), confirmed that the human intervention from dams and jetties seriously reduces the supply of sand to the shore. He admitted that the dams on the St. Joseph's River and jetties at that harbor fit his referenced description of human intervention. TR. 1039-41. He admitted that in the 1992 USGS - NOAA Report (PX 33) down cutting in the Plaintiffs' zone was up to four vertical meters. TR. 1047-48. When asked...

---

geographic groupings of Plaintiffs. The geology of each reach is described based on a summary of the information provided by Larson (2006). Nairn Report, DX 1, p 4-109.

Q. Based on Dr. Larson's work then, do you believe that you can treat the shoreline as predominately sandy for plaintiff's zone?

A. Yes.

TR. 1216, 11-16 (Nairn)

[4] An opinion rejected by this Court in its September 28, 2007 opinion in the liability phase of the trial.

Q. Instead of geographical extrapolation, would it be fair to use numerical calculations or extrapolations and extrapolate the rate of down-cutting to the present in order to try to understand what the current conditions are?

Dr. Larson answered:

A. I couldn't answer that sir.

TR. 1048, 18-22.

After Dr. Larson admitted that data of down cutting existed and was documented in the USGS - NOAA Report in Plaintiffs' zone[5], he confirms that down cutting indicated the presence of glacial till, and "probably not" the presence of sand. *See* TR. 1036-37 directly referencing again PX 33, Figure 11. As Dr. Larson further testified on the objective data contained in the USGS - NOAA Report admitting sand couldn't be replenished from bluffs if "you have good shoreline protection", he backed off on testifying on the effect of waves on a lowering lake bed:

> I don't deal with wave dynamics, and so that's a realm that I could talk about, but I don't really feel that I'm qualified in this case.

TR 1038, 4-17.

Since Dr. Larson was not qualified as a coastal engineer, his geology opinions only reflect a potential shoreline erosion from *natural* forces over 7000 years in time. He provided no credible or competent evidence of the current shoreline condition, said he couldn't answer that question and stated he wasn't qualified.

Moreover, the Court held that (1) there was no mitigation prior to 1970, and (2) the government's mitigation after 1970 was not effective. The absence of mitigation or its ineffectiveness causes erosion and changes the profile of each Plaintiffs'

lakebed/lakeshore profile. Dr. Larson's opinion concerning "natural" erosion, which supports his profile opinions, does not take into account the impact of Court's decision that a taking has resulted. His opinion is no different than an expert opinion that an automobile is in a certain condition one year after manufacture taking into account only *ordinary* wear and tear, and ignoring the actual condition of the automobile after an accident. Since Dr. Nairn was not qualified as a geology expert, he could only incorporate Dr. Larson's opinions into his report. Neither expert actually performed any testing to verify the actual lakeshore/lakebed profile.

Contrasted with the absence of competent evidence of each Plaintiffs' lakeshore profile after reviewing Dr. Nairn's and Dr. Larson's testimony is the competent unrebutted evidence in the trial that the lakeshore is cohesive in Plaintiff's zone.

We begin with the Court's own observation.

> There is no dispute that, prior to this litigation, defendant consistently held the position that the shore in the area south of St. Joseph Harbor was cohesive. PX 33 (1992 Pilot Study) 10; PX 23 (1996 Report) 48; PX 24 (1997 Report) 1, 3-8. Mr. Thompson, a fact witness who was not qualified as an expert, also reflected this view. Dr. Chrzastowski, plaintiffs' expert who opined that the lake bottom was cohesive, based his evaluation on existing literature, aerial photography, historical maps, and ground photography, not his own personal tests. TR. 206:20-207:12 (Chrzastowski).

78 Fed. Ct. at 627.[6]

---

[5] Dr. Larson references Figure 11 which covers the entire area from St. Joseph to Grand Mere.

[6] While Dr. Chrzastowski's testimony is questioned by the Court since he did not review Nairn's Report, or Larson's Report, those facts have now been shown to be inconsequential as Dr. Nairn was not qualified and did not have his own opinion on lakebed composition and merely relied on Dr. Larson's incompetent and irrelevant opinions on historic natural erosion. See also pages 12-16 *infra* which further demonstrate Dr. Larson's lack of reasonable geological certainly in his criticism of the Corp Reports and 1992 Pilot Study. Further, the Court qualified Dr. Chrzastowski as an expert in coastal geology, down cutting, glacial till, lake bed lowering, erosion and its causes, all areas outside of the expertise of Dr. Larson.

The USGS-NOAA Report describes the results of two bathymetric data sets from surveys conducted in 1945-1946 and 1064-1965. By 1965 "relatively significant areas of lake-bottom have eroded close to shore south of St. Joseph to Grand Mere State Park. As much as 4 miles of lake-bed have been eroded, resulting in a steepened lake floor profile near shore." PX 33, p. 409. "A detailed lake bottom difference map for the area between St. Joseph and Grand Mere State Park (fig. 11) shows the amount of erosion of the lake floor in the area where severe coastal bluff erosion (Bucklor, 1981) has occurred." Id. at 409, 429,[7]

Plaintiff's expert, Dr. Guy Meadows, testified that the evidence of downcutting resulting in a cohesive shoreline would continue in Plaintiff's zone at 3.5 inches per year which over 15 years is "approximately 53 inches, just under 5 feet." TR. 50-54; 54, 2.[8]

A third witness, Mr. Charles Thompson, who was an employee for the Corps until 2003, testified that there was erosion on the lake bed from "St. Joseph harbor dam south to the Grand Mere area." TR 412, 24-413, 4 referencing PX 33, Figure 11. Mr. Thompson agreed with the USGS-NOAA Report that:

> "This process appears to be more active for the area of Shoreham where historically coastal bluff and lake bed erosion have been severe. The harbor jetties to the north of this area have effectively trapped some of the southerly littoral drift which has resulted in the sediment starved near shore area to the south. *Sand cover, therefore, is not sufficient to protect the till from erosion.*

TR. 415, 18-416, 1 (emphasis added). Thompson's testimony references the conditions depicted in Figure 11 which contains Plaintiffs' zone.

---

[7] Dr. Larson conceded the data of a lowering lakebed was indicative of downcutting at trial. TR. 1036, 19-1037, 4.

[8] Dr. Meadows was qualified as an expert in littoral drift and littoral zone among other areas. His testimony references PX 33, Figure 11.

Thus, three witnesses whose testimony is unrebutted, and the admissions of the defendant in the USGS-NOAA Report, all confirm that downcutting and a cohesive shore profile existed in Plaintiffs' zone as early as 1992. As shown above, neither Dr. Nairn nor Dr. Larson provided competent evidence to rebut this evidence.

No doubt the government will contend that Dr. Larson's opinion is that the USGS-NOAA Report is flawed by (i) a presumption that a cohesive shore existed prior to its testing, and (ii) its inadequate testing methods. The government will further contend that Dr. Larson's opinion that well logs are more reliable indicators of a shoreline profile should limit the scope of evidence this Court should consider during the damages phase of the trial. These arguments fail for evidentiary and legal reasons.

First, Dr. Larson's opinion that the USGS-NOAA Report is suspect because the presumption prior to the testing and reporting of the participants was that the shoreline was already cohesive is not a substantive geological expert opinion, but pure speculation of the state of mind of the USGS and NOAA, and potentially the *42 attendees* at the Regional Great Lakes Mapping project on March 17, 1992 who participated in the project. The attendees were from NOAA, Western Michigan Department of Geology, Michigan Department of Natural Resources, Great Lakes Environmental Research Laboratory, Indiana Department of Natural Resources, United States Corps of Engineers, Environmental Protection Agency, U.S. Geological Survey, Terra Surveys, Department of Geology Michigan State University, Bowling Green State University, Navel Architecture and Mechanical Engineering of the University of Michigan, Indiana Dunes National Lakeshore National Park Service, Michigan Sea Guard, Illinois' Geological Survey, Indiana Geological Survey, and Great Lakes Coastal Research Laboratory School

of Civil Engineering Purdue University. Dr. Larson's opinion that highly educated representatives from four United States government agencies, five different states agencies, five different universities, and at least four other independent entities all drank the same Kool-Aid to develop a pre-disposition to their independent research provides comic relief at the trial. Indeed, he admitted on cross examination that he did not even know all the participants. TR. 1046, 15-1047, 8. Thus Dr. Larson lacks personal knowledge, which is a pre-requisite to even offering his "mind reading" opinion.

The USGS-NOAA Report itself discloses its mandate from the United States Congress and the purpose of the study.

> The National Oceanic and Atmospheric Administration, in cooperation with the U.S. Geological Survey, has been tasked by the U.S. Congress to update the obsolete shoreline maps of the U.S. Great Lakes. Because of intense erosion, especially during the high water periods of the 1970's and 1980's, many existing maps are no longer useful for planning the environmental, recreational, and industrial development of the shores of the U.S. Great Lakes.
>
> To provide the necessary comprehensive information that will serve as the basis for rational development and management of this great resource, in 1991, NOAA and USGS, with researchers from the University of Michigan, Michigan State University, and Western Michigan University, carried out a pilot study of the southwest shoreline of Michigan. Bathymetric, geophysical, and geologic data were collected as far as 10 km offshore. Results of these studies show that the offshore sand and beach sand that provide protection for the underlying glacial till and for the bluffs along the margin of the lake, are thin to non-existent in many areas. Near St. Joseph, MI, our data show that, locally, as much as 4 m of the lake bottom has been removed by geologic processes during the past 50 years and the adjacent beach and bluff have been severely eroded (see cover photo).

PX 33, p. 404.

Both the historic maps and the current testing in 1992 confirmed erosion and the lowering of the lakebed in Plaintiffs' zone. Dr. Larson was careful not to dispute that the

testing utilized was a acceptable scientific method, nor did he dispute that the lakebed had eroded. After assuming from historic glacial maps and lake levels that only "natural erosion" had occurred, and refusing to consider the impact of human intervention on the littoral drift, he opines that a cohesive shoreline as disclosed in the 1992 USGS-NOAA Report just doesn't make "historic… geological sense." TR. 1035, 5; 1014, 2-4. His omission of critical historic facts, however, show from an evidentiary perspective that his opinion lacks competency. If the Corps itself stated that erosion was permanent and irreversible as a result of the jetties, it makes perfect historic sense a cohesive shoreline could result in the Plaintiffs' zone. Simply ignoring that fact in his defined world of reality does not result in a competent opinion.

As to the well logs, Dr. Larson admitted "30 percent of them are unreliable." TR. 1006. He admits his straitigrapher projections are a "characterization."

> Somebody might want to make it a little longer or shorter. That's up to them. The same is done in the petroleum industry. It's a characterization.
>
> So what is below this dotted line going across is a characterization of what I *think* it looks like. The well logs tell me there is sand – there are sand layers and there are clay layers. *How far they extend, that's a bit hard for me to tell based on the well logs, okay*. But I have some idea. And so it's geological judgment.

TR. 1007, 17-1008, 1 (emphasis added).

This is hardly an opinion to a reasonable degree of geological certainty.

Dr. Larson further admitted he did not identify and exclude data from wells dug by the jetting process, and that some wells were well inland. TR. 1027, 1043.

Significantly, Dr. Larson did not and could not correlate historic well logs data to the lakebed profile in front of each individual Plaintiff's property. He admitted that actually drilling would give that evidence. TR. 1071, 18-24.

Thus, the data in the well logs does not provide the government with competent evidence of the actual lakebed profile of any particular Plaintiff's property.

The government's position is essentially one of collateral estoppel issue preclusion. Collateral estoppel "bars litigation of an issue if an identical issue was actually litigated and necessarily decided in a prior case where the interests of the party to be precluded were fully represented." *Simmons v. Small Business Admin.,* 475 F. 3d 372, 1374 (Fed. Cir. 2007), *cert. denied,* 128 S. Ct. 361, 169 L. ED. 2d 89 (2007). Here, the Court's own opinion bifurcated the damages issue, appropriately declined specific evidence regarding each Plaintiffs' property, and therefore could not and did not decide the lakebed profile of each Plaintiffs' property to reach a liability decision. The government's collateral estoppel argument is misplaced, and legally fails as there has been no decision on the merits resulting from competent evidence. The issue as to the lakebed profile in front of John Banks' property, Eugene Frett's property, Carol Ehret's property, and every other individual Plaintiff for purposes of calculating damages remains in issue[9].

**CONCLUSION**

Based upon the foregoing, after eight years of litigation, appeals and numerous interim decisions, now that the Plaintiffs are armed with a liability finding, each Plaintiff

[9] The Court suggested that if the Plaintiffs' understanding of the proofs necessary at the damages trial involved reopening evidence, that this Brief be considered in the alternative as a Motion to Reconsider and Reopen the Evidence. While we believe that as shown above the Court's opinion can be harmonized with Plaintiffs' position on damages, nevertheless, Plaintiffs' assert the alternative relief per suggestion of the Court as though fully set out herein.

should finally be entitled to present full and competent evidence of the nature and extent of his or her damages.

Dated: May 20, 2008

Respectfully submitted,

s/Mark E. Christensen
Mark E. Christensen
Christensen & Ehret, LLP
222 West Adams, Ste. 2170
Chicago, IL 60606
(312) 634-1014
(312) 634-1018 Fax

John Ehret, Esq.
20860 Greenwood
Olympia Fields, IL 60461

Eugene J. Frett, Esq.
Sperling & Slater, P.C.
55 West Monroe Street, Ste. 3200
Chicago, IL 60603

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the **PLAINTIFFS' DAMAGES TRIAL MEMORANDUM** by electronic filing with the United States Court of Federal Claims on this 20th day of May, 2008 on:

Terry M. Petrie
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80284
Attorney for Defendant

Gary W. Segrest, Esq.
Office of Counsel
U.S. Army Corps of Engineers
477 Michigan Avenue, Room 659
Detroit, MI 48226
Attorney for Defendant

Heide L. Herrmann
G. Even Pritchard
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Attorney for Defendant

s/Mark E. Christensen
MARK E. CHRISTENSEN