# In the United States Court of Federal Claims

No. 99-4451 L
c/w 99-4453L, 99-4454L, 99-4455L, 99-4456L, 99-4457L, 99-4458L, 99-4459L, 99-44510L, 99-44511L, 99-44512L, 00-365L, 00-379L, 00-380L, 00-381L, 00-382L, 00-383L, 00-384L, 00-385L, 00-386L, 00-387L, 00-388L, 00-389L, 00-390L, 00-391L, 00-392L, 00-393L, 00-394L, 00-395L, 00-396L, 00-398L, 00-399L, 00-400L, 00-401L, 05-1353L, 05-1381L, 06-72L

(E-Filed: September 28, 2007)

| | | | |
|---|---|---|---|
| JOHN H. BANKS, ET AL., | ) | | |
| Plaintiffs, | ) | 99-4451 L | Taking; Trial of Liability for Erosion of Beachfront Properties South of Harbor Jetties at St. Joseph, Michigan |
| v. | ) | | |
| THE UNITED STATES, | ) | | |
| Defendant. | ) | | |
| EUGENE J. FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust, | ) | | |
| Plaintiff, | ) | 05-1353 L | |
| v. | ) | | |
| THE UNITED STATES, | ) | | |
| Defendant. | ) | | |



Exhibit 3 - 1 of 4

John B. Ehret, Olympia Fields, IL, for plaintiffs in Nos. 99-4451 L, 05-1381 L, and 06-72 L. Eugene J. Frett, Chicago, IL, pro se in No. 03-1353 L.

Terry M. Petrie, Denver, CO, with whom were Heide L. Herrmann and G. Evan Pritchard, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. Gary W. Segrest, Office of Counsel, United States Army Corps of Engineers, Detroit, MI, of counsel.

## OPINION[1]

### I. Procedural Background

The St. Joseph River enters Lake Michigan between St. Joseph, Michigan, and Benton Harbor, Michigan. Motion to Partially Dismiss and Memorandum in Support Thereof (Motion or Def.'s Mot.), Feb. 26, 2007, 5.[2] In the 1830s, the United States Army Corps of Engineers (Corps) re-constructed the mouth of the St. Joseph River and began constructing harbor jetties[3] that jutted generally westward into Lake Michigan in order to accommodate commercial shipping traversing the St. Joseph River into Lake Michigan. Id. The Corps lengthened the jetties periodically until they reached their present-day length in the year 1903. Id. From the early 1950s to 1989, the Corps incrementally encased the jetties in steel. Id.

In the 1970s, the Corps instituted a beach nourishment program to mitigate erosion along the shoreline south of the harbor jetties. Banks v. United States (Banks (accrual) II), 314 F.3d 1304, 1306-07 (Fed. Cir. 2003). "The Corps has provided fine sand nourishment for more than [fifteen] years on feeder beaches, deposited coarser sediments along the shoreline at least five times between 1986 and 1993, and placed barge-loads of large rocks into Lake Michigan in 1995." Def.'s Mot. 5-6. The Corps issued three technical reports in 1996, 1997, and 1999 (Reports), which "addressed the Corps'

---

[1]The court attaches an Appendix at the end of this Opinion with a Table of Contents. Page numbers keyed to this slip opinion are shown in parentheses following each Table of Contents topic line.

[2]Facts relied on in this Opinion and cited to the filings of only one of the parties do not appear to be in dispute.

[3]This Opinion will refer to the harbor jetties at St. Joseph, Michigan, interchangeably as St. Joseph Harbor, the harbor, the piers, or the jetties.

Plaintiffs' characterization of the evidence in the 1992 Pilot Study as "direct scientific evidence" of nearshore lake bed composition, Pls.' Br. 29, does not comport with expert testimony about the methods used in that study. Dr. Larson testified that the "side scan sonar" used to gather data is "an electronic signal that gives you an image." Tr. 1070:1-10 (Larson). The sonar, therefore, reflects an image of the location to be studied. See PX 33 (1992 Pilot Study) 31;[42] Tr. 1070:1-10 (Larson). Inexplicably, however, plaintiffs appear to tear down their own argument by eliciting from Dr. Larson testimony that the sonar images in the 1992 Pilot Study were on average about 1,500 feet offshore, see Tr. 1071:9-11 (Larson), which leaves 1,500 feet between the edge of the shore and the data from the 1992 Pilot Study unaccounted for. Plaintiffs' main argument is that Dr. Larson's stratigraphy is erroneous simply because it was not a sample from the actual study area. Pls.' Br. 29. While Dr. Larson acknowledged that "it would always be better to drill" in the study area, Tr. 1071:18-20 (Larson), plaintiffs point to no evidence that refutes the soundness of Dr. Larson's stratigraphic method.

Similarly, plaintiffs' argument that Dr. Larson's failure to look directly at the lake bottom from his boat constitutes a gap in Dr. Larson's methodology, Pls.' Br. 29, 30, is not corroborated by evidence. Dr. Meadows testified that "a commercially available underwater remote operative vehicle" known as Michigan's Remote Operated Vehicle for Education and Research (M-ROVER) was used "as a survey and sampling tool across the lakebed." Tr. 59:2-15 (Meadows). The 1996 Report further explained that M-ROVER "visually document[ed] glacial till exposure" by providing "photographs of the lakebed." PX 23 (1996 Report) 15. However, the 1996 Report studied the area from St. Joseph Harbor to 3.7 miles south, which does not include plaintiffs' zone. Tr. 1109:24-1111:8 (Nairn). The court has no indication that M-ROVER or any other means of photography was used to verify or refute Dr. Larson's findings in plaintiffs' zone specifically. See Pls.' Br. passim; Pls.' Resp. passim; Def.'s Br. passim; Def.'s Resp. passim. Furthermore, Dr. Larson explained as a scientific imperative that studies not rely solely on data from the surface of the lake bed to determine the composition of the underlying material. See Tr. 1013:1-14 (Larson) (discussing the need to validate studies based on results from the lake bed surface with well-logs that penetrate into the lake bed).

There is no dispute that, prior to this litigation, defendant consistently held the position that the shore in the area south of St. Joseph Harbor was cohesive. PX 33 (1992 Pilot Study) 10; PX 23 (1996 Report) 48; PX 24 (1997 Report) 1, 3-8. Mr. Thompson, a

---

[42]The page number in PX 33 has been completely cut off. The court notes that page 33 of PX 33 corresponds with page 434 of the alternate numbering system in that exhibit. See PX 33 (1992 Pilot Study) 33; Tr. 1069:22-23 (Larson).

fact witness who was not qualified as an expert, also reflected this view.[43] Dr. Chrzastowski, plaintiffs' expert who opined that the lake bottom was cohesive, based his evaluation on existing literature, aerial photography, historical maps, and ground photography, not his own personal tests. Tr. 206:20-207:12 (Chrzastowki). In fact, Dr. Chrzastowski has made it clear that he has "never reviewed the [Nairn Report]," Tr. 175:13-16 (Chrzastowki), and plaintiffs point the court to no evidence from Dr. Chrzastowski that he had reviewed Dr. Larson's testimony or the Larson Report, Pls.' Br. passim; Pls.' Resp. passim. Dr. Chrzastowski's opinion is based on the same documentary evidence that Dr. Larson credibly refuted. With no expert evidence from plaintiffs to counter defendant's expert's studies and explanations, and no expert review of Dr. Nairn's – and particularly Dr. Larson's – research conclusions regarding the lake bottom composition, the court finds that plaintiffs failed to prove by a preponderance of the credible evidence that plaintiffs' properties are located on a cohesive lake bottom.

Dr. Nairn described the shore along plaintiffs' zone as "predominantly sandy." Tr. 1216:10-14 (Nairn). The inference of this conclusion is that for any given plaintiff it is more likely than not that his or her property is located in a sandy zone. Dr. Nairn's testimony also acknowledges that the sandy zone may not fully extend to the northernmost of plaintiffs' properties. Id. at 1213:23-1214:5. The trial did not focus on particular properties. If, in further proceedings, some or all of a plaintiff's property is determined to lie in the northernmost zone characterized by Dr. Nairn and Dr. Larson in their expert reports as not predominantly sandy, the erosion damage to such property will be analyzed as damage to a cohesive shore. That analysis, unrefuted by defendant, Def.'s Br. passim; Def.'s Resp. passim, is that erosion of cohesive material is permanent and irreversible. Tr. 178:12-14 (Chrzastowki); PX 23 (1996 Report) 10; PX 24 (1997 Report) 8; PX 41 (1999 Report) 3.

2. Type of Nourishment

Plaintiffs argue, based on documentary admissions by defendant, that "[t]he beach nourishment material should have the same physical characteristics (composition, gradation, etc.) as the natural material found on the beach and nearshore." PX 41 (1999

---

[43]Plaintiffs' Exhibit 113 states that the lakeshore in Berrien Country is generally "covered with a blanket of glacial drift and unconsolidated lacustrian and aeolian sediments." PX 113 (1994 Site Visit Day 1) 2; Tr. 455:1-8 (Thompson); Pls.' Br. 28. Mr. Thompson testified that this is a document that he "probably would have authored much or most of. With input from other folks as well." Tr. 452:11-14 (Thompson). There is no indication on the face of the document or from Mr. Thompson that this guide represented anything more than a summary of existing research rather than an original study. See id.; PX 113 (1994 Site Visit).