**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **JOHN H. and MARY E. BANKS, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **June 5, 2008**<br><br>**No. 99-4451 L**<br>**Judge Emily C. Hewitt** |
| **EUGENE J. FRETT, Individually and as trustee of the Victor J. Horvath and Frances B. Horvath Trust, and**<br><br>**DONNA P. FRETT,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **No. 05-1353 L**<br>**Judge Emily C. Hewitt** |

**DECLARATION OF DAVID P. WOLF**

1. My name is David P. Wolf. I live in Baroda, Michigan. I have a bachelor's degree in civil engineering and am a licensed engineer in the State of Michigan. I have been employed by Oselka Construction since 1996. Currently, I am one of the owners of Oselka Construction Co. and hold the position of Vice President. The offices of Oselka Construction are located in Union Pier, Michigan, approximately 18 miles from St. Joseph, Michigan.

2. Before I joined Oselka Construction, I was employed as a consultant for 5 ½ years with a design firm located in St. Joseph, Michigan. I am quite familiar with the shoreline in the St. Joseph area both because of my work and because I grew up in the area. While I

worked as a consultant and for most of my time at Oselka Construction I lived in the area of Glenlord Road. Specifically, I lived about one mile from Lake Michigan.

3. Oselka Construction has designed and built shore protection structures along the coast of Lake Michigan for more than 30 years, particularly along that part of the shore that stretches approximately 40 to 45 miles from Ogden Dunes, Indiana to south of St. Joseph, Michigan. Much of that work has occurred in a span of 20 miles which includes the St. Joseph area. From the time that I joined Oselka Construction, I estimate that I have been involved in the construction of approximately 15 shore protection structures in the St. Joseph area.

4. I have had limited contact with counsel for both parties. In 2004, in response to a request made by John Ehret, I provided him an estimate for constructing a quarry stone revetment for multiple properties. My firm has not been hired to do any work as a result of that estimate. Mr. Ehret provided some reference materials labeled as "exhibits" which I used to prepare the estimate, dated June 2, 2004. In a March 28, 2007, telephone conversation with Gary Segrest, an attorney with the Corps of Engineers, I was informed that Mr. Ehret had listed me as a witness for the trial to be conducted later in the summer of 2007. I had a second telephone conversation with Mr. Segrest and Terry Petrie, an attorney with the Department of Justice, on May 8, 2007. In both conversations, I was informed that they were calling me with the permission of Mr. Ehret. Thereafter, I spoke with Mr. Ehret before the trial but I did not testify at the trial.

5. Subsequently, I have spoken with Mr. Petrie and Mr. Segrest on April 4, 2008, and April 30, 2008. They had called me to ask what my experience had been with the practice of

taking soil borings in conjunction with building shore protection structures along the coast of Lake Michigan. I called Mr. Ehret after I spoke with them on April 30, 2008. Other than that phone call, I have not spoken with Mr. Ehret since the spring of 2007.

6. I am providing this declaration of my own free will. In asking me to provide this sworn statement, both Mr. Petrie and Mr. Segrest had earlier recognized and acknowledged in my April 4, 2008, conversation with them that it might be a difficult thing for me to do because it could be viewed unfavorably by potential customers for my company, Oselka Construction Co. At that time, they mentioned how the information I had would be useful for the Court but understood why I might not want to provide a declaration. I confirmed their impression that I would prefer not to provide a statement.

7. Mr. Petrie and Mr. Segrest called me again on April 30, 2008. Mr. Petrie described their reluctance to approach me again but that how, under the circumstances, they believed they had to re-visit the matter. He described how they could attempt to obtain the information from me by either subpoenaing me for a deposition or by having me provide a declaration. He specifically informed me that I could certainly decide to oppose any subpoena that was served on me, and that they would understand and respect whatever choice I made. Mr. Petrie did not offer any opinion about the likelihood of my succeeding if I were to oppose any subpoena served upon me.

8. In response to their renewed request I asked for time to think about their request and that I would discuss it with them the next day, on May 1, 2008. After speaking with Mr. Segrest and Mr. Petrie, I telephoned Mr. Ehret and informed him that my testimony was being sought. After a few minutes of conversation, Mr. Ehret elected to end the call so as

not to "taint" me with his (Mr. Ehret's) thoughts on the substantive issues. Mr. Ehret did not have any issue with me providing a declaration. The next day, May 1, 2008, I called Mr. Segrest and informed him that I had spoken with Mr. Ehret and that I was willing to provide a declaration.

9. Mr. Petrie provided a draft of this declaration which I have reviewed and modified. Both he and Mr. Segrest informed me that the goal of my declaration is to be totally truthful and that, therefore, I was free to change, add, or delete any part of it, and that I must be completely comfortable with the accuracy and truthfulness of the declaration. To that end, I have fully participated in the drafting of this final declaration and have made changes I believe necessary to ensure that it states the truth as clearly as I best understand it.

10. From my personal observation and experience I have found the shoreline in our area of work and specifically in the vicinity of St. Joseph, Michigan to be alternating layers of sand and clay. The thicknesses of the sand and clay layers change as we move North to South and East to West, but a good generalization is 4 to 12 foot thick, per layer. Oselka Construction Co. (and I, personally) believe the best shore protection for our residential customers is a quarried limestone boulder stone revetment. That is why I provided a stone revetment estimate to Mr. Ehret 2004. The stone revetment is preferred because it is more aesthetically pleasing and my experience is that it is less likely to fail catastrophically during a single storm event. Also, constructing a means of conveyance over our stone wall is easier, we have the home owner place posts above the wall, below the wall, and on a rock in the middle of the wall. This allows a wooden step system from the top of their

bluff to the beach. The next best revetment option, in my opinion, is a steel sheet wall. Over the years, I have worked on the installation of approximately 80 shore protection projects using boulders and approximately 8 shore protection projects using steel sheet piling.

11. Some of the factors used in considering what type of shore protection to build include what kind of shore protection, if any, the adjoining neighbors have; the angle of repose of the slope of the bluff immediately behind the shore protection and the soil types involved. It is very important to ensure the lowest point of any wall is built at the proper elevation, that a global slope failure not damage the wall and that the ends of the wall are protected. Soil borings could assist in constructing steel sheet piling shore protection, in a perfect world. However, it is my experience that most shore protection jobs don't fit a perfect model. Most sheet designers know what is taught in academia, which is "perfect" models and static conditions. In fact during a Lake Michigan storm event the conditions are very fluid and many modes of failure could occur. Because of our firm's knowledge and experience constructing revetments we do not typically perform soil borings before we design a revetment for a residential client. A worst case scenario would be a site with the native soil being sand alone. In that situation the "scouring" action of the waves in front of the wall would erode the material in front of the wall quickly. This situation is addressed by making the steel sheets longer and increasing the length of toe embedment. We typically design for a near "worst case" situation and then check our assumptions after we get on site to do the actual work. After we check our assumptions we might or might not modify the design to fit the actual field conditions.

12. Oselka Construction Co. would consider the use of preconstruction soil borings if our client was a municipality or a business proposing a large project, ie. over 1000 feet long. However, I have never seen residential property owners use soil borings to assist in building shore protection. Because of our firm's familiarity with the area, the marginal gain for our Company, to acquire the soil boring information is far exceeded by the additional costs of obtaining such borings. It is far more practical, economical and efficient to modify the design, if necessary, after we are on site. The practice is to assume near worst case scenario for any revetment project and thus avoid the additional expense of obtaining soil borings.

I certify under penalty of perjury that the foregoing is true and correct.

Date: 6/10 2008

DAVID P. WOLF