# In the United States Court of Federal Claims

No. 99-4451 L
c/w 99-4453L, 99-4454L, 99-4455L, 99-4456L, 99-4457L, 99-4458L, 99-4459L, 99-44510L, 99-44511L, 99-44512L, 00-365L, 00-379L, 00-380L, 00-381L, 00-382L, 00-383L, 00-384L, 00-385L, 00-386L, 00-387L, 00-388L, 00-389L, 00-390L, 00-391L, 00-392L, 00-393L, 00-394L, 00-395L, 00-396L, 00-398L, 00-399L, 00-400L, 00-401L, 05-1353L, 05-1381L, 06-72L

(E-Filed: October 15, 2008)

_____
                                    )
JOHN H. BANKS, ET AL.,              )
                                    )
            Plaintiffs,             )   99-4451 L      Motion for
                                    )                  Reconsideration
    v.                              )                  Of Trial Opinion
                                    )                  On Liability
                                    )
THE UNITED STATES,                  )
                                    )
            Defendant.              )
                                    )
_____ )

                                    )
EUGENE J. FRETT, Individually and   )
as Trustee of the Victor J. Horvath )
and Frances B. Horvath Trust,       )
                                    )
            Plaintiff,              )   05-1353 L
                                    )
    v.                              )
                                    )
THE UNITED STATES,                  )
                                    )
            Defendant.              )
                                    )
_____ )

John B. Ehret, Stevensville, MI, with whom was Mark E. Christensen, Chicago, IL, for

plaintiffs in Nos. 99-4451 L, 05-1381 L, and 06-72 L.  Eugene J. Frett, Chicago, IL, pro se in No. 03-1353 L.

Terry M. Petrie, with whom was Ronald J. Tenpas, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Denver, CO, for defendant.  Gary W. Segrest, Office of Counsel, United States Army Corps of Engineers, Detroit, MI, of counsel.

OPINION and ORDER

HEWITT, Judge

I.    Background

    A.    Procedural Setting

The facts of this case are set forth in detail in the court's September 28, 2007 opinion, Banks v. United States (Banks Liability Opinion), 78 Fed. Cl. 603, 603-10 (2007).  The current procedural posture of this case is described briefly here.

After consolidating the claims of all plaintiffs, the court held a trial for the purpose of determining liability.  Trial on liability began on Monday, June 4, 2007, and concluded on Friday, June 8, 2007.  Banks Liability Opinion, 78 Fed. Cl. at 609.  Following the liability trial, the court issued the Banks Liability Opinion.  Before the court are the parties' post-liability trial briefings: Plaintiffs' Damages Trial Memorandum (plaintiffs' Memorandum or Pls.' Mem.); Defendant's Response to Plaintiffs' Damages Trial Memorandum (Def.'s Resp.); and Plaintiffs' Reply in Support of Plaintiffs' Damages Trial Memorandum (Pls.' Reply).  The court treats plaintiffs' Memorandum as a motion for reconsideration for the reasons set forth below in Part I.B.  The court has not relied in this opinion on the documents addressed in plaintiffs' Motion to Strike Declaration of David Wolf and James Selegean (Motion to Strike) and, accordingly, deems plaintiffs' Motion to Strike to be MOOT.

    B.    Plaintiffs' Memorandum Is Treated as a Motion for Reconsideration

Plaintiffs contend that defendant is liable for erosion of plaintiffs' properties located along the eastern shore of Lake Michigan south of the St. Joseph Harbor.  Banks Liability Opinion, 78 Fed. Cl. at 604.  The court determined after trial that defendant was liable for a portion of the erosion of plaintiffs' properties, id. at 621, and, further, that the extent of defendant's liability depended in part on the nearshore lakebed composition, id. at 622.  In particular, defendant's liability depended on whether the nearshore lakebed

composition was found to be sandy or cohesive.  Id. at 622-23.  The Banks Liability Opinion concluded that the nearshore lakebed composition along plaintiffs' zone[1] is predominantly sandy, with the exception of certain of plaintiffs' properties located in the northernmost portion of plaintiffs' zone, some of which properties were characterized as having a cohesive nearshore lakebed composition.  Id. at 628.

Plaintiffs now present two theories in support of allowing the presentation of additional evidence regarding the nearshore lakebed composition in plaintiffs' zone during the damages phase of the trial.

First, plaintiffs argue that the presentation of evidence as to the nearshore lakebed composition in plaintiffs' zone should not be precluded during the damages trial because "there has been no definitive ruling [on the nearshore lakebed composition] to reconsider."  Pls.' Reply 8.  Plaintiffs argue that "[t]he issue of each individual [p]laintiff's shoreline composition was not, and could not have been[,] conclusively addressed in the liability phase of the trial," Pls.' Reply 6, because "there is no definitive competent evidence in the record of the [shoreline] profile of each [p]laintiff's property, nor should there be," Pls.' Mem. 6.

Plaintiffs argue that calculating damages as to individual plaintiffs during the damages trial necessarily requires the court also to address the issue of nearshore lakebed composition in plaintiffs' zone during the damages phase.  Pls.' Reply 7 ("At the damages trial, the parties can move crisply with the calculation of damages, including the submission of actual and current shoreline composition evidence.").  The court disagrees.  Plaintiffs' argument mischaracterizes the scope of the liability trial and fails to account for the findings made by the court in the Banks Liability Opinion.  Contrary to plaintiffs' contention, the court explicitly and conclusively determined the issue of the nearshore lakebed composition in plaintiffs' zone, as more particularly discussed below.

Findings based on evidence as to the nearshore lakebed composition of plaintiffs' zone were necessary to determine defendant's liability for the erosion in plaintiffs' zone.  In the Banks Liability Opinion, the court stated that "the composition of the lake bed is relevant because the composition affects erosion and mitigation processes."  Banks Liability Opinion, 78 Fed. Cl. at 622.  The parties presented, and the court reviewed, detailed documentary and testimonial evidence on the specific issue of the nearshore lakebed composition within plaintiffs' zone.  See id. at 621-28.  On the issue of nearshore lakebed composition, the court held:

---

[1]  "Plaintiffs' zone" refers to the portions of the eastern shore of Lake Michigan south of St. Joseph Harbor where plaintiffs' properties are located.

3

> With no expert evidence from plaintiffs to counter defendant's expert's studies and explanations, and no expert review of Dr. Nairn's - and particularly Dr. Larson's - research conclusions regarding the lake bottom composition, the court finds that plaintiffs failed to prove by a preponderance of the credible evidence that plaintiffs' properties are located on a cohesive lake bottom.

Id. at 628.  The court accepted defendant's experts' findings that the nearshore lakebed "along plaintiffs' zone is predominantly sandy," with the exception of any of plaintiffs' properties located in the northernmost portion of plaintiffs' zone (some of which properties were characterized by defendant's experts as cohesive).  Id.  The evidence at trial did not permit the court to determine (by, for example, an overlay of plaintiffs' property lines onto the lakebed composition data presented by defendant) exactly which of plaintiffs' properties in the northernmost portion of plaintiffs' zone were adjacent to the cohesive nearshore lakebed shown on defendant's exhibits.  See, e.g., Defendant's Exhibits 1 (Nairn Report), 3 (Larson Report), and 28-31 (Figures from Larson Report) (demonstrating the composition of the nearshore lakebed, but not correlating the composition data to individual plaintiffs' property lines); see also infra note 6 (discussing the reasons why evidence as to individual plaintiff's specific property ownership was not presented at the liability trial).  The court stated that the questions of specific property ownership and damages would be based upon the court's liability findings, including the court's factual findings regarding the nearshore lakebed composition.  See Banks Liability Opinion, 78 Fed. Cl. at 616.  Plaintiffs' argument that the court made "no definitive ruling" about the composition of the nearshore lakebed, Pls.' Reply 8, is simply inaccurate.

Secondly, and in the alternative, plaintiffs argue that the court should grant a motion for reconsideration of its findings regarding the nearshore lakebed composition in plaintiffs' zone. Pls.' Reply 8.  Given the fact that the court issued findings on the nearshore lakebed composition in the Banks Liability Opinion, the court treats plaintiffs' Memorandum as a motion for reconsideration.

For the reasons discussed below in Part III, plaintiffs' arguments are insufficient to meet the standard of review for motions for reconsideration.  However, for the reasons discussed below in Part IV, that is, to prevent possible injustice to the parties that could result from a possible extraordinary delay in resolving plaintiffs' claims, the court affords plaintiffs the opportunity to present additional evidence regarding the composition of the nearshore lakebed in plaintiffs' zone.

II.     Standards of Review

The standards applicable to reconsideration of non-final decisions are set forth in Rules 54(b) and 59(a) of the Rules of the United States Court of Federal Claims (RCFC). RCFC 54(b) provides that "any order or other form of decision . . . is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." RCFC 54(b). RCFC 59(a)(1) provides that, "rehearing or reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59(a)(1).

"The decision whether to grant reconsideration lies largely within the discretion of the [trial] court." Yuba Natural Res., Inc. v. United States (Yuba Natural), 904 F.2d 1577, 1583 (Fed. Cir. 1990). "The court must consider such motion with 'exceptional care.'" Henderson County Drainage Dist. No. 3 v. United States (Henderson County), 55 Fed. Cl. 334, 337 (2003) (quoting Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999)). "A motion for reconsideration is not intended . . . to give an 'unhappy litigant an additional chance to sway' the court." Matthews v. United States (Matthews), 73 Fed. Cl. 524, 525 (2006) (quoting Froudi v. United States, 22 Cl. Ct. 290, 300 (1991)). The moving party must support its motion for reconsideration by a showing of exceptional circumstances justifying relief, based on a manifest error of law or mistake in fact. Henderson County, 55 Fed. Cl. at 337; see Principal Mut. Life Ins. Co. v. United States, 29 Fed. Cl. 157, 164 (1993). "Specifically, the moving party must show: (1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) the necessity of allowing the motion to prevent manifest injustice." Matthews, 73 Fed. Cl. at 526 (citing Griswold v. United States, 61 Fed. Cl. 458, 460-61 (2004)). Accordingly, plaintiff "must do more than 'merely reassert arguments which were previously made and carefully considered by the court.'" Bannum, Inc. v. United States, 59 Fed. Cl. 241, 243 (2003) (quoting Henderson County, 55 Fed. Cl. at 337). Further, a party may not "prevail on a motion for reconsideration by raising an issue for the first time on reconsideration when the issue was available to be litigated at the time the complaint was filed." Matthews, 73 Fed. Cl. at 525-26 (citing Lamle v. Mattel, Inc. (Lamle), 394 F.3d 1355, 1359 n.1 (Fed. Cir. 2005)).

III.     Discussion

Plaintiffs urge the court to reconsider its conclusions regarding the composition of the nearshore lakebed made in the Banks Liability Opinion following the liability phase of the trial. Pls.' Reply 8-11. Plaintiffs argue that additional evidence of the composition of the nearshore lakebed of plaintiffs' properties should be allowed during the damages phase of the trial. Pls.' Mem. 6. Plaintiffs' arguments in support of allowing additional evidence of the nearshore lakebed composition are based on attacks on defendant's expert witness testimony presented during the liability phase of the trial, that is, in the evidence

relied upon by the court in the Banks Liability Opinion. Pls.' Mem. 7-16. Plaintiffs' arguments fail to demonstrate any of the three circumstances which would support reconsideration: the occurrence of an intervening change in the controlling law, the availability of previously unavailable evidence, or the necessity of allowing the motion to prevent manifest injustice. Matthews, 73 Fed. Cl. at 526.

    A.    Plaintiffs' Attack on Dr. Nairn's Competency

Plaintiffs argue that defendant's expert, Dr. Nairn, "did not, and could not, provide competent or credible expert evidence that the profile of each Plaintiff's shoreline was either cohesive or sandy." Pls.' Mem. 8. Plaintiffs offer two reasons for their attack on Dr. Nairn's testimony. First, plaintiffs argue that Dr. Nairn's testimony was not competent or credible because Dr. Nairn was not qualified as a geologist, or in glacial geology, or glaciology and incorporated Dr. Larson's work into his own. Id. at 7-8. Second, as further proof of Dr. Nairn's inability to provide credible evidence of the shoreline profile, plaintiffs point to the court's rejection of Dr. Nairn's opinion that defendant's mitigation efforts after 1970 were sufficient. Id. at 8.

Dr. Nairn was qualified as an expert witness in "coastal engineering, river engineering, coastal processes, sediment transport, including the use of a sediment budget and the calculation of longshore transport rate, numerical modeling, and shore protection, including shore protection design, impacts of coastal structures on shore erosion, and beach erosion." Banks Liability Opinion, 78 Fed. Cl. at 610 n.11 (citing Banks Trial Transcript (Tr.) at 1107:22-24; 1081:8-1082:3). While it is true that Dr. Nairn incorporated Dr. Larson's work into his report, plaintiffs misstate the nature of Dr. Nairn's reliance on Dr. Larson's work. Plaintiffs contend that Dr. Nairn incorporated Dr. Larson's work "as an assumption that . . . a sandy profile existed" upon which Dr. Nairn then relied in order to form his opinion as to the sufficiency of defendant's mitigation efforts after 1970. Pls.' Mem. 8. According to Dr. Nairn's testimony, however, he relied on his own expertise in erosion processes to interpret Dr. Larson's stratigraphy and conclude that the composition of the nearshore lakebed was predominantly sandy for plaintiffs' zone. Banks Liability Opinion, 78 Fed. Cl. at 625 (citing Tr. 1213:20-1214:5 (Nairn) ("Dr. Larson provided the stratigraphy and being a person with expertise in erosion processes, then I interpret that as to whether it's cohesive or is a sandy shore.")). Plaintiffs do not offer any reason for the court to question Dr. Nairn's use of his own expertise in erosion processes as the basis for his interpretation. See Pls.' Mem. at 7-8. In addition, plaintiffs offer no credible argument as to why Dr. Nairn's expertise in erosion processes does not qualify him to provide competent evidence as to the nearshore lakebed composition of plaintiffs' zone. Id. Moreover, plaintiffs had the opportunity at trial to question Dr. Nairn's expertise in erosion processes and his reliance on that expertise in formulating his interpretations, but chose not to do so. See Matthews, 73

Fed. Cl. at 525-26 (stating that a party may not "prevail on a motion for reconsideration by raising an issue for the first time on reconsideration when the issue was available to be litigated at the time the complaint was filed").

Even if the court were to agree with plaintiffs' contention that Dr. Nairn did not independently reach his conclusions regarding the nearshore lakebed composition, but instead directly relied upon Dr. Larson's opinion that the composition of the nearshore lakebed in plaintiffs' zone is predominantly sandy, the court's ruling on the nearshore lakebed composition would not be affected. Plaintiffs did not carry their burden of proof regarding the composition of the nearshore lakebed during the liability trial. Banks Liability Opinion, 78 Fed. Cl. at 622. The court found Dr. Larson's testimony regarding the composition of the nearshore lakebed more persuasive than plaintiffs' experts for the reasons discussed in detail in the Banks Liability Opinion, 78 Fed. Cl. at 624-28.[2] As discussed below in Part III.B, plaintiffs' attacks on Dr. Larson's testimony are unpersuasive.

Plaintiffs also argue that the court's rejection of Dr. Nairn's conclusions regarding the sufficiency of defendant's mitigation efforts after 1970 serves as proof of Dr. Nairn's incompetence to render a credible opinion as to the composition of the nearshore lakebed in plaintiffs' zone. Pls.' Mem. 6. Plaintiffs offer no support for this contention. It appears to the court that plaintiffs' argument is based on a premise that the court's rejection of Dr. Nairn's testimony as to mitigation efforts requires the court also to reject Dr. Larson's and Dr. Nairn's opinions as to the nearshore lakebed composition of plaintiffs' properties. This argument fails for two reasons.

---

[2] The court's discussion of the evidence presented at the liability trial regarding nearshore lakebed composition can be found in the court's September 27, 2008 opinion, Banks v. United States (Banks Liability Opinion), 78 Fed. Cl. 603, 624-28 (2007). The court made a factual finding regarding the nearshore lakebed composition after an analysis of the credibility of the parties' witnesses and the probative value of their testimony on a topic extremely technical in nature. Id. In brief, the court found that the evidence presented by plaintiffs, including the 1992 Pilot Study upon which plaintiffs' experts primarily relied, was credibly refuted by defendant's experts, and plaintiffs offered no evidence or expert review to counter defendant's expert's studies and explanations. Id. The court also found that several studies (not relied on by plaintiffs in their briefing here) were similarly unpersuasive concerning the nearshore lakebed composition in plaintiffs' zone. See id. at 623-24 (discussing plaintiffs' expert testimony and documentary evidence regarding the nearshore lakebed composition, including the reasons why the court could not consider Plaintiffs' Exhibit (PX) 96 (the Illinois Geological Survey) as an impeachment device, and defendant's experts' credible refutation of the evidence presented in Plaintiffs' Exhibits (PX) 23 and 24 (the U.S. Army Corps of Engineers Reports of 1996 and 1997)).

First, the court's findings as to the composition of the nearshore lakebed are independent of the court's analysis of the sufficiency of mitigation efforts. Compare Banks Liability Opinion, 78 Fed. Cl. at 621-28 (discussing the credibility and probative value of documentary and testimonial evidence regarding nearshore lakebed composition in Part IV.B.1 entitled "Composition of the Lakebed"), with id. at 628-31 (discussing the credibility and probative value of documentary and testimonial evidence regarding the efficacy of defendant's mitigation efforts in Part IV.B.2 entitled "Type of Nourishment"). While the composition of the nearshore lakebed is a necessary prerequisite to the analysis of the sufficiency of mitigation efforts, the court's conclusion as to the insufficiency of defendant's mitigation efforts does not require that the court reconsider its findings as to the composition of the nearshore lakebed. Instead, the court's conclusions both as to the composition of the nearshore lakebed and as to the sufficiency of mitigation efforts are, as they must be, independently supported in the evidence in order to permit the court to proceed to the calculation of damages as to each individual plaintiff in the damages phase of the trial.

Second, if the court were to accept plaintiffs' argument that Dr. Nairn relied exclusively on Dr. Larson's opinion regarding the composition of the nearshore lakebed, the court's credibility findings as to Dr. Nairn's opinion on defendant's mitigation efforts would be irrelevant to the court's credibility determination regarding Dr. Larson's opinion as to the composition of the nearshore lakebed. The court's credibility findings as to each expert's opinion are independent of one another. In short, the court does not perceive how its rejection of Dr. Nairn's opinion as to the sufficiency of defendant's mitigation efforts after 1970 requires, or indeed impacts at all, the court's factual determinations regarding the composition of the nearshore lakebed in plaintiffs' zone.

      B.     Plaintiffs' Attack on Dr. Larson's Testimony

Dr. Larson was qualified as an expert witness in "glacial geology, glaciology, and hydrology." Banks Liability Opinion, 78 Fed. Cl. at 610 n.11 (citing Tr. 976:22-25). Dr. Larson testified about the geological history of Berrien County in which plaintiffs' properties are located, Tr. 981:22-987:1 (Larson), and long-term natural erosion of the area, id. at 988:1-991:8. Dr. Larson explained the scientific techniques he employed and upon which he based his opinion as to the nearshore lakebed composition in plaintiffs' zone, and compared his techniques with those employed by plaintiffs' experts. Id. at 1012:3-1014:10.

Plaintiffs attack the competency of Dr. Larson's testimony on two grounds. First, plaintiffs state that Dr. Larson's opinions of the geological history of Lake Michigan do not take "into account the acceleration of erosion due to the interruption of the littoral drift from jetties and dams without the benefit of proper mitigation." Pls.' Mem. 8.

8

Plaintiffs argue that Dr. Larson's opinion lacks competency because of his "refus[al] to consider the impact of human intervention on the littoral drift." Pls.' Mem. 14. Second, plaintiffs contend that Dr. Larson did not sufficiently refute plaintiffs' evidence of the composition of the nearshore lakebed as presented in the 1992 Pilot Study. Pls.' Mem. 12-14. Neither of plaintiffs' arguments meets the standard for a motion for reconsideration.

Plaintiffs' attack on Dr. Larson's testimony concerning the geological history of Lake Michigan is misplaced. At trial, Dr. Larson reviewed the geological history of Berrien County, the county in which plaintiffs' properties are located. Tr. 981:22-987:1 (Larson). Dr. Larson then explained his estimate of the rate of long-term natural erosion of the shore over a period of 7,000 years. Id. at 988:1-991:8. Dr. Larson's review of the geological history and his estimated erosion rate are separate and apart from the scientific methods upon which his opinion as to the composition of the nearshore lakebed is based. Plaintiffs' arguments as to Dr. Larson's failure to account for human intervention in his review of the geological history of the area and associated rates of erosion are irrelevant to the issue of nearshore lakebed composition presently at issue because Dr. Larson testified that he relied upon well logs that are on file with the "Michigan [G]eological [S]urvey" in order to obtain information about the geology of the nearshore lakebed. Id. at 1004:5-9. The well logs, upon which Dr. Larson's conclusions as to the nearshore lakebed composition are based, are reports of the characteristics of soils found at various depths in drilling operations. Id. at 1004:10-23. Well logs simply record and report information regarding subsurface materials at various depths as the materials are encountered during well drilling.[3]

Plaintiffs also argue that Dr. Larson's testimony does not credibly refute the 1992 Pilot Study upon which plaintiffs relied. Pls.' Mem. 12-14. The 1992 Pilot Study is a preliminary report of the results of a shoreline mapping project undertaken by the U.S. Geological Survey (USGS) in cooperation with the National Oceanic and Atmospheric

---

[3] The court notes that plaintiffs' reference to their attempt at impeaching Dr. Larson's testimony regarding the composition of the nearshore lakebed during trial with Plaintiffs' Exhibit (PX) 101 (Origin and Evolution of the Great Lakes) is similarly misplaced. See Plaintiffs' Damages Trial Memorandum (plaintiffs' Memorandum or Pls.' Mem.) 8-9. PX 101 (Origin and Evolution of the Great Lakes), an article Dr. Larson co-authored in which he stated that human intervention does play a role in erosion processes, PX 101 at 537, does not discredit Dr. Larson's reliance on the well logs to characterize the composition of the nearshore lakebed because the historical rate of erosion over the course of the geological history of Lake Michigan is irrelevant to the question of nearshore lakebed composition presently at issue.

Administration (NOAA).[4]  Plaintiffs argue that "Dr. Larson's opinion that the [1992 Pilot Study] is suspect because the presumption prior to the testing and reporting of the participants was that the shoreline was already cohesive is not a substantive geological expert opinion, but pure speculation of the state of mind of the USGS and NOAA." Id. at 12.  The court does not find this attack on Dr. Larson's testimony persuasive because it was not relied upon by the court in its factual findings regarding the composition of the nearshore lakebed.  The court relied primarily upon the fact that Dr. Larson's well logs contradicted the findings of the 1992 Pilot Study, Banks Liability Opinion, 78 Fed. Cl. at 627, while simply noting Dr. Larson's statement regarding the preconceived notions of the authors of the 1992 Pilot Study in a footnote, id. at 627 n.40.

Plaintiffs further argue that Dr. Larson's testimony does not sufficiently refute the 1992 Pilot Study because "Dr. Larson was careful not to dispute that the testing utilized [in the 1992 Pilot Study] was a[n] acceptable scientific method, nor did he dispute that the lakebed had eroded." Pls.' Mem. 14.  First, the fact that Dr. Larson did not dispute that the lakebed had eroded is irrelevant to the nearshore lakebed composition presently at issue.  Second, although Dr. Larson called the scientific methods used in the 1992 Pilot Study "good science," he also stated that "it has to be verified." Tr. 1014:1-2 (Larson).  The two scientific techniques used by the authors of the 1992 Pilot Study to gather data on the composition of the nearshore lakebed were side scan sonar and ground-penetrating radar.  Banks Liability Opinion, 78 Fed. Cl. at 626.  Dr. Larson stated that well logs are used as a validation tool for findings made using the techniques relied upon in the 1992 Pilot Study.  Tr. at 1013:10-14 (Larson).  The court found Dr. Larson's opinion more credible in part because Dr. Larson's well logs in this case invalidated the findings of the 1992 Pilot Study.  Banks Liability Opinion, 78 Fed. Cl. at 627.  In addition, the court found Dr. Larson's use of well logs superior to the side scan sonar and ground-penetrating radar techniques used in the 1992 Pilot Study.  Id. at 626-27 ("[The 1992 Pilot Study's] 'periodic sampling of the surface' contrasts with Dr. Larson's extensive use of well logs, which obtains samples of materials in strata that are at the same depth as the subsurface of the adjacent nearshore.").  Plaintiffs have not provided the court with any persuasive reason to question its previous findings regarding the superiority of the well logs technique as compared with the scientific methods used in the 1992 Pilot Study.

C.   Plaintiffs' Attack on Dr. Larson's Scientific Techniques

Plaintiffs urge the court to reconsider its reliance on Dr. Larson's scientific methods as a basis for the court's factual findings regarding the composition of the nearshore lakebed in plaintiffs' zone.  Pls.' Mem. 14-15.  First, plaintiffs criticize Dr.

---

[4] For the court's analysis of the 1992 Pilot Study in relation to the composition of the nearshore lakebed, see Banks Liability Opinion, 78 Fed. Cl. at 625-27.

Larson's reliance on well logs and his stratigraphy based on well log data.  See id. Second, plaintiffs argue that, because Dr. Larson did not "correlate historic well logs data to the lakebed profile in front of each individual [p]laintiff's property" and acknowledged that "actually drilling would give that evidence," plaintiffs should be able to present additional evidence as to the lakebed profile during the damages phase of the trial.  Id. at 15.

Plaintiffs assert that because thirty percent of well logs are unreliable, Dr. Larson's opinion lacks a "reasonable degree of geological certainty."  Id. at 14-15.  However, while Dr. Larson testified to the thirty percent figure during his testimony, he also testified that he eliminated the logs that he found unreliable.  Tr. 1006:19-20 (Larson). The reliability of the well log data upon which Dr. Larson relied has already been addressed at trial and in the Banks Liability Opinion.  Banks Liability Opinion, 78 Fed. Cl. at 625.  Plaintiffs present no reason for the court to revisit its findings on this issue.

Plaintiffs also argue that Dr. Larson's opinions are not made to "a reasonable degree of geological certainty," Pls.' Mem. 15, because "[Dr. Larson] admits that his straitigrapher [sic] projections are a 'characterization,'" id. at 14.  Dr. Larson testified that his conclusions as to the sandy profile of the shoreline were based on his "geological judgment."  Tr. 1008:1 (Larson).  Dr. Larson was "fairly confident" in his characterization of the geology.  Id. at 1008:7.  Dr. Larson then presented his stratigraphy which he prepared "based on standard geologic technique."  Id. at 1005:19-20.  It appears to the court that plaintiffs are arguing that Dr. Larson's opinions are vulnerable simply because his projections are based on an exercise of geological judgment in the absence of direct evidence.  Although plaintiffs attack the court's reliance on Dr. Larson's projections and characterizations in determining the composition of the nearshore lakebed, plaintiffs' experts did not present findings based on actual testing at trial and plaintiffs do not present any new evidence in plaintiffs' Memorandum.  The court found that plaintiffs' experts failed effectively to refute Dr. Larson's and Dr. Nairn's testimony and, in fact, did not even review Dr. Nairn's report.  Banks Liability Opinion, 78 Fed. Cl. at 628 (citing Tr. 175:13-16).  Both Dr. Nairn's and Dr. Larson's reports were available to plaintiffs in advance of trial.  See Memorandum of Contentions of Fact and Law: Defendant's Exhibits, filed April 25, 2007, 4.  Plaintiffs could have elected to perform testing in an effort to discredit Dr. Larson's testimony during the liability trial, but chose not to do so.  Banks Liability Opinion, 78 Fed. Cl. at 627 ("Plaintiffs' main argument is that Dr. Larson's stratigraphy is erroneous simply because it was not a sample from the actual study area.  While Dr. Larson acknowledged that 'it would always be better to drill' in the study area, plaintiffs point to no evidence that refutes the soundness of Dr. Larson's stratigraphic method." (citations omitted)).  In short, plaintiffs offer no reason for the court to question its reliance on Dr. Larson's geological judgment in creating the stratigraphy he presented during the liability trial.  In the court's evaluation of the

credibility of witnesses and the relevance of the testimony and the evidence, plaintiffs simply failed to carry their burden to demonstrate the composition of the nearshore lakebed.

In addition, techniques similar to Dr. Larson's stratigraphy and use of well log data have been found persuasive when direct evidence as to actual subsurface conditions is unavailable. In Renda Marine, Inc. v. United States, the United States Court of Appeals for the Federal Circuit (Federal Circuit) upheld the factual findings made by this court as to subsurface site conditions in a government contract case. Renda Marine, Inc. v. United States (Renda Marine II), 509 F.3d 1372, 1378 (Fed. Cir. 2007), aff'g Renda Marine, Inc. v. United States (Renda Marine I), 66 Fed. Cl. 639 (2005). In Renda Marine I, this court relied upon expert testimony extrapolating subsurface profiles based on data from boring logs. Renda Marine I, 66 Fed. Cl. at 687-88. In order to determine the subsurface geology in the area of contract performance, this court relied upon data collected from logs of borings located in adjacent areas. Renda Marine II, 509 F.3d 1372, 1378 ("Boring logs 93-62, 93-63, 3ST-4, 3ST-5, and 3ST-6 are in the record, and their contents are undisputed. As noted, the latter three logs show the presence of stiff clays. At the same time, while the latter three boring logs are, as the [United States Court of Federal Claims] noted, from locations across the navigation channel from the Flare Area, those locations are aligned so that if one extends the borders of the Flare Area to across the channel, each of those logs falls within the Flare Area.").[5]

---

[5] In Arundel Corp. v. United States (Arundel), the United States Court of Claims upheld factual findings made by the Board of Contract Appeals, based upon a study of boring logs. Arundel, 515 F.2d 1116 (Ct. Cl. 1975) (affirming and adopting recommended decision by Trial Judge Thomas J. Lydon). The court in Arundel stated:

> In determining whether or not the actual quantities of rock encountered during performance were excessive in relation to the amounts of rock one could reasonably anticipate from a study of the contract boring logs, the Board [of Contract Appeals] did not have the benefit of data reflecting what percentage of the material excavated actually consisted of rock. What it did have were estimates of the percentages of rock which geologists believed probably existed in the area excavated based on their survey station examinations of the banks of the excavated area and subsequent interpolation of the data which they believed comprised the banks. Faced with this situation, the Board [of Contract Appeals] had to resolve and/or reconcile the conflicting reports of qualified geologists in order to reach a factual determination of what the subsurface conditions actually were in the excavated borrow area.

Id. at 1124.

12

Plaintiffs also argue that Dr. Larson's testimony should not be relied upon because it does not provide individualized findings as to each plaintiff's property. Pls.' Mem. 15. While it is true that logs of further drilling would provide more detailed evidence of the composition of the nearshore lakebed adjacent to the property of each individual plaintiff, Dr. Larson's testimony correlated historic well log data to the lakebed profile throughout plaintiffs' zone. See Banks Liability Opinion, 78 Fed. Cl. at 625; see also Telephonic Status Conference Transcript of Jan. 22, 2008, 13:13-22 (describing the findings as to the composition of the nearshore lakebed made in the Banks Liability Opinion, the court states, "[W]e don't have evidence explained to the [c]ourt [about] whose properties were at the northerly end of the [p]laintiff[s'] properties, who could have fallen into the area that it shows as cohesive on Dr. Larson's study. So that is not a question of [studying] the entire shore. That's a question of, what does the grid look like when you put [p]laintiff[s'] properties on top of the Larson study. So it's a very much smaller issue"). The court agrees with defendant that "though the trial did not focus on individual . . . properties, [the court accepted Dr. Larson's stratigraphy as] an assessment for the entirety of the shoreline upon which all of [p]laintiffs' properties are located." Def.'s Resp. 10.

IV.   Conclusion

Plaintiffs had the opportunity during trial to present evidence regarding the composition of the nearshore lakebed of plaintiffs' zone. [6] The court considered the

---

[6] The court notes that plaintiffs failed to present, as they might have and indeed should have, evidence on each individual plaintiff's specific property interest, including title, date of acquisition, and boundaries, at the liability trial. Plaintiffs' Memorandum, which the court assumes was prepared by Mr. Mark E. Christensen acting as of counsel to the attorney of record, states that "the Court for its own reasons of efficiency 'left the questions of specific property ownership and damages to be determined after trial on causation.'" Pls.' Mem. 7 (quoting Banks Liability Opinion, 78 Fed. Cl. at 616) (emphasis added). The transcript of the pre-trial conference held on May 16, 2007, makes clear, however, that the court deferred resolution of specific property ownership solely because plaintiffs had not prepared exhibits or other evidence that addressed the question of plaintiffs' property interests. Banks Pretrial Transcript (Pretrial Tr.) 174:5-15. During pre-trial briefing, defendant argued that plaintiffs' proposed evidence failed to establish property interests sufficient to support a takings claim because plaintiffs' evidence "d[id] not include factual averments or exhibits to establish ownership for all individual plaintiffs." Defendant's Memorandum of Contentions of Fact and Law, filed April 25, 2007, 19. Plaintiffs simply assumed with no legal basis that it was unnecessary to present evidence establishing plaintiffs' property interests. Plaintiffs' Reply to Defendant's Memorandum of Contentions of Fact and Law, filed May 7, 2007, 5 ("Plaintiffs have not presented their ownership evidence here because . . . . [t]he presentation of deeds and depositions [in prior non-trial proceedings] suffice to meet plaintiff's burden to prove ownership. The burden therefore shifts to defendant to challenge ownership based on documentation already provided."). Given

13

evidence before it and concluded that plaintiffs had failed to show by a preponderance of the credible evidence that the composition of the nearshore lakebed in plaintiffs' zone is cohesive. Banks Liability Opinion, 78 Fed. Cl. at 628. The court found defendant's experts credible, and made findings regarding the composition of the nearshore lakebed in plaintiffs' zone. Id. at 624-28. For the foregoing reasons, plaintiffs' arguments fail to demonstrate any of the three circumstances which would support reconsideration: the occurrence of an intervening change in the controlling law, the availability of previously unavailable evidence, or the necessity of allowing the motion to prevent manifest injustice. Matthews, 73 Fed. Cl. at 526.

However, in order to avoid possible inefficiency and delay in resolving plaintiffs' claims, the court will accept additional evidence regarding the composition of the nearshore lakebed in plaintiffs' zone. The history of the dispute out of which this case arises counsels this decision.

Activities by defendant at St. Joseph's Harbor date to the 1830s. Banks Liability Opinion, 78 Fed. Cl. at 604. Remediation activities by defendant affecting plaintiffs' zone began in 1970. Id. at 655 (citing Defendant's Exhibit (DX) 34 (St. Joseph Dredging)). Plaintiffs brought suit in 1999. Id. at 604. In 2001, the court granted defendant's motion to dismiss plaintiffs' claims, concluding that plaintiffs' claims were barred by the statute of limitations. Id. at 605 (citing Banks v. United States, 49 Fed. Cl. 806, 825 (2001)). Plaintiffs appealed and the Federal Circuit reversed and remanded, determining that the suit had been timely brought. Banks v. United States, 314 F.3d 1304, 1310 (Fed. Cir. 2003). The case was reopened in 2003. The court and the parties have addressed numerous pretrial issues, Banks Liability Opinion, 78 Fed. Cl. at 604-10, culminating in the liability trial held in June 2007.

Were the Federal Circuit to disagree with this court's conclusion regarding plaintiffs' entitlement to present additional evidence regarding the composition of the nearshore lakebed, the delay occasioned would be extraordinary. The court believes that justice will be better served by permitting plaintiffs the opportunity to present additional evidence of the composition of the nearshore lakebed in an expeditious manner at this time. See RCFC 1 ("[The RCFC] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."); see also Yuba Natural, 904

---

the fact that preparation for trial was otherwise nearly complete, the court noted its agreement with defendant's position regarding the lacunae in plaintiffs' case, Pretrial Tr. 174:5-15, but permitted plaintiffs the opportunity to present evidence of ownership at a later time in order to expedite the case. Id. at 174:16-175:2. The court recommended that plaintiffs proceed with a motion for summary judgment as soon as practicable after trial to address the property interest issue. Id. Plaintiffs have not done so.

14

F.2d at 1583 ("The decision whether to grant reconsideration lies largely within the discretion of the [trial] court.").

The parties shall confer and file a joint status report, or, if the parties cannot agree, separate status reports, on or before Wednesday, October 29, 2008, suggesting a schedule for further proceedings in accordance with this Opinion and Order.

IT IS SO ORDERED.

s/ Emily C. Hewitt  
EMILY C. HEWITT  
Judge