# In the United States Court of Federal Claims

No. 99-4451 L

c/w 99-4453L, 99-4454L, 99-4455L, 99-4456L, 99-4457L, 99-4458L, 99-4459L, 99-44510L, 99-44511L, 99-44512L, 00-365L, 00-379L, 00-380L, 00-381L, 00-382L, 00-383L, 00-384L, 00-385L, 00-386L, 00-387L, 00-388L, 00-389L, 00-390L, 00-391L, 00-392L, 00-393L, 00-394L, 00-395L, 00-396L, 00-398L, 00-399L, 00-400L, 00-401L, 05-1353L, 05-1381L, 06-72L

(E-Filed:  August 11, 2009)

| | |
|---|---|
| _____ )<br>JOHN H. BANKS, ET AL., )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>THE UNITED STATES, )<br> )<br>Defendant. )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br> )<br>_____ )<br>EUGENE J. FRETT, Individually and )<br>as Trustee of the Victor J. Horvath )<br>and Frances B. Horvath Trust, )<br> )<br>Plaintiff, )<br>v. )<br> )<br>THE UNITED STATES, )<br> )<br>Defendant. )<br>_____ ) | Governmental Taking by Gradual Physical Process; Erosion; Date of Taking; Determination of Owners to Whom Just Compensation is Due; Entitlement to Damages for Loss Preceding Date of Acquisition of Property Interest; Entitlement to Damages for All Reasonably Foreseeable Future Loss Irrespective of Subsequent Transfer of Property Interest; Entitlement to a Portion of the Cost of Shore Protection Measures; In the Alternative, Entitlement to a Portion of the Value of All Reasonably Foreseeable Future Loss to Plaintiffs' Properties<br><br>99-4451 L<br><br><br><br>05-1353 L |

John B. Ehret, Stevensville, MI, with whom was Mark E. Christensen, Chicago, IL, for plaintiffs in No. 99-4451 L.  Eugene J. Frett, Chicago, IL, pro se in No. 05-1353 L.

Terry M. Petrie, with whom was John C. Cruden, Acting Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Denver, CO, for defendant.  Gary W. Segrest and Don C. Erwin, Office of Counsel, United States Army Corps of Engineers, Detroit, MI, of counsel.

OPINION and ORDER

HEWITT, Chief Judge

This Opinion and Order addresses a significant subset of numerous motions in limine on damages issues in dispute, with the purpose of assisting the parties in concluding discovery and preparing for a trial on damages.

Before the court are Plaintiffs' Motion for Declaration of the Court That As the Result of One Government Action, the Building of the Jetties, Which Ripened into a Permanent Physical Taking by Erosion in January of 2000, the Landowners Who Held Title to the Property in January of 2000 Are Entitled to All Damages to that Property and Reasonably Foreseeable Future Damages and for Clarification of the Court's June 23, 2005 Order and Opinion (plaintiffs' Motion or Pls.' Mot.),[1] Defendant's Response to

---

[1] The court addresses in this footnote two procedural disputes ancillary to the damages issues discussed in this Opinion and Order.

Plaintiffs' Motion for Declaration of the Court That As the Result of One Government Action, the Building of the Jetties, Which Ripened into a Permanent Physical Taking by Erosion in January of 2000, the Landowners Who Held Title to the Property in January of 2000 Are Entitled to All Damages to that Property and Reasonably Foreseeable Future Damages and for Clarification of the Court's June 23, 2005 Order and Opinion (plaintiffs' Motion or Pls.' Mot.) is in the form of a motion for declaratory judgment.  See Pls.' Mot. 1; Plaintiffs' Reply in Support of Their Motion for Declaration and for Clarification of the Court's June 23, 2005 Order and Opinion (plaintiffs' Reply or Pls.' Reply) 1.  Defendant argues that "the Declaratory Judgment Act does not apply in the proceedings presently before this court."  Defendant's Response to Plaintiffs' Motion for Declaratory Judgment and Omnibus Motion for Summary Judgment, and Defendant's Motion for Partial Dismissal or, in the Alternative, for Partial Summary Judgment (defendant's Response or Def.'s Resp.) 7.  Plaintiffs argue that "this [c]ourt has authority to issue a declaratory judgment because such an order would be tied and subordinate to a monetary award."  Pls.' Reply 5.  The court need not address the parties' procedural dispute in order to resolve the questions of law before the court in the parties' briefing.  The court agrees with plaintiffs that defendant's contentions are no bar to the court's ability to issue its opinion on the

Plaintiffs' Motion for Declaratory Judgment and Omnibus Motion for Summary Judgment, and Defendant's Motion for Partial Dismissal or, in the Alternative, for Partial Summary Judgment (defendant's Response or Def.'s Resp.),[2] and Plaintiffs' Reply in Support of Their Motion for Declaration and for Clarification of the Court's June 23, 2005 Order and Opinion (plaintiffs' Reply or Pls.' Reply).

For the following reasons, plaintiffs' Motion is GRANTED to the extent set out in this Opinion and Order and otherwise DENIED.

Also before the court are Plaintiffs' Brief Setting Forth the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss" (plaintiffs' Loss Memorandum, or Pls.' Loss Mem.) filed May 7, 2009, Defendant's Memorandum on the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Loss" (defendant's Loss Memorandum, or Def.'s Loss Mem.) filed May 7, 2009, Plaintiffs'

---

legal issues briefed by the parties. See Pls.' Reply 6 (requesting a court ruling on the legal issues briefed by the parties even if not in the form of a declaratory judgment). Accordingly, the court treats plaintiffs' Motion as a pre-trial motion, and treats this opinion as a legal ruling intended to narrow the issues for trial and expedite resolution of this case. See Rules of the United States Court of Federal Claims (RCFC) 1 (directing that the court resolve procedural issues in a manner that "secure[s] the just, speedy, and inexpensive determination of every action and proceeding").

Plaintiffs also move for "clarification from this [c]ourt of its June 23, 2005 Opinion and Order on the legal standing issue to request past, present, and prospective damages in the damage phase of the trial." Pls.' Mot. 16. Specifically, plaintiffs' Motion requests clarification of footnote 12 of a prior opinion published by the court in this case, id., in which the court stated that "each plaintiff is entitled to '"just compensation"' [that] includes . . . recovery for "all damages, past, present and prospective,"'" Banks v. United States (Banks Stabilization Opinion), 68 Fed. Cl. 524, 531 n.12 (2005) (citations omitted) (alteration and omission in original). As plaintiffs correctly acknowledge, because entitlement to compensation was not directly before the court in its prior Opinion, the court ordered the present briefing submitted by the parties. See Pls.' Reply 7 ("The parties have not previously briefed issues pertaining to the scope of damages and those who are entitled to damages. Consequently, there has not been a ruling on the specific issues raised in [p]laintiffs' motion."); see also Pls.' Mot. 2 (referring to the court's order directing the parties to submit the present set of briefing). The court's legal rulings contained within this Opinion and Order clarify the law that will govern the damages phase of the case.

---

[2] In its March 18, 2009 Order, the court deferred ruling on plaintiff's Omnibus Motion for Summary Judgment and for Leave of Court to Supplement This Motion, filed March 10, 2009, subject to the court's ruling on plaintiffs' Motion. Order of Mar. 18, 2009. Accordingly, the court considers defendant's Response only to the extent that it is responsive to plaintiffs' Motion presently before the court.

Response to Defendant's Memorandum on the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss" (plaintiffs' Loss Response or Pls.' Loss Resp.) filed June 15, 2009, Defendant's Response to Plaintiffs' Brief Setting Forth the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss" (defendant's Loss Response or Def.'s Loss Resp.) filed June 15, 2009, Defendant's Reply to Plaintiffs' Response to Defendant's Memorandum on the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss" (defendant's Loss Reply or Def.'s Loss Reply) filed June 29, 2009, and Plaintiffs' Reply in Support of Their Brief Setting Forth the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss" (plaintiffs' Loss Reply or Pls.' Loss Reply) filed June 29, 2009.

I.      Background

        The facts of this case are set forth in detail in the court's September 28, 2007 opinion, Banks v. United States (Banks Liability Opinion), 78 Fed. Cl. 603, 604-10 (2007).  The current procedural posture of this case is described briefly here.

        In June 2007, the court held a trial in this matter for the purpose of determining liability of the United States for a taking of plaintiffs' properties without just compensation and in contravention of the Fifth Amendment to the United States Constitution.  See Banks Liability Opinion, 78 Fed. Cl. at 609, 614.  The court held that defendant was liable for the portion of erosion to plaintiffs' properties, located along the eastern shore of Lake Michigan, that was caused by the United States Army Corps of Engineers' construction and maintenance of jetties in the harbor at St. Joseph, Michigan. Id. at 656-57.

        On November 12, 2008, following the court's findings in the liability phase of the case, the court directed the parties to brief the parties' theories regarding the nature of compensation to which plaintiffs are entitled in preparation for the damages portion of plaintiffs' case.  See Order of Nov. 12, 2008.

        For the parties efficiently to conclude discovery in preparation for the damages phase of the case, the court must determine which owners are due compensation from the government,[3] the scope of the just compensation due to those owners, and the types of

_____

[3] Portions of defendant's Response discuss the implications of this court's legal rulings on various individuals' standing to recover damages in this case.  See, e.g., Def.'s Resp. 17-24 (discussing standing of particular plaintiffs).  This Opinion and Order does not address the standing of any individual plaintiff.  After considering this Opinion and Order, if the parties continue to be unable to resolve disputes as to the standing of particular individuals, the parties shall bring those specific issues to the court's attention in the status report(s) filed by the parties

damages to which plaintiffs are entitled if such damages are proven at trial.

II.     Discussion

    A.     A Single Permanent Physical Taking Occurred in January 2000, the Date of Stabilization

The parties do not dispute that the taking that occurred in this case stemmed from one permanent physical taking of plaintiffs' land by the government.  Pls.' Mot. 2-3; See Def.'s Resp. passim (arguing that only a single permanent taking is at issue in this case).[4]

---

following publication of this Opinion and Order.  See infra Part III ("The parties shall confer and file a joint status report, or, if the parties cannot agree, separate status reports, on or before 5:00 p.m. EDT Wednesday, August 26, 2009, suggesting a schedule for further proceedings in accordance with this Opinion and Order.").

[4] The continuing claim doctrine is inapplicable to the facts of this case.  Pls.' Mot. 2-3; See Def.'s Resp. passim (arguing that only a single permanent taking is at issue in this case).  This is because a continuing claim is one that is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."  Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1456 (Fed. Cir. 1997).  The continuing claim doctrine has been applied, for example, in suits for compensation of overtime pay, in which separate causes of action accrue each time overtime compensation is excluded from an individual's pay.  See id. at 1456-58 (discussing the application of the continuing claim doctrine in overtime compensation cases).  Here, however, the construction of the jetties at St. Joseph Harbor is the single governmental action which caused the erosion for which plaintiffs are claiming damages.  "[A] claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim."  Id. at 1456; see also Voisin v. United States (Voisin), 80 Fed. Cl. 164, 176-77 (2008) (holding that the continuing claim doctrine is inapplicable to cases "'where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach'") (quoting Boling v. United States (Boling II), 220 F.3d 1365, 1373 (Fed. Cir. 2000)).

In Boling II, the United States Court of Appeals for the Federal Circuit dealt with a taking that, as in this case, was caused "by a gradual physical process[,] erosion."  Boling II, 220 F.3d at 1370.  Erosion to plaintiffs' properties in Boling II was caused by an artificial waterway constructed by the government.  Id. at 1368.  In Boling II, the Federal Circuit declined to extend the application of the continuing claim doctrine into environmental takings.  Id. at 1373-74.  The court clarified that, although erosion is "a process that gradually increases the property damage over time, there [was] only a single governmental act that breache[d] a duty to the plaintiffs" in Boling II.  Id. at 1374.  The taking in Boling II occurred when the government "allow[ed] the erosion . . . to substantially encroach the plaintiffs' property."  Id.  Here, as in Boling II, the

In its opinion reviewing the timeliness of plaintiffs' complaint in this case, the Federal Circuit applied the stabilization doctrine and found that, for purposes of the accrual of plaintiffs' claims, a permanent taking took place only after defendant issued reports in 1996, 1997, and 1999 that "collectively indicated that erosion [due to the government's construction of jetties at St. Joseph Harbor] was permanent and irreversible."  Banks v. United States (Banks Accrual Opinion), 314 F.3d 1304, 1310 (Fed. Cir. 2003).  Plaintiffs' claims remained uncertain up until that time because the permanency of the taking itself was uncertain in light of defendant's ongoing mitigation efforts which had previously "appeared to successfully stave off the damaging effects of the jetties."  Id.  Upon remand, and in accordance with the Federal Circuit's decision in the Banks Accrual Opinion, this court fixed the date of stabilization as January 2000, the date upon which plaintiffs' land had been clearly and permanently taken.  Banks v. United States (Banks Stabilization Opinion), 68 Fed. Cl. 524, 528-29 (2005) ("Because the last of the three reports, the 1999 Report, was issued in January 2000 . . . the effective date of claim accrual for plaintiffs' claims in this case is January 2000.").

The doctrine of stabilization was developed within the statute of limitations jurisprudence addressing takings that occur as a result of gradual physical processes such as the erosion in this case.  In the leading case, involving flooding and erosion caused by a government-constructed dam, the United States Court of Appeals for the Fourth Circuit explained that "when a permanent structure erected by government authority results in the invasion of or damage to land, only one right of action arises and this accrues upon the completion of the structure and the happening of the injury."  United States v. Dickinson (Dickinson I), 152 F.2d 865, 867 (4th Cir. 1946).  The Supreme Court granted certiorari "because important questions were raised relevant to the determination of just compensation for the taking of private property by the [g]overnment."  United States v. Dickinson (Dickinson II), 331 U.S. 745, 747 (1947).  In Dickinson II, the Supreme Court established the concept of stabilization to govern the accrual of takings that occur as a result of gradual physical processes, such as the flooding and erosion that were before the Fourth Circuit in Dickinson I.  Id. at 749.  Because "the source of . . . [plaintiffs'] claim

---

increasing damage to plaintiffs' property over time is "not the result of new and independent breaches by the government, but [is] merely the natural and foreseeable consequence[] of the government's single breach."  Id.  In this case, defendant's construction of the jetties at St. Joseph Harbor resulted in the government's single breach on the date of stabilization in January 2000.  See generally infra Part II.A.  Therefore, here, as in Boling II, the continuing claim doctrine is inapplicable.  See Boling II, 220 F.3d at 1373-74; see also United States v. Dickinson (Dickinson I), 152 F.2d 865, 867 (4th Cir. 1946) (stating, in a case involving flooding and erosion caused by a government-constructed dam, that "although the use of the lands by the United States was continuous, only one cause of action accrued"), aff'd United States v. Dickinson (Dickinson II), 331 U.S. 745 (1947).

[in <u>Dickinson I</u>] - the overflow due to rises in the level of the river - [was] not a single event; [but was instead] continuous," the Court held that owners of the land could properly postpone bringing suit "until the situation [became] stabilized." <u>Id.</u>

The Fourth Circuit in <u>Dickinson I</u> stated that "the extent of the land to be taken [was] not established with certainty until the pool was raised to its permanent level.  Until this occurred . . . the taking [due to the flooding and erosion] was not complete." <u>Dickinson I</u>, 152 F.2d at 868.  In <u>Boling v. United States</u> (<u>Boling II</u>), the Federal Circuit applied <u>Dickinson II</u>, stating that "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." <u>Boling II</u>, 220 F.3d 1365, 1370-71 (Fed. Cir. 2000).  The taking in <u>Boling II</u> occurred when the government "allow[ed] the erosion . . . to substantially encroach the plaintiffs' property." <u>Id.</u> at 1374.  The Federal Circuit stated, "Once [the substantial encroachment] has occurred, the permanence of the taking is manifest, its progressive nature is apparent, and its ultimate extent is reasonably foreseeable."  <u>Id.</u>

While the date of claim accrual for statute of limitations purposes is clearly established in gradual takings cases by <u>Dickinson II</u>, the issue of whether or not the date of accrual is also the date of the taking for purposes of determining ownership and rights to compensation is not as clear.[5]  In <u>Applegate v. United States</u> (<u>Applegate I</u>), as in the

_____

[5] The Supreme Court of the United States, in <u>Dickinson II</u>, acknowledged that it did not "decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens."  <u>Dickinson II</u>, 331 U.S. at 749.  "[In <u>Dickinson II</u>], [t]he [Supreme Court] acknowledged that such litigation may have its risks . . . but did not address whether such litigation was permissible."  <u>Hansen v. United States</u> (<u>Hansen</u>), 65 Fed. Cl. 76, 125 (2005).  As this court has observed, "[<u>Dickinson II</u>] permits plaintiffs to delay filing takings claims under certain circumstances, but does not provide specific guidance regarding cases in which plaintiffs choose not to delay filing."  <u>Id.</u> (citation omitted).  Plaintiffs in this case, as was the case in <u>Dickinson II</u>, are individuals whose ownership on the date of stabilization is uncontested.  <u>See</u> <u>Dickinson II</u>, 331 U.S. <u>passim</u>; Pls.' Mot. <u>passim</u>; Def.'s Resp. <u>passim</u>.  However, unlike the plaintiffs in <u>Dickinson II</u>, plaintiffs here brought suit in July 1999, before the January 2000 date of stabilization, <u>Banks Stabilization Opinion</u>, 68 Fed. Cl. at 528-29, and therefore present the scenario contemplated by the Supreme Court in <u>Dickinson II</u>, but for which the Supreme Court "[did] not provide specific guidance," <u>Hansen</u>, 65 Fed. Cl. at 125.  <u>See</u> <u>Dickinson II</u>, 331 U.S. at 749 ("We are not now called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation [or erosion] threatens. . . .  All that we are here holding is that when the [g]overnment chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'").  In the Federal Circuit's opinion reviewing the timeliness of plaintiffs' complaint, there is no suggestion

Banks Accrual Opinion, the Federal Circuit applied the stabilization doctrine in a gradual takings case and decided that the statute of limitations was no bar to plaintiffs' claim. Applegate I, 25 F.3d 1579, 1583-84 (Fed. Cir. 1994). On remand, the trial court acknowledged that the exact dates of the alleged takings may have remained "uncertain due to the gradual erosion of the beaches." Applegate v. United States (Applegate II), 35 Fed. Cl. 406, 420 (1996).

The parties equate the date of the taking in this case with the date of stabilization, see Pls.' Mot. 7-9; Def.'s Resp. 6, agreeing that for purposes of determining the plaintiffs to whom compensation is due, the taking in this case occurred in January 2000, see Pls.' Mot. 9; Def.'s Resp. 6. The court sees no reason to disagree. In a situation such as the one presented here, where plaintiffs are individuals who acquired their interests in the affected properties during the period of erosion prior to the date of stabilization, and continued to hold their property interests on the date of stabilization, there is no legal or practical difficulty with equating the date of the taking with the date of stabilization.[6]

> B.     Owners at the Time of the Taking Are Entitled to Compensation for All Damages, Past, Present, and Future

As the case law discussed below requires, the parties do not dispute that the only individuals entitled to compensation due to the government's taking are those individuals who were property owners at the time of the taking. Pls.' Mot. 7; Def.'s Resp. 4-5. However, the parties do dispute whether the property owners at the time of the taking are entitled to compensation for damage to their property that occurred before and after the periods of each respective property owner's ownership. Def.'s Resp. 13 (arguing that plaintiffs are entitled only to damages that occurred during their "periods of actual

------

that the filing by plaintiffs slightly before the subsequently determined date of stabilization is in any way impermissible. See Banks v. United States (Banks Accrual Opinion), 314 F.3d 1304, passim (Fed. Cir. 2003). Further, given the uncertainty of gradual erosion cases, the court finds the date of filing proper in the circumstances of this case. This is a practical approach. It is not necessary, for example, to dismiss plaintiffs' action or require plaintiffs to refile their complaints. See Dickinson II, 331 U.S. at 748 ("The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action' - when they are born, whether they proliferate, and when they die.").

[6] The court can readily envision cases in which marking the date of the taking as the date of stabilization is contested by plaintiffs whose periods of ownership precede the date of stabilization, and who therefore institute an action on the basis that a taking occurred prior to the date of stabilization. Because plaintiffs in this case are individuals whose ownership as of the date of stabilization is uncontested by the parties, that issue is not presently before the court.

ownership"); Pls.' Reply 6-15 (arguing that plaintiffs are entitled to all damages to the eroding land, beginning in 1950 and including all reasonably foreseeable future loss).  For the following reasons, the court finds that property owners at the time of the taking are entitled to compensation for "all damages, past, present, and prospective."  Dickinson I, 152 F.2d at 867.

1.     General Rule:  Compensation is Due to the Owner at the Time of the Taking

In Danforth v. United States (Danforth), the Supreme Court addressed the compensation due to a plaintiff-landowner following condemnation proceedings instituted against the landowner by the United States.  Danforth, 308 U.S. 271, 276 (1939).  In Danforth, the Supreme Court explained that because "compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment."  Id. at 284; see also United States v. Dow (Dow), 357 U.S. 17, 20-21 (1958) (applying the Danforth rule to a physical possession case and stating that "it is undisputed that '[because] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment'" (quoting Danforth, 308 U.S. at 284)).

The parties agree that individuals whose periods of ownership of the eroding properties ended prior to the date of the taking are not entitled to a compensation award.  Pls.' Reply 15 ("[P]roperty owners who obtained and conveyed their interest in the property prior to January of 2000 . . . may not claim damages . . . ."); Def.'s Resp. 4 ("[A] plaintiff who fails to establish that he or she had an ownership interest in the property . . . on the date of taking has no standing to assert a takings claim . . . and . . . no right to be awarded damages.").

The accrual date of a claim "fix[es] the government's alleged liability."  See Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (stating that a claim accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence").  In the case of physical takings of a continuous nature, the date of accrual of plaintiffs' claims is the date of stabilization.  See Dickinson II, 331 U.S. at 749; Banks Accrual Opinion, 314 F.3d at 1310; Banks Stabilization Opinion, 68 Fed. Cl. at 528-29.  The stabilization date marks the date of the taking in this case for purposes of determining the individuals entitled to compensation.  See supra Part II.A.  Under the Supreme Court's rule in Danforth, individuals whose property interest in the eroding land ended prior to the date of taking do not receive payment.  Danforth, 308 U.S. at 284 ("[T]he owner at [the] time [of the taking] . . . receives the payment."); see also Wyatt v. United States (Wyatt), 271 F.3d 1090, 1096-97 (Fed. Cir. 2001) (explaining that the government

may exercise its eminent domain power by either physical invasion or regulation, stating that "[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation," and denying a takings claim brought by a plaintiff who relinquished its interest in the property prior to the date of the taking).

It is well established that owners who acquired their property interests subsequent to the time of the taking are not entitled to compensation from the government. See, e.g., 26 Am. Jur. 2d Eminent Domain § 230 (Ownership and Entitlement) (2009) ("[T]he right to compensation in eminent domain belongs solely to the owner of the property at the time of taking and does not pass to subsequent owners.") (footnote omitted). Applying the rule it established in Danforth, the Supreme Court in Dow held that a landowner who acquired ownership of land two years after the date upon which the United States entered into physical possession of the land was not entitled to a compensation award as a result of the government's taking. Dow, 357 U.S. at 18 (stating that plaintiff acquired interest two years after government's taking), 27 (holding that plaintiff was not entitled to compensation award). The Court stated that it could not "accept the suggestion that in cases like the present one[, involving governmental takings by physical possession,] the total compensation should be divided between the first and second owners of the property, the former taking that portion of the award attributable to the [g]overnment's use of the property until the passage of title, and the latter receiving the balance." Id. at 26. The Court explained the rationale behind its decision as follows: "To require the Government to deal with more than one party, particularly when division of the condemnation award would entail a complex apportionment, might severely impede the orderly progress of condemnation proceedings and would conflict with the policies underlying the Anti-Assignment Act." Id.

In Bailey v. United States (Bailey), this court explained that:

[T]he rationale for finding claims to be personal to those owning property at the time the property became burdened is that, by physically using or physically interfering with the use of the property, the entity operating under the eminent domain power was permanently removing that interest from the private owner, and substituting a full measure of compensation in its stead.

Bailey, 78 Fed. Cl. 239, 262 (2007). In Ferrell v. United States (Ferrell), the government's construction of a lock caused water to submerge plaintiff's property and resulted in a taking. Ferrell, 49 Ct. Cl. 222, 223 (1914). The plaintiff in Ferrell owned the land at the time of the taking, but subsequently sold the land to a third party. Id. The court held that the plaintiff had a claim to compensation from the government for the taking because the deed to the purchaser of the land did not assign plaintiff's cause of

action against the government to the purchaser.  Id. at 223-24.

In this case, the date of stabilization marks the point at which it became certain that the damage to plaintiffs' properties was in fact "permanent and irreversible."  Banks Accrual Opinion, 314 F.3d at 1310.  In January 2000, plaintiffs here, like the plaintiffs in Bailey, experienced a "permanent removal of the property interest, which swapped a suit for compensation, or 'chose in action' not running with the land, in place of a real property interest."  Bailey, 78 Fed. Cl. at 263 (a regulatory takings case in which the court undertakes an in-depth discussion of case law applied to takings by physical possession).  Upon this permanent removal of plaintiffs' property interests in this case, "the property interest[s] in question [were] no longer [each] individual's to convey."  Id. at 264 (footnote omitted).  Because plaintiffs in this case are individuals who owned the property at the time of the taking, they, under both applicable precedent and persuasive analysis in dicta, are entitled to compensation for the taking.

      2.      Determining the Scope of Just Compensation Due to the Owners at the Time of the Taking

The parties dispute the scope of the compensation that is due to the individuals who owned the property on the date of stabilization.  Defendant argues that plaintiffs, who have established that they were the property owners as of January 2000, are entitled only to damages that occurred during their "periods of actual ownership."  Def.'s Resp. 13.[7]  Plaintiffs, on the other hand, argue that they are entitled to all damages to the

---

      [7]  In its Response, defendant argues that plaintiffs are procedurally barred from arguing that they are entitled to damages that occurred outside of their respective dates of ownership because "the [c]ourt has already addressed this issue."  Def.'s Resp. 8 (citing Banks Stabilization Opinion, 68 Fed. Cl. at 530-31); see also Banks Stabilization Opinion, 68 Fed. Cl. at 535 (stating that "[w]ith respect to a particular plaintiff, the proper date for measurement of the high water mark is the date of the particular plaintiff's property acquisition"); Banks v. United States (Banks Liability Opinion), 78 Fed. Cl. 603, 656 (2007) (stating that "[d]efendant is therefore [not] responsible for damages . . . prior to [each plaintiff's] acquisition").

      Defendant's argument – based on the doctrine of the law of the case – is not persuasive to the court.  As plaintiff correctly states, the specific issues briefed by the parties here have not previously been squarely before the court.  See Pls.' Reply 7 ("The parties have not previously briefed issues pertaining to the scope of damages and those who are entitled to damages.  Consequently, there has not been a ruling on the specific issues raised in [p]laintiffs' motion.").  "'[T]he law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts.'"  Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995) (quoting Jamesbury Corp. v. Litton Indus. Prods., Inc., 839 F.2d 1544, 1550 (Fed.Cir. 1988)) (other

eroding land, beginning in 1950 and including all reasonably foreseeable future loss.
Pls.' Reply 6-15.

Determining plaintiffs' rights to compensation for damages before and after their
dates of ownership requires a determination of the applicability or not of two alternative
principles:  on the one hand, it is axiomatic that the government must pay for the entirety
of a taking, Dickinson II, 331 U.S. at 750 ("[F]or all that the government takes, it must
pay."); on the other hand, a plaintiff cannot be compensated for damage that it did not
suffer.  See Applegate II, 35 Fed. Cl. at 420 (denying recovery on the theory that "damage
to [plaintiffs'] properties logically only can commence when plaintiffs own the properties,
not before").

a.      Plaintiffs Are Entitled to Damages That Precede Each Owner's Respective
        Date of Ownership

The parties' arguments regarding what constitutes the compensation award payable
to plaintiffs turns in large part on the meaning given to the principle that plaintiffs are
entitled to payment for "all damages, past, present, and prospective."  Dickinson I, 152
F.2d at 867; Ridge Line, Inc. v. United States (Ridge Line), 346 F.3d 1346, 1359 (Fed.
Cir. 2003) ("'[J]ust compensation' includes a recovery for 'all damages, past, present and
prospective.'") (quoting Dickinson I, 152 F.2d at 867).  Plaintiffs argue that the Fourth
Circuit's decision in Dickinson I supports their contention that plaintiffs are entitled to
compensation for damages to the eroding properties which preceded their dates of
ownership.  Pls.' Mot. 9-11.  However, the precise issue confronting the court in this case
– the time periods of damage which are compensable to plaintiffs who acquired a
property interest after the date upon which the damage to the eroding properties
commenced – was not directly addressed by the Fourth Circuit in Dickinson I.  See id. at
868-71.[8]  The statement upon which plaintiffs rely appears in the course of the court's

_____

citations omitted).  Because the issue before the court has not been squarely decided, and "[a]s
there has been no appellate court ruling on the[] specific matters [here briefed by the parties], the
law of the case doctrine does not apply."  Pls.' Reply 7.  Because there has been no final
judgment issued in this case, statements contained in the court's previous opinions in this case do
not preclude the court from deciding the specific issues now fully briefed and argued by the
parties.  Accordingly, the court addresses in this Part II.B.2 the substantive legal arguments put
forth by each party regarding the proper time period for which plaintiffs are due compensation.

        [8] In its decision affirming the decision of the United States Court of Appeals for the
Fourth Circuit in Dickinson I, the Supreme Court of the United States did not discuss the time
periods for which damages are compensable by plaintiffs in a gradual takings case.  See
Dickinson II, 331 U.S. passim.

discussion of the application of the statute of limitations in that case and is not further explained by the court. See id. at 867.[9]

Nevertheless, the facts in Dickinson I are consistent with plaintiffs' argument here. The Dickinson I plaintiffs' properties suffered erosion and flooding due to the government's construction and operation of the Winfield Lock and Dam on the Kanawha River in South Charleston, West Virginia. Dickinson I, 152 F.2d at 866. One of the plaintiffs in Dickinson I, Mr. Dickinson, like some of the plaintiffs in this case, acquired his interest in the affected property after the erosion and flooding damage began, and owned the property on the date of the taking. See id. at 866-67. Specifically, Mr. Dickinson acquired his interest in the property on August 16, 1937, id. at 866, after the commencement, on May 30, 1937, of the damage to the property, id. at 867, and owned

_____

[9] Because the Dickinson I court did not itself expand on the application of the damages theory it enunciated – that "all damages, past, present[,] and prospective are recoverable" – the court reviewed the state court cases upon which the Dickinson I court relied for that proposition. Those cases, see Dickinson I at 867, however, do not address whether erosion damages occurring before a plaintiff acquired its property interest are compensable. In Suehr v. Sanitary District of Chicago (Suehr), the Supreme Court of Illinois entertained a suit brought by a plaintiff, an owner of an island, a portion of which was washed away after experiencing increased water flow due to the government's construction of a drainage canal. Suehr, 90 N.E. 197, 197-98 (Ill. 1909). The court in Suehr stated that the plaintiff had "the right . . . to recover all damages, past, present[,] and future, which his real estate had sustained by reason of the construction [of the drainage canal]." Id. at 198. However, because the plaintiff in Suehr purchased the property in 1897, three years prior to the date, January 17, 1900, on which the damage began, the plaintiff in Suehr, unlike plaintiffs here, did not seek damages which preceded his ownership interest in the affected property. See id. In King v. Board of Council of City of Danville (King), the plaintiff brought suit after the government's construction of a dam caused a diversion of the natural flow of water which had previously "flowed to and supplied the power for the operation of [plaintiff's] mill." King, 107 S.W. 1189, 1190 (Ky. 1908). The court in King stated that "only one action for damages [was] allowed. In that action plaintiff must sue for all damages, past and future." Id. at 1191. In deciding whether the King plaintiff's action was time-barred under the applicable five-year statute of limitations, the King court held that the plaintiff's action was not time-barred and that the plaintiff could recover for damages during the five years preceding the plaintiff's filing of the action. Id. In King, although the date when plaintiff acquired his property interest is not stated, the issue of compensation to the King plaintiff for any periods prior to his ownership was not before the court. See id. The third case upon which Dickinson I relied upon for the assertion that "all damages, past, present and prospective are recoverable" is Carpenter v. Lancaster (Carpenter), 61 A. 1113 (Pa. 1905). In Carpenter, as in Suehr and King, the court was not presented with a plaintiff seeking to recover damages with respect to erosion from a gradual taking that had commenced before its ownership of the eroding property. See Carpenter, 61 A. at 1113-14.

13

the property on the accrual date, September 22, 1938, when portions of his property were permanently submerged.  Id.  The Dickinson I decision, on clearly stated facts, intimates no concern about the application of the legal principle enunciated by the court to loss in a gradual taking prior to the acquisition of the property by the owner at the time of stabilization.  See id. passim.  Plaintiffs here properly invoke the phrase "all damages, past, present[,] and prospective" from Dickinson I, id. at 867, to support plaintiffs' theory of entitlement to damages for erosion that occurred prior to each plaintiff's respective date of ownership.

Plaintiffs also rely on the Federal Circuit's decision in Cooper v. United States (Cooper) for the proposition that plaintiffs are entitled to the full value of erosion damage to the affected property, including damage that predated their dates of ownership.  Pls.' Mot. 9-12; Pls.' Reply 15-17.  The destruction of the plaintiff's timber due to the flooding of the plaintiff's property in Cooper, like the erosion to plaintiffs' properties in this case, was a governmental taking through a gradual physical process.  See Cooper, 827 F.2d 762, 763 (Fed. Cir. 1987).  The plaintiff in Cooper, like some of the plaintiffs in this case, acquired his interest in the affected property after the damage began, and held a protectable interest in the property on the date of the taking.  See id. at 763-64.  In Cooper, damage to the affected property began in 1979.  Id. at 762-63.  Specifically, the plaintiff in Cooper acquired his interest in the property in 1982, "after the physical events causing the taking began," id. at 763-64, and brought a takings case in 1984, after the extent of the destruction to his property became "ascertainable," and while he still owned his property interest, id.  The three issues presented to the Federal Circuit for resolution in Cooper were "what was taken[,] . . . when . . . it [was] taken[,] and from whom . . . [it] was . . . taken."  Id. at 763.  While addressing these issues, the Federal Circuit also discussed the damages due to the Cooper plaintiff.  Id. at 764.  The Federal Circuit, relying upon Dickinson I, concluded that the Cooper plaintiff was entitled to damages.  Id.  The court stated, "It is clear that [plaintiff] had a property interest in the timber when the taking of the timber became complete.  Consequently, he is entitled to compensation for the value of the timber destroyed."  Id.  Plaintiffs argue that the "value of the timber destroyed," for which the Cooper plaintiff could recover, should be read to include damages to its property between 1979 and 1982, before the Cooper plaintiff acquired legal title to the property.  See Pls.' Mot. 10-12; Pls.' Reply 15-17.  Defendant, on the other hand, urges that the Cooper decision entitling the plaintiff to compensation for the value of the timber destroyed "was made in the context of when [the plaintiff] acquired his property interest."  Def.'s Resp. 11.

The court agrees with plaintiffs that the Cooper decision lends support to plaintiffs' theory of entitlement to recovery for damages occurring prior to their ownership.  The plaintiff in Cooper was compensated for the entire value of the trees lost.  See Cooper, 827 F.2d at 764.  There is no suggestion in the Cooper decision that the

14

plaintiff's recovery was prorated to limit the plaintiff's recovery only to the portion of damage related to the growth of the trees during the years the <u>Cooper</u> plaintiff owned the affected property.  <u>See id. passim</u>.  Defendant does not point to anything in the <u>Cooper</u> decision that either requires or persuades the court to adopt defendant's position that the value that the <u>Cooper</u> plaintiff recovered should be limited by "when [the plaintiff] acquired his property interest."  <u>See</u> Def.'s Resp. 11.  Moreover, the <u>Cooper</u> court's decision entitling the plaintiff to damages was based upon <u>Dickinson I</u>, <u>id.</u> at 764, in which the Fourth Circuit awarded "all damages, past, present and prospective" in a case where at least one of the plaintiffs – like the <u>Cooper</u> plaintiff and plaintiffs in this case – acquired an interest in the property after the damage began, <u>Dickinson I</u>, 152 F.2d at 867. <u>Cooper</u> can be fairly interpreted to support the award of damages to plaintiffs for erosion that occurred prior to their ownership.  Indeed, the record of proceedings on remand make it crystal clear that damages in <u>Cooper</u> were calculated to include the entire period of flooding, including the years of flooding prior to the <u>Cooper</u> plaintiff's acquisition of the property.[10]

---

[10] The bases for the damages ultimately awarded to the plaintiff in <u>Cooper v. United States</u> (<u>Cooper</u>), 827 F.2d 762 (Fed. Cir. 1987), can be ascertained from the proceedings in the trial court both before and after the United States Court of Appeals for the Federal Circuit's decision in <u>Cooper</u>.  Before the publication of the <u>Cooper</u> decision, defendant submitted an assessment – undertaken by defendant's expert – of the acreage affected by and the tree damage due to the flooding in its Motion for Summary Judgment (<u>Cooper</u> defendant's Motion for Summary Judgment or <u>Cooper</u> Def.'s Mot. for Summ. J.), filed November 1, 1985 in the trial court in case number 84-681 L.  <u>See Cooper</u> Def.'s Mot. for Summ. J. Attach. 1 (Aff. of W. Frank Miller) at 4 ("Damage/Mortality Estimates from CIR Imagery, 1979-1985").  The time period assessed by the defendant's expert began in 1979.  <u>Id.; see also Cooper</u> Def.'s Mot. for Summ. J. 3 (referring to the five-year period between May 1979 and September 1984 examined by defendant's expert and stating that "[t]his five year period is approximately the period in which the flooding condition causing the tree damage is alleged in plaintiff's complaint to have taken place").  The year 1979 is the year when the flooding began – three years before the <u>Cooper</u> plaintiff acquired his property interest.  <u>Cooper</u>, 827 F.2d at 763-64 (stating that the flooding began in 1979 and that the plaintiff acquired his interest in 1982).  According to the defendant's own evidence on summary judgment, the total acreage affected by the flooding from the time the flooding began in 1979, and when the <u>Cooper</u> plaintiff brought his suit in 1984, was 75 acres. <u>See</u> Aff. of W. Frank Miller at 4.  The trial court proceedings regarding damages, which took place after the government's liability was established in <u>Cooper</u>, make clear that the damage award agreed to by the parties in <u>Cooper</u> encompassed damage to the entire 75 acres of affected land, which included damage dating back to 1979, before the <u>Cooper</u> plaintiff acquired his interest in the property in 1982.  <u>See</u> Transcript of Apr. 14, 1988 Status Conference (Tr.) 4:17-25 (defendant discussing payment for damage to 75 acres of affected land); defendant's Status Report, filed April 4, 1988, ¶ 1 (same); Stipulation for Dismissal, filed May 10, 1988 (reflecting payment for damage to 75 acres of affected land, plus interest and costs).

Both parties also rely on the decision of the Court of Federal Claims in Applegate II, but offer competing interpretations of the decision.  Plaintiffs assert that Applegate II is inapplicable to this case, and "contrary to Cooper and Boling [II]," because the court in Applegate II "posit[ed] a 'continuous' taking to cutoff past damages" to the Applegate II plaintiffs.  Pls.' Reply 12.  Defendant argues that the facts in Applegate II are indistinguishable from the facts before the court in this case, and urges the court to follow the approach taken in Applegate II.  Def.'s Resp. 9-10.

The court agrees with defendant that the facts in Applegate II are similar to the facts in this case.  However, the court does not follow the approach taken in Applegate II for determining plaintiffs' entitlement to damages predating their ownership period for the following reasons.

The plaintiffs in Applegate II were beachfront property owners south of Port Canaveral in Florida.  Applegate II, 35 Fed. Cl. 406, 411 (1996).  The Applegate II plaintiffs filed suit in December 1992 alleging that the Army Corps of Engineers' (Corps') construction of the Canaveral Harbor Project during the 1950s caused erosion of plaintiffs' properties and thereby effected an uncompensated taking.  See id. at 411-12.  The Corps' Canaveral Harbor Project, which was intended "to provide a deep-water harbor . . . immediately south of Cape Canaveral," involved the dredging of a channel in the Atlantic Ocean and the construction of "two jetties projecting from the shoreline eastward into the Atlantic Ocean."  Id. at 411.  The Applegate II plaintiffs, all but one of whom acquired their property "at various times after construction began on the federal project," complained that the jetties and the periodic dredging of the channel effected a taking by blocking the flow of sand to their beachfront properties.  Id.

The facts in this case are analogous in relevant respects to the facts in Applegate II.  Here, plaintiffs first filed suit in July 1999 alleging that the installation by the Corps of sheet piling at the jetties in St. Joseph Harbor between 1950 and 1989 caused the erosion of their shoreline properties and thereby effected a taking.  Banks Stabilization Opinion, 68 Fed. Cl. at 529-30.  The Federal Circuit determined that stabilization occurred after defendant issued reports concluding that mitigation efforts could not reverse the loss.  Banks Accrual Opinion, 314 F.3d at 1310.  Plaintiffs acquired their properties at various times before, during and after the period 1950 to 1989.  Banks Stabilization Opinion, 68 Fed. Cl. at 529-30.  The taking as to all plaintiffs occurred at the same time in January 2000.  See supra Part II.A.

The Applegate II court addressed the Applegate II plaintiffs' claim that each landowner was "entitled to compensation dating back to the initial construction of the [Canaveral Harbor] Project, regardless of the date of [his or her property] purchase, because the alleged taking became permanent only after their ownership commenced."

Id. at 418-19.  The Applegate II plaintiffs, like plaintiffs in this case, specifically relied on Dickinson II and Cooper for the proposition that they could recover "for any taking that anteceded their ownership because they, not their predecessors, [bore] the risk of permanent loss" from the gradual process of beach erosion caused by the Canaveral Harbor Project because "the taking of their property had not stabilized at the time of purchase."  Id. at 419.  On the basis of its conclusion that "[n]either Dickinson [II] nor Cooper established that a claimant may recover damages for a taking of property that occurred prior to his ownership," the court rejected the plaintiffs' position.  Id. at 420.  The court cited the Fifth Amendment and case law directing the payment of just compensation for the taking of private property to the owner of the property at the time of the alleged taking.  Id. at 419 (citing, inter alia, U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"), Danforth, 308 U.S. at 284 ("For the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment."), Dow, 357 U.S. at 20-21 ("'[because] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'") (citation omitted), and Lacey v. United States, 219 Ct. Cl. 551, 560, 595 F.2d 614, 619 (1979) ("The person entitled to compensation for a taking of property by the [g]overnment is the owner of the property at the time of the taking.")).  The Applegate II court found it "axiomatic that a party must hold a compensable property interest to recover compensation for a taking."  Id. (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027 (1992), and Kaiser Aetna v. United States, 444 U.S. 164, 179-80 (1979)).  The Applegate II court went on to conclude that "[n]o claimant may ever claim compensation for an interest which he does not own."  Id. at 420.  The Applegate II court found that the plaintiffs' claims for damages that predated individual ownership were "barred, absent a valid assignment of a previous owner's claim under the Assignment of Claims Act,"[11] id., and further found that the Applegate II plaintiffs did not hold valid assignments from previous owners, id. at 421.

Contrary to plaintiffs' argument, see Pls.' Reply 12, the Applegate II court's discussion of the Assignment of Claims Act does not establish that the court either found or assumed the applicability of the continuing claim doctrine to the facts of that case.  The continuing claim doctrine, which the court found inapplicable to the facts of this case, see supra n.4, permits separate causes of action to accrue each time a plaintiff suffers damage

---

[11] The Assignment of Claims Act provides that "[a]n assignment [or transfer of any part of a claim against the United States government or of an interest in the claim] may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."  31 U.S.C. § 3727(a)-(b) (2006).  Where, as here, the date of taking is established as the date of stabilization, it is difficult to see how a person or entity who was an owner prior to the date of taking could effectuate "a valid assignment of [his or its] . . . claim under the Assignment of Claims Act."  See Applegate II, 35 Fed. Cl. 406, 420 (1996).

which is the "result of [a] new and independent breach[] by the government," see Boling II, 220 F.3d at 1374.  In light of the Federal Circuit's explicit finding – contained in its decision remanding the Applegate case for further proceedings in the Court of Federal Claims – that the continuing claim doctrine did not apply to the facts of that case, Applegate I, 25 F.3d at 1583-84, the court does not read into the Court of Federal Claims Applegate II decision, after remand, a finding that is contrary to the Federal Circuit's decisions in Boling II, Cooper, and Applegate I itself regarding the inapplicability of the continuing claim doctrine to a gradual taking.  Therefore, while plaintiffs' assertion that Applegate II "cut[]off past damages" to the Applegate II plaintiffs, Pls.' Reply 12, is correct, the Applegate II court did not do so on a continuing claim theory.

However, the Applegate II court's decision explicitly stated that one of plaintiffs' contentions in that case, as here, was that the Assignment of Claims Act was inapplicable to the facts of the case.  Applegate II, 35 Fed. Cl. at 420 ("Plaintiffs [argue] that the [Assignment of Claims] Act does not apply to this case [because it depends upon the existence of an assignable claim] and thus is no bar to their claims."); Pls.' Mot. 8 ("[P]rior to January 2000 no takings claim had yet accrued because no permanent taking had been established.").  The Applegate II court found that no valid assignment occurred in that case.  Id. at 421.  The Applegate II court did not have before it the question of whether or not owners prior to the Applegate II plaintiffs would have had a valid takings claim.  See id. passim.  The court merely found and ruled that the Applegate II plaintiffs themselves did not hold valid assignments from previous owners.  See id. at 421.  The court held that, absent a valid assignment of a claim from a prior owner, the law would not recognize an Applegate II plaintiff's right to damages for erosion occurring prior to its ownership.  Id. at 420.

The court respectfully disagrees.  Instead, the court finds that the Assignment of Claims Act cannot operate to preclude plaintiffs' claim of entitlement to past damages because the Assignment of Claims Act is inapplicable to the facts of this case.  A takings claim did not accrue until the date of stabilization, which in this case was January 2000.  See supra Part II.A.  Even though Dickinson II did not address whether litigation would be permissible if brought by owners prior to the date of stabilization in a gradual takings case, see Dickinson II, 331 U.S. at 749, and therefore "does not provide specific guidance regarding cases in which plaintiffs choose not to delay filing," Hansen v. United States (Hansen), 65 Fed. Cl. 76, 125 (2005), the court finds that, given the stabilization doctrine created in Dickinson II, it is difficult to envision how an individual whose ownership period ended prior to stabilization could, as a practical matter, bring a takings claim.  The court therefore finds it reasonable to conclude that, prior to the date of stabilization, an assignable claim did not exist in this case.  Accordingly, the court does not follow the Applegate II court's application of the Assignment of Claims Act to bar plaintiffs' claims for past damages.  See Applegate II, 35 Fed. Cl. at 420 (concluding that "plaintiffs'

18

claims for damages that antecede individual ownership are barred, absent a valid assignment of a previous owner's claim under the Assignment of Claims Act").

Plaintiffs here argue that they "are entitled to damages beginning in 1950 because when they took title to their respective properties, they did so with the understanding that they were entitled to full restoration of the eroded lands. . . .  As long as there were mitigation efforts, there was the reasonable prospect that no taking would occur at all." Pls.' Reply 12.  The court respectfully disagrees with the Applegate II court's characterization of similar arguments made by the Applegate II plaintiffs as "appeals to equity . . . beyond the court's jurisdiction." Applegate II, 35 Fed. Cl. at 420.  The court rejected the Applegate II plaintiffs' arguments, stating that "plaintiffs are not entitled to compensation for a mere expectancy, such as construction of a sand transfer plant." Id. In the court's view, however, a reasonable and diligent plaintiff who purchased an affected property on or after 1970 may be assumed to have known of the mitigation efforts underway at the time of acquisition of its interest in the property, and therefore was entitled, prior to stabilization, to have viewed those mitigation efforts with the expectation that the efforts would be successful.  In fact, the Federal Circuit has stated that defendant's ongoing mitigation efforts had previously "appeared to successfully stave off the damaging effects of the jetties." Banks Accrual Opinion, 314 F.3d at 1310.  It is therefore reasonable to assume that the fair market value of the affected properties, at the time plaintiffs purchased their properties prior to stabilization, did not reflect a taking. Plaintiffs' reasonable expectation that defendant's mitigation efforts would be successful, and that any damage to the properties was remediable, was not, as Applegate II states, "a mere expectancy," Applegate II, 35 Fed. Cl. at 420, but instead was a reasonable expectation entitling plaintiffs to value their properties at the time of purchase as properties unaffected by a taking.  Moreover, because it was the mitigation effort itself that made shoreline owners aware of the possible responsibility of the government, the fair market value of the properties may be assumed not to have reflected any awareness of a taking that was gradually occurring by erosion from and after the beginning of the installation of the steel sheet piling around the jetties in 1950 but prior to the commencement of mitigation efforts.  Each plaintiff is therefore entitled to compensation for any damage attributable to the jetties from the time the jetty improvements began in 1950, notwithstanding the fact that 1950 may be prior to the date on which that plaintiff acquired its respective property interest.  The court concludes that the market should be viewed as having disregarded a taking that had not occurred and therefore respectfully disagrees with the alternative conclusion that a plaintiff's right to compensation in a gradual takings case "logically only can commence when [a] plaintiff[] own[s] the properties, not before."  See Applegate II, 35 Fed. Cl. at 418.

b.      Plaintiffs Are Entitled to All Reasonably Foreseeable Future Loss Irrespective of Subsequent Changes in Ownership

19

The parties agree that plaintiffs who owned their properties on the date of stabilization and continue to own their properties are entitled to compensation for all reasonably foreseeable future loss to their properties. Def.'s Loss Resp. 13-14; Pls.' Loss Reply 8-9 (arguing that all owners as of the date of stabilization are entitled to damages for reasonably foreseeable future loss); however, the parties remain apart as to the recovery owed to plaintiffs who owned eroding properties on the date of taking, but later transferred their interests in their eroding properties. Defendant argues that the reasonably foreseeable future losses of plaintiffs who transferred their properties after January 2000 should be limited, "end[ing] at that point in time when they conveyed their property interests." Def.'s Loss Resp. 13.[12] Plaintiffs maintain that plaintiffs who owned their properties on the date of the taking, but who no longer hold title to their respective properties, are entitled to claim all reasonably foreseeable future damages irrespective of a change in ownership subsequent to the date of the taking. Pls.' Loss Reply 8-10. The court agrees with plaintiff.

"The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action' - when they are born, whether they proliferate, and when they die." Dickinson II, 331 U.S. at 748. The court in Dickinson II applied this view of the Fifth Amendment to enunciate the doctrine of stabilization to govern the accrual of gradual takings claims so as to facilitate an equitable result under the "diverse circumstances" presented by gradual takings cases. See id. at 748-49. Explaining that "[t]he Constitution is intended to preserve practical and substantial rights, not to maintain theories," id. at 748 (internal quotations omitted), the Court in Dickinson II cautioned that "procedural rigidities should be avoided" in gradual takings cases, id. at 749; see also Hansen, 65 Fed. Cl. at 125 (explaining that Dickinson II "warned against applying an excessively rigid rule when the government takes property through a gradual physical process"). The court believes that precluding plaintiffs who were owners on the date of the taking – and therefore the only individuals entitled under law to receive compensation in this case, see Danforth, 308 U.S. at 284 (explaining that because "compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment"); supra Part II.B.1 – from compensation for all reasonably foreseeable future loss would be not only "excessively rigid," but also would frustrate the spirit in which the Supreme Court

---

[12] In Defendant's Response to Plaintiffs' Brief Setting Forth the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss" (defendant's Loss Response or Def.'s Loss Resp.), defendant states that it previously "incorrectly asserted that . . . plaintiffs [who owned their properties as of January 2000 and subsequently sold their properties] were not entitled to recover 'all reasonably foreseeable damages.'" Def.'s Loss Resp. 13. Accordingly, the court treats the portion of defendant's Response requesting that the court dismiss those plaintiffs' claims as MOOT. See Def.'s Resp. 21-22.

intended that the law should address the complicated process presented by gradual takings cases.  See Dickinson II, 331 U.S. at 749.

In Dow, the right to compensation for a governmental taking by physical invasion vested with the property owners on the date of the taking.  Dow, 357 U.S. at 22.  The Supreme Court saw "no merit in the suggestion that it is inequitable to deny . . . [an individual who acquired an interest in the burdened property subsequent to the date of taking] recovery in [that] action."  Id. at 27.  Rejecting a theory that compensation for a takings claim should be apportioned between individuals upon the passage of title, with one owner "taking that portion of the award attributable to the [g]overnment's use of the property until the passage of title [to the next owner who then] . . . receiv[es] the balance," id. at 26, the Court emphasized that owners of affected land subsequent to the date of taking have "readily available contractual means by which . . . [to] protect[] [themselves] vis-a-vis [their] grantors," id. at 27.

Applying the Supreme Court's rationale for denying recovery to the subsequent owner in Dow to the facts of this case, the court assumes that, when an individual acquires an interest in land which is affected by continuing erosion that has stabilized, that individual negotiates any entitlement to any portion of the compensation for the taking with the seller through private contractual means.  Therefore, in a scenario in which a plaintiff divested itself of ownership in the eroding property through a sale after the date of stabilization and accrual, the price of the property at the time of sale should be assumed to reflect the reasonably foreseeable future loss to the eroding land.  Because the fair market value of the eroding property after stabilization is assumed to reflect the ongoing erosion, a plaintiff who has sold its land should be entitled to compensation from the government for all reasonably foreseeable future loss.  "The Fifth Amendment's takings clause does not permit the [g]overnment to continually erode private property . . . and avoid compensation for actual loss because of intervening transfer of title." Applegate II, 35 Fed. Cl. at 415 (rejecting defendant's argument that plaintiffs in that case could not recover because they acquired their property interest after the taking commenced but before the date of stabilization).  The court concludes that an injustice would result if plaintiffs who, the court assumes, have borne the cost of all reasonably foreseeable future loss at the time of a sale after stabilization and accrual, would not be able to recover from defendant for all reasonably foreseeable future loss.  See Dickinson II, 331 U.S. at 750 ("[F]or all that the [g]overnment takes, it must pay.").  Here, as in Dow, "whatever may be the equities between [other parties not before the court]," such as between plaintiffs and subsequent owners, or between subsequent owners and the government, "such equities cannot serve to prevent the application of the correct rule of law as between [defendant and plaintiffs] in this case."  Dow, 357 U.S. at 27.

In Hansen, the Court of Federal Claims dealt with a gradual takings case in which

groundwater on plaintiff's land was contaminated by pesticides from cans buried on neighboring property used as a work center by the Forest Service of the United States Department of Agriculture.  Hansen, 65 Fed. Cl. at 81.  The harmful contaminant had spread across a portion of plaintiff's property over a period of years prior to the time he brought suit, and plaintiff argued that the pesticide would continue to spread to the groundwater on the remainder of the property.  Id.  The Hansen court stated that "a plaintiff may seek just compensation for harm to private property that has not occurred, so long as that harm is shown to be reasonably foreseeable."  Id. at 126.  The court in Hansen rejected defendant's argument that plaintiff, Mr. Hansen, lacked standing to bring the takings claim because he had transferred title to the land after the claim had accrued.  Id. at 130-31.  While the issue before the Hansen court was one of standing, as distinguished from the issue of right to compensation presently before the court, the reasoning of the Hansen court is instructive.  In Hansen, the court described the defendant's argument against plaintiff's standing as "a red herring."  Id. at 129.  The court stated:

> [Defendant's] argument . . . is a red herring because it is inconsistent with takings jurisprudence that focuses on the claimant's property interest at the time the taking occurred, rather than on the time at which the claim itself is brought.  Indeed, the important question is who holds the property interest at the time the claim accrues.

Id. (citing Palazzolo v. Rhode Island, 533 U.S. 606, 628 (2001), and Dow, 357 U.S. at 20-21).  The court concludes that a focus on the time the taking occurred, which for purposes of determining the right to compensation in this gradual takings case is the date of stabilization, see supra Part II.A, supports the conclusion that the right to compensation for all reasonably foreseeable future loss vests in the owners on that date.

    C.    The Types of Damages to Which Plaintiffs May Be Entitled If Such Damages Are Proven at Trial

The court has previously found, and the parties do not dispute, that plaintiffs may recover the value of the property taken.  The court determined at the trial on liability that plaintiffs may recover 30% of the total value of the property lost to erosion.  See Banks Liability Opinion, 78 Fed. Cl. at 656.  Determining the value of the lost property is not currently before the court and will be decided at trial.  In addition to their recovery for lost property, plaintiffs may recover either 30% of the cost of building and maintaining shore protection or, in the alternative, 30% of the reasonably foreseeable future loss to their property.

Portions of the parties' briefing discuss plaintiffs' entitlement to severance

damages.  Plaintiffs claim they are entitled to compensation for loss of beach access, loss of use of the land as a real estate development, and loss of future income-generating capacity.  Pls.' Loss Mem. 8-10.  Defendant contends that plaintiffs are not entitled to recover damages for loss of beach access, lost potential uses of the land or lost profits as a separate category of damages because these are generally deemed consequential damages. Def.'s Loss Resp. 8-10 (citing United States v. General Motors Corp. (General Motors), 323 U.S. 373, 379 (1945).  In General Motors, the court considered the types of damages to which the plaintiff was entitled and stated, "[C]ompensation for [the property] interest does not include future loss of profits . . . or other like consequential losses which would ensue [in] the sale of the property to someone other than the sovereign."  General Motors, 323 U.S. at 379.  However, defendant acknowledges that these kinds of damages could be recoverable as factors in the calculation of the diminution in value of plaintiffs' land remaining after the taking.  Def.'s Loss Resp. 8-10.  In Dickinson I, for instance, the cost of shore protection measures (plus the value of the land permanently flooded and the value of an easement to periodically flood) was viewed as just compensation by the court, and no further severance damages were awarded.  Dickinson I, 152 F.2d at 870-871.  The court follows the rationale of Dickinson I and determines that just compensation is based on the value of the property up to the date of taking, plus either the value of the property reasonably foreseen to be lost to future erosion or, alternatively, the cost of shore protection measures.[13]

In Dickinson II, the Supreme Court held that where plaintiffs' properties experienced flooding due to the government's construction of a dam, "[i]f the resulting erosion which, as a practical matter, constituted part of the taking was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage."  Dickinson II, 331 U.S. at 751.  In Boling v. United States (Boling I), the Court of Federal Claims heard a gradual takings claim.  Boling I, 41 Fed. Cl. 674 (2000), vacated on other grounds by Boling II, 220 F.3d 1365.  The Boling I court viewed "the award of [the cost of bank protection as] . . . an alternative to holding the [g]overnment liable for the value of all the land to be lost in the future.  If revetments are less expensive than the value of the land forecast to be lost, then the [g]overnment may discharge its liability by bearing the cost of bank protection."  Id. at 694 (citing Dickinson II, 331 U.S. at 751).

Although the general rule in takings cases is to award plaintiff the form of just compensation that will be least expensive for the government, the court finds this rule

---

[13] Because the trial on damages will occur approximately a decade after the taking, the court will need to address, in addition, just compensation for property lost between the date of taking and the date of trial.

inapplicable in the particular circumstances of the present case.  Here, the government is not the sole cause of the erosion to plaintiffs' property, Banks Liability Opinion, 78 Fed. Cl. at 656, and therefore would bear only 30% of the cost to construct shore protection. See id.  In these circumstances, the court views it as unreasonable to restrict plaintiffs' compensation award to 30% of the cost to construct shore protection measures if less than the value of the reasonably foreseeable future loss.  Plaintiffs may not be financially able to pay 70% of the cost to construct shore protection measures out of their own pockets, resulting in continued erosion of their property without mitigation.  The government would therefore discharge its liability by paying 30% of the cost of shore protection measures that would never be constructed without fully compensating plaintiffs for the land that they could be expected to lose in such a scenario.  Therefore, the court determines that, as an alternative to seeking 30% of the cost of shore protection measures, plaintiffs may instead seek 30% of the cost of "reasonably foreseeable future loss" to their property, although this amount may result in greater cost to the government.

1.      Shore Protection Measures

Plaintiffs may recover 30% of the cost to construct and maintain shore protection measures, as the share of the government's liability laid out in the Banks Liability Opinion, 78 Fed. Cl. at 656.  Plaintiffs and defendant do not dispute that the cost of shore protection measures is compensable.  Pls.' Loss Mem. 5; Def.'s Loss Resp. 3.  However, plaintiffs and defendant disagree as to what constitutes compensable shore protection measures.  Plaintiffs claim that they are entitled to:

> (1) the cost of materials to restore the land; (2) the cost of labor, delivery, and implementation of the design for restoring the land; (3) the cost of implementing new shore protection measures to protect the land from any future erosion; (4) the cost of routine maintenance of shore protection measures; and (5) the cost of repairing, replacing or updating features of the shore protection system to ensure its effectiveness in protecting . . . [p]laintiffs' shore.

Pls.' Loss Mem. 7.  Defendant agrees that (3), (4), and (5) are recoverable by plaintiffs, but disputes (1) and (2), asserting that plaintiffs are "not . . . entitled to include within their measurement of damages for reasonably foreseeable future losses, an amount for the replenishment and restoration of land lost to past erosion."  Def.'s Loss Resp. 3.  Defendant argues that restoration speaks to past damages.  Id. at 4.  Defendant also contends that Eyherabide v. United States (Eyherabide), which plaintiffs cite for the proposition that "the cost of placing the property in its pre-taking condition . . . [and for] clearing and restoring the property in the condition for rebuilding" is compensable, Eyherabide, 170 Ct. Cl. 598, 607, 345 F.2d 565, 570-71 (1965), applies only to

temporary takings, and not to the permanent taking in this case.  Def.'s Resp. 4-5.  The court agrees with defendant.  In a permanent taking scenario such as this case, plaintiffs are entitled to the value of the property permanently lost, rather than restoration of property lost.

    a.    The Government's Share of the Cost of Constructing and Maintaining Shore Protection Measures is Compensable[14]

The costs of shore protection measures have been held compensable in gradual erosion and water flowage easement cases, both before and after such measures have been instituted by a plaintiff.  In Dickinson I, the court awarded the cost of shore protection measures to plaintiffs whose property had experienced erosion as the result of the construction and operation of the Winfield Lock and Dam on the Kanawha River in South Charleston, West Virginia.  Dickinson I, 152 F.2d at 866.  It appears that no shore protection measures had already been constructed by plaintiffs at the time the court decided the case.  See id.  In addition to awarding damages for the land actually taken by erosion and for an intermittent flooding easement, the district judge awarded "the reasonable cost . . . of protective work adequate to prevent the damage by erosion if installed prior to the raising of the level of the river."  Id. at 870.  The Fourth Circuit affirmed the trial court's damages award, holding that the evidence showed "that the erosion unchecked would destroy property values equal to or in excess of the cost of preventive structures," id., and thus the conclusion of the trial court to award the cost of shore protection measures instead of awarding the value of plaintiffs' entire property likely to be eroded in the future was reasonable.[15]  Id.

In Ridge Line, the Federal Circuit heard an appeal of the dismissal of an inverse

---

[14]  Damage to plaintiffs' properties as a result of the shore protection measures they have installed is also "a compensable injury if plaintiffs establish at trial a causal link between defendant's activities and the construction of the revetments . . . [a]ccordingly, the Corps will be liable for damage caused by plaintiffs' revetments to plaintiffs' properties if defendant's activities can be shown to have caused damage to plaintiffs' properties compensable as a taking." Banks Liability Opinion, 78 Fed. Cl. at 609.

[15]  In Dickinson I, the United States Court of Appeals for the Fourth Circuit held that shore protection measures were part of compensating the landowner "for the loss to the residue of his property occasioned by the building of the dam."  Dickinson I, 152 F.2d at 870.  The parties here treat the cost of shore protection measures as a separate cost.  See Pls.' Loss Mem. 5-7; Def.'s Loss Resp. 3-5.  Given the absence of dispute, and the practical advantages of separating the cost of shore protection from other elements of damages, the court treats shore protection measures as a separately compensable cost.

condemnation suit in which the plaintiff claimed that increased storm water runoff onto plaintiff's property, which was due to the development of a United States Postal Service facility on land adjacent to and uphill from plaintiff's property, "constituted a taking by the government of a flowage easement entitling [plaintiff] to compensation under the Takings Clause of the United States Constitution." Ridge Line, 346 F.3d at 1350-51. As a result of the increased water runoff, Ridge Line, Inc. "was forced to construct . . . water detention facilities much earlier and on a larger scale than would have been required without the increased runoff caused by the government development," id. at 1351, and sought compensation for "the costs it had incurred to deal with the defendant's runoff and reasonably projected costs to be incurred in the future," id. at 1350. Upon vacating the Court of Federal Claims' finding that no taking had occurred, the Federal Circuit discussed damages determinations that might be made if the lower court, upon remand, found that a taking had occurred and that plaintiff held a protectable property interest. Id. at 1359. The court noted that if "the [trial] court determines on remand that . . . the increased storm water flowage onto [the plaintiff's] property constituted a taking of an easement in violation of [a valid] property interest, damages may be assessed based on [the plaintiff's] cost in constructing prudent flood control measures." Id. at 1358-59 (citing Dickinson II, 331 U.S. at 751). The Federal Circuit stated that "[a] share of the costs of building and maintaining storm water control facilities, proportionate to the government's quantitative contributions of storm water volumes, erosion, and sedimentation, is an entirely acceptable method of calculating damages." Id. at 1359. In Ridge Line, as in this case, the government bore partial responsibility for increased runoff. See id. at 1358 ("By covering much of its land with impervious surfaces but failing to build water retention facilities, the government, according to [plaintiff's] evidence, forced [plaintiff] to build larger, more expensive control facilities . . . than would otherwise have been necessary."). In Ridge Line, flood control measures were instituted by plaintiff before the court decided the matter. Id. at 1351. The Federal Circuit held that damages could reasonably consist of the government's share of the cost of constructing flood control measures. Id. at 1359 ("A share of the costs of building and maintaining storm water control facilities, proportionate to the government's quantitative contributions of storm water volumes, erosion, and sedimentation, is an entirely acceptable method of calculating damages.").

In this case, plaintiffs have experienced erosion as a result, in part, of jetties built by the Army Corps of Engineers. Banks Liability Opinion, 78 Fed. Cl. at 656-57. Evidence already before the court indicates that the mitigation efforts by defendant have not been fully successful in curbing the government-caused portion of the erosion,

suggesting that erosion of plaintiffs' shore will continue.[16]  Id. at 656.  As in Dickinson I
and Ridge Line, the court finds that it is reasonable to award damages to plaintiffs for the
government's share of the cost of the construction and maintenance of shore protection
measures.  As noted in Boling I, "the award of . . . costs [for bank protection] is merely a
method by which damages may be measured - i.e., an alternative to holding the
[g]overnment liable for the value of all land to be lost in the future. . . . [T]he
[g]overnment may discharge its liability by bearing the cost of bank protection."  Boling
I, 41 Fed. Cl. at 694.  Therefore, if plaintiffs choose to seek damages in the amount of
the government's share of the cost of shore protection measures, the court finds that this
would be an appropriate damage award as part of the just compensation due in this case.

> b.      The Cost of Restoring or Replacing Land Already Lost to Erosion is Not
>         Compensable

        Contrary to plaintiffs' argument, see Pls.' Loss Mem. 7, plaintiffs are not entitled
to recover for the cost of replacing or restoring the land lost to erosion.  Plaintiffs'
reliance on Eyherabide for the proposition that they are due compensation for restoring
the land lost to erosion is misplaced.  In Eyherabide, the government effected a
temporary taking by firing shells and other ordnance onto plaintiff's property.
Ehyerabide, 170 Ct. Cl. at 601-03, 345 F.2d at 567-69.  The court required the
government to compensate the plaintiff "for the cost of placing the property in its pre-
taking condition," which the court recognized as "differing somewhat from [the
standard] applicable where a full interest is acquired," id. at 607, 345 F.2d at 570, such
as in the case presented here.  Plaintiffs will be compensated for the portion of their land
already lost to erosion that was caused by defendant, because this was the land actually
taken for which the government is required to pay just compensation.  See supra Part
II.C ("The court has previously found, and the parties do not dispute, that plaintiffs may
recover the value of the property taken.  The court determined at the trial on liability that
plaintiffs may recover 30% of the total value of the property lost to erosion.") (citing
Banks Liability Opinion, 78 Fed. Cl. at 656)).  "[B]y physically using or physically
interfering with the use of the property, the entity operating under the eminent domain
power [is] permanently removing that interest from the private owner, and substituting a
full measure of compensation in its stead."  Bailey, 78 Fed. Cl. at 262.  Here, the

---

[16]  Continuing erosion damage due to defendant's activities will vary based on the
circumstances of each individual plaintiff.  During the damages phase of trial, plaintiffs who
have already instituted shore protection measures may introduce evidence of the cost to build and
maintain them.  Plaintiffs who have not yet installed shore protection measures and seek damages
for their installation must show that shore protection measures are necessary to prevent or control
further erosion to their property, and provide evidence of the anticipated cost to build and
maintain them.

government has permanently taken plaintiffs' property through erosion, and thus it removes the interest in that property from plaintiffs and substitutes full compensation. Evidence as to what constitutes full compensation for the property eroded will be taken during the damages phase of the trial, see supra Part II.C ("Determining the value of the lost property is not currently before the court and will be decided at trial"), and is generally held to be the "fair market value" of the property taken, United States v. 158.24 Acres of Land, 696 F.2d 559, 564 (8th Cir. 1982).  An owner "is entitled to receive the value of what he has been deprived of, and no more.  To award him less would be unjust to him; to award him more would be unjust to the public." Bauman v. Ross, 167 U.S. 548, 574 (1897).  Requiring the government to pay compensation for the property taken due to erosion, and to pay for restoring the property lost, would essentially require the government to pay twice for the property taken.  This would be a windfall to plaintiffs and will not be considered a proper measure of the just compensation owed by the government in this case.[17]

     2.     In the Alternative to 30% of the Cost of Shore Protection Measures, Plaintiffs Are Entitled to 30% of the Reasonably Foreseeable Future Loss to the Eroding Properties

Though not briefed by the parties, the court will also consider at trial evidence of the reasonably foreseeable future loss to plaintiffs' property if plaintiffs choose to seek this remedy rather than seek compensation for shore protection measures.  In the court's view, reasonably foreseeable future loss refers to future loss of plaintiffs' land due to government-caused erosion.  In Boling II, the Federal Circuit contemplated the possibility of reasonably foreseeable future losses, past the date of stabilization, in the context of taking by a gradual physical process.  Boling II, 220 F.3d at 1370-71.  The Boling II court noted that although "stabilization occurs when it has become clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined," id., the extent of the damages must be "reasonably foreseeable," thereby contemplating

---

[17] In Plaintiffs' Reply in Support of Their Brief Setting Forth the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss" (plaintiffs' Loss Reply or Pls.' Loss Reply), plaintiffs state that "restoration of the land, for purposes of stabilizing shore protection, is a proper . . . element of damages for future shore protection." Pls.' Loss Reply 5-6. The court's decision regarding costs incurred to replace or restore land does not preclude plaintiffs from introducing evidence at trial showing that some replenishment of land is a necessary part of constructing effective shore protection measures – as opposed to a method of recovering their taken land – in an effort to present an accurate measure of damages for the government's share of the cost of constructing shore protection measures adequate to protect plaintiffs' property.

both that a plaintiff's property would continue to erode after the stabilization date and that such erosion, if foreseeable, would be compensable. Id. at 1373.

The Fourth Circuit has also considered compensation for "prospective" damages in the context of a taking by a continuing physical process. See Dickinson I, 152 F.2d at 867 (holding that plaintiffs are entitled to all damages "past, present and prospective"). The Federal Circuit similarly stated that "prospective" damages were compensable in the context of a flowage easement case. Ridge Line, 346 F.3d at 1359 ("'[J]ust compensation' includes a recovery for 'all damages, past, present and prospective.'") (quoting Dickinson I, 152 F.2d at 867). In addition, the Court of Federal Claims has held in the context of a gradual takings case that "a plaintiff may seek compensation for harm to private property that has not occurred, so long as that harm is shown to be reasonably foreseeable." Hansen, 65 Fed. Cl. at 126.

The court recognizes the possibility that the entirety of some plaintiffs' properties might be eroded away over time if plaintiffs do not institute shore protection measures. Under the Banks Liability Opinion, 78 Fed. Cl at 656, the government would be liable for 30% of such erosion. Plaintiffs argue that, in the case that "shore protection measures [are] ineffective or imprudent," they would be "entitled to claim damages for the anticipated loss of the entirety of each of their respective properties" due to continuous and foreseeable future erosion. Pls.' Loss Mem. 11. Defendant responds that "[p]laintiffs' claims of total loss are far too speculative . . . [and] if [d]efendant pays for a complete loss of the property, then [d]efendant necessarily has purchased the property." Def.'s Loss Resp. 12.

To the extent that plaintiffs have not yet proven that the erosion of their entire property is "reasonably foreseeable," the court agrees with defendant that at this point the damages remain speculative. However, because the court may compensate plaintiffs for reasonably foreseeable future losses to their property, see Banks Liability Opinion, 78 Fed. Cl. at 656, if plaintiffs prove at trial that a total loss is reasonably foreseeable, the damages would no longer be speculative and would therefore be a proper basis upon which to award damages to plaintiffs. It should be noted, however, that even if plaintiffs prove that the loss of their entire property is reasonably foreseeable, prior decisions in this case have determined that defendant is liable for 30% of the reasonably foreseeable future loss suffered by plaintiffs. Banks Liability Opinion, 78 Fed. Cl. at 656. Plaintiffs' claim that the "[g]overnment will eventually take all of [p]laintiffs' property . . . [and] [p]laintiffs are entitled to damages for the reasonably foreseeable future loss of all their lands" is incorrect. Pls.' Loss Mem. 12 (emphases added).

As to defendant's second claim that the government would own a portion of plaintiffs' properties upon payment for the reasonably foreseeable future loss to the

29

affected land, the court finds this argument unavailing in the unique circumstances of a gradual taking where the government is responsible for only a portion of the total erosion of plaintiffs' properties.  In a traditional condemnation proceeding, title to a piece of condemned property passes to the government when the government has paid the just compensation due under a court order.  See Cadorette v. United States, 988 F.2d 215, 223 (1st Cir. 1993) ("The title to the property vests in the United States when the award of 'just compensation' has been ascertained and paid.") (citing Albert Hanson Lumber Co. v. United States, 261 U.S. 581, 587 (1923) and United States v. 341.45 Acres of Land, 751 F.2d 924, 926 n.2 (8th Cir. 1984)).  However, in this case, as in Dickinson II, the government "left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy."  Dickinson II, 331 U.S. at 748.  The Supreme Court in Dickinson II acknowledged that in a gradual takings case, a property owner may be unsure of whether and when a permanent taking has occurred.  Id. at 749.  Accordingly, the stabilization doctrine was intended to avoid "procedural rigidities" when making determinations as to the timeliness of a plaintiff's claim.  Id.  A property owner who has properly filed suit within the statute of limitations must not then be penalized when it comes to the award of compensation for reasonably foreseeable future loss.  Dickinson II created the concept of a stabilization date in order to avoid "requir[ing] the owner to resort to piecemeal . . . litigation."  Applegate I, 25 F.3d at 1581 (citing Dickinson II, 331 U.S. at 749).  If the court were to adopt the theory advanced by defendant, that as soon as defendant pays for 30% of the reasonably foreseeable future loss to plaintiffs' remaining property, defendant would then own 30% of plaintiffs' remaining property, plaintiffs would be deprived of their property before it erodes away, and thereby be penalized for seeking the full extent of just compensation in this gradual takings case.  This punitive result would encourage piecemeal litigation, forcing plaintiffs to bring suit to recover just compensation for their land only after it has been actually lost.  The court finds the result sought by defendant incompatible with the single date of stabilization recognized in Dickinson II, and the related concept of compensable "reasonably foreseeable future loss" envisioned by Dickinson II and Boling II.  In the circumstances of a gradual takings case in which the government bears only a portion of the burden of responsibility for erosion, the court finds it inapposite to apply the approach used to determine the date of transfer of title in condemnation suits involving entire properties or practicably severable portions of properties.

III.   Conclusion

For the foregoing reasons, plaintiffs are entitled to damages for erosion caused by defendant beginning in 1950 with the installation of steel sheet piling around the jetties, and to damages for all reasonably foreseeable future losses from erosion caused by defendant, even if plaintiffs transferred their ownership interests after stabilization.  In

addition to the value of the land already taken by defendant, plaintiffs will also be entitled, if proven, to the government's share of the cost of shore protection measures, or, in the alternative, to 30% of the value of plaintiffs' property that will be lost due to reasonably foreseeable future erosion.

Plaintiffs' Motion is GRANTED to the extent consistent this Opinion and Order and otherwise DENIED.

The parties shall confer and file a joint status report, or, if the parties cannot agree, separate status reports, on or before 5:00 p.m. EDT Wednesday, August 26, 2009, suggesting a schedule for further proceedings in accordance with this Opinion and Order.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge