# In the United States Court of Federal Claims

No. 99-4451 (and consolidated cases)
(Filed: April 17, 2024)

```
* * * * * * * * * * * * * * * **  *
                                   *
BANKS et al.,                      *
                                   *
                    Plaintiffs,    *
                                   *
          v.                       *
                                   *
THE UNITED STATES,                 *
                                   *
                    Defendant.     *
                                   *
* * * * * * * * * * * * * * * * *  *
```

*Nancie G. Marzulla*, with whom was, *Roger J. Marzulla*, Marzulla Law, LLC, of Washington, D.C. for the Marzulla Plaintiffs.

*Mark E. Christensen*, Christensen Hsu Sipes, LLP, of Chicago, IL, for the Christensen Plaintiffs.

*Eugene J. Frett*, Sperling & Slater, P.C., of Chicago, IL, for himself and the Victor J. Horvath and Frances B. Horvath Trust.

*Mark A. Pacella*, with whom was, *Gregory M. Cumming*, Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, of Washington, D.C. for the government.

### OPINION AND ORDER

**SOMERS**, Judge.

Litigation, like all things, must eventually come to an end. On July 9, 1999, John Ehret filed complaints in this Court on behalf of John and Mary Banks and Robert and June Cunat. In their complaints, Plaintiffs alleged that the United States effected a taking of their lakefront property through erosion caused by the construction and maintenance of jetties on Lake Michigan by the Army Corps of Engineers. *See* ECF No. 1 at 2. Thirty-five more suits would follow the initial complaints filed by the Banks and the Cunats, all of which were eventually consolidated with the Banks' case. Nearly a quarter of a century after its inception, this opinion will hopefully draw this litigation to its long-awaited conclusion. The sole remaining issue before the Court is the award of attorneys' fees and litigation expenses pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policy Act ("URA"), 42 U.S.C. § 4654.

# BACKGROUND

## A.      Factual History

The facts of this case are fully described and discussed in the numerous opinions previously issued in this case; therefore, the Court will only attempt to briefly summarize them here.  *See, e.g.*, *Banks v. United States*, 78 Fed. Cl. 603 (2007), *vacated in part*, 721 F. App'x 928 (Fed. Cir. 2017).  Beginning in 1999, Plaintiffs began filing suit in this Court alleging the jetties that the Army Corps of Engineers ("Corps") constructed and maintain at St. Joseph Harbor in Michigan interfere with the natural littoral flow of sand and river sediment along a roughly four-and-a-half-mile stretch of land on Lake Michigan, south of St. Joseph Harbor, on which their properties are, or were, located.  *Id.* at 605.  Specifically, Plaintiffs complained that the construction and maintenance of the jetties altered the supply of sand to the lakebed and interrupted the natural flow of sand from the north, resulting in a deficit of sand on their properties.  *Banks v. United States (accrual) II*, 314 F.3d 1304, 1306 (Fed. Cir. 2003).  Plaintiffs further complained that the dredging and barging of river and littoral sand permanently removed sand from the littoral ecology and resulted in the downcutting of the shoreline south of St. Joseph Harbor.  *Id.*  They alleged that, as a result of the Corps' actions in constructing and maintaining the jetties, their properties along the shoreline of Lake Michigan were physically taken, and they were, therefore, entitled to just compensation under the Fifth Amendment.

During the litigation, the parties agreed that erosion of shorelines on the Great Lakes occurs naturally but that the St. Joseph Harbor jetties exacerbated this phenomenon.  According to the parties, the presence of the harbor jetties "significantly increased the annual rate of shoreline erosion, which, without human intervention, occurs naturally at a rate of approximately one foot per year."  *Banks (accrual) II*, 314 F.3d at 1306 (internal quotations omitted).  Indeed, "[t]he Corps . . . acknowledged the longstanding and significant exacerbation of erosion caused by its harbor jetties since at least the mid-1970s."  *Id.* (internal quotations omitted).  In an effort to address the additional erosion caused by the jetties, the Corps attempted to mitigate the erosion pursuant to federal law beginning in 1970.  *Id.*  Over the years, the Corps tried several different techniques to stave off the damaging effects of the jetties.  *Id.* at 1307.  With these mitigation efforts underway, "the accrual of [P]laintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible."  *Id.* at 1310.  Once the taking stabilized, as a result of the Corps' acknowledgment that its mitigation efforts were not working, Plaintiffs brought suit.

## B.      Procedural History

John Ehret filed the first two of these consolidated cases in 1999.  Eventually, the *Banks* litigation spawned twenty-three reported opinions, three appeals, and eight hundred and thirty-two filings over a nearly twenty-five-year litigation history.  The case was first dismissed in 2001 as time-barred under 28 U.S.C. § 2501, which provides that claims brought under the Tucker Act must be filed within six years of their accrual.  *Banks v. United States (accrual) I*, 49 Fed. Cl. 806, 809, 825–826 (2001).  Plaintiffs appealed to the Federal Circuit, which disagreed with Judge Hewitt's opinion, finding the complaints to be timely filed.  *Banks v. United States (accrual) II*, 314 F.3d 1304, 1309–10 (Fed. Cir. 2003).  A series of opinions followed from Judge Hewitt on accrual, scope, revetments, and, finally, liability.  *Banks v. United States*, 78 Fed. Cl.

603, 605–08 (2007). In 2011, Judge Hewitt dismissed Plaintiffs' claims again, finding that subject matter jurisdiction was lacking, but, in the event her jurisdictional determination was once again overturned on appeal, she also made findings on liability and damages "in the alternative." *Banks v. United States (Banks III)*, 102 Fed. Cl. 115, 119–20 (2011). The Federal Circuit once again reversed and remanded the case, finding that Judge Hewitt's ruling violated the circuit's mandate from the previous appeal that Plaintiffs' claims did not accrue until 1996 at the earliest. *Banks v. United States (Banks IV)*, 741 F.3d 1268, 1279 (Fed. Cir. 2014). The circuit also noted that the Court of Federal Claims "may reconsider any merits rulings that were rendered at a time it mistakenly believed it lacked jurisdiction." *Id.* at 1283. On remand, Judge Campbell-Smith, then assigned to the case, entered the alternative merits findings from Judge Hewitt's *Banks III* opinion and ordered the parties to file a joint stipulation to shoreline protection measures. *Banks v. United States*, No. 99-4451L, 2015 WL 4939954, at *3–4 (Fed. Cl. Aug. 18, 2015). Plaintiffs and the government then appealed to the Federal Circuit yet again, which once again reversed and remanded the case. *Banks v. United States (Banks V)*, 721 Fed. App'x. 928, 943 (Fed. Cir. 2017). The circuit determined that Judge Campbell-Smith's ruling "violated the mandate's spirit by ignoring [the circuit's] express warning that [the] alternative merits findings would not withstand appellate scrutiny" and gave instructions as to the findings that needed to be made on remand. *Id.* at 934–35.

Thereafter, the case was stayed, and the parties engaged in alternative dispute resolution ("ADR") with Judge Firestone in an attempt to resolve Plaintiffs' claims. ECF No. 601. In early 2020, the case was reassigned to Judge Roumel. ECF No. 613. By June 2020, some of the plaintiffs moved to terminate ADR, because they believed the process had failed, and requested that the case be set for trial. ECF No. 622 at 1. Judge Roumel granted the motion in part, allowing Plaintiffs, but not their counsel, to decide whether to continue with ADR or go to trial. ECF 630 at 2. At this point in the case, Plaintiffs diverged into two groups: fourteen plaintiffs who continued to be represented by Mr. Ehret, and twenty-three plaintiffs who split off and were represented by Mark Christensen and Eugene Frett. ECF 633 at 2; ECF No. 638 at 1. The Court substituted Mr. Christensen for Mr. Ehret as the attorney of record for ADR over the objections of Mr. Ehret. *Banks v. United States (Banks VI)*, 00-365 L, 2020 WL 3970178, at *2–3 (Fed. Cl. July 10, 2020). The plaintiffs represented by Mr. Ehret moved forward towards trial, while the plaintiffs represented by Mr. Christensen remained in ADR. *Id.* at *3. After Mr. Ehret's death, Nancie Marzulla replaced him as attorney of record for his group of plaintiffs. ECF No. 685. These plaintiffs continued toward trial, with a discovery schedule being set in January 2022. ECF No. 702. Trial was to begin on May 15, 2023. ECF 731 at 2. On the eve of trial, however, the plaintiffs represented by Ms. Marzulla each accepted an offer of judgment from the United States. *See* ECF No. 797. In the meantime, the plaintiffs represented by Mr. Christensen settled their just compensation claims. *See* ECF No. 809-1.

Both groups of plaintiffs resolved their claims with the government on all issues except attorneys' fees and litigation expenses, which have apparently proved impossible to settle amicably. The first group, which the Court will refer to as the Marzulla plaintiffs[1] for the

---

[1] The Marzulla plaintiffs are identified as follows: Sarah Kane Skoglund (99-4456), Notre Dame Path Association (99-4458), J. Thomas Concklin Trust (00-384), Marilyn J. Cunat (99-4452), John W. Phillippe, III (00-398), Hyun S. Jyung Trust (00-400), George J. Gregule, Jr. (99-4455), Robert D.

remainder of this opinion, accepted offers of judgment totaling $5,177,579.98.  ECF No. 797.
The government paid the second group of plaintiffs, which the Court will refer to as the
Christensen plaintiffs,[2] a total of $12,678,148.49 as part of their settlement.  ECF No. 809-1.
Last year, both sets of plaintiffs moved the Court to award attorneys' fees and litigation expenses
pursuant to the URA.  ECF Nos. 798, 799, 809, 810.  The Marzulla plaintiffs have requested
reimbursement for the forty percent (or in one case twenty percent) contingency fee they were
obligated to pay Marzulla Law ($2,032,676.07), or, alternatively, for $1,836,245.65 in attorneys'
fees calculated under the lodestar approach, plus taxable costs of $21,806.62 and non-taxable
expenses of $370,836.50.  *See* ECF Nos. 798, 799.  The Christensen plaintiffs' request is slightly
more complicated for a few reasons, including the fact that their requested fees include not only
fees for work performed on their behalf but also includes fees for the Marzulla plaintiffs for work
done when all of the plaintiffs were represented by the same attorneys.  The Christensen
plaintiffs' fee motion filed on behalf of *all* plaintiffs requested attorneys' fees of
$10,707,445.84,[3] plus litigation expenses of $375,671.95.  ECF No. 809 at 21 and ECF No. 810
at 3.[4]

The government provided a lengthy and thorough response to the motions.  ECF No. 816.
In this response, it argued that the Court should "reimburse Plaintiffs . . . in an amount not to
exceed the sum of: (1) the contingency fee of $2,032,676.07 for the [Marzulla] Plaintiffs and
$4,871,951.35 for the Christensen Plaintiffs; (2) other litigation expenses in the amount
$363,995.06 for the [Marzulla] Plaintiffs and $248,769.00 for the Christensen Plaintiffs; and (3)

---

Melcher (00-401), Richard R. & M. Lynn Carter (00-387), Richard Neuser (00-379), Trust of Ruth C.
Cosgrove (00-391), Dr. Herzl Ragins (00-394), Julie Ehret Adams, Caren Ehret, and Kristin Rutkowski
[in place of Carole L. Ehret] & Theodore L. Ehret (99-4453), and Nicholas D. & Suzanne M. Lahr (99-
4457).  ECF No. 797.

[2] The Christensen plaintiffs are identified as follows: Michael R. Anderson and Janice Anderson
(00-388); Andrew C. Bodnar and Christine M. Zahl-Bodnar (05-1381); John and Mary Banks (99-4451);
Gregory R. Bovee and Candace C. Bovee (00-383); Frank J. Bunker (deceased) c/o Joan Bunker (00-
381); Dorothy A. Renner (99-44511); Donald R. Chapman and Gail Chapman (00-0380); Mark and Mary
Del Mariani (00-386); Victoria Jackson (deceased) c/o Harris Jackson (00-399); Richard Marzke and
Nancy A. Marzke (00-0382); Thelma McKay (deceased) c/o Mary Irwin McKay (99-4459); Carolyn K.
Morvis (00-389); Donald D. Miller and Judith E. Miller (00-390); Country LLC c/o Carol Friedman-
Scallon (00-392); Craig D. Okonski and Cherie R. Okonski (06-0072); Robert E. Pancoast and Pamela S.
Pancoast (99-44510); Elizabeth S. Errant Trust c/o Elizabeth Saphir (aka Elizabeth Errant) (00-385);
Greenbriar Development (99-4454); Leonard J. Smith (00-393); Kent and Margaret Werger (00-396);
Marcia A. Wineberg (00-0365); Roger B. Wilschke and Ann C. Wilschke (00-395); and Eugene Frett (05-
1353).  ECF No. 644 at 2.

[3] This number is the sum of the fees requested by the Christensen plaintiffs on behalf of *all*
plaintiffs from John Ehret ($7,013,370.00), Mark Christensen/Christensen Hsu and Sipes, LLP
($2,743,215.00), and for just the Christensen plaintiffs from Eugene Frett/Sperling & Slater, LLC
($950,860.84).

[4] ECF No. 810 is a motion ostensibly filed on behalf of both the Christensen plaintiffs and the
Marzulla plaintiffs to award a seven-and-a-half percent contingency fee to Mr. Frett.  As explained below,
attorneys' fees in URA cases are awarded to successful property owners, not their attorneys.  To the
extent that Mr. Frett is owed compensation for his services, it is from the forty percent contingency fee
the Court is awarding all of the plaintiffs.  There is no separate seven-and-a-half percent pot of money for
Mr. Frett.

taxable costs in the amount of 12,365.72 for the [Marzulla] Plaintiffs."  ECF No. 816 at 60.
These motions for fees and costs are now before the Court.

## DISCUSSION

### A.    Legal Standard

As a general principle, our legal system follows the American Rule under which "each
party in a lawsuit ordinarily shall bear its own attorney's fees."  *Hensley v. Eckerhart*, 461 U.S.
424, 429 (1983).  There are, however, "certain categories of cases [in which] Congress has
carved out exceptions to the American Rule and allowed for recovery of attorneys' fees."
*Bywaters v. United States*, 670 F.3d 1221, 1226 (Fed. Cir. 2012).  One such category are those
cases covered by the URA.  Under the URA, attorneys' fees and litigation expenses may be
awarded in cases in which a property owner successfully brings suit against the United States
alleging the denial of just compensation under the Fifth Amendment.  Pursuant to the URA,

> [t]he court rendering a judgment for the plaintiff in a proceeding brought under
> section 1346(a)(2) or 1491 of title 28, awarding compensation for the taking of
> property by a Federal agency, or the Attorney General effecting a settlement of any
> such proceeding, shall determine and award or allow to such plaintiff, as a part of
> such judgment or settlement, such sum as will in the opinion of the court or the
> Attorney General reimburse such plaintiff for his reasonable costs, disbursements,
> and expenses, including reasonable attorney, appraisal, and engineering fees,
> actually incurred because of such proceeding.

42 U.S.C. § 4654(c).

As the Federal Circuit observed, "the URA provision was expressly enacted with the
primary purpose of rendering property owners whole."  *Haggart v. Woodley (Haggart II)*, 809
F.3d 1336, 1359 (Fed. Cir. 2016).  In other words, "[t]he URA expressly allows landowners to
retain the full compensation of the value of their property by mandating the Government to
assume the litigation expenses of counsel in bringing forth the takings claim."  *Id.* at 1357
(internal citations omitted).  Moreover, the URA, like other fee shifting statutes, helps ensure that
property owners can attract competent counsel: "[t]he URA's fee-shifting provision ensures that
plaintiffs with small takings claims can attract and retain the assistance of competent counsel."
*Arnold v. United States*, 163 Fed. Cl. 13, 22–23 (2022) (citing *Bywaters v. United States*, 684
F.3d at 1295).

In seeking attorneys' fees under the URA, a plaintiff bears the burden of documenting its
entitlement to a fee award.  *Hensley*, 461 U.S. at 437 ("[T]he fee applicant bears the burden of
establishing entitlement to an award and documenting the appropriate hours expended and hourly
rates.").  "This burden is generally satisfied through the submission of invoices and billing
records," *Hardy v. United States*, 157 Fed. Cl. 464, 469 (2021) (citing cases), which must
provide "sufficient detail" to permit the Court "to determine whether the hours, fees, and
expenses are reasonable for any individual item invoiced," *Preseault v. United States*, 52 Fed.
Cl. 667, 679 (2002).  Ultimately, the Court exercises "considerable discretion" in determining

the amount of the attorneys' fees and expenses to award.  *Bywaters*, 670 F.3d at 1228.  This discretion stems from the trial court's "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437.

## B.     Analysis

As discussed above, most of the plaintiffs in this case were originally represented by John Ehret.[5]  After representing the plaintiffs by himself and then with Mark Christensen and Eugene Frett, there was a split among the plaintiffs with one set of plaintiffs choosing to have Messrs. Christensen and Frett continue representing them (the Christensen plaintiffs) and the other set sticking with Mr. Ehret.  After Mr. Ehret's death, the set of plaintiffs he represented engaged Marzulla Law to represent them (the Marzulla plaintiffs).  As will be discussed in more detail below, Plaintiffs have always had a forty percent contingency fee arrangement with their attorneys during these varying representations.  As the Court finds this forty percent contingency fee to be both reasonable and actually incurred by Plaintiffs, it is this contingency fee to which the Court finds Plaintiffs are entitled in addition to their reasonable litigation expenses.

### 1.   The Marzulla Plaintiffs Are Entitled to a Forty Percent Contingency Fee Award Plus Litigation Expenses Under the URA

In exchange for representation, the Marzulla plaintiffs and Marzulla Law agreed to the following contingency fee arrangement:

> For our services, you agree that Marzulla Law, LLC will be paid a contingent fee of 40% of the net recovery.  "Net recovery" means the total sum recovered by judgment, settlement or otherwise as a result of this litigation, after first reimbursing Marzulla Law, LLC for all costs and expenses incurred.  Should there be no recovery, you will not owe anything to Marzulla Law.

ECF No. 816-1 at 4.  According to the Marzulla plaintiffs, "[i]n accordance with their fee agreements, the[y] . . . have paid a 40% (or in one instance 20%) contingent fee ($2,032,676.07) to Marzulla Law, plus litigation fees and expenses, for a total of $2,453,519.19."  ECF No. 820 at 2.  Thus, the Marzulla plaintiffs assert that "[t]o make the[m] . . . whole, the Court would need to award them the full amount of the contingent fee and out-of-pocket expense reimbursement that they have already paid Marzulla Law." *Id.*  The Marzulla plaintiffs primarily sought reimbursement for fees under the lodestar approach, despite the fact that they actually paid their attorneys about ten percent more than they claim under this approach. *Id.* at 2–3.  ("[T]he difference between the contingent fee and the lodestar hourly rate calculation is relatively minor: [Marzulla] [p]laintiffs' contingent fee of $2,032,676.07 is only about ten percent more than the lodestar calculation under the LSI Laffey Matrix.").  Although they sought reimbursement primarily under the lodestar approach, the Marzulla plaintiffs also asserted that they "do not oppose reimbursement of the contingent fee they have paid." *Id.* at 3.  The Marzulla plaintiffs,

---

[5] Eugene Frett has represented himself and the Victor J. Horvath and Frances B. Horvath Trust throughout the litigation in addition to eventually becoming one of Mr. Ehret's, and then Mr. Christensen's, co-counsels.

however, requested to be reimbursed under the lodestar approach because they believed that approach was favored by judges of this Court.  *Id.*

In direct response to the Marzulla plaintiffs' request for fees, the government largely takes issue with a portion of the number of hours billed by Marzulla Law and the rates at which some of those hours are billed.  However, the government spends most of its response more generally addressing *all* of the plaintiffs' entitlement to attorneys' fees and arguing why the contingency fee that *all* of the plaintiffs agreed to is the proper measure of reimbursement for the attorneys' fees incurred:

> Plaintiff's [sic] 40% contingency fee defines the upper limit on their potential reimbursement under the URA because it is what they agreed to pay—*i.e.*, it is the amount that, by the plain language of their fee agreements, they "actually incurred" as a result of this litigation.  Reimbursement of that amount, provided it is also reasonable withing [sic] the meaning of the URA, is consistent with both the terms of Plaintiffs' agreements and the statutory text of the URA . . . .

ECF No. 816 at 12.  Moreover, in conclusion, "the United States respectfully requests that the Court reimburse Plaintiffs for their reasonable fees, costs, disbursements, and expenses in an amount not to exceed the sum of . . . the contingency fee of $2,032,676.07 for the [Marzulla] Plaintiffs."  *Id.* at 60.

The Court concurs with the government that the forty percent contingency fee to which all of the plaintiffs, including the Marzulla plaintiffs, agreed, is the correct measure of the attorneys' fees actually incurred in this case.  Although the Marzulla plaintiffs principally requested attorneys' fees calculated under the lodestar method (which results in a reimbursement lower than the fees they actually incurred), as mentioned above, the Marzulla plaintiffs alternatively sought to be reimbursed for the contingency fees they actually paid their attorneys.  As this Court is afforded considerable discretion in the assessment of attorneys' fees, *Bywaters*, 670 F.3d at 1228, and the government (correctly) argued at length that the contingency fee is the proper measure of fees in this case, the Court will award the Marzulla plaintiffs the forty percent contingency fee they agreed to pay, and evidently did pay, Marzulla Law.

Despite arguing at length for why the contingency fee is the correct measure of attorneys' fees in this case, the government does spend some effort in its briefing addressing the fees requested by the Marzulla plaintiffs under the lodestar approach.  In this analysis, the government argues that the Marzulla plaintiffs' lodestar fee request is high in terms of the number of hours billed and the rate at which those hours are billed.  The government then argues that "[t]he lodestar provides a cross-check for the court to ensure the reasonableness of an attorney's fee."  ECF No. 816 at 27 (citing *Gisbrecht v. Barnhart*, 535 U.S. 789, 808 (2002) (explaining it is "appropriate" for courts to "look[] first to the contingent-fee agreement, [and] then test[] it for reasonableness")).  According to the government,

> a contingency fee that substantially exceeds the lodestar would run afoul of the URA's limitation of reimbursement to "reasonable attorney . . . fees."  Thus, where a contingency fee is substantially higher than a properly calculated lodestar, the

lodestar amount is the proper measure of reimbursement because the contingency
fee is unreasonable in relation to the work that was done.

*Id.* (internal citations omitted).

The Court concurs with the government on this point.  In this case, however, both parties'
lodestar calculations indicate that the forty percent contingency fee that the Marzulla plaintiffs
agree to pay Marzulla Law was reasonable.  The Marzulla plaintiffs requested $1,864,445.65 in
attorneys' fees calculated using the lodestar method or approximately thirty-seven percent of the
just compensation awarded the Marzulla plaintiffs.  The government's response to the Marzulla
plaintiffs' attorneys' fee request argued that the Marzulla plaintiffs should receive an award of
$1,525,978.28 in attorneys' fees under the lodestar method or approximately thirty percent of the
just compensation awarded.  The Court finds that both these calculations show that the forty
percent contingency fee does not substantially exceed the lodestar.  Moreover, to any extent that
the "contingency fee [] substantially exceeds the lodestar," the government never makes such an
argument in its response brief, waiving any claim that the forty percent contingency fee was
unreasonable.  *See, e.g.*, *Cap Exp., LLC v. Zinus, Inc.*, 722 F. App'x 1004, 1009 (Fed. Cir. 2018)
(quoting *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1132
(C.D. Cal. 2011), for the proposition that "in most circumstances, failure to respond in an
opposition brief to an argument put forward in an opening brief constitutes waiver or
abandonment in regard to the uncontested issue").

As the Marzulla plaintiffs' forty percent contingency fee request is consistent with both
the terms of their contingency fee agreements and the statutory text of the URA and is reasonable
within the meaning of the URA, the Court awards the Marzulla plaintiffs $2,032,676.07 in
attorneys' fees.

The Marzulla plaintiffs also request "taxable costs of $21,806.62 . . . [and] non-taxable
expenses of $370,836.50, including expert witness expenses and travel expenses . . . ."  ECF No.
799 at 19.  According to the Marzulla plaintiffs "[t]he largest component of . . . nontaxable
expenses is the fees their counsel, Marzulla Law, has already paid to expert witnesses[, and] [i]n
addition to the expert witness expenses, [they] incurred . . . nontaxable expenses, totaling
$20,040.47, in preparing this case for trial."  *Id.* at 19, 21.  In response, the government contends
that the Marzulla plaintiffs' "request for expenses should be reduced by $6,841.44, to
$363,995.06."  ECF No. 816 at 58.  The government objects to two of the expenses requested: 1)
"$6,344.14 in Westlaw expenses as non-reimbursable overhead," *id.* at 57, and 2) "$497.30 for
Federal Express and priority mail, as there is insufficient explanation of why such expenses were
necessary as opposed to for the convenience of counsel," *id.* at 58.

The URA provides that successful property owners are entitled to the reimbursement of
reasonable expenses incurred in the course of the litigation.  "To recover litigation expenses,
however, plaintiffs must demonstrate the costs incurred were 'reasonable and necessary' in
furtherance of the case and produce adequate proof to facilitate the Court's review."  *Arnold*, 163
Fed. Cl at 41 (internal citations omitted). With regard to the Westlaw expenses for which the
Marzulla plaintiffs seek reimbursement, "[t]he prevailing and customary industry practice is that
law firms pay a flat fee or rate for research services like Westlaw, LexisNexis, and Pacer

regardless of actual use" and that, in the absence of evidence that a law firm "is or was charged for these research services per session or per search," such expenses are non-reimbursable under the URA.  *Id.* at 42.

However, the Marzulla plaintiffs assert that,

[w]hen a firm "normally bills its paying clients for the cost of online research services, that expense should be included in the fee award."  Marzulla Law normally bills its hourly clients monthly for the Westlaw charges [it] incur[s] on their behalf.  Here, [Marzulla Law] did not monthly bill the [plaintiffs] since they engaged [] services under a contingent fee arrangement.  [Marzulla Law] instead kept a monthly record of the Westlaw monthly charges for this case, and those total charges ($6,344.14) are reflected in the Motion for Attorney's Fees and Bill of Cost.

ECF No. 820 at 19 (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004) (*per curiam*)).  In fact, the contingency fee agreement the Marzulla plaintiffs all signed provides that they will pay for digital legal research: "Marzulla Law, LLC agrees to advance all costs incurred in this litigation, including (but not limited to) expert witness fees, travel, transcripts, *digital legal research*, copying, and reproduction."  ECF No. 816-1 at 3–4 (emphasis added).  The Court concurs with the Marzulla plaintiffs that, because Marzulla Law normally bills its clients for Westlaw fees, such fees are awardable under the URA in this case.  *See, e.g.*, *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 975 (D.C. Cir. 2004) ("The government urges us to deny any recovery for computer-research charges, but we decline to do so because such services presumably save money by making legal research more efficient." (internal citations omitted)); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1257 (10th Cir. 1998) ("Reasonable expenses incurred in representing a client in a civil rights case should be included in the attorney's fee award if such expenses are usually billed in addition to the attorney's hourly rate." (internal citations omitted)); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) ("But the more important point is that the market—the paying, arms' length market—reimburses lawyers' LEXIS and WESTLAW expenses . . .  rather than requiring that these items be folded into overhead.").

With regard to the claim for $497.30 for Federal Express and priority mail, the government contends that "there is insufficient explanation of why such expenses were necessary as opposed to for the convenience of counsel."  ECF No. 816 at 58.  The Marzulla plaintiffs rejoin that "the use of these services was reasonable and necessary" because: 1) "[m]any of these elderly Plaintiffs did not use email, some [were] without internet, [] important documents had to be sent via priority mail or Federal Express to make sure they were aware [the documents] had arrived"; 2) "the majority of these costs were incurred to serve subpoenas to twelve Berrien County residents so Plaintiffs' counsel and experts could enter properties that were no longer owned by a Plaintiff"; and 3) "to ensure a reliable means of obtaining signatures on responses to the Government's Interrogatories, [Marzulla Law] provided the document requiring a signature to the Plaintiff using a priority mailing service."  ECF No. 820 at 19–20.  The Court finds these costs to be reasonable.

Finally, the Marzulla plaintiffs submitted a bill of costs seeking $21,806.62 in taxable costs under 28 U.S.C. § 2412(a). *See* ECF No. 798 at 1. A plaintiff "has the burden to establish that [taxable] costs . . . are 'allowable, reasonable, and necessary.'" *Colonial Chevrolet Co. United States*, 161 Fed. Cl. 132, 138 (2022) (quoting *Sonoma Apartment Assocs. v. United States*, 150 Fed. Cl. 226, 228 (2020)). The categories of taxable costs that may be awarded are listed in 28 U.S.C. § 1920:

> (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under [28 U.S.C. § 1923]; and (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section [28 U.S.C. § 1828].

28 U.S.C. § 1920; *see also* Rules of the United States Court of Federal Claims App'x. Form 4.

The government argues that the Marzulla plaintiffs' bill of costs should be reduced by $9,440.90, to $12,365.72. In support thereof, the government makes two assertions: 1) the "request for taxation of $352.90 in PACER fees as 'fees of the clerk' should be disallowed [because] PACER fees are not 'fees of the clerk' and are therefore not taxable under 28 U.S.C. § 1920"; and 2) the request for copying costs is only supported by a "vague statement [that] does not meet Plaintiffs' burden. To tax duplication costs, the Court must determine whether the cost was both reasonable and necessary to the litigation." ECF No. 816 at 58–59 (internal citations omitted). In reply, the Marzulla plaintiffs assert that "[t]o recreate a case file, [they] had to track down and copy hearing and trial transcripts, deposition transcripts, expert reports, decisions, and all the other related documents from over twenty years of litigation." ECF No. 820 at 18. Moreover, they assert that they "are entitled to recover [] copying (duplication) costs for 18,881 of documents at $.50 a page, which is the copying charge set by the Court of Federal Claims fee schedule." *Id.*

The Court may only tax costs "if the costs are allowable and if they are both reasonable and necessary." *Standard Commc'ns, Inc. v. United States*, 106 Fed. Cl. 165, 175 (2012). Moreover, "[t]he requesting party has the burden of establishing that the requested costs are taxable and is obligated to provide clear documentation that allows the court to determine whether the costs were reasonable and necessary to the litigation." *Id.* Thus, a "list of costs and expenses must be adequately detailed, identifying the purpose of each expenditure and not filled with generic references . . . ." *In re Ricoh Co.*, 661 F.3d 1361, 1367 (Fed. Cir. 2011) (internal quotations and citations omitted).

The Court concurs with the government that the Marzulla plaintiffs are not entitled to reimbursement for their claimed PACER fees or duplication costs. The PACER fees are, quite simply, not "[f]ees of the clerk and marshal" as the Marzulla plaintiffs assert in their bill of costs; therefore, PACER fees are not taxable. Moreover, to the extent that these fees could be recovered under the URA as an expense related to "online legal research" that is "typically billed to paying clients," as the Marzulla plaintiffs assert in their reply brief, that argument is waived.

If the Marzulla plaintiffs wanted to recoup PACER fees under the URA, they needed to make that request in the motion they styled as their "motion for attorney fees" in which they made all of their claims for litigation expenses under the URA.  *See, e.g.*, *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 296–97 (2023) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver." (quoting *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58-59 (2021)).

Moreover, with regard to duplication costs, while such costs are taxable, the Marzulla plaintiffs have not met their burden to demonstrate that their duplication costs were reasonable and necessary to the litigation.  As the government points out, the Marzulla plaintiffs' explanation of why these costs were reasonable and necessary is the definition of vague: "[i]ncluded in these costs are the cost of printing discovery documents, the costs of printing materials for depositions, and the cost of printing copies of court filings.  All costs were necessary to adequately represent the [Marzulla plaintiffs] and to successfully litigate the case." ECF No. 798-1 at 7.  This conclusory assertion that "[a]ll costs were necessary" is wholly inadequate to meet the Marzulla plaintiffs' burden.  Furthermore, their *brand new* assertion in their reply brief that they "had to track down and copy hearing and trial transcripts, deposition transcripts, expert reports, decisions, and all the other related documents from over twenty years of litigation," ECF No. 820 at 18, is both too little and too late.  The Marzulla plaintiffs requested taxable costs are reduced by $9,440.90 to $12,365.72.

### 2. The Christensen Plaintiffs Are Entitled to a Forty Percent Contingency Fee Award Plus Litigation Expenses

The Christensen plaintiffs seek $10,707,445.84[6] in attorneys' fees and $375,671.95 in litigation expenses under the URA on behalf of themselves and the Marzulla plaintiffs (for the that work that was done for *all* of the plaintiffs in this litigation while Plaintiffs were represented by the same set of attorneys).  Although the Court concurs with the Christensen plaintiffs that they are entitled to attorneys' fees and other litigation expenses, the Court finds that the Christensen plaintiffs are only entitled to recover a forty percent contingency fee plus litigation expenses and that such fees and expenses are awardable under the Tucker Act rather than the URA because the Court did not render a judgment awarding just compensation in order to effect settlement of the Christensen plaintiffs' claims.

### a. The Christensen Plaintiffs Fees and Expenses are Awardable Under the Tucker Act with the URA Serving as a Money-Mandating Provision of Law

The Christensen plaintiffs also seek attorneys' fees and litigation expenses pursuant to the URA.  Unfortunately, because of the Attorney General's improper application of the URA in settling the Christensen plaintiffs' claims, the award of attorneys' fees and litigation expenses to the Christensen plaintiffs is not quite as straightforward as the award to the Marzulla plaintiffs.  As outlined above, the URA provides in relevant part that:

---

[6] As noted above, this number is the sum of the fees requested by the Christensen plaintiffs on behalf of all plaintiffs from John Ehret ($7,013,370.00), Mark Christensen/Christensen Hsu and Sipes, LLP ($2,743,215.00), and for just the Christensen plaintiffs from Eugene Frett/Sperling & Slater, LLC ($950,860.84).

The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a party of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c). In short, the plain language of the URA states that a court (if it enters a judgment awarding just compensation) or the Attorney General (if he or she settles a just compensation case without a court entering judgment) "shall determine and award" (in the case of a court) or "allow" (in the case of the Attorney General) a sum to "reimburse" a plaintiff for his or her reasonable attorneys' fees and other litigation expenses. In other words, the waiver of sovereign immunity for a court to award attorneys' fees and litigation expenses pursuant to the URA only applies in cases in which such court "render[s] a judgment for the plaintiff . . . awarding compensation for the taking of property by a Federal agency."[7] For a claim that is settled without the Court entering judgment awarding just compensation, the Attorney General is *required* to reimburse the plaintiff for his or her reasonable attorneys' fees and other litigation expenses.

In this case, the Christensen plaintiffs and the United States settled those plaintiffs' just compensation claims without this Court "rendering a judgment . . . awarding compensation for the taking of property by a Federal agency." 42 U.S.C. § 4654(c).[8] Unlike the Marzulla plaintiffs, who "settled" their claims through acceptance of offers for judgment—judgment upon which the Court then "rendered"—the Christensen plaintiffs and the United States settled the claims through settlement agreement without the Court rendering a judgment awarding just compensation. Accordingly, under the URA, the Attorney General was required to "allow" to

---

[7] The Justice Department has articulated this exact same reading of the URA on at least one occasion in briefing to the Supreme Court. In opposing *certiorari* in *Haggart v. Woodley*, a leading Federal Circuit URA case, the Solicitor General argued that:

> while most fee-shifting provisions make awards discretionary, Section 4654(c) is phrased in mandatory terms, requiring that courts (when they enter a judgment awarding just compensation) and the Attorney General (when she settles a case without a court judgment) "shall determine and award" a sum to "reimburse [the takings] plaintiff" for his reasonable litigation expenses.

Brief for the United States in Opposition to Certiorari, *Haggart v. Woodley*, 579 U.S. 928 (No 15-1072) (quoting 42 U.S.C. § 4654(c)) (internal emphasis and citations omitted).

[8] After the Court pointed out to the parties the failure of the Attorney General to reimburse the Christensen plaintiffs for their reasonable fees and expenses, *see* ECF No. 825, the Christensen plaintiffs and the United States moved the Court to enter judgment, *see* ECF No. 830. The Court hereby **DENIES** that motion because the judgment that is requested to be entered would be a judgment in name only. However, even if the Court granted the motion, the judgment the parties sought to have the Court enter is not one "awarding compensation for the taking of property by a Federal agency" as required by the URA.

the Christensen plaintiffs "such sum as [would] in the opinion of . . . the Attorney General reimburse such plaintiff[s] for [their] reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred . . . ." The Attorney General failed to fulfill this statutory obligation. Instead, the settlement agreement essentially leaves resolution of attorneys' fees and litigation expenses to the Court. *See* ECF No. 830 at 7, 10.

Although judges of this Court regularly determine and award attorneys' fees and other litigation expenses in "settled" cases covered by the URA, in those reported cases of which the undersigned is aware, the Court also entered judgment awarding just compensation to effect the settlement. *See, e.g.*, *Bradley v. United States*, 164 Fed. Cl. 236, 245 (2023) (noting that the Court entered judgments pursuant to RCFC 54(b) for the settling plaintiffs prior to awarding attorneys' fees); *Arnold*, 163 Fed. Cl. at 21 ("After reaching an impasse in their efforts to settle plaintiffs' claims for attorney's fees . . . the parties stipulated to the entry of partial final judgment under RCFC 54(b) . . . [for] the aggregate sum of $7,595.17 in just compensation . . . ."); *Haggart v. United States*, 136 Fed. Cl. 70, 81 (2018) (approving settlement and instructing the Clerk to enter judgment awarding just compensation of $159,636,521.65).. Because the manner in which the parties effected settlement of the Christensen plaintiffs' claims did not involve the Court entering judgment awarding just compensation, the Attorney General was required to reimburse the Christensen plaintiffs for their reasonable attorneys' fees and other litigation expenses. The URA's clear mandate to the Attorney General does not permit leaving resolution of attorneys' fees and other litigation expenses to the Court.

Notwithstanding the Attorney General's failure to fulfill his statutory obligation and the Court's lack of authority to award fees and costs under the URA directly in the circumstances present here, the Christensen plaintiffs have moved the Court to determine and award fees and expenses, and their complaints requested the award of "costs, including reasonable attorney and expert fees incurred in the prosecution of this action." *See, e.g.*, ECF No. 1 at 6. Helpfully for the Christensen plaintiffs, the provision of the URA that requires the Attorney General to reimburse a plaintiff for his or her reasonable costs, disbursements, and expenses, is "reasonably amenable to the reading that it mandates a right of recovery in damages," *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003), as it clearly "mandate[s] compensation by the Federal Government for the damages sustained," *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983) (citing *United States v. Testan*, 424 U.S. 392, 400 (1976)). Thus, because the Court finds that the Attorney General's obligation in the URA to award reasonable costs is money-mandating, the Court will award the Christensen plaintiffs their reasonable costs pursuant to the waiver of sovereign immunity contained in the Tucker Act with the above-cited URA provision requiring the Attorney General to reimburse reasonable fees and expenses serving as the money-mandating provision of law that entitles the Christensen plaintiffs to damages (in this case reasonable attorneys' fees and litigation expenses).

### b. The Christensen Plaintiffs Actually Incurred a Forty Percent Contingency Fee for Which They Are Entitled to Reimbursement

Like the Marzulla plaintiffs, the Christensen plaintiffs originally retained fellow property owner John Ehret to represent them in this litigation. A 2017 updated retention agreement

between Mr. Ehret and the plaintiffs provided that they would "pay to [John Ehret], as the attorney of record, 40% of the recovery."[9]  ECF No. 809-7 at 3.  In 2020, when the Christensen plaintiffs split from Mr. Ehret's representation, they updated their retention agreements with Mr. Christensen's and Mr. Frett's law firms, Christensen Hsu and Sipes, LLP, and Sperling & Slater, LLC:

> This agreement amends and does not replace my/our prior retention agreements in the Litigation.  I/We hereby confirm the payment terms contained in my/our prior retention agreements with counsel, pursuant to which I/we agree to pay 40% of any recovery I/we obtain through the Litigation (whether by settlement or otherwise) to my attorneys as their fee for legal services rendered.  Nothing in this amendment modifies the agreement among counsel regarding the division of the 40% contingency fee.

ECF No. 809-9.  In sum, the Christensen plaintiffs, through both their original retention agreements with Mr. Ehret and their amended agreements with Christensen Hsu and Sipes, LLP and Sperling & Slater, LLC, have always had agreements that provided that they will pay their attorneys a forty percent contingency fee.  These agreements to pay their attorneys a forty percent contingency fee encompass what the Christensen plaintiffs "actually incurred" for which they are entitled to "reimbursement" within the meaning of the URA.

Despite never having an agreement with their attorneys that required them to pay their attorneys hourly fees[10]; one attorney having no hourly billing records[11]; and another having billing records that appear on their face unreasonable, purport to charge an hourly rate that no plaintiff agreed to pay, and seem unjustified in any event (given the lack of substantiation of any litigation experience of the attorney in question,[12] no substantiation that these were rates ever billed to any client outside this litigation,[13] and that these rates were markedly higher than the prevailing rates for the attorney's locality), the Christensen plaintiffs seek attorneys' fees of $10,707,445.84 on behalf of all the plaintiffs in this litigation.  When added to the amount of attorneys' fees the Marzulla plaintiffs actually incurred, this would amount to an over seventy percent contingency fee—almost double the agreed-upon amount.  The Court finds that awarding the Christensen plaintiffs their requested attorneys' fees would be inconsistent with the plain text of the URA and their retention agreements, and that their requested fees are unreasonable in any event.  Accordingly, the Court will award the Christensen plaintiffs a forty percent contingency

---

[9] The Christensen plaintiffs did not provide a copy of John Ehret's original fee agreement; however, the 2017 agreement (quoted above) indicates that it was intended to "bring up-to-date the commitment previously made in writing by you or your predecessor party in interest."  ECF No. 809-7 at 3.

[10] See ECF Nos. 809-7 and 809-9.

[11] In the motion for attorneys' fees submitted by Mr. Frett, he states that "[i]n reliance on th[e] contingency agreement, Mr. Frett did not keep track of his hours . . . ."  ECF No. 810 at 3.

[12] The Christensen plaintiffs offer the Court little to no support regarding Mr. Ehret's litigation experience, and certainly none that justifies the reasonableness of the $600 rate they claim for his hourly work.  It was the Christensen plaintiffs' burden to establish that Mr. Ehret had the type of experience that would make a $600 hourly rate reasonable if they wanted his fees awarded at that rate.

[13] See id.

fee of $4,871,951.35, which the Court finds to be a reasonable fee for the work performed in this case.

As discussed above, the URA's reimbursement provision was designed both to make property owners who successfully pursue just compensation cases whole and ensure that property owners (even those with small just compensation claims) are able to find and retain competent counsel to enforce their just compensation rights against the federal government. The forty percent contingency fee that the Christensen plaintiffs agreed to pay their attorneys is fully in line with both of these goals. The Christensen plaintiffs are only obligated to pay their attorneys forty percent of the just compensation they received from the United States. They have no obligation to pay their attorneys the hourly fees requested in their fee petition and, therefore, awarding fees in that amount would "produce windfalls to [their] attorneys" rather than make the Christensen plaintiffs "whole." Moreover, the forty percent contingency fee is apparently what it took for the Christensen plaintiffs to retain competent counsel. Therefore, a forty percent contingency fee award serves the goals of the URA.

Furthermore, awarding a forty percent contingency fee to the Christensen plaintiffs is consistent with the plain language of the URA, whereas an award of hourly fees would be inconsistent with the text of the statute in this case. The URA provides three guideposts for a trial court applying its substantial discretion to determine an award of attorneys' fees and litigation expenses. Those guideposts are encapsulated in the terms "actually incurred," "reimburse," and "reasonable." First, the URA only provides for the reimbursement of attorneys' fees and litigation costs that are "*actually incurred* because of [a proceeding awarding just compensation]." 42 U.S.C. § 4654(c) (emphasis added). That is to say, the URA only allows reimbursement of attorneys' fees that property owners have agreed to pay their attorneys or have obligated themselves to seek from the government on their attorneys' behalf. In other words, in determining whether to award attorneys' fees under the URA, a court "must determine whether [the property owner] has any legal obligation to pay his attorney [], either by operation of the fee arrangement between them or otherwise." *United States v. 122.00 Acres of Land, More or Less, Located in Koochiching Cnty., Minn.*, 856 F.2d 56, 58 (8th Cir. 1988); *Marré v. United States*, 38 F.3d 823, 829 (5th Cir. 1994) ("Because § 7430 limits attorney's fees to those actually incurred, Marré is entitled only to the amount owed under the contingency fee agreement plus costs, to the extent reasonable."); *see also United States v. Paisley*, 957 F.2d 1161, 1164 (4th Cir. 1992) (holding that party entitled to full indemnification of attorney's fees by her employer did not "incur" any expenses under EAJA). Here, the Christensen plaintiffs agreed to pay their attorneys a forty percent contingency fee and, thus, that is what they actually incurred for representation in this matter.

The URA's use of the term "reimburse" bolsters this reading. Under the URA, a successful just compensation plaintiff is entitled to "such sum as will in the opinion of the court or the Attorney General *reimburse* such plaintiff for his reasonable costs . . . ." 42 U.S.C. § 4654(c) (emphasis added). To "reimburse" of course means "to pay back to someone: repay" or "to make restoration or payment of an equivalent to." *Reimburse*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998). Therefore, in order to reimburse someone, or for someone to be entitled to be reimbursed, some amount of money or an equivalent thereof must be owed or obligated. If no money is owed or obligated, it is impossible to reimburse.

Accordingly, a just compensation plaintiff must owe his or her attorney fees, or at least be obligated to seek attorneys' fees from the government, to be entitled to reimbursement under the URA. Here, the Christensen plaintiffs owe (or have already paid) their attorneys forty percent of their recovery. This is the amount that can be reimbursed, as it was actually incurred.

The URA's limitation to "reasonable" attorneys' fees also informs this reading. If a just compensation plaintiff was able to retain counsel for a contingency fee, it would not be reasonable for the government to compensate a successful just compensation plaintiff above the amount of the contingency fee when the plaintiff has no obligation to pay the attorney more than that amount, and the attorney was willing to take the case for the contingency fee amount.

The Christensen plaintiffs argue that the forty percent contingency fee to which they obligated themselves is not a cap on the amount of their attorneys' fees. The Court disagrees. The unambiguous and reasonable meaning of the agreements between the Christensen plaintiffs and their attorneys indicate that plaintiffs will only owe counsel forty percent of any just compensation awarded. The closest the Christensen plaintiffs' fee agreements come to anything resembling an agreement to pay hourly fees are two statements in the 2017 Ehret fee agreement. That agreement mentions that "[a]ttorney cost and expenses will be paid by EAJA" and that "we will claim enhanced prevailing fees under the Equal Access to Justice Act (EAJA) 28 U.S.C. Section 2412(d)." ECF No. 809-7 at 3. The 2017 Ehret fee agreement does not mention the URA, and neither the URA nor EAJA are mentioned in the 2020 retention agreement between the Christensen plaintiffs and Christensen Hsu and Sipes, LLP and Sperling & Slater, LLC, which amends the 2017 Ehret fee agreement. Regardless of this, the Christensen plaintiffs argue in their motion for fees that the reference to EAJA in the Ehret fee agreement is interchangeable with, or, in their words, "equally applicable to the URA." ECF No. 809 at 20. This argument, even were it correct, does not obligate the Christensen plaintiffs to pay their attorneys, or seek from the United States on their attorneys' behalf, hourly fees for representation.

First, the 2020 retention agreement "amends . . . prior retention agreements" and specifically states that the Christensen plaintiffs "agree to pay 40% of any recovery" obtained to their attorneys. ECF No. 809-9. The 2020 retention agreement does not mention EAJA or the URA. *Id.* Therefore, even if the retention fee clause of the 2017 Ehret fee agreement did contemplate that the plaintiffs had to seek EAJA fees (or hourly fees under the URA) on behalf of their attorneys, the fact that the 2020 retention agreement, which purports to "amend" the previous retention agreements, restated the fee obligation supersedes any previous commitment to seek EAJA or URA fees, as the new agreement specifically and fully states that the "payment terms" contained in their prior retention agreements obligated them "to pay 40% of any recovery [they] obtain[ed] through the Litigation (whether by settlement or otherwise) to [their] attorneys as their fee for legal services rendered." ECF No. 809-9.

Second, even if the "payment terms" of the 2020 retention agreement did not supersede the payment terms of the 2017 retention agreement, the 2017 agreement still only obligates the plaintiffs to pay their attorneys a forty percent contingency fee. The 2017 Ehret agreement does mention that "[a]ttorney cost and expenses will be paid by EAJA," but that falls short of an obligation for the plaintiffs to seek the greater of a forty percent contingency fee or the hourly rate under the lodestar approach that the Christensen plaintiffs seek here. To start, the

Christensen plaintiffs disavow that they intended to seek fees under EAJA, calling the reference to EAJA a "scrivener's error."  ECF No. 819 at 6.  While referencing EAJA instead of the URA may be a mistake (as EAJA rates are generally lower than those that can be obtained pursuant to the lodestar approach under the URA), after eighteen years of litigation, including trials and appeals, counsel should have been aware of the URA and their ability to seek reimbursement on their clients' behalf under it; the Court cannot simply chalk the reference to EAJA up to a scrivener's error.  *See Barlow v. United States*, 32 U.S. (7 Pet.) 404, 411 (1833) ("It is a common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally . . . .").  If the Christensen plaintiffs' attorneys intended to seek reimbursement under the URA, and not EAJA, they should have included the URA in their retention agreements.

More to the point, even if the Court read the URA into the retention agreements instead of EAJA (and ignored the 2020 amendment to the payment terms of those agreements, which mentions neither EAJA nor the URA), what the Christensen plaintiffs truly seek (or more accurately what the Christensen plaintiffs' attorneys seek) is reformation of their retention agreements to make them read similarly to the agreements at issue in cases like *Bywaters v. United States* in which the retention agreements specifically provided that the property owners' attorneys' fees would be "calculated *as the greater of either* the value of [their] professional services at [their] regular hourly rates *or* by multiplying by one third the amount recovered for the plaintiff class as damages."  *Bywaters*, 670 F.3d at 1226 (emphasis added and internal quotations omitted); *see also Arnold*, 163 Fed. Cl. at 23 (finding that the retention agreement at issue "expressly entitle[d] [plaintiffs' counsel] to 'the greater of either' one-third of the total damages award recovered by all plaintiffs (including interest and statutory attorneys' fees) 'or' 'the statutory attorney fee determined by the Court'").  But reformation is not warranted here, as the agreements are clear and unambiguous, the Christensen plaintiffs will be made whole by applying the retention agreements as written, and the Christensen plaintiffs offer no evidence that the EAJA language they point to was supposed to operate in the manner as the above-cited clause from *Bywaters*.  The sum total of the Christensen plaintiffs' argument that the contract should be reformed to provide for the greater of hourly fees or the forty percent contingency fee are the following three conclusory sentences:

> The government supports its contingency "cap" argument in part by suggesting the Plaintiffs and counsel never agreed to an "either-or" fee arrangement, under which counsel would only enforce the contingency fee if their fees were not fully paid by the government pursuant to a fee-shifting statute.  That position is false.  As evidenced by the Declaration of Mark Christensen, attached to the CHS-Ehret Fee Motion as Ex. L [ECF 809-12], the Plaintiffs and their counsel always understood that counsel would seek their hourly fees from the government first, and only enforce the contingency if the statutory fee recovery was less than 40%.  *See*, ECF 809-12, ⁋ 5.

ECF No. 819 at 5.  This short, conclusory statement and the equally conclusory declaration paragraph referenced therein are insufficient to meet the high bar for contract reformation. *Westdale Nw. Ctr., LP v. United States*, 154 Fed. Cl. 557, 583 (2021) ("The standard of review

for assessing whether reformation is appropriate is clear and convincing evidence." (citing *Nat. Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006)).

Finally, the Christensen plaintiffs allude to a few cases in their reply brief that stand for the proposition that a contingency fee does not automatically impose a cap on attorney's fees under federal fee shifting statutes. ECF No. 819 at 3–5. Although the Christensen plaintiffs do not fully develop this argument, the Court will address it nonetheless. The Supreme Court has held that,

> [i]f a contingent-fee agreement were to govern as a strict limitation on the award of attorney's fees, an undesirable emphasis might be placed on the importance of the recovery of damages in *civil rights litigation*. The intention of Congress was to encourage successful *civil rights litigation*, not to create a special incentive to prove damages and shortchange efforts to seek effective injunctive or declaratory relief. Affirming the decision below would create an artificial disincentive for an attorney who enters into a contingent-fee agreement, unsure of whether his client's claim sounded in state tort law or in federal civil rights, from fully exploring all possible avenues of relief. *Section 1988* makes no distinction between actions for damages and suits for equitable relief. Congress has elected to encourage *meritorious civil rights claims* because of the benefits of such litigation for the named plaintiff and for society at large, *irrespective of whether the action seeks monetary damages*.

*Blanchard v. Bergeron*, 489 U.S. 87, 95–96 (1989) (emphasis added). The Supreme Court's holding may, at first blush, appear to support the Christensen plaintiffs' claim. However, while just compensation claims are certainly civil rights claims, they are not the type of civil rights claims to which the Supreme Court was referring in *Blanchard*.

Rather, the *Blanchard* Court was concerned with capping attorneys' fees at a contingency fee-based percentage because, "'[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.'" *Id.* at 96 (quoting *Riverside v. Rivera*, 477 U.S. 561, 574 (1986)). Thus, according to the Supreme Court, "[t]he contingent-fee model, premised on the award to an attorney of an amount representing a percentage of the damages, is . . . inappropriate for the determination of fees under § 1988. The attorney's fee provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable under § 1988." *Id.* But, unlike a claim under section 1988 to vindicate certain civil rights that may not be valued solely in monetary terms, just compensation claims are, in fact, valued solely in monetary terms. In contrast to, for instance, the First Amendment, which prohibits, *inter alia*, government restrictions on speech, the Just Compensation Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First Eng. Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 315 (1987) (emphasis in original). In other words, unlike a prohibition on speech, the government may take private property; it simply must pay for it. Thus, in a just compensation case brought pursuant to the Tucker Act, the whole object is to receive money. Critically, this feature differentiates a Tucker Act just compensation claim from a section 1988 civil rights claim, in which non-monetary relief may be equal to, or more important than, monetary damages. Accordingly,

18

*Blanchard*'s holding that a contingency fee agreement does not serve as an automatic cap on fees in "civil rights litigation" is not applicable to just compensation cases.

Moreover, the fee-shifting statute at issue in *Blanchard* did not require that reasonable attorneys' fees be "actually incurred" or refer to the attorneys' fees being awarded to "reimburse" a plaintiff. *Compare* 42 U.S.C. § 1988(b) *with* 42 U.S.C. § 4654(c). These two requirements of the URA distinguish it from the fee shifting provision in section 1988 at issue in *Blanchard*. All of this explains why the Federal Circuit determined in *Bywaters* that the issue of whether a contingency fee serves as a cap on attorneys' fees under the URA is an open question not foreclosed by the Supreme Court's decision in *Blanchard*. *See Bywaters*, 670 F.3d at 1232 n.7 ("We need not decide in this case whether a contingent-fee agreement providing for fees based on a percentage of the appellants' recovery would impose a limit on recovery of attorneys' fees under the URA, which similarly requires that the attorneys' fees be 'actually incurred.'" (quoting 42 U.S.C. § 4654(c)).

The Court finds that the forty percent contingency fee to which the Christensen plaintiffs agreed caps their recovery of attorneys' fees in this case. The Court also finds that this fee is reasonable for the twenty-plus years of work in this case, particularly because the attorneys faced the prospect of an uncertain recovery both when this case was filed and through its several trials and appeals. While the forty percent contingency fee may initially have been high for the expertise of the Christensen plaintiffs' attorneys (especially in the subject matter specialty of just compensation claims against the United States), the length and complexity of the proceedings in this case has adequately balanced this out.

What is more, even if the contingency fee agreement did not limit or cap the amount of attorneys' fees to which the Christensen plaintiffs are entitled under the URA, the Court finds that the requested fees under the lodestar approach are unreasonable for several reasons. *See Bradley*, 164 Fed. Cl. at 247 ("[I]t is the court's role to determine what it believes, in its 'considerable discretion,' is the amount that will reimburse a plaintiff for attorneys' fees actually incurred." (quoting *Bywaters*, 670 F.3d at 1228)). The government does an excellent job of cataloguing the myriad issues with the hours of legal work claimed by Christensen plaintiffs in their motion. Because the Court finds that the forty percent contingency fee is the amount that these plaintiffs actually and reasonably incurred in successfully pursuing their just compensation claims, it will not go through all of these time entries with a fine tooth comb; however, it has reviewed the timesheets and other supporting material submitted by the Christensen plaintiffs and believes that the below descriptions of some of the issues identified by the government provide a good summary of why the billable hours requested by the Christensen plaintiffs are unreasonable:

- [T]he [Christensen plaintiffs'] motion requests attorneys' fees for work done by Mr. Ehret beginning as early as March 8, 1998, well over a year before the filing of the first complaint on July 9, 1999. There is no documentation of when Mr. Ehret first entered into any retention agreement with any plaintiff, or when any plaintiff first decided to file its lawsuit.

- [C]ertain Ehret time entries between July 9, 1999 (when the initial complaint was filed on behalf of thirteen plaintiffs) and February 23, 2000 (when a "notice of additional parties"

was filed on behalf of additional plaintiffs) relates to potential future claimants for whom there is no evidence they had decided to file suit or who never joined the litigation. *See, e.g.*, 8/13/99 ("Call from landowner north of St. Joseph piers, David Frazier regarding loss of patio"); 8/24/99 ("Propert[y] owner Carolynne Morvis visited"); 9/1/99 ("Verify plaintiffs Frazer, Del Mariani, Morivs and Scallan as to interest, address, tax ID, etc."); 11/19/99 ("Call prospective client Bob Melcher").

- The CHS motion seeks fees for work done by Ehret that related, in part, to work for former plaintiff Michael Walsh, whose complaint was voluntarily dismissed by stipulation on March 21, 2006. ECF No. 132. That complaint was filed on February 23, 2000. *See* Case No. 00-397, ECF No. 1. Fees for work on behalf of unsuccessful claimants are not reimbursable under the URA.

- [T]he CHS motion seeks fees for time expended on numerous unsuccessful or unnecessary endeavors by Mr. Ehret and CHS that did not contribute to a favorable result. These include at least the following hours spent on motions that were denied: (1) motion for class certification, Case No. 99-445, ECF No. 12 (6.0 hours, Ex. 6 at 96-100); (2) motion for Plaintiffs' attorney to testify, No. 99-445, ECF No. 69 (13.95 hours, Ex. 6 at 91-95); (3) motions to strike defense experts, ECF Nos. 170, 403, 419 (554.75 hours, Ex. 6 at 34-66); (4) various motions to take judicial notice of or certify issues of the OHWM under state law, ECF Nos. 56, 114, 141 (78.7 hours, Ex. 6 at 16-24); (5) motion for leave to file a notice of Cook Nuclear shutdown during a storm and extensive time pursuing irrelevant issues of nuclear plant safety issues and filings with the NRC (done while the case was on appeal after the 2011 trial), ECF No. 541 (201.2 hours, Ex. 6 at 2-15); (6) post-trial motion for recusal of trial judge, ECF No. 553 (68.90 hours, Ex. 6 at 67-75); two petitions for writ of mandamus, ECF Nos. 616, 620 (61.5 hours, Ex. 6 at 25-33); and (7) motion for partial summary judgment on damages seeking over $584 million based on 1903 OHWM theory, withdrawn by subsequent counsel, ECF No. 650, 652, 655, 703 (80.0 hours, Ex. 6 at 96-100). Finally, at least 150.6 hours were expended pursuing a theory that Plaintiffs had a compensable property interest in the value of the volume of lost sand under state law of accretion and reliction, which this Court and the Federal Circuit squarely rejected. *See* ECF Nos. 540-41; *Banks v. United States*, 721 F. App'x 928, 943 (Fed. Cir. 2017); Ex. 6 at 76-90.

- [S]ignificant adjustments should be made for time entries that would never survive the scrutiny of a paying client. For example, the Ehret timesheets include numerous clearly excessive and unreasonable entries. *See, e.g.*, ECF No. 809-3 at 41 (11/10/01: 6 hours for "DAB called. He's trying to FAX his argument."); *id.* at 78 (11/13/06-11/30/06: 120 hours to "[r]eceive and review Joint Record with IV Volume Appendix Ehret's assistance in preparation."); *id.* at 114 (6/18/2010: 14.0 hours to review a single contract). Other entries indicate billing for more than 24 hours in a single day, which is clearly not accurate and patently excessive. *See, e.g., id.* at 45 (5/6/2002: 39 hours); *id.* at 132 (4/11/2015: 40 hours). And worse yet, many combine work over several days, weeks, or months with no itemization of when or for how long any specific work was done. *See, e.g., id.* at 111 (36 hours "Jan thru June 2010" to "[c]onstantly review Nairn's 2006 report"); *id.* at 117 (380 hours from "May 1 through 6/17/2011" for assisting in preparation of a post-trial brief); *id.*

at 113 (420.00 hours in "[l]ate May June July (early) 2010" for real estate valuation research); *id.* at 112 (3/26/2010: 50 hours for research billed as "[c]umulative hours over several weeks plus references as required – estimate").

- Several of the Ehret time entries duplicate descriptions of the same work in other entries and are therefore not reasonable. For example, 13.0 hours to "[r]eceive and review" defendant's response to a motion to strike, and 13.0 hours to "[r]eceive" the same motion to strike. *See* ECF No. 809-3 at 79 (Dec. 9 and 16, 2006); *see also id.* at 66 (two exact duplicate entries for 5/18/2006.

- The Ehret timesheets include numerous entries for tasks such as 1.5 hours for "Finish page numbers faxed to DAB" (11/02/01); 12 hours for "[p]rovide and prepare Table of Contents for Appendix. Print all designated materials and ship to SSG" (11/17/01); and 1.5 hours for "Copy and mail various documents to MEC. . . ." (8/11/09). *See* ECF No. 809-3 at 41, 42, 105. Such administrative and clerical tasks are appropriately treated as non-reimbursable firm overhead and are reimbursable, if at all, at the rate of a paralegal in the relevant market.

- The CHS timesheets include hours billed at partner attorney rates for clerical tasks such as "file organization," "send briefs to John Ehret," and "prepare brief for the printer so a proof can be prepared." *See* ECF No. 809-5 at 247, 361, 398. They also include numerous hours at attorney rates for preparing documents such as a joint appendix for appeal that should be done by a paralegal. *See id.* at 480-81.

- The CHS time records include 135.8 hours of travel time, without indication that any work on this case was done during that time.

- [S]ome of the Ehret time entries are so incomprehensible that it is impossible to discern what, if any, work was done. For example, one entry attributes 4 hours for "to wave height (H2 or H3·5)? South bound .3X=110,000cy/yr then X= 366,666 cy/yr." *See* ECF No. 809-3 at 65 (04/30/2006); *see also id.* at 104 (07/14-21/09: 10.00 hr. for "back from production requests").

- Other entries seek fees for items that are not properly charged to a client as attorneys' fees, such as "Develp [sic] and sort photos" (10/24/99) and "Check Continuing Legal Education with ISBA" (4/16/2008). *See* ECF No. 809-3 at 92, 145.

- The [Christensen plaintiffs'] motion seeks 118.7 hours for nonallowable time such as work that appears to relate to other matters, discussions with experts and vendors, and even an expert's attorney, about their unpaid invoices, time related to disputes between counsel, agreements between the attorneys, or client representation agreements, and over 40 hours of paralegal time for the clerical task of typing up the Ehret billing spreadsheets.

- Certain time entries of both Mr. Ehret and CHS are too vague to determine their reasonableness. *See, e.g.*, ECF No. 809-5 at 458 (02/16/2015: "Review most recent fax from Mr. Ehret"); ECF No. 809-3 at 98 (1/22/2009: 2.0 hours for "Emails.").

- The Ehret timesheets are [] replete with block billing where questionable time entries, such as travel, administrative tasks, and time pursuing unsuccessful or unnecessary endeavors are commingled with other descriptions, making it impossible to allocate the time spent on each. *See, e.g.*, ECF No. 809-3 at 46 (10/31/2002: combining travel with work descriptions); id.at 123 (combining "Nuclear Regulatory Commission Open House" and vague description of "Nairn unpublished slopes").

- [T]he CHS time entries also include such block billing. *See, e.g.*, ECF No. 809-5 at 206 (5/26/10: combining call with expert regarding report and outstanding invoice); *id.* at 551 (06/06/20: combining "review client representation issues" with case related tasks).

ECF No. 816 at 42–52, 63.

In addition to the issues identified above with the Christensen plaintiffs' billing entries and others that exist in the submitted records but not discussed herein, the Christensen plaintiffs also fail to meet their burden of establishing that the hourly rates requested for Mr. Ehret are reasonable. The Christensen plaintiffs' motion seeks more than more than $7 million in fees for services performed by Mr. Ehret. A substantial reason for the amount of this request (apart from the unreasonable amount of hours billed discussed above) is that the Christensen plaintiffs claim that "John Ehret billed his time at the rate of $600 per hour throughout the entirety of the Litigation." ECF No. 809-11 at 2. However, there is no evidence that any plaintiff ever agreed to the hourly rate claimed for Mr. Ehret's services, that Mr. Ehret ever charged that rate to any paying client, or that comparable attorneys in the market in which he provided his services in this case ever billed at that rate. Rather, the Christensen plaintiffs offer a few sentences of educational history regarding Mr. Ehret; claim in a conclusory fashion that "his engineering, law, and naval background uniquely qualified him to prosecute the plaintiffs' claims and warranted an above-market billing rate"; and admit that for the first seven years of the litigation that "Mr. Ehret's $600 hourly rate exceeded the *Laffey* matrix."[14] ECF No. 809 at 14. This lack of support fails to meet the Christensen plaintiffs' burden of demonstrating that this claimed rate is reasonable. *Hensley*, 461 U.S. at 437 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."). In short, more than a few conclusory sentences were needed to justify the $600 hourly rate.

### c. The Christensen Plaintiffs are also Entitled to be Reimbursed for Reasonable Litigation Expenses

In addition to attorneys' fees, the Christensen plaintiffs seek litigation expenses in the amount of $375,671.96. According to the Christensen plaintiffs, "[t]hese costs and expenses include expert fees, legal research charges, PACER charges, travel expenses, court reporting

---

[14] This, of course, assumes that the Laffey matrix is the correct metric to measure against. Mr. Ehret never practiced law in the Baltimore-Washington area to which the Laffey matrix applies and listed his address as being located in Stevensville, Michigan at one of the properties at issue in this case. Both trials in the case were conducted in Niles, Michigan, and, as far as the Court can tell, Mr. Ehret performed most of his work on this case in southwestern Michigan where the prevailing rates for legal services are much lower than the Laffey matrix rates. *See* ECF No. 816 at 29–33.

fees, witness fees, and miscellaneous administrative costs (copying, postage, etc.)." ECF No. 809 at 21. The government objects to certain of these expenses "because they are inadequately explained and documented and/or are otherwise non-reimbursable" and requests that the Christensen plaintiffs' requested expenses "be reduced by $126,902.95 to $248,769.00." ECF No. 816 at 53. The government spends approximately five pages of its response brief specifically addressing—in six different categories—the issues it has identified with the Christensen plaintiffs' request for litigation expenses. In addition, the government, in an exhibit, went line-by-line through the Christensen plaintiffs' claimed expenses and identified "undocumented expenses [that] also could not be found in CHS's billing records," "items for which some documentation has been provided," and "certain expenses that are either unexplained or otherwise unallowable." *Id.* at 53–54, 57 (citing ECF No. 816-13).

In reply to the government's specific arguments regarding expenses and its supporting exhibit, the Christensen plaintiffs simply stated:

> CHS tracked itemized costs incurred in the prosecution of the Plaintiffs' takings claim against the government since it entered the case in 2008, which costs total $375,671.95. *See* ECF 809-13. Plaintiffs' bear the burden of proving these reasonable costs, and have done so via the Declaration of Mark Christensen. ECF 809-12, ⁋ 10. Even without complete documentation of costs incurred and paid over CHS's 15-year history in this case, the testimony of Mr. Christensen given in his declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 concerning the accuracy, reasonableness, and necessity of the costs claimed meets that burden. Accordingly, the government's suggested cost reduction of $126,902.95 should be rejected, and CHS's requested costs of $375,671.95 should be awarded in full.

ECF No. 819 at 7–8 (emphasis omitted). In fact, Mr. Christensen's declaration neither meets the plaintiffs' burden nor addresses the government's arguments as to why these expenses should not be allowed. The Christensen plaintiffs have, therefore, failed to meet their burden of showing that their claimed litigation expenses were "allowable, reasonable, and necessary" considering the government's response, *Colonial Chevrolet Co.*, 161 Fed. Cl. at 138 (quoting *Sonoma Apartment Assocs.*, 150 Fed. Cl. at 228), and failed to respond to the government's arguments as to why certain expenses should be disallowed, thus conceding to the government's arguments regarding the identified expenses, *see, e.g.*, *Sarro & Assocs., Inc.*, 152 Fed. Cl. at 58–59 ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver.").

To take just one example of the Christensen plaintiffs' failure to reply to the government's arguments on expenses, the Christensen plaintiffs' seek $6,475.35 for LexisNexis and $342.60 for PACER fees. As the Court observed above regarding a similar request from the Marzulla plaintiffs, "[t]he prevailing and customary industry practice is that law firms pay a flat fee or rate for research services like Westlaw, LexisNexis, and Pacer regardless of actual use," and that, in the absence of evidence that a law firm "is or was charged for these research services per session or per search," LexisNexis and PACER expenses are non-reimbursable under the URA. *Arnold*, 163 Fed. Cl. at 42. The Court determined that the Marzulla plaintiffs' Westlaw fees are nonetheless reimbursable because they established that "Marzulla Law normally bills its hourly clients monthly for the Westlaw charges [it] incur[s] on their behalf," ECF No. 820 at 19,

23

and in instances in which a law firm "normally bills its paying clients for the cost of online research services, that expense should be included in the fee award," *Arbor Hill Concerned Citizens Neighborhood Ass'n*, 369 F.3d at 98.  The Christensen plaintiffs offered the Court nothing similar regarding the LexisNexis and PACER fees they seek to recoup.  Instead, the Christensen plaintiffs make the general assertion with regard to expenses that "CHS tracked itemized costs incurred in the prosecution of the Plaintiffs' takings claim against the government since it entered the case in 2008, which costs total $375,671.95.  Plaintiffs' [sic] bear the burden of proving these reasonable costs, and have done so via the Declaration of Mark Christensen."  ECF No. 819 at 7 (citing ECF Nos. 809-13 and 809-12 ¶ 10).  The cited declaration mentions nothing whatsoever about whether CHS regularly bills clients for LexisNexis and PACER fees.

Accordingly, because the Christensen plaintiffs failed to meaningfully reply to the government's arguments regarding litigation expenses and put little effort into meeting their burden in their opening brief, the Court must grant the government's request to reduce the Christensen plaintiffs' litigation expenses by $126,902.95.

### 3. The Court Awards Attorneys' Fees and Costs to Successful Plaintiffs, not Their Attorneys

Finally, the Court must observe that, under the URA, it is the Marzulla plaintiffs and the Christensen plaintiffs that are entitled to an award of attorneys' fees and expenses, not their respective counsel.  This observation seems necessary because the Court received three separate fee petitions in this case, from three different law firms.  Nancie Marzulla submitted a fee petition on behalf of the Marzulla plaintiffs seeking reimbursement for the forty percent contingency fee the Marzulla plaintiffs paid Marzulla Law.  ECF Nos. 798, 799.  Mark Christensen submitted a fee petition on behalf of both the Christensen plaintiffs and the Marzulla plaintiffs seeking the hourly fees his firm and John Ehret billed both sets of plaintiffs.  ECF No. 809.  Finally, Eugene Frett submitted a fee petition seeking a seven-and-half percent contingency fee on behalf of both sets of plaintiffs.  The Court permitted these separate fee petitions but makes its fee awards to the plaintiffs themselves to reimburse them for the fees they actually incurred.

Moreover, this observation also appears necessary because during a status conference regarding these fee petitions it became apparent to the Court that there may be some dispute amongst counsel as to who is entitled to what portion of the attorneys' fees awarded and whether certain counsel are entitled to any award of attorneys' fees at all.  The Court will not weigh in on any of these potential disputes except to reiterate that the URA's entitlement to attorneys' fees and litigation expenses is expressly granted to the "plaintiff."  Therefore, an attorney, appraiser, or engineer who may have provided services in support of a successful just compensation claim has no direct rights against the United States under the URA for reimbursement.  As the Supreme Court has explained regarding EAJA's fee-shifting language but which is equally applicable here: "[t]he fact that the statute awards to the prevailing party fees in which her attorney may have a beneficial interest or a contractual right does not establish that the statute 'awards' the fees directly to the attorney." *Astrue v. Ratliff*, 560 U.S. 586, 593 (2010).  The Federal Circuit has observed the same regarding EAJA: "any fee award is made to the 'prevailing party,' not the attorney.  Thus, [plaintiff's] attorney could not directly claim or be entitled to the award.  It had

to be requested on behalf of the party." *Phillips v. Gen. Servs. Admin.*, 924 F.2d 1577, 1582 (Fed. Cir. 1991).

Accordingly, the Court awards attorneys' fees and other litigation expenses to the Marzulla plaintiffs and the Christensen plaintiffs, respectively, rather than to Marzulla Law, Mr. Christensen/Christensen Hsu Sipes, LLP, the Ehret estate, or Mr. Frett/Sperling & Slater, LLC. All of the plaintiffs in this case agreed to a forty percent contingency fee to their attorneys and that is what the Court is awarding. Division of those fees among the various law firms involved in this litigation (including any side agreements among the various attorneys regarding division of fees) and any questions regarding the continued viability of some of the various retention agreements are matters for another day and another court (if they cannot be worked out amicably amongst counsel).

## CONCLUSION

For the reasons stated above, Plaintiffs' motions for attorneys' fees and other litigation expenses are **GRANTED–IN–PART** and **DENIED–IN–PART**. Specifically, the Marzulla plaintiffs—as identified in footnote 1—are awarded attorneys' fees in the aggregate amount of $2,032,676.07 and litigation expenses in the total amount of $370,836.50 in non-taxable costs, and $12,365.72 in taxable costs. The Christensen plaintiffs—as identified in footnote 2—are awarded attorneys' fees in the amount of $4,871,951.35 and litigation expenses in the amount of $248,769.00. All outstanding issues being resolved, these consolidated cases are closed. The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge